1    SEAN R. CALLAGY (*Pro Hac Vice Application Pending*)
     Email:        scallagy@callagylaw.com
2    MICHAEL J. SMIKUN (*Pro Hac Vice Application Pending*)
     Email:        msmikun@callagylaw.com
3    CALLAGY LAW, P.C.
     650 From Rd., Suite 565
4    Paramus, NJ  07652
     Telephone:    (201) 261-1700
5    Facsimile:    (201) 261-1775

6    JEFFREY L. GREYBER (*Pro Hac Vice Application Pending*)
     Email:        jgreyber@callagylaw.com
7    CALLAGY LAW, P.C.
     1900 N.W. Corporate Blvd., Suite 310W
8    Boca Raton, FL  33431
     Telephone:    (561) 405-7966
9    Facsimile:    (201) 549-8753

10   CONSTANCE J. YU (SBN 182704)
     E-mail:       cyu@plylaw.com
11   PUTTERMAN LANDRY + YU LLP
     345 California Street, Suite 1160
12   San Francisco, CA 94104-2626
     Telephone:    (415) 839-8779
13   Facsimile:    (415) 737-1363

14   Attorneys for Plaintiff
     JASON FYK
15

16                    **UNITED STATES DISTRICT COURT**

17            **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

18   JASON FYK,                          │  Case No.

19              Plaintiff,               │  **VERIFIED COMPLAINT AND
                                         │  DEMAND FOR JURY TRIAL**
20        v.                             │

21   FACEBOOK, INC.,                     │

22                                       │

23              Defendant.               │

24

25

26

27

28

Plaintiff, Jason Fyk ("Fyk"), respectfully brings this action for damages and relief against Defendant, Facebook, Inc. ("Facebook"), and alleges as follows:[1]

## NATURE OF THE ACTION

1.      This case asks whether Facebook can, without consequence, engage in brazen tortious, unfair and anti-competitive, extortionate, and/or fraudulent practices that caused the build-up (through years of hard work and entrepreneurship) and subsequent destruction of Fyk's multi-million dollar business with over 25,000,000 followers merely because Facebook "owns" its "free" social media platform.  So as to put in perspective just how large Fyk's following was, one source ranked Fyk's primary business/page as the fifth most active page on Facebook, ranking one spot ahead of CNN, for example.

2.      Fyk, believing in Facebook's promise of a "free" social media platform to connect the world, was a remarkable success story.  Fyk created and posted humorous content on Facebook's "free" social media platform.  Fyk's content was extremely popular, as evidenced by over 25,000,000 followers.  The success of Fyk's Facebook pages resulted in these pages becoming business ventures, generating hundreds of thousands of dollars a month in advertising and/or web trafficking earnings flowing from Fyk's valuable high-volume fan base.

3.      Fyk developed a significant "voice" in reliance on Facebook's inducement to build his businesses on its "free" social media platform.  Fyk invested tremendous time, energy, and resources in reliance on Facebook's promises.  Facebook's promises made it one of the most lucrative and valuable economic and influential forces in the world.

4.      Facebook has broken its promise to everyone and committed significant wrongs specific to Fyk.  Facebook's systemic and specific wrongs are both wrongs with remedies.

5.      More specifically, Facebook induced many (including Fyk) to build the Facebook empire and then, in a classic bait and switch, stole the value for its own commercial gain by changing its operating system and forcing itself into the business arenas others had developed.  Fyk suffered damages as a result of this bait and switch.  So as to put in perspective just how much Facebook

---

[1] As litigation and discovery progress, Fyk reserves the right to amend this complaint should additional causes of action manifest.

1  damaged Fyk, former Fyk competitors (who were smaller and/or less successful than Fyk before

2  Facebook destroyed Fyk's businesses/pages) have been valued between $100,000,000.00 and

3  $1,500,000,000.00.

4       6.    Amidst its bait and switch, Facebook damaged Fyk (and likely many others) by

5  pretextually wielding the Communications Decency Act ("CDA"), Title 47, United States Code,

6  Section 230(c)(2), against Fyk in order to unfairly and unlawfully destroy and/or severely devalue

7  Fyk's businesses/pages.  This case asks whether Facebook can manipulate its users' content and direct

8  preferential treatment to certain users to the detriment of other users by applying discretionary

9  "enforcement" policies and practices (under the guise of the CDA, for example) because Facebook

10  exercises plenary control over its "free" social media platform.  So as to put in perspective just how

11  different Facebook's treatment of Fyk was compared to others, Facebook flew representation to Los

12  Angeles, California to aid and abet a Fyk competitor in the competitor's Facebook-driven acquisition

13  of the Fyk businesses/pages that Facebook had destroyed.

14       7.    In stark contrast to its public claims (before Congress, for example) of freely and openly

15  connecting the world, Facebook is unlawfully silencing people (including Fyk) for its own financial

16  gain.

17       8.    Despite Facebook's claims of being able to fully and completely control anything and

18  everything that occurs on its "free" social media platform, Facebook is not above the law and must be

19  held accountable for its wrongs.

20       9.    Our system of justice is what prevents the strongest and most powerful in our nation

21  from trampling on those who are weaker and less powerful.  It would be hard to imagine a clearer

22  illustration of why our justice system must protect the weak from the powerful than this case where the

23  mighty (Facebook) has destroyed the weaker's (Fyk's) businesses and American Dream.  This is a true

24  case of David versus Goliath.

25                              **PARTIES**

26       10.   At all material times, Fyk was/is a citizen and resident of Cochranville, Pennsylvania.

27       11.   Upon information and belief and at all material times, Facebook was/is a company

28  incorporated in the State of Delaware, with its principal place of business in Menlo Park, California.

1    While there is some question as to whether the California forum selection and choice of law provisions

2    embedded in Facebook's terms of service are applicable to this action (which does not relate to the

3    terms of service akin to a breach of contract), Fyk does not wish to squander time and resources (his or

4    the Court's) quarreling with venue.

5    **<u>JURISDICTION AND VENUE</u>**

6    12.    This Court possesses original jurisdiction pursuant to Title 28, United States Code,

7    Section 1332, as the parties are diverse and the amount in controversy exceeds $75,000.00 exclusive

8    of fees, costs, interest, or otherwise.

9    13.    Venue is proper in the Northern District Court of California pursuant to Title 28, United

10    States Code, Section 1391(b), since this judicial district is where Facebook maintains its principal place

11    of business, since various events or omissions which give rise to and/or underlie this suit occurred

12    within this judicial district, and/or since the (in)applicability of the forum selection and choice of law

13    provisions in Facebook's terms of service are not worth fighting about.

14    **<u>COMMON ALLEGATIONS</u>**

15    14.    For a period of many years, Fyk maintained businesses/pages on Facebook's

16    purportedly "free" social media platform.  That is until Facebook unilaterally, systematically,

17    systemically, and/or capriciously (in tortious, unfair, anti-competitive, extortionate, and/or fraudulent

18    fashion) changed the Facebook "free" social media platform model almost overnight and pursuant to

19    corporate greed, playing judge, jury, and executioner as to the continued existence of businesses/pages

20    of those like Fyk who had developed a livelihood on the platform.

21    15.    Fyk's businesses were made up of many Facebook pages, with over 25,000,000

22    viewers/followers/audience at their peak.  These businesses/pages were humorous in nature, designed

23    to get a laugh out of Fyk's viewers/followers audience.  The intended nature of the subject

24    businesses/pages worked – at his peak, Fyk's primary business/page was, according to some ratings,

25    the fifth largest Facebook viewership presence in the entire world (ahead of competitors like BuzzFeed,

26    College Humor, and Upworthy, for examples, and ahead of other large media presences like CNN, for

27    example) and making hundreds of thousands of dollars a month in advertising and/or web trafficking

28    earnings.

16.     Indeed, the primary source of income generated by Fyk's businesses/pages was through advertisement earnings and/or web traffic to other sites (for valuable increased fanbase) – naturally, companies were inclined to pay Fyk to associate with his pages consisting of millions of viewers/followers.[2]

17.     For many years in the 2010-2016 range (or thereabouts), Facebook had systematically and systemically welcomed folks into the seemingly warm waters of making a living on the "free" Facebook social media platform.

18.     Upon information and belief, it was towards the latter part of the aforementioned 2010-2016 timeframe that Facebook unilaterally, systematically, systemically, and/or capriciously (in tortious, unfair, anti-competitive, extortionate, and/or fraudulent fashion) decided to implement an "optional" paid for reach program, rather than the organic reach program (*i.e.*, "free" Facebook social media platform) that Fyk and many other Facebook businessmen and businesswomen had been part of for years.  Why?  Because Facebook all-of-a-sudden no longer cared to continue to make business smooth for those who declined the "optional" paid for reach program.  Why?  Because Facebook was now of the unilateral, systematic, systemic, and/or capricious mindset (in tortious, unfair, anti-competitive, extortionate, and/or fraudulent fashion) that it was time to make its "free" social media platform profitable at the expense of those like Fyk upon whose backs the "free" Facebook social media platform succeeded and notwithstanding nothing explicitly making the "optional" paid for reach

---

[2]   Companies that paid Fyk to advertise and/or traffic their companies (that is, before Facebook destroyed such economic relationships) included, but were not necessarily limited to, the following: (a) College Humor, (b) Guff, (c) Memez, (d) Mylikes, (e) Smarty Social, (f) Diply, (g) Top Ten Hen, (h) LOLWOT, (i) Cybrid Media, (j) PBH Media, (k) Liquid Social, (l) Red Can, (m) Ranker, (n) Bored Panda, and (o) Providr.  And, then, there were many other realistic ways in which Fyk could have increased his economic advantage (*i.e.*, made money) but for Facebook's wrongdoing, which such realistic ways would have included, but not necessarily been limited to, the following:  (a) an application called APPularity, further discussed below, (b) a TV series and/or movie, and (c) a book. Facebook was/is well aware that Fyk had business relations with companies like these, as Facebook's new mission is to demonetize folks like Fyk out of these relations by crushing folks like Fyk under the guise of CDA, filtering of purportedly low-quality content. *See, e.g.,* footnote 11, *infra*; *see also, e.g.,* June 22, 2016, https://www.c-span.org/video/?411573-1/facebook-coo-sheryl-sandberg-discusses-technological-innovation; July 1, 2015, http://fortune.com/2015/07/01/facebook-video-monetization; and Tessa Lyons' April 13, 2018 (https://www.youtube.com/watch?v=X3LxpEej7gQ).

program "mandatory."[3]  What did this create for Fyk and likely the myriad other businessmen and businesswomen on Facebook's "free" social media platform?  Fear.  Fear (analogized in averments twenty-five through thirty-five, *infra*, to "claim jumping") that if Fyk did not engage in Facebook's new "optional" paid for reach program, he would be blacklisted in the form of having his businesses heavily curtailed or altogether eliminated.  And, for Fyk, this fear was heightened when a high-ranking Facebook executive advised him that his business was not one Facebook much cared to work with when compared to other businesses (specific names intentionally omitted from this public record) who relented to Facebook's new "optional" paid for reach program to the tune of tens of millions of dollars in payments a year to Facebook.

19.    So, with the very real fear hanging over him of losing his businesses/pages and the incredibly hard work that went into same in the spirit of the American Dream (most likely like many other Americans/administrators who, like Fyk, had built their businesses/pages on the premise that Facebook was indeed what it proclaimed and/or held itself out to be – a "free" social media platform), Fyk attempted to placate Facebook (and accordingly avoid putting his businesses/pages at risk of Facebook-created destruction) by entering Facebook's new "optional" paid for reach program for a period of time, investing approximately $43,000.00 into Facebook's "optional" paid for reach program.  Such Fyk investment was underway and ongoing until Facebook unilaterally, systematically, systemically, and/or capriciously (in tortious, unfair, anti-competitive, extortionate, and/or fraudulent fashion) deactivated Fyk's "ads account," making it such where Fyk could no longer be a protected or chosen one under Facebook's "optional" paid for reach program.  Because of Facebook, Fyk was left with no reasonable alternative other than to return to an organic reach model.  Then Facebook's interference, unfair competition, civil extortion, and/or fraud increased – starting in small increments

---

[3]  Although there is nothing explicitly making the "optional" paid for reach program "mandatory" that we are presently aware of sans the benefit of discovery, the threat is there that if people do not pay Facebook, they will not play with Facebook.  For example, some news outlets report that Facebook (through the likes of Facebook's head of global news partnerships, Campbell Brown) is advising behind "closed doors" that Facebook will put people on "hospice" if people do not work with Facebook; *i.e.*, if payments are not received.  *See, e.g.*, August 14, 2018, https://www.thesun.co.uk/news/7014408/facebook-threatens-press-saying-work-with-us-or-end-up-in-hospice.

1    and escalating into destruction and/or severe devaluation of at least eleven of Fyk's businesses/pages

2    (discussed further below).

3        20.    Facebook's misconduct (again, implemented gradually by Facebook so as to not be so

4    obvious) included, for examples, unilateral, systematic, systemic, and/or capricious (pretty much

5    overnight) page and content outlawing, Facebook Messenger disconnection, page and content banning,

6    reduction of organic views (reach) of pages and content, reduction of website link views (reach),

7    advertising account deletion, page and content unpublishing, page and content deletion, deletion of

8    individual Facebook administrative profiles, and/or splitting of posts into four categories (text, picture,

9    video, and website links) and systematically directing its tortious inference the hardest at links because

10   links were what made others (like Fyk) the most money and Facebook the least money.   This

11   misconduct was grounded, in whole or in part, in Facebook's overarching desire to redistribute reach

12   and value (*e.g.*, wiping out Fyk and orchestrating the handing over of his businesses/pages to a

13   competitor, discussed in greater detail below) through the disproportionate implementation of "rules"

14   (*e.g.*, treating Fyk's page content differently for Fyk than for the competitor to whom Fyk's content

15   was redistributed).   Part and parcel with Facebook's disproportionate implementation of "rules" was a

16   disproportionate implementation of Facebook's appeal and/or customer service programs for Fyk

17   (discussed in greater detail in the following averment, and punctuated by things like Facebook

18   arranging meetings between its representatives and other businessmen and businesswomen, not named

19   Fyk, in order to assist them but not Fyk).   Of course, inoperable pages consisting of millions of viewers

20   who are no longer engaged in such pages due to the inoperativeness of same does not make for an

21   environment in which high paying advertisers and/or web traffickers (from whom Fyk and his

22   employees had made a living) were interested in continuing to be a part of.

23       21.    Not thinking much of Facebook's misconduct early on (again, Facebook's misconduct

24   unfolded gradually and covertly), Fyk availed himself time and time again of the appeal and/or

25   customer service programs supposedly in place at Facebook to remedy <u>incorrect</u> page and content

26   outlawing, Facebook Messenger disconnection, page and content banning, reduction of organic views

27   (reach) of pages and content, reduction of website link views (reach), advertising account deletion,

28   page and content unpublishing, page and content deletion, and/or deletion of individual Facebook

administrative profiles.  These programs worked for Fyk for a period of time; *i.e.*, Facebook would capriciously breathe life back into Fyk's businesses/pages, conceding in the process that its page and content outlawing, Facebook Messenger disconnection, page and content banning, reduction of organic views (reach) of pages and content, reduction of website link views (reach), advertising account deletion, page and content unpublishing, page and content deletion, and/or deletion of individual Facebook administrative profiles was, in fact, <u>incorrect</u>.  Fyk's businesses/pages would operate relatively smoothly for a while, until Facebook meddled again with Fyk's businesses/pages (with millions of viewers, reach in the billions, and hundreds of thousands of monthly advertisement and/or web trafficking earnings at issue).  Then, Fyk would appeal and/or work with customer service again. Then, Facebook would breathe life back into the subject businesses/pages.  Then, Facebook would meddle again.  Then, Facebook would breathe life back into the subject businesses/pages.  So on and so forth for years, not tipping Fyk off as to what he was truly experiencing (or what Facebook's ulterior motives were, which such motives are still not entirely known sans the benefit of discovery) until Facebook's meddling culminated with the complete destruction and/or severe devaluation of eleven of Fyk's businesses/pages in October 2016 and unresponsiveness to Fyk's subsequent pleas for appeal and/or customer service.

22.     More specifically, in October 2016, Facebook destroyed and/or severely devalued eleven of Fyk's pages (made up of over 25,000,000 viewers/followers), sending his millions of viewers and hundreds of thousands of dollars of monthly advertisement and/or web trafficking earnings down the proverbial drain.  More specifically, the Fyk businesses/pages that Facebook destroyed and/or severely devalued (along with the viewer/follower count associated with each) were as follows: (a) Funniest pics – approx. 2,879,000, https://www.facebook.com/FunniestPicsOfficial, (b) Funnier pics – approx. 3,753,000, https://www.facebook.com/FunnierPics, (c) Take the piss funny pics and videos – approx. 4,300,000, https://www.facebook.com/takeapissfunny, (d) She ratchet – approx. 1,980,000, https://www.facebook.com/sheratchetwtf, (e) All things Disney – approx. 1,173,000, https://www.facebook.com/Smilingloveyou, (f) Cleveland Brown – approx. 2,062,000, https://www.facebook.com/ClevelandBrownsfans, (g) Quagmire – approx. 1,899,000, https://www.faceboook.com/quagmirefans, (h) Peter Griffin – approx. 532,000,

https://www.facebook.com/petergriffinfans, (i) WTF Magazine – approx. 2,600,000, https://www.facebook.com/wtfmagazine, (j) Truly Amazing – approx. 1,800,000, https://www.facebook.com/trulyamazingpage, and (k) APPularity – approx. 2,200,000, https://www.facebook.com/appularity. These page URL addresses were the original addresses, they may have subsequently changed, and they may accordingly not direct to the original locations.

23. Facebook's professed "justification" for its destruction and/or severe devaluation of Fyk's eleven businesses/pages was that the content of such businesses/pages was supposedly violative of the CDA. We now illustrate the ludicrousness of Facebook's CDA-related basis for destroying and/or severely devaluing Fyk's businesses/pages and interfering with his prospective economic advantage/relations (*e.g.*, advertisement and/or web trafficking earnings). As discussed in greater detail below, Facebook selectively "enforced" the CDA against Fyk by, for example, deeming identical content CDA-violative as it related to Fyk but not CDA-violative as it related to a Fyk competitor.

24. In or around the end of 2016, Facebook deleted one of Fyk's pages (with millions of viewers and thousands of advertising and/or web trafficking earnings at issue) because, for example, it contained a posted screenshot from the Disney movie *Pocahontas*. Facebook claimed that this screenshot (from a Disney children's movie) was racist and accordingly violative of the CDA; *i.e.*, to use Facebook terminology, the *Pocahontas* screenshot post constituted a "strike" (the "strike" notion is discussed in greater detail at footnote 8, *infra*). Meanwhile, for comparison's sake, Facebook allowed other businesses/pages at that same time (in or around the end of 2016) and thereafter for that matter to maintain, for examples, a posted screenshot of a mutilated child or instant article Facebook advertisements (moneymakers for Facebook) of things like sexual activities, among other things that really were violative of the CDA.[4] And, for purposes of a public record, these are "benign" examples

---

[4] Fyk even reported the disgusting posted screenshot of the mutilated child to Facebook and in December 2016 Facebook advised Fyk that such disgusting post was perfectly ok. Of note, Fyk has routinely reported unsavory content to Facebook in an effort to keep Facebook a "safe and welcoming" community. More specifically as to Fyk's reporting of the mutilated child post, Facebook advised Fyk as follows: "Thank you taking the time to report something that you feel may violate our Community Standards. Reports like yours are an important part of making Facebook a safe and welcoming environment. We reviewed the photo you reported for being annoying and uninteresting and found it doesn't violate our Community Standards." An example of a BuzzFeed (a Fyk competitor) post that Facebook apparently deemed perfectly ok was BuzzFeed's July 23, 2017, post entitled *27 NSFW Movie*

compared to the other examples we have.  And, meanwhile, for comparison's sake within Fyk's own businesses/pages, Facebook allowed other Fyk businesses/pages (of incredibly similar nature to the business/page with the *Pocahontas* screenshot post) to stand.  Translated, there was absolutely positively nothing about Fyk's pages violative of the CDA warranting Facebook's crippling of Fyk's livelihood (and the livelihood of his employees), certainly no "good faith" basis for Facebook's wreaking havoc on Fyk under the pretext of the CDA, which such "good faith" language is straight out of Section 230(c)(2) of the CDA.  But the best proof in the "there was nothing CDA violative about Fyk's businesses/pages" pudding is set forth in averments forty-two through forty-six, *infra*, in relation to Fyk's fire sale of eight of his businesses/pages (out of the subject eleven businesses/pages noted above) to a similar (if not identical) competitor because of Facebook's irrational and unwarranted tortious interference, unfair and anti-competitive conduct, extortion, and/or fraud leaving him with no other reasonable alternative.

25.     Another way to properly classify and better illustrate Facebook's conduct (when one properly disregards Facebook's wayward CDA contention) is "claim jumping," which is more of a lay description of tortious interference with prospective economic advantage/relations.

26.     A locally rooted example of "claim jumping" in this country's history was California gold mining.  Analogous to Facebook's conduct here, centuries ago in California a small percentage of smalltime miners struck gold/staked claims.  Then, it was not uncommon for a stronger, richer mining company to swoop in and "jump the claim" of the smalltime miner.  Put differently, it was not uncommon for the stronger, richer mining company to make the smalltime miner an offer he or she could not refuse (often backed by direct or indirect threat for livelihood, striking fear in the miner), strong-arming the smalltime miner out of his or her realized economic advantage (or prospective economic advantage associated with the extraction of the found gold) developed by his or her hard

---

*Sex Scenes That'll Turn You The Fu[$#] On.*  Ironically, "NSFW" stands for "Not Safe for Work," and remember that Facebook was purportedly concerned with maintaining "a safe and welcoming environment."  Other examples (and the list could go on) of BuzzFeed posts that Facebook deemed "safe and welcoming" amidst its "Community Standards" include:  *12 Sex Positions Everyone In A Long-Term Relationship Should Try* on May 7, 2016, *Here's How Most People Have Anal Sex* on April 25, 2017, *These Insane Sex Stories Will Blow Your Fu[$#]ing Mind* on May 12, 2017, and *15 Sex + Poop Horror Stories That'll Make You Feel Better About Yourself* on August 11, 2017.

work in the vein of the American Dream.

27.     Here, the land that was/is replete with resources was/is the worldwide web.  Facebook does not own the worldwide web, Facebook manages/services a space on the worldwide web (called a platform) in which people (like Fyk) can stake claims (create pages, *see* averment number twenty-two, *supra*).  Staking a claim first involves the discovery of a valuable "mineral" in quantity.  Here, the "mineral" (gold) that Fyk discovered on the land (the worldwide web) was advertising earnings, distribution value, news feed space, and/or the like.  Fyk prudently invested time and resources in recovering the "mineral" and otherwise staked claims within Facebook's "free" social media platform through the development of boundaries (*i.e.*, development of businesses/pages, web URLs, page identity numbers).

28.     Facebook (worldwide web manager/servicer) realized there was a lot of money to be made in the "gold mining" (advertising and web trafficking spaces), so Facebook began mining gold for itself in tortious, unfair, extortionate, fraudulent competition with claim stakeholders like Fyk.  Most of the best gold claims (pages, news feeds), however, had been staked by people like Fyk.  With past being prologue, Facebook wanted more and more and more … and, then, some more.  And, so, Facebook (the land manager/servicer turned mining company) changed its strategy to suppress the resources of the larger claim stakeholders (Fyk).  Facebook did not want to get caught sapping the resources of other claim stakeholders, so Facebook came up with "rules and regulations" to be disproportionately implemented/enforced depending on whether or not the claim stakeholder (Fyk) was favorable to or preferred by the land manager/servicer (Facebook).  The rules and regulations that Facebook made up were so nebulous in nature that any and all types of gold mining effectively became violative of the land manager's/servicer's new rules and regulations, justifying the Facebook "claim jumping" that ensued in "we can do whatever we want because we are Facebook" fashion.

29.     Facebook's "claim jumping" was effectuated by Facebook's doing a variety of things, for examples (a) closing the mine gates (Fyk's businesses/pages) until the land management/service company (Facebook) was paid more by the claim stakeholder (Fyk) – unpublishing pages so as to tortiously interfere, unfairly compete, and/or extort, (b) closing the mine down or cancelling the claim – deleting pages so as to tortiously interfere, unfairly compete, and/or extort, (c) cutting off resources

to the mine – reducing reach/distribution so as to tortiously interfere, unfairly compete, and/or extort, (d) replacing individual miners with management/service company (Facebook) miners – replacing Fyk news feeds with Facebook ads so as to tortiously interfere, unfairly compete, and/or extort, and/or (e) imposing regulations that made the mine financially unsound with the intent to usher in a new mining company (Fyk competitor) who paid the management/servicing company (Facebook) a higher percentage – unpublishing, reducing reach, deleting pages, and assisting a competitor in purchasing the pages so as to tortiously interfere, unfairly compete, and/or extort.

30. As Facebook CEO, Mark Zuckerberg, has proclaimed, Facebook is a "platform for all ideas" (just as California land was once a platform for all gold miners).[5]  Land management/servicing was Facebook's business, whereas mining the land was Fyk's business.  Once Facebook saw how lucrative Fyk's business was, Facebook jumped the claims that Fyk had staked.  Like big mining companies did to the little gold miner in California centuries ago, Facebook crushed Fyk who had staked successful claims through hard work and had not volunteered himself to being crushed.

31. One key common denominator between "claim jumping" (like the gold mining example) and Facebook's conduct here is the involuntariness of same – the crushed little guy in each instance (including Fyk here) had no choice or alternative in the business world other than to swallow the difficult pill that the mighty (here, Facebook) had force-fed.  Here, Facebook welcomed Fyk (as well as many others, for that matter) into a "free" social media platform and lurked around until someone became the so-called miner who found gold on the Facebook platform; i.e., until someone like Fyk did tremendously well on the "free" Facebook social media platform by building his assets/economic advantage (e.g., audience and distribution, akin to the aforementioned gold).  Then,

_____

[5]  Mr. Zuckerberg disingenuously proclaimed at his Harvard commencement speech last summer, Facebook "understand[s] the great arc of human history bends towards people coming together in greater even numbers – from tribes to cities to nations – to achieve things we couldn't on our own… . This is my story too – a student at a dorm connecting one community at a time and keeping at it until one day we connect the whole world."  Mr. Zuckerberg's disingenuous lip service also included this: "Finding your purpose isn't enough.  The challenge for our generation is to create a world where everyone has a sense of purpose."  Sounds so rosy, sounds so nice … but, alas, Facebook talks that talk and then walks the Fyk walk.  Fyk found his sense of purpose, Facebook destroyed it.  Facebook disconnected Fyk, rather than connected Fyk.   Facebook is destroying and/or disconnecting businesses/pages (like Fyk's) that generate advertising and/or web trafficking earnings so that Facebook can bleed away such monies for itself in legally untenable ways.

Facebook swooped in with an "optional" paid for reach program (*i.e.*, an offer people were not supposed to refuse), devalued and redistributed Fyk's economic advantage without Fyk volunteering himself or his businesses to same.

32. Fyk had hardly anything to his name when he launched his businesses/pages on Facebook's "free" social media platform. More specifically, Fyk was facing bankruptcy and eviction when he joined the "free" Facebook social media platform in the hopes of experiencing the American Dream and building a future for his family. He dedicated all the money he had on building a Facebook audience, rather than buying food and other household necessities for him and his family. Kudos to Fyk for building successful businesses/pages through very hard work in the vein of the American Dream.

33. Then, Facebook sent Fyk's American Dream up in smoke, pretty much overnight, without Fyk volunteering himself or his businesses to same. What is next if Facebook's conduct is allowed to stand? Will fast food restaurant franchisors, for example, lurk around to find the most successful franchisees (built upon the hard work of the franchisee prescribing to the American Dream) and swoop in to "jump the claim;" *i.e.*, steal or destroy the franchisee's restaurant and redistribute the franchisee's restaurant to the franchisor mothership or some other franchisee who the franchisor likes better as Facebook did to Fyk here? Those are not the pillars upon which this country and the associated American Dream were built.

34. "Claim jumping" (predicated on force exerted by the mighty that the little guy could not reasonably evade in the business world) is not the economic model upon which this country has functioned since its existence, as "claim jumping" makes for a highly unstable economy. Thankfully, in today's legal world the little guy has legal recourse to rectify the wrongful forced conduct experienced at the hands of the mighty in the business world. Today, we call this kind of legal recourse claims for relief, *infra*, which sound in Facebook's tortious interference with prospective economic advantage/relations (First Claim for Relief), unfair competition (Second Claim for Relief), civil extortion (Third Claim for Relief), and/or fraud (Fourth Claim for Relief). As noted in averment numbers one through nine, *supra*, these legal actions are designed to protect the weaker from the stronger; *i.e.*, meant as legal checks and balances to the unbridled "we can do anything we want because

1    we are stronger" mentality of those like Facebook.

2        35.    Another way to view one of Facebook's seeming motivations for jumping the claims of

3    those (like Fyk) who did well for themselves on the "free" Facebook social media platform was/is to

4    steal the advertising and/or web trafficking earnings generated on successful pages like Fyk's pages;

5    *i.e.*, take the Fyk-built reach from which the advertising and/or web trafficking monies enjoyed by Fyk

6    flowed and redistribute same to other "sponsors."

7        36.    One need only look to one's Facebook news feed to see examples of such.  There stands

8    a good chance that there will be a post on one's news feed from an unknown source; *i.e.*, from

9    somebody or some company unknown to the user of the news feed.  This unknown, mystery post will

10   likely have the word "sponsored" in light print.  The "sponsor" is a paid advertiser on Facebook.

11       37.    Facebook is now making money in the advertising space (like Fyk did) by unilaterally,

12   systematically, systemically, and/or capriciously replacing Fyk with "sponsors."  In order to clear

13   space for Facebook's advertising efforts, Facebook had to clear out posts on Facebook user news

14   feeds that the users actually wanted to see.  For example, users wanted to see Fyk's content – that is

15   why he had over 25,000,000 viewers across the subject eleven businesses/pages.  Accordingly, Fyk's

16   posts would take up a sizable portion of users' news feeds.  So, in order for users to see the random

17   Facebook-sponsored posts that they did not care to see, Facebook had to eliminate (or heavily curtail)

18   the posts that people liked seeing on their news feeds (*e.g.*, Fyk's posts) and force Facebook-

19   sponsored posts onto user news feeds whether the user wanted that or not.

20       38.    In an effort to insulate itself from this misconduct, Facebook initially forced out folks

21   like Fyk under the guise that Fyk's content was "spam."  Per Merriam-Webster's Dictionary, "spam"

22   is defined as "unsolicited usually commercial messages (such as … Internet postings) sent to a large

23   number of recipients or posted in a large number of places."[6]  Fyk's audience chose to be his audience

24   at the threshold and then had to choose to click on any content website link found in Fyk's

25   businesses/pages which would then lead to content on the website in which an advertisement could be

26   seen that would earn Fyk money; *i.e.*, there was nothing "unsolicited" about Fyk's businesses/pages

27

28   ----
     [6]  https://www.merriam-webster.com/dictionary/spam

and associated content website links. Put differently, there was nothing "spammy" about Fyk's businesses/pages and associated content website links upon which Facebook could have legitimately justified muscling him out under the guise of "spam."

39. By way of this misconduct, Facebook was/is making money from whatever advertisers and/or web traffickers are associating themselves with the random Facebook-sponsored posts it is forcing onto user news feeds while strong-arming out user-friendly news feed posts like Fyk's. What Facebook is doing (the forced removal of Fyk-like posts on user news feeds and the forced insertion of Facebook-sponsored posts) is the definition of "spam."[7]

40. So, as best we can presently tell sans the benefit of discovery, Facebook's effort to crush the American Dream of hard workers like Fyk who built a life for themselves (and their employees, since laid off in Fyk's case due to Facebook's crippling) on the "free" Facebook social media platform all boils down to Facebook's crooked corporate greed: (a) Muscle out (through interference, unfair competition, extortion, fraud, and/or *et cetera*) those who do not wish to (or could no longer, in Fyk's case) partake in Facebook's "optional" paid for reach program, and (b) Delete the news feed posts that Facebook users want to see and inject news feed Facebook-sponsored posts (*i.e.*, "spam") that Facebook users do not want to see and/or have the ability to avoid. The methods by which Facebook is accomplishing such amount to unfair competition, extortion, and fraud, which badly interferes with the prospective economic advantage/relations of hard working Americans who built lives for themselves, their families, their employees, and their employees' families around Facebook's false promises of a "free" social media platform.

---

[7] As another example of Facebook's forcing itself upon users in "spammy" fashion, when a user scrolls through their news feed and has their audio setting set to "off," some advertisements will mysteriously pop up and disregard the user's audio "off" setting (*i.e.*, force the user's audio setting to "on"). This kind of mystery advertisement, of course, is a Facebook-sponsored advertisement and Facebook is blatantly and unilaterally disregarding the user's settings so as to loudly announce (literally) something that makes Facebook money. Facebook's manipulation of users' news feeds hurts the user just as much as the content provider and, to call a fig a fig, amounts to censorship. In lay terms, Facebook is no longer allowing the user to see what he/she wants to see and hear what he/she wants to hear. Many "loved" that they could watch videos with sound off, *see, e.g.,* July 1, 2015, http://fortune.com/2015/07/01/facebook-video-monetization, that is until Facebook unilaterally force-changed users' preferences. This Facebook force-feeding as it relates to the user cripples the content provider (like Fyk) in tortious, unfair, anti-competitive, extortionate, and/or fraudulent fashion.

41.     In relation to Facebook's October 2016 destruction and/or severe devaluation of Fyk's eleven businesses/pages, Fyk's efforts to unravel Facebook's misconduct (akin to the procedure set forth in averment twenty-one, *supra*) was regrettably to no avail – Facebook had now officially decided it was time to completely destroy Fyk's business and interfere with his prospective economic advantage/relations.  Facebook's interference and unfair competition even went so far as to lock Fyk out of his advertisement account; *i.e.*, not allowing Fyk to continue his participation in the "optional" paid for reach program.

42.     After a few months of Fyk's inability to breathe life back into the businesses/pages that Facebook had destroyed and/or severely devalued (eleven pages consisting of over 25,000,000 viewers/followers) and after Fyk regrettably had to lay off employees due to Facebook's crippling interference, Fyk was left with no reasonable alternative other than to fire sell eight of his crippled pages (realistically valued by some in the nine figure range) for a relatively nominal approximate $1,000,000.00 in January 2017 to a competitor located in Los Angeles, California with that competitor already having been advised by Facebook that Facebook would breathe life back into the subject eight pages only if such were purchased by the competitor.  This proves, among other things, that there was nothing CDA violative about these eight Fyk businesses/pages that Facebook crippled, as further discussed below.

43.     Facebook offered the competitor customer service before, during, and after the fire sale of Fyk's eight business/pages so as to effectuate the fire sale (*i.e.*, so as to redistribute Fyk's economic advantage) to the competitor.  In fact, the Facebook customer service offered to the competitor (but never to Fyk at any such level, or, really, at any meaningful level) rose to the level of Facebook flying representation down to Los Angeles to meet with the competitor to make sure the Facebook-induced redistribution of Fyk's economic advantage (fire sale of the audience and reach that made up the subject eight businesses/pages) went through.

44.     Reason being, Facebook plainly wanted to play a direct role in ushering Fyk out of the Facebook "free" social media platform business world in favor of Fyk's competitor.  Facebook made clear that the subject eight Fyk businesses/pages that Facebook had blacklisted would have no chance of having life breathed back into them until the sale of the businesses/pages was completed with Fyk's

competitor – indeed, this is what Facebook represented to the Fyk competitor out of Los Angeles. Facebook worked with the competitor to orchestrate and carry out the sale.

45.     Almost immediately after the fire sale to the Fyk competitor went through (thanks, in whole or in part, to Facebook's interactions with the competitor before, during, and after the fire sale process), the supposedly CDA violative Fyk businesses/pages that were fire sold were magically reinstated by Facebook within days of the fire sale's consummation (*i.e.*, contract completion between Fyk and the competitor) <u>with no appreciable change (if any change) in the content of the pages that were supposedly violative of the CDA</u>.  Meaning, again, there was absolutely nothing CDA violative about Fyk's businesses/pages … Facebook just wanted to steer Fyk's businesses/pages (a/k/a assets, a/k/a economic advantage) to a competitor and otherwise eliminate Fyk by any means necessary. Facebook did so – it severely devalued Fyk's eleven businesses/pages (economic advantage) to the point of Fyk having no reasonable alternative other than to fire sell eight of the businesses/pages for a relatively low sum and then it revalued the same businesses/pages for the Fyk competitor to whom the businesses/pages were sold.[8]

---

[8]  The three businesses/pages that Fyk still maintains (Truly Amazing, WTF Magazine, APPularity) are valueless from advertising and/or web trafficking perspectives (which were the real moneymakers) because of Facebook.  Though these three businesses / pages were crippled by Facebook along with the other eight businesses/pages in October 2016, Facebook's more recent disproportionate implementation and/or shell-gaming of "rules" pertaining to branded content is what is causing the current advertising and/or web trafficking valuelessness of these three pages.  To further illustrate Facebook's discriminatory treatment of Fyk, the chronology concerning Facebook's new branded content rules is noteworthy.  Facebook was to roll out its new branded content "rules" starting March 1, 2018, and yet further crippled one of Fyk's remaining three pages prior in February 2018 for two posts purportedly violative of Facebook's new branded content "rules."   A certain number of "violations" (called "strikes" by Facebook) on a page could result in the page being banned (lost), Facebook does not tell folks how many such strikes are afforded until there is a ban, and Facebook has kept arbitrarily levying strikes against Fyk (still to this day on his remaining three pages) until it accomplishes what it wants – Fyk's being banned, which cripples his reach.  *See* https://newsroom.fb.com/news/2018/08/enforcing-our-community-standards/.  The writing is on the wall as to this vicious circular cycle predicated on Facebook whim.  Moreover as to Facebook's continued wrongdoing related to Fyk's remaining three businesses/pages, Facebook is still treating Fyk unlike others.  For example, on August 13, 2018, Fyk's WTF Magazine business/page received a post ban by Facebook.  Fyk's profile was subsequently banned for thirty days due to the purported inappropriate content of the aforementioned post, which such post was doing quite well for Fyk until Facebook's interference.  So, Fyk went to the original post of the aforementioned post (on another's page where he originally found the post) and reported that identical post to Facebook.  Facebook found the identical post acceptable for another.  More specifically, by message dated August 15, 2018,

---

16

46.     And the timing of Facebook's ultimate Fyk crippling in October 2016 is no coincidence to the timing of the Facebook-aided fire sale of Fyk's business/pages to the Fyk competitor who was in Facebook's good, paying graces.  Put differently, the proximity of this cause and effect further demonstrates the relevant connection to Facebook's wrongdoing (interference with prospective economic advantage/relations, unfair or deceptive practices, unfair competition, civil extortion, and/or fraud)

47.     Fyk was wrongly singled out by Facebook, even per the admission of a high-ranking Facebook employee (Chuck Rossi, director of engineering at Facebook) kind enough to communicate reality to Fyk because Mr. Rossi seemingly does not share Facebook's devious and publicly harmful agendas.[9]  Indeed, Mr. Rossi, whether known to Facebook or not, administers a group dedicated to restoring businesses/pages that Facebook has wrongly shut down.  Such singling out of Fyk by Facebook might rightly be characterized as discrimination

48.     In sum, Facebook's actions with Fyk were unlawful.

### FIRST CLAIM FOR RELIEF – INTENTIONAL INTEFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE/RELATIONS

49.     Fyk re-alleges Paragraphs 1 through 48 as if fully set forth herein.

50.     Facebook intentionally interfered with economic relationships between Fyk and his various advertising companies and/or web traffickers (*see* footnote 2, *supra*, for a non-exhaustive list of such companies) associated with the aforementioned eleven businesses/pages that Facebook intentionally interfered with, which such economic relationships would have doubtless continued to

Facebook advised Fyk as follows as to the identical post on another's page that Fyk reported to Facebook:  "Thanks for letting us know about this.  We looked over the photo, and though it doesn't go against one of our specific Community Standards, you did the right thing by letting us know about it. …"  Moreover as to damages, Fyk built the APPularity business/page to support an application called APPularity and Fyk personally invested approximately $50,000.00 (and countless hours) in this ap endeavor.  Facebook's crippling (again, still to this day) of APPularity (which, again, is one of the three businesses/pages Fyk still maintains) has rendered the APPularity application worthless; *i.e.*, robbed Fyk of his approximate $50,000.00 investment and all the future monies (*i.e.*, prospective economic advantage) he would have doubtless enjoyed from same.

[9]  In October 2016, Fyk's Peter Griffin business/page had been unpublished by Facebook.  Mr. Rossi helped Fyk restore the Peter Griffin business/page that had been wrongfully unpublished by Facebook.  Regrettably, very soon thereafter, Facebook again shut Peter Griffin down.

1    result in an economic benefit/advantage to Fyk.

2         51.    Facebook knew of Fyk's advertising and/or web trafficking relationships … advertising

3    and/or web trafficking in general on the Facebook "free" social media platform is no secret, that is how

4    most (if not all) businesses/pages make money through the Facebook social media platform.  In fact,

5    Facebook was/is so aware of advertising and/or web trafficking relationships and the lucrativeness of

6    same that Facebook has muscled its way into that line of work while muscling out the very folks who

7    cultivated that line of work all the way back in the days when Facebook was akin to baron land or an

8    unchartered frontier.  Recall, Facebook is not that old,[10] and it needed worker bees (like Fyk) to make

9    it what it is today over a relatively short period of time – that is until the honey was produced and

10    Facebook figured it would kill the bees and take the honey and/or redistribute the honey to other worker

11    bees.

12         52.    Facebook engaged in wrongful conduct separate from the interference with Fyk itself.

13    For example, as discussed in the above common allegations and below other causes of action, Facebook

14    implemented its interference with Fyk *via* the separately wrong conduct of civil extortion (*e.g.*,

15    coercing Fyk to pay approximately $43,000.00 towards worthless "optional" paid for reach amidst

16    threat and fear that his businesses/pages would be crippled if he did not and then not allowing Fyk to

17    continue in the "optional" paid for reach program).  As another example, as discussed in the above

18    common allegations and below other causes of action, Facebook implemented its interference with Fyk

19    *via* the separately wrong conduct of unfair competition (*e.g.*, unilaterally deleting Fyk posts from users'

20    news feeds that garnered significant advertising and/or web trafficking monies so as to begin forcing

21    random "spammy" Facebook-sponsored posts into users' news feeds).  And, no, there is no competition

22    privilege at play here somehow justifying Facebook's conduct – that privilege only applies when the

23    competition is by fair play; *i.e.*, devoid of independently wrongful conduct.  Put differently and for

24    example, there was, in theory, nothing wrong with Facebook entering the advertising and/or web

25    trafficking realms on its platform if that is all Facebook had done side-by-side, mano-a-mano with other

26

27

28

---

[10]  Although Facebook is so interwoven into the fabric of our society (to the point of obsession, in particularly with society's youth) that one might think it has been around since Creation or the Big Bang (depending on belief systems), it has only been around since February 4, 2004, the same day the United States government (Darpa) nixed its LifeLog program.

advertising and/or web trafficking competitors; but, Facebook did not just enter the advertising and/or web trafficking realms in side-by-side, mano-a-mano competition with other companies earning advertising and/or web trafficking income (like Fyk), Facebook instead engaged in a calculated, systematic, systemic campaign to eliminate its competition by, for examples, (a) unilateral deletion of competitors' news feed posts and unilateral force-placing of "spammy" Facebook-sponsored posts into the news feeds of users who did not invite same (at least not consciously, since so much of the Facebook paradigm is cryptic beyond ordinary comprehension or recognition), (b) deletion of competitor businesses/pages (to which advertisements and/or web trafficking were tied) under misrepresentative pretext like CDA violation, and (c) splitting of posts into four categories (text, picture, video, and website links) and systematically directing its tortious inference the hardest at links because links were what made others (like Fyk) the most money and Facebook the least money.

53.    Facebook, in engaging in the aforementioned interference *via* myriad methods of conduct wrongful in and of itself, either intended or knew that the advertising and/or web trafficking disruption experienced by Fyk (not to mention other lost economic opportunities set forth in footnote 2, *supra*) was certain or substantially certain to occur as a result of such interference.

54.    Fyk's relationships with myriad advertising and/or web trafficking companies was significantly disrupted (in fact, eliminated) due to Facebook's interference.  Again, Fyk had to fire sell eight businesses/pages (out of the eleven Facebook had crippled) to a competitor amidst Facebook's direct involvement in effectuating that sale; *i.e.*, amidst Facebook's steering of competition.

55.    Facebook has deprived Fyk of hundreds of millions of dollars (if not billions of dollars – case in point, BuzzFeed, a Fyk competitor, now being worth approximately $1,500,000,000.00 according to some sources) by way of Facebook's interference and disruption of his advertising and/or web trafficking monies.  At a peak and prior to Facebook's interference, Fyk earned approximately $300,000.00 in one month in advertising and/or web trafficking monies, for example.  There was no realistic end in sight to Fyk's economic gain before Facebook's interference; rather, all signs pointed towards Fyk earning even more advertising money but for Facebook's interference.  To illustrate, competitors who have survived Facebook's onslaught and were far less successful than Fyk at the time of Facebook's devastating interference (*i.e.*, had millions less followers and accordingly earning

significantly less advertising earnings than Fyk) have, upon information and belief, had their businesses on Facebook's platform professionally valued in the hundreds of millions to billions of dollars range. And, yet, Fyk had to fire sell eight of his hard-earned businesses/pages for many zeros less than what they should have been worth but for Facebook's interference; *i.e.*, for a relatively nominal approximate $1,000,000.00 due to Facebook's interference.

56.    Not only was Facebook's conduct a substantial factor in Fyk's significant loss of business income and prospective economic advantage, it was the only factor.  Facebook's interference with Fyk's economic advantage imposes liability on Facebook for improper methods of disrupting or diverting Fyk's business relationships (*e.g.*, advertising and/or web trafficking companies, *see* footnote 2, *supra*) outside the boundaries of fair competition.  In actuality, one of Facebook's motives (collecting "optional" paid for reach monies on a purportedly "free" social media platform) amounts to extortion, which, in turn, has a chilling effect on fair competition.  When it comes to Facebook's desire to take over the advertising and/or web trafficking businesses through forced and unwanted Facebook-sponsored "spammy" posts on users' news feeds by muscling out the posts users want (like Fyk posts), that is where glaring unfair competition comes into play.  Users cannot avoid the forced, "spammy" Facebook-sponsored posts, and Facebook is no longer the "free," "give the people a voice" social media platform it purports to be;[11] rather, it, again, has become a platform predicated on redistribution of assets (through legally untenable means) developed by folks (like Fyk) under the pillar of our society that is the American Dream.

57.    Tortious interference with prospective economic advantage/relations is intended to protect stable economic relationships; again, the United States of America was built on fostering stable economic relationships developed in the spirit of the American Dream.  Facebook's conduct with Fyk (and many others, for that matter) frustrates such stability and the underlying American Dream, akin

---

[11]  "Purports" because of the kind of false rhetoric Facebook disseminates to the public with a brainwashing aim based, in part (sans the benefit of discovery), on supposed feedback from mystery Facebook focus groups.  *See, e.g.,* Tessa Lyons' April 13, 2018 (https://www.youtube.com/watch?v=X3LxpEej7gQ), May 23, 2018 (https://www.bloomberg.com/news/videos/2018-05-23/facebook-s-fight-against-misinformation-and-fake-news-video), and June 21, 2018 (https://www.youtube.com/watch?v=DEVZeNESiqw).  Ms. Lyons is Facebook's product manager; *see also, e.g.*, June 22, 2016, https://www.c-span.org/video/?411573-1/facebook-coo-sheryl-sandberg-discusses-technological-innovation.

to the crooked "claim jumping" scheme set forth above.

WHEREFORE, Plaintiff Jason Fyk respectfully requests the entry of judgment against Defendant Facebook, Inc. for damages including, but not necessarily limited to, (a) compensatory damages well in excess of the $75,000.00 amount in controversy threshold, (b) punitive damages, (c) any awardable attorneys' fees and costs incurred in relation to this action, (d) any awardable forms of interest, and (e) other relief as this Court deems equitable (*e.g.*, injunction), just, and/or proper.

**SECOND CLAIM FOR RELIEF – VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE SECTIONS 17200-17210 (UNFAIR COMPETITION)**

58.      Fyk re-alleges Paragraphs 1 through 48 as if fully set forth herein.

59.      California Business & Professions Code Section 17203 provides, in pertinent part, as follows:

> Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction.  The court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition.

60.      California Business & Professions Code Section 17201 provides, in pertinent part, as follows: "As used in this chapter, the term person shall mean and include natural persons, corporations, firms, partnerships, joint stock companies, associations and other organizations of persons."

61.      California Business & Professions Code Section 17200 provides, in pertinent part, as follows:  "As used in this chapter, unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising … ."

62.      California's unfair competition law affords a private right of action where (as here) the conduct is predicated on "unfair" conduct.

63.      Here, there was nothing fair about Facebook's steering Fyk's business/pages to the competitor to whom Fyk had to fire sell eight businesses/pages due to Facebook's leaving Fyk with no reasonable alternative.  Such is the epitome of unfair competition, conducive of economic instability and antithetical to the American Dream.

64.    Again, Facebook wished to eliminate one competitor (Fyk) in favor of another competitor (the company Fyk was forced to fire sell to because of Facebook) because, for example, the other competitor paid Facebook lucrative sums under Facebook's "optional" paid for reach program. Again, Facebook's excuse for eliminating Fyk was of course not its preference to steer his businesses/pages to a competitor who paid Facebook lots of money notwithstanding a purportedly "free" social media platform, but was instead the nonsense about the content of Fyk's businesses/pages being violative of the CDA (mainly, supposedly "spammy"). But, again, as discussed in greater detail above, this was a lie as evidenced by the fact that Facebook immediately reinstated the supposedly CDA violative pages for the competitor who Fyk was forced to sell to because of Facebook without any appreciable change, if any change, in the content of the subject pages.

65.    And there is more to Facebook's unfair competition. Facebook wished to enter into the lucrative advertising and/or web trafficking businesses for itself once it saw how successful those businesses had become for folks like Fyk. Facebook did not fairly enter into competition with Fyk in this regard, such as by building a massive fanbase as Fyk did from the ground up and then reaping the benefits of the advertising and/or web trafficking earnings that flowed from such hard work in the vein of the American Dream. Rather, Facebook imposed its might in anti-competitive fashion by muscling out the Fyk-related posts from user news feeds that users actually wanted and muscling the "spammy" Facebook-sponsored posts into user news feeds that users had not asked for. This is the epitome of unfair competition.

66.    Moreover, Facebook's unfair competition contravenes its own policies – for examples, Facebook has policies of public neutrality in filtering content, giving people a "voice" (as Ms. Lyons, for example, disingenuously proclaims, *see* footnote 11, *supra*), and "connecting" people (as Mr. Zuckerberg, for example, disingenuously proclaims, *see* footnote 5, *supra*). Where (as here) there is, for example, no neutrality employed in content filtering so as to filter out a competitor (Fyk) and his businesses/pages, predicated on Facebook's false advertising (among other things), California law geared towards safeguarding fair competition is turned upside down. Facebook should be held (whether that is legally, equitably, or both) to its professed policies of public neutrality, voice, and

connection; *i.e.*, Facebook should not be allowed to arbitrarily throw its professed public policies aside so as to engage in case-by-case unfair competition that singles out and destroys one person (Fyk) both by unfairly steering the hard work of one competitor (Fyk) to another competitor (*e.g.*, Facebook's aiding and abetting the fire sale of eight Fyk businesses/pages to another competitor), by muscling Fyk's advertisement-backed posts off of users' news feeds and muscling in unwanted random "spammy" Facebook-sponsored posts laced with advertising money, and who knows what else sans the benefit of discovery.

WHEREFORE, Plaintiff Jason Fyk, pursuant to California  Business & Professions Code Section 17203, respectfully requests the entry of judgment against Defendant Facebook, Inc., for damages including, but not necessarily limited to, (a) restitution in an amount appropriate to restore Fyk's loss of advertising and/or web trafficking monies at the hands of Facebook's unfair competition (*e.g.*, restore Fyk for every bit of lost advertising and/or web trafficking money associated with every one of his posts on user news feeds that Facebook unilaterally supplanted with its "spammy" sponsored news feed posts), (b) an order enjoining the methods, acts, or practices complained of in this complaint (*e.g.*, Facebook's unsubstantiated banning, reduction of organic views (reach) of pages and content, reduction of website link views (reach), advertising account deletion, page and content unpublishing, page and content deletion, deletion of individual Facebook administrative profiles, and/or the like of Fyk businesses/pages), (c) any awardable attorneys' fees and costs incurred in relation to this action, (d) any awardable forms of interest, and (e) other relief as this Court deems equitable, just, and/or proper.

## **THIRD CLAIM FOR RELIEF – CIVIL EXTORTION**

67.     Fyk re-alleges Paragraphs 1 through 48 as if fully set forth herein.

68.     Facebook implemented its "optional" paid for reach program, in out-of-the-blue fashion for those (like Fyk) who had functioned under an organic reach program on the purportedly "free" Facebook social media platform for years, backed by a transparent "threat" that those who did not engage in the "optional" paid for reach program would suffer (*see, e.g.,* averment number eighteen, *supra*, in regards to the high-ranking Facebook representative advising Fyk that one has to pay Facebook in order to play with Facebook).  Then, to boot, Facebook would not even allow Fyk to

continue participating in the "optional" paid for reach program beyond his approximate $43,000.00 investment into same.

69.     In so implementing, Facebook knew its "threat" was wrongful or had no basis in fact. Facebook's unilateral "optional" paid for reach program was anything but "optional," as Fyk learned the hard way after his approximate $43,000.00 investment in the "optional" paid for reach program proved worthless and Facebook subsequently kicked him out of the "optional" paid for reach program. "The hard way" because, not-so-coincidentally, Facebook's elimination of Fyk from the "optional" paid for reach program coincided with the financially detrimental merry-go-round that Facebook then subjected him to as outlined in averment number twenty-one, *supra*, and culminating in Facebook's October 2016 destruction and/or severe devaluation of eleven of Fyk's very lucrative businesses/pages and the Facebook-aided fire sale of eight of Fyk's business/pages to a Fyk competitor in January 2017.

70.     The "threat" that was the "optional" paid for reach program was coupled with an express demand for money.  Fyk reasonably feared for the sustainability of his business/pages if he did not relent to Facebook's "optional" paid for reach program "threat."  Because of that fear, Fyk relented to the "optional" paid for reach program for a period of time (to the tune of approximately $43,000.00) in an effort to placate Facebook; *i.e.*, in an effort to inspire Facebook not to meddle with (or eventually crush) this businesses/pages.   Again, Fyk noticed no appreciable increase in his already sizable viewership.  Again, then Facebook excluded Fyk from the "optional" paid for reach program.  And, again, this is when "threat" and related fear became very real.  Once Fyk's "optional" payments to Facebook went away, Facebook's "threat" materialized into what Fyk had feared – the very real hardships outlined in the preceding averment and detailed throughout this complaint.

71.     Again, as with all of the Facebook misconduct set forth in this complaint, Facebook's civil extortion undermines the pillars upon which America was built – hard work invested by the proverbial little guy like the gold miner (here, Fyk) to accomplish the American Dream and economic stability crushed (*via* extortion or otherwise) by the powerful like big mining (here, Facebook) bent on snuffing out the little guy's American Dream.[12]

---

[12]  Public record reflects that the vast majority of Facebook's shareholder population is made up of institutions rather than individuals.

WHEREFORE, Plaintiff Jason Fyk respectfully requests the entry of judgment against Defendant Facebook, Inc., for damages including, but not necessarily limited to, (a) Facebook's reimbursement to Fyk of the approximate $43,000.00 Fyk paid to Facebook in conjunction with Facebook's "optional" paid for reach program, (b) punitive damages, (c) any awardable attorneys' fees and costs incurred in relation to this action, (d) any awardable forms of interest, and (e) other relief as this Court deems equitable, just, and/or proper.

**FOURTH CLAIM FOR RELIEF – FRAUD / INTENTIONAL MISREPRESENTATION**

72.     Fyk re-alleges Paragraphs 1 through 48 as if fully set forth herein.

73.     Facebook made myriad false representations to Fyk that harmed him.  For example, Facebook represented to Fyk that the "free" organic reach program was perfectly acceptable when, in reality, only the "optional" paid for reach program is acceptable (*see, e.g.,* footnote 3, *supra*).  As another example, Facebook represented to Fyk that he was welcomed to participate in the "optional" paid for reach program when, in reality, that was false.  As another example, Facebook represented to Fyk that the businesses/pages Facebook crippled in or around October 2016 were violative of the CDA when, in reality, there was nothing CDA violative about such businesses/pages.

74.     Facebook either knew its representations to Fyk (exemplified in the preceding averment) were false or Facebook made such representations to Fyk recklessly and without regard for the truth of such representations

75.     Facebook intended for Fyk to rely on its representations.  For example, Facebook wished to bait Fyk into the "optional" paid for reach program knowing that it would be quick to pull that rug out from underneath Fyk, and Fyk relied on Facebook's representations that he was welcomed in the "paid for" reach program to the tune of a $43,000.00 investment into same.  As another example, Facebook wished for Fyk to rely on its representation that his businesses/pages were violative of the CDA knowing such representation to be false, and Fyk relied on Facebook's representation that his businesses/pages were CDA violative in fire selling eight of same to the competitor who Facebook steered the fire sale towards.

76.     Fyk's reliance on Facebook's representation was reasonable, especially considering the unequal balance of power between the parties.  Fyk had no reasonable alternatives other than to try the "optional" paid for reach program and fire sell eight of his crippled businesses/pages, for example.

77.     Fyk was harmed by his reliance.  For example, Fyk's $43,000.00 investment into the "optional" paid for reach program proved useless.  As another example, Fyk's fire sale of eight pages for a relatively nominal approximate $1,000,000.00 to a competitor when competitors (once smaller and/or less successful than Fyk) are now valued anywhere from hundreds of millions of dollars to billions of dollars.

78.     Fyk's reliance on Facebook's misrepresentations was not only a substantial factor in Fyk's losing substantial economic advantage (realized and prospective), we submit it was the only factor.

WHEREFORE, Plaintiff Jason Fyk respectfully requests the entry of judgment against Defendant Facebook, Inc., for damages including, but not necessarily limited to, (a) compensatory damages well in excess of the $75,000.00 amount in controversy threshold, (b) punitive damages, (c) any awardable attorneys' fees and costs incurred in relation to this action, (d) any awardable forms of interest, and (e) other relief as this Court deems equitable (*e.g.*, injunction/enjoinder), just, and/or proper.

///
///
///
///
///
///
///
///
///
///

## **JURY DEMAND**

Fyk hereby demands jury trial on all matters so triable as a matter of right.

DATED: August 22, 2018                           Respectfully submitted,

PUTTERMAN LANDRY + YU LLP

By:  /s/ *Constance J. Yu*
          CONSTANCE J. YU

*and*

CALLAGY LAW, P.C.
Sean R. Callagy, Esq.
*Pro Hac Vice Application Pending*
Michael J. Smikun, Esq.
*Pro Hac Vice Application Pending*
msmikun@callagylaw.com
Jeffrey L. Greyber, Esq.
*Pro Hac Vice Application Pending*
jgreyber@callagylaw.com
*Attorneys for Plaintiff*

1

**VERIFICATION**

2

I, JASON FYK declare:

3

I am the Plaintiff in the above-entitled matter.

4

I have read the foregoing VERIFIED COMPLAINT and know the contents thereof.  The

5

same is true of my own knowledge, except as to those matters which are therein stated on

6

information and belief, and, as to those matters, I believe it to be true.

7

I declare (or certify) under penalty of perjury under the laws of the State of California and

8

the United States that the foregoing is true and correct.

9

Executed on August 22, 2018.

10

11

JASON FYK

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28