1   SEAN R. CALLAGY (*Pro Hac Vice Admitted*)
    Email:    scallagy@callagylaw.com
2   MICHAEL J. SMIKUN (*Pro Hac Vice Admitted*)
    Email:    msmikun@callagylaw.com
3   CALLAGY LAW, P.C.
    650 From Rd., Suite 565
4   Paramus, NJ  07652
    Telephone:    (201) 261-1700
5   Facsimile:    (201) 261-1775

6   JEFFREY L. GREYBER (*Pro Hac Vice Admitted*)
    Email:    jgreyber@callagylaw.com
7   CALLAGY LAW, P.C.
    1900 N.W. Corporate Blvd., Suite 310W
8   Boca Raton, FL  33431
    Telephone:    (561) 405-7966
9   Facsimile:    (201) 549-8753

10  CONSTANCE J. YU (SBN 182704)
    E-mail:    cyu@plylaw.com
11  PUTTERMAN LANDRY + YU LLP
    345 California Street, Suite 1160
12  San Francisco, CA 94104-2626
    Telephone:    (415) 839-8779
13  Facsimile:    (415) 737-1363

14  Attorneys for Plaintiff
    JASON FYK

15

16              **UNITED STATES DISTRICT COURT**

17       **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

18  JASON FYK,                          Case No.  4:18-cv-05159-JSW

19              Plaintiff,              **RESPONSE IN OPPOSITION TO**
                                        **DEFENDANT'S NOVEMBER 1, 2018,**
20       v.                             **MOTION TO DISMISS**

21  FACEBOOK, INC.,                     **HEARING:  FEB. 1, 2019, 9:00 A.M.**

22                                      **BEFORE:  JUDGE WHITE**

23              Defendant.              **LOCATION:  OAKLAND, CT. 5, FL. 2**

24

25

26

27

28

**TABLE OF CONTENTS**

| | Page(s) |
|---|---|
| Statement of Relevant Facts ................................................................ | 1-4 |
|    Preliminary Statement ................................................................. | 1 |
|    Summary of the M2D's Untenableness ......................................... | 1-4 |
| Statement of Issues to be Decided ..................................................... | 4 |
| Memorandum of Law ......................................................................... | 4-25 |
|    Legal Standards (Section A) ........................................................ | 4-5 |
|       Applicable Federal Rules of Civil Procedure, F.R.C.P. 12(b)(6) .................. | 4-5 |
|       The Communications Decency Act, 47 U.S.C. § 230(c)(1) – (c)(2)(A) .......... | 5 |
|    Facebook's M2D is a Thinly Veiled Pre-Discovery Motion for Summary Judgment (Fed. R. Civ. P. 12(c) and 12(d)) (Section B) ......................................... | 5-6 |
|    Facebook's Interpretation / Application of Subsection (c)(1) "Immunity" Is Legally Amiss (Section C) ........................................................................ | 6-15 |
|       Subsection (c)(1) of the CDA Affords Some Third-Party Immunity, Not First Party (Section C.1) ......................................................... | 7-10 |
|          The Cases Cited in the M2D are Inapposite or Misconstrued By Facebook (Section C.1.a) ........................................................ | 7-8 |
|          Fyk's Interpretation of Subsection (c)(1) is Well-Supported By Case Law (Section C.1.b) ........................................................ | 8-10 |
|       Subsection (c)(1) was not Meant to Immunize a Party from Itself when the Party was Acting, in Whole or in Part, as the "Information Content Provider" (Section C.2) ................................................................... | 10-15 |
|    Facebook's Subsection (c)(1) Litigation Arguments Must be Estopped and/or Have Been Waived (Section D) ....................................................... | 15-19 |
|    Facebook's M2D is Replete with Skewed Statements (Section E) ......................... | 19-20 |
|    The Complaint's Averments Sufficiently Support Each Claim for Relief (Fed. R. Civ. P. 12(b)(6)) (Section F) ..................................................... | 20-25 |
|       Civil Extortion (Pages 8-10 of the M2D) (Section F.1) ......................... | 21-22 |
|       Unfair Competition (Pages 10-12 of the M2D) (Section F.2) ..................... | 22-24 |
|       Fraud / Intentional Misrepresentation (Pages 12-13 of the M2D) (Section F.3) ............................................................... | 24-25 |
|       Intentional Interference with Prospective Economic Advantage / Relations (Pages 13-14 of the M2D) (Section F.4) ...................................... | 25 |
| WHEREFORE ..................................................................................... | 25 |

1

**TABLE OF AUTHORITIES**                                          **Page(s)**

2

*Case Law*

3

*Spy Phone Labs, LLC v. Google, Inc.*, No. 15-cv-03756-KAW, 2016 WL 6025469,
4      at *8 (N.D. Cal. Oct. 14, 2016) ................................................................. 3 n.4

5      *Finkelstein, M.D. v. AXA Equitable Life Ins. Co.*, 325 F. Supp. 3d 1061 (N.D. Cal. 2018) ...   4, 6 n.
       5, 20

6      *Cunningham v. Mahoney*, No. C 10-03211 JSW, 2010 WL 11575083 (N.D. Cal.
7      Dec. 7, 2010) ........................................................................................... 4, 20-21

       *Fraley v. Facebook*, 830 F. Supp. 2d 785, 795 (N.D. Cal. 2011) ................................   6 n. 5,
8                                                                                                        12-14,
                                                                                                         22-23
9
       *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250 (4th Cir. 2009) ............ 7-8
10
       *Fair Hous. Council v. Roommates.com, LLC*, 521 F.3d 1157, 1162 (9th Cir. 2008) ............   7, 10,
11                                                                                                      12, 14

12     *Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 419 (1st Cir. 2007) ................ 7

13     *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096 (9th Cir. 2009) ........................................... 7-8

       *Levitt v. Yelp! Inc.*, Nos. C-10-1321 EMC, C-10-2351 EMC, 2011 WL 5079526 (N.D. Cal.
14     Oct. 26, 2011) .......................................................................................... 8

15     *Jurin v. Google, Inc.*, 695 F. Supp. 2d 1117 (E.D. Cal. 2010) .................................... 8, 14-
                                                                                                         15
16
       *Perfect 10, Inc. v. CCBill, LLC*, 481 F.3d 751 (9th Cir. 2007) / *Perfect 10, Inc. v. CCBill, LLC*,
17     488 F.3d 1102 (9th Cir. 2007) ......................................................................... 8

18     *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119 (9th Cir. 2003) .............................. 8, 15

       *e-ventures Worldwide, LLC v. Google, Inc.*, 214CV646FTMPAMCM, 2017 WL 2210029,
19     at *1 (M.D. Fla. Feb. 8, 2017) ........................................................................ 9, 9 n.
                                                                                                         7
20
       *Atl. Recording Corp. v. Project Playlist, Inc.*, 603 F. Supp. 2d 690 (S.D.N.Y. 2009) ............. 10
21
       *Batzel v. Smith*, 333 F.3d 1018, 1033 (9th Cir. 2003) .................................................. 12, 14
22
       *Perkins v. LinkedIn Corp.*, 53 F. Supp. 3d 1222, 1247 (N.D. Cal. 2014) .......................... 14
23
       *Harbor Ins. Co. v. Continental Bank Corp.*, 922 F.2d 357, 362 (7th Cir. 1990) ................. 15 n.
24                                                                                                      10, 16

       *Railway Co. v. McCarthy*, 96 U.S. 258, 6 Otto 258, 24 L.Ed. 693 (1877) ........................... 15
25
       *Connally v. Medlie*, 58 F.2d 629 (2d Cir. 1932) ........................................................ 16
26
       *Tonopah & T.R. Co. v. Commissioner of Internal Revenue*, 112 F.2d 970, 972 (9th Cir. 1940) ... 16
27
       *Polson Logging Co. v. Neumeyer*, 229 F. 705, 707-708 (9th Cir. 1916) ............................ 16
28
       *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................... 20-21

ii

*Levitt v. Yelp!, Inc.*, 765 F.3d 1123 (9th Cir. 2014) ..................................................... 23

**United States Code**

47 U.S.C. § 230(c)(1) ........................................................................... 5

47 U.S.C. § 230(c)(2)(A) ...................................................................... 5

47 U.S.C. § 230(f) ................................................................................ 7

47 U.S.C. § 230(e) ............................................................................... 10

\* *See also* Exhibit A for a full printout of 47 U.S.C. § 230 \*

**State Statutes / Codes / Jury Instructions**

Cal. Civ. Jury Inst. 2202 ...................................................................... 20 n. 13

Cal. Code §§ 17200-17210 .................................................................. 20 n. 13, 23

Cal. Penal Code §§ 518-519 ................................................................ 20 n. 13

Cal. Civ. Jury Inst. §§ 1900-1902 ....................................................... 20 n. 13

**Federal Rules**

Fed. R. Civ. P. 12(b)(6) ....................................................................... 4-5

Fed. R. Civ. P. 12(c) ........................................................................... 5

Fed. R. Civ. P. 12(d) ........................................................................... 3, 5-6

Fed. R. Civ. P. 15 ................................................................................ 25 n. 17

**Law Reviews / Journals / Treatises / Legal Dictionaries**

66 N.Y.U. Ann. Surv. Am. L. 371, 379 (2010) .................................... 2 n. 1

33 Hastings Comm. & Ent. L.J. 455, 456 (2013) ................................ 2 n. 1

Harvard Journal of Law & Technology, 20, p. 163 SSRN 916529 .......... 2 n. 2, 6

5B Wright & Miller, *Federal Practice and Procedure 3d* § 1356, at 354 ........... 5

Bryan A. Garner, *Black's Law Dictionary* 247 (2001 2d pocket ed.) ............ 15 n. 11

**Congressional Reg.**

141 Cong. Reg. 8088 (1995) ................................................................ 2 n. 1

iii

1

## STATEMENT OF RELEVANT FACTS

2

### A.    Preliminary Statement

3
4
5
6
7
8
9

On August 23, 2018, Fyk filed his Verified Complaint and Demand for Jury Trial (the "Complaint"), [D.E. 1], wherein he described in detail Facebook's brazen tortious, unfair and anti-competitive, extortionate, and/or fraudulent practices that caused the destruction of his multi-million dollar business with over 25,000,000 followers. *Id.* at ¶ 1. Facebook's November 1, 2018, response, a Motion to Dismiss ("M2D"), [D.E. 20], is disingenuous and inapposite because the facts show this lawsuit is about the "content provider" (Fyk) pursuing an "interactive computer service" (Facebook) in a **first-party** posture for Facebook's destruction of his livelihood (*i.e.*, businesses / pages).

10
11
12
13
14

Fyk's businesses / pages at their height were generating him hundreds of thousands of dollars a month, and his growth potential was without ceiling. *See, e.g.,* [D.E. 1] at ¶¶ 1-2, 15-16, n. 2 and n. 8. Competitors who Facebook did not cripple, as it did Fyk, are now valued in the hundreds of millions to billions of dollars range. *See, e.g.,* [D.E. 1] at ¶ 5. Facebook is not being sued by a third-party over Fyk's content, but by Fyk over Facebook's own extensive wrongdoing as described in the Complaint.

15
16
17
18
19

The M2D disingenuously argues that Facebook is entitled to immunity under Subsection (c)(1) of the Communications Decency Act ("CDA"), Title 47, United States Code, Section 230, intentionally omitting that such immunity is available when ***another*** "content provider" sues Facebook in a **third-party** posture (*e.g.*, car manufacturer suing a consumer website, Consumer Affairs, for hosting third-party consumer reviews about their car). **Again, Fyk is suing in a first-party posture**.

20
21
22
23

These two situations are markedly different, resulting in Facebook's M2D having completely missed the mark. The M2D's CDA nonsense is procedurally flawed (Section B), legally flawed (Section C), equitably flawed (Section D), and factually flawed (Section E). Similarly, Facebook's Rule 12(b)(6) arguments are legally, procedurally, and factually flawed (Section F). The M2D must be denied.

24

### B.    Summary of the M2D's Untenableness

25
26
27

Facebook's M2D is based on an untenable theory that its actions are entitled to blanket, unbridled "just because" immunity under Subsection (c)(1) of the CDA.[1] More specifically, Facebook baselessly

28

---

[1] Legislative commentary is critical for an understanding of the extent of Facebook's misuse of the CDA. The CDA was originally enacted in 1996 with the primary (if not sole) aim of regulating internet

1

attempts to apply the inapposite Subsection (c)(1) of the CDA to this case – "inapposite" because the express language of the CDA (and the case law cited in the M2D, for that matter) makes abundantly clear that Subsection (c)(1) only immunizes a "provider … of an interactive computer service" (here, Facebook) from **third-party** liability concerning information (*i.e.*, content) published or spoken by "***another*** information content provider" on the "interactive computer service['s]" platform. 47 U.S.C. § 230(c)(1) (emphasis added).[2] Subsection (c)(1) **does not** immunize Facebook from **first-party** liability concerning information (*i.e.*, content) published or spoken by **the** "content provider" (here, Fyk).

Put differently, Subsection (c)(1) is inapplicable here because this is not a case where (1) somebody else is suing Facebook over Fyk publications or speeches found on the Facebook platform just because Facebook was the "interactive computer service" that provided the platform upon which

---

pornography. *See, e.g.,* 141 Cong. Reg. 88088 (1995) ("… the heart and soul of the Communication Decency Act is to provide much-needed protection for families and children"); *id.* (Statement of Senator Exon while introducing the CDA, "[t]he fundamental purpose of the Act was to provide the much-needed protection for children in the new age of the Internet"). In creating Section 230 of the CDA, Representatives Cox and Wyden had the same goal as Senator Exon, "relief … from the smut on the Internet," but sought to achieve that end by "empower[ing] parents without Federal regulation," by the Federal Communications Commission. *See* 66 N.Y.U. Ann. Surv. Am. L. 371, 379 (2010). "Congress enacted the CDA as part of the Telecommunications Act of 1996, due to concerns over pornography on the Internet. Section 230 was added to support and encourage the proliferation of information on the Internet." 35 Hastings Comm. & Ent. L.J. 455, 456 (2013).

At Mr. Zuckerberg's April 10, 2018, Congressional Testimony, Senator Ted Cruz acutely and accurately pointed out to Mr. Zuckerberg that "the predicate for Section 230 immunity under the CDA is that you are a neutral public forum." But Facebook is anything but neutral – Facebook's Tessa Lyons, for example, publicly states the polar opposite of Senator Cruz's correct statement, yet further evidencing Facebook's misunderstanding, misapplication, and/or systemic abuse of the CDA: "And we approach integrity in really three ways. The first thing that we would do is we remove anything that violates our Community Standards," which such Facebook "Community Standards" are found nowhere in the express language of the CDA, which such legislation Facebook conflates with its own de-neutralizing business decisions aimed at re-distributing the hard-earned money of others (like Fyk) to Facebook and/or Fyk competitors who pay Facebook a lot more money than Fyk (*see* [D.E. 1] and below). Something that is supposed to be "neutral" is not something that should be wielded against others (like Facebook has done to Fyk and countless others) in a non-neutral "immunity" fashion.

[2] This third-party understanding of Subsection (c)(1) immunity is so elementary that it finds its way into Wikipedia. *See* https://en.wikipedia.org/wiki/Communications_Decency_Act (Section 230 "added protection for online service providers and users from actions against them based on the content of third parties… . … [T]his section immunizes both ISPs and Internet users from liability for torts committed by others using their website or online forum, even if the provider fails to take action after receiving actual notice of the harmful or offensive content," citing the *Harvard Journal of Law & Technology*).

Fyk (or another) provided information, or (2) Fyk is suing Facebook over something someone else published or spoke.  Subsection (c)(1) (and case law) says that Facebook is not liable for "information provided by *another* information content provider," emphasis added, simply because "another" publishes or speaks on the Facebook platform because, again, the language of Subsection (c)(1) does not classify Facebook as the *per se* publisher or speaker of "another's" content.  Again, Facebook is **not** facing third-party liability regarding the content of the "information provided" by or posted by Fyk.

Additionally, as discussed in Section D of this brief, Facebook is estopped from advancing and/or has waived its ability to advance its wayward Subsection (c)(1) theory given the sole pre-suit "basis" for its destruction of Fyk's businesses / pages was Subsection (c)(2)(A).  Facebook's destruction of Fyk's businesses / pages was entirely predicated on Facebook's unviable and unsubstantiated position that the content of the businesses / pages somehow violated, for examples, Facebook's "Community Standards" or "terms."[3]  Given Fyk dismantled Facebook's Subsection (c)(2)(A) nonsense by way of pre-suit letters (with the same defense counsel presently involved), Facebook has inequitably changed its pre-suit "basis" for destroying Fyk's businesses / pages to unsubstantiated footnote.  *See* [D.E. 20] at n. 1.

Moreover, the Court should deny the Subsection (c)(1) aspect of the M2D because it is plainly an attempt to turn this case into a "matter[ ] outside the pleadings," since this matter is nowhere close to a Subsection (c)(1) matter and is accordingly deserving of (1) being "excluded by the [C]ourt" at this juncture, or (2) being "treated as [a motion] for summary judgment" that should not be entertained by the Court without, among other things, discovery having first occurred.  *See* Fed. R. Civ. P. 12(d).[4]

---

[3] The nature of "information provided" / content and Facebook's ability "in *good faith* to restrict access to or availability of" same when same is "obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable" is what Subsection (c)(2)(A) is all about.  47 U.S.C. § 230(c)(2)(A) (emphasis added).  Facebook's suggestion that there was something "lewd" or "filthy" about Fyk's businesses / pages *via* its glancing reference to a takeapissfunny page, *see* [D.E. 20] at 1, amidst the unrelated Subsection (c)(1) pitch actually made in the M2D, is misplaced, inaccurate, and out-of-context.

[4] *See also, e.g., Spy Phone Labs, LLC v. Google, Inc.*, No. 15-cv-03756-KAW, 2016 WL 6025469, at *8 (N.D. Cal. Oct. 14, 2016) (holding that a CDA immunity defense, at least within the Subsection (c)(2)(A) context, "cannot be determined at the pleading stage[,]" but may be raised "at a later stage, such as summary judgment").

As also discussed in greater detail below, though the dismissal stage of litigation is no place for factual adjudication (given the Court is supposed to accept the allegations of the Complaint as true), a lot of what is said in the M2D is false, misrepresentative, misleading, and/or incoherent.  A case should not be disposed of where (as here) the motion requesting disposal is deceitful.

As for the Rule 12(b)(6) aspect of the M2D, there is not much introductory summary that can be provided other than to say that there are plenty of supportive averments in the Complaint for each of the four claims for relief set forth in the Complaint and to advise the Court that the correlation of averments supportive of each of the four claims for relief is set forth in detail below (Section F), which such correlation is all that is legally needed at this stage of the proceedings in a Rule 12(b)(6) analysis.  But, for introductory purposes, we provide a chart of the averments supporting each claim for relief:

| 1st Claim For Relief | 2d Claim For Relief | 3d Claim For Relief | 4th Claim For Relief |
|---|---|---|---|
| [D.E. 1] at ¶¶ 1-2, 14-16, 18, 20, 22-23, 25-34, 42-47, 49-57 | [D.E. 1] at ¶¶ 6, 14, 18, 20, 35-41, 43-45, 47, 58-66 | [D.E. 1] at ¶¶ 14, 18-20, 37-40, 67-71 | [D.E. 1] at ¶¶ 4-7, 14, 17-18, 20-21, 23-24, 30, 35-40, 45-47, 72-78 |

## STATEMENT OF ISSUES TO BE DECIDED

1.      Legally, equitably, procedurally, and/or factually speaking, can Facebook somehow enjoy the limited third-party immunity prescribed by Subsection 230(c)(1) of the CDA in this first-party action?

2.      Has Fyk somehow "fail[ed] to state a claim upon which relief can be granted" pursuant to Federal Rule of Civil Procedure 12(b)(6)?

## MEMORANDUM OF LAW

### A.      LEGAL STANDARDS

#### 1.      Applicable Federal Rules of Civil Procedure

Federal Rule of Civil Procedure 12(b) provides, in pertinent part, as follows:  "Every defense to a claim for relief in any pleading must be asserted in the responsive pleading if one is required. But a party may assert the following defenses by motion: … (6) failure to state a claim upon which relief can be granted … ."  *Id.; see also Finkelstein, M.D. v. AXA Equitable Life Ins. Co.*, 325 F. Supp. 3d 1061 (N.D. Cal. 2018); *Cunningham v. Mahoney*, No. C 10-03211 JSW, 2010 WL 11575083 (N.D. Cal. Dec. 7, 2010).  A Rule 12(b)(6) motion tests the formal sufficiency of the statement of the claim for relief; the

motion is not a procedure for resolving a contest between the parties about the facts or the substantive merits of the claimant's case. *See, e.g.,* 5B Wright & Miller, *Fed. Prac. & Proc. 3d* § 1356, 354.

**2.      The Communications Decency Act**

For brevity's sake, the CDA is attached as Exhibit A and incorporated fully herein. Though, for ease of reference, we cite Subsections (c)(1) and (c)(2)(A).

**(c)   PROTECTION FOR "GOOD SAMARITAN" BLOCKING AND SCREENING OF OFFENSIVE MATERIAL**

**(1) TREATMENT OF PUBLISHER OR SPEAKER**
No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

**(2) CIVIL LIABILITY** No provider or user of an interactive computer service shall be held liable on account of —

**(A)** any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected;

**B.   FACEBOOK'S M2D IS A THINLY VEILED PRE-DISCOVERY MOTION FOR SUMMARY JUDGMENT (FED. R. CIV. P. 12(C) AND 12(D))**

The reader of the M2D is left guessing as to the procedural underpinnings of Facebook's Subsection (c)(1) dismissal effort. Assuming that the procedural underpinning is Federal Rule of Civil Procedure 12(c) (which brings Federal Rule of Civil Procedure 12(d) into play), the M2D must fail because Subsection (c)(1) is a "matter" that could not be further "outside the pleadings" – the facts needed to support a claim for immunity under Subsection (c)(1), which would require a lawsuit filed against Facebook relating to the publications or speeches of "another," are not present here.

Here, in stark contrast to a Subsection (c)(1) third-party posture, Fyk (as the "information content provider") is suing Facebook (as the "interactive computer service" upon which Fyk's publications or speeches were provided) in a first-party posture based on Facebook's wrongful destruction (actionable under all of the Complaint's four claims for relief) of Fyk's businesses / pages (*i.e.*, destruction of Fyk's publications or speeches in existence at the time of Facebook's destruction and destruction of Fyk's ability to publish or speak after the destruction). This destruction occurred as a result of banning, ads account blocking, domain blocking, unpublishing, and/or deleting of Fyk's businesses / pages, which silenced his voice and/or eliminated his reach and distribution. The Facebook acts that destroyed Fyk's

businesses / pages were based on its pre-suit contention that the content / "information provided by" Fyk on the "interactive computer service" (Facebook platform) was violative of Facebook's "Community Standards" or "terms;" *i.e.*, violative of Subsection (c)(2)(A).[5]  *See* [D.E. 1] at ¶ 23.

Given Facebook's novel Subsection (c)(1) argument is a "matter outside the pleadings," Rule 12(d) directs the Court to "exclude[ ]" the Subsection (c)(1) argument or treat the argument "as one for summary judgment under Rule 56 [and allow] [a]ll parties … a reasonable opportunity [*i.e.*, discovery] to present all material that is pertinent to the motion [for summary judgment]." *Id.*

## C.   FACEBOOK'S INTERPRETATION / APPLICATION OF SUBSECTION (c)(1) "IMMUNITY" IS LEGALLY AMISS

The legal untenableness of Facebook's novel Subsection (c)(1) twist is twofold.  First, it is readily apparent from even just Wikipedia (citing the *Harvard Journal of Law & Technology*), *see* n. 2, *supra*, that Subsection (c)(1) affords third-party immunity under some circumstances, but by no means first-party immunity.  Second, Subsection (c)(1) does not immunize folks from themselves.

---

[5] Since the M2D tees it up and there are averments in the Complaint to this effect, *see, e.g.*, [D.E. 1] at ¶ 23, attached as **Exhibit B** (and fully incorporated herein) is a representative sampling of screenshots of the written representations Fyk received from Facebook pre-suit in conjunction with its crippling of his businesses / pages.  *See, e.g.*, *Finkelstein, M.D.*, 325 F. Supp. 3d at 1066 ("Under the incorporation by reference doctrine, courts are permitted to look beyond the pleadings without converting a Rule 12(b)(6) motion into a motion for summary judgment.  Courts may look into … documents that are not physically attached to the complaint if the contents of the document are referred to in the complaint and the authenticity of the documents is not questioned," internal citations omitted, but citing *inter alia Fraley v. Facebook*, 830 F. Supp. 2d 785, 795 (N.D. Cal. 2011)).  What the collection of screenshots making up Exhibit B depict is addressed in greater detail in conjunction with Section D of this brief below.  But, as for this section of the brief, Exhibit B is provided to evidence that Facebook's "justification" for the crippling of the businesses / pages was that the content of such pages purportedly violated Facebook's "Community Standards" / "terms," which, if anything, implicates Subsection (c)(2)(A).  Put differently, there is not one hint in Exhibit B (*i.e.*, in Facebook's written "justification" for crippling Fyk's businesses / pages) that Facebook's crippling of Fyk's businesses / pages was based on Facebook being pursued by other third-parties based on the content of Fyk's businesses / pages.  Facebook plainly cannot pull that off because, among other things, Facebook re-established the identical (or virtually identical) content of Fyk's businesses / pages for the new owner of same following Fyk's Facebook-induced fire sale of the subject businesses / pages to a competitor who Facebook apparently liked better at the time.  *See, e.g.*, Complaint, [D.E. 1] at ¶ 45.  "At the time" because Facebook is now making things very difficult for the new owner of the subject businesses / pages (probably because of this lawsuit).

1.      **Subsection (c)(1) Of The CDA Affords Some Third-Party Immunity, Not First-Party**

The plain language of Subsection (c)(1) of the CDA and the well-settled case interpretation of same in no way immunizes Facebook from its destructive acts here.  Subsection (c)(1) immunity is afforded to Facebook where (as not here) it is being pursued by someone else for Fyk's publications or speeches (*i.e.*, content / "information provided") or by Fyk for someone else's publications or speeches (*i.e.*, content / "information provided").  And this is clearly evidenced by the case law cited in the M2D.

a.      **The Cases Cited In The M2D Are Inapposite Or Misconstrued By Facebook**

In *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250 (4th Cir. 2009), cited by Facebook at page four of the M2D, Nemet Chevrolet, Ltd. was suing Consumeraffairs.com over consumer reviews that others had posted on the Consumeraffairs.com platform about Nemet Chevrolet, Ltd. Consistent with Fyk's interpretation of Subsection (c)(1), the district court in *Nemet Chevrolet, Ltd.* concluded (and the Fourth Circuit affirmed) that "the allegations contained in the Amended Complaint [d]o not sufficiently set forth a claim asserting that [Consumeraffairs.com] authored the content at issue." *Id.* at 253.  In affirming, the Fourth Circuit held, in pertinent part, that Consumeraffairs.com was an "'information content provider' under § 230(f)(3) of the CDA," and, most critically, that "interactive computer service providers [are not] legally responsible for information created and developed by *third parties*." *Id.* at 254 (emphasis added) (citing *Fair Hous. Council v. Roommates.com, LLC*, 521 F.3d 1157, 1162 (9th Cir. 2008)).  Instructively, the Fourth Circuit also held that "Congress thus established a general rule that providers of interactive computer services are liable only for speech that is properly attributable to them." *Id.* at 254 (citing *Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 419 (1st Cir. 2007)).  *Nemet Chevrolet, Ltd.* further confirms reality – that Subsection (c)(1) immunity pertains to third-party liability.  **The case *sub judice* is a first-party case**.

Same with *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096 (9th Cir. 2009), cited by Facebook at pages one, five, and seven of the M2D.  In *Barnes*, the plaintiff sued the defendant over defendant's alleged failure to remove indecent posts of her (or pertaining to her) made by her ex-boyfriend on the Yahoo!, Inc. platform.  Barnes sought to remove Yahoo!, Inc. from Subsection (c)(1) immunity based on her arguments that Yahoo!, Inc. served as a "publisher" in relation to the subject indecent posts, which such

removal is doable under certain circumstances (discussed below).  The *Barnes* court concluded, however, that the "publisher" of the indecent posts was the third-party ex-boyfriend, thereby finding that Subsection (c)(1)'s third-party liability immunity applied to Yahoo!, Inc.  Again, the case *sub judice* is a first-party case involving Facebook's wrongful destruction of Fyk's businesses / pages, not a third-party case against Facebook over some notion that someone else's post about Fyk on the Facebook platform was indecent and Facebook should have taken the third-party's post down.

Same with *Levitt v. Yelp! Inc.*, Nos. C-10-1321 EMC, C-10-2351 EMC, 2011 WL 5079526 (N.D. Cal. Oct. 26, 2011), cited by Facebook repeatedly in its M2D.  In *Levitt*, Yelp! Inc. was accused of manipulating third-party reviews (*i.e.*, reviews posted on Yelp! Inc. by users not named Levitt).  And, with the same kind of third-party post backdrop as with *Nemet Chevrolet, Ltd.*, the *Levitt* court found that Subsection (c)(1) immunized Yelp! Inc.  Again, this case does not concern third-party posts.

This remains true for *Jurin v. Google, Inc.*, 695 F. Supp. 2d 1117 (E.D. Cal. 2010), *Perfect 10, Inc. v. CCBill, LLC*, 481 F.3d 751 (9th Cir. 2007) / *Perfect 10, Inc. v. CCBill, LLC*, 488 F.3d 1102 (9th Cir. 2007), and *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119 (9th Cir. 2003).  Again, our case is about the publications or speeches (*i.e.*, content) of a first-party (Fyk, the "information provider") being wrongly destroyed by the "interactive computer service" (Facebook).

b.     **Fyk's Interpretation Of Subsection (c)(1) Is Well-Supported By Case Law**

After discarding Facebook's inapposite cases (or after unraveling Facebook's misconstruction of same), there remains an abundance of case law supportive of Fyk's position that Subsection (c)(1) is inapplicable here.  For example, in *Song Fi, Inc. v. Google, Inc.*, 108 F. Supp. 3d 876 (N.D. Cal. 2015), the Court determined that YouTube was <u>not</u> immune under the CDA.  In *Song Fi*, action was brought against operators of video-sharing website, alleging that the operators' decision to remove plaintiffs' music video from the publicly-accessible section of the website was inappropriate.  The *Song Fi* court found that the phrase "otherwise objectionable" as used in Subsection (c)(2) entitled "[p]rotection for 'Good Samaritan' blocking and screening of offensive material," but did not extend so far as to make operators of video-sharing website immune from suit based on California-law … tortious interference with business relations claims by users in relation to operators' decision to remove users' music video

from publicly accessible section of website.  The *Song Fi* court went on to find that the "obscene, lewd, lascivious, filthy, excessively violent [and] harassing" material suggested lack of congressional intent to immunize operators from removing materials from a website simply because materials posed a "problem" for operators.  Though Facebook viewed Fyk as some sort of "problem," that does not mean he violated the CDA.[6]  As discussed in Section D (and as thoroughly explained in the Complaint and as depicted in Exhibit B), the Subsection (c)(2) underpinning of *Song Fi* was the only pretext professed by Facebook when crippling Fyk's businesses / pages.  When Facebook realized that its Subsection (c)(2)(A) "justification" was untenable, Facebook's counsel tried to convert Subsection (c)(1) into a *carte blanche* blanket immunity, in contravention of the CDA's content "proliferation" intent, *see* n. 1, *supra*, and of Subsection (c)(1)'s well-settled application as a limited third-party immunity tool.

As another example, *e-ventures Worldwide, LLC v. Google, Inc.*, 214CV646FTMPAMCM, 2017 WL 2210029, at *1 (M.D. Fla. Feb. 8, 2017) is instructive.  e-ventures Worldwide, LLC, was a search engine optimizing service.  According to e-ventures, Google's investigation and removal of e-ventures' content was motivated not by a concern over web spam, but by Google's concern that e-ventures was cutting into Google's revenues.  The Court found Subsection (c)(1) did not immunize Google's actions.[7]

---

[6] Facebook has made it its goal to eliminate businesses and competition by labeling them as "problems." Ms. Lyons has publicly said as much: "The second area is reducing the spread of problematic content, and if we can reduce the spread of those links we reduce the number of people who click through and we reduce the economic incentive that they have to create that content in the first place."  Reducing the economic advantage of folks like Fyk is precisely what the First Claim for Relief in the Complaint is all about.  More on the point of Facebook's strategy to interfere with the economic advantage of the approximate 70,000,000 businesses on Facebook that Mr. Zuckerberg disingenuously says he wishes to promote (*see* n. 9, *infra*), Ms. Lyons has publicly stated as follows: "So going after the instances of actors who repeatedly share this kind of content and reducing their distribution, removing their ability to monetize, removing their ability to advertise is part of our strategy."  And Mr. Zuckerberg hypocritically shares that sentiment, stating at his April 10, 2018, Congressional Testimony that "… advertisers and developers will never take priority … as long as I'm running Facebook." "Hypocritically" when compared to that set forth in footnote nine below.

[7] As an aside, the *e-ventures Worldwide* court noted that Subsection (c)(2) might provide immunity, but determined that a genuine issue of fact as to Google's "good faith" existed precluding summary judgment.  As noted elsewhere in this brief (mainly in Section D), Facebook's lack of confidence in its professed Subsection (c)(2)(A) pre-suit basis for crippling Fyk's businesses / pages has tellingly resulted in Facebook's reducing its pre-suit basis to footnote fodder and is accordingly not worthy of this Court's consideration.

As another example, in *Fair Hous. Council of San Fernando Valley v. Roomates.Com, LLC*, 521 F.3d 1157 (9th Cir. 2008) the Ninth Circuit determined that the CDA does not grant immunity for inducing third-parties to express illegal preferences. Roomates.Com's own acts (posting surveys and requiring answers) were entirely Roomates.Com's doing and, thus, Section 230 of the CDA did not apply to them. Roomates.Com was not entitled to immunity as the third-party in that circumstance.

As another example, in *Atl. Recording Corp. v. Project Playlist, Inc.*, 603 F. Supp. 2d 690 (S.D.N.Y. 2009) the court found that where (as here) the interactive computer service (here, Facebook) was not acting as the information content provider (here, Fyk) and suit was based on state law claims of unfair business practices (as here), the situation falls under the immunity carve out set forth in Subsection 230(e) of the CDA. *See* Ex. A. More specifically, it was determined that the CDA did not bar state law claims for, *inter alia*, unfair competition (a claim for relief here) against an interactive computer service (Facebook) that was not the information content provider (Fyk), where the interactive computer service did not show that the state law claims were inconsistent with the CDA.

The list could go on. It is clear Subsection (c)(1) is inapplicable in this **first-party** case since this subsection provides immunity for "interactive computer services" **in a third-party setting** under some circumstances. The M2D must be denied as a matter of law.

## 2. Subsection (c)(1) Was Not Meant To Immunize A Party From Itself When The Party Was Acting, In Whole Or In Part, As The "Information Content Provider"

The legislature certainly did not enact Subsection (c)(1) to immunize bad actors from themselves. More specifically and for example, Facebook deleted some of Fyk's businesses / pages, which is different from Facebook's unpublishings, bannings, ads account blocking, domain blocking, for examples. For example, Facebook deleted the She Ratchet business / page, which was a business / page that consisted of approximately 1,980,000 viewers / followers at the time of Facebook's foul play. *See* [D.E. 1] at ¶¶ 20-24. As to the She Ratchet business / page, Facebook first unpublished and devalued same due to the content of same purportedly violating Facebook's "Community Standards" / "terms." Upon Fyk's appeal of the unpublishing, Facebook deleted (without explanation) She Ratchet, cutting Fyk off from the business / page but preserving his page content on its own and for itself (as evidenced by Facebook's later publishing the same She Ratchet content for the Los Angeles competitor to whom

Fyk's Facebook-induced fire sale was made). Then the following occurred: (1) The competitor to whom Fyk would eventually fire sell the She Ratchet business / page to (along with other businesses / pages, as detailed in the Complaint, *see, e.g.*, [D.E. 1] at ¶¶ 22, 42-45) requested Facebook's assurance of recovering the business / page (or "breathing life back into" the business / page, as the Complaint would say) following the fire sale; and (2) Facebook restored the value of the deleted She Ratchet business / page by publishing (yes, publishing) same for the Fyk competitor around the time the Facebook-induced fire sale of same went through, with the page content being identical (or virtually identical) to that which it was when under Fyk's ownership. *See, e.g.*, [D.E. 1] at ¶ 45.

Again, deletion (like with the She Ratchet business / page, for example) is different than unpublishing, banning, ads account blocking, and/or domain blocking. Again, at the time of deletion, Facebook acquired, albeit illegally as detailed in the Complaint's four claims for relief, "ownership" of Fyk's content (*i.e.*, the "information provided" by Fyk on the "interactive computer service" platform that is Facebook).[8] And, again, when Facebook breathed life back into the She Ratchet business / page for the Fyk competitor to whom the Facebook-induced fire sale was made, Facebook became the independent "publisher" / "information content provider" of the same content it had stolen from Fyk. Facebook's theft and re-publishing of the identical content Fyk had published was motivated by Facebook's desire to enrich Fyk's competition, thereby enriching Facebook as it enjoyed a far more lucrative relationship with that competitor than with Fyk ... that competitor has paid Facebook millions whereas Fyk paid Facebook approximately $43,000.00. *See, e.g.*, [D.E. 1] at ¶¶ 19, 46, 52.[9]

---

[8] Facebook publicly recognizes Fyk as the "owner" of his content / "information provided." *See, e.g.*, Facebook's public domain "Community Standards," https://www.facebook.com/communitystandards ("[y]ou own all of the content and information you post on Facebook…"). This is a 2018 publication of "Community Standards," but presumably does not significantly deviate from prior iterations of the "Community Standards" and/or is otherwise instructive for purposes of this discussion.

[9] These actions are in stark contrast to what Facebook's professed mission (or "social contract") supposedly is: "Our mission is all about embracing diverse views. We err on the side of allowing content, even when some find it objectionable, unless removing the content can prevent a specific harm. Moreover, at times we allow content that might otherwise violate our standards if we *feel* it is newsworthy, significant, or important to the public interest." *See* Facebook's public domain "Community Standards," https://www.facebook.com/communitystandards (emphasis added); *see also* Mr. Mark Zuckerberg's April 10, 2018, Congressional Testimony ("I am very committed to making sure

Moreover, in addition to indirectly interfering and competing with Fyk, **Facebook is a direct competitor that is not entitled to CDA immunity**. In addition to serving as an "interactive computer service" for which CDA immunity may apply (though not in this context), Facebook also serves as an "information content provider" (defined in CDA Subsection (f)(3), *see* Ex. A) at least with respect to its Sponsored Story Advertising News Feed scheme, and accordingly enjoys no CDA immunity:

> 'A website operator can be both a service provider and a content provider … [A]s to content that it creates itself, or is responsible, in whole or in part for creating or developing, the website is also a content provider.' *Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1162 (9th Cir. 2008) (en banc). Furthermore, 'that [members] are information content providers does not preclude [Facebook] from *also* being an information content provider by helping develop at least in part the information' posted in the form of Sponsored Stories. *Id.* at 1165 (emphasis in original). As the Ninth Circuit clearly stated, 'the party responsible for putting information online may be subject to liability, even if the information originated with a user.' *Id.* (citing *Batzel v. Smith*, 333 F.3d 1018, 1033 (9th Cir. 2003)). Here, Plaintiffs allege that Facebook creates content by deceptively mistranslating members' actions … and further combining that … with … the label 'Sponsored Story.' Plaintiffs allege that they themselves have no control over whether to post a particular company's name or logo, and that Facebook maintains sole control over whether to display a Sponsored Story at all. Based on Plaintiffs' allegations, Defendant appears to be a content provider, in addition to being an interactive computer service provider. CDA immunity 'applies only if the interactive computer service provider is not also an 'information content provider,' *Roommates.com*, 521 F.3d at 1162, and therefore, construing all facts in the light most favorable to Plaintiffs, Defendant is not at this stage entitled to CDA immunity. For the same reasons that Defendant appears to be a content provider, Defendant's assertion that its actions are 'well within the editorial function for which websites receive immunity' is unpersuasive. … Facebook's actions in creating Sponsored Stories go beyond 'a publisher's traditional editorial functions… . … [A]nd thus Defendant's motion to dismiss under CDA § 230 is denied.

*Fraley*, 830 F. Supp. 2d at 802-803.

In this vein, Facebook directly interferes with the economic advantage of others (First Claim for Relief in the Complaint) who are doing nothing wrong (in particularly with respect to the CDA) in an unfairly and deceptively competitive manner (Second Claim for Relief and Fourth Claim for Relief in the Complaint) **directly** for its own benefit. Mr. Zuckerberg stated in his April 10, 2018, Congressional Testimony that "what we allow is for advertisers to tell us who they want to reach and *then we do the placement."* (emphasis added). For context on Facebook's "placement," Fyk has blocked on his

---

that Facebook is a platform for all ideas, that is a very important founding principle of what we do"); *id.* ("For most of our existence, we focused on … and for building communities and businesses").

12

personal News Feed, for example, sites called NowThis and UNILAD, and yet Facebook keeps forcing those sites into Fyk's personal News Feed, further evidencing that the user has no control of the user's News Feed (contrary to Facebook's pronouncements about user control) and Facebook jams its sponsored unsolicited material (*i.e.*, "spam") into the user's News Feed anyway to make Facebook money (NowThis and UNILAD doubtless pay Facebook money).   Judge Koh recognized or acknowledged as much too: "Although Facebook's Statement of Rights and Responsibilities provides that members may alter their privacy settings to 'limit how your name and [Facebook] profile picture may be associated with commercial, sponsored, or related content (such as a brand you like) served or enhanced by us,' members are unable to opt out of the Sponsored Stories service altogether." *Id.* at 792.

The "placement," in one form, is Facebook's steering / displacing of businesses that do not pay Facebook as much money (like Fyk's businesses / pages) to competitors who pay Facebook millions (like the Fyk competitor out of Los Angeles who was the benefactor in the Facebook-induced fire sale of Fyk's businesses).  The "placement," in another form, is Facebook's manipulation of the News Feed to bring its sponsored posts (*i.e.*, posts in which Facebook is the money-making partner) to the top and shove other News Feed posts down where users are less likely to see despite the News Feed supposedly being something wherein the user is allowed to read what he / she chooses … in Facebook's words:

> It is helpful to think about [News Feed] for what it is, which is a ranking algorithm … and the problem that the News Feed ranking algorithm is solving is what order should I show your stories in News Feed.  The News Feed ranking algorithm prioritizes them … now we do this whole process for every story in your inventory … inventory is the collection of stories from the people that you friend and the pages that you follow … You're a lot more likely to see a story that's in the first spot on your News Feed than the one that's in the 3000[th] spot.

Ms. Lyons' public speech, uploaded on April 13, 2018.  In that same public speech, Ms. Lyons elaborates on Facebook's direct competition mindset: "If [a News Feed post] says sponsored that means that someone spent money in order to increase its distribution."  One of the benefactors of a sponsored News Feed post is the introducer / supporter / partner of the post (in many cases, Facebook), as Judge Koh recognized. *See Fraley*, 830 F. Supp. 2d at 790 ("While members join Facebook.com for free, Facebook generates its revenue through the sale of advertising [*i.e.,* sponsored ads with Facebook as the paid sponsor / partner] targeted at its users").

Facebook's unilateral placement of its "spam" News Feed material (from which Facebook profits) to the top of a user's News Feed, *see, e.g.,* [D.E. 1] at ¶¶ 35-40, and burying the News Feed material users' want / solicit (like Fyk's material) in the "3000th spot" (as Facebook's Tessa Lyons admits in the commentary cited above) is the epitome of the Second Claim for Relief (Unfair Competition) in the Complaint and quite deceitful in the vein of the Fourth Claim for Relief (fraud / intentional misrepresentation), tying in directly to the destruction of economic advantage (the First Claim for Relief in the Complaint) of folks (like Fyk) who earn ad and web-trafficking monies through posts that users actually want to see … entitling Facebook to no CDA immunity per this Court (*e.g., Fraley*) and the Ninth Circuit (*e.g., Fair Housing Council of San Fernando Valley*).

As discussed above, Subsection (c)(1) immunity is only afforded to an "interactive computer service" under the right circumstances, not to the "publisher" (*i.e.,* the "information content provider"). But Facebook's conduct as to the She Ratchet business / page and Sponsored Stories advertisements News Feed scheme, for examples, took it outside the shoes of an "interactive computer service" and inside the shoes of "information content provider," in whole or in part; thus, Facebook is not immune under Subsection (c)(1), regardless of whether this Court accepts or rejects Facebook's interpretation of Subsection (c)(1). *See, e.g., Fair Housing Council of San Fernando Valley,* 521 F.3d at 1165 ("the party responsible for putting information online may be subject to liability, even if the information originated with a user," citing *Batzel v. Smith,* 333 F.3d 1018, 1033 (9th Cir. 2003)); *Fraley,* 830 F. Supp. 2d 785 (denying Facebook's CDA motion to dismiss, determining that Facebook's acting as both an "interactive computer service" and an "information content provider" went beyond a publisher's traditional editorial functions when it allegedly took members' information without their consent and used same to create new content published as endorsements of third-party products or services); *Perkins v. LinkedIn Corp.,* 53 F. Supp. 3d 1222, 1247 (N.D. Cal. 2014) (denying LinkedIn's CDA motion to dismiss wherein LinkedIn sought CDA immunity as a pure interactive computer service, with the court endorsing, at least at the dismissal stage where complaint allegations are deemed true, plaintiffs' claim that LinkedIn provided no means by which a user could edit or otherwise select the language included in reminder emails and that true authorship of the reminder emails laid with LinkedIn); *Jurin v. Google, Inc.,* 695 F.

14

Supp. 2d 1117, 1122 (E.D. Cal. 2010) (cited in Facebook's own M2D, this case held, in part, that "[u]nder the CDA an interactive computer service qualifies for immunity so long as it does not also function as an 'information content provider' for the portion of the statement or publication at issue," citing *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1123 (9th Cir. 2003)).

Facebook's attempt to distance itself from the "information content provider" role in shell game / have its cake and eat it too fashion translates to: "Accuse your enemy of what you are doing. As you are doing it to create confusion." ~ Karl Marx. The M2D must be denied as a matter of law.

## D.    FACEBOOK'S SUBSECTION (c)(1) LITIGATION ARGUMENTS MUST BE ESTOPPED AND/OR HAVE BEEN WAIVED

Facebook must be estopped from enjoying (or has waived) Subsection (c)(1) immunity. For over a century, the United States Supreme Court has counseled against allowing the kind of "bait and switch" that is Facebook's seismic shift from Subsection (c)(2)(A) to Subsection (c)(1), albeit within the phrase of art that is "Mend the Hold,"[10] which is legalese for estoppel and, to some extent, waiver.[11] *See, e.g., Railway Co. v. McCarthy*, 96 U.S. 258, 6 Otto 258, 24 L.Ed. 693 (1877). Thus, it would be improper for the Court to allow Facebook to cripple Fyk's businesses / pages on one ground (purported violation of "Community Standards" / "terms," implicating Subsection (c)(2)(A)) and later, when that ground is challenged (this lawsuit), try to avoid liability on totally different grounds (Subsection (c)(1)).

---

[10] Judge Posner of the Seventh Circuit Court of Appeals pointed out that the "Mend the Hold" doctrine comes from a "nineteenth-century wrestling term, meaning to get a better grip (hold) on your opponent." *Harbor Ins. Co. v. Continental Bank Corp.*, 922 F.2d 357, 362 (7th Cir. 1990).

[11] The hornbook definitions of glaringly applicable forms of estoppel are as follows: (1) "Estoppel" is defined as "[a] bar that prevents one from asserting a claim or right that contradicts what one has said or done before… ." Bryan A. Garner, *Black's Law Dictionary* 247 (2001 2d pocket ed.). (2) "Equitable estoppel" is defined as "[a] defensive doctrine preventing one party from taking unfair advantage of another when, through false language or conduct, the person to be estopped has induced another person to act in a certain way, with the result that the other person has been injured in some way." *Id.* (3) "Quasi-estoppel" is defined as "[a]n equitable doctrine preventing one from repudiating an act or assertion if it would harm another who reasonably relied on the act or the assertion." *Id.* And a less glaring (though equally applicable, we submit) form of estoppel is "estoppel by silence," which is defined as "[e]stoppel that arises when a party is under a duty to speak but fails to do so." *Id.* Here, as to estoppel by silence, Facebook should have spoken its novel interpretation / twist of Subsection (c)(1) immunity to Fyk when it was professing to Fyk (*see* Ex. B) its "bases" for crippling his businesses / pages, but Facebook did not do so (*see* Ex. B).

As written by Justice Lerned Hand of the Second Circuit Court of Appeals in *Connally v. Medlie*, 58 F.2d 629 (2d Cir. 1932), the "Mend the Hold" doctrine estops a party from changing (or constitutes a waiver of a party's ability to change) the ground on which it refused to perform, whether or not that ground was stated in a pleading or otherwise in the course of litigation. *See also Harbor Ins.* at 363 (a party's "hok[ing] up a phony defense … and then when that defense fails (at some expense to the other party) tr[ying] on another defense for size, can properly be said to be acting in bad faith"). The Ninth Circuit has embraced the "Mend the Hold" doctrine (*i.e.*, estoppel / wavier) for over a century. *See, e.g.*, *Tonopah & T.R. Co. v. Commissioner of Internal Revenue*, 112 F.2d 970, 972 (9th Cir. 1940); *Polson Logging Co. v. Neumeyer*, 229 F. 705, 707-708 (9th Cir. 1916).

As evidenced by Exhibit B (which is illustrative, not all-inclusive), Facebook's sole professed "basis" to Fyk (*via* apathetic, round-about, circular, intentionally glossy messaging) for destroying his businesses / pages was that the content of same purportedly violated Facebook's "Community Standards" or "terms," *see, e.g.*, [D.E. 1] at ¶ 23, which sounds in the subsection of the CDA that addresses the nature of content / "information provided" – Subsection (c)(2)(A). One of the Fyk businesses / pages that Facebook unlawfully crushed was ClevelandBrownfans. *See* [D.E. 1] at ¶ 22(f). Attached as Exhibit B(1) is an illustrative screenshot showing Facebook's explanation for unpublishing that business / page on one occasion – "We remove any promotion or encouragement of self-mutilation, eating disorders or substance abuse." This Facebook unpublishing "basis" is just factually wrong, but, for purposes of this briefing, Exhibit B(1) demonstrates that Facebook's "basis" was grounded in Subsection (c)(2)(A) (relating to the nature of the content), not Subsection (c)(1). Exhibit B(2) shows another instance of Facebook's unpublishing this Fyk business / page, providing this "basis" for unpublishing: "This happened because the Page doesn't follow one or more of the Facebook Page Term(s)." The explanation of "Facebook Page Term(s)" has nothing to do with the CDA. If anything, this "basis" would again relate to Subsection (c)(2)(A) because the "basis" seems to relate to content, but "Facebook Page Term(s)" is intentionally nebulous. Exhibit B(3) demonstrates Facebook republished this business / page for the competitor who obtained the business / page in relation to the Facebook-induced fire sale of same with no change in the content across owners.

Another Fyk business / page that Facebook unlawfully crushed was petergriffinfans. *See* [D.E. 1] at ¶ 22(h). Attached as Exhibit B(4) is an illustrative screenshot showing Facebook's explanation for unpublishing that business / page on one occasion – "This happened because the Page doesn't follow one or more of the Facebook Page Term(s)." The explanation of "Facebook Page Term(s)" has nothing to do with the CDA. If anything, this "basis" would again relate to Subsection (c)(2)(A) because the "basis" seems to relate to content, but "Facebook Page Term(s)" is intentionally nebulous. Attached as Exhibit B(5) is an illustrative screenshot showing Facebook's explanation for unpublishing that business / page on another occasion – "Your page has been unpublished. Post unauthorized commercial communications (ex. spam) on Facebook. All content on Pages must comply with the Facebook Community Standards." The "spam" aspect of this Facebook unpublishing "basis" is just factually wrong, but, for purposes of this briefing, Exhibit B(5) demonstrates that Facebook's "basis" was grounded in Subsection (c)(2)(A) (relating to the nature of the content), not Subsection (c)(1). The "Facebook Community Standards" aspect of this Facebook unpublishing "basis" has nothing to do with the CDA. If anything, this "basis" would relate to Subsection (c)(2)(A) because the "basis" seems to relate to content, but "Facebook Community Standards" is intentionally nebulous. Exhibit B(6) demonstrates Facebook re-published this business / page for the competitor who obtained the business / page in relation to the Facebook-induced fire sale of same with no change in the content across owners.

Fyk heavily relied, to his detriment in time and money, on Facebook's professed "bases" for its businesses / pages crippling, which, again, such "bases" related to Subsection (c)(2)(A) (*i.e.*, were content-oriented) or were intentionally nebulous so as to keep Fyk guessing as to why Facebook was destroying his livelihood. First, for example as to detriment, Fyk was induced into his fire sale of the subject businesses / pages to a competitor based on Facebook's Subsection (c)(2)(A) actions, which such fire sale was of great monetary detriment to Fyk.[12] *See, e.g.*, [D.E. 1] at ¶¶ 41-46. Second, for example,

---

[12] As to "monetary detriment," Facebook's Motion scoffs at our classification of the approximate $1,000,000.00 being "relatively nominal." *See, e.g.*, [D.E. 20] at 1-2. The "relatively nominal" nature of the monies recovered by Fyk in relation to his Facebook-induced fire sale of the subject businesses / pages, however, is very serious and very real. It is plain that there was no letup in sight of Fyk's impressive growth curve, *see, e.g.*, [D.E. 1] at n. 2, but for Facebook's unlawful destruction of his businesses / pages. The competitor who reaped the benefits of the Facebook-induced fire sale of the subject pages was smaller than / less successful than Fyk at the time of Facebook's destruction of the

17

Fyk underwent a time-consuming and expensive pre-suit letter writing campaign with Facebook and its current defense counsel seeking to unravel Facebook's unlawful conduct without litigation. Third, for example, Fyk crafted his litigation campaign, a time-consuming and expensive endeavor, around Facebook's sole professed basis, unconcerned with a Subsection (c)(2)(A) immunity defense because such defense never was (and never will be) fruitful for Facebook, as evidenced by Facebook's essential abandonment of a Subsection (c)(2)(A) immunity defense. *See* [D.E. 20] at n. 1.

Moreover, if the Court were to somehow endorse (in contravention of ordinary estoppel / waiver tenets) Facebook's attempt to recast its Subsection(c)(2)(A) "basis" for crippling Fyk's businesses / pages into Subsection (c)(1) immunity, Facebook's recast would still fail under ordinary statutory construction principles. More specifically, if Facebook's interpretation / application of Subsection (c)(1) was correct (which it is not), Subsection (c)(2)(A) would be rendered superfluous to Subsection (c)(1), which such superfluidity is presumed to not be the legislature's intent under ordinary statutory construction principles. Even more specifically, if Facebook's interpretation of Subsection (c)(1) was correct (which it is not), Subsection (c)(1) and Subsection (c)(2)(A) would be the exact same thing under these circumstances (or perhaps altogether). Certainly the legislature would not put duplicative / redundant law on the books; *i.e.*, our interpretation / application of the express language of Subsection (c)(1) (and the cases dealing with same) is correct – again, Subsection (c)(1) immunizes "interactive

---

subject businesses / pages. Upon information and belief, that competitor grew to a worth of $100,000,000.00 give or take. *See* [D.E. 1] at ¶¶ 5, 15). As another example, another Fyk competitor (Viral Nova) who Fyk was once bigger than / more successful than, upon information and belief, sold out for $100,000,000.00 before Facebook subsequently crushed Viral Nova and whomever purchased Viral Nova. As another example, another Fyk competitor (NowThis News) who Facebook did not mess with like it did with Fyk and who Fyk was once bigger than / more successful than was, upon information and belief, valued at or about $585,000,000.00. As another example, another Fyk competitor (BuzzFeed) who Facebook did not mess with like it did with Fyk and who Fyk was once bigger than / more successful than was, upon information and belief, valued at or around $1,700,000,000.00. *See* [D.E. 1] at ¶¶ 5, 15 (Paragraph 5 of the Complaint states $1,500,000,000.00, but, upon information and belief, that value is now around $1,700,000,000.00). The range of Fyk's value (and, thus, some of his damages in this case) but for Facebook's wrongful destruction of his businesses / pages was between $100,000,000.00 and $1,700,000,000.00 (maybe more). So, put in proper perspective (which such proper perspective is offered in the Complaint, *see* [D.E. 1] at ¶¶ 5, 42, but not in the M2D), the approximate $1,000,000.00 relating to Fyk's Facebook-induced fire sale (when Facebook's wrongful conduct had rendered the subject businesses / pages valueless) was, in fact, "relatively nominal."

computer services" in some circumstances from third-party liability emanating from the publications or speeches posted by "another information content provider," whereas Subsection (c)(2)(A) immunizes "interactive computer service" from first-party liability where (as here) the "interactive computer service" "restrict[s] access to or availability of material" of "another information content provider" that the "interactive computer service" deems "in good faith" (not here, hence Facebook's essential abandonment of a Subsection (c)(2)(A) immunity defense, *see* [D.E. 20] at n. 1) to be "obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable (not here, hence Facebook's essential abandonment of a Subsection (c)(2)(A) immunity defense, *see* [D.E. 20] at n. 1).  The M2D must be denied as a matter of equity and statutory construction.

**E.      FACEBOOK'S M2D IS REPLETE WITH SKEWED STATEMENTS**

    Here is a sampling of things said by Facebook in its M2D that are wrong:

- Facebook falsely suggests that the Complaint takes issue with Facebook not treating "similar" content of others (like Fyk competitors) the way it treated Fyk. *See, e.g.,* [D.E. 20] at p. 1, ln. 27; p. 3, ln. 6; p. 6, ln. 10. In actuality, the Complaint speaks of Facebook not interfering with the content of others that was "identical" to Fyk's content; *i.e.*, wrongly discriminating against or singling out Fyk. *See, e.g.,* [D.E. 1] at p. 8, lns. 10-12; n. 8, p. 16, lns. 24-28 – n. 8, p. 17, lns. 21-23; p. 16, lns. 3-8.

- Facebook implies Facebook is not a direct competitor, so as to try to capture this case in the CDA net it has cast in the entirely wrong direction. [D.E. 20] at p. 6, ln. 13 (calling itself, intentionally so, the "unidentified advertiser"); p. 6, ln. 23 (misrepresenting that Facebook did not create content). Wrong. As the Northern District of California and the Ninth Circuit (discussed in Section C above) rightly recognize, Facebook has acted as a direct competitor (or "information content provider"), and the Complaint says plenty about that reality. *See, e.g.,* [D.E. 1] at 18, ln. 23 – p. 19, ln. 11; p. 9, ln. 13 – p. 13, ln. 1 (discussing Facebook's "claim jumping" scheme); p. 13, ln. 2 – p. 14, ln. 20 (discussing Facebook's Sponsored Story advertisement News Feed scheme); p. 15, ln. 1 – p. 17, ln. 6 (discussing Facebook's stealing and re-distributing of Fyk's businesses to a Los Angeles competitor who paid Facebook more money than Fyk); p. 20, lns. 10-19; p. 21, ln. 25 – p. 23, ln. 7 (punctuating Facebook's direct competition schemes).

- Facebook misleads / downplays what it did to Fyk's content by calling itself a mere "moderator." [D.E. 20] at p. 4, ln. 7. In reality, Facebook did not just "moderate" Fyk's content, it destroyed / devalued, stole, and/or re-distributed his content. *See, e.g.,* [D.E. 1] at p. 1, lns. 6-7; p. 1, lns. 23-26; p. 2, lns. 4-7, 15-16; p. 3, lns. 16-20; p. 5, ln. 21 – p. 6, ln. 2; p. 6, lns. 3-22; p. 7, lns. 11-16; p. 7, ln. 17 – p. 9, ln. 12; p. 10, ln. 24 – p. 11, ln. 7; p. 11, lns. 10-13 – p. 12, ln. 3; p. 13, lns. 2-6, 16-19; p. 14, lns. 1-3, 9-20 and n. 7; p. 15, ln. 8 – p. 17, ln. 12.

- Facebook misrepresents that Facebook "delet[ed] content from [Fyk's] page," so as to downplay its destruction of Fyk. [D.E. 20] at p. 7, lns. 16-17.  In truth, Facebook did not just delete some Fyk

content on his businesses / pages, it crushed all of Fyk's businesses / pages. *See, e.g.,* [D.E. 1] at p. 7, ln. 17 – p. 8, ln. 4; p. 15, ln. 8 – p. 17, ln. 6.

- Facebook misrepresents that Fyk's Facebook-induced fire sale of the subject businesses / pages was "voluntar[y]." [D.E. 20] at p. 11, ln. 19. Rather, the Complaint says what the M2D says a few sentences later, that Facebook left Fyk "with no reasonable alternative" other than to fire sell the subject businesses / pages that Facebook's wrongdoing had rendered valueless (for Fyk at least, but not for the Los Angeles competitor in Facebook's good graces at the time). *See, e.g.,* [D.E. 1] at p. 5, lns. 20-21; p. 9, lns. 7-12; p. 15, lns. 8-17; p. 16, lns. 8-14; p. 21, lns. 25-27; p. 26, lns. 1-4.

- Facebook misrepresents part of the fraud / intentional misrepresentation that the Complaint takes issues with, trying to take the sting out of the Fourth Claim for Relief by contending that Facebook never represented to Fyk that his participation in the Facebook paid for reach program extended into "perpetuity." *See* [D.E. 20] at p. 13, lns. 6-10. Rather, the fraud / intentional misrepresentation concerning the Facebook paid for reach program was, for examples, (1) the sham worthlessness (*i.e.,* fraud) of same, *see, e.g.,* [D.E. 1] at p. 18, lns. 12-17; p. 24, lns. 3-11; (2) the supposed optional nature of the not-so-optional paid for reach program, *see, e.g.,* [D.E. 1] at p. 5, lns. 2-9; p. 5, n. 3, (3) Facebook's never telling Fyk (*i.e.,* misrepresentation) that it could at any time completely shut him out of his ads account, thereby disallowing his participation in the paid for reach program, and/or (4) never providing Fyk with an explanation (*i.e.,* misrepresentation) as to why he was shut out of his ads account, *see, e.g.,* [D.E. 1] at p. 5, ln. 19; p. 6, lns. 7, 27; p. 7, lns. 4-5; p. 15, lns. 5-7; p. 23, ln. 16.

It would be unjust (at minimum) to afford any relief to an untruthful, misrepresentative, misleading, and/or incoherent movant. The M2D must be denied as a matter of fact.

## F.   THE COMPLAINT'S AVERMENTS SUFFICIENTLY SUPPORT EACH CLAIM FOR RELIEF (FED. R. CIV. P. 12(b)(6))

Preliminarily, it is important to note that the elements for each of the four claims for relief set forth in the Complaint are taken from the primary sources for same – California Civil Jury Instructions and/or California Code.[13] There are a wealth of supportive averments for each claim for relief in the Complaint, especially when viewed in a light most favorable to the complainant (which is the law). And there is so much more Facebook wrongdoing that we are privy to (enough to write a book, really); but, even amidst a *Twombly* backdrop, we did our level best to adhere to Federal Rule of Civil Procedure 8(a)(2) – "a short and plain statement of the claim showing that the pleader is entitled to relief." *Id.* Per this very Court's recitation of *Twombly* in *Cunningham* and *Finkelstein, M.D.* (cited in Section A), Fyk

---

[13] As to elements of the First Claim For Relief, *see, e.g.,* Cal. Civ. Jury Inst. 2202. As to elements of the Second Claim for Relief, *see, e.g.,* Cal. Code §§ 17200-17210 (Unfair Competition). As to elements of the Third Claim for Relief, *see, e.g.,* Cal. Penal Code §§ 518-519 (also applies to civil extortion). As to elements of the Fourth Claim for Relief, *see, e.g.,* Cal. Civ. Jury Inst. §§ 1900-1902.

has pleaded plenty "factual content t[o] allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Cunningham*, 2010 WL 11575083 at *2.[14]

All of Facebook's <u>arguments</u> set forth in the M2D (at pages eight through fourteen) are the epitome of premature red-herrings.  Facebook can someday try to persuade the Court that the facts of this case are analogous to whatever facts were present in the 12(b)(6) case law cited in the M2D; but, on a legal sufficiency motion, that time is not now.  For now, *Twombly* is the measure, and the incredibly detailed Complaint has plainly stated causes of action upon which relief can someday be granted.  But, to be safe, we now address the cause of action elements the M2D glossily claims are missing.

1.    **Civil Extortion (Pages 8-10 Of The M2D)**

Facebook claims that Fyk fails to state a Civil Extortion claim "because he does not and cannot allege that Facebook wrongly threatened to withhold from him anything that he had a right to possess." [D.E. 20 at 8].  Onward in this vein, Facebook misrepresents that "the Complaint does not identify any contractual provision or any law giving him the right to maintain content on Facebook or to prevent Facebook from promoting the content of other Facebook users or advertisers."  *Id.* at 9.  Wrong – Facebook publicly admits Fyk's "ownership" of his content.  *See* n. 8 *supra*; *see also* Mr. Zuckerberg's April 10, 2018 Congressional Testimony (Senator Hatch: "Now, Mr. Zuckerberg, I remember well your

---

[14] At pages thirteen through fourteen of the M2D, Facebook argues that Fyk's First Claim for Relief (Intentional Interference With Prospective Economic Advantage/Relations) cannot stand by itself.  As for the third element found in Cal. Civ. Jury Inst. 2202, the "Directions for Use" says, in pertinent part, that "Regarding element 3, the interfering conduct must be wrongful by some legal measure other than the fact of the interference itself."  The extensive wrongful conduct set forth in great detail in the Complaint (and all the more that will doubtless be learned in discovery) constitutes more than enough to serve as the First Claim for Relief's foundation.  For example, the Second Claim for Relief (Unfair Competition) set forth in the Complaint squares nicely with the First Claim for Relief.  Just a brief demonstration as to how that is so can be found in footnote twelve above.  And Facebook's intentional interference with Fyk's prospective economic advantage continues to this day in the form of theft / conversion / embezzlement – Facebook has commandeered two successful Instagram accounts (note: Facebook owns Instagram) in which Fyk is a partner by stealing those accounts (Instagram Account Nos. 522601519 and 2817831134) and re-distributing them to a person named Sommer Ray Beaty (who is making millions because of Facebook's re-distribution) and then telling Fyk (when Fyk, as he always does, tried to appeal the problem rather than racing to the courtroom) that action would not be taken "without a valid court order."  But, in any event, it is premature for the Court to make the First Claim for Relief foundational determination at the dismissal stage (in particularly, sans discovery).

first visit to Capitol Hill, back in 2010.  You spoke to Senate Republican High-Tech Task Force, which I chair.  You said back then that Facebook would always be free.  Is that still your objective?"  Mr. Zuckerberg:  "Senator, yes.").  Facebook's own words (footnote 8 above and Mr. Zuckerberg's Congressional Testimony) would create a contract (at best) or work an estoppel (at worst), but, either way, Facebook cannot legitimately disclaim its own words in order to throw this lawsuit out.

Then, Facebook tries to delegitimize Fyk's "fear" and its "threat" by misrepresenting to the Court that the Complaint only contains a "vague allegation" about representations made to Fyk by a "high ranking Facebook executive."  First, that is enough at the 12(b)(6) stage and the fact that we were respectful enough not to include that individual's name in the Complaint by no means renders that individual's critical statement to Fyk "vague."  Second, the Complaint is replete with detailed allegations of "fear" and "threat."  *See, e.g.*, [D.E. 1] at ¶ 18 (discussing Facebook's unilateral implementation of a not-so-optional "paid for reach program," creating Fyk's "[f]ear (analogized in averments twenty-five through thirty-five, *infra*, to 'claim jumping') that if Fyk did not engage in Facebook's new 'optional' paid for reach program, he would be blacklisted in the form of having his businesses heavily curtailed or altogether eliminated…"); *id.* at ¶ 19 (discussing that Fyk's very real fear induced him into relenting to Facebook's extortion; *i.e.*, investing $43,000.00 into the worthless paid for reach program); *id.* at ¶¶ 25-35 (discussing the very real fear / threat of Facebook's jumping Fyk's claim; *i.e.*, hijacking his businesses / pages); *id.* at ¶ 47 (discussing Fyk's fear of or the threat of Facebook's singling him out); *id.* at n. 3 (discussing how Facebook aimed to put folks on "hospice" who did not work with / pay Facebook – putting one on "hospice" equals fear); *id.* at ¶¶ 67-71 (thoroughly summing up or punctuating Facebook's civil extortion).  This 12(b)(6) aspect of the M2D must be denied.

## 2.        Unfair Competition (Pages 10-12 Of The M2D)

Preliminarily, perhaps the most instructive case to look at (not-so-coincidentally not cited in the M2D) is *Fraley*.  There, as discussed above, the unfair competition was in the form of Facebook's Sponsored Story advertisement News Feed scheme, and the *Fraley* court denied Facebook's attempt to dismiss the unfair competition aspect of that complaint.  Here, the Complaint is replete with allegations as to that scheme and how that scheme crippled Fyk's ad and web-trafficking money-making abilities

with Facebook burying his posts underneath its own sponsored posts contrary to and in disregard for users' preferences. *See, e.g.*, [D.E. 1] at ¶¶ 35-40 (ample discussion of Facebook's Sponsored Story advertisement News Feed scheme and how that resulted in significant financial detriment to Fyk). But, here, there is more to Facebook's unfair competition than that which was present in *Fraley*. Here, for example, the Complaint thoroughly avers that Facebook steered Fyk's businesses / pages to a Los Angeles competitor who paid Facebook more money. *See, e.g.*, [D.E. 1] at ¶¶ 6, 41-46. Then Paragraphs 58-66 of the Complaint thoroughly sum up or punctuate Facebook's unfair competition.

Oddly, the M2D tries to conflate the Second Claim for Relief (unfair competition, cognizable under California Business & Professions Code Sections 17200-17210) with anti-trust. The Complaint's Second Claim for Relief is not an anti-trust action (which such anti-trust action would be cognizable under things like the Sherman Act, Federal Trade Commission Act, and / or Clayton Act). The *Fraley* court points out what an unfair competition cause of action is (which is not an anti-trust action):

> California's UCL … does not prohibit specific activities but instead broadly prescribes 'any unfair competition, which means any unlawful, unfair **or** fraudulent business practice or act. The UCL is designed to ensure 'fair business competition' and governs both anti-competitive business practices and consumer injuries. Its scope is 'sweeping,' and its standard for wrongful business conduct is 'intentionally broad,' allowing courts 'maximum discretion to prohibit new schemes … . Each of the three UCL prongs provides a 'separate and distinct theory of liability' and an independent basis for relief.

*Fraley*, 830 F. Supp. 2d at 810 (internal citations, which include Ninth Circuit cases, omitted and emphasis added). Even the case cited by Facebook in its M2D (*Levitt II*) says that there can be an anti-trust undertone to a UCL claim, but that a UCL claim also (as here) deals with things that "otherwise significantly threaten[ ] or harm[ ] competition." [D.E. 20] at 10.[15] And then the M2D inappositely states that a UCL claim has to be tied to some sort of legislative policy. Wrong – Facebook's own case (*Levitt II*) states, a UCL claim can also emanate from "actual or threatened impact on competition,"

---

[15] And it is not just us talking about Facebook's unfair direct competitive tactics. *See, e.g.*, The NY Times' Dec. 5, 2018, article entitled *Facebook Email Show Its Real Mission: Making Money and Crushing Competition*, https://www.nytimes.com/2018/12/05/technology/facebook-emails-privacy-data.html?rref=collection%2Ftimestopic%2FFacebook&action=click&contentCollection=business&region=stream&module=stream_unit&version=latest&contentPlacement=1&pgtype=collection; CNN's Dec. 5, 2018, article entitled *Facebook internal emails show Zuckerberg targeting competitor Vine*, https://www.cnn.com/2018/12/05/media/facebook-six4three-internal-documents-emails/index.html.

which, again, is what the Second Claim for Relief of the Complaint is all about. There being plenty of supportive averments in the Complaint for the UCL claim, the UCL being intentionally broad, and Facebook's twisting its case law in the wrong direction, this 12(b)(6) aspect of the M2D must be denied.

**3.      Fraud / Intentional Misrepresentation (Pages 12-13 Of The M2D)**

Tellingly, the M2D dedicates a mere five paragraphs to trying to dismiss the Complaint's Fourth Claim for Relief and tries to focus the Court in on a small percentage of Complaint averments in order to create the misimpression that the Complaint is not specific enough. Turning us, then, to showing the Court just how many supportive averments there are for the Fourth Claim for Relief, though just about everything said about Facebook and what it has done to Fyk has a fraud / intentional misrepresentation undercurrent.[16] *See, e.g.,* [D.E. 1] at ¶¶ 14, 17 (going to the purported "free" nature of Facebook, which such freeness was false); *id.* at ¶ 19 (discussing Fyk's approximate $43,000.00 investment in a Facebook product, the paid for reach program, which was supposed to increase Fyk's reach and distribution, which proved false); *id.* at ¶¶ 20-24 (discussing Facebook's "justification" for crippling Fyk's businesses / pages, which such "justification" was the epitome of fraud and/or intentional misrepresentation because there was nothing Subsection (c)(2)(A) violative about the content of Fyk's businesses / pages and Subsection (c)(2)(A) was Facebook's intentionally misrepresentative "reason" for crippling Fyk); *id.* at n. 4 (discussing Facebook's lies about the safe and welcoming nature of the disgusting content on other pages compared to Facebook's intentionally misrepresentative disproportionate treatment of Fyk's content); *id.* at ¶ 30 and n. 5 (discussing Mr. Zuckerberg's misrepresentations about what Facebook supposedly is, whereas it was nothing of the sort when it came to Facebook's treatment of Fyk); *id.* at ¶¶ 35-40 (again discussing the purported misrepresentative "free" nature of Facebook, whereas the truth is that Facebook uses the platform to shift the hard-earned wealth of others into its pocket through myriad illegal methods or "strategies" as Facebook would call it); ¶¶ 42-45 (discussing Facebook's lies to Fyk that his content was supposedly CDA violative – "lies" because Facebook re-published the crippled Fyk pages for a competitor with little, if any, change to the purportedly CDA violative content of such pages);

---

[16] And it is not just us talking about Facebook's fraudulent / misrepresentative ways. *See, e.g.*, USA Today's Dec. 5, 2018, article entitled *Facebook emails suggest company explored selling people's data despite pledges not to*, https://www.google.com/amp/s/amp.usatoday.com/amp/2214513002.

*id.* at ¶¶ 72-78 (thoroughly summing up or punctuating Facebook's fraud / intentional misrepresentation). This 12(b)(6) aspect of the M2D must be denied.

**4.      Intentional Interference With Prospective Economic Advantage / Relations (Pages 13-14 Of The M2D)**

Tellingly, the M2D dedicates a mere three paragraphs to trying to dismiss the Complaint's First Claim for Relief, simply stating that because the Complaint's other three claims for relief fail (which they plainly do not), the "derivative" First Claim for Relief cannot stand.  The Complaint could not be more detailed as to how Facebook has destroyed Fyk's economic advantage / relations (both actual and prospective).  Whether Facebook's destruction of Fyk's economic advantage / relations was underlain by Facebook's civil extortion (thoroughly averred in the Complaint), unfair competition (thoroughly averred in the Complaint), and/or fraud / intentional misrepresentation (thoroughly averred in the Complaint), the First Claim for Relief must stand.  *See also* n. 14, *supra*.  The M2D does not quarrel with the fact that Facebook destroyed Fyk's economic advantage / relations – reason being, Facebook cannot genuinely do so … it undeniably destroyed Fyk's economic advantage / relations.  Rather, the M2D simply says "well, we think the other three claims for relief fail, though we are not going to provide detail as to how that is so, so the First Claim for Relief has gotta go."  Such does not rise to the level of colorable argument, and it is pure argument nevertheless – no case (let alone one as serious as this) should be thrown out based on naked lawyer argument.  This 12(b)(6) aspect of the M2D must be denied.

WHEREFORE, Plaintiff, Jason Fyk, respectfully requests entry of an order (1) denying the M2D [D.E. 20] filed by Defendant, Facebook, Inc., on November 1, 2018,[17] and (2) awarding any other relief to Fyk that the Court deems equitable, just, or proper.

---

[17] Though Fyk believes that he has adequately pleaded all causes of action with sufficient facts to satisfy the relevant pleading standard, to the extent the Court finds that there are insufficient facts to support his claims for relief, Fyk respectfully requests leave to amend his Complaint pursuant to Federal Rule of Civil Procedure 15.

Dated:  December 7, 2018

Respectfully submitted,

**CALLAGY LAW, P.C.**

/s/ Jeffrey L. Greyber
**Jeffrey L. Greyber, Esq.**
*Pro Hac Vice* Admitted
jgreyber@callagylaw.com
**Sean R. Callagy, Esq.**
*Pro Hac Vice* Admitted
scallagy@callagylaw.com
**Michael J. Smikun, Esq.**
*Pro Hac Vice* Admitted
msmikun@callagylaw.com
*Attorneys for Plaintiff*

*and*

**PUTTERMAN LANDRY + YU, LLP**
**Constance J. Yu, Esq.**
SBN 182704
cyu@plylaw.com

RESPONSE IN OPPOSITION TO MOTION TO DISMISS, Case No.: 4:18-cv-05159-JSW

1

## **CERTIFICATE OF SERVICE**

2

I HEREBY CERTIFY that on December 7, 2018, I electronically filed the foregoing documents

3

with the Clerk of the Court by using CM / ECF.  I also certify that the foregoing document is being

4

served this day on all counsel of record via Notices of Electronic Filing generated by CM / ECF, and via

5

emails to defense counsel of record.

6

7
                            /s/ Constance J. Yu
                            **Constance J. Yu, Esq.**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

Case 4:18-cv-05159-HSG   Document 23   Filed 12/07/18   Page 33 of 47



Support Us!

U.S. Code › Title 47 › Chapter 5 › Subchapter II › Part I › § 230

# 47 U.S. Code § 230 - Protection for private blocking and screening of offensive material

**(a) FINDINGS** The Congress finds the following:

**(1)** The rapidly developing array of Internet and other interactive computer services available to individual Americans represent an extraordinary advance in the availability of educational and informational resources to our citizens.

**(2)** These services offer users a great degree of control over the information that they receive, as well as the potential for even greater control in the future as technology develops.

**(3)** The Internet and other interactive computer services offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity.

**(4)** The Internet and other interactive computer services have flourished, to the benefit of all Americans, with a minimum of government regulation.

**(5)** Increasingly Americans are relying on interactive media for a variety of political, educational, cultural, and entertainment services.

**(b) POLICY** It is the policy of the United States—

**(1)** to promote the continued development of the Internet and other interactive computer services and other interactive media;

**(2)** to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation;

**(3)** to encourage the development of technologies which maximize user control over what information is received by individuals, families, and schools who use the Internet and other interactive computer services;

**(4)** to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material; and

**(5)** to ensure vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer.

**(c) PROTECTION FOR "GOOD SAMARITAN" BLOCKING AND SCREENING OF OFFENSIVE MATERIAL**

**(1) TREATMENT OF PUBLISHER OR SPEAKER**
No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

Support Us!

**(2) Civil liability** No provider or user of an interactive computer service shall be held liable on account of—

> **(A)** any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or

> **(B)** any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1).[1]

### (d) Obligations of interactive computer service

A provider of interactive computer service shall, at the time of entering an agreement with a customer for the provision of interactive computer service and in a manner deemed appropriate by the provider, notify such customer that parental control protections (such as computer hardware, software, or filtering services) are commercially available that may assist the customer in limiting access to material that is harmful to minors. Such notice shall identify, or provide the customer with access to information identifying, current providers of such protections.

### (e) Effect on other laws

#### (1) No effect on criminal law

Nothing in this section shall be construed to impair the enforcement of section 223 or 231 of this title, chapter 71 (relating to obscenity) or 110 (relating to sexual exploitation of children) of title 18, or any other Federal criminal statute.

#### (2) No effect on intellectual property law

Nothing in this section shall be construed to limit or expand any law pertaining to intellectual property.

#### (3) State law

Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section. No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.

#### (4) No effect on communications privacy law

Nothing in this section shall be construed to limit the application of the Electronic Communications Privacy Act of 1986 or any of the amendments made by such Act, or any similar State law.

### (f) Definitions As used in this section:

#### (1) Internet

The term "Internet" means the international computer network of both Federal and non-Federal interoperable packet switched data networks.

#### (2) Interactive computer service

Support Us!

The term "interactive computer service" means any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions.

**(3) INFORMATION CONTENT PROVIDER**

The term "information content provider" means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service.

**(4) ACCESS SOFTWARE PROVIDER** The term "access software provider" means a provider of software (including client or server software), or enabling tools that do any one or more of the following:

    **(A)** filter, screen, allow, or disallow content;

    **(B)** pick, choose, analyze, or digest content; or

    **(C)** transmit, receive, display, forward, cache, search, subset, organize, reorganize, or translate content.

(June 19, 1934, ch. 652, title II, § 230, as added Pub. L. 104–104, title V, § 509, Feb. 8, 1996, 110 Stat. 137; amended Pub. L. 105–277, div. C, title XIV, § 1404(a), Oct. 21, 1998, 112 Stat. 2681–739.)

[1] So in original. Probably should be "subparagraph (A)."

*LII has no control over and does not endorse any external Internet site that contains links to or references LII.*

About LII

Contact us

Advertise here

Help

Terms of use

Privacy

Support Us!

# EXHIBIT B(1)



# EXHIBIT B(2)



# EXHIBIT B(3)



# EXHIBIT B(4)



# EXHIBIT B(5)



# EXHIBIT B(6)

