SEAN R. CALLAGY (*Pro Hac Vice Admitted*)
Email:        scallagy@callagylaw.com
MICHAEL J. SMIKUN (*Pro Hac Vice Admitted*)
Email:        msmikun@callagylaw.com
CALLAGY LAW, P.C.
650 From Rd., Suite 565
Paramus, NJ  07652
Telephone:    (201) 261-1700
Facsimile:    (201) 261-1775

JEFFREY L. GREYBER (*Pro Hac Vice Admitted*)
Email:        jgreyber@callagylaw.com
CALLAGY LAW, P.C.
1900 N.W. Corporate Blvd., Suite 310W
Boca Raton, FL  33431
Telephone:    (561) 405-7966
Facsimile:    (201) 549-8753

CONSTANCE J. YU (SBN 182704)
E-mail:       cyu@plylaw.com
PUTTERMAN LANDRY + YU LLP
345 California Street, Suite 1160
San Francisco, CA 94104-2626
Telephone:    (415) 839-8779
Facsimile:    (415) 737-1363

Attorneys for Plaintiff
JASON FYK

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| JASON FYK,<br><br>             Plaintiff,<br><br>    v.<br><br>FACEBOOK, INC.,<br><br><br>             Defendant. | Case No.  4:18-cv-05159-JSW<br><br>**CONFORMED RESPONSE IN OPPOSITION TO DEFENDANT'S NOVEMBER 1, 2018, MOTION TO DISMISS**<br><br>**HEARING:  FEB. 1, 2019, 9:00 A.M.**<br><br>**BEFORE:  HON. JEFFREY S. WHITE**<br><br>**LOCATION:  OAKLAND, CT. 5, FL. 2** |

## **<u>TABLE OF CONTENTS</u>**

| | Page(s) |
|---|---|
| Statement of Relevant Facts .................................................................................. | 1-2 |
| Statement of Issues to be Decided ......................................................................... | 2 |
| Memorandum of Law ............................................................................................. | 2-15 |
|     Legal Standards (Section A) ............................................................................. | 2 |
|     Facebook's M2D is a Thinly Veiled Pre-Discovery Motion for Summary Judgment (Fed. R. Civ. P. 12(c) and 12(d)) (Section B) ...................................................... | 2-3 |
|     Facebook's Interpretation / Application of Subsection (c)(1) "Immunity" Is Legally Amiss (Section C) .............................................................................................. | 3-9 |
|         Subsection (c)(1) of the CDA Affords Some Third-Party Immunity, Not First Party (Section C.1) .............................................................................. | 3-6 |
|         Subsection (c)(1) was not Meant to Immunize a Party from Itself when the Party was Acting, in Whole or in Part, as the "Information Content Provider" (Section C.2) ................................................................................................. | 6-9 |
|     Facebook's Subsection (c)(1) Litigation Arguments Must be Estopped and/or Have Been Waived (Section D) ...................................................................................... | 9-10 |
|     Facebook's M2D is Replete with Skewed Statements (Section E) ......................... | 10-12 |
|     The Complaint's Averments Sufficiently Support Each Claim for Relief (Fed. R. Civ. P. 12(b)(6)) (Section F) ..................................................................................... | 12-15 |
|         Civil Extortion (Pages 8-10 of the M2D) (Section F.1) .............................. | 12-13 |
|         Unfair Competition (Pages 10-12 of the M2D) (Section F.2) ...................... | 13-14 |
|         Fraud / Intentional Misrepresentation (Pages 12-13 of the M2D) (Section F.3) ........................................................................................................ | 14 |
|         Intentional Interference with Prospective Economic Advantage / Relations (Pages 13-14 of the M2D) (Section F.4) ................................................... | 15 |

1

<b><u>TABLE OF AUTHORITIES</u></b>   <b><u>Page(s)</u></b>

2

*Case Law*

3
*Atl. Recording Corp. v. Project Playlist, Inc.*, 603 F. Supp. 2d 690 (S.D.N.Y. 2009) ............. 5, iv

4
*Barnes v. Yahoo!, Inc.*, 570 F.3d 1096 (9th Cir. 2009) ...................................................... 4, iv

5
*Batzel v. Smith*, 333 F.3d 1018, 1033 (9th Cir. 2003) ...................................................... 9, iv

6
*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ....................................................... 12

7
*Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119 (9th Cir. 2003) ................................ 4, 9, iv

*Connally v. Medlie*, 58 F.2d 629 (2d Cir. 1932) ......................................................... 10

8
*Cunningham v. Mahoney*, No. C 10-03211 JSW, 2010 WL 11575083 (N.D. Cal.

9
Dec. 7, 2010) ...................................................................................................... 2, 12

10
*e-ventures Worldwide, LLC v. Google, Inc.*, 214CV646FTMPAMCM, 2017 WL 2210029,

at *1 (M.D. Fla. Feb. 8, 2017) ......................................................................... 5, iv

11
*Fair Hous. Council v. Roommates.com, LLC*, 521 F.3d 1157, 1162 (9th Cir. 2008) ........... 4-5,

12
8-9, iv

*Finkelstein, M.D. v. AXA Equitable Life Ins. Co.*, 325 F. Supp. 3d 1061 (N.D. Cal. 2018) ... 2, 12

13
*Fraley v. Facebook*, 830 F. Supp. 2d. 785, 795 (N.D. Cal. 2011) ................................ 7-9,

14
13-14,

iv

15
*Harbor Ins. Co. v. Continental Bank Corp.*, 922 F.2d 357, 362 (7th Cir. 1990) .................. 9

16
*Jurin v. Google, Inc.*, 695 F. Supp. 2d 1117 (E.D. Cal. 2010) ...................................... 4, 9, iv

17
*Levitt v. Yelp!, Inc.*, 765 F.3d 1123 (9th Cir. 2014) ...................................................... 14, iv

18
*Levitt v. Yelp! Inc.*, Nos. C-10-1321 EMC, C-10-2351 EMC, 2011 WL 5079526 (N.D. Cal.

Oct. 26, 2011) ...................................................................................................... 4, iv

19
*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250 (4th Cir. 2009) ............. 3-4, iv

20
*Perfect 10, Inc. v. CCBill, LLC*, 481 F.3d 751 (9th Cir. 2007) / *Perfect 10, Inc. v. CCBill, LLC*,

488 F.3d 1102 (9th Cir. 2007) ......................................................................... 4, iv

21
*Perkins v. LinkedIn Corp.*, 53 F. Supp. 3d 1222, 1247 (N.D. Cal. 2014) ......................... 9, iv

22
*Railway Co. v. McCarthy*, 96 U.S. 258, 6 Otto 258, 24 L.Ed. 693 (1877) ......................... 9

23
*Song Fi, Inc. v. Google, Inc.,* 108 F. Supp. 3d 876 (N.D. Cal. 2015) ................................ 4-5, iv

24
*Spy Phone Labs, LLC v. Google, Inc.*, No. 15-cv-03756-KAW, 2016 WL 6025469,

at *8 (N.D. Cal. Oct. 14, 2016) ......................................................................... 3 n. 4

25
*Tonopah & T.R. Co. v. Commissioner of Internal Revenue*, 112 F.2d 970, 972 (9th Cir. 1940) ... 10

26
*Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 419 (1st Cir. 2007) ................... 4

*United States Code*

27

28
47 U.S.C. § 230(c)(1) ................................................................................................ 1-6,
8-10

ii

47 U.S.C. § 230(c)(2)(A) ............................................................... 2, 2-3 n. 3-4 6, 9-10 14-15 n. 15

47 U.S.C. § 230(f) ........................................................................ 3

47 U.S.C. § 230(e) ....................................................................... 5

* *See also* Exhibit A for a full printout of 47 U.S.C. § 230 *

**State Statutes / Codes / Jury Instructions**

Cal. Civ. Jury Inst. 2202 ......................................................... 12 n. 10

Cal. Code §§ 17200-17210 ...................................................... 12 n. 10

Cal. Penal Code §§ 518-519 .................................................... 12 n. 10

Cal. Civ. Jury Inst. §§ 1900-1902 ........................................... 12 n. 10

**Federal Rules**

Fed. R. Civ. P. 12(b)(6) ......................................................... 2, 12-15

Fed. R. Civ. P. 12(c) ................................................................ 2

Fed. R. Civ. P. 12(d) .............................................................. 2-3

Fed. R. Civ. P. 15 .................................................................. 15 n. 18

**Law Reviews / Journals / Treatises / Legal Dictionaries**

Bryan A. Garner, *Black's Law Dictionary* 247 (2001 2d pocket ed.) ............................ 9

Harvard Journal of Law & Technology, 20, p. 163 SSRN 916529 ................................. 3

33 Hastings Comm. & Ent. L.J. 455, 456 (2013) ....................................... 1 n. 1

66 N.Y.U. Ann. Surv. Am. L. 371, 379 (2010) ......................................... 1 n. 1

5B Wright & Miller, *Federal Practice and Procedure 3d* § 1356, at 354 ........................ 2

**Congressional Reg.**

141 Cong. Reg. 8088 (1995) ................................................................ 1 n.1

**ADDITIONAL ONE PAGE SUMMARY OF ARGUMENT**

1

2    Facebook's Motion to Dismiss ("M2D") is based on an untenable theory that its actions are entitled

3    to blanket, unbridled "just because" immunity under 47 U.S.C. § 230(c)(1) ("CDA").  But the express

4    language of the CDA (and case law, *see* Section C, citing *Nemet, Barnes, Levitt, Jurin, Perfect 10, Carafano,*

5    *Song Fi, e-ventures, Atl. Recording Corp., Fraley, Fair Hous. Council, Batzel, Perkins*) makes clear that

6    Subsection (c)(1) only immunizes a "provider … of an interactive computer service" (Facebook) from **third-**

7    **party** liability concerning information (*i.e.*, content) published or spoken by "***another*** information content

8    provider" on the "interactive computer service['s]" platform.  47 U.S.C. § 230(c)(1) (emphasis added).  This

9    is not a third-party case where (1) someone else is suing Facebook over Fyk publications or speeches found

10   on the Facebook platform, or (2) Fyk is suing Facebook over something someone else published or spoke.

11   Subsection (c)(1) (and case law) says that Facebook is not liable for "information provided by another

12   information content provider" simply because "another" publishes or speaks on the Facebook platform

13   because, again, the language of Subsection (c)(1) does not classify Facebook as the *per se* publisher or

14   speaker of "another's" content.  Subsection (c)(1) **does not**, however, immunize Facebook from **first-party**

15   liability concerning content published or spoken by **the** "content provider" (Fyk) – this case is first-party.

16   And Facebook is estopped from advancing and/or has waived its ability to advance its wayward

17   Subsection (c)(1) theory given the sole pre-suit "basis" for its destruction of Fyk's businesses / pages was

18   Subsection (c)(2)(A); *i.e.*, Facebook "Community Standards" or "terms." *See* Section D.[1]  *See* [D.E. 20] at

19   n. 1.  To allow such a shift would work an injustice / inequity.  Moreover, the Court should deny the

20   Subsection (c)(1) aspect of the M2D (1) pursuant to Rules 12(c) and 12(d) (*see* Section B), and (2) since a

21   lot of what is said in the M2D is false, misrepresentative, misleading, and/or incoherent (*see* Section E).

22   As for the Rule 12(b)(6) aspect of the M2D, there are plenty of supportive averments in the Complaint

23   (*see* Section F).  *See, e.g.,* [D.E. 1] at ¶¶ 1-2, 14-16, 18, 20, 22-23, 25-34, 42-47, 49-57 (1st Claim for Relief);

24   ¶¶ 6, 14, 18, 20, 35-41, 43-45, 47, 58-66 (2d Claim for Relief); ¶¶ 14, 18-20, 37-40, 67-71 (3d Claim for

25   Relief); ¶¶ 4-7, 14, 17-18, 20-21, 23-24, 30, 35-40, 45-47, 72-78 (4th Claim for Relief).

26

27   _____

[1] The nature of "information provided" / content is what Subsection (c)(2)(A) pertains to.  Facebook's
28   suggestion that there was something "filthy" about Fyk's businesses / pages *via* its glancing reference to a
     takeapissfunny page, *see* [D.E. 20] at 1, is misplaced, inaccurate, and out-of-context; *i.e.*, is not "good faith."

## STATEMENT OF RELEVANT FACTS

On August 23, Fyk filed his Verified Complaint (the "Complaint"), [D.E. 1], detailing Facebook's brazen tortious, unfair and anti-competitive, extortionate, and/or fraudulent practices that caused the destruction of his multi-million dollar business with over 25,000,000 followers. *Id.* at ¶ 1. Facebook's November 1 Motion to Dismiss ("M2D"), [D.E. 20], is disingenuous and inapposite because this lawsuit is about the "content provider" (Fyk) pursuing an "interactive computer service" (Facebook) in a **first-party** posture for destruction of his livelihood. On December 7, Fyk filed his M2D Response [D.E. 25], inadvertently tracking Local Rule rather than Standing Order page limitations; thus, this conformed brief.

Fyk's businesses / pages at their height were generating him hundreds of thousands of dollars a month, and his growth potential was limitless. *See, e.g.,* [D.E. 1] at ¶¶ 1-2, 15-16, n. 2 and n. 8. Competitors who Facebook did not cripple, as it did Fyk, are now valued in the hundreds of millions to billions of dollars range. *See, e.g.,* [D.E. 1] at ¶ 5. The M2D argues that Facebook is immune under Subsection (c)(1) of the CDA, omitting that such immunity is available when ***another*** "content provider" sues Facebook in a **third-party** posture (*e.g.*, car manufacturer suing a consumer website, Consumer Affairs, for hosting third-party consumer reviews about their car).[1,2] **Again, Fyk is suing in a first-party posture over Facebook's own extensive wrongdoing**. The M2D's CDA nonsense is flawed procedurally (Section B), legally (Section C),

---

[1] Legislative intent is critical for understanding Facebook's misuse of the CDA. The CDA was enacted in 1996 to regulate internet pornography. *See, e.g.,* 141 Cong. Reg. 88088 (1995) ("… the heart and soul of the [CDA] is to provide much-needed protection for families and children"); 66 N.Y.U. Ann. Surv. Am. L. 371, 379 (2010) (same); 35 Hastings Comm. & Ent. L.J. 455, 456 (2013) (same, adding that "Section 230 was added to support and encourage the proliferation of information on the Internet"). At Mr. Zuckerberg's April 10, 2018, Congressional Testimony, Senator Ted Cruz acutely and accurately pointed out to Mr. Zuckerberg that "the predicate for Section 230 immunity under the CDA is that you are a neutral public forum." But Facebook is anything but neutral – Facebook's Tessa Lyons, for example, publicly states the polar opposite of Senator Cruz's correct statement, yet further evidencing Facebook's misunderstanding, misapplication, and/or systemic abuse of the CDA: "And we approach integrity in really three ways. The first thing that we would do is we remove anything that violates our Community Standards," which such Facebook "Community Standards" are found nowhere in the express language of the CDA, which such legislation Facebook conflates with its own de-neutralizing business decisions aimed at re-distributing the hard-earned money of others (like Fyk) to Facebook and/or Fyk competitors who pay Facebook a lot more money than Fyk (*see* [D.E. 1] and below). A "neutral" thing is not something to wield against others in a non-neutral "immunity" fashion (as here).

[2] This third-party understanding of Subsection (c)(1) immunity is so elementary that it finds its way into Wikipedia. *See* https://en.wikipedia.org/wiki/Communications_Decency_Act.

equitably (Section D), and factually (Section E).  Facebook's Rule 12(b)(6) nonsense is legally, procedurally, and factually flawed (Section F).  The M2D must be denied.

**STATEMENT OF ISSUES TO BE DECIDED**

Legally, equitably, procedurally, and/or factually speaking, can Facebook somehow enjoy the limited third-party immunity prescribed by Subsection 230(c)(1) of the CDA in this first-party action?  And has Fyk somehow "fail[ed] to state a claim upon which relief can be granted" pursuant to Rule 12(b)(6)?

**MEMORANDUM OF LAW**

**A.    LEGAL STANDARDS**

Federal Rule of Civil Procedure 12(b) provides, in pertinent part, that "…a party may assert the following defenses by motion: … (6) failure to state a claim upon which relief can be granted … ."  *Id.; see also Finkelstein, M.D. v. AXA Equitable Life Ins. Co.*, 325 F. Supp. 3d 1061 (N.D. Cal. 2018); *Cunningham v. Mahoney*, No. C 10-03211 JSW, 2010 WL 11575083 (N.D. Cal. Dec. 7, 2010).  A Rule 12(b)(6) motion tests the formal sufficiency of a claim, it is not for resolving a fact / merit contest between the parties.  *See, e.g.,* 5B Wright & Miller, *Fed. Prac. & Proc. 3d* § 1356, 354.  For brevity's sake, the CDA is attached as Exhibit A and incorporated herein.

**B.    FACEBOOK'S M2D IS A THINLY VEILED PRE-DISCOVERY MOTION FOR SUMMARY JUDGMENT (FED. R. CIV. P. 12(C) AND 12(D))**

We assume the procedural underpinning of Facebook's Subsection (c)(1) dismissal effort is Rule 12(c), which brings Rule 12(d) into play.  In stark contrast to a Subsection (c)(1) third-party posture, Fyk ("information content provider") is suing Facebook ("interactive computer service") in a first-party posture based on Facebook's wrongful destruction (actionable under all four claims for relief) of Fyk's businesses / pages (*i.e.*, destruction of Fyk's past and future publications or speeches) *via* banning, ads account blocking, domain blocking, unpublishing, and/or deleting of Fyk's businesses / pages, silencing his voice and/or eliminating his reach and distribution.  Facebook's destruction of Fyk's businesses / pages was based on a pre-suit contention that Fyk's content violated "Community Standards" or "terms;" *i.e.*, violated Subsection (c)(2)(A).[3]  *See* [D.E. 1] at ¶ 23.  Because Facebook's novel Subsection (c)(1) argument is a "matter outside

---

[3] Attached as **Exhibit B** (incorporated herein) is a representative sampling of screenshots of the written representations Fyk received from Facebook pre-suit in relation to its crippling of his businesses / pages. Exhibit B evidences that Facebook's "justification" for the crippling of the businesses / pages was that the

2

the pleadings," the Court should "exclude[ ]" the Subsection (c)(1) argument or treat the argument "as one for summary judgment under Rule 56 [and allow] [a]ll parties … a reasonable opportunity [*i.e.*, discovery] to present all material that is pertinent to the motion [for summary judgment]." Fed. R. Civ. P. 12(d).[4]

### C.   FACEBOOK'S INTERPRETATION / APPLICATION OF SUBSECTION (c)(1) "IMMUNITY" IS LEGALLY AMISS

The legal untenableness of Facebook's novel Subsection (c)(1) twist is twofold. First, it is readily apparent from even just Wikipedia (citing the *Harvard Journal of Law & Technology*), *see* n. 2, *supra*, that Subsection (c)(1) affords third-party immunity under some circumstances, but by no means first-party immunity. Second, Subsection (c)(1) does not immunize folks from themselves.

### 1.   Subsection (c)(1) Of The CDA Affords Some Third-Party Immunity, Not First-Party

Subsection (c)(1) and the well-settled case interpretation of same in no way immunizes Facebook from its destructive acts here. Subsection (c)(1) immunity is afforded to Facebook where (as not here) it is being pursued by someone else for Fyk's publications or speeches (*i.e.*, content / "information provided") or by Fyk for someone else's publications or speeches (*i.e.*, content / "information provided").

The cases cited in the M2D are inapposite or misconstrued by Facebook. In *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250 (4th Cir. 2009), cited at page four of the M2D, Nemet Chevrolet, Ltd. was suing Consumeraffairs.com over consumer reviews that others had posted on the Consumeraffairs.com platform about Nemet Chevrolet, Ltd. Consistent with Fyk's interpretation of Subsection (c)(1), the district court in *Nemet Chevrolet, Ltd.* concluded (and the Fourth Circuit affirmed) that "the allegations contained in the Amended Complaint [d]o not sufficiently set forth a claim asserting that [Consumeraffairs.com] authored the content at issue." *Id.* at 253. In affirming, the Fourth Circuit held, in pertinent part, that Consumeraffairs.com was an "'information content provider' under § 230(f)(3) of the

---

content of same purportedly violated Facebook's "Community Standards" / "terms," which, if anything, implicates Subsection (c)(2)(A). There is no hint in Exhibit B that Facebook's crippling of Fyk's businesses / pages was based on Facebook being pursued by other third-parties based on the content of Fyk's businesses / pages. Facebook plainly cannot pull that off because, among other things, it re-established the (virtually) identical content of Fyk's businesses / pages for the new owner of same after Fyk's Facebook-induced fire sale of same to a competitor who Facebook apparently liked better at the time. *See, e.g.*, [D.E. 1] at ¶ 45. "At the time" because, since this suit, Facebook is now making things very difficult for the new owner.

[4] *See also, e.g., Spy Phone Labs, LLC v. Google, Inc.*, No. 15-cv-03756-KAW, 2016 WL 6025469, at *8 (N.D. Cal. Oct. 14, 2016) (a CDA immunity defense, at least as to Subsection (c)(2)(A), "cannot be determined at the pleading stage[,]" but may be raised "at a later stage, such as summary judgment").

3

CDA," and, most critically, that "interactive computer service providers [are not] legally responsible for information created and developed by *third parties*." *Id.* at 254 (emphasis added) (citing *Fair Hous. Council v. Roommates.com, LLC*, 521 F.3d 1157, 1162 (9th Cir. 2008) (en banc)).  Instructively, the Fourth Circuit also held that "Congress thus established a general rule that providers of interactive computer services are liable only for speech that is properly attributable to them." *Id.* at 254 (citing *Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 419 (1st Cir. 2007)).  *Nemet Chevrolet, Ltd.* further confirms reality – that Subsection (c)(1) immunity pertains to third-party liability.  **The case *sub judice* is a first-party case**.

Same with *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096 (9th Cir. 2009), cited at pages one, five, and seven of the M2D.  In *Barnes*, the plaintiff sued over defendant's alleged failure to remove indecent posts of (or pertaining to) her made by her ex-boyfriend on the Yahoo!, Inc. platform.  Barnes sought to remove Yahoo!, Inc. from Subsection (c)(1) immunity based on her arguments that Yahoo!, Inc. served as a "publisher" in relation to the subject indecent posts, which such removal is doable under certain circumstances (discussed below).  The *Barnes* court concluded, however, that the "publisher" of the indecent posts was the third-party ex-boyfriend, thereby finding that Subsection (c)(1)'s third-party liability immunity applied to Yahoo!, Inc.  Again, the case *sub judice* is a first-party case involving Facebook's wrongful destruction of Fyk's businesses / pages, not a third-party case against Facebook over some notion that someone else's post about Fyk on the Facebook platform was indecent and Facebook should have taken the third-party's post down.

This remains true for *Levitt v. Yelp! Inc.*, Nos. C-10-1321 EMC, C-10-2351 EMC, 2011 WL 5079526 (N.D. Cal. Oct. 26, 2011), *Jurin v. Google, Inc.*, 695 F. Supp. 2d 1117 (E.D. Cal. 2010), *Perfect 10, Inc. v. CCBill, LLC*, 481 F.3d 751 (9th Cir. 2007) / *Perfect 10, Inc. v. CCBill, LLC*, 488 F.3d 1102 (9th Cir. 2007), and *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119 (9th Cir. 2003).  This case is about the content of a first-party (Fyk) being wrongly destroyed by an "interactive computer service" (Facebook).

And there is more case law supportive of Fyk's position that Subsection (c)(1) is inapplicable here.  For example, in *Song Fi, Inc. v. Google, Inc.*, 108 F. Supp. 3d 876 (N.D. Cal. 2015), the Court determined that YouTube was <u>not</u> immune under the CDA.  In *Song Fi*, action was brought against operators of video-sharing website, alleging that the operators' decision to remove plaintiffs' music video from the publicly-accessible section of the website was inappropriate.  The *Song Fi* court found that the phrase "otherwise

objectionable" as used in Subsection (c)(2) did not extend so far as to make operators of video-sharing website immune from suit based on California-law … tortious interference with business relations claims by users in relation to operators' decision to remove users' music video from publicly accessible section of website.  The *Song Fi* court went on to find that the "obscene, lewd, lascivious, filthy, excessively violent [and] harassing" material suggested lack of congressional intent to immunize operators from removing materials from a website simply because materials posed a "problem" for operators.  Though Facebook viewed Fyk as some sort of "problem," that does not mean he violated the CDA.[5]

Then there is *e-ventures Worldwide, LLC v. Google, Inc.*, 214CV646FTMPAMCM, 2017 WL 2210029, at *1 (M.D. Fla. Feb. 8, 2017) as another example, where, accepting as true e-ventures' allegations that Google's investigation and removal of e-ventures' content was motivated not by a concern over web spam, but by Google's concern that e-ventures was cutting into Google's revenues, the Court found Subsection (c)(1) did not immunize Google's actions.  Then there is *Fair Housing Council,* 521 F.3d 1157 as another example, where Section 230 of the CDA was found inapplicable because Roomates.Com's own acts (posting surveys and requiring answers) were entirely Roomates.Com's doing.  Then there is *Atl. Recording Corp. v. Project Playlist, Inc.*, 603 F. Supp. 2d 690 (S.D.N.Y. 2009), as another example, where it was found that where the interactive computer service was not acting as the information content provider and suit was based on state law claims of unfair business practices, the situation falls under the immunity carve out set forth in Subsection 230(e) of the CDA.  *See* Ex. A.

As discussed in Section D and in the Complaint (and depicted in Exhibit B), the Subsection (c)(2) underpinning of *Song Fi* was the only pretext professed by Facebook when crippling Fyk's businesses /

---

[5] Facebook's goal is to eliminate businesses and competition by labeling them as "problems."  Ms. Lyons has publicly said so: "The second area is reducing the spread of problematic content, and if we can reduce the spread of those links we reduce the number of people who click through and we reduce the economic incentive that they have to create that content in the first place."  Reducing the economic advantage of folks like Fyk is what the First Claim for Relief is all about.  More on the point of Facebook's strategy to interfere with the economic advantage of the approximate 70,000,000 businesses on Facebook that Mr. Zuckerberg disingenuously says he wishes to promote (*see* n. 7, *infra*), Ms. Lyons has publicly stated as follows:  "So going after the instances of actors who repeatedly share this kind of content and reducing their distribution, removing their ability to monetize, removing their ability to advertise is part of our strategy."  And Mr. Zuckerberg hypocritically shares that sentiment, stating at his April 10, 2018, Congressional Testimony that "… advertisers and developers will never take priority … as long as I'm running Facebook." "Hypocritically" when compared to that set forth in footnote seven below.

CONFORMED RESPONSE IN OPPOSITION TO MOTION TO DISMISS, Case No.: 4:18-cv-05159-JSW

1   pages. Facebook's Subsection (c)(1) *carte blanche* blanket immunity about-face from Subsection (c)(2)(A)

2   contravenes the CDA's content "proliferation" intent, *see* n. 1, *supra*, and Subsection (c)(1)'s well-settled

3   application as a limited third-party immunity tool. Subsection (c)(1)'s limited **third-party** immunity is

4   inapplicable in this pure **first-party** case. The M2D must be denied as a matter of law.

5   **2.    Subsection (c)(1) Was Not Meant To Immunize A Party From Itself When The Party Was**
        **Acting, In Whole Or In Part, As The "Information Content Provider"**

6

7           The legislature certainly did not enact Subsection (c)(1) to immunize bad actors from themselves.

8   More specifically and for example, Facebook deleted some of Fyk's businesses / pages, which is different

9   from Facebook's unpublishings, bannings, ads account blocking, domain blocking, for examples. For

10  example, Facebook deleted (without explanation) the She Ratchet business / page, which was a business /

11  page that consisted of approximately 1,980,000 viewers / followers at the time of Facebook's foul play. *See*

12  [D.E. 1] at ¶¶ 20-24. Facebook's deletion cut Fyk off from the business / page but preserved his page content

13  on its own and for itself (as evidenced by Facebook's later publishing the same She Ratchet content for the

14  Los Angeles competitor to whom Fyk's Facebook-induced fire sale was made). Then the following occurred:

15  (1) The competitor to whom Fyk would eventually fire sell the She Ratchet business / page to (along with

16  other businesses / pages, as detailed in the Complaint, *see, e.g.,* [D.E. 1] at ¶¶ 22, 42-45) requested Facebook's

17  assurance of recovering the business / page following the fire sale; and (2) Facebook restored the value of

18  the deleted She Ratchet business / page by publishing (yes, publishing) same for the Fyk competitor around

19  the time the Facebook-induced fire sale of same went through, with the page content being (virtually)

20  identical to that which it was when under Fyk's ownership. *See, e.g.,* [D.E. 1] at ¶ 45.

21          At the time of SheRatchet deletion, Facebook illegally acquired "ownership" of Fyk's content (*i.e.,*

22  "information provided" by Fyk on the Facebook "interactive computer service" platform).[6] When Facebook

23  published She Ratchet for the Fyk competitor to whom the Facebook-induced fire sale was made, Facebook

24  became the independent "publisher" / "information content provider" of the same content it had stolen from

25  Fyk. Facebook's theft and re-publishing of the (virtually) identical content Fyk had published was motivated

26  by Facebook's desire to enrich Fyk's competition, thereby enriching Facebook as it enjoyed a far more

27  _____

28  [6] Facebook publicly recognizes Fyk as the "owner" of his content / "information provided." *See, e.g.,*
    https://www.facebook.com/communitystandards ("[y]ou own all of the content and information you post").

lucrative relationship with that competitor than with Fyk … that competitor has paid Facebook millions whereas Fyk paid Facebook approximately $43,000.00. *See, e.g.,* [D.E. 1] at ¶¶ 19, 46, 52.[7]

Moreover, in addition to indirectly interfering and competing with Fyk, **Facebook is a direct competitor that is not entitled to CDA immunity**.  In addition to serving as an "interactive computer service" for which CDA immunity may apply (though not in this context), Facebook also serves as an "information content provider" (defined in CDA Subsection (f)(3), *see* Ex. A) at least with respect to its Sponsored Story Advertising News Feed scheme, and accordingly enjoys no CDA immunity.  *See, e.g., Fraley,* 830 F. Supp. 2d at 802-803.  In this vein, Facebook directly interferes with the economic advantage of others who are doing nothing wrong (First Claim for Relief) in an unfairly and deceptively competitive manner (Second and Fourth Claims for Relief) **directly** for its own benefit.  Mr. Zuckerberg stated in his April 10, 2018, Congressional Testimony that "what we allow is for advertisers to tell us who they want to reach and *then we do the placement."* (emphasis added).  For context on Facebook's "placement," Fyk has blocked on his personal News Feed, for example, sites called NowThis and UNILAD, and yet Facebook keeps forcing those sites into Fyk's personal News Feed, further evidencing that the user has no control of the user's News Feed (contrary to Facebook's pronouncements about user control) and Facebook jams its sponsored unsolicited material (*i.e.*, "spam") into the user's News Feed anyway to make Facebook money (NowThis and UNILAD doubtless pay Facebook money).  Judge Koh recognized or acknowledged as much too: "Although Facebook's Statement of Rights and Responsibilities provides that members may alter their privacy settings to 'limit how your name and [Facebook] profile picture may be associated with commercial, sponsored, or related content (such as a brand you like) served or enhanced by us,' members are unable to opt out of the Sponsored Stories service altogether." *Id.* at 792.

---

[7] These actions are in stark contrast to what Facebook's professed mission (or "social contract") supposedly is: "Our mission is all about embracing diverse views.  We err on the side of allowing content, even when some find it objectionable, unless removing the content can prevent a specific harm.  Moreover, at times we allow content that might otherwise violate our standards if we *feel* it is newsworthy, significant, or important to the public interest." *See* Facebook's public domain "Community Standards," https://www.facebook.com/communitystandards (emphasis added); *see also* Mr. Mark Zuckerberg's April 10, 2018, Congressional Testimony ("I am very committed to making sure that Facebook is a platform for all ideas, that is a very important founding principle of what we do"); *id.* ("For most of our existence, we focused on … and for building communities and businesses").

The "placement," in one form, is Facebook's steering / displacing of businesses that do not pay Facebook as much money (like Fyk's businesses / pages) to competitors who pay Facebook millions (like the Fyk competitor out of Los Angeles who was the benefactor in the Facebook-induced fire sale of Fyk's businesses). The "placement," in another form, is Facebook's manipulation of the News Feed to bring its sponsored posts (*i.e.*, posts in which Facebook is the money-making partner) to the top and shove other News Feed posts down where users are less likely to see same despite the News Feed supposedly being something wherein the user is allowed to read what he / she chooses … in Facebook's words:

> It is helpful to think about [News Feed] for what it is, which is a ranking algorithm … and the problem that the News Feed ranking algorithm is solving is what order should I show your stories in News Feed. The News Feed ranking algorithm prioritizes them … now we do this whole process for every story in your inventory … inventory is the collection of stories from the people that you friend and the pages that you follow … You're a lot more likely to see a story that's in the first spot on your News Feed than the one that's in the 3000th spot.

Ms. Lyons' public speech, uploaded on April 13, 2018. In that same public speech, Ms. Lyons elaborates on Facebook's direct competition mindset: "If [a News Feed post] says sponsored that means that someone spent money in order to increase its distribution." One of the benefactors of a sponsored News Feed post is the introducer / supporter / partner of the post (in many cases, Facebook), as Judge Koh recognized. *See Fraley*, 830 F. Supp. 2d at 790 ("Facebook generates its revenue through the sale of advertising [*i.e.*, sponsored ads with Facebook as the paid sponsor / partner] targeted at its users").

Facebook's unilateral placement of its "spam" News Feed material (from which Facebook profits) to the top of a user's News Feed, *see, e.g.,* [D.E. 1] at ¶¶ 35-40, and burying the News Feed material users' want / solicit (like Fyk's material) in the "3000th spot" (as Facebook's Tessa Lyons admits in the commentary cited above) is the epitome of the Second Claim for Relief (Unfair Competition) and quite deceitful in the vein of the Fourth Claim for Relief (fraud / intentional misrepresentation), tying in directly to the destruction of economic advantage (the First Claim for Relief) of folks (like Fyk) who earn ad and web-trafficking monies through posts that users actually want to see … entitling Facebook to no immunity. *See, e.g., Fraley* and *Fair Hous. Council.*

Subsection (c)(1) immunity is only afforded to an "interactive computer service" under some situations, not to the "publisher" (*i.e.*, "information content provider"). But Facebook's conduct as to the She Ratchet business / page and Sponsored Stories advertisements News Feed scheme, for examples, took it

8

outside the shoes of an "interactive computer service" and inside the shoes of "information content provider," in whole or in part; thus, Facebook is not Subsection (c)(1) immune. *See, e.g.*, *Fair Hous. Council*, 521 F.3d at 1165 ("the party responsible for putting information online may be subject to liability, even if the information originated with a user," citing *Batzel v. Smith*, 333 F.3d 1018, 1033 (9th Cir. 2003)); *Fraley*, 830 F. Supp. 2d 785 (denying the CDA motion to dismiss, as Facebook's being both an "interactive computer service" and an "information content provider" went beyond a publisher's traditional editorial functions when it allegedly took members' information without their consent and used same to create new content published as endorsements of third-party products or services); *Perkins v. LinkedIn Corp.*, 53 F. Supp. 3d 1222, 1247 (N.D. Cal. 2014) (denying the CDA motion to dismiss wherein LinkedIn sought immunity as an interactive computer service, with the court endorsing, at least at the dismissal stage, plaintiffs' claim that LinkedIn provided no means by which a user could edit or otherwise select the language included in reminder emails and that true authorship of the reminder emails laid with LinkedIn); *Jurin*, 695 F. Supp. 2d at 1122 (holding, in part, that "[u]nder the CDA an interactive computer service qualifies for immunity so long as it does not also function as an 'information content provider' for the portion of the statement or publication at issue," citing *Carafano*, 339 F.3d at 1123). Facebook's attempt to distance itself from the "information content provider" role in have its cake and eat it too fashion translates to: "Accuse your enemy of what you are doing. As you are doing it to create confusion." ~ Karl Marx. The M2D must be denied as a matter of law.

**D.   FACEBOOK'S SUBSECTION (c)(1) LITIGATION ARGUMENTS MUST BE ESTOPPED AND/OR HAVE BEEN WAIVED**

Facebook is estopped from enjoying (or has waived) Subsection (c)(1) immunity. The United States Supreme Court counsels against allowing the kind of "bait and switch" that is Facebook's seismic shift from Subsection (c)(2)(A) to (c)(1), albeit within the phrase of art that is "Mend the Hold," which is legalese for estoppel and, to some extent, waiver.[8] *See, e.g.*, *Railway Co. v. McCarthy*, 96 U.S. 258, 6 Otto 258, 24 L.Ed. 693 (1877). *See also Harbor Ins. Co. v. Continental Bank Corp.*, 922 F.2d 357, 363 (a party's "hok[ing] up a phony defense … and then when that defense fails (at some expense to the other party) tr[ying] on another

---

[8] Glaringly applicable forms of estoppel include "estoppel," *see* Bryan A. Garner, *Black's Law Dictionary* 247 (2001 2d pocket ed.) (defining same), "equitable estoppel," *see id.* (defining same), "quasi-estoppel," *see id.* (defining same), and "estoppel by silence," *see id.* (defining same).

defense for size, can properly be said to be acting in bad faith"); *Tonopah & T.R. Co. v. Commissioner of Internal Revenue*, 112 F.2d 970, 972 (9th Cir. 1940); *Connally v. Medlie*, 58 F.2d 629 (2d Cir. 1932).

As Exhibit B illustrates, Facebook's professed "basis" to Fyk for destroying his businesses / pages was that the content of same purportedly violated Facebook's "Community Standards" or "terms," *see, e.g.,* [D.E. 1] at ¶ 23, which sounds in Subsection (c)(2)(A) (content-oriented). Fyk heavily relied, to his detriment in time and money, on Facebook's professed "basis" for its businesses / pages crippling,[9] which, again, such "basis" was content-oriented or intentionally nebulous so as to keep Fyk guessing as to why Facebook was destroying his livelihood. It would be improper to allow Facebook to cripple Fyk's businesses / pages on one ground (purported violation of "Community Standards" / "terms," implicating Subsection (c)(2)(A)) and try to avoid liability on different grounds (Subsection (c)(1)) when that ground is challenged (this suit).

Moreover, Facebook's inequitable recast from Subsection (c)(2)(A) to (c)(1) would still fail under ordinary statutory construction principles. If Facebook's interpretation of Subsection (c)(1) was correct (which it is not), Subsection (c)(1) and Subsection (c)(2)(A) would be the exact same thing under these circumstances (or perhaps altogether). The legislature would not put redundant law on the books; *i.e.,* our interpretation / application of Subsection (c)(1) (and related case law) is correct.

**E.   FACEBOOK'S M2D IS REPLETE WITH SKEWED STATEMENTS**

Here is a sampling of things said by Facebook in its M2D that are wrong:

---

[9] As to "reliance," we point to the sale of the subject businesses / pages to a competitor, this lawsuit, and/or a pre-suit letter writing campaign with defense counsel, as examples. As to "monetary detriment," Facebook's Motion scoffs at our classification of the approximate $1,000,000.00 being "relatively nominal." *See, e.g.,* [D.E. 20] at 1-2. The "relatively nominal" nature of the monies recovered by Fyk in relation to his Facebook-induced fire sale of the subject businesses / pages, however, is very serious and real. There was no letup in sight of Fyk's impressive growth curve, *see, e.g.,* [D.E. 1] at n. 2, but for Facebook's unlawful destruction of his businesses / pages. The competitor who reaped the benefits of the Facebook-induced fire sale of the subject businesses / pages was smaller than / less successful than Fyk at the time of Facebook's destruction of the subject businesses / pages. It is believed that that competitor grew to a worth of ~ $100,000,000.00. *See* [D.E. 1] at ¶¶ 5, 15. As another example, it is believed that another Fyk competitor (BuzzFeed) who Facebook did not mess with like it did with Fyk and who Fyk was once bigger than / more successful than is presently valued at ~ $1,700,000,000.00. *See* [D.E. 1] at ¶¶ 5, 15. The range of Fyk's value (and, thus, some of his damages in this case) but for Facebook's wrongful destruction of his businesses / pages was between $100,000,000.00 and $1,700,000,000.00 (maybe more). So, put in proper perspective (*see, e.g.,* [D.E. 1] at ¶¶ 5, 42), the approximate $1,000,000.00 relating to Fyk's Facebook-induced fire sale (when Facebook had rendered the subject businesses / pages valueless) was, in fact, "relatively nominal."

| Facebook's Representations | The Truth |
|---|---|
| Facebook falsely suggests that the Complaint takes issue with Facebook not treating "similar" content of others (like Fyk competitors) the way it treated Fyk. *See, e.g.,* [D.E. 20] at p. 1, ln. 27; p. 3, ln. 6; p. 6, ln. 10. | Actually, the Complaint speaks of Facebook not interfering with the content of others that was "identical" to Fyk's content; *i.e.,* wrongly discriminating against or singling out Fyk. *See, e.g.,* [D.E. 1] at p. 8, lns. 10-12; n. 8, p. 16, lns. 24-28 – n. 8, p. 17, lns. 21-23; p. 16, lns. 3-8. |
| Facebook implies Facebook is not a direct competitor, so as to try to capture this case in the CDA net it has cast in the entirely wrong direction. [D.E. 20] at p. 6, ln. 13 (calling itself, intentionally so, the "unidentified advertiser"); p. 6, ln. 23 (misrepresenting that Facebook did not create content). | Actually, Facebook has acted as a direct competitor (or "information content provider"), and the Complaint says plenty about that reality. *See, e.g.,* [D.E. 1] at 18, ln. 23 – p. 19, ln. 11; p. 9, ln. 13 – p. 13, ln. 1 (discussing Facebook's "claim jumping" scheme); p. 13, ln. 2 – p. 14, ln. 20 (discussing Facebook's Sponsored Story advertisement News Feed scheme); p. 15, ln. 1 – p. 17, ln. 6 (discussing Facebook's stealing and re-distributing of Fyk's businesses to a Los Angeles competitor who paid Facebook more money than Fyk); p. 20, lns. 10-19; p. 21, ln. 25 – p. 23, ln. 7 (punctuating Facebook's direct competition schemes). |
| Facebook misleads / downplays what it did to Fyk's content by calling itself a mere "moderator." [D.E. 20] at p. 4, ln. 7. | Actually, Facebook did not just "moderate" Fyk's content, it destroyed / devalued, stole, and/or re-distributed his content. *See, e.g.,* [D.E. 1] at p. 1, lns. 6-7; p. 1, lns. 23-26; p. 2, lns. 4-7, 15-16; p. 3, lns. 16-20; p. 5, ln. 21 – p. 6, ln. 2; p. 6, lns. 3-22; p. 7, lns. 11-16; p. 7, ln. 17 – p. 9, ln. 12; p. 10, ln. 24 – p. 11, ln. 7; p. 11, lns. 10-13 – p. 12, ln. 3; p. 13, lns. 2-6, 16-19; p. 14, lns. 1-3, 9-20 and n. 7; p. 15, ln. 8 – p. 17, ln. 12. |
| Facebook misrepresents that Facebook "delet[ed] content from [Fyk's] page," so as to downplay its destruction of Fyk. [D.E. 20] at p. 7, lns. 16-17. | Actually, Facebook did not just delete some Fyk content on his businesses / pages, it crushed all of Fyk's businesses / pages. *See, e.g.,* [D.E. 1] at p. 7, ln. 17 – p. 8, ln. 4; p. 15, ln. 8 – p. 17, ln. 6 |
| Facebook misrepresents that Fyk's Facebook-induced fire sale of the subject businesses / pages was "voluntar[y]." [D.E. 20] at p. 11, ln. 19. | Actually, the Complaint says what the M2D says a few sentences later, that Facebook left Fyk "with no reasonable alternative" other than to fire sell the subject businesses / pages that Facebook's wrongdoing had rendered valueless (for Fyk at least, but not for the Los Angeles competitor in Facebook's good graces at the time). *See, e.g.,* [D.E. 1] at p. 5, lns. 20-21; p. 9, lns. 7-12; p. 15, lns. 8-17; p. 16, lns. 8-14; p. 21, lns. 25-27; p. 26, lns. 1-4. |
| Facebook misrepresents part of the fraud / intentional misrepresentation that the Complaint takes issues with, trying to take the sting out of the Fourth Claim for Relief by contending that Facebook never represented to Fyk that his participation in the Facebook paid for reach program extended into | Actually, the fraud / intentional misrepresentation concerning the Facebook paid for reach program was, for examples, (1) the sham worthlessness (*i.e.,* fraud) of same, *see, e.g.,* [D.E. 1] at p. 18, lns. 12-17; p. 24, lns. 3-11; (2) the supposed optional nature of the not-so-optional paid for reach program, *see, e.g.,* [D.E. 1] at p. 5, lns. 2-9; p. 5, n. 3, (3) Facebook's never telling Fyk (*i.e.,* misrepresentation) that it could at any time completely shut him out of his ads account, thereby disallowing his participation in the paid for reach program, and/or (4) never providing Fyk with an explanation (*i.e.,* misrepresentation) as to why he was shut out of his ads account, *see,* |

| "perpetuity."  *See* [D.E. 20] at p. 13, lns. 6-10. | *e.g.,* [D.E. 1] at p. 5, ln. 19; p. 6, lns. 7, 27; p. 7, lns. 4-5; p. 15, lns. 5-7; p. 23, ln. 16. |

It would be unjust (at minimum) to afford any relief to an untruthful, misrepresentative, misleading, and/or incoherent movant.  The M2D must be denied as a matter of fact.

**F.     THE COMPLAINT'S AVERMENTS SUFFICIENTLY SUPPORT EACH CLAIM FOR RELIEF (FED. R. CIV. P. 12(b)(6))**

Preliminarily, it is important to note that the elements for each of the four claims for relief set forth in the Complaint are taken from the California Civil Jury Instructions and/or California Code.[10]  There are a wealth of supportive averments for each claim for relief in the Complaint, especially when viewed in a light most favorable to the complainant (which is the law).  And there is far more Facebook wrongdoing; but, even amidst a *Twombly* backdrop, we did our best to adhere to Federal Rule of Civil Procedure 8(a)(2) – "a short and plain statement of the claim showing that the pleader is entitled to relief."  *Id.*  Per this Court's recitation of *Twombly* in *Cunningham* and *Finkelstein, M.D.* (*see* Section A, *supra*), Fyk pleaded plenty "factual content t[o] allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Cunningham*, 2010 WL 11575083 at *2.

All of Facebook's <u>arguments</u> set forth in the M2D (at pages eight through fourteen) are the epitome of premature, unsubstantiated red-herrings.  Facebook can someday try to persuade the Court that the facts of this case are analogous to whatever facts were present in the 12(b)(6) case law cited in the M2D; but, on a legal sufficiency motion, that time is not now.  For now, *Twombly* is the measure, and the incredibly detailed Complaint has plainly stated causes of action upon which relief can someday be granted.  But, to be safe, we now address the cause of action elements the M2D glossily claims are missing.

**1.     Civil Extortion (Pages 8-10 Of The M2D)**

Facebook claims that Fyk fails to state a Civil Extortion claim "because he does not and cannot allege that Facebook wrongly threatened to withhold from him anything that he had a right to possess." [D.E. 20 at 8].  Onward in this vein, Facebook misrepresents that "the Complaint does not identify any contractual provision or any law giving him the right to maintain content on Facebook or to prevent Facebook from

---

[10] As to elements of the First Claim For Relief, *see, e.g.,* Cal. Civ. Jury Inst. 2202; Second Claim for Relief, *see, e.g.,* Cal. Code §§ 17200-17210; Third Claim for Relief, *see, e.g.,* Cal. Penal Code §§ 518-519 (also applies to civil extortion); Fourth Claim for Relief, *see, e.g.,* Cal. Civ. Jury Inst. §§ 1900-1902.

promoting the content of other Facebook users or advertisers." *Id.* at 9.  Wrong – Facebook publicly admits

Fyk's "ownership" of his content.  *See* n. 6 *supra*; *see also* Mr. Zuckerberg's April 10, 2018 Congressional

Testimony.[11]  Facebook's own words (footnote six above and Mr. Zuckerberg's Congressional Testimony)

would create a contract (at best) or work an estoppel (at worst), but, either way, Facebook cannot legitimately

disclaim its own words in order to throw this lawsuit out.

Then, Facebook tries to delegitimize Fyk's "fear" and its "threat" by misrepresenting to the Court

that the Complaint only contains a "vague allegation" about representations made to Fyk by a "high ranking

Facebook executive."  First, that is enough at the 12(b)(6) stage and the fact that we were respectful enough

not to include that individual's name in the Complaint by no means renders that individual's critical statement

to Fyk "vague."  Second, the Complaint is replete with detailed allegations of "fear" and "threat."  *See, e.g.*,

[D.E. 1] at ¶¶ 18-19, 25-35, 47, 67-71.[12]  This 12(b)(6) aspect of the M2D must be denied.

## 2.   Unfair Competition (Pages 10-12 Of The M2D)

Perhaps the most instructive case to look at (not cited in the M2D) is *Fraley*.  There, as discussed

above, the unfair competition was in the form of Facebook's Sponsored Story advertisement News Feed

scheme, and the *Fraley* court denied Facebook's attempt to dismiss the unfair competition aspect of that

complaint.  Here, the Complaint is replete with allegations as to that scheme and how that scheme crippled

Fyk's ad and web-trafficking money-making abilities with Facebook burying his posts underneath its own

sponsored posts contrary to and in disregard for users' preferences.  *See, e.g.*, [D.E. 1] at ¶¶ 35-40.  But, here,

there is more to Facebook's unfair competition than that which was present in *Fraley*.  Here, for example,

the Complaint thoroughly avers that Facebook steered Fyk's businesses / pages to a Los Angeles competitor

---

[11] Senator Hatch: "Now, Mr. Zuckerberg, I remember well your first visit to Capitol Hill, back in 2010.  You spoke to Senate Republican High-Tech Task Force, which I chair.  You said back then that Facebook would always be free.  Is that still your objective?"  Mr. Zuckerberg: "Senator, yes."

[12] ¶ 18 (discussing Facebook's unilateral implementation of a not-so-optional "paid for reach program," creating Fyk's "[f]ear (analogized in averments twenty-five through thirty-five, *infra*, to 'claim jumping') that if Fyk did not engage in Facebook's new 'optional' paid for reach program, he would be blacklisted in the form of having his businesses heavily curtailed or altogether eliminated…"); ¶ 19 (discussing that Fyk's very real fear induced him into relenting to Facebook's extortion; *i.e.*, investing $43,000.00 into the worthless paid for reach program); ¶¶ 25-35 (discussing the very real fear / threat of Facebook's jumping Fyk's claim; *i.e.*, hijacking his businesses / pages); ¶ 47 (discussing Fyk's fear of or the threat of Facebook's singling him out); *id.* at n. 3 (discussing how Facebook aimed to put folks on "hospice" who did not work with / pay Facebook – putting one on "hospice" equals fear); ¶¶ 67-71 (summary / punctuation).

13

who paid Facebook more money.  *See, e.g.*, [D.E. 1] at ¶¶ 6, 41-46.  Then Paragraphs 58-66 of the Complaint thoroughly sum up or punctuate Facebook's unfair competition.

Oddly, the M2D tries to conflate the Second Claim for Relief (unfair competition, cognizable under California Business & Professions Code Sections 17200-17210) with anti-trust.  The Complaint's Second Claim for Relief is not an anti-trust action.  The *Fraley* court points out what an unfair competition cause of action is (which is not an anti-trust action):

> [The] UCL … does not prohibit specific activities but instead broadly prescribes 'any unfair competition, which means any unlawful, unfair **or** fraudulent business practice or act.  The UCL is designed to ensure 'fair business competition' and governs both anti-competitive business practices and consumer injuries.  Its scope is 'sweeping,' and its standard for wrongful business conduct is 'intentionally broad' … .  Each of the three UCL prongs provides a 'separate and distinct theory of liability' and an independent basis for relief.

*Fraley*, 830 F. Supp. 2d at 810 (internal citations, which include Ninth Circuit cases, omitted and emphasis added).  Even the case cited by Facebook in its M2D (*Levitt II*) says that there can be an anti-trust undertone to a UCL claim, but that a UCL claim also (as here) deals with things that "otherwise significantly threaten[ ] or harm[ ] competition."  [D.E. 20] at 10.[13]  And then the M2D inappositely states that a UCL claim has to be tied to some sort of legislative policy.  Wrong – Facebook's own case (*Levitt II*) states, a UCL claim can also emanate from "actual or threatened impact on competition," which, again, is what the Second Claim for Relief of the Complaint is about.  There being plenty of supportive averments in the Complaint for the UCL claim, the UCL being intentionally broad, and Facebook's twisting its case law in the wrong direction, this 12(b)(6) aspect of the M2D must be denied.

### 3.  Fraud / Intentional Misrepresentation (Pages 12-13 Of The M2D)

The M2D sparsely tries to focus the Court in on a small percentage of Complaint averments to create the misimpression that the Complaint is not specific enough.  So, then, we show the Court how many averments support the Fourth Claim for Relief, though just about everything said about Facebook and what it has done to Fyk has a fraud / intentional misrepresentation undercurrent.[14]  *See, e.g.*, [D.E. 1] at ¶¶ 14, 17, 19, ¶¶ 20-24, 30, 35-40, 42-45, 72-78 n. 4-5.[15]  This 12(b)(6) aspect of the M2D must be denied.

---

[13] And it is not just us talking about Facebook's unfair direct competitive tactics.  *See* Exhibit C.

[14] And it is not just us talking about Facebook's fraudulent / misrepresentative ways.  *See* Exhibit D.

[15] ¶¶ 14, 17 (going to the purported "free" nature of Facebook, which such freeness was false); ¶ 19 (discussing Fyk's approximate $43,000.00 investment in a Facebook product, the paid for reach program,

1    **4.      Intentional Interference With Prospective Economic Advantage / Relations (Pages 13-14 Of The M2D)**

2

3          The M2D sparsely states that because the Complaint's other three claims for relief fail (which they

4    plainly do not), the "derivative" First Claim for Relief cannot stand.  The Complaint is very detailed as to

5    how Facebook has destroyed Fyk's economic advantage / relations (both actual and prospective).  Whether

     Facebook's destruction of Fyk's economic advantage / relations was underlain by Facebook's civil extortion,

6    unfair competition,[16] and/or fraud / intentional misrepresentation, the First Claim for Relief must stand.  The

7    M2D does not quarrel with the fact that Facebook destroyed Fyk's economic advantage / relations – reason

8    being, Facebook cannot genuinely do so … it undeniably destroyed Fyk's economic advantage / relations.[17]

9    Rather, the M2D simply says "well, we think the other three claims for relief fail, though we are not going

10   to provide detail as to how that is so, so the First Claim for Relief has gotta go."  Such does not rise to the

11   level of colorable argument, and it is pure argument nevertheless – no case (let alone one as serious as this)

12   should be thrown out based on naked lawyer argument.  This 12(b)(6) aspect of the M2D must be denied.

13          WHEREFORE, Plaintiff, Jason Fyk, respectfully requests entry of an order (1) denying the M2D

14   [D.E. 20] filed by Defendant, Facebook, Inc., on November 1, 2018,[18] and (2) awarding any other relief to

15   Fyk that the Court deems equitable, just, or proper.

16

17   ───────────────

     which was supposed to increase Fyk's reach and distribution, which proved false); ¶¶ 20-24 (discussing

18   Facebook's Subsection (c)(2)(a) "justification" for crippling Fyk's businesses / pages, which such
     "justification" was the epitome of fraud and/or intentional misrepresentation because there was nothing

19   Subsection (c)(2)(A) violative about Fyk's content); n. 4 (discussing Facebook's lies about the safe and
     welcoming nature of the disgusting content on other pages compared to Facebook's intentionally

20   misrepresentative disproportionate treatment of Fyk's content); ¶ 30 and n. 5 (discussing Mr. Zuckerberg's
     misrepresentations about what Facebook supposedly is, whereas it was nothing of the sort when it came to

21   Facebook's treatment of Fyk); ¶¶ 35-40 (discussing the purported misrepresentative "free" nature of
     Facebook, whereas the truth is that Facebook uses the platform to shift the hard-earned wealth of others into

22   its pocket through myriad illegal methods or "strategies" as Facebook would call it); ¶¶ 42-45 (discussing
     Facebook's lies to Fyk that his content was supposedly CDA violative – "lies" because Facebook re-

23   published the (virtually) identical content); ¶¶ 72-78 (summary / punctuation).
     [16] For more on the First and Second Claims for Relief squaring, *see* footnotes five and nine.

24   [17] Facebook's intentional interference with Fyk's prospective economic advantage continues to this day –

25   Facebook has stolen / converted / embezzled two successful Instagram accounts (Instagram Account Nos.

26   522601519 and 2817831134, and Facebook owns Instagram) in which Fyk is a partner and re-distributed
     them to a person named Sommer Ray Beaty (who is making millions because of Facebook's re-distribution),

27   then telling Fyk that action would not be taken "without a valid court order."
     [18] To the extent the Court somehow finds that there are insufficient facts to support his claims for relief, Fyk

28   respectfully requests leave to amend his Complaint pursuant to Federal Rule of Civil Procedure 15.

                                                      15

Dated:  December 14, 2018

Respectfully submitted,

**CALLAGY LAW, P.C.**

/s/ Jeffrey L. Greyber
**Jeffrey L. Greyber, Esq.**
*Pro Hac Vice* Admitted
jgreyber@callagylaw.com
**Sean R. Callagy, Esq.**
*Pro Hac Vice* Admitted
scallagy@callagylaw.com
**Michael J. Smikun, Esq.**
*Pro Hac Vice* Admitted
msmikun@callagylaw.com
*Attorneys for Plaintiff*

*and*

**PUTTERMAN LANDRY + YU, LLP**
**Constance J. Yu, Esq.**
SBN 182704
cyu@plylaw.com

1

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 14, 2018, I electronically filed the foregoing documents with the Clerk of the Court by using CM / ECF.  I also certify that the foregoing document is being served this day on all counsel of record via Notices of Electronic Filing generated by CM / ECF, and via emails to defense counsel of record.

/s/ Jeffrey L. Greyber
**Jeffrey L. Greyber, Esq.**

# EXHIBIT A

Support Us!



U.S. Code › Title 47 › Chapter 5 › Subchapter II › Part I › § 230

# 47 U.S. Code § 230 - Protection for private blocking and screening of offensive material

**(a) FINDINGS** The Congress finds the following:

**(1)** The rapidly developing array of Internet and other interactive computer services available to individual Americans represent an extraordinary advance in the availability of educational and informational resources to our citizens.

**(2)** These services offer users a great degree of control over the information that they receive, as well as the potential for even greater control in the future as technology develops.

**(3)** The Internet and other interactive computer services offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity.

**(4)** The Internet and other interactive computer services have flourished, to the benefit of all Americans, with a minimum of government regulation.

**(5)** Increasingly Americans are relying on interactive media for a variety of political, educational, cultural, and entertainment services.

**(b) POLICY** It is the policy of the United States—

**(1)** to promote the continued development of the Internet and other interactive computer services and other interactive media;

**(2)** to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation;

**(3)** to encourage the development of technologies which maximize user control over what information is received by individuals, families, and schools who use the Internet and other interactive computer services;

**(4)** to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material; and

**(5)** to ensure vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer.

**(c) PROTECTION FOR "GOOD SAMARITAN" BLOCKING AND SCREENING OF OFFENSIVE MATERIAL**

**(1) TREATMENT OF PUBLISHER OR SPEAKER**
No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

Support Us!

**(2) CIVIL LIABILITY** No provider or user of an interactive computer service shall be held liable on account of—

**(A)** any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or

**(B)** any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1).[1]

**(d) OBLIGATIONS OF INTERACTIVE COMPUTER SERVICE**

A provider of interactive computer service shall, at the time of entering an agreement with a customer for the provision of interactive computer service and in a manner deemed appropriate by the provider, notify such customer that parental control protections (such as computer hardware, software, or filtering services) are commercially available that may assist the customer in limiting access to material that is harmful to minors. Such notice shall identify, or provide the customer with access to information identifying, current providers of such protections.

**(e) EFFECT ON OTHER LAWS**

**(1) NO EFFECT ON CRIMINAL LAW**

Nothing in this section shall be construed to impair the enforcement of section 223 or 231 of this title, chapter 71 (relating to obscenity) or 110 (relating to sexual exploitation of children) of title 18, or any other Federal criminal statute.

**(2) NO EFFECT ON INTELLECTUAL PROPERTY LAW**

Nothing in this section shall be construed to limit or expand any law pertaining to intellectual property.

**(3) STATE LAW**

Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section. No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.

**(4) NO EFFECT ON COMMUNICATIONS PRIVACY LAW**

Nothing in this section shall be construed to limit the application of the Electronic Communications Privacy Act of 1986 or any of the amendments made by such Act, or any similar State law.

**(f) DEFINITIONS** As used in this section:

**(1) INTERNET**

The term "Internet" means the international computer network of both Federal and non-Federal interoperable packet switched data networks.

**(2) INTERACTIVE COMPUTER SERVICE**

Case 4:18-cv-05159-HSG   Document 27   Filed 12/14/18   Page 26 of 49

12/4/2018          47 U.S. Code § 230 - Protection for private blocking and screening of offensive material | US Law | LII / Legal Information Institute

The term "interactive computer service" means any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions.

**(3) INFORMATION CONTENT PROVIDER**
The term "information content provider" means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service.

**(4) ACCESS SOFTWARE PROVIDER** The term "access software provider" means a provider of software (including client or server software), or enabling tools that do any one or more of the following:

(A) filter, screen, allow, or disallow content;

(B) pick, choose, analyze, or digest content; or

(C) transmit, receive, display, forward, cache, search, subset, organize, reorganize, or translate content.

(June 19, 1934, ch. 652, title II, § 230, as added Pub. L. 104–104, title V, § 509, Feb. 8, 1996, 110 Stat. 137; amended Pub. L. 105–277, div. C, title XIV, § 1404(a), Oct. 21, 1998, 112 Stat. 2681–739.)

[1] So in original. Probably should be "subparagraph (A)."

*LII has no control over and does not endorse any external Internet site that contains links to or references LII.*

About LII

Contact us

Advertise here

Help

Terms of use

Privacy

# EXHIBIT B(1)

Page   Activity   Insights   Settings

www.facebook.com/clevelandbrownfans

Build Audien...

**Your page has been unpublished**

Your Page is currently not visible on Facebook. It looks like content posted on your Page doesn't follow the Facebook Terms, so it was unpublished.

We never posted anything like this!

We remove any promotion or encouragement of self-mutilation, eating disorders or substance abuse.

We keep these Terms in place to help ensure that Facebook remains a welcoming, respectful environment. If you think your Page was unpublished in error, you can appeal. Please keep in mind that if your appeal is denied, your Page will be deleted permanently.

You appealed this decision Wednesday, August 27, 2014 at 12:07pm





Cleveland Brown
Fictional Character
Community Page about The Cleveland Show

Create Call-to-Action   Liked   Message   ...

Timeline   About   Photos   Likes   More

Status   Photo / Video   Event, Milestone

What have you been up to?

PEOPLE

2,237,322 likes

# EXHIBIT B(2)



# EXHIBIT B(3)



# EXHIBIT B(4)



# EXHIBIT B(5)



# EXHIBIT B(6)



# EXHIBIT C

# The New York Times

THE SHIFT

# *Facebook Emails Show Its Real Mission: Making Money and Crushing Competition*

By Kevin Roose

Dec. 5, 2018

British lawmakers on Wednesday gave a gift to every Facebook critic who has argued that the company, while branding itself as a do-gooder enterprise, has actually been acting much like any other profit-seeking behemoth.

That gift was 250 pages' worth of internal emails, in which Facebook's executives are shown discussing ways to undermine their competitors, obscure their collection of user data and — above all — ensure that their products kept growing.

The emails, which span 2012 to 2015, were originally sealed as evidence in a lawsuit brought against Facebook by Six4Three, an app developer. They were part of a cache of documents seized by a British parliamentary committee as part of a larger investigation into Facebook's practices and released to the public on Wednesday.

It should not come as a surprise that Facebook — a giant, for-profit company whose early employees reportedly ended staff meetings by chanting "domination!" — would act in its own interests.

But the internal emails, a rare glimpse into Facebook's inner workings, show that the image the company promoted for years — as an idealistic enterprise more dedicated to "bringing the world closer together" than increasing its own bottom line — was a carefully cultivated smoke screen.

*[Documents released in Britain show how Facebook used account data to favor some partners and punish rivals.]*

These emails reveal that in the formative years of Facebook's growth, the company's executives were ruthless and unsparing in their ambition to collect more data from users, extract concessions from developers and stamp out possible competitors.

"It shows the degree to which the company knowingly and intentionally prioritized growth at all costs," said Ashkan Soltani, a privacy researcher and former chief technologist of the Federal Trade Commission.

In a blog post on Wednesday, Facebook said the documents included in the lawsuit were a cherry-picked sample that "tells only one side of the story and omits important context."

Here are four revelations from the emails that detail Facebook's aggressive quest for growth:

**1. The company engineered ways to collect Android users' data without alerting them.**

In February 2015, Facebook had a privacy dilemma.

The company's growth team — a powerful force within Facebook — wanted to release an update to the Android app that would continually collect users' entire SMS and call log history. That data would be uploaded to Facebook's servers, and would help Facebook make better recommendations, such as suggesting new friends to Android users based on the people they'd recently called or texted. (This feature, called "People You May Know," has been the subject of much controversy.)

But there was a problem: Android's privacy policies meant that Facebook would need to ask users to opt in to having this data collected. Facebook's executives worried that asking users for this data could bring a public backlash.

"This is a pretty high risk thing to do from a PR perspective but it appears that the growth team will charge ahead and do it," one executive, Michael LeBeau, wrote.

He outlined the nightmare scenario: "Screenshot of the scary Android permissions screen becomes a meme (as it has in the past), propagates around the web, it gets press attention, and enterprising journalists dig into what exactly the new update is requesting, then write stories about 'Facebook uses new Android update to pry into your private life in ever more terrifying ways.'"

Ultimately, Facebook found a workaround. Yul Kwon, the head of Facebook's privacy program, wrote in an email that the growth team had found that if Facebook's upgraded app asked only to read Android users' call logs, and not request other types of data from them, users would not be shown a permission pop-up.

"Based on their initial testing, it seems that this would allow us to upgrade users without subjecting them to an Android permissions dialog at all," Mr. Kwon wrote.

In a blog post on Wednesday, Facebook said that it collects call and text message logs only from Android users who opt in, and that as of 2018, it keeps this information only temporarily, since "the information is not as useful after about a year."

**2. Mark Zuckerberg personally approved cutting off a competitor's data access.**

In January 2013, one of Mr. Zuckerberg's lieutenants emailed him with news about Twitter, one of Facebook's biggest competitors. The company had introduced a video-sharing service called Vine, which allowed users to create and post six-second video clips.

When new users signed up for Vine, they were given the option of following their Facebook friends — a feature enabled through Facebook's application program interface, or API. This feature was widely used, and had become a valuable tool for new apps to accelerate user growth. But in Vine's case, Facebook played hardball.

"Unless anyone raises objections, we will shut down their friends API access today," wrote the lieutenant, Justin Osofsky, now a Facebook vice president.

Mr. Zuckerberg, the chief executive, replied: "Yup, go for it."

On Wednesday, Rus Yusupov, one of Vine's co-founders, said on Twitter, "I remember that day like it was yesterday."

Facebook's decision to shut off Vine's API access proved fateful. Months later, Instagram released its own short-form video feature, which many saw as a further attempt by Facebook to hobble Vine's growth. Vine shut down in 2016, after stagnant growth and heavy competition led many of its stars and users to go elsewhere.

On Tuesday, Facebook changed its developer policies, ending the prohibition on apps that competed with the company's own features.

**3. Facebook used a privacy app to collect usage data about its competitors.**

In 2013, Facebook acquired Onavo, an Israeli analytics company, announcing that Onavo's tools "will help us provide better, more efficient mobile products."

One of those tools, an app called Onavo Protect, was especially helpful in helping Facebook sniff out potential competitors. The app, which was billed to users as a way to keep their internet browsing private, also collected data about which apps those people used the most — including apps not owned by Facebook — and fed that information back to Facebook.

According to the emails released on Wednesday, Facebook executives received reports about the performance of rival apps, using data obtained through Onavo.

Sometimes, those reports revealed up-and-coming competitors. One report included in the email cache, dated April 2013, said that WhatsApp, the mobile messaging app, was gaining steam. According to Onavo's proprietary data, WhatsApp was being used to send 8.2 billion messages a day, whereas Facebook's own mobile app was sending just 3.5 billion messages daily.

Ten months later, Facebook announced that it was acquiring WhatsApp in a deal valued at $14 billion.

In August, Facebook pulled Onavo Protect from the App Store, after Apple reportedly said that it violated the company's privacy rules.

**4. Facebook executives wanted more social sharing, as long as it happened on Facebook.**

In November 2012, Mr. Zuckerberg sent a lengthy note to several top executives called "Platform Model Thoughts." It outlined how intensely he wanted Facebook to be the center of everyone's social life online.

The email addressed a debate that was raging inside Facebook at the time, about whether outside app developers should have to pay to connect their apps to Facebook's developer platform. Mr. Zuckerberg said that he was leaning away from a charge-for-access model, and toward what he called "full reciprocity" — giving third-party developers the ability to connect their apps to Facebook free, in exchange for those apps' giving data back to Facebook, and making it easy for users to post their activity from those services on their Facebook timelines.

By giving away access, Mr. Zuckerberg said, Facebook could entice more developers to build on its platform. And by requiring app developers to send data back to Facebook, it could use those apps to increase the value of its own network. He wrote that social apps "may be good for the world but it's not good for us unless people also share back to Facebook."

Facebook later put in place a version of this "reciprocity rule" that required developers to make it possible for users of their apps to post their activity to Facebook, but did not require them to send usage data back to Facebook. (Not coincidentally, this "reciprocity rule" explains why for several years, it was virtually impossible to go on Facebook without seeing dozens of updates about what your friends were watching on Hulu or listening to on Spotify.)

In a Facebook post on Wednesday, after the emails were made public, Mr. Zuckerberg wrote that the company had tightened its developer policies in 2014 in order to protect users from "sketchy apps" that might misuse their data.

But back in 2012, the company's worry was not about data misuse. Instead, the company was chiefly concerned with how to use those developers' apps to spur its own growth.

Sheryl Sandberg, Facebook's chief operating officer, wrote back to concur with Mr. Zuckerberg's approach to data reciprocity.

"I think the observation that we are trying to maximize sharing on Facebook, not just sharing in the world, is a critical one," she wrote.

A version of this article appears in print on Dec. 6, 2018, on Page B1 of the New York edition with the headline: Facebook Emails Show Its Real Mission: Making Money and Crushing Competition

READ 189 COMMENTS

# Facebook internal emails show Zuckerberg targeting competitor Vine

By <u>Donie O'Sullivan</u> and <u>Hadas Gold</u>, <u>CNN Business</u>

**Updated 5:16 PM ET, Wed December 5, 2018**

**New York and London (CNN Business)** — Mark Zuckerberg and his colleagues were apparently concerned enough about Vine, a video app from Twitter, that on the day it launched in January 2013, they moved to restrict its access to Facebook user data, a trove of internal Facebook emails released by the U.K. Parliament on Wednesday shows.

The decision to restrict Vine's access to data, which would have allowed its users to invite their Facebook friends to join the app, was in line with a company policy at the time, Facebook told CNN on Wednesday. That policy restricted apps' access to Facebook data when the company deemed that the apps "replicated" Facebook's "core functionality." In other word, apps that Facebook thought might compete with them.

"Twitter launched Vine today which lets you shoot multiple short video segments to make one single, 6-second video," Facebook vice-president Justin Osofsky wrote to Zuckerberg and others the day Vine launched, according to the emails released by the UK Parliament.

"Unless anyone raises objections, we will shut down their friends API access today. We've prepared reactive PR," Osofsky added.

"Yup, go for it," Zuckerberg responded.

Facebook said Wednesday that Zuckerberg and his colleagues were only following Facebook's policy protecting against competitors. But the company changed the policy on Tuesday, one day before the emails were released.

"As part of our ongoing review we have decided that we will remove this out of date policy so that our platform remains as open as possible. We think this is the right thing to do as platforms and technology develop and grow," a Facebook spokesperson said Wednesday.

"We built our developer platform years ago to pave the way for innovation in social apps and services. At that time we made the decision to restrict apps built on top of our platform that replicated our core functionality," the spokesperson said, adding, "These kind of restrictions are common across the tech industry with different platforms having their own variant including YouTube, Twitter, Snap and Apple."

Vine, which allowed users to shoot and posts six second looped videos, <u>shut down in 2017.</u> Twitter did not immediately respond to a request for comment.

Apparently responding to Wednesday's revelations, Vine co-founder <u>Rus Yusupov tweeted</u>, "Competition sucks, right? No. It allows for products to improve, become available to more people, at lower costs. Strive to build new things that people want and influence other creators for the cycle to continue."

# Zuckerberg talks

The documents include conversations among senior Facebook executives.

The cache stems from a lawsuit brought against Facebook by a small app company called Six4Three. In a blog post Wednesday, Facebook said "The documents were selectively leaked to publish some, but not all, of the internal discussions at Facebook."

Zuckerberg himself posted on Facebook as well, writing, "I understand there is a lot of scrutiny on how we run our systems. That's healthy given the vast number of people who use our services around the world, and it is right that we are constantly asked to explain what we do. But it's also important that the coverage of what we do -- including the explanation of these internal documents -- doesn't misrepresent our actions or motives. This was an important change to protect our community, and it achieved its goal."

## The documents

A California judge had placed the documents under seal. But when Six4Three's CEO, Ted Kramer, was in London last month, he was escorted to Parliament and told to produce the documents or be held in contempt.

Six4Three — which had an app that allowed users to search for pictures of their friends in swimsuits — has accused the social media giant of having little regard for user privacy and claimed that Zuckerberg devised a plan that forced some of Facebook's rivals, or potential rivals, out of business. Facebook says the lawsuit is without merit.

The UK parliamentary committee, led by Damian Collins, asked for the documents as part of a larger investigation into Facebook, fake news, disinformation and data privacy that has been going on for more than a year. The committee has repeatedly asked Zuckerberg to give evidence, but thus far he's avoided the committee, even when it brought together lawmakers from nine different countries for an unprecedented "International Grand Committee on Disinformation."

"I believe there is considerable public interest in releasing these documents. They raise important questions about how Facebook treats users data, their policies for working with app developers, and how they exercise their dominant position in the social media market," Collins said on Twitter. "We don't feel we have had straight answers from Facebook on these important issues, which is why we are releasing the documents."

A Facebook spokesperson said in a statement after the release of the documents, "As we've said many times, the documents Six4Three gathered for their baseless case are only part of the story and are presented in a way that is very misleading without additional context. We stand by the platform changes we made in 2015 to stop a person from sharing their friends' data with developers. Like any business, we had many of internal conversations about the various ways we could build a sustainable business model for our platform. But the facts are clear: we've never sold people's data."

*Correction: An earlier version of this story incorrectly reported the day on which the emails had been released.*

# EXHIBIT D

# Facebook emails suggest company explored selling people's data despite pledges not to

<u>Jessica Guynn</u>, USA TODAY    Published 11:59 a.m. ET Dec. 5, 2018 | Updated 4:36 p.m. ET Dec. 5, 2018



*(Photo: Jonathan Nackstrand, AFP/Getty Images)*

SAN FRANCISCO – Internal Facebook emails published online by U.K. lawmakers, some involving CEO Mark Zuckerberg, paint a picture of a company aggressively hunting for ways to make money from the reams of personal information it was collecting from users.

Wednesday's release of some 250 pages (https://www.parliament.uk/documents/commons-committees/culture-media-and-sport/Note-by-Chair-and-selected-documents-ordered-from-Six4Three.pdf) of emails from 2012 to 2015 – a period of dramatic growth for the newly publicly traded company – provides a rare glimpse into Facebook's internal conversations, suggesting the social media giant gave preferential access to some third-party app developers such as Airbnb, Lyft and Netflix, while restricting access for others. It also considered charging app developers for access to data, despite pledges that it would never do so.

There is no indication that Facebook went forward with a proposal to charge app developers for access to the personal information of Facebook users. On Wednesday, Zuckerberg denied Facebook ever sold or considered selling the data of its more than 2 billion users.

ADVERTISEMENT

"Like any organization, we had a lot of internal discussion and people raised different ideas. Ultimately, we decided on a model where we continued to provide the developer platform for free and developers could choose to buy ads if they wanted," he wrote in a Facebook post (https://www.facebook.com/zuck/posts/10105559172610321) responding to the release of the internal emails by U.K. lawmakers. "Other ideas we considered but decided against included charging developers for usage of our platform, similar to how developers pay to use Amazon AWS or Google Cloud. To be clear, that's different from selling people's data. We've never sold anyone's data."

According to some of the emails, Facebook discussed cutting off access to rival companies and giving app developers who bought advertising special access to data. It also provided access to app developers that encouraged Facebook users to spend more time on the social network.

The revelations that shed light on previously unknown Facebook practices were included in internal documents seized by U.K. lawmakers from the developer of a now-defunct bikini photo searching app, Pikinis, as part of an investigation into fake news. The emails were sealed in a California lawsuit filed by Six4Three. Six4Three sued Facebook in 2015, alleging the social network's data policies favored some companies over others.

"I've been thinking about platform business model a lot this weekend....if we make it so (developers) can generate revenue for us in different ways, then it makes it more acceptable for us to charge them quite a bit more for using platform," Zuckerberg wrote in one email.

In another email in 2012, Zuckerberg seemed to shrug off concerns about the security of Facebook users' data. "I think we leak info to developers, but I just can't think of any instances where that data has leaked from developer to developer and caused real issue for us," he wrote.

**More:** Facebook's Sheryl Sandberg pledges to release update on civil rights audit (/story/news/2018/11/29/facebooks-sheryl-sandberg-pledges-release-civil-rights-audit/2157665002/)

**More:** Facebook uncovers Iran disinformation to sow political discord over Trump, race (/story/news/2018/10/26/facebook-uncovers-iran-disinformation-sow-discord-over-trump-race/1774224002/)

**More:** Nearly 30 million Facebook users' data stolen. How to find out if you're one of them (/story/tech/2018/10/12/facebook-hack-update-30-million-users-personal-information-stolen/1614394002/)

Facebook called the Six4Three lawsuit "baseless" and says the company "cherrypicked" documents.

"The set of documents, by design, tells only one side of the story and omits important context," the company said in a statement (https://newsroom.fb.com/news/2018/12/response-to-six4three-documents/).

Public trust in Facebook's handling of people's personal information has been shaken by a series of crises. Chief among them is Cambridge Analytica, a political consulting firm hired by Donald Trump's presidential campaign that has been accused of improperly accessing millions of Facebook accounts without users' consent.

A British researcher and his firm, Global Science Research, legitimately gained access to the personal data of Facebook users and their friends in 2013 while working on a personality app, and passed that data to Cambridge Analytica. Facebook began restricting app developers' access user data in 2014 and 2015.

"We still stand by the platform changes we made in 2014/2015, which prevented people from sharing their friends' information with developers like the creators of Pikinis," Facebook said in a statement. "The extensions we granted at that time were short term and only used to prevent people from losing access to specific functions as developers updated their apps. Pikinis didn't receive an extension, and they went to court."

Damian Collins, chairman of the digital, culture, media and sport parliamentary committee investigating Facebook, said lawmakers released the documents because "we don't feel we have had straight answers from Facebook on these important issues."

Last week, Collins announced he planned to release the emails after forcing Ted Kramer, the founder of Six4Three, to hand them over during a business trip to London. On Friday, California Superior Court Judge V. Raymond Swope ordered Kramer to turn over his laptop to a forensic expert after Kramer admitted he had turned over the Facebook documents to lawmakers.

"I believe there is considerable public interest in releasing these documents. They raise important questions about how Facebook treats users data, their policies for working with app developers, and how they exercise their dominant position in the social media market," he wrote in a Twitter post.

  **Damian Collins** @DamianCollins · Dec 5, 2018
I believe there is considerable public interest in releasing these documents. They raise important questions about how Facebook treats users data, their policies for working with app developers, and how they exercise their dominant position in the social media market.

  **Damian Collins**
@DamianCollins

We don't feel we have had straight answers from Facebook on these important issues, which is why we are releasing the documents.

352   9:31 AM - Dec 5, 2018

160 people are talking about this

Among the details in the Facebook emails:

–Facebook staffers explored how to use access to Facebook users' data to get companies to spend more on advertising. In 2012, Facebook staffers debated removing restrictions on user data for developers who spent $250,000 or more on ads.

Facebook's response (https://newsroom.fb.com/news/2018/12/response-to-six4three-documents/): "We explored multiple ways to build a sustainable business with developers who were building apps that were useful to people. ... We ultimately settled on a model where developers did not need to purchase advertising."

–When competitor Twitter launched Vine in 2013, Facebook shut down access to keep the mobile video app from growing through friends on the platform and competing with Instagram, which it owns. "Unless anyone raises objections, we will shut down their friends API access today. We've prepared reactive PR," Facebook executive Justin Osofsky wrote to Zuckerberg. "Yup, go for it," Zuckerberg replied.

Facebook's response: "We built our developer platform years ago to pave the way for innovation in social apps and services. At that time we made the decision to restrict apps built on top of our platform that replicated our core functionality. These kind of restrictions are common across the tech industry."

–In 2015, the company began uploading call and text logs from Android phones. Collins' committee says Facebook tried to make it "as hard as possible" for users to understand that their calls and texts would be collected. At the time, a Facebook engineer said the practice was a "high-risk thing to do from a PR perspective." The data offered a comprehensive look into how users communicated on their mobile devices.

Facebook's response: The company says it allowed Facebook users to opt into giving the social network access to their call and text logs, but did it in the Facebook app, not on Android. "This was not a discussion about avoiding asking people for permission," it said.

–Facebook used its security app, Onavo, to gather information on how many people used certain apps and how often they used them to help Facebook decide which companies it should acquire, including messaging app WhatsApp for $19 billion, and which to view as a competitive threat.

Facebook's response: "We've always been clear when people download Onavo about the information that is collected and how it is used, including by Facebook. ... People can opt-out via the control in their settings and their data won't be used for anything other than to provide, improve and develop Onavo products and services."

Read or Share this story: https://www.usatoday.com/story/news/2018/12/05/facebook-emails-suggest-considered-selling-users-personal-data/2214513002/

