JEFFREY L. GREYBER (*Pro Hac Vice Admitted*)
Email:        jgreyber@pmzlaw.com
POLI, MOON & ZANE, PLLC
7016 Charleston Shores Blvd, #8
Lake Worth, FL  33467
Telephone:    (602) 857-8180
Facsimile:    (561) 834-2504

CONSTANCE J. YU (SBN 182704)
E-mail:       cyu@plylaw.com
PUTTERMAN | YU | WANG LLP
345 California Street, Suite 1160
San Francisco, CA 94104-2626
Telephone:    (415) 839-8779
Facsimile:    (415) 737-1363

*Attorneys for Plaintiff Jason Fyk*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JASON FYK, | Case No. 4:18-cv-05159-JSW |
| *Plaintiff*, | **SECOND MOTION FOR RELIEF PURSUANT TO FED.R.CIV.P. 60(b) TO VACATE AND SET ASIDE ENTRY OF JUDGMENT** |
| v. | |
| FACEBOOK, INC., | **BEFORE:  HON. JEFFREY S. WHITE** |
| *Defendant*. | **LOCATION:  OAKLAND, CT. 5, FL. 2** |

Plaintiff, Jason Fyk ("Fyk"), moves this Court to reconsider and reverse its June 2019 dismissal of the Verified Complaint [D.E. 1] following Fyk's appeal to the Ninth Circuit (twice) and Supreme Court of the United States ("SCOTUS") (twice).

## I.   PRELIMINARY STATEMENT

Fyk returns to this Court on his second motion for reconsideration shortly after SCOTUS denied his petition for writ of certiorari in mid-April 2023 and immediately after SCOTUS rendered its decision declining to address CDA §230[1] in the *Gonzalez v. Google, LLC*, S.Ct. No. 21-1333.

## II.   RELEVANT PROCEDURAL HISTORY AND FACTUAL BACKGROUND

On June 18, 2019, this Court dismissed on written motion, *see* [D.E. 38], the August 22, 2018, Verified Complaint sans hearing and entered judgment of equal date. *See* [D.E. 39]. One day later, Fyk commenced an appeal with the Ninth Circuit. On June 12, 2020, the Ninth Circuit affirmed dismissal. *See* [D.E. 42]. Fyk promptly moved for rehearing *en banc*, which was denied on July 21, 2020. On November 2, 2020, Fyk petitioned SCOTUS for a writ of certiorari, divesting the California courts of jurisdiction during the pendency of the SCOTUS petition. On January 11, 2021, SCOTUS denied writ. On March 22, 2021, Fyk timely filed his first 60(b) motion with this Court. *See* [D.E. 46].

On November 1, 2021, this Court denied Fyk's reconsideration motion. *See* [D.E. 51]. Fyk accordingly timely filed another appeal with the Ninth Circuit, with an opening brief filing date of March 3, 2022. By October 19, 2022 memorandum [D.E. 54], the Ninth Circuit stated that Fyk's 60(b) motion filed with this Court was tardy. On November 2, 2022, Fyk timely moved the Ninth Circuit for reconsideration/rehearing, *see* [D.E. 37], and the Ninth Circuit denied same, culminating with a November 17, 2022, mandate. *See* [D.E. 40]. On February 7, 2023, therefore, Fyk petitioned SCOTUS (again) for a writ of certiorari. On April 17, 2023, SCOTUS denied Fyk's petition again, sans explanation. This second motion for reconsideration follows, and factual background is now discussed.

Fyk is "the publisher" of Where's The Fun ("WTF") Magazine. Fyk used Facebook's purportedly "free" "platform for all ideas" (Mark Zuckerberg) to publish humorous content. Fyk's business pages, at one time, had more than 25,000,000 documented followers. Fyk's large online presence resulted in his

---

[1] *Gonzalez* oral argument was on February 21, 2023, but SCOTUS' recent *Gonalez* decision did not address §230 immunity.

pages becoming income generating advertising and marketing business tools, generating hundreds of thousands of dollars a month (*i.e.*, Fyk's real intellectual or physical property).

Facebook began selling the same reach and distribution "Newsfeed" space to Fyk's straight-line advertising competitors, space previously offered for free. In so doing, Facebook itself became a direct advertising competitor (*i.e.*, a dominant party partnered with Fyk's straight-line competitors; *i.e.*, in a group boycott) of all interactive computer service ("ICS") users, like Fyk. This business model, "create[d] a misalignment of interests between [Facebook] and people who use [Facebook's] services." This pecuniary "misalignment" incentivizes(d) Facebook to tortiously restrict lower valued ICS users, in favor of developing Facebook's higher valued advertising "partners" who benefit Facebook.

In October 2016, after reducing Fyk's competitive reach to almost nothing (for Facebook's own financial interests), Facebook deactivated several of Fyk's pages/businesses, totaling over 14,000,000 fans cumulatively, under the *fraudulent* aegis of "otherwise objectionable" – purportedly improper content restriction (factually applicable to §230(c)(2)(A) protection, if any, certainly not §230(c)(1)).

In February/March 2017, Fyk contacted a prior business colleague (and now a straight-line competitor) who was more favored by Facebook, having paid Facebook over $22,000,000.00 in advertised content development. Fyk's competitor was offered exclusive service(s) and community standards (*i.e.*, "rules") exemptions unavailable to Fyk. Fyk asked his competitor to see if their Facebook representative would restore Fyk's deleted pages for Fyk. Fyk's competitor approached Facebook with Fyk's request, and Facebook declined the request unless Fyk's competitor would take over ownership (*i.e.*, Facebook solicited a new owner) of Fyk's information/property.

Facing no equitable solution, Fyk fire sold/transferred his (previously published) property to his competitor at an extremely reduced amount. Thereafter, Facebook "re-published" Fyk's information (*i.e.*, Facebook substantively contributed to the conscious alteration/development of Fyk's information) for Fyk's competitor and not for Fyk.[2]

---

[2] To put substantive contribution in the context of information development (at issue in *Gonzalez v. Google*), we use the extreme example of *Henderson v. Public Data* to analogize Fyk's situation:

> An extreme example helps illustrate this point. Take a writer of a ransom note, for example, who cuts letters out of a magazine [developing] to list his demands [intent]. That writer might be said to be 'altering' content [knowingly/consciously selecting

Fyk is undeniably "the publisher" and speaker of his information, and Facebook undeniably contributed substantively to the harms caused to Fyk. "But for" Facebook's conduct, the illegalities espoused in the Verified Complaint would not have occurred. Here, Facebook's anti-competitive actions to de-publish and republish the exact same content (*i.e.,* a change in function, not form) is *prima facie* evidence there was never any improper content legitimately at issue.[3] Fyk's case was never about treating Facebook as the original author or speaker of Fyk's purportedly improper content, it has always been about Facebook's own unlawful conduct.

## III.    INTRODUCTION – IN REALITY RATHER THAN JUDICIAL MISCONCEPTION

*Now realized by at least the Fourth Circuit, §230(c)(1) of the CDA is not a license to do whatever one wants online, because it does not provide any immunity, for any conduct, at all.* Page one of Fyk's Verified Complaint makes clear: "This case asks whether Facebook can, without consequence, engage in brazen tortious, unfair and anti-competitive, extortionate, and/or fraudulent practices" (*i.e.,* ***conscious conduct***). [D.E. 1] at ¶ 1.

"Intent generally refers to the mental objective behind an action. The concept of intent is often the focal point of Criminal Law and is generally shown by circumstantial evidence such as the acts or *knowledge* of the defendant."[4] Facebook had both knowledge and intent behind what it was doing to Fyk. Intent and knowledge play key roles in understanding the correct application of §230 protection.

The gravamen of Fyk's §230(c)(1) dismissal rested on this Court's erroneous determination "if the duty that the plaintiff alleges was violated by defendant derives from the defendant's status or *conduct* as

---

letters]. Yet, the note's writer [Facebook] is hardly acting as an 'editor' of [Fyk's] magazine [information]. Instead, [Facebook] has *substantively changed* [Fyk's] magazine's content and transformed it from benign [less valued/unpublished] information into [higher value/republished] information [for a different purpose] …

*Henderson*, *et al. v. Source for Public Data, L.P. Data at footnote 25*

[3] A claim treats the defendant "'as the publisher or speaker of any information' when it (1) makes the defendant liable for publishing certain information to third-parties [not for third-parties], and (2) seeks to impose liability based on that information's *improper content*." *Henderson* at 120-121; *see also id.* at 122-124 (*The Source for Public Data, L.P., et al.*, 53 F.4th 110, n.5 (4th Cir. 2022) (emphasis added) regarding "but for" causation).

[4] https://www.law.cornell.edu/wex/intent

*a 'published or speaker,'* . . . §230(c)(1) precludes liability."[5] *Fyk v. Facebook, Inc.* No. 18-cv-05159-JSW, 2019 WL 11288576 at *2 (N.D. Cal. June 18, 2019) (citing *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009),   a decision entirely undermined by *Henderson*, as *Barnes* rests on the Fourth Circuit's approximate 26-year-old *Zeran v. American Online, Inc.*, 129 F.3d 327 (4th Cir. 1997) decision that *Henderson* unwound) (emphasis added)). The Ninth Circuit erroneously advanced the same sloppy draftsmanship (*i.e.,* using "a publisher" instead of "the publisher"): "In any event, it is clear that Fyk seeks to hold Facebook liable as *a publisher* for its decisions (*i.e.,* a conscious alteration/material contribution) to de-publish and re-publish the pages." [D.E. 42] (emphasis added).

Both California *Fyk* Courts fell prey to the same sloppy draftsmanship. Courts have mistakenly converted *"the"* specific publisher or speaker (*i.e.,* "another") into "a" *unspecified publisher or speaker*; *i.e.,* in the *indefinite general* sense; *i.e.,* including themselves. §230(c)(1) went from not being treated as another publisher (*i.e.,* someone else) to not being treated as themselves. Under such "reasoning," this Court absurdly concluded that §230(c)(1) precludes Fyk from "treating" Facebook as Facebook its own illegal conduct. Naturally, §230(c)(1) only applies when a plaintiff seeks to treat the defendant as someone else, whereas the plaintiff seeks to hold the defendant responsible for the conduct and content of another. Here, Fyk did not allege that there was any improper content spoken by Facebook. Here, Fyk did not attempt to treat Facebook as anyone else other than Facebook.

While this Court has previously rendered decisions as to the purported "§230(c)(1) immunity" of Facebook's anti-competitive misconduct (*e.g.,* the June 18, 2019, dismissal order [D.E. 38] and the November 1, 2021, first motion for reconsideration order [D.E. 51] revolving largely, if not entirely, around *Enigma*), these decisions cannot possibly be reconciled with new case law that has come about since those decisions. For examples, and as discussed in greater detail below: (a) *Henderson*, (b) *Rumble, Inc. v. Google, LLC*, No. 21-cv-00229-HSG (N.D. Cal. July 29, 2022), (c) *Jarkesy v. SEC*, No. 20-61007 (5th Cir. May 18, 2022), (d) *Doe v. Facebook, Inc.*, 595 U.S. ____, 2022 WL 660628 (Mar. 7, 2022), and (d) *DZ Reserve v. Meta Platforms, Inc.* No. 3-18:cv-04978 (N.D. Cal.) (which is an unfair competition

---

[5] An example of sloppy drafting. The statute accurately reads "**the** publisher or speaker."

case, just like this case, that has properly withstood dismissal unlike this case.)[6, 7] Not only has the law substantively changed since this Court made its premature, unfounded dispositive determinations here, but equitable considerations also militate towards vacating the judgment. If the Court does not vacate its judgment, it will continue to allow social media platforms to illegally prevent any sort of competition, like Fyk, predicated on their own "anti-competitive animus," rather than "blocking and screening of offensive materials," in good faith, as a "Good Samaritan."

On November 3, 2022, *Henderson*, a case deciding two of the very issues at the heart of this matter (the scope of §230(c)(1) protections, and the interplay of "publisher" and "content provider"), successfully overcame a 12(b)(6) motion to dismiss. *Henderson* shed new light on the unanswered question that has plagued courts, (*i.e.,* because the answer is arbitrary, capricious); where do the courts draw the line between "traditional editorial function" and "information content provision?" In *Gonzalez,* SCOTUS raised that same question, but ultimately declined to answer it, in its final opinion.

> Justice Kagan: … I can imagine a world where you're right that none of this stuff [*i.e.,* content provision] gets protection. And, you know, every other industry has to internalize the costs of its conduct. Why is it that the tech industry gets a pass? A little bit unclear.
>
> On the other hand, I mean, we're a court. We really don't know about these things. You know, these are not like the nine greatest experts on the Internet.
>
> … I don't have to accept all Ms. Blatt's 'the sky is falling' stuff to accept [that], there is a lot of uncertainty about going the way you would have us go, in part, just because of the difficulty of *drawing lines* in this area and just because of the fact that, once we go with you, all of a sudden, we're finding that Google isn't protected.
>
> Mr. Schnapper (attorney for Gonzalez):  Well, [] I think [] the *line-drawing* problems are real. No one minimizes that. *I think that the task for this Court is to apply the statute the way it was written* … .

---

[6]  The then new case *Enigma* was the subject matter of the first motion for reconsideration [D.E. 51]. The *Lemmon v. Snap, Inc.*, 995 F.3d 1085 (9th Cir. 2021) case during the first motion for reconsideration proceedings, *see* [D.E. 49] was not addressed in this Court's reconsideration order [D.E. 51], and this Court should now pay attention to it.

[7] *Henderson*, *Rumble*, *Jarkesy*, and *Doe* were supplemented into the most recent Ninth Circuit appeal record, but the Ninth Circuit did not address the cases on the merits of Fyk's appeal. These cases, along with *DZ Reserve* and *Lemmon* and Professor Adam Candeub's §230 treatise, any of which warrants this Court's overturning its dismissal/judgment are attached hereto as **Exhibit 1** and incorporated fully herein by reference.

*Gonzalez* Feb. 21, 2023, SCOTUS Oral Argument, Ex. 3 at 45:11 – 46:12 (emphasis added).[8]

We agree, this Court should apply the statute *"the way it was written."* And, just because the content provision "line" is difficult to draw, it does not mean "the tech industry gets a pass" for all its conduct. But, the "line" can also not be arbitrary, whereby Facebook's conscious alterations, here, fell short of the *material contribution* line (*i.e.,* this Court arbitrarily disagreed with Fyk), and Public Data's conscious conduct in *Henderson* surpassed the line (*i.e.,* the Fourth Circuit agreed with Plaintiff(s), contrary to this Court's decision). Different protections within different jurisdictions, applying the same statute, resulting in different outcomes, is juridically intolerable. Compared to Fyk's decision, *Rumble*, *Jarkesy*, *Doe*, *Enigma, Lemmon*, and now *Henderson* and *DZ Reserve, see* Ex. 1, comport with even-handed statutory construction and reflect the opinions of over a dozen Congressmen*,* Attorneys General*,* the DOJ*,* and SCOTUS Justices (at least the wise Justice Thomas), *see* Ex. 2.

> Section 230(c)(1) of the Communications Decency Act protects some parties operating online from specific claims that would lead to liability for conduct done offline. ***But it is not a license to do whatever one wants online.*** Protection under §230(c)(1) extends only to bar *certain claims* imposing liability for *specific information* that another party provided.

*Henderson,* 53 F.4th at 117 (emphasis added).

To understand Congress' original intent, we must look to the legislature and statutory text for guidance. Senator Cruz and sixteen other members of Congress posit: ***"§230(c)(1) does not immunize any conduct at all"*** (Facebook's conduct being at the heart of Fyk's case). Cruz, Senator Ted, et al., No. 21-1333, 2022 WL 17669645 at *13 (Dec. 7, 2022) (emphasis added), Ex. 2 (*see* n. 12, *infra*).

> **[§]230(c)(1) does not provide any immunity**. Rather, it states a definition: no [ICS provider] 'shall be treated as the publisher or speaker of any information provided by another information content provider ["ICP"].' 47 U.S.C §230(c)(1). Although this requirement can *indirectly* affect liability, it (1) **does not directly confer immunity**, and (2) applies only in limited circumstances where the elements of a claim turn on treating an Internet platform as **the speaker or publisher** of others' words. Outside of this limited realm, §230(c)(1) plays no role whatsoever, and **the lower courts – including the Ninth Circuit [] – have erred by turning §230(c)(1) into a super-immunity provision**.

*Id.* at *7 (original emphasis in italics, added emphasis in bold).

---

[8] For ease of reference, the *Gonzalez* transcript is attached hereto as **Exhibit 3** and incorporated fully herein by reference.

Here too, this Court erred by "turning §230(c)(1) into a super immunity provision." More specifically, if courts are somehow correct (they are not) that "[s]ubsection (c)(1), by itself, shields from liability all publication decisions [*i.e.,* all conduct],"[9] and also correct that "nothing in §230(c)(1) turns on the alleged motives underlying the editorial decisions of the provider of an interactive computer service,"[10] then §230(c)(1) is, "by itself," absolute, unlimited "super-immunity," which such "super-immunity" eviscerates §230(c)'s "Good Samaritan" general provision, §230(c)(2)'s (limited conduct) civil liability protections, §230(f)(3)'s definition of an ICP, and even §502 (codified at 47 U.S.C. §223(d)) of the very same act (whereby §502 makes it a crime to "*knowingly . . .* display" obscene material to children (*i.e.,* conscious intent), even if a third-party created that content).

The overbroad, unconstitutional application of §230(c)(1) "super-immunity" derives from erroneous judicial construction, not from age, vagueness, or from the legislation. The text of the statute simply does not support §230(c)(1)'s absurd "super-immunity" (*i.e.,* §230(c)(1) "does not insulate [Facebook] from liability for all conduct that happens to be transmitted through the internet").

For the reasons set forth more fully herein, the previous judgment dismissing this case should be vacated by this Court, thereby correcting the injustice Fyk has suffered and finally live up to (in this case at least, five years into the Twilight Zone that has been this case) the "honor" in "Your Honor."

## IV.      MEMORANDUM OF LAW

### A.      *Legal Standard*

Rule 60(b) motions allow the Court the opportunity to revisit cases and correct injustice. Rule 60(b) motions are addressed to the sound discretion of this Court. *See, e.g., Martella v. Marine Cooks & Stewards Union,* 448 F.2d 729, 730 (9th Cir. 1971). When faced with a Rule 60(b) motion, a court should balance the competing principles of finality and relief from unjust judgments giving a "liberal construction to (60b)." *Id.* quoting 7 Moore's Federal Practice P.60.18[8] P.60-138.

---

[9] *See* [D.E 17] at 14-15, Facebook's November 18, 2019, Ninth Circuit Answering Brief (citing, inter alia, *Barnes,* 570 F.3d at 1105 and *Zeran,* 129 F.3d 327). Of note, the bulk (if not all) of the anti-Fyk points made by Facebook, this Court, and the Ninth Circuit throughout the history of this case have the Fourth Circuit's *Zeran* decision at their root/foundation. And, again, the Fourth Circuit's *Henderson* decision completely undermined *Zeran* and its progeny (*e.g.*, *Barnes* and *Fyk*).
[10] *See* [D.E. 42] at 4, the Ninth Circuit's June 12, 2020, Memorandum.

Rule 60(b)(5) specifically provides parties with relief from a judgment or order when "a prior judgment upon which it is based has been reversed or otherwise vacated [*e.g., Zeran*], or it is no longer equitable that the judgment should have prospective application." *See id*.[11] Relief under Rule 60(b) is appropriate where there has been a subsequent change in the law. *See, e.g., Milgard Tempering, Inc. v. Selas Corp. of America,* 902 F.2d 703, 715 (9th Cir. 1990) (A court "properly exercises its discretion to reconsider an issue previously decided" when "a change in the law has occurred"); *see also, e.g., Kirkbride v. Continental Cas. Co.,* 933 F.2d 729, 732 (9th Cir. 1991) ("[t]he district court was entitled to reconsider its position" in light of new law). Notably, the Ninth Circuit has expressly embraced the "flexible standard" for Rule 60(b)(5) adopted by the United States Supreme Court in *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367 (1992). *See, e.g., Bellevue Manor Assocs. v. United States*, 165 F.3d 1249, 1255-56 (9th Cir. 1999); *Hook v. Arizona*, 120 F.3d 921, 924 (9th Cir. 1997). Under this standard, a party seeking a modification of a court order need only establish that a "significant change in facts or law warrants a revision of the decree and that the proposed modification is suitably tailored to the changed circumstance." *Rufo*, 502 U.S. at 393; *SEC v. Coldicutt*, 258 F.3d 939, 942 (9th Cir. 2002). A significant change in law has occurred that warrants a revision of the decree.

Moreover, SCOTUS has repeatedly confirmed that a district court always possesses the inherent authority to modify a judgment in-light-of significant changed circumstances, including changes in law or fact. *See, e.g., System Federation v. Wright,* 364 U.S. 642, 647 (1961). "[T]he court cannot be required to disregard significant changes in law or facts if it is 'satisfied that what it has been doing has been turned through chang[ed] circumstances into an instrument of wrong.'" *Agostini v. Felton,* 521 U.S. 203, 215 (1997) (citing *System Federation*, 364 U.S. at 647, quoting *United States v. Swift & Co., 286 U.S.* 106, 114-15 (1932)). Rule 60(b)(6) compels reconsideration of this new case authority.

### B.      Rule 60(b)(5) – Law Change Warrants Reversal Of The Antiquated Dismissal Order

This Court should vacate/set aside dismissal, as the Fourth Circuit's *Henderson* decision unraveled its prior *Zeran* decision, which this Court relied on (substantially; more actually, foundationally) to

---

[11] **Again,** the root foundation of this Court's prior rulings was the Fourth Circuit's *Zeran* decision, and the Fourth Circuit nuked its 26-year-old *Zeran* decision (when the Internet was a mystery) with its few-months-old *Henderson* decision.

dismiss Fyk's case, constituting a substantial change in law that warrants reconsideration and reversal of Fyk's decision. Whether directly (*e.g., Zeran*) or indirectly (*e.g., Barnes* (with conclusions flowing from gross misinterpretation of *Zeran*), this Court and the Ninth Circuit relied on superseded case law (changed by *Henderson)* to dismiss Fyk's case. The *Henderson* decision serves as new legal precedent that undermines this Court's previous findings and conclusions. Alternatively, Fyk should be granted leave to amend his Verified Complaint, since this case is certainly no longer "futile, in the instance."

After this Court granted Facebook's 12(b)(6) motion and after Fyk had filed his appeal in the Ninth Circuit, and after this Court denied Fyk's first 60(b) motion and after Fyk filed his second appeal in the Ninth Circuit, the Fourth Circuit issued its opinion in *Henderson,* "explaining that a defendant is an information content provider if they ***contribute[d] materially to the alleged illegality of the <u>conduct</u>***" (*i.e.,* an opinion that cannot be reconciled with Fyk's case) (citing *Fair. Hous. Council of San Fernando Valley v. Roommates.com, LLC,* 521 F.3d 1157, 1168 (9th Cir. 2008), emphasis added), solidifying new precedent that was unavailable to Fyk, which, had it been applied to Fyk's case (which such case could not more specifically allege Facebook's anti-competitive misconduct), would have resulted in the unraveling of this Court's dismissal of Fyk's Verified Complaint. This Court should re-examine the dismissal honorably under the Fourth Circuit's new seminal *Henderson* decision (which, once again, undermined *Zeran* and *Barnes*, which, once again, were decisions this Court relied upon heavily, if not entirely in kicking, Fyk to the curb in deprivation of "day in court"/Due Process), as well as under *Rumble* (from this Court), *Jarkesy* (from the Fifth Circuit), *Doe* (from J. Thomas), and even *DZ Reserve* (from this Court). This Court should also revisit *Lemmon* (from the Ninth Circuit) since it did not consider it in the first reconsideration motion. The conflicting decisions of *Henderson, Rumble*, *Jarkesy*, *Doe,* and *etc.*, *see* Ex. 1., underscore the importance of addressing court conflicts as to the application of the CDA immunity in pure business tort cases, which such cases we now briefly discuss.

The *Rumble* decision (this Court's decision) addresses whether a complaint involving unfair competition/antitrust allegations (Sherman Act in the *Rumble* case, California Business & Professions Code §§17200-17210 (Unfair Competition) in Fyk's case) is subject to dismissal. The *Rumble* Court held, in pertinent part, as follows: (a) "the Supreme Court's direction [is] that Sherman Act plaintiffs 'should be given the full benefit of their proof without compartmentalizing the various factual components and

wiping the slate clean after scrutiny of each,'" *id.* at 6 (internal citations omitted); (b) "This is especially true given the Ninth Circuit's holding that 'even though [a] restraint effected may be reasonable under section 1, it may constitute an attempt to monopolize forbidden by section 2 if a specific intent to monopolize may be shown,'" *id.* (internal citations omitted). These holdings are much like that of *Enigma* and *Fyk*. That is, actions underlain by anti-competitive animus (as specifically alleged by Fyk against Facebook, and as alleged by Rumble against Google) are not subject to dismissal at the CDA "Good Samaritan" immunity threshold. Just as Rumble was permitted to engage in discovery (*i.e.*, was "given the full benefit of their proof") vis-à-vis the District Court's denial of Google's motion to dismiss in a Sherman Act context (*i.e.*, federal anti-competition context), Fyk should have been given the benefit of engaging in discovery (*i.e.*, "given the full benefit of [his] proof") vis-à-vis this Court's denial of Facebook's motion to dismiss in the California Business & Professions Code §§17200-17210 context (*i.e.*, state anti-competition context).

The *Jarkesy* (Fifth Circuit) case deals with the mandate that Congress supply an "intelligible principle"/general provision, where (as here) delegating administrative enforcement authority of a law. As *Jarkesy* concludes, if Congress does not supply an "intelligible principle" under such a delegation setting, then the law is unconstitutional. So, either all of §230(c) is governed by the overarching "Good Samaritan" "intelligible principle" (as Fyk's briefings have consistently argued) or §230(c) is unconstitutional authority. Either way, Facebook cannot enjoy *carte blanche* §230(c)(1) super-immunity sans a "Good Samaritan" threshold requirement (*i.e.*, the anti-competitive animus espoused in *Enigma*, *Rumble, Henderson*, and in *Fyk*). Furthermore, the facts of Fyk's case more aptly fit the §230(c)(2) paradigm (if any part of §230), certainly not §230(c)(1). If this Court's view that the "Good Samaritan" *general* provision is not applied *generally* (*i.e.*, somehow applies to only §230(c)(2)), then, per *Jarkesy* and per an elementary understanding of what a general provision/"intelligible principle" is, §230 is unconstitutional. Again, ither way, Facebook cannot enjoy §230(c)(1) *carte blanche* super-immunity in this unfair competition/anti-competitive animus case.

In *Doe*, Justice Thomas put forth another spot-on Statement in the denial of certiorari mirroring the spot-on Statement that Justice Thomas put forth in *Enigma*, "It is hard to see why the protection §230(c)(1) grants publishers against being held strictly liable for third parties' content should protect

1  Facebook from liability for its *own* 'acts and omissions,'" *id.* at *1 (emphasis in original), with the subject

2  *Fyk* case being one that seeks to hold Facebook accountable for Facebook's "own" actions, namely actions

3  of an anti-competitive animus.

4  In *Henderson*, whether relying directly on the Fourth Circuit's *Zeran* decision or *Zeran's* progeny

5  (*i.e., Barnes)*, courts (*e.g.*, this Court and the Ninth Circuit) who relied on *Zeran* to build their questionable

6  foundation were undermined by the Fourth Circuit's *Henderson* decision. The Fourth Circuit's

7  reformation of its 1997 *Zeran* decision undermined the precedent this Court and the Ninth Circuit relied

8  on when deciding Facebook's §230(c)(1) "immunity." *Henderson*'s rearticulation of *Zeran,* and the

9  changes it caused to *Barnes* (stemming from *Zeran*) represents a substantial change of "the law" that this

10  Court specifically relied on in its dismissal order, which clearly warrants this Court's reconsideration and

11  immediate reversal of its antiquated dismissal order. Notably, the *Henderson* decision relied heavily on a

12  treatise written by Professor Adam Candeub, who (not-so-coincidentally) read all Fyk's prior briefs before

13  memorializing same in: *READING SECTION 230 AS WRITTEN.*[12]

14  Fyk's Verified Complaint (filed in August 2018) asked this Court "…whether Facebook can,

15  without consequence, engage in brazen tortious, unfair and anti-competitive, extortionate, and/or

16  fraudulent practices… ." [D.E. 1] at 1. *Fyk's allegations were based entirely on Facebook's illegal*

17  *anti-competitive* <u>*conduct*</u> (*i.e.,* a UCL claim)*, not based on the* <u>*impropriety*</u> *of any* <u>*content*</u> *or treating*

18  *Facebook as "the publisher or speaker" of said content.*

19  We have interpreted 'publisher' in §230(c)(1) in line with th[e] common-law
20  understanding. Thus for §230(c)(1) protection to apply, we require that liability attach
   to the defendant on account of some *improper content* within their publication. See Erie
21  Ins. Co., 925 F.3d at 139–40 ('There is no claim made based on the content of speech
   published by [Defendant] – such as a claim that [Defendant] had liability as the
22  publisher of a misrepresentation of the product or of defamatory content.').

23  *Henderson*, 53 F.4th at 122 (emphasis added). "This improper-content requirement helps dispel

24  [Defendant's] notion that a claim holds a defendant liable as a publisher anytime there is a 'but-for'

25

26  [12] Again *Henderson*, *Rumble*, *Jarkesy*, *Doe, DZ Reserve, Lemmon*, and Mr. Candeub's treatise are attached
   as Ex. 1. And, mentioned elsewhere in this brief, courtesy copies of the amicus curiae briefs submitted in
27  *Gonzalez* (all of which such amicus curiae briefs may as well have been cut and pasted from Fyk's briefing
   in this case) by Senator Cruz and myriad other congressmen, Texas Attorney General Paxton and others,
28  and the DOJ are attached hereto as composite **Exhibit 2** and incorporated fully herein by reference.

1    causal relationship between the act of publication and liability." *Id.*[13]

2         Section 230(c)(1) provides protection to interactive computer services. *Zeran*, 129 F.3d
3         at 331. But it does not insulate a company from liability for all conduct that happens to
          be transmitted through the internet. Instead, protection under §230(c)(1) extends only
4         to bar certain claims, in specific circumstances, against particular types of parties. Here,
          the district court erred by finding that §230(c)(1) barred all counts asserted against
5         Public Data. To the contrary, on the facts as alleged, it does not apply to any of them.

6    *Id.* at 129.

7         Here too, this Court "erred by finding that §230(c)(1) barred all [Fyk's] counts." "There [wa]s no

8    claim made [by Fyk] based on the content of speech published by [Fyk or Facebook]." For §230(c)(1) to

9    apply here, Fyk's "claims (must) demand the information's content be *improper* before imposing

10   liability." Fyk's allegations were undeniably about Facebook's conduct, not about the substance of any

11   "improper content" alleged to have been authored or spoken by Facebook. The only reason to identify

12   content at all (*i.e.,* in the general sense), was to show the impropriety of Facebook's conduct (*i.e.,* disparate

13   treatment; *e.g.,* disproportionate "rules"), in "treating Fyk's page content differently for Fyk than for the

14   competitor to whom Fyk's content was redistributed." [D.E. 1] at n. 2.

15        While certain editorial conduct may be immune in certain circumstances (*e.g.,* §230(c)(2)(A)),

16   §230(c)(1) does not protect "all conduct that happens to be transmitted through the internet." It certainly

17   does not immunize "all publication decisions," including disparate/anti-competitive treatment. In

18   reality, *"§230(c)(1) does not immunize any conduct at all."* Cruz, Senator Ted, et al., 2022 WL 17669645

19   at *13 (emphasis added), Ex. 2. This Court also concluded that "granting leave to amend would be futile

20   in this instance as Plaintiff's claims are barred as a matter of law." [D.E. 38] at 4. In finding that Fyk's

21   claims could not be amended for purportedly being "futile in this instance," this Court falls into the

22   minority of the current evaluation of §230 case authority addressing the limitations of CDA immunity.

23   *See, e.g.,* Exs. 1-2. The Fourth Circuit definitively ruled in *Henderson,* that §230(c)(1) immunity is not

24   absolute (*i.e.,* not "futile in this instance"); *i.e.,* §230(c)(1) "does not insulate a company from liability for

25

26   ───────────────

27   [13] At a peak (prior to Facebook's interference), Fyk earned ~ $300,000.00 in one month in advertising
     and/or web trafficking monies, for example. There was no realistic end in sight to Fyk's economic gain
28   before Facebook's interference; rather, all signs pointed towards Fyk earning even more advertising
     money "but for" Facebook's interference. [D.E. 1] at ¶ 55.

all conduct that happens to be transmitted through the internet," *Henderson*, 53 F.4th at 129, a determination directly at odds with this Court's prior decision(s) finding that §230(c)(1) "shields from liability all publication decisions," absent intent (*i.e.,* unconstitutional "super-immunity"). This Court cannot disregard significant changes in law or facts if it is "satisfied that what it has been doing has been turned through chang[ed] circumstances into an instrument of wrong." *Swift & Co.,* 286 U.S. at 114-115.

Fyk's erroneous §230(c)(1) dismissal hinged on the application of both the second and third requirements of the so-called[14] §230(c)(1) immunity test. The Ninth Circuit held in pertinent part:

> The first and second requirements for §230(c)(1) immunity are not in dispute. Fyk focuses on the third requirement. He contends that Facebook is not entitled to §230(c)(1) immunity because it acted as a content developer by allegedly de-publishing pages that he created and then re-publishing them for another third party after he sold them to a competitor. *We disagree.*

[D.E. 42] at 2-3 (emphasis added).

Here, the Ninth Circuit erred in two respects. First, the "second requirement" of the test was, *in fact,* disputed to the extent that the courts used an inaccurate three-part test to determine immunity (*i.e., the test itself was wrong*) (further discussed in §B.1 below). And, second, while this Court, and the Ninth Circuit may not necessarily have agreed at the time, the "third requirement" of the test was, in retrospect, met because Facebook's actions to de-publish and re-publish Fyk's content are content provision decisions (*i.e.,* development conduct) (further discussed in §B.2 below). The Court's nonsense about their needing to be a *substantial contribution* to be considered content development (*i.e.,* the arbitrary responsibility line) is entirely made up, because the necessity of the contribution being "substantial" is directly contradicted by §230(f)(3)'s actual text: "in part."

While *Henderson* agreed that Plaintiff's allegations (like Fyk's here), met the material contribution line, this Court and the Ninth Circuit disagreed (in antiquated fashion), whereby *Fyk's* allegations fell short of this Court's arbitrary (*i.e.,* different) material contribution line.

> Public Data sought §230(c)(1) protection against four claims brought against it for violating the Fair Credit Reporting Act ('FCRA'). The district court agreed that the claims were precluded by §230(c)(1). Plaintiffs appealed, arguing that §230(c)(1) does

---

[14] "So-called" because §230(c)(1) does not technically provide any civil liability immunity for any conduct, at all.

not apply. **We agree.**[15] Plaintiffs have alleged facts that, if true, render §230(c)(1) inapplicable to their four claims. So we reverse the district court and remand for further proceedings.

*Henderson*, 53 F.4th at 117 (emphasis added). The Court's "material contribution" "line" cannot be arbitrary or capricious. Different protections, within different jurisdictions for a federal statute relating to internet communications, is untenable.

### 1. §230(c)(1) Does Not Confer Any Immunity For Any Conduct At All

The second requirement of the *Barnes* three-part §230(c)(1) immunity test, is *textually flawed* (*i.e.,* sloppy draftsmanship). In contrast, the Fourth Circuit's *Henderson* three-part immunity test is textually accurate (*i.e.,* it correctly cites §230(c)(1)). The *Henderson* test and the *Barnes* test differ by one word, but that one word completely changes the results of the test. This Court was flat wrong in using the textually inaccurate *Barnes* test. This Court should have instead used the textually accurate *Henderson* test to determine Facebook's §230(c)(1) protection – this Court now needs to remedy same.

Why have courts been using the textually inaccurate *Barnes* test to consider §230(c)(1) protection? Defendants (*e.g.,* Facebook, Yelp!, *etc.*) cite "questionable precedent" (*e.g. Barnes, Zeran, Kimzey*) out-of-context to set up defendants' proof-text of isolated snippets from bad case law to advance their own presuppositions, agendas, or biases (*e.g.,* §230(c)(1): "seeks to treat as ***a*** *publisher* or speaker," or "shields from liability ***all*** *publication decisions*…"), and to distort the statutory language and/or intent of §230.

So as not to distort the statutory language and/or intent of §230, we must look to the text itself, rather than rely on case precedent snippets. §230(c)(1) does not describe what "a publisher" does (*i.e.,* what conduct is "immune"); rather, it specifically identifies *who* "the publisher" is (*i.e.,* "another" ICP). Changing "the" (of "the publisher") into "a" (of "a publisher") changes *who* "the (particular) publisher" is, that the ICS provider or ICS user cannot be treated as (*i.e.,* distorts the intent of §230(c)(1)). This subtle word substitution significantly impacts the proper (*i.e.,* textual) application of §230(c)(1).

---

[15] Facebook sought §230(c)(1) protections against Fyk's four claims for unfair competition, tortious interference, fraud, and extortion. This Court determined §230(c)(1) precluded Fyk's illegal conduct related claims. Fyk appealed, arguing that §230(c)(1) does not apply. The Ninth Circuit *disagreed* (*i.e.,* although Fyk alleged similar facts as *Henderson*, the Ninth Circuit drew a different "material contribution" line than that of the Fourth Circuit in *Henderson*).

§230(c)(1) *specifically* reads: "No provider or user of an interactive computer service shall be treated as *the publisher* or speaker of any information provided by another information content provider." *Id.* (emphasis added). James Madison once argued that the most important word in "The Right To Free Speech" is the word "the" because it denotes "the right" *preexisted* any potential abridgement. In the English language, a definite article such as the word "the," in "the publisher," is used to "denote [a] particular, [or] specified persons or things."[16] "The publisher," in the context of §230(c)(1), specifies "the (*particular* or *specified*) publisher" who created and/or developed the information entirely – *"another"* ICP (here Fyk). In other words, "the publisher" is not just *any unspecified publisher* (which includes the ICS provider or user), "the publisher" is specifically the *known publisher*. "The" *known* publisher is "another [ICP]" (*i.e.,* anyone other than the ICS provider or user). In the context of §230(c)(1), Facebook cannot possibly be "the publisher" in Fyk's case, because Fyk is "the (known) publisher," and Fyk's publishing preexisted Facebook's involvement.

**This subtle, yet critical drafting mistake – using "a" and "the" interchangeably in "the publisher or speaker" (as this Court has) – is the genesis of the misinterpretation of §230(c)(1) and the origin of the confusion surrounding §230's proper application. Once "the publisher" is identified for the purposes of §230(c)(1), the rest of the statute's intended purpose is clear.**

"Pursuant to §230(c)(1) of the CDA, 47 U.S.C. §230(c)(1), '[i]mmunity from liability exists for: … (1) a[n] [ICSP] or [ICSU] of an [ICS] (2) whom a plaintiff seeks to treat, under a state law cause of action, as *a publisher* or speaker (3) of information provided by another [ICP].'" *Fyk v. Facebook, Inc.*, 808 Fed. Appx. 597 (9th Cir. 2020) (citing *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1097 (9th Cir. 2019) (quoting *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100–01 (9th Cir. 2009)).

§230(c)(1) explicitly reads: "the publisher," not "a publisher." The *Barnes* three-part "immunity" test (employing "*a publisher*") is inconsistent with the text of the statute (*i.e.,* an example of sloppy draftsmanship). Compare that to the three-part test used in *Henderson*, which accurately quotes and applies §230(c)(1): "The defendant is a '[ICSP] or [ICSU] of an [ICS]'; (2) the plaintiff's claim holds the defendant 'responsible 'as *the publisher* or speaker of any information'; and (3) the relevant information

---

[16] https://www.wordnik.com/words/the

was 'provided by another [ICP].'" *Henderson*, 53 F.4th at 119 (citing *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 254 (4th Cir. 2009) (quoting §230(c)(1)).

As a result of conflating "the" and "a," correct courts (*e.g.,* the Fourth Circuit in *Henderson via* "the") properly read §230(c)(1) to not protect any publishing conduct, while other incorrect courts (*e.g.,* this Court in *Fyk via* "a") improperly read §230(c)(1) to protect all publishing conduct in "super-immunity" fashion.[17] §230(c)(1) is judicially righted by, for example, giving the word "the" proper effect, thereby restoring the meaningful difference between §230(c)(1) and §230(c)(2), while simultaneously reconciling the inconsistency between §502 and §230 (*i.e.,* §230 would no longer be absurd "super-immunity"). This Court simply needs to apply §230(c)(1) *as written*.

"§230(c)(1) prevents suits that 'cast [the defendant] in the same position as the party who originally posted the offensive messages.'" *Henderson* at n. 26. "… §230(c)(1) applies only when the claim depends on the content's impropriety." *Id.* at 125. "In other words, for protection to apply, the claim must turn on some 'information,' and must treat the defendant as the 'publisher or speaker' of that information." *Id.* at 120. Fyk posted his original messages and has never cast Facebook in the same position as himself. Fyk has made clear, on more than one occasion throughout the lifespan of this case, that "*this case is not about objectionable content.* … This case is about Facebook's fraud, extortion, unfair competition, and tortious interference with Fyk's business." *Fyk v. Facebook, Inc.*, No. 19-16232, 2020 WL 709442 at * (9th Cir.) No. 19-16232; *see also* Ver. Compl. [D.E. 1] at ¶ 1.

This Court and Ninth Circuit, relying on *Zeran/Barnes* (now eviscerated by *Henderson*), imaginary policy and purpose, and not the law itself, erroneously dismissed all four of Fyk's anti-competitive *conduct* claims under §230(c)(1)'s purported "super-immunity," because Fyk was precluded from treating Facebook as "a publisher" in the general sense (*i.e.,* treating Facebook as Facebook for Facebook's own conduct), which runs afoul of the Absurdity Doctrine (as well as several other constitutional doctrines and canons of statutory construction). This Court's determination that §230(c)(1) insulates all Facebook's conduct was proven wrong (though wrong at all times prior) by the Fourth Circuit *Henderson* decision.

---

[17] There is no real textual "correction" required here; rather, it is as simple as this Court giving the current text the correct effect (*i.e.,* apply the law as written). Subsequently, this Court should vacate or set aside its prior judgment because the *Barnes* test, used by this Court, is textually inaccurate. It should reconsider immunity under the new correct *Henderson* test.

Not only does §230(c)(1) not insulate Facebook from liability for all conduct that happens to be transmitted through the Internet, it does not protect any conduct, at all.

This Court should be "satisfied that what it has been doing [*e.g.,* falling prey to proof-texting, sloppy thinking and draftsmanship, and textual mistakes] has been turned through chang[ed] circumstances [*e.g., Henderson, etc.*, Exs. 1-2] into an instrument of wrong." *Agostini*, 521 U.S. at 215.

**2.  Any Editorial Conduct With Intent Or Knowledge Is Information Content Provision**

In his prior briefs, Fyk argued §230(c)(1) cannot protect "all publication decisions," because if "all publication decisions" are immune under §230(c)(1), then that would include restricting materials (*i.e.,* the purpose of §230(c)(2)(A)). Rejecting Fyk's argument, and again relying heavily on *Barnes* (eviscerated by *Henderson,* as *Barnes* stemmed from *Zeran*), the Ninth Circuit held in pertinent part:

> We reject Fyk's argument that granting §230(c)(1) immunity to Facebook renders §230(c)(2)(A) mere surplusage. As we have explained, §230(c)(2)(a) 'provides an additional shield from liability.' *Barnes,* 570 F.3d at 1105 '[T]he persons who can take advantage of this liability shield are not merely those whom subsection (c)(1) already protects,[18] but any provider of an interactive computer service. ***Thus, even those who cannot take advantage of subsection (c)(1), perhaps because they developed, even in part, the content at issue can take advantage of subsection (c)(2).'***

[D.E. 42] at 4-5 (emphasis added).

Here, the Ninth Circuit misbelieves §230(c)(1) and §230(c)(2)(A) are *not redundant* because content development decisions are somehow not included in "all publication decisions." Wrong all six ways to Sunday – content development decisions are entirely publication decisions. The statute remained redundant. The Ninth Circuit (and this Court) resolved absolutely nothing here, much less reconciled the surplusage issue – *i.e.,* the redundancy between §230(c)(1) and §230(c)(2)(A).

Per §230(f)(3), an ICP "means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." *Id.* Courts, like this Court, have relied on "non-textual arguments" in interpreting §230, narrowly interpreting "development" to preserve §230(c)(1)'s absurd "super-immunity." Per Justice Thomas*:*

> Courts have [] departed from the most natural reading of the text by giving Internet companies immunity for their own content [*i.e.,* content development/content provision

---

[18] Which is "no provider or user;" *i.e.,* "any provider or user" of an ICS; *i.e.,* the same persons in §230(c)(1) and §230(c)(2).

conduct]. Section 230(c)(1) protects a company from publisher liability only when content is 'provided by *another* information content provider.' (Emphasis added.) Nowhere does this provision protect a company that is itself the information content provider. See *Fair Housing Council of San Fernando Valley* v. *Roommates.Com, LLC*, 521 F. 3d 1157, 1165 (CA9 2008). And *an information content provider is not just the primary author or creator* [Fyk]; it is anyone 'responsible, in whole or in part, for the creation or development' of the content [Facebook]. §230(f)(3) (emphasis added).

But from the beginning [*e.g., Zeran, Barnes*], courts have held that §230(c)(1) protects the 'exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or *alter content*.' *E.g., Zeran*, 129 F. 3d, at 330 (emphasis added); cf. *id.*, at 332 (stating also that §230(c)(1) protects the decision to 'edit'). *Only later did courts wrestle with the language in §230(f)(3)* suggesting providers are liable for content they help develop 'in part.' *To harmonize that text with the interpretation that §230(c)(1) protects 'traditional editorial functions,'* [*i.e.,* to reconcile the actual text with the court's mistaken interpretation] *courts relied on policy arguments* [*i.e.,* not the text itself] *to narrowly construe §230(f)(3) to cover only substantial or material edits and additions* [*i.e.,* made it up]. *E.g., Batzel* v. *Smith*, 333 F. 3d 1018, 1031, and n. 18 (CA9 2003) ('[A] central purpose of the Act was to protect from liability service providers and users who take some *affirmative steps*[19] to edit the material posted') [i.e., "edit" in the restrictive sense, pursuant to §230(c)(2)].

Under this interpretation [*i.e.,* misinterpretation], a company can solicit[20] thousands of potentially defamatory statements, 'selec[t] and edi[t] . . . for publication' several of those statements, add commentary, and then feature the final product prominently over other submissions[21]—all while enjoying immunity [*i.e.,* act as a content provider]. *Jones* v. *Dirty World Entertainment Recordings LLC*, 755 F. 3d 398, 403, 410, 416 (CA6 2014) (*interpreting "development" narrowly to "preserv[e] the broad [i.e., make-believe] immunity th[at §230] provides for website operators' exercise of traditional publisher functions"*). *To say that editing a statement and adding commentary in this context does not "creat[e] or develo[p]" the final product, even in part, is dubious* (emphasis added).

*Malwarebytes, Inc. v. Enigma Software Group USA, LLC*, 141 S.Ct. 13, 16 (2020) (emphasis added).

As stated previously, defendants typically cite out-of-context precedent to proof-text their own presuppositions, agendas, or biases (*i.e.,* like Facebook did in this case). As a result, courts have mistakenly accepted out of context proof and misunderstood the original intent of the case precedent, like *Zeran*. *Barnes* is a great example of the mistaken interpretation of *Zeran's* contextual intent. In *Zeran*, the Fourth Circuit held §230(c)(1) protects the "exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content." *Barnes* interpreted *Zeran* such that

---

[19] The ICS provider only consciously ("considers") engages in editorial conduct under §230(c)(2)(A).

[20] Here, Facebook solicited a new owner of Fyk's property (*i.e.,* conduct that is anti-competitive).

[21] "Featur[ing] the final product prominently over other submissions" is content prioritization/development/provision.

an ICS provider should have protection from all of its own publishing conduct (*i.e.,* how this Court applied §230(c)(1)), but that is not the case. The ICS provider's own publishing conduct only relates to §230(c)(2)'s limited protections.

Context is utmost when reading case precedent. The Fourth Circuit cited Professor Adam Candeub's: *Reading Section §230 As Written,* extensively. Regarding the context surrounding *Zeran's* intended use of the phrase "traditional editorial function," he wrote:

> Some courts have taken a different approach, holding that [§] 230 bars 'lawsuits seeking to hold a [ICSP] liable for its exercise of a publisher's *traditional editorial functions – such as deciding whether to publish, withdraw, postpone or alter content.'* [*Zeran*, 129 F.3d at 330 (4th Cir. 1997)]. That language has been quoted extensively [*i.e.,* used as proof-text].

Candeub, Prof. Adam, *Reading Section §230 As Written* at 148 (Mich. St. U. 2021) (emphasis added) (footnote omitted), Ex. 1.

> The language comes from the influential *Zeran* case, but *many courts forget the immediately preceding language* [*i.e.,* it's used out of context]. To quote *Zeran* fully, section 230
>
> > creates a federal immunity to any cause of action that would make [ICSPs] *liable for information originating with a third-party user of the service.* Specifically, §230 precludes courts from entertaining claims that would place a[n] [ICSP] in a publisher's role. Thus, lawsuits seeking to hold a[n] [ICSP] liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content—are barred. [FN: Barrett v. Rosenthal, 146 P.3d 510, 516 (Cal. 2006) (quoting Zeran, 129 F.3d at 330) (emphasis added)]
>
> **The 'traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content,' id., are examples of third-party content decisions [i.e., third-party conduct] that §230 protects. It does not protect platform as to their *own editorial decisions or judgments* [*i.e., first-party conduct*].**
>
> When quoted out of context [*e.g.*, "proof-texting," and textual mistakes], the 'its' would seem to suggest that [§]230 immunizes the platform's publisher role. But this is an example of **sloppy drafting** and an imprecise pronoun antecedent, as the sentence prior speaks of 'information originating with a third-party user of the service.'

*Id.* at 148-149 (italicized emphasis in original, bold emphasis added).

Logically, when an ICS provider makes a conscious "publication decision" to "allow" (*i.e., knowingly* provide) content, it automatically transforms itself into an ICP, as it becomes responsible for providing that content, at least "in part." It has done *something more* than providing the interactive

computer publication service (*i.e.,* the platform). The ICS provider is now involved in the provision of that content at least in part. So, we raise the question again; where does "responsibility" "in part" cross the line from inconsequential publication - interactive computer service provision, into substantively contributing to content provision (the question at the heart of Fyk's case)? The Fourth Circuit explains:

> This Court has never fully defined the terms 'creation' or 'development' as they are used in the statute. But we have explained that "lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content—are barred." *Zeran*, 129 F.3d at 330; see also Nemet, 591 F.3d at 258 *('creation' or 'development' of information requires 'something more than [what] a website operator performs as part of its traditional editorial function' [i.e., publication services]).*
>
> Other circuits have put more flesh onto these definitions, determining that an [ICS] provider or user is responsible for the development of the information at issue in the case if *they 'directly and 'materially' contributed to* [*i.e.,* knowingly, divisibly, consciously, and with intent] what made the content itself 'unlawful.'' Force v. Facebook, 934 F.3d 53, 68 (2d Cir. 2019) (quoting LeadClick, 838 F.3d at 174); see Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC, 521 F.3d 1157, 1168 (9th Cir. 2008) *(explaining that a defendant is an information content provider if they 'contribute[d] materially to the alleged illegality of the conduct')*; …

*Henderson*, 53 F.4th at 127.

> When Zeran proclaimed that §230(c)(1) barred claims based on a defendant's exercise of traditional editorial functions, it also provided a suggestive list including "deciding whether to publish, withdraw, postpone or alter content." Zeran, 129 …
>
> Yet, Zeran's list of protected functions must be read *in its context*, and that context cabins that list to merely "editorial" functions. *It cannot be stretched to include actions that go beyond formatting or procedural alterations [i.e., interactive computer service functions] and change the substance of the content altered. An interactive service provider becomes an information content provider whenever their actions cross the line into substantively altering the content at issue in ways that make it unlawful.*

*Id.* at 129.

Facebook did *"something more"* than standard "formatting or procedural alterations" here (*i.e.,* more than provider interactive computer publication services), it directly, affirmatively, and knowingly ***"contribute[d] materially to the alleged illegality of the conduct"*** (*i.e.,* it consciously got involved in the provision of Fyk's content). Accordingly, Facebook is responsible for the *illegality of their own conduct*, consistent with *Henderson* (and all other decisions in Ex. 1) and the opinions of dozens of other notable officials (*see* Ex. 2). This Court's decision to immunize Facebook under §230(c)(1) does not comport with the majority of courts addressing ICS provider's own unlawful or tortious conduct.

Numerous courts mischaracterize the *Zeran* language and **interpret §230 as immunizing platforms'** *own editorial decisions.* To take a typical example, in *Levitt* the plaintiff alleged that Yelp! 'manipulate[d] … review pages—by removing certain reviews and publishing others or changing their order of appearance.' [*Levitt v. Yelp! Inc.*, Nos. C-10-1321 EMC, C-10-2351 EMC, 2011 WL 5079526 at *6 (N.D. Cal. Oct. 26, 2011)]. The *Levitt* plaintiffs argued that Yelp!'s [illegal] behavior constituted **unfair or fraudulent business under Cal. Bus. & Prof. Code §17200. But the elements of the unfair or fraudulent business practices law have nothing to do with speaking or publishing third party content.** Rather, they ask whether Yelp! engaged in an **'unlawful, unfair or fraudulent business act or practice' or an 'unfair, deceptive, untrue or misleading advertising and any act.'**

**Ignoring this straightforward analysis,** the court ruled that §230(c)(1) immunized Yelp!'s conduct, supporting its conclusion by quoting the 'traditional editorial functions' language of *Zeran*. But notice the court's confusion here: **Yelp! allegedly made changes and conscious re-arrangements [i.e., substantive alterations without any creation] to reviews in violation of its representations to users and customers – plaintiffs sought to make Yelp! accountable for** *its own* **editorial decisions and false representations.**

Candeub Treatise, Ex. 1 at 149 (italicized emphasis in original, bold emphasis added).

What Facebook did with Fyk's content was not a traditional "formatting or procedural alteration," it was "conscious rearrangements" done by intent (*i.e.,* for monetary gain). The deliberate de-publishing and re-publishing of Fyk's content (*i.e.,* with knowledge and intent) are ***"conscious rearrangements."*** Knowingly soliciting a new owner for Fyk's property, based on an anti-competitive intent, is ***"elements of unfair or fraudulent business practices law [that] have nothing to do with speaking or publishing third party content."*** "But for" Facebook's conduct, the illegalities espoused in the Verified Complaint would not have occurred. Had Fyk's case been brought in the Fourth Circuit Court or possibly drawn a different Judge in this Court, a different result would have occurred.

There is an inherent problem (*i.e.,* §230's irreconcilable problem) with both allowing some content alterations (*e.g.,* §230(c)(2)(A)'s content restrictions), while also disallowing other content alterations (*e.g.,* §230(c)(1)'s content provision). Both types of alteration are the *by proxy* result of content consideration. Thus, if you allow content consideration at all, you allow both content restriction and content provision. If an ICS provider can "consider" what information to remove (per §230(c)(2)(A)), *by proxy,* it can also consider what information to provide (*i.e.,* what information to allow/develop). This inevitably causes a blurring of the line between "traditional editorial function" and a "material

contribution" to the development of the information (*i.e.,* provision). SCOTUS wrestled with the complexity of this not so futile question, but failed to render a definitive answer.

> Justice Sotomayor:  All right. So, even if I accept that you're right that sending you unrequested things [*i.e.,* provide unsolicited content] that are similar to what you've viewed, whether it's a thumbnail or an e-mail, how does that become aiding and abetting? … I guess the question is, ***how do you get yourself from a neutral algorithm to an aiding and abetting?*** *… An **intent, knowledge**. There has to be some intent to aid and abet.* You have to have *knowledge* that you're doing this. … So how do you get there? …

> Mr. Schnapper: … if they didn't know it was happening, and the other elements of an aiding-and-abetting claim were present, they would not be liable for aiding and abetting.

Ex. 3 at 24:7 – 25:23 (emphasis added).

Indeed, how do you get yourself from a neutral ICS provider to an ICP: *knowledge* and *intent*? If a website has no knowledge or intent behind the content it provides, §230(c)(1) would apply. But, as soon as they "consider" the content, they are consciously involving themselves in the content provision decision and become responsible in part for their own knowledge/intent. Thus, if they have any potential liability (*i.e.,* responsibility in part), the courts should apply that conduct to §230(c)(2)(A)'s civil liability protection, not to §230(c)(1)'s treatment protection. This harmonious interpretation confines conduct to §230(c)(2)(A), and squares nicely with "good faith" and "Good Samaritan[ism]."

Therefore, if a website has *no knowledge* or *intent* when providing users' materials (*i.e., passively* hosting), the provider in that case cannot be treated as "the publisher or speaker" who consciously considered and provided the materials (*i.e.,* had knowledge and responsibility). But, as soon as the ICS provider crosses the content "consideration" line (*i.e.,* acts with intent and knowledge to develop/manipulate content), it does "something more" than just provide an interactive computer publication service, it is now consciously providing the content. Considering §230 as a harmonious whole, §230(c) naturally applies to the motivation/intent, §230(c)(1) applies when the ICS provider has *no knowledge* of the content it provides, §230(c)(2)(A) applies when the ICS provider or user "considers" content (*i.e.,* consciously develops information in part), and §230(c)(2)(B) applies when the ICS provider provides the tools necessary to other ICS users, to restrict information for themselves.

Facebook *knowingly* considered Fyk's materials (*i.e.,* a conscious/substantive contribution), unpublished those materials (*i.e.,* a conscious rearrangement), solicited another owner for Fyk's property

(*i.e.,* an anti-competitive intent), *knowingly* considered Fyk's content again (*i.e.,* another substantive contribution), and then *knowingly* re-published the same content (*i.e.,* another conscious rearrangement), based on its own anti-competitive animus (*i.e.,* the motivation/*intent*). All of Facebook's conduct was antithetical to the "Good Samaritan" general provision (*i.e.,* the "good faith" *intent* of §230). Facebook certainly did "something more" than traditional "formatting and procedural alterations" and consequently should not receive any protection for any of its anti-competitive conduct.

On Fyk's first 60(b) go-round with this Court, seeking to reconcile *Fyk* and *Enigma*, this Court (and the Ninth Circuit, effectively ratifying same by entirely refusing to address the merits of Fyk's appeal) held, in pertinent part: "The Order that Fyk seeks to vacate based its conclusion on 47 U.S.C. §230(c)(1). By contrast, the Ninth Circuit's *Enigma* opinion did not involve the application of §230(c)(1); instead, the court examined §230(c)(2)." *Fyk*, 18-cv-05159-JSW, 2021 WL 5764249 at *1 (N.D. Cal. Nov. 1, 2021) (internal citations omitted). Rather than harmonize or even rationalize *Fyk* with *Enigma* (*i.e.,* consider §230 as a whole), this Court adopted an absurd interpretation that the "Good Samaritan" *general* provision does not apply *"generally"* to the statute and is exclusive to a §230(c)(2) analysis. If that is truly the case, §230 is unconstitutional per *Jarkesy*. Either way, Fyk's case was dismissed improperly.

This Court entirely missed that Fyk's case was never a §230(c)(1) case. As "Professor" Eric Goldman inadvertently stumbled upon in a perverse article regarding Fyk's dismissal: "Yet again, the court relies on 230(c)(1) for facts fitting the 230(c)(2) paradigm." Both *Fyk* Courts inexplicably misapplied §230(c)(1) as "super-immunity" to a §230(c)(2)(A) case. The facts of Fyk's case simply do not fit the §230(c)(1) paradigm, at all. Like the District Court in *Henderson*, "[h]ere [too], th[is] district court erred by finding that §230(c)(1) barred all counts asserted against [Facebook]. To the contrary, on the facts as alleged [by Fyk], [§230(c)(1)] does not apply to any of them." *Henderson*, 53 F.4th at 129.

### C.   *Rule 60(b)(6) – Equitable Powers Can Be Used To Prevent Furtherance Of Injustice*

Even if this Court were to deny Fyk's second request (now five years into litigation) to vacate the judgment pursuant to Rule 60(b)(5), it should still vacate the judgment under Rule 60(b)(6) to avoid a "manifest injustice." Rule 60 offers equitable relief to a party seeking to vacate a judgment in order to avoid "manifest injustice." *Latshaw v. Trainer Wortham Comp. Inc.*, 452 F.3d 1097, 1103 (9th Cir. 2006); *U.S. v. Washington* 394 F.3d 1152, 1157(9th Cir. 2005), overruled on other grounds in *U.S. v.*

*Washington* 593 F.3d 790 (9th Cir. 2010), *U.S. v. Alpine Land & Reservoir Co.* 984 F.2d 1047, 1049 (9th Cir. 1993)). Rule 60(b)(6) has been called "a grand reservoir of equitable power," and it affords courts the discretion and power "to vacate judgments whenever such action is appropriate to accomplish justice." *Phelps v. Alameida* 569 F.3d 1120, 1135 (9th Cir. 2009) (quoting *Gonzalez v. Crosby* 545 U.S. 524, 542 (2005), quoting *Liljeberg v. Health Serv. Acquisition Corp.* 486 U.S. 847, 864 (1988)). Under this standard, Rule 60 relief is not governed by any *per se* rule, but is to be granted on a case-by-case basis when the facts of a given case warrant such relief.

In *Phelps*, the Ninth Circuit set forth certain factors "designed to guide courts in determining whether … extraordinary circumstances [as required for Rule 60 relief] have been demonstrated by an individual seeking relief under the rule." *Phelps,* 569 F.3d 1120. Courts should consider whether:

> (1) a litigant has diligently pursued relief that respects the strong public interest in timeliness and finality", "(2) whether granting relief would 'undo the past, executed effects of the judgment, thereby disturbing the parties' reliance interest in the finality of the case, as evidence, for example, by detrimental reliance or a change in position" and if "(3) given, in the court's opinion, that a central purpose of Rule 60(b) is to correct erroneous legal judgments that, if left uncorrected, would prevent the true merits of a petitioner's constitutional claims from ever being heard[;] [i]n such cases, this factor will cut in favor of granting Rule 60(b)(6) relief.

*Phelps*, 569 F.3d at 1137-1140. These factors all support Fyk's request for relief.

First, Fyk has been diligent, as explained in §I above and §IV.D below. Second, no party has detrimentally relied on the judgment where it would cause harm for the case to be litigated. Facebook's conduct has not changed in reliance on the Court's Order because the Order merely maintained the status quo prior to this action. Third, this Court must correct the judgment to prevent massive injustice from continuing. Issues surrounding broad CDA immunity are of national/global significance and federal courts' consistently inconsistent application of §230 protections have "serious consequences" for millions of users like Fyk who face anti-competitive conduct by ISPs. By canning Fyk, there will never be a resolution on the open question of §230 immunity scope (*i.e.,* Fyk's case is not *"futile in this instance"*).

### D.      This Motion Is Timely

Motions filed pursuant to Rule 60(b) "must be made within a reasonable time." Fed. R. Civ. P. 60(c)(1). "What constitutes a reasonable time depends on the facts of each case." *In re Pac. Far E. Lines, Inc.*, 889 F.2d 242, 249 (9th Cir. 1989).

1

2

3

> What constitutes reasonable time depends on the facts of each case. *See Washington v. Penwell,* 700 F.2d 570, 572-73 (9th Cir. 1983) (four-year delay not unreasonable because of extraordinary circumstances); *Twentieth Century-Fox Film Corp. v. Dunnahoo,* 637 F.2d 1338, 1841 (9th Cir 1981) (six-year delay unreasonable in case of liquidated damages decree and no extraordinary circumstances); *Clarke v. Burkle,* 570 F.2d at 831-32 (six year delay not unreasonable).

4

*U.S. v. Holtzman,* 762 F.2d 720, 725 (9th Cir. 1985).

5

6

7

8

9

10

11

12

13

When determining if a delay was reasonable, courts consider "the danger of prejudice to the petitioner; length of the delay and its potential impact on judicial proceedings; reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith." *Pioneer Inv. Serv. Co v. Brunswick Associates L.P.*, 507 U.S. 380, 392-97, 113 S. Ct. 1489, 1497-99 (1993). In the instant matter, Fyk acted with good faith. SCOTUS denied his section petition for writ of certiorari a mere couple months ago in mid-April, and Fyk reasonably waited on SCOTUS' *Gonzalez* decision, which was handed down just a few weeks ago. Thus, there is no possible way (capable of surviving the laugh test) for this motion to be considered untimely. Moreover, and again, no prejudice will be suffered by Facebook having to finally put forth a substantive defense.

14

**V.      CONCLUSION**

15

16

17

18

New law that directly impacts the outcome of this case has been decided: *Henderson* (Fourth Circuit), *Rumble* (this Court), *Doe* (SCOTUS), *Jarkesy* (Fifth Circuit), *Lemmon* (Ninth Circuit), *DZ Reserve* (this Court). Those decisions cannot be reconciled with this Court's previous decision. This reason alone justifies this Court's vacating the judgment under 60(b).

19

20

21

WHEREFORE, Plaintiff, Jason Fyk, respectfully requests entry of an order (1) granting Fyk's 60(b) motion; *i.e.*, vacating the Court's prior judgment, and/or (2) affording Fyk any other relief the Court deems equitable, just, or proper (*e.g.*, leave to amend the Verified Complaint).

22

Dated:  June 16, 2023.

23

24

Respectfully Submitted,

25

/s/ Jeffrey Greyber
**Jeffrey L. Greyber, Esq.**

26

Poli, Moon & Zane, PLLC
*Counsel for Plaintiff*

27

28

1

### CERTIFICATE OF SERVICE

2

I HEREBY CERTIFY that on June 16, 2023, I electronically filed the foregoing documents with

3

the Clerk of the Court by using CM/ECF. I also certify that the foregoing document is being served this

4

day on all counsel of record *via* Notices of Electronic Filing generated by CM/ECF.

5

/s/ Jeffrey Greyber
**Jeffrey Greyber, Esq.**

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FRCP 60(B) MOTION TO VACATE AND SET ASIDE ENTRY OF JUDGMENT, Case No.: 4:18-cv-05159-JSW