Exhibit #1

KeyCite Yellow Flag - Negative Treatment

Declined to Follow by  Prager University v. Google LLC,   Cal.App. 6 Dist., December 5, 2022

53 F.4th 110

United States Court of Appeals, Fourth Circuit.

Tyrone HENDERSON, Sr.; George I. Harrison, Jr.; Robert McBride, on behalf of himself and others similarly situated, Plaintiffs-Appellants,

v.

The SOURCE FOR PUBLIC DATA, L.P.,

d/b/a Publicdata.com; ShadowSoft, Inc.;

Harlington-Straker Studio, Inc.; and Dale Bruce Stringfellow, Defendants-Appellees.

Federal Trade Commission; Consumer Financial Protection Bureau; North Carolina; Texas; Alabama; Arizona; Arkansas; Connecticut; Georgia; Iowa; Maine; Michigan; Minnesota; Mississippi; Nebraska; Nevada; North Dakota; Ohio; South Carolina; South Dakota; Utah; Vermont; Virginia; National Consumer Law Center; National Fair Housing Alliance; Lawyers' Committee for Civil Rights Under Law Amici Supporting Appellants.

No. 21-1678
|
Argued: May 3, 2022
|
Decided: November 3, 2022

**Synopsis**

**Background:** Job seekers brought putative class action against website operator alleging violation of Fair Credit Reporting Act (FCRA) by including inaccurate criminal information in background check reports furnished to potential employers. The United States District Court for the Eastern District of Virginia, Henry E. Hudson, Senior District Judge, 540 F.Supp.3d 539, granted judgment on the pleadings in favor of operator. Job seekers appealed.

**Holdings:** The Court of Appeals, Richardson, Circuit Judge, held that:

[1] claim alleging that operator violated FCRA by failing to provide the job seekers with a copy of their own consumer reports did not seek to hold operator "as a publisher" of information, and thus, operator was not entitled to CDA immunity for that claim;

[2] operator was not entitled to CDA immunity for FCRA claim alleging operator failed to obtain certification from potential employer and failed to provide summary of consumer's FCRA rights to employer; and

[3] operator was allegedly "information content provider" not entitled to immunity under CDA.

Reversed and remanded.

**Procedural Posture(s):** On Appeal; Motion for Judgment on the Pleadings.

West Headnotes (34)

**[1]    Federal Courts    Judgment on the pleadings**

The Court of Appeals reviews de novo the district court's ruling on a motion for judgment on the pleadings, and the Court of Appeals applies the same standards as it would for a motion to dismiss for failure to state a claim. Fed. R. Civ. P. 12(b)(6), 12(c).

**[2]    Federal Civil Procedure    Matters deemed admitted**

A court deciding a motion for judgment on the pleadings accepts all well-pleaded facts in the complaint as true. Fed. R. Civ. P. 12(c).

**[3]    Telecommunications    Privilege or immunity**

Hosting a website enables computer access by multiple users to a computer server, so that the host or operator of the website qualifies as a provider of "interactive computer service," as required for immunity under the Communications Decency Act (CDA). Communications Act of 1934 § 230, 47 U.S.C.A. § 230(c)(1).

**[4]**     **Telecommunications** 🗝 Privilege or immunity

A claim treats the defendant as the "publisher or speaker of any information," as required for immunity under the Communications Decency Act (CDA) when it (1) alleges that the defendant is liable for publishing certain information to third parties, and (2) seeks to impose liability based on that information's improper content. Communications Act of 1934 § 230, 47 U.S.C.A. § 230(c)(1).

1 Case that cites this headnote

**[5]**     **Telecommunications** 🗝 Privilege or immunity

In determining whether a claim treats the defendant as the "publisher or speaker of any information," as required for immunity under the Communications Decency Act (CDA), the court asks whether the claim thrusts the interactive computer service provider into the role of a traditional publisher. Communications Act of 1934 § 230, 47 U.S.C.A. § 230(c)(1).

2 Cases that cite this headnote

**[6]**     **Telecommunications** 🗝 Privilege or immunity

The scope of the role of a traditional publisher, and therefore the scope of what the Communications Decency Act (CDA) protects, is guided by the common law of defamation. Communications Act of 1934 § 230, 47 U.S.C.A. § 230(c)(1).

**[7]**     **Statutes** 🗝 Statutory terms with common law meanings
           **Statutes** 🗝 Other Statutes

When a word in a statute is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it.

**[8]**     **Telecommunications** 🗝 Privilege or immunity

The Communications Decency Act (CDA) alters the way common law defamation claims apply to users and providers of interactive computer services that the common law would otherwise hold liable as publishers. Communications Act of 1934 § 230, 47 U.S.C.A. § 230(c)(1).

**[9]**     **Libel and Slander** 🗝 Publication

For purpose of a common law defamation claim, a "publisher" is someone who intentionally or negligently disseminated information to third parties.

**[10]**    **Libel and Slander** 🗝 Publication

For purpose of a common law defamation claim, a third party to whom the allegedly defamatory information is disseminated is someone other than the subject of the information disseminated.

**[11]**    **Telecommunications** 🗝 Privilege or immunity

For a claim to treat the defendant as a "publisher," as required for immunity under the Communications Decency Act, the claim must seek to impose liability based on the defendant's dissemination of information to someone who is not subject of information. Communications Act of 1934 § 230, 47 U.S.C.A. § 230(c)(1).

**[12]**    **Telecommunications** 🗝 Privilege or immunity

For immunity under the Communications Decency Act (CDA), the defendant's alleged liability under the claim must be "based on the content of the speech" published by the interactive service provider. Communications Act of 1934 § 230, 47 U.S.C.A. § 230(c)(1).

**[13]   Libel and Slander**  🔑  Nature and form of remedy

To hold someone liable as a publisher, in a common law defamation claim, is to hold them responsible for the improper character of the speech or content published.

**[14]   Telecommunications**  🔑  Privilege or immunity

For immunity to apply to an interactive computer services provider under the Communications Decency Act (CDA), the alleged liability must attach to the provider on account of some improper content within their publication. Communications Act of 1934 § 230, 47 U.S.C.A. § 230(c)(1).

1 Case that cites this headnote

**[15]   Torts**  🔑  False Light

Common law false-light claims hold a publisher of a statement liable only when there is at least an implicit false statement of objective fact.

**[16]   Telecommunications**  🔑  Privilege or immunity

To be allegedly liable for information as "publisher or speaker," as required for immunity under the Communications Decency Act (CDA), means more than the publication of information was a but-for cause of the alleged harm. Communications Act of 1934 § 230, 47 U.S.C.A. § 230(c)(1).

**[17]   Finance, Banking, and Credit**  🔑  Persons Liable

**Telecommunications**  🔑  Privilege or immunity

The Communications Decency Act (CDA) does not provide blanket protection for interactive computer services providers from claims asserted under the Fair Credit Reporting Act (FCRA) just because they depend in some

way on publishing information. Consumer Credit Protection Act §§ 603, 609, 15 U.S.C.A. §§ 1681a(d)(1), 1681a(f), 1681g(a); Communications Act of 1934 § 230, 47 U.S.C.A. § 230(c)(1).

**[18]   Finance, Banking, and Credit**  🔑  Credit Reporting

The Fair Credit Reporting Act (FCRA) imposes procedural obligations on any consumer reporting agency. Consumer Credit Protection Act §§ 603, 609, 15 U.S.C.A. §§ 1681a(d)(1), 1681a(f), 1681g(a).

**[19]   Finance, Banking, and Credit**  🔑  Persons Liable

**Telecommunications**  🔑  Privilege or immunity

A Fair Credit Reporting Act (FCRA) claim must first impose liability on defendant as publisher or speaker of information, in order for immunity to apply to the defendant for that claim under the Communications Decency Act (CDA). Consumer Credit Protection Act §§ 603, 609, 15 U.S.C.A. §§ 1681a(d)(1), 1681a(f), 1681g(a); Communications Act of 1934 § 230, 47 U.S.C.A. § 230(c)(1).

**[20]   Telecommunications**  🔑  Privilege or immunity

When considering whether any claim treats a defendant as a publisher, as will support immunity under the Communications Decency Act (CDA), the court must look beyond the claim's formal elements. Communications Act of 1934 § 230, 47 U.S.C.A. § 230(c)(1).

**[21]   Telecommunications**  🔑  Privilege or immunity

In determining whether a claim seeks to hold defendant liable as a publisher, as will support immunity under the Communications Decency Act, the court looks to see what the plaintiff

in the particular case must prove, that is, if the plaintiff's recovery requires treating the defendant as a publisher. Communications Act of 1934 § 230, 47 U.S.C.A. § 230(c)(1).

**[22]**   **Finance, Banking, and Credit** 🔑 Persons Liable

**Telecommunications** 🔑 Privilege or immunity

Job seekers' claim against website operator, alleging that operator violated the Fair Credit Reporting Act (FCRA) by failing to provide the job seekers with a copy of their own consumer reports along with a notice of their consumer rights under the FCRA did not seek to hold operator liable "as a publisher" of information, and thus operator was not entitled to immunity for any such FCRA violations under the Communications Decency Act (CDA); claim was not based on operator's failure to disseminate information to a third party. Consumer Credit Protection Act § 609, 15 U.S.C.A. § 1681g; Communications Act of 1934 § 230, 47 U.S.C.A. § 230(c)(1).

**[23]**   **Finance, Banking, and Credit** 🔑 Persons Liable

**Telecommunications** 🔑 Privilege or immunity

Job seekers' claim against website operator, alleging that operator violated the Fair Credit Reporting Act (FCRA) by failing to obtain certification from a potential employer requesting consumer reports that it has complied with the FCRA and would not use the information in violation of the law and by failing to provide summary of consumer's FCRA rights to the requesting employer, did not seek to hold operator liable "as a publisher" of information, and thus operator was not entitled to immunity for any such FCRA violations under the Communications Decency Act (CDA); claim was not based on operator's failure to disseminate information to a third party, and claim did not depend on the information's improper content. Consumer Credit Protection Act § 604, 15

U.S.C.A. § 1681b(b)(1); Communications Act of 1934 § 230, 47 U.S.C.A. § 230(c)(1).

**[24]**   **Finance, Banking, and Credit** 🔑 Liability for inaccurate or incomplete information

A consumer bringing a Fair Credit Reporting Act (FCRA) claim against a consumer reporting agency for failure to follow reasonable procedures to assure maximum possible accuracy of the information in a consumer report must show that the consumer report contains inaccurate information. Consumer Credit Protection Act § 607, 15 U.S.C.A. § 1681e(b).

**[25]**   **Finance, Banking, and Credit** 🔑 Credit reporting

A private plaintiff bringing a Fair Credit Reporting Act (FCRA) claim against a consumer reporting agency for failure to follow reasonable procedures to assure maximum possible accuracy of the information in a consumer report must show that the reporting agency disseminated information to third parties to satisfy Article III standing. U.S. Const. art. 3, § 2, cl. 1; Consumer Credit Protection Act § 607, 15 U.S.C.A. § 1681e(b).

**[26]**   **Finance, Banking, and Credit** 🔑 Persons Liable

**Telecommunications** 🔑 Privilege or immunity

Website operator that allegedly disseminated consumer reports to requesting employers that included inaccurate or incomplete criminal background information about job seekers was allegedly "information content provider" not entitled to immunity under Communications Decency Act (CDA) for job seekers' Fair Credit Reporting Act (FCRA) claims, alleging failure to maintain reasonable procedures to ensure accuracy of information in consumer reports; operator allegedly obtained public criminal records, stripped certain information from the public records, replaced that information with

its own summaries of criminal charges and their dispositions, did not look for or fix inaccuracies in that information before including it in reports, and sold the reports to requesting employers. Consumer Credit Protection Act § 607, 15 U.S.C.A. § 1681e(b); Communications Act of 1934 § 230, 47 U.S.C.A. § 230(c)(1).

**[27]**    **Telecommunications** 🔑 Privilege or immunity

A defendant can be both a provider or user of an interactive computer service and also an information content provider, and when a defendant is both, the immunity provision of the Communications Decency Act (CDA) does not apply. Communications Act of 1934 § 230, 47 U.S.C.A. § 230(c)(1).

1 Case that cites this headnote

**[28]**    **Telecommunications** 🔑 Privilege or immunity

When provider of interactive computer service also provides the challenged information at issue in the claim, it receives no protection from liability under the Communications Decency Act (CDA). Communications Act of 1934 § 230, 47 U.S.C.A. § 230(c)(1).

**[29]**    **Telecommunications** 🔑 Privilege or immunity

An interactive computer services company is "information content provider," for purpose of determining entitlement to immunity under the Communications Decency Act (CDA), if it is responsible, in whole or in part, for the creation or development of the information at issue. Communications Act of 1934 § 230, 47 U.S.C.A. § 230(c)(1).

**[30]**    **Telecommunications** 🔑 Privilege or immunity

The Communications Decency Act (CDA) bars liability against internet computer service companies that serve as intermediaries for other parties' potentially injurious messages. Communications Act of 1934 § 230, 47 U.S.C.A. § 230(c)(1).

**[31]**    **Telecommunications** 🔑 Privilege or immunity

An interactive computer service is not responsible for developing the unlawful information, as will defeat immunity under the Communications Decency Act (CDA), unless they have gone beyond the exercise of traditional editorial functions and materially contributed to what made the content unlawful. Communications Act of 1934 § 230, 47 U.S.C.A. § 230(c)(1).

**[32]**    **Telecommunications** 🔑 Privilege or immunity

Whether a defendant developed information such that they are an "information content provider" not entitled to immunity under the Communications Decency Act turns on whether the defendant has materially contributed to the pieces of information relevant to liability. Communications Act of 1934 § 230, 47 U.S.C.A. § 230(c)(1).

**[33]**    **Telecommunications** 🔑 Privilege or immunity

An interactive computer service provider becomes an "information content provider," supporting denial of immunity under the Communications Decency Act (CDA), whenever their actions cross the line into substantively altering the content at issue in ways that make it unlawful. Communications Act of 1934 § 230, 47 U.S.C.A. § 230(c)(1).

**[34]**    **Telecommunications** 🔑 Privilege or immunity

The Communications Decency Act (CDA) does not insulate a company from liability for all conduct that happens to be transmitted through

the internet. Communications Act of 1934 § 230, 47 U.S.C.A. § 230(c)(1).

**\*115** Appeal from the United States District Court for the Eastern District of Virginia, at Richmond. Henry E. Hudson, Senior District Judge. (3:20-cv-00294-HEH)

**Attorneys and Law Firms**

ARGUED: Jennifer D. Bennett, GUPTA WESSLER, San Francisco, California, for Appellants. Kyle David Highful, OFFICE OF THE ATTORNEY GENERAL OF TEXAS, Austin, Texas, for Amici States. Theodore (Jack) Metzler, FEDERAL TRADE COMMISSION, Washington, D.C., for Amicus Federal Trade Commission. Misha Tseytlin, TROUTMAN PEPPER HAMILTON SANDERS LLP, Chicago, Illinois, for Appellees. ON BRIEF: Leonard A. Bennett, Craig C. Marchiando, CONSUMER LITIGATION ASSOCIATES, P.C., Newport News, Virginia; Kristi C. Kelly, KELLY GUZZO PLC, Fairfax, Virginia; Matthew W.H. Wessler, GUPTA WESSLER, Washington, D.C., for Appellants. Timothy J. St. George, Richmond, Virginia, Ronald I. Raether, Jr., TROUTMAN PEPPER HAMILTON SANDERS LLP, Irvine, California, for Appellees. Steven Van Meter, Acting General Counsel, Steven Y. Bressler, Acting Deputy General Counsel, Laura Hussain, Assistant General Counsel, Derick Sohn, Senior Counsel, CONSUMER FINANCIAL PROTECTION BUREAU, Washington, D.C.; James Reilly Dolan, Acting General Counsel, Joel Marcus, Deputy General Counsel, FEDERAL TRADE COMMISSION, Washington, D.C.; Joshua H. Stein, Attorney General, Daniel P. Mosteller, Deputy General Counsel, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Amici Federal Trade Commission, Consumer Financial Protection Bureau, and North Carolina. John G. Albanese, Ariana Kiener, BERGER MONTAGUE PC, Minneapolis, Minnesota, for Amici National Consumer Law Center, Upturn, American Civil Liberties Union, National Housing Law Project, National Employment Law Project, and National Low Income Housing Coalition. Ken Paxton, Attorney General, Brent Webster, First Assistant Attorney General, Judd E. Stone II, Solicitor General, Bill Davis, Deputy Solicitor General, OFFICE OF THE ATTORNEY GENERAL OF TEXAS, Austin, Texas, for Amicus State of Texas. Steve Marshall, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ALABAMA, Montgomery, Alabama, for Amicus State of Alabama.

Mark Brnovich, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ARIZONA, Phoenix, Arizona, for Amicus State of Arizona. Leslie Rutledge, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ARKANSAS, Little Rock, Arkansas, for Amicus State of Arkansas. William Tong, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF CONNECTICUT, Hartford, Connecticut, for Amicus State of Connecticut. Christopher M. Carr, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF GEORGIA, Atlanta, Georgia, for Amicus State of Georgia. Tom Miller, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF IOWA, Des Moines, Iowa, for Amicus State of Iowa. Aaron M. Frey, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MAINE, Augusta, Maine, for Amicus State of Maine. Dana Nessel, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MICHIGAN, Lansing, Michigan, for Amicus State of Michigan. Keith Ellison, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MINNESOTA, St. Paul, Minnesota, for Amicus State of Minnesota. Lynn Fitch, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MISSISSIPPI, Jackson, Mississippi, for Amicus State of Mississippi. Douglas J. Peterson, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEBRASKA, Lincoln, Nebraska, for Amicus State of Nebraska. Aaron D. Ford, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEVADA, Las Vegas, Nevada, for Amicus State of Nevada. Wayne Stenehjem, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NORTH DAKOTA, Bismarck, North Dakota, for Amicus State of North Dakota. Dave Yost, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF OHIO, Columbus, Ohio, for Amicus State of Ohio. Alan Wilson, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF SOUTH CAROLINA, Columbia, South Carolina, for Amicus State of South Carolina. Jason R. Ravnsborg, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF SOUTH DAKOTA, Pierre, South Dakota, for Amicus State of South Dakota. Sean D. Reyes, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF UTAH, Salt Lake City, Utah, for Amicus State of Utah. Thomas J. Donovan, Jr., Attorney General, OFFICE OF THE ATTORNEY GENERAL OF VERMONT, Montpelier, Vermont, for Amicus State of Vermont. Mark R. Herring, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Amicus Commonwealth of Virginia. Jon Greenbaum, David Brody, Noah Baron, Adonne Washington, LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER

LAW, Washington, D.C.; D. Scott Chang, Morgan Williams, NATIONAL FAIR HOUSING ALLIANCE, Washington, D.C.; Zarema A. Jaramillo, Joshua E. Morris, Washington, D.C.; Mary J. Hildebrand, Sydney J. Kaplan, LOWENSTEIN SANDLER LLP, New York, New York, for Amici the Lawyers' Committee for Civil Rights Under Law and the National Fair Housing Alliance.

Before AGEE, RICHARDSON, and QUATTLEBAUM, Circuit Judges.

**Opinion**

Reversed and remanded by published opinion. Judge Richardson wrote the opinion, in which Judge Agee and Judge Quattlebaum joined.

RICHARDSON, Circuit Judge:

 **\*117** Section 230(c)(1) of the Communications Decency Act protects some parties operating online from specific claims that would lead to liability for conduct done offline. But it is not a license to do whatever one wants online. Protection under § 230(c)(1) extends only to bar certain claims imposing liability for specific information that another party provided.

Public Data sought § 230(c)(1) protection against four claims brought against it for violating the Fair Credit Reporting Act ("FCRA"). The district court agreed that the claims were precluded by § 230(c)(1). Plaintiffs appealed, arguing that § 230(c)(1) does not apply. We agree. Plaintiffs have alleged facts that, if true, render § 230(c)(1) inapplicable to their four claims. So we reverse the district court and remand for further proceedings.

**I. Background**

 **[1]**   **[2]**  Defendants are The Source of Public Data, L.P.; ShadowSoft, Inc.; Harlington-Straker Studio, Inc.; and Dale Bruce Stringfellow. Defendants' relation to each other and to the website PublicData.com is complex but unimportant to this appeal. Rather than break out the white board and red string to understand how they fit together, we accept on appeal Plaintiffs' allegation that all Defendants are alter egos jointly responsible for any FCRA liability arising from the business activities conducted on PublicData.com. [1] So we refer to Defendants collectively as "Public Data."

[1]   This case comes to us on appeal from the district court's grant of a motion for judgment on the

pleadings under Federal Rule of Civil Procedure 12(c). Our review is de novo, and we apply the same standards as we would for a Rule 12(b)(6) motion. *Massey v. Ojaniit*, 759 F.3d 343, 353 (4th Cir. 2014). This means that we accept all well-pleaded facts in the complaint as true. *Drager v. PLIVA USA, Inc.*, 741 F.3d 470, 474 (4th Cir. 2014). Given the procedural posture, our factual summary takes Plaintiffs' Second Amended Complaint at face value.

Public Data's business is providing third parties with information about individuals. Plaintiffs allege that it involves four steps.

First, Public Data acquires public records, such as criminal and civil records, voting records, driving information, and professional licensing. These records come from various local, state, and federal authorities (and other businesses that have already collected those records).

Second, Public Data "parses" the collected information and puts it into a proprietary format. This can include taking steps **\*118** to "reformat and alter" the raw documents, putting them "into a layout or presentation [Public Data] believe[s] is more user-friendly." J.A. 16. For criminal records, Public Data "distill[s]" the data subject's criminal history into "glib statements," "strip[s] out or suppress[es] all identifying information relating to the charges," and then "replace[s] this information with [its] own internally created summaries of the charges, bereft of any detail." J.A. 30.

Third, Public Data creates a database of all this information which it then "publishes" on the website PublicData.com. Public Data does not look for or fix inaccuracies in the database, and the website disclaims any responsibility for inaccurate information. Public Data also does not respond to requests to correct or remove inaccurate information from the database.

Fourth, Public Data sells access to the database, "disbursing [the] information ... for the purpose of furnishing consumer reports to third parties." J.A. 19. All things told, Plaintiffs allege that Public Data sells 50 million consumer searches and reports per year. Public Data knows that traffic includes some buyers using its data and reports to check creditworthiness and some performing background checks for employment purposes.

Plaintiffs allege that Public Data's activities injured them. Plaintiffs Henderson, Harrison, and McBride have each requested a copy of the records Public Data keeps on them, but Public Data has not provided those records. Plaintiff McBride also alleges that he applied for a job that required a background check. As part of that check, his potential employer used a background report from Public Data. Public Data's report on McBride was inaccurate because it contained misleading and incomplete criminal history. McBride was not hired. [2]

[2]    McBride alleges that he learned about the inaccurate information included in the report when he sued his potential employer and obtained the report in discovery.

Plaintiffs bring four claims against Public Data alleging it violated four provisions of the FCRA. [3] Underlying each claim is the contention that Public Data must comply with the FCRA because they produce "consumer report[s]" and are a "consumer reporting agency" under the Act. [4]

[3]    Plaintiffs together represent a putative class for Count One, Plaintiff McBride alone represents a class for Counts Two and Three, and Count Four is an individual claim brought by Plaintiff McBride. Given the posture of this case, we express no opinion on the class allegations or propriety of class certification.

[4]    These terms are defined in 15 U.S.C. § 1681a(d) and (f), respectively. Since the only issue on appeal is whether 47 U.S.C. § 230(c)(1) bars Plaintiffs' claims, we do not address whether Public Data qualifies as a "consumer reporting agency" under the FCRA.

In Count One, Plaintiffs allege that Public Data violated § 1681g [5] by failing to provide them a copy of their own records and a notice of their FCRA rights when requested. In Count Three, Plaintiff McBride alleges that Public Data violated § 1681b(b)(1) [6] by failing to get certain **119 certifications from employers it provided reports to, and by failing to provide those employers with a consumer-rights summary. Counts Two and Four both seek to impose liability for Public Data's failure to maintain proper procedures to ensure accurate information. Count Two alleges that Public Data violated § 1681k(a) [7] by failing to notify Plaintiffs when it provided their records for employment purposes and by

failing to establish adequate procedures to ensure complete and up to date information in those records. And in Count Four, Plaintiff McBride alleges, for himself only, that Public Data violated § 1681e(b) [8] by not implementing sufficient procedures to ensure accuracy in its reports.

[5]    "Every consumer reporting agency shall, upon request ... clearly and accurately disclose to the consumer" certain information including "[a]ll information in the consumer's file at the time of the request," "[t]he sources of the information," and the "[i]dentification of each person ... that procured a consumer report" within the two years before the request, if procured "for employment purposes," or within one year otherwise. 15 U.S.C. § 1681g(a)(1)–(3).

[6]    Section 1681b(b)(1) requires that a consumer reporting agency obtain certifications from its employer-customers stating they will comply with § 1681b(b)(2)(A), and that the consumer reporting agency provide those employer-customers with a summary of the consumer's rights. 15 U.S.C. § 1681b(b)(1).

[7]    "A consumer reporting agency which furnishes a consumer report for employment purposes and which for that purpose compiles and reports items of information on consumers which are matters of public record and are likely to have an adverse effect upon a consumer's ability to obtain employment shall—(1) at the time such public record information is reported to the user of such consumer report, notify the consumer of the fact that public record information is being reported by the consumer reporting agency, together with the name and address of the person to whom such information is being reported; or (2) maintain strict procedures designed to insure that whenever public record information which is likely to have an adverse effect on a consumer's ability to obtain employment is reported it is complete and up to date." 15 U.S.C. § 1681k(a).

[8]    "Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).

Public Data moved for judgment on the pleadings, arguing that each claim was barred by § 230(c)(1). The district court agreed and granted judgment for Public Data. *See Henderson v. Source for Pub. Data*, 540 F. Supp. 3d 539, 543 (E.D. Va. 2021). Plaintiffs appealed, and we have jurisdiction under 28 U.S.C. § 1291.

## II. Discussion

Section 230 provides internet platforms with limited legal protections. *See generally* Adam Candeub, *Reading Section 230 as Written*, 1 J. Free Speech L. 139 (2021). Subsection 230(c)(1) prohibits treating an interactive computer service as a publisher or speaker of any information provided by a third party. And § 230(c)(2) bars liability for a platform's actions to restrict access to obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise-objectionable material.

On appeal, this case deals exclusively with the protection provided by § 230(c)(1): "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." Read plainly, this text requires that a defendant like Public Data must establish three things to claim protection: (1) The defendant is a " 'provider or user of an interactive computer service' "; (2) the plaintiff's claim holds the defendant "responsible 'as the publisher or speaker of any information' "; and (3) the relevant information was " 'provided by another information content provider.' " *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 254 (4th Cir. 2009) (quoting § 230(c)(1)).[9] These three requirements **120** look first to the defendant's status (i.e., are they a provider or user of an "interactive computer service"), then to the kind of claim the plaintiff has brought (i.e., does the plaintiff treat the defendant as a publisher or speaker of information), and finally to the source of the information underlying the plaintiff's claim (i.e., who provided the information).

[9] There was some confusion below about these requirements. *See Henderson*, 540 F. Supp. 3d at 547. And that is understandable given that we have not been clear about separating (c)(1)'s three distinct requirements. *See Zeran v. America Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997) (discussing the protection in broad terms, without separating into distinct prongs). But when grappling with § 230(c)(1), we have applied these ideas, if not always in a neat and ordered row. *See id.*

(discussing (1) "service providers" being (2) held "liable for information originating with a third-party user of the service," (3) "in a publisher's role"); *see also Nemet*, 591 F.3d at 254–55; *Erie Ins. Co. v. Amazon.com, Inc.*, 925 F.3d 135, 139–40 (4th Cir. 2019). To avoid confusion, we follow our sister circuits and read the statute to create three requirements. *See HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 681 (9th Cir. 2019); *FTC v. LeadClick Media, LLC*, 838 F.3d 158, 173 (2d Cir. 2016); *Marshall's Locksmith Serv. Inc. v. Google, LLC*, 925 F.3d 1263, 1267–68 (D.C. Cir. 2019).

**[3]** Public Data asserts that its activities, as described in Plaintiffs' FRCA claims, satisfy all three § 230(c)(1) requirements, so that § 230(c)(1) bars those claims. Plaintiffs disagree. For this appeal, they admit that Public Data is an interactive computer service [10] but challenge the other two requirements necessary for § 230(c)(1) protection. On the second requirement, Plaintiffs argue their claims do not treat Public Data as the publisher or speaker of the offending information. And on the third requirement, Plaintiffs allege that Public Data *itself* acted as an "information content provider" of the offending information such that the information did not come solely from "*another* information content provider."

[10] "The term 'interactive computer service' means any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions." § 230(f)(2). Hosting a website "enables computer access by multiple users to a computer server." *See LeadClick*, 838 F.3d at 174 ("Courts typically have held that internet service providers, website exchange systems, online message boards, and search engines fall within this definition.").

We conclude that § 230(c)(1) does not bar Counts One and Three because those claims do not treat Public Data as a publisher or speaker of information. For Counts Two and Four, we need not determine whether this second requirement is met because we conclude that Plaintiffs have alleged enough facts to plausibly infer that Public Data is an information content provider that provided the improper

information. As Public Data cannot establish at this stage that it meets the third requirement for Counts Two and Four, § 230(c)(1) does not now apply. So we reverse, and all claims are remanded for further proceedings consistent with this opinion.

### A. Requirement Two: Publisher or Speaker of Information

**[4]**  Section 230(c)(1)'s second requirement asks whether the plaintiff's legal claim requires that the defendant be "treated as the publisher or speaker of any information." In other words, for protection to apply, the claim must turn on some "information," and must treat the defendant as the "publisher or speaker" of that information. *See* § 230(c)(1) (No internet platform "shall be treated as the publisher or speaker of any information ..."); *see also Zeran*, 129 F.3d at 330 (describing § 230(c)(1) as protecting a defendant from being "liable for information" when the defendant acts in the "publisher's role" for that information). A claim treats the defendant "as the publisher or speaker of any information" when it (1) makes the defendant liable for publishing certain information **\*121** to third parties, and (2) seeks to impose liability based on that information's improper content.

**[5]**  **[6]**  **[7]**  **[8]**  Our precedent demands that we ask whether the claim "thrust[s]" the interactive service provider "into the role of a traditional publisher." *Zeran*, 129 F.3d at 332. The term "publisher" as used in § 230(c)(1) "derive[s] [its] legal significance from the context of defamation law." *Id.* [11] Thus, the scope of "the role of a traditional publisher," and therefore the scope of what § 230(c)(1) protects, is guided by the common law. *See id.* ("[Defendant] falls squarely within this traditional definition of a publisher and, therefore, is clearly protected by § 230's immunity." (citing W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 113, at 803 (5th ed. 1984)). [12]

[11]  When "a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it." *Stokeling v. United States*, —— U.S. ——, 139 S. Ct. 544, 551, 202 L.Ed.2d 512 (2019) (internal citation and quotation marks omitted). "Publisher" is just such a transplanted word. Section 230(c)(1) altered the way common-law-defamation claims would apply to users and providers of interactive computer services that the common law would otherwise hold liable as publishers. *Malwarebytes,*

*Inc. v. Enigma Software Grp. USA, LLC*, —— U.S. ——, 141 S. Ct. 13, 14, 208 L.Ed.2d 197 (2020) (Thomas, J., statement respecting denial of certiorari) (discussing *Stratton Oakmont, Inc. v. Prodigy Services Co.*, 1995 WL 323710, at *3–*4 (N.Y. Sup. Ct. May 24, 1995)); *Jones v. Dirty World Ent. Recordings LLC*, 755 F.3d 398, 407 (6th Cir. 2014) ("Section 230 marks a departure from the common-law rule that allocates liability to publishers ... of tortious material written or prepared by others.").

[12]  Defamation at common law distinguished between publisher and distributor liability but *Zeran* did not make this distinction. Instead, *Zeran* determined that distributor liability "is merely a subset, or a species, of publisher liability" and so treated them the same under § 230(c)(1). *Zeran*, 129 F.3d at 332. The decision has been questioned for failing to make this distinction. *See, e.g., Malwarebytes*, 141 S. Ct. at 14–15 (Thomas, J., statement respecting denial of certiorari). But the approach taken in the Fourth Circuit since *Zeran* has been clear, and the parties have made no arguments based on this distinction.

**[9]**  **[10]**  **[11]**  At common law, a publisher was someone who intentionally or negligently disseminated information to third parties. [13] In this context, a third party is someone other than the subject of the information disseminated. [14] Thus, for a claim to treat someone as a publisher under § 230(c)(1), the claim must seek to impose liability based on the defendant's dissemination of information to someone who is not the subject of the information.

[13]  *See* Restatement (Second) of Torts § 577, at 201 (Am. L. Inst. 1965) ("Publication of defamatory matter is its communication intentionally or by a negligent act to one other than the person defamed."); *Publish*, Black's Law Dictionary 1268 (8th ed. 2004) (defining "publish" as including "[t]o distribute copies ... to the public" and "[t]o communicate (defamatory words) to someone other than the person defamed"); *Yousling v. Dare*, 122 Iowa 539, 98 N.W. 371, 371 (1904) ("The cases ... uniformly hold that ... the sending of a communication containing defamatory language directly to the person defamed, without any proof that, through the agency or in pursuance

of the intention of the sender, it has come to the knowledge of any one else, does not show such publication as to render the sender liable in damages.").

14   *See* Restatement (Second) of Torts § 577 cmt. b, at 202 (Am. L. Inst. 1965); *Scottsdale Cap. Advisors Corp. v. The Deal, LLC*, 887 F.3d 17, 21 (1st Cir. 2018) ("[P]ublication, does not mean merely uttering or writing. Rather, 'publication' ... means to communicate the defamatory material to a third party (that is, a party who is not the subject of the defamatory material) ..."); *Sheffill v. Van Deusen*, 79 Mass. 304, 305 (1859) (asserting that there can be no publication unless the words spoken were heard by third persons).

**\*122  [12]  [13]  [14]  [15]**   But that alone is not enough. To meet the second requirement for § 230(c)(1) protection, liability under the claim must be "based on the *content of the speech published*" by the interactive service provider. *Erie Insurance Co.*, 925 F.3d at 139. At common law, defamation required publishing a "false and defamatory statement." Restatement (Second) of Torts § 558(a), at 155 (Am. L. Inst. 1965). The publisher was held liable because of the improper nature of the content of the published information.[15] In other words, to hold someone liable as a publisher at common law was to hold them responsible for the content's improper character. We have interpreted "publisher" in § 230(c)(1) in line with this common-law understanding. Thus for § 230(c)(1) protection to apply, we require that liability attach to the defendant on account of some improper content within their publication. *See Erie Ins. Co.*, 925 F.3d at 139–40 ("There is no claim made based on the *content of speech published* by [Defendant]—such as a claim that [Defendant] had liability as the publisher of a misrepresentation of the product or of defamatory content.").

15   Other information-based torts at common law follow this mold, imposing liability on publishers for the improper nature of their disseminated content. For example, false-light claims hold a publisher liable only when there is "at least an implicit false statement of objective fact." *Flowers v. Carville*, 310 F.3d 1118, 1132 (9th Cir. 2002). And publisher liability at common law did not always require that the "impropriety" of the content be that it was false and defamatory. Claims based on publicity given to private life impose liability on a publisher for information that is "highly

offensive to a reasonable person." Restatement (Second) of Torts § 652D, at 383 (Am. L. Inst. 1965). Reaching further back, publishers in England were prosecuted under a fourteenth century statute banning "constructive treason" for printing "seditious, poisonous, and scandalous" information even if that information was not false and defamatory. William T. Mayton, *Seditious Libel and the Lost Guarantee of a Freedom of Expression*, 84 Colum. L. Rev. 91, 100–101 (1984); Geoffrey R. Stone et al., Constitutional Law 1009–10 (8th ed. 2018). Similarly, while libel required that the published information dishonor another or provoke violence, "truth was no defense." Philip Hamburger, *The Development of the law of Seditious Libel and the Control of the Press*, 37 Stan. L. Rev. 661, 712 (1985).

While it is commonly accepted that Congress passed § 230 in part as reaction to a case involving a defamation suit against an internet company, *see Malwarebytes, Inc.*, 141 S. Ct. at 14 (Thomas, J., statement respecting denial of certiorari) (discussing *Stratton*, 1995 WL 323710), § 230(c)(1) protection is not limited to defamation suits.

**[16]**   This improper-content requirement helps dispel Public Data's notion that a claim holds a defendant liable as a publisher anytime there is a "but-for" causal relationship between the act of publication and liability. *See* Appellee's Response Brief 20–21 ("Put another way, had Public Data not published court records on its website, Plaintiffs could not have brought their Section 1681g(a) claim."). This "but-for" publication test would say a claim treats an entity as a "publisher" under § 230(c)(1) if liability hinges in any way on the act of publishing. This but-for test bears little relation to publisher liability at common law. To be held liable for information "as the publisher or speaker" means more than that the publication of information was a but-for cause of the harm. *See Erie Ins. Co.*, 925 F.3d at 139–40; *HomeAway.com*, 918 F.3d at 682.

*Erie Insurance* is a good example. There, we held that Amazon was not protected by § 230(c)(1) in a product-liability suit even though publishing information was a but-for cause of the harm—i.e., the product was bought from Amazon's website, making the advertisement's publication a necessary link in the causal chain that led to setting the buyer's house on **\*123** fire. *See Erie Insurance Co.*, 925 F.3d at 138–40. Though publishing information was a but-for cause, we

refused to apply § 230(c)(1) protection because the plaintiff's product-liability claim was based on Amazon "as the seller of the defective product ... [not] *content of speech published* by Amazon." *Id.* at 139–40.

So, to paraphrase the test we began with, a claim only treats the defendant "as the publisher or speaker of any information" under § 230(c)(1) if it (1) bases the defendant's liability on the disseminating of information to third parties and (2) imposes liability based on the information's improper content.

 **[17]**  **[18]**  **[19]**  Based on these two requirements, we can see that § 230(c)(1) does not provide blanket protection from claims asserted under the FCRA just because they depend in some way on publishing information. Yes, the FCRA imposes procedural obligations on any "consumer reporting agency." *See Ross v. FDIC*, 625 F.3d 808, 812 (4th Cir. 2010) ("The FCRA is a comprehensive statutory scheme designed to regulate the consumer reporting industry."). And each claim here alleges that Public Data ignored those obligations as a member of that regulated industry.[16] So publishing information online is a but-for cause of Public Data being a consumer reporting agency subject to the FCRA's requirements. Most of what Public Data allegedly does, after all, is publish things on the internet. That means that publishing information is one but-for cause of these FCRA claims against Public Data. If Public Data is a "consumer reporting agency" subject to FCRA liability, it is one because it is the publisher or speaker of consumer report information. Yet that alone is not sufficient, as we do not apply a but-for test. *See Erie Ins.*, 925 F.3d at 139–140; *HomeAway.com*, 918 F.3d at 682. We must instead examine each specific claim.[17]

[16] Each FCRA claim here is triggered by a defendant's status as a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). *See* 15 U.S.C. §§ 1681g(a) ("Every consumer reporting agency shall"); 1681k(a) ("A consumer reporting agency ... shall"); 1681b(b)(1) ("A consumer reporting agency may furnish a consumer report for employment purposes only if"); 1681e(b) ("Whenever a consumer reporting agency prepares a consumer report it shall").
A "consumer reporting agency" is defined as "any person which, for monetary fees ... regularly engages ... in the practice of assembling or evaluating consumer credit information ... for the

purpose of furnishing consumer reports to third parties." § 1681a(f). Circular as it is, "companies that regularly prepare consumer reports" are consumer reporting agencies. *Berry v. Schulman*, 807 F.3d 600, 605 (4th Cir. 2015). The district court did not determine whether Plaintiffs made sufficient allegations to prove that Public Data is a "consumer reporting agency," and we take no position on that question. Of course, Public Data may contest that claim below. But here we only consider the preliminary question of whether § 230 bars Plaintiffs' FCRA claims even if Public Data is a "consumer reporting agency."

[17] Section 230(e) catalogues other laws for which § 230(c)(1) must not be construed to impair. And the FCRA is not on the that list. But that tells us little about whether § 230(c)(1) can bar specific FCRA claims because § 230(e) does not establish "an exception to a prohibition that would otherwise reach the conduct excepted." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 582, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988). Instead, it suggests a "clarification of the meaning of [§ 230] rather than an exception" to its coverage. *Id.* at 586, 108 S.Ct. 1392. In other words, a FCRA claim must first impose liability on the defendant as the publisher or speaker of information to trigger the FCRA in the first place. If it does, then § 230(c)(1) can apply to FCRA claims. And if it does not, then § 230(c)(1) will not apply.

It is also true that, at a high level, liability under the FCRA depends on the **\*124** content of the information published. Both the definition of "consumer reporting agency" and the definition of "consumer reports" reference "credit information" or "information ... bearing on a consumer's credit worthiness." § 1681a(d)(1), (f). If Public Data and its activities did not meet these definitions, there could be no liability under these FCRA claims. In this way, liability for each claim hinges on the published information's content. Yet, while the informational content matters, § 230(c)(1) protects Public Data only from claims that demand the information's content be improper before imposing liability. And, as a class, there is nothing improper about "credit information" or "information ... bearing on a consumer's credit worthiness." Again, we must examine each specific claim in context to see if the claim treats Public Data as a publisher under § 230(c)(1).

**[20]    [21]    [22]** Finally, when considering whether any claim treats Public Data as a publisher, our precedent teaches that we must look beyond the claim's formal elements. Beginning in *Zeran*, our Court has stressed a functional approach. In our functional analysis, we ask whether holding this defendant liable requires treating them as a publisher, not whether every abstract violation requires it. *See Zeran*, 129 F.3d at 332; *Erie Ins. Co.*, 925 F.3d at 139. To make this determination, we look to see what the plaintiff in our case must prove. If the plaintiff's recovery requires treating the defendant as a publisher, then the defendant has satisfied § 230(c)(1)'s second requirement.

*Zeran* itself is instructive. There, Kenneth Zeran made a negligence claim against AOL. *Zeran*, 129 F.3d at 332. A defendant can, of course, be negligent without publishing anything. Yet Zeran asserted that AOL was negligent "because it communicated to third parties an allegedly defamatory statement." *Id.* at 333. That is, Zeran's specific negligence claim treated the defendant as a publisher. So while not every negligence claim treats a defendant as a publisher, Zeran's negligence claim did; so we held that claim was foreclosed by § 230(c)(1). *Id.* at 332–33.

We thus turn to the four specific claims asserted.

Count One is based on FCRA § 1681g and does not seek to impose liability on Public Data as a speaker or publisher of any information. Section 1681g requires consumer reporting agencies to give consumers a copy of their own consumer report along with an FCRA notice upon request.[18] So it is based on a failure to disseminate information about an individual to that same individual, not a third party. Recall that "[p]ublication of defamatory matter is its communication intentionally or by a negligent act *to one other than the person defamed.*" *See* Restatement (Second) of Torts § 577, at 201 (emphasis added). So § 1681g does not seek to hold Public Data liable "as the publisher" **\*125** under § 230(c)(1), and § 230(c)(1) does not bar Count One.

---

[18]  *Zeran* left the door open to finding § 230(c)(1) protection applies when a claim holds a party liable for a decision not to publish, *Zeran*, 129 F.3d at 330, and we need not decide here if we should shut it. *Zeran suggested* that it might allow § 230(c)(1) to bar claims whenever avoiding liability under those claims would require acting as a publisher. *Id.* In other words, it is possible to read *Zeran* as applying

§ 230(c)(1) protection when an interactive service provider would be held liable for failing to publish information. *See id.; see also Doe v. Internet Brands, Inc.*, 824 F.3d 846, 851 (9th Cir .2016) (implying that not providing a warning can be an act of publishing by considering whether § 230(c)(1) could bar a negligent-failure-to-warn claim). Since even in those circumstances the failure to publish would still need to relate to information meant to be disseminated to third-parties, we need not reach this question here.

**[23]** Like Count One, Count Three does not treat Public Data as a speaker or publisher. Count Three seeks to impose liability on Public Data for violating § 1681b(b)(1), which lays out two requirements that a consumer reporting agency must meet before they may provide a consumer report "for employment purposes." § 1681b(b)(1). First, the employer who gets the report must certify both that they have complied with the FCRA's requirements and that they will not use the information in violation of state or federal law. § 1681b(b)(1)(A)(i)–(ii). And, second, the consumer reporting agency must also provide a summary of the consumer's FCRA rights to the employer. § 1681b(b)(1)(B).

The requirement that a consumer reporting agency obtain certification from an employer is easily disposed of because liability is in no way based on the improper content of any information spoken or published by Public Data. Here, if liability is based on information, it is only Public Data's failure to obtain the required information (certification) from the employer that matters.

Slightly more vexingly, Count Three also does not treat Public Data as a publisher because liability depends on Public Data's failure to provide a summary of consumer rights to the putative employer (§ 1681b(b)(1)'s second requirement). Even if Public Data's decision to not provide the required summary could be described as a publisher's decision, the information it failed to provide is proper and lawful content. And § 230(c)(1) applies only when the claim depends on the content's impropriety. Therefore, Public Data's failure to summarize consumer rights cannot fall within § 230(c)(1) protection.

Unlike Counts One and Three, Counts Two and Four *may* seek to hold Public Data liable as the publisher of information. Section 1681e(b), the basis for Count Four, requires that a consumer reporting agency "follow reasonable procedures to assure maximum possible accuracy of the information

concerning the individual about whom the report relates." Likewise, liability under § 1681k(a), the gravamen of Count Two, requires that a consumer reporting agency that is selling consumer reports "for employment purposes" which "are likely to have an adverse effect on a consumer's ability to obtain employment" must "maintain strict procedures" to ensure that any consumer information "is complete and up to date." §§ 1681k(a), 1681(k)(a)(2).[19] Thus, both claims seek to impose liability based on an agency's failure to maintain proper procedures to ensure accurate information. On its face, liability for failing to maintain proper procedures does not seem to fall within § 230(c)(1)'s ambit as we have described it. After all, the FCRA's statutory language here requires neither dissemination of information to third parties nor improper content. Yet a little digging uncovers two levels of complexity.

19    Liability under § 1681k(a) also requires that the defendant fail to provide notifications to the consumer that the report was provided to a potential employer. § 1681k(a)(1). We have already explained why a consumer-notification requirement like this does not impose liability on Public Data as a publisher or speaker of information —it is a failure to disseminate information about an individual to that same individual, not a third party.

[24] First, current Fourth Circuit precedent requires that a plaintiff bringing a claim under both § 1681e(b), and by implication § 1681k(a), show the defendant's "consumer report contains inaccurate information." **126 Dalton v. Capital Associated Industries, Inc., 257 F.3d 409, 415 (4th Cir. 2001). Though the textual basis for requiring an inaccuracy is unclear, Dalton provided that liability under Counts 2 and 4 depend on inaccurate information.[20] And that suggests that Counts 2 and 4 thus functionally impose liability on the defendant based on the information's impropriety.

20    Dalton held that violating § 1681e(b) requires inaccurate information. Id. While Dalton did not address § 1681k(a)'s reasonable-procedures requirement, we see no principled way to distinguish the two provisions and so read Dalton to require the same inaccuracy.

[25] Second, a private plaintiff bringing a claim in federal court, as is the case here, under § 1681e(b) or § 1681k(a) must show that Public Data disseminated information to third parties to satisfy Article III standing. TransUnion LLC v.

Ramirez, ___ U.S. ___, 141 S. Ct. 2190, 2214, 210 L.Ed.2d 568 (2021). The statutory provisions might be violated without the dissemination of any information, as the FCRA itself does not condition these provisions on disseminating the report but on failing to follow proper procedures to ensure a report's accuracy. But a private plaintiff lacks standing to bring a reasonable-procedures claim unless the plaintiff's report was provided to a third party. Id. So it may be that these reasonable-procedures claims turn on Public Data providing the inaccurate information to a third party.[21] See id.; Spokeo, Inc. v. Robins, 578 U.S. 330, 342, 136 S.Ct. 1540, 194 L.Ed.2d 635 (2016) (providing "entirely accurate" information without complying fully with the FCRA's procedures is a "bare procedural violation" that cannot "satisfy ... Article III"). Considering past precedent and the Constitution's limited judicial power, perhaps Counts Two and Four functionally depend on Public Data disseminating inaccurate information to a third party. But we need not, and do not, decide whether our functional approach can stretch the meaning of being "treated as the publisher or speaker of any information" far enough to cover Counts Two and Four. For as we will see, Public Data was "another information content provider" for the information at issue in Counts 2 and 4. So, based on the third requirement, § 230(c)(1) protection fails for those two counts.

21    Again, at least in federal court. See TransUnion, 141 S. Ct. at 2224 n.9 (Thomas, J., dissenting) (suggesting a non-publication claim could be brought in state court).

## B. Requirement Three: Provided by Another Information Content Provider

The third and final requirement for § 230(c)(1) protection is that the information at issue in the plaintiff's claim be "provided by *another* information content provider." § 230(c) (1) (emphasis added). An " 'information content provider' means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." § 230(f)(3).

[26] [27] [28] Plaintiffs argue that this third requirement is not met because Public Data itself is an "information content provider" for the relevant information.[22] We **127 agree. The plaintiffs' complaint plausibly alleges that Public Data is an information content provider for the information that

creates liability under these two counts. So, on these alleged facts, § 230(c)(1) does not bar Counts Two and Four. [23]

[22]  Public Data can be both "a provider or user of an interactive computer service" and also the "information content provider." And when a defendant is both, § 230(c)(1) provides no protection. Section 230(c)(1) applies only when the information for which liability is being imposed on the provider or user of an interactive computer service is "provided" by "another" information content provider. § 230(c)(1). The use of the modifier *another* shows that an interactive computer service provider can be an information content provider at the same time. *See* § 230(c)(1) ("No *provider or user of an interactive computer service* shall be treated as the publisher or speaker of any information provided by *another* information content provider." (emphasis added)). And when a provider of an interactive computer service also provides the information at issue in a claim, it receives no protection under § 230(c)(1). *See Nemet*, 591 F.3d at 254. In other words, § 230(c)(1) does not protect entities for their own speech, it protects them only when they serve as a conduit for other's speech. *See Zeran*, 129 F.3d at 333.

[23]  Since we determine that Public Data is an information content provider, we do not address Plaintiffs' argument that "provided" in the statute means "provided *to the internet user*" not "provided *to the internet company.*" Appellee's Brief 34–35; *see, e.g., Batzel v. Smith*, 333 F.3d 1018, 1033 (9th Cir. 2003) ("The structure and purpose of § 230(c)(1) indicate that the immunity applies only with regard to third-party information provided *for use on the Internet.*").

[29]  Public Data is an "information content provider" if they are "responsible, in whole or in part, for the creation or development" of the information at issue. This Court has never fully defined the terms "creation" or "development" as they are used in the statute. But we have explained that "lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content—are barred." *Zeran*, 129 F.3d at 330; *see also Nemet*, 591 F.3d at 258 ("creation" or "development" of information

requires "something more than [what] a website operator performs as part of its traditional editorial function").

Other circuits have put more flesh onto these definitions, determining that an interactive computer service provider or user is responsible for the development [24] of the information at issue in the case if they "directly and 'materially' contributed to what made the content itself 'unlawful.' " *Force v. Facebook*, 934 F.3d 53, 68 (2d Cir. 2019) (quoting *LeadClick*, 838 F.3d at 174); *see Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1168 (9th Cir. 2008) (explaining that a defendant is an information content provider if they "contribute[d] materially to the alleged illegality of the conduct"); *Jones*, 755 F.3d at 413 ("Consistent with our sister circuits, we adopt the material contribution test."). And while this Court has never explicitly adopted "material contribution" as the test, we applied it in *Nemet* to determine that the website operator there was not an information content provider. *See Nemet*, 591 F.3d at 257–58 (noting that the plaintiff failed to allege that the website operator "contributed to the allegedly fraudulent nature of the comments at issue").

[24]  Since we find that Public Data has "developed" the information at issue we need not consider whether it might also have "created" that information.

[30]  [31]  Additionally, the material-contribution test fits well within our broader § 230(c)(1) jurisprudence. *Zeran* and *Nemet* rest on the principle that liability for an interactive computer service user or provider must turn on "something more than ... its traditional editorial function." *Nemet*, 591 F.3d at 258 (citing *Zeran*, 129 F.3d at 330). All the material-contribution test does is put a more helpful name to this "something more" standard. And defining "something more" as a material contribution makes sense. As *Zeran* notes, § 230 bars liability against "companies that serve as intermediaries for other parties' potentially injurious messages." **\*128** *Zeran*, 129 F.3d at 330–31. But where a company materially contributes to a message's unlawful content, that company stops being a mere "intermediary" for another party's message. Instead, the company is adding new content to the message that harms the plaintiff. We thus hold that an interactive computer service is not responsible for developing the unlawful information unless they have gone beyond the exercise of traditional editorial functions and materially contributed to what made the content unlawful.

**[32]** Whether a defendant developed information such that they are an "information content provider" turns on whether the defendant has materially contributed to the piece(s) of information relevant to liability. Section 230(c)(1) applies if a defendant has materially contributed only to parts of the disseminated information that do not make the disseminated information unlawful (if § 230(c)(1) is otherwise applicable). For example, in *Jones*, the Sixth Circuit determined that a website had not materially contributed to defamatory content that it hosted. *Jones*, 755 F.3d at 416. This was so even though the website operator had authored his own comments underneath the alleged defamatory material. *Id.* In drawing this conclusion, the court noted that "[t]o be sure, [the operator] was an information content provider as to his comment ... [b]ut [Plaintiff] did not allege that [the operator's] comments were defamatory." *Id.* In other words, the § 230(c)(1)'s third requirement did not turn on whether the defendant materially contributed to some part of the total information disseminated—i.e., the entire post—but on whether the defendant materially contributed to the defamatory aspect of the information. *Id.*; *see La Liberte v. Reid*, 966 F.3d 79, 89 (2d Cir. 2020) (applying liability when defendant was responsible for the content's defamatory portion). Our approach is the same. *See Nemet*, 591 F.3d at 255–60 (discussing twenty allegedly defamatory posts in separate groups based on the defendant's involvement with the posts before concluding that the plaintiff failed to show that defendant "was responsible for the creation or development of the allegedly defamatory content at issue").

Plaintiffs have alleged enough facts to show that Public Data's own actions contributed in a material way to what made the content at issue in Counts Two and Four inaccurate and thus improper. Plaintiff McBride claims that the report Public Data sent to his potential employer was inaccurate because it omitted or summarized information in a way that made it misleading. And, from Plaintiffs' allegations, it is plausible that McBride's report was misleading based on Public Data's own actions.

As a general matter, Plaintiffs claim that Public Data handles criminal matters by "strip[ping] out or suppress[ing] all identifying information relating to the charges ... [including] dispositions" and that it then "replace[s] this information with [its] own internally created summaries of the charges, bereft of any detail." J.A. 30. As to McBride's report specifically, Plaintiffs allege that the report "suggest[ed] that Plaintiff McBride had been convicted of each of the offenses listed," but that "the report was inaccurate and incomplete as it

failed to indicate that several of the offenses listed had been nolle prossed." J.A. 37–38. These allegations, and all reasonable inferences, sufficiently allege that the inaccuracies in McBride's report resulted from Public Data's stripping out the nolle prosequi disposition for McBride's charges and adding in its own misleading summaries.

**[33]** Thus, on Plaintiffs' allegations, Public Data's summaries and omissions **\*129** materially contribute to the report's impropriety. They are not merely an exercise of traditional editorial functions. When *Zeran* proclaimed that § 230(c)(1) barred claims based on a defendant's exercise of traditional editorial functions, it also provided a suggestive list including "deciding whether to publish, withdraw, postpone or alter content." *Zeran*, 129 F.3d at 330. Of course, in a sense, omitting the criminal charge dispositions is just "altering" their content, as is creating new charge summaries. Yet, *Zeran*'s list of protected functions must be read in its context, and that context cabins that list to merely "editorial" functions. It cannot be stretched to include actions that go beyond formatting or procedural alterations and change the substance of the content altered. [25] An interactive service provider becomes an information content provider whenever their actions cross the line into substantively altering the content at issue in ways that make it unlawful. [26]

[25]   An extreme example helps illustrate this point. Take a writer of a ransom note who cuts letters out of a magazine to list his demands. That writer might be said to be "altering" content. Yet, the note's writer is hardly acting as an "editor" of the magazine. Instead, he has substantively changed the magazine's content and transformed it from benign information about sports or entertainment into threatening information about bags of cash and ultimatums.

[26]   Drawing this line here is reinforced by another contextual reading of *Zeran*'s list of traditional editorial functions. After listing some traditional editorial functions for which liability is barred, *Zeran* then said that § 230(c)(1) prevents suits that "cast [the defendant] in the same position as the party who originally posted the offensive messages." *Id.* at 333. *Zeran* saw § 230(c)(1) as vicarious liability protection that could not be used as a shield when the offensiveness of the message comes from the defendant themselves rather than a third party. *See id.*; *see also Nemet*,

591 F.3d at 254 ("Congress thus established a general rule that providers of interactive computer services are liable ... for speech that is properly attributable to them"); *cf. La Liberte*, 966 F.3d at 89 (holding that there is no § 230 immunity for a defendant who posted a third-party's photo, but who supplied her own defamatory commentary to it). So we may not read the traditional editorial functions listed in *Zeran* so broadly as to include a defendant's substantive alterations that introduced the inaccuracy or falsity at issue in the claim.

Applying these principles to Counts Two and Four, Public Data—according to Plaintiffs' allegations—has materially contributed to what makes the content at issue unlawful. The content relevant to Counts Two and Four is only unlawful because it is inaccurate. But, as alleged, the content provided to Public Data about McBride was not inaccurate. Instead, through Public Data's actions, the records were changed so as to introduce the inaccuracies. Public Data thus made substantive changes to the records' content that materially contributed to the records' unlawfulness. That makes Public Data an information content provider, under the allegations, for the information relevant to Counts Two and Four, meaning that it is not entitled to § 230(c)(1) protection for those claims.

\* \* \*

 **[34]** Section 230(c)(1) provides protection to interactive computer services. *Zeran*, 129 F.3d at 331. But it does not insulate a company from liability for all conduct that happens to be transmitted through the internet. Instead, protection under § 230(c)(1) extends only to bar certain claims, in specific circumstances, against particular types of parties. Here, the district court erred by finding that § 230(c)(1) barred all counts asserted against Public Data. To the contrary, on the facts as alleged, it does not apply to any of them. Counts One and Three are **\*130** not barred because they do not seek to hold Public Data liable as a publisher under the provision. Counts Two and Four are not barred because Public Data is itself an information content provider for the information relevant to those counts.

REVERSED AND REMANDED

**All Citations**

53 F.4th 110

---

End of Document

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 3018062
Only the Westlaw citation is currently available.
United States District Court, N.D. California.

RUMBLE, INC., Plaintiff,

v.

GOOGLE LLC, Defendant.

Case No. 21-cv-00229-HSG

|

Signed July 29, 2022

**Attorneys and Law Firms**

Nicholas A. Gravante, Jr., Pro Hac Vice, Jack G. Stern, Pro Hac Vice, Philip J. Iovieno, Cadwalader Wickersham and Taft LLP, New York, NY, Robert William Dickerson, Burke, Williams & Sorensen, LLP, Los Angeles, CA, for Plaintiff.

John Edward Schmidtlein, Williams & Connolly LLP, Washington, DC, for Defendant.

## ORDER DENYING MOTION TO DISMISS AND TO STRIKE

Re: Dkt. No. 32

HAYWOOD S. GILLIAM, JR., United States District Judge

*\*1* Pending before the Court is Defendant's partial motion to dismiss and motion to strike, briefing for which is complete. *See* Dkt. No. 32 ("Mot."), 44 ("Opp."), 45 ("Reply"). Defendant asks the Court to dismiss Plaintiff's tying and search-dominance theories of liability and strike paragraphs 34, 35, and 75-176 of Plaintiff's First Amended Complaint. *See* Mot. at i. The Court held a hearing on the motion, *see* Dkt. No. 50, and now **DENIES** it.

## I. BACKGROUND

"Since 2013, Rumble has operated an online video platform." Dkt. No. 21 ("FAC") ¶ 14. Plaintiff alleges that "Rumble is one of the most respected independent and privately owned companies in the online video platform industry and market, and its business model is premised upon helping the 'little guy/gal' video content creators monetize their videos." *Id.* According to Plaintiff, "Rumble currently has more than 2 million amateur and professional video content-creators that

now contribute to more than 100 million streams per month." *Id.* ¶ 22. Plaintiff alleges that "Rumble's success, however, has been far less than it could and should have been as a direct result of Google's unlawful anticompetitive, exclusionary and monopolistic behavior...." *Id.* ¶ 23.

Rumble alleges that "Google has willfully and unlawfully created and maintained a monopoly in the online video platform market by pursuing at least two anticompetitive and exclusionary strategies":

> First, by manipulating the algorithms (and/or other means and mechanisms) by which searched-for-video results are listed, Google insures [sic] that the videos on YouTube are listed first, and that those of its competitors, such as Rumble, are listed way down the list on the first page of the search results, or not on the first page at all. Second, by pre-installation of the YouTube app (which deters smart phone manufacturers from pre-installing any competitive video platform apps) as the default online video app on Google smart phones, and by entering into anti-competitive, illegal tying agreements with other smartphone manufacturers to do the same (in addition to requiring them to give the YouTube app a prime location on their phones' opening page and making it not-deletable by the user), Google assures the dominance of YouTube and forecloses competition in the video platform market.

*Id.* ¶ 27; *see also id.* ¶ 194 (alleging that Google's "anticompetitive and exclusionary conduct ... has included rigging its search engine algorithms such that YouTube videos will always be listed first in search results and requiring pre-installation and prominent placement of Google's YouTube apps on all Android smartphones in the United States"). Plaintiff further alleges that "manufacturers and carriers are beholden to Google's Android ecosystem, which Google uses to preserve its monopolies in general search, search

advertising, general search text advertising and the online video platform market." *Id.* ¶ 147. Plaintiff alleges that Defendant's "chokehold on search is impenetrable, and that chokehold allows it to continue unfairly and unlawfully to self-preference YouTube over its rivals, including Rumble, and to monopolize the online video platform market." *Id.* ¶ 146.

**\*2** Plaintiff alleges that Defendant uses various agreements with Android-based mobile smart device manufacturers and distributors to ensure its monopoly of the video platform market. *See id.* ¶¶ 75–89. According to Plaintiff, Defendant "requires Android device manufacturers that want to preinstall certain of Google's proprietary apps to sign an anti-forking agreement." *Id.* ¶ 84.[1] Plaintiff alleges that once an Android device manufacturer signs an anti-forking agreement, Google will only provide access to its vital proprietary apps and application program interfaces if the manufacturer agrees: "(1) to take (that is, pre-install) a bundle of other Google apps (such as its YouTube app); (2) to make certain apps undeletable (including its YouTube app); and (3) to give Google the most valuable and important location on the device's default home screen (including for its YouTube app)." *Id.* ¶ 85. As another example, Plaintiff asserts that "Google provides a share of its search advertising revenue to Android device manufacturers, mobile phone carriers, competing browsers, and Apple; in exchange, Google becomes the preset default general search engine for the most important search access points on a computer or mobile device." *Id.* ¶ 86. "And, by becoming the default general search engine, Google is able to continue its manipulation of search results using its search engine to self-preference its YouTube platform, making sure that links to videos on the YouTube platform are listed above the fold on the search results page." *Id.*; *see also id.* ¶¶ 161–72 (alleging that Google's revenue sharing agreements allow it to maintain a monopoly in the general search market and online video platform market).

Plaintiff alleges that Defendant uses these agreements "to ensure that its entire suite of search-related products (including YouTube) is given premium placement on Android GMS devices." *Id.* ¶ 149. Rumble alleges that the agreements "effectuate a tie" that "reinforces Google's monopolies." *Id.* ¶ 151. Specifically, Plaintiff alleges that Defendant provides "Android device manufacturers an all-or-nothing choice: if a manufacturer wants Google Play or GPS, then the manufacturer must also preinstall, and in some cases give premium placement to, an entire suite of Google

apps, including Google's search products and Google's YouTube app." *Id.* Plaintiff alleges that "[t]he forced preinstallation of Google's apps (including the YouTube app) deters manufacturers from preinstalling those of competitors, including Rumble's app.... [and] forecloses distribution opportunities to rival general search engines and video platforms, protecting Google's monopolies." *Id.* Moreover, Plaintiff alleges that "[i]n many cases" the agreements expressly prohibit the preinstallation of rival online video platforms, like Rumble. *See id.* ¶ 87.

According to Plaintiff, Defendant's "monopolist's stranglehold on search, obtained and maintained through anticompetitive conduct, including tying agreements in violation of antitrust laws, has allowed Google to unfairly and wrongfully direct massive video search traffic to its wholly-owned YouTube platform" and therefore secure monopoly profits from YouTube-generated ad revenue. *Id.* ¶ 176. Plaintiff alleges that because "a very large chunk of that video search traffic ... should have rightfully been directly to Rumble's platform," Plaintiff and content creators who have exclusively licensed their videos to Rumble "have lost a massive amount of ad revenue they would otherwise have received but for Google's unfair, unlawful, exclusionary and anticompetitive conduct." *Id.*

Accordingly, Plaintiff alleges that Defendant's conduct violates Section 2 of the Sherman Act, which makes it unlawful for any person to "monopolize, or attempt to monopolize ... any part of the trade or commerce among the several States, or with foreign nations...." 15 U.S.C. § 2; *see id.* ¶¶ 55, 191–200.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 8(a) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A defendant may move to dismiss a complaint for failing to state a claim upon which relief can be granted under Rule 12(b)(6). "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). To survive a Rule 12(b)(6) motion, a plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when a plaintiff pleads "factual content that allows the court to draw

the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

**\*3** In reviewing the plausibility of a complaint, courts "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). Nevertheless, courts do not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (quoting *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)).

## III. DISCUSSION

### A. Motion to Dismiss

Plaintiff pleads a single cause of action alleging Defendant violated Section 2 of the Sherman Act. "The offense of monopoly under [Section 2] has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966). Plaintiff defines the relevant market as the "online video platform market," where platforms "allow content creators and other consumers to upload, view, share and download video content." FAC ¶ 55.

Without real dispute, Plaintiff has adequately alleged a Section 2 claim. First, it alleges that Defendant obtained and maintains monopoly power in the online video platform market, asserting that YouTube controls 73% of global online video activity. *Id.* ¶¶ 37, 63, 193. And second, Plaintiff alleges among other things that Defendant, with no valid business purpose or benefit to users, designs its search engine algorithms to show users YouTube links instead of links to its competitors' sites. *Id.* ¶ 71; *see also* ¶¶ 68-74. According to Plaintiff, "Rumble and consumers (*e.g.* content creators) are disadvantaged, and competition is harmed, in the defined market because Google provides self-preferencing search advantages to its wholly-owned YouTube platform as a part of its scheme to maintain its monopoly power, and to reap a monopolist's financial rewards." *Id.* ¶ 74.

Instead, Defendant's motion is based on the somewhat counterintuitive premise that Plaintiff has pled *too* much. Defendant argues that Plaintiff's amended complaint should be broken into distinct theories of liability based on (1) self-preferencing, (2) tying of the YouTube app to other Google apps, and (3) unlawfully dominating the search market with agreements involving distribution of Defendant's search product. Mot. at 1. Defendant does not dispute that Plaintiff has adequately pled a Section 2 claim based on the first theory of liability, self-preferencing, but argues that the second and third theories, tying and unlawful domination of the search market, should be dismissed. *Id.* at 1-2.

The only authority Defendant cites for the premise that a court can disaggregate a single Section 2 cause of action into subtheories, then scrutinize and potentially dismiss some subtheories without dismissing the entire cause of action, comes from two unpublished district court cases, one from the Northern District of California and another from the District of Delaware. *See* Mot. at 3; *Staley v. Gilead Scis., Inc.*, No. 19-cv-02573, 2020 WL 5507555, at \*11 (N.D. Cal. July 29, 2020); *see also In re Sensipar (Cinacalcet Hydrochloride Tablets) Antitrust Litig.*, No. 19-CV-01461, 2020 WL 7022364, at \*3-4 (D. Del. Nov. 30, 2020).[2] Defendant does not cite, and the Court has been unable to find, any Supreme Court or Ninth Circuit authority ratifying this approach. And the sort of parsing urged by Defendants is at least arguably in tension with the Supreme Court's direction that Sherman Act plaintiffs "should be given the full benefit of their proof without compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962); *see also LePage's Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003). This is especially true given the Ninth Circuit's holding that "even though [a] restraint effected may be reasonable under section 1, it may constitute an attempt to monopolize forbidden by section 2 if a specific intent to monopolize may be shown." *California Comput. Prods., Inc. v. Int'l Bus. Machs. Corp.*, 613 F.2d 727, 737 (9th Cir. 1979) (quoting *United States v. Columbia Steel Co.*, 334 U.S. 495, 531-532 (1948)). Ultimately, in the absence of controlling authority supporting Defendant's proposed approach, the Court declines to reach the viability of each of the purported subtheories, given that Plaintiff undisputedly has adequately pled a Section 2 claim based on self-preferencing. Defendant's motion to dismiss is accordingly **DENIED**.[3]

**B. Motion to Strike**

**\*4**  Defendant also moves to strike paragraphs 34, 35, and 75 through 176 of the amended complaint. *See* Mot. at 2. These paragraphs generally concern Plaintiff's allegations that Google has unlawfully achieved and continues to maintain a monopoly in the online video platform market by conditioning access to its mobile operating system and Defendant's other popular services on preinstallation of the YouTube app and in some cases "expressly prohibiting the preinstallation of any rival ... apps (which would include the Rumble app)[.]" *See* FAC ¶¶ 34, 87. Plaintiff argues that the allegations Defendant seeks to strike relate to forms of exclusionary conduct that are properly considered in adjudicating a monopolization claim, and further argues that "antitrust claims are to be adjudicated as a whole, ... not parsed into discrete pieces." Opp. at 20.

Rule 12(f) of the Federal Rules of Civil Procedure states that a district court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Motions to strike are "regarded with disfavor" because they are often used as delaying tactics and because of the limited importance of pleadings in federal practice. *Z.A. ex rel. K.A. v. St. Helena Unified Sch. Dist.*, No. 09-CV-03557-JSW, 2010 WL 370333, at \*2 (N.D. Cal. Jan. 25, 2010). Where there is any doubt about the relevance of the challenged allegations, courts in this Circuit err on the side of permitting the allegations to stand. *See id.* (citing *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1528 (9th Cir. 1993), *rev'd on other grounds,* *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534, 114 S. Ct. 1023 (1994)); *accord Pilgram v. Lafave*, No. 12-CV-5304 GAF-EX, 2013 WL 12124126, at \*5 (C.D. Cal. Feb. 7, 2013); *Art Attacks Ink, LLC v. MGA Ent., Inc.*, No. 04-CV-1035-BLM, 2006 WL 8439887, at \*4 (S.D. Cal. June 21, 2006). This is particularly true when the moving party shows no prejudice and when striking the allegations will not streamline the ultimate resolution of the action. *St. Helena Unified Sch. Dist.*, 2010 WL 370333 at \*2.

For the same reasons underlying the Court's denial of the motion to dismiss, Defendant has not shown that the allegations are so redundant, immaterial, impertinent, or scandalous as to justify striking them. As noted above, substantial authority suggests that, depending on the factual record as it actually develops, all of the interrelated conduct alleged in the complaint could be relevant to the Section 2 claim that is not being challenged in this motion. That fact alone weighs dispositively against striking the allegations targeted by Defendant. Obviously, whether those allegations end up being backed by sufficient evidence to survive a summary judgment motion, or to warrant presentation to the jury at trial under the Federal Rules of Evidence, is a matter for a later stage of the case. Accordingly, Defendant's motion to strike is **DENIED**.

**IV. CONCLUSION**

Defendant's motion to dismiss and to strike is **DENIED.** The court **SETS** a telephonic case management conference on August 30, 2022 at 2:00 p.m. The parties shall submit an updated joint case management statement by August 23, 2022. All counsel shall use the following dial-in information to access the call:

Dial-In: 888-808-6929;

Passcode: 6064255

For call clarity, parties shall NOT use speaker phone or earpieces for these calls, and where at all possible, parties shall use landlines.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2022 WL 3018062

**Footnotes**

1   Plaintiff explains that "in general an anti-forking agreement sets strict limits on the manufacturers' ability to make and sell Android-based devices that do not comply with Google's technical and design standards." FAC ¶ 84.

2   In its Reply, Defendant cites two additional authorities referencing the expense of antitrust discovery, but these cases are also not controlling, and do not support (or even discuss) the premise that a court can dismiss select subtheories within a single cause of action. *See* Reply at 4, 🚩*Kelsey K. v. NFL Enters., LLC*, 757 F. App'x 524, 527 (9th Cir. 2018) (affirming denial of discovery where "no plausible claim for relief has been pled"); 🚩*Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019, 1025 (N.D. Cal. 2015).

3   Plaintiff also contends that Defendant's motion to dismiss is procedurally improper under Federal Rule of Civil Procedure 12(g)(2). Opp. at 19-20. However, the Court finds that the allegations in the original complaint were insufficient to place Defendant on notice of the additional theories described in the new allegations it seeks to dismiss. The Court's finding is consistent with the purpose of the federal rules, as described by the Ninth Circuit. *See* 🚩*In re Apple iPhone Antitrust Litig.*, 846 F.3d 313, 318 (9th Cir. 2017) (reading "12(g)(2) in light of the general policy of the Federal Rules of Civil Procedure, expressed in Rule 1"). And to the extent Defendant could have raised its arguments in a prior motion, the Court nonetheless exercises its discretion to consider those arguments in the interest of judicial economy. *See id.* (quoting *Banko v. Apple, Inc.*, No. 13–02977 RS, 2013 WL 6623913, at *2 (N.D. Cal. Dec. 16, 2013) ("Although Rule 12(g) technically prohibits successive motions to dismiss that raise arguments that could have been made in a prior motion ... courts faced with a successive motion often exercise their discretion to consider the new arguments in the interests of judicial economy.")).

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**Procedural Posture(s):** Review of Administrative Decision.

KeyCite Yellow Flag - Negative Treatment

Declined to Follow by   Bonan v. Federal Deposit Insurance Corporation,
E.D.Mo.,   January 11, 2023

34 F.4th 446
United States Court of Appeals, Fifth Circuit.

George R. JARKESY, Jr.; Patriot28, L.L.C., Petitioners,

v.

SECURITIES AND EXCHANGE
COMMISSION, Respondent.

No. 20-61007

|

FILED May 18, 2022

**Synopsis**

**Background:** Hedge fund operator and investment advisor
filed petition for review of order of the United States
Securities and Exchange Commission (SEC),   2020 WL
5291417, affirming administrative law judge's (ALJ) finding
in civil enforcement action that they had committed fraud
under Securities Act, Securities Exchange Act, and Advisers
Act.

**Holdings:** The Court of Appeals, Elrod, Circuit Judge, held
that:

[1] Seventh Amendment jury-trial right applied to civil
enforcement action;

[2] action was not sort that could be properly assigned to
agency adjudication under public-rights doctrine;

[3] Congress unconstitutionally delegated legislative power
when it gave SEC unfettered authority to choose whether
to bring enforcement actions in Article III courts or within
agency; and

[4] statutory removal restrictions for SEC ALJs violated
President's power of removal under Take Care Clause.

Reversed and remanded.

Davis, Circuit Judge, dissented and filed opinion.

**West Headnotes (22)**

**[1]   Federal Courts**   Constitutional questions in
general

Court of Appeals reviews constitutional issues de
novo.

1 Case that cites this headnote

**[2]   Jury**   Denial or Infringement of Right

Because maintenance of jury as fact-finding
body is of such importance and occupies so firm
a place in American history and jurisprudence,
any seeming curtailment of Seventh Amendment
right to jury trial should be scrutinized with
utmost care. U.S. Const. Amend. 7.

1 Case that cites this headnote

**[3]   Jury**   Common law or statutory actions, in
general

Term "suits at common law," as used in Seventh
Amendment, can include suits brought under
statute as long as suit seeks common-law-like
legal remedies. U.S. Const. Amend. 7.

**[4]   Jury**   Civil Proceedings Other Than
Actions;  Special Proceedings

When Congress properly assigns matter to
adjudication in non-Article III tribunal, Seventh
Amendment poses no independent bar to
adjudication of that action by nonjury factfinder.
U.S. Const. art. 3, § 1 et seq.; U.S. Const. Amend.
7.

**[5]   Jury**   Civil Proceedings Other Than
Actions;  Special Proceedings

In cases in which public rights are being
litigated, e.g., cases in which government sues
in its sovereign capacity to enforce public rights
created by statutes within power of Congress
to enact, Seventh Amendment does not prohibit

Congress from assigning factfinding function and initial adjudication to administrative forum with which jury would be incompatible. U.S. Const. Amend. 7.

1 Case that cites this headnote

**[6]**   **Jury**   Civil Proceedings Other Than Actions; Special Proceedings

Congress cannot circumvent Seventh Amendment jury-trial right simply by passing statute that assigns traditional legal claims to administrative tribunal. U.S. Const. Amend. 7.

**[7]**   **Jury**   Civil Proceedings Other Than Actions; Special Proceedings

For purposes of rule that Seventh Amendment does not prohibit Congress from assigning resolution of statutory claim that is legal in nature to non-Article III tribunal that does not use jury as fact finder so long as claim asserted is public right, "public rights" arise when Congress passes statute under its constitutional authority that creates right so closely integrated with comprehensive regulatory scheme that right is appropriate for agency resolution. U.S. Const. art. 3, § 1 et seq.; U.S. Const. Amend. 7.

1 Case that cites this headnote

**[8]**   **Jury**   Civil Proceedings Other Than Actions; Special Proceedings

In determining whether Seventh Amendment right to jury trial applies to matter that Congress has assigned to administrative adjudication, court must first determine whether action's claims arise at common law under Seventh Amendment, and if action involves common-law claims, court must then determine whether Supreme Court's public-rights cases nonetheless permit Congress to assign it to agency adjudication without jury trial. U.S. Const. Amend. 7.

3 Cases that cite this headnote

**[9]**   **Jury**   Civil Proceedings Other Than Actions; Special Proceedings

Factor that court may consider in determining whether Seventh Amendment right to jury trial applies to matter that Congress has assigned to administrative adjudication include: (1) whether Congress created new cause of action, and remedies therefor, unknown to common law, because traditional rights and remedies were inadequate to cope with manifest public problem; and (2) whether jury trials would go far to dismantle statutory scheme or impede swift resolution of claims created by statute. U.S. Const. Amend. 7.

1 Case that cites this headnote

**[10]**   **Jury**   Civil Proceedings Other Than Actions; Special Proceedings

Securities and Exchange Commission's (SEC) administrative civil enforcement action accusing hedge fund operator and investment advisor of securities fraud and seeking civil penalties was akin to traditional actions at law to which jury-trial right attached, and thus Seventh Amendment jury-trial right applied to action, even though SEC also sought equitable remedies to ban operator from participation in securities industry activities and to require advisor to disgorge ill-gotten gains; fraud prosecutions were regularly brought in English courts at common law, and actions seeking civil penalties were akin to special types of actions in debt from early in nation's history that were distinctly legal claims. U.S. Const. Amend. 7.

1 Case that cites this headnote

**[11]**   **Jury**   Joinder of Legal and Equitable Issues

Seventh Amendment applies to proceedings that involve mix of legal and equitable claims—facts relevant to legal claims should be adjudicated by jury, even if those facts relate to equitable claims too. U.S. Const. Amend. 7.

1 Case that cites this headnote

**[12] Jury** 🔑 **Civil Proceedings Other Than Actions; Special Proceedings**

Securities and Exchange Commission's (SEC) administrative civil enforcement action accusing hedge fund operator and investment advisor of securities fraud was not sort that could be properly assigned to agency adjudication free from Seventh Amendment's strictures under public-rights doctrine, even if SEC sought to vindicate rights on public's behalf; relevant federal securities statutes created causes of action that reflected common-law fraud actions, jury trials would not go far to dismantle statutory scheme or impede swift resolution of statutory claims, government alleged that operator and advisor defrauded particular investors, and Congress had not limited SEC's ability to bring enforcement actions in Article III courts. U.S. Const. art. 3, § 1 et seq.; U.S. Const. Amend. 7.

3 Cases that cite this headnote

**[13] Fraud** 🔑 **Elements of Actual Fraud**

**Fraud** 🔑 **Statements recklessly made; negligent misrepresentation**

Traditional elements of common-law fraud are (1) knowing or reckless material misrepresentation, (2) that tortfeasor intended to act on, and (3) that harmed plaintiff.

1 Case that cites this headnote

**[14] Statutes** 🔑 **Common or civil law**

When Congress uses terms that have accumulated settled meaning under common law, court must infer, unless statute otherwise dictates, that Congress means to incorporate established meaning of these terms.

**[15] Securities Regulation** 🔑 **Registration Requirement in General**

**Securities Regulation** 🔑 **Fraud and Manipulation**

Fraud actions under federal securities statutes echo actions that historically have been available under common law. Securities Act of 1933 § 1

et seq., 15 U.S.C.A. § 77a et seq.; Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); Investment Advisers Act of 1940 § 206, 15 U.S.C.A. § 80b-6.

1 Case that cites this headnote

**[16] Jury** 🔑 **Civil Proceedings Other Than Actions; Special Proceedings**

Congress cannot eliminate party's Seventh Amendment right to jury trial merely by relabeling cause of action to which it attaches and placing exclusive jurisdiction in administrative agency or specialized court of equity. U.S. Const. Amend. 7.

**[17] Constitutional Law** 🔑 **Securities regulation**

**Securities Regulation** 🔑 **Powers and functions in general; sanctions**

Congress unconstitutionally delegated legislative power to Securities and Exchange Commission (SEC) when it gave SEC unfettered authority to choose whether to bring enforcement actions in Article III courts or within agency; Congress effectively gave SEC power to decide which defendants should receive certain legal processes without providing SEC with intelligible principle by which to exercise that power. U.S. Const. art. 1, § 1; U.S. Const. art. 3, § 1 et seq.; Securities Exchange Act of 1934 § 21B, 🚩 15 U.S.C.A. § 78u-2(a).

5 Cases that cite this headnote

**[18] Courts** 🔑 **Previous Decisions as Controlling or as Precedents**

**Courts** 🔑 **Dicta**

Alternative holdings are binding precedent and not obiter dictum.

5 Cases that cite this headnote

**[19] Constitutional Law** 🔑 **Delegation of Powers**

**Constitutional Law** 🔑 **To Judiciary**

Congress cannot delegate to courts, or to any other tribunals, powers that are strictly and exclusively legislative. U.S. Const. art. 1, § 1.

**[20]  Constitutional Law  🔑  Delegation of Powers**

Congress may grant regulatory power to another entity only if it provides intelligible principle by which recipient of power can exercise it. U.S. Const. art. 1, § 1.

5 Cases that cite this headnote

**[21]  Constitutional Law  🔑  Nature and scope in general**

Government actions are "legislative" if they have purpose and effect of altering legal rights, duties, and relations of persons outside legislative branch.

**[22]  Public Employment  🔑  Authority to impose adverse action; manner and mode of imposition**

**Securities Regulation  🔑  Securities and Exchange Commission in general**

Statutory removal restrictions for Securities and Exchange Commission (SEC) administrative law judges (ALJ) violated President's power of removal under Take Care Clause; SEC ALJs were inferior officers, and they could only be removed by SEC Commissioners if good cause is found by Merits Systems Protection Board, and SEC Commissioners and MSPB members could only be removed by President for cause. U.S. Const. art. 2, § 3; 🚩 5 U.S.C.A. § 7521(a).

**West Codenotes**

**Held Unconstitutional**

🚩 5 U.S.C.A. § 7521(a); Securities Exchange Act of 1934 § 21B, 🚩 15 U.S.C.A. § 78u-2(a)

***449** Petition for Review of an Order of the United States Securities and Exchange Commission, No. 3-15255

**Attorneys and Law Firms**

S. Michael McColloch, S. Michael McColloch, P.L.L.C., Dallas, TX, Karen L. Cook, Karen Cook, P.L.L.C., Dallas, TX, for Petitioners.

Paul Gerard Alvarez, Attorney, Dominick V. Freda, Assistant General Counsel, U.S. Securities & Exchange Commission, Washington, DC, Daniel J. Aguilar, Amanda Mundell, Joshua Marc Salzman, U.S. Department of Justice, Civil Division, Appellate Section, Washington, DC, for Respondent.

Margaret A. Little, New Civil Liberties Alliance, Washington, DC, for Amicus Curiae New Civil Liberties Alliance.

Russell Ryan, King & Spalding, L.L.P., Washington, DC, for Amicus Curiae Cato Institute.

Samuel Wollin Cooper, Paul Hastings L.L.P., Houston, TX, for Amici Curiae Phillip Goldstein, Mark Cuban, and Nelson Obus.

Before Davis, Elrod, and Oldham, Circuit Judges.

**Opinion**

Jennifer Walker Elrod, Circuit Judge:

Congress has given the Securities and Exchange Commission substantial power to enforce the nation's securities laws. It often acts as both prosecutor and judge, and its decisions have broad consequences for personal liberty and property. But the Constitution constrains the SEC's powers by protecting individual rights and the prerogatives of the other branches of government. This case is about the nature and extent of those constraints in securities fraud cases in which the SEC seeks penalties.

The SEC brought an enforcement action within the agency against Petitioners for securities fraud. An SEC administrative law judge adjudged Petitioners liable and ordered various remedies, and the SEC affirmed on appeal over several constitutional arguments that Petitioners raised. Petitioners raise those same arguments before this court. We hold that: (1) the SEC's in-house adjudication of Petitioners' case violated their Seventh Amendment right to a jury trial; (2) Congress unconstitutionally delegated legislative power to the SEC by failing to provide an intelligible principle by which the SEC would exercise the delegated power, in violation of Article I's vesting of "all" legislative power in Congress; and (3) statutory removal restrictions on SEC ALJs

Fed. Sec. L. Rep. P 101,401

violate the Take Care Clause of Article II. Because the agency proceedings below were unconstitutional, **\*450** we GRANT the petition for review, VACATE the decision of the SEC, and REMAND for further proceedings consistent with this opinion.

## I.

Petitioner Jarkesy established two hedge funds and selected Petitioner Patriot28 as the investment adviser. The funds brought in over 100 investors and held about $24 million in assets. In 2011, the SEC launched an investigation into Petitioners' investing activities, and a couple of years later the SEC chose to bring an action within the agency, alleging that Petitioners (along with some former co-parties) committed fraud under the Securities Act, the Securities Exchange Act, and the Advisers Act. Specifically, the agency charged that Petitioners: (1) misrepresented who served as the prime broker and as the auditor; (2) misrepresented the funds' investment parameters and safeguards; and (3) overvalued the funds' assets to increase the fees that they could charge investors.

Petitioners sued in the U.S. District Court for the District of Columbia to enjoin the agency proceedings, arguing that the proceedings infringed on various constitutional rights. But the district court, and later the U.S. Court of Appeals for the D.C. Circuit, refused to issue an injunction, deciding that the district court had no jurisdiction and that Petitioners had to continue with the agency proceedings and petition the court of appeals to review any adverse final order. *See Jarkesy v. SEC*, 48 F. Supp. 3d 32, 40 (D.D.C. 2014), *aff'd*, 803 F.3d 9, 12 (D.C. Cir. 2015).

Petitioners' proceedings moved forward. The ALJ held an evidentiary hearing and concluded that Petitioners committed securities fraud. Petitioners then sought review by the Commission. While their petition for Commission review was pending, the Supreme Court held that SEC ALJs had not been properly appointed under the Constitution. *Lucia v. SEC*, —— U.S. ——, 138 S. Ct. 2044, 2054–55, 201 L.Ed.2d 464 (2018). In accordance with that decision, the SEC assigned Petitioners' proceeding to an ALJ who was properly appointed. But Petitioners chose to waive their right to a new hearing and continued under their original petition to the Commission.

The Commission affirmed that Petitioners committed various forms of securities fraud. It ordered Petitioners to cease and desist from committing further violations and to pay a civil penalty of $300,000, and it ordered Patriot28 to disgorge nearly $685,000 in ill-gotten gains. The Commission also barred Jarkesy from various securities industry activities: associating with brokers, dealers, and advisers; offering penny stocks; and serving as an officer or director of an advisory board or as an investment adviser.

Critical to this case, the Commission rejected several constitutional arguments Petitioners raised. It determined that: (1) the ALJ was not biased against Petitioners; (2) the Commission did not inappropriately prejudge the case; (3) the Commission did not use unconstitutionally delegated legislative power—or violate Petitioners' equal protection rights—when it decided to pursue the case within the agency instead of in an Article III court; (4) the removal restrictions on SEC ALJs did not violate Article II and separation-of-powers principles; and (5) the proceedings did not violate Petitioners' Seventh Amendment right to a jury trial. Petitioners then filed a petition for review in this court.

## II.

Petitioners raise several constitutional challenges to the SEC enforcement proceedings. [1] **\*451** We agree with Petitioners that the proceedings suffered from three independent constitutional defects: (1) Petitioners were deprived of their constitutional right to a jury trial; (2) Congress unconstitutionally delegated legislative power to the SEC by failing to provide it with an intelligible principle by which to exercise the delegated power; and (3) statutory removal restrictions on SEC ALJs violate Article II.

## A.

**[1]** Petitioners challenge the agency's rejection of their constitutional arguments. We review such issues *de novo. See Emp. Sols. Staffing Grp. II, L.L.C. v. Off. of Chief Admin. Hearing Officer*, 833 F.3d 480, 484 (5th Cir. 2016); *Trinity Marine Prods., Inc. v. Chao*, 512 F.3d 198, 201 (5th Cir. 2007).

Fed. Sec. L. Rep. P 101,401

B.

Petitioners argue that they were deprived of their Seventh Amendment right to a jury trial. The SEC responds that the legal interests at issue in this case vindicate distinctly public rights, and that Congress therefore appropriately allowed such actions to be brought in agency proceedings without juries. We agree with Petitioners. The Seventh Amendment guarantees Petitioners a jury trial because the SEC's enforcement action is akin to traditional actions at law to which the jury-trial right attaches. And Congress, or an agency acting pursuant to congressional authorization, cannot assign the adjudication of such claims to an agency because such claims do not concern public rights alone.

1.

Thomas Jefferson identified the jury "as the only anchor, ever yet imagined by man, by which a government can be held to the principles of its constitution." Letter from Thomas Jefferson to Thomas Paine (July 11, 1789), *in* The Papers of Thomas Jefferson 267 (Julian P. Boyd ed., 1958). And John Adams called trial by jury (along with popular elections) "the heart and lungs of liberty." The Revolutionary Writings of John Adams 55 (C. Bradley Thompson ed., 2000); *see also* Jennifer W. Elrod, *Is the Jury Still Out?: A Case for the Continued Viability of the American Jury*, 44 Tex. Tech L. Rev. 303, 303–04 (2012) (explaining that the jury is "as central to the American conception of the consent of the governed as an elected legislature or the independent judiciary").[2]

Civil juries in particular have long served as a critical check on government power. So precious were civil juries at the **\*452** time of the Founding that the Constitution likely would not have been ratified absent assurance that the institution would be protected expressly by amendment. 2 The Debate on the Constitution 549, 551, 555, 560, 567 (Bernard Bailyn ed. 1993) (collecting various state ratification convention documents calling for the adoption of a civil jury trial amendment); The Federalist No. 83 (Alexander Hamilton) ("The objection to the plan of the convention, which has met with most success in this State [i.e., New York], and perhaps in several of the other States, is that relative to the want of a constitutional provision for the trial by jury in civil cases."); Mercy Otis Warren, Observations on the Constitution (1788), *in* 2 The Debate on the Constitution 290 (Bernard Bailyn ed.

1993) (worrying that the unamended Constitution would lead to "[t]he abolition of trial by jury in civil causes"); *Parsons v. Bedford*, 28 U.S. (3 Pet.) 433, 446, 7 L.Ed. 732 (1830) ("One of the strongest objections originally taken against the constitution of the United States, was the want of an express provision securing the right of trial by jury in civil cases.").[3]

**[2]**   Trial by jury therefore is a "fundamental" component of our legal system "and remains one of our most vital barriers to governmental arbitrariness." *Reid v. Covert*, 354 U.S. 1, 9– 10, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957). "Indeed, '[t]he right to trial by jury was probably the only one universally secured by the first American state constitutions ....' " *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 341, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979) (Rehnquist, J., dissenting) (quoting Leonard Levy, Legacy of Suppression: Freedom of Speech and Press in Early American History 281 (1960)). Because "[m]aintenance of the jury as a fact-finding body is of such importance and occupies so firm a place in our history and jurisprudence[,] ... any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care." *Dimick v. Schiedt*, 293 U.S. 474, 486, 55 S.Ct. 296, 79 L.Ed. 603 (1935).

**[3]**   The Seventh Amendment protects that right. It provides that "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law." U.S. Const. amend. VII. The Supreme Court has interpreted "Suits at common law" to include all actions akin to those brought at common law as those actions were understood at the time of the Seventh Amendment's adoption. *Tull v. United States*, 481 U.S. 412, 417, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987). The term can include suits brought under a statute as long as the suit seeks common-law-like legal remedies. *Id.* at 418–19, 107 S.Ct. 1831. And the Court has specifically held that, under this standard, the Seventh Amendment jury-trial right applies to suits brought under a statute seeking civil penalties. *Id.* at 418–24, 107 S.Ct. 1831.

**[4]**   That is not to say, however, that Congress may never assign adjudications to agency processes that exclude a jury. *See* **\*453** *Atlas Roofing Co. v. Occupational Safety & Health Rev. Comm'n*, 430 U.S. 442, 455, 97 S.Ct.

1261, 51 L.Ed.2d 464 (1977). "[W]hen Congress properly assigns a matter to adjudication in a non-Article III tribunal, the Seventh Amendment poses no independent bar to the adjudication of that action by a nonjury factfinder." *Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, ––– U.S. ––––, 138 S. Ct. 1365, 1379, 200 L.Ed.2d 671 (2018) (internal quotations omitted).

 **[5]**  Whether Congress may properly assign an action to administrative adjudication depends on whether the proceedings center on "public rights." *Atlas Roofing*, 430 U.S. at 450, 97 S.Ct. 1261. "[I]n cases in which 'public rights' are being litigated[,] e.g., cases in which the Government sues in its sovereign capacity to enforce public rights created by statutes within the power of Congress to enact[,] the Seventh Amendment does not prohibit Congress from assigning the factfinding function and initial adjudication to an administrative forum with which the jury would be incompatible." *Id.* Describing proper assignments, the Supreme Court identified situations "where the Government is involved in its sovereign capacity under an otherwise valid statute creating enforceable public rights. Wholly private tort, contract, and property cases, [and] a vast range of other cases as well are not at all implicated." *Id.* at 458, 97 S.Ct. 1261.

 **[6]**  **[7]**  The Supreme Court refined the public-right concept as it relates to the Seventh Amendment in *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989). There, the Court clarified that Congress cannot circumvent the Seventh Amendment jury-trial right simply by passing a statute that assigns "traditional legal claims" to an administrative tribunal. *Id.* at 52, 109 S.Ct. 2782. Public rights, the Court explained, arise when Congress passes a statute under its constitutional authority that creates a right so closely integrated with a comprehensive regulatory scheme that the right is appropriate for agency resolution. *Id.* at 54, 109 S.Ct. 2782.

 **[8]**  **[9]**  The analysis thus moves in two stages. First, a court must determine whether an action's claims arise "at common law" under the Seventh Amendment. *See Tull*, 481 U.S. at 417, 107 S.Ct. 1831. Second, if the action involves common-law claims, a court must determine whether the Supreme Court's public-rights cases nonetheless permit Congress to assign it to agency adjudication without a jury trial. *See*

*Granfinanciera*, 492 U.S. at 54, 109 S.Ct. 2782; *Atlas Roofing*, 430 U.S. at 455, 97 S.Ct. 1261. Here, the relevant considerations include: (1) whether "Congress 'creat[ed] a new cause of action, and remedies therefor, unknown to the common law,' because traditional rights and remedies were inadequate to cope with a manifest public problem"; and (2) whether jury trials would "go far to dismantle the statutory scheme" or "impede swift resolution" of the claims created by statute. *Granfinanciera*, 492 U.S. at 60–63, 109 S.Ct. 2782 (quoting *Atlas Roofing*, 430 U.S. at 454 n.11, 461, 97 S.Ct. 1261 (first and second quotations)).

### 2.

The rights that the SEC sought to vindicate in its enforcement action here arise "at common law" under the Seventh Amendment. Fraud prosecutions were regularly brought in English courts at common law. *See* 3 William Blackstone, Commentaries on the Laws of England *42 (explaining the common-law courts' jurisdiction over "actions on the case which allege any falsity or fraud; all of which savour of a criminal nature, although the action is brought for a civil remedy; and make the defendant liable in strictness to **\*454** pay a fine to the king, as well as damages to the injured party"). And even more pointedly, the Supreme Court has held that actions seeking civil penalties are akin to special types of actions in debt from early in our nation's history which were distinctly legal claims. *Tull*, 481 U.S. at 418–19, 107 S.Ct. 1831. Thus, "[a] civil penalty was a type of remedy at common law that could only be enforced in courts of law." *Id.* at 422, 107 S.Ct. 1831.

 **[10]**  Applying that principle, the Court in *Tull* held that the right to a jury trial applied to an action brought by an agency seeking civil penalties for violations of the Clean Water Act. *Id.* at 425, 107 S.Ct. 1831. Likewise here, the actions the SEC brought seeking civil penalties under securities statutes are akin to those same traditional actions in debt. Under the Seventh Amendment, both as originally understood and as interpreted by the Supreme Court, the jury-trial right applies to the penalties action the SEC brought in this case.

That conclusion harmonizes with the holdings of other courts applying *Tull*. The Seventh Circuit followed the Supreme

Court's lead in that case and has specifically said that when the SEC brings an enforcement action to obtain civil penalties under a statute, the subject of the action has the right to a jury trial. *SEC v. Lipson*, 278 F.3d 656, 662 (7th Cir. 2002) ("Because the SEC was seeking both legal and equitable relief (the former under the Insider Trading Sanctions Act, 15 U.S.C. § 78u–1, which (in subsection (a)(1)) authorizes the imposition of civil penalties for insider trading at the suit of the SEC[)] ... [the defendant] was entitled to and received a jury trial."); *see also id.* (explaining that another circuit was wrong to tacitly assume "that civil penalties in SEC cases are not a form of legal relief" [4] ). Some district courts have applied *Tull* similarly. *See, e.g., SEC v. Badian*, 822 F. Supp. 2d 352, 365 (S.D.N.Y. 2011) (explaining that "whether the facts are such that the defendants can be subjected to a civil penalty ... is a question for the jury, [and] the determination of the severity of the civil penalty to be imposed ... is a question for the Court, once liability is established"); *SEC v. Solow*, 554 F. Supp. 2d 1356, 1367 (S.D. Fla. 2008) (applying *Tull* for the proposition that civil penalties are "legal, as opposed to equitable, in nature," and that it therefore "was [the defendant's] constitutional right to have a jury determine his liability, with [the court] thereafter determining the amount of penalty, if any").

[11]  Other elements of the action brought by the SEC against Petitioners are more equitable in nature, but that fact does not invalidate the jury-trial right that attaches because of the civil penalties sought. The Supreme Court has held that the Seventh Amendment applies to proceedings that involve a mix of legal and equitable claims—the facts relevant to the legal claims should be adjudicated by a jury, even if those facts relate to equitable claims too. *See Ross v. Bernhard*, 396 U.S. 531, 537–38, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970); *see also Lipson*, 278 F.3d at 662 (noting that the defendant was entitled to a jury trial because the SEC sought legal relief in the form of penalties, even though the SEC also sought equitable relief). Here, the SEC sought to ban Jarkesy from participation in securities industry activities and to require Patriot28 to disgorge ill-gotten gains—both equitable remedies. Even so, the penalty facet of the action suffices for the jury-trial right to **\*455** apply to an adjudication of the underlying facts supporting fraud liability.

3.

[12]  Next, the action the SEC brought against Petitioners is not the sort that may be properly assigned to agency adjudication under the public-rights doctrine. Securities fraud actions are not new actions unknown to the common law. Jury trials in securities fraud suits would not "dismantle the statutory scheme" addressing securities fraud or "impede swift resolution" of the SEC's fraud prosecutions. And such suits are not uniquely suited for agency adjudication.

[13]  [14]  Common-law courts have heard fraud actions for centuries, even actions brought by the government for fines. *See* Blackstone, *supra* at \*42; *see also Tull*, 481 U.S. at 422, 107 S.Ct. 1831 ("A civil penalty was a type of remedy at common law that could only be enforced in courts of law."). Naturally, then, the securities statutes at play in this case created causes of action that reflect common-law fraud actions. The traditional elements of common-law fraud are (1) a knowing or reckless material misrepresentation, (2) that the tortfeasor intended to act on, and (3) that harmed the plaintiff. *In re Deepwater Horizon*, 857 F.3d 246, 249 (5th Cir. 2017). The statutes under which the SEC brought securities fraud actions use terms like "fraud" and "untrue statement[s] of material fact" to describe the prohibited conduct. *See* 15 U.S.C. §§ 77a–77aa, 78j(b), 80b-6. When "Congress uses terms that have accumulated settled meaning under ... the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms." *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992) (quoting *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 739, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989)); *see also* Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 537 (1947) (explaining that "if a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it").

[15]  Accordingly, the Supreme Court has often looked to common-law principles to interpret fraud and misrepresentation under securities statutes. *See, e.g, Omnicare, Inc. v. Laborers Dist. Council Indus. Pension Fund*, 575 U.S. 175, 191, 135 S.Ct. 1318, 191 L.Ed.2d 253 (2015) (considering the Restatement (Second) of Torts to determine whether material omissions are actionable under a

securities statute); *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 343–44, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005) (relying on "the common-law roots of the securities fraud action" in "common-law deceit and misrepresentation actions" to interpret the statutory securities-fraud action); *SEC v. Cap. Gains Rsch. Bureau*, 375 U.S. 180, 192–95, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963) (considering the principles of common-law fraud to determine the requirements of fraud under the Advisers Act). Thus, fraud actions under the securities statutes echo actions that historically have been available under the common law.

Next, jury trials would not "go far to dismantle the statutory scheme" or "impede swift resolution" of the statutory claims. *See Granfinanciera*, 492 U.S. at 60–63, 109 S.Ct. 2782. For one, the statutory scheme itself allows the SEC to bring enforcement actions either in-house or in Article III courts, where the jury-trial right would apply. *See* Dodd–Frank Act § 929P(a), 15 U.S.C. § 78u-2(a). If Congress has not prevented the SEC from bringing claims in Article III courts with **\*456** juries as often as it sees fit to do so, and if the SEC has in fact brought many such actions to jury trial over the years,[5] then it is difficult to see how jury trials could "dismantle the statutory scheme." Congress could have purported to assign such proceedings *solely* to administrative tribunals, but it did not. And there also is no evidence that jury trials would impede swift resolution of the claims.[6] In this case, for example, the SEC took seven years to dispose of Petitioners' case and makes no argument that proceedings with a jury trial would have been less efficient.

Relatedly, securities-fraud enforcement actions are not the sort that are uniquely suited for agency adjudication. Again, Congress has not limited the SEC's ability to bring enforcement actions in Article III courts. Consider the statutory scheme in *Atlas Roofing* for contrast. The statutes in that case were new and somewhat unusual. They provided elaborate enforcement mechanisms for the sorts of claims that likely could not have been brought in legal actions before that point. *See Atlas Roofing*, 430 U.S. at 445, 97 S.Ct. 1261 (describing how the statutes required factfinders to undertake detailed assessments of workplace safety conditions and to make unsafe-conditions findings even if no injury had occurred). But the federal courts have dealt with actions under the securities statutes for many decades, and there is no reason to believe that such courts

are suddenly incapable of continuing that work just because an agency may now share some of the workload. In fact, for the first decades of the SEC's existence, securities-fraud actions against nonregistered parties could be brought *only* in Article III courts. Thomas Glassman, *Ice Skating Uphill: Constitutional Challenges to SEC Administrative Proceedings*, 16 J. Bus. & Sec. L. 47, 50–52 (2015).[7]

The SEC counters that the securities statutes are designed to protect the public at large, and that some circuits have identified SEC enforcement actions as vindicating rights on behalf of the public. Indeed, the SEC says, the statutes allow for enforcement proceedings based on theories broader than actions like fraud that existed at common law.

Those facts do not convert the SEC's action into one focused on public rights. Surely Congress believes that the securities statutes it passes serve the public interest and the U.S. economy overall, not just individual parties. Yet Congress cannot **\*457** convert any sort of action into a "public right" simply by finding a public purpose for it and codifying it in federal statutory law. *See Granfinanciera*, 492 U.S. at 61, 109 S.Ct. 2782 (explaining that "Congress cannot eliminate a party's Seventh Amendment right to a jury trial merely by relabeling the cause of action to which it attaches and placing exclusive jurisdiction in an administrative agency or a specialized court of equity"). Purely private suits for securities fraud likely would have a similar public purpose —they too would serve to discourage and remedy fraudulent behavior in securities markets. That does not mean such suits concern public rights at their core. Granted, some actions provided for by the securities statutes may be new and not rooted in any common-law corollary. The fact remains, though, that the enforcement action seeking penalties in this case was one for securities fraud, which is nothing new and nothing foreign to Article III tribunals and juries.

That being so, Petitioners had the right for a jury to adjudicate the facts underlying any potential fraud liability that justifies penalties. And because those facts would potentially support not only the civil penalties sought by the SEC, but the injunctive remedies as well, Petitioners had a Seventh Amendment right to a jury trial for the liability-determination portion of their case.

4.

**[16]** The dissenting opinion cannot define a "public right" without using the term itself in the definition. That leads to a good bit of question-begging. It says at times that the "SEC's enforcement action" is itself "a 'public right' because it is a case 'in which the Government sues in its sovereign capacity to enforce public rights.'" *Post* at 469. So the action is a public right because (1) the SEC is the government, and (2) it is vindicating a public right. And what is that public right being vindicated? The dissenting opinion does not say. In reality, the dissenting opinion's rule is satisfied by the first step alone: The action is itself a "public right" because the SEC is the government. And the not-so-far-removed consequences that flow from that conclusion: When the federal government sues, no jury is required. This is perhaps a runner-up in the competition for the "Nine Most Terrifying Words in the English Language."[8] But fear not, the dissenting opinion's proposal runs headlong into *Granfinanciera*: "Congress cannot eliminate a party's Seventh Amendment right to a jury trial merely by relabeling the cause of action to which it attaches and placing exclusive jurisdiction in an administrative agency or a specialized court of equity." *492 U.S. at 61, 109 S.Ct. 2782*. With that limit in place, the dissenting opinion's bright-line rule burns out. Congress cannot change the nature of a right, thereby circumventing the Seventh Amendment, by simply giving the keys to the SEC to do the vindicating.

In this light, this approach treats the government's involvement as a sufficient condition for converting "private rights" into public ones. But from 1856 to 1989, the government's involvement in a suit was only a necessary condition, *not* a sufficient condition, for determining whether a suit vindicated public rights. *See Granfinanciera, 492 U.S. at 65–66, 68–69, 109 S.Ct. 2782* (Scalia, J., concurring in part) (referring to *Murray's Lessee v. Hoboken Land & Improvement Co., 59 U.S. (18 How.) 272, 283, 15 L.Ed. 372 (1856)*, and ***458** N. Pipeline Constr. Co. v. Marathon Pipe Line Co., 458 U.S. 50, 68–69, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982)* (plurality op.)); *cf. N. Pipeline Constr. Co., 458 U.S. at 69 n.23, 102 S.Ct. 2858* ("It is thus clear that the presence of the United States as a proper party to the proceeding is a necessary but not sufficient means of distinguishing 'private rights' from 'public rights.' "). Then *Granfinanciera* said that a dispute between two private parties could still vindicate "public rights," such that the government was no longer a *necessary* condition for

such suits. *See 492 U.S. at 53–55, 109 S.Ct. 2782*. The dissenting opinion thus says that, after *Granfinanciera*, the government is no longer a necessary condition, but it is now a *sufficient* condition. That is at odds with *Granfinanciera* and does not follow from any of the Court's previous decisions, which stressed that the government's involvement alone does not convert a suit about private rights into one about public rights.

The question is not just whether the government is a party, but also whether the right being vindicated is public or private, and how it is being vindicated. Tracing the roots of, and justification for, the public-rights doctrine, the Supreme Court has explained "that certain prerogatives were [historically] reserved to the political Branches of Government." *N. Pipeline Constr. Co., 458 U.S. at 67, 102 S.Ct. 2858*. Specifically, "[t]he public-rights doctrine is grounded in a historically recognized distinction between matters that could be conclusively determined by the Executive and Legislative Branches and matters that are 'inherently ... judicial.' " *Id. at 68, 102 S.Ct. 2858* (quoting *Ex parte Bakelite Corp., 279 U.S. 438, 458, 49 S.Ct. 411, 73 L.Ed. 789 (1929)*).

The inquiry is thus inherently historical. The dissenting opinion tries to avoid the history by again emphasizing that *Granfinanciera* dealt with private parties, not the government. But again, if the right being vindicated is a private one, it is not enough that the government is doing the suing. That means we must consider whether the form of the action—whether brought by the government or by a private entity—is historically judicial, or if it reflects the sorts of issues which courts of law did not traditionally decide.

As discussed in Part II.B.2, history demonstrates that fraud claims like these are "traditional legal claims" that arose at common law. Even aside from post-*Atlas Roofing* refinements of the "public rights" doctrine, this fact, among others, distinguishes that case. In *Atlas Roofing*, OSHA empowered the government to pursue civil penalties and abatement orders whether or not any employees were "actually injured or killed as a result of the [unsafe working] condition." *430 U.S. at 445, 97 S.Ct. 1261*; *see also id. at 461, 97 S.Ct. 1261* ("[Congress] created a new cause of action, and remedies therefor, unknown to the common law ...."). The government's right to relief was exclusively

a creature of statute and was therefore distinctly public in nature.

In contrast, fraud claims, including the securities-fraud claims here, are quintessentially about the redress of private harms. Indeed, the government alleges that Petitioners defrauded particular investors. *Cf.* 15 U.S.C. §§ 77q(a), 78j(b), 80b-6. As explained above, these fraud claims and civil penalties are analogous to traditional fraud claims at common law in a way that the "new" claims and remedies in 🚩 *Atlas Roofing* were not. *See* 🚩 *Atlas Roofing*, 430 U.S. at 461, 97 S.Ct. 1261.

That being so, 🚩 *Granfinanciera*'s considerations about whether Congress created a new action unfamiliar to the common law, and whether jury trial rights are incompatible with the statutory scheme, are appropriate **\*459** for us to address even if the suit involves the federal government. And as discussed above: (1) this type of action was commonplace at common law, (2) jury trial rights are consistent and compatible with the statutory scheme, and (3) such actions are commonly considered by federal courts with or without the federal government's involvement. Thus, the agency proceedings below violated Petitioners' Seventh Amendment rights, and the SEC's decision must be vacated.

### C.

**[17]** **[18]** Petitioners next argue that Congress unconstitutionally delegated legislative power to the SEC when it gave the SEC the unfettered authority to choose whether to bring enforcement actions in Article III courts or within the agency. Because Congress gave the SEC a significant legislative power by failing to provide it with an intelligible principle to guide its use of the delegated power, we agree with Petitioners.[9]

"We the People" are the fountainhead of all government power. Through the Constitution, the People delegated some of that power to the federal government so that it would protect rights and promote the common good. *See* The Federalist No. 10 (James Madison) (explaining that one of the defining features of a republic is "the delegation of the government ... to a small number of citizens elected by the rest"). But, in keeping with the Founding principles that (1) men are not angels, and (2) "[a]mbition must be made to counteract ambition," *see* The Federalist No. 51 (James Madison), the People did not vest all governmental

power in one person or entity. It separated the power among the legislative, executive, and judicial branches. *See* The Federalist No. 47 (James Madison) ("The accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny."). The legislative power is the greatest of these powers, and, of course, it was given to Congress. U.S. Const. art. I, § 1.

The Constitution, in turn, provides strict rules to ensure that Congress exercises the legislative power in a way that comports with the People's will. Every member of Congress is accountable to his or her constituents through regular popular elections. U.S. Const. art I, §§ 2, 3; *id.* amend. XVII, cl. 1. And a duly elected Congress may exercise the legislative power only through the assent of two separately constituted chambers (bicameralism) and the approval of the President (presentment). U.S. Const. art. I, § 7. This process, cumbersome though it may often seem to eager onlookers,[10] ensures that the **\*460** People can be heard and that their representatives have deliberated before the strong hand of the federal government raises to change the rights and responsibilities attendant to our public life. *Cf.* Rachel E. Barkow, *Separation of Powers and the Criminal Law*, 58 Stan. L. Rev. 989, 1017 (2006). ("[T]he Framers weighed the need for federal government efficiency against the potential for abuse and came out heavily in favor of limiting federal government power over crime.").

But that accountability evaporates if a person or entity other than Congress exercises legislative power. *See* 🚩 *Gundy v. United States*, ―― U.S. ――, 139 S. Ct. 2116, 2134, 204 L.Ed.2d 522 (2019) (Gorsuch, J., dissenting) ("[B]y directing that legislating be done only by elected representatives in a public process, the Constitution sought to ensure that the lines of accountability would be clear: The sovereign people would know, without ambiguity, whom to hold accountable for the laws they would have to follow."). Thus, sequestering that power within the halls of Congress was essential to the Framers. As John Locke—a particularly influential thinker at the Founding—explained, not even the legislative branch itself may give the power away:

> The legislative cannot transfer the
> power of making laws to any other
> hands; for it being but a delegated

power from the people, they who have it cannot pass it over to others. The people alone can appoint the form of the commonwealth, which is by constituting the legislative, and appointing in whose hands that shall be. And when the people have said we will submit to rules, and be governed by laws made by such men, and in such forms, nobody else can say other men shall make laws for them; nor can the people be bound by any laws but such as are enacted by those whom they have chosen and authorised to make laws for them.

*Id.* at 2133–34 (quoting John Locke, The Second Treatise of Civil Government and a Letter Concerning Toleration § 141, p. 71 (1947)). [11]

[19] [20] Article I of the Constitution thus provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." U.S. Const. art. I, § 1 (emphasis added). In keeping with Founding conceptions of separation of powers, [12] the Supreme Court has made clear that Congress cannot "delegate to the Courts, or to any other tribunals, powers which are strictly and exclusively legislative." *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 42, 6 L.Ed. 253 (1825); *see also* *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529, 55 S.Ct. 837, 79 L.Ed. 1570 (1935) ("Congress is not permitted to abdicate or to transfer to others the essential legislative functions with which it is thus vested."). According to the Supreme Court's more recent formulations **\*461** of that longstanding rule, [13] Congress may grant regulatory power to another entity only if it provides an "intelligible principle" by which the recipient of the power can exercise it. *Mistretta v. United States*, 488 U.S. 361, 372, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989) (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409, 48 S.Ct. 348, 72 L.Ed. 624 (1928)). The two questions we must address, then, are (1) whether Congress has delegated power to the agency that would be legislative power but-for an intelligible principle to guide its use and, if it has, (2) whether it has provided an intelligible principle such that the agency exercises only executive power. [14]

[21] We first conclude that Congress has delegated to the SEC what would be legislative power absent a guiding intelligible principle. Government actions are "legislative" if they have "the purpose and effect of altering the legal rights, duties and relations of persons ... outside the legislative branch." *INS v. Chadha*, 462 U.S. 919, 952, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983). The Supreme Court has noted that the power to assign disputes to agency adjudication is "peculiarly within the authority of the legislative department." *Oceanic Steam Navigation Co. v. Stranahan*, 214 U.S. 320, 339, 29 S.Ct. 671, 53 L.Ed. 1013 (1909). [15] And, as discussed above, in some special circumstances *Congress* has the power to assign to agency adjudication matters traditionally at home in Article III courts. *Atlas Roofing*, 430 U.S. at 455, 97 S.Ct. 1261. Through Dodd–Frank § 929P(a), Congress gave *the SEC* the power to bring securities fraud actions for monetary penalties within the agency instead of in an Article III court whenever the SEC in its unfettered discretion decides to do so. *See* 15 U.S.C. § 78u-2(a). Thus, it gave the SEC the ability to determine which subjects of its enforcement actions are entitled to Article III proceedings with a jury trial, and which are not. That was a delegation of legislative power. As the Court said in *Crowell v. Benson*, "the mode of determining" which cases are assigned to administrative tribunals "is completely within congressional control." 285 U.S. 22, 50, 52 S.Ct. 285, 76 L.Ed. 598 (1932) (quoting *Ex parte Bakelite Corp.*, 279 U.S. at 451, 49 S.Ct. 411).

The SEC argues that by choosing whether to bring an action in an agency tribunal instead of in an Article III court it merely exercises a form of prosecutorial **\*462** discretion —an executive, not legislative, power. That position reflects a misunderstanding of the nature of the delegated power. Congress did not, for example, merely give the SEC the power to decide whether to bring enforcement actions in the first place, or to choose where to bring a case among those district courts that might have proper jurisdiction. It instead effectively gave the SEC the power to decide which defendants should receive *certain legal processes* (those accompanying Article III proceedings) and which should not. Such a decision—to assign certain actions to agency adjudication—is a power that Congress uniquely possesses. *See* *id.*

Fed. Sec. L. Rep. P 101,401

Next, Congress did not provide the SEC with an intelligible principle by which to exercise that power. We recognize that the Supreme Court has not in the past several decades held that Congress failed to provide a requisite intelligible principle. *Cf.* 🚩 *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 474–75, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001) (cataloguing the various congressional directives that the Court has found to be "intelligible principle[s]"). But neither in the last eighty years has the Supreme Court considered the issue when Congress offered *no guidance* whatsoever. The last time it did consider such an open-ended delegation of legislative power, it concluded that Congress had acted unconstitutionally: In 🚩 *Panama Refining Co. v. Ryan*, 293 U.S. 388, 405–06, 55 S.Ct. 241, 79 L.Ed. 446 (1935), the Court considered a statutory provision granting the President the authority to prohibit the transportation in interstate commerce of petroleum and related products. The Court scoured the statute for directives to guide the President's use of that authority, but it found none. 🚩 *Id.* at 414–20, 55 S.Ct. 241. It therefore explained:

> [I]n every case in which the question has been raised, the Court has recognized that there are limits of delegation which there is no constitutional authority to transcend. We think that section 9(c) goes beyond those limits. As to the transportation of oil production in excess of state permission, the Congress has declared no policy, has established no standard, has laid down no rule.

🚩 *Id.* at 430, 55 S.Ct. 241.

Congress's grant of authority to the SEC here is similarly open-ended. Even the SEC agrees that Congress has given it exclusive authority and absolute discretion to decide whether to bring securities fraud enforcement actions within the agency instead of in an Article III court. Congress has said nothing at all indicating how the SEC should make that call in any given case. If the intelligible principle standard means anything, it must mean that a total absence of guidance is impermissible under the Constitution.[16] *See* 🚩 *Gundy*, 139 S. Ct. at 2123 (Kagan, J., plurality op.) (noting that "we *would*

face a nondelegation question" if the statutory provision at issue had "grant[ed] the Attorney General plenary power to determine SORNA's applicability to pre-Act offenders—to require them to register, or not, as she sees fit, **\*463** and to change her policy for any reason and at any time" (emphasis added)). We therefore vacate the SEC's judgment on this ground as well.

### D.

**[22]** The SEC proceedings below suffered from another constitutional infirmity: the statutory removal restrictions for SEC ALJs are unconstitutional.[17] SEC ALJs perform substantial executive functions. The President therefore must have sufficient control over the performance of their functions, and, by implication, he must be able to choose who holds the positions. Two layers of for-cause protection impede that control; Supreme Court precedent forbids such impediment.

Article II provides that the President must "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. The Supreme Court has held that this provision guarantees the President a certain degree of control over executive officers; the President must have adequate power over officers' appointment and removal.[18] 🚩 *Myers v. United States*, 272 U.S. 52, 117, 47 S.Ct. 21, 71 L.Ed. 160 (1926). Only then can the People, to whom the President is directly accountable, vicariously exercise authority over high-ranking executive officials. 🚩 *Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 498, 130 S.Ct. 3138, 177 L.Ed.2d 706 (2010). Yet not all removal restrictions are constitutionally problematic. "Inferior officers" may retain some amount of for-cause protection from firing. *See, e.g.,* 🚩 *Morrison v. Olson*, 487 U.S. 654, 691–92, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988). Likewise, even principal officers may retain for-cause protection when they act as part of an expert board. 🚩 *Seila Law LLC v. CFPB*, ––– U.S. ––––, 140 S. Ct. 2183, 2192, 207 L.Ed.2d 494 (2020).

But a problem arises when both of those protections act in concert. In 🚩 *Free Enterprise Fund*, the Supreme Court considered the constitutionality of two layers of for-cause protection for members of the 🚩 Public Company Accounting Oversight Board (PCAOB). 561 U.S. at 492,

130 S.Ct. 3138. The members of the board answered to the SEC Commissioners. But the SEC could remove them only for "willful violations of the [Sarbanes–Oxley] Act, Board rules, or the securities laws; willful abuse of authority; or unreasonable failure to enforce compliance—as determined in a formal Commission order, rendered on the record and after notice and an opportunity for a hearing." *Id.* at 503, 130 S.Ct. 3138. On top of that, the President could only remove SEC Commissioners for "inefficiency, neglect of duty, or malfeasance in office." *Id.* at 486–87, 502, 130 S.Ct. 3138. The Supreme Court held that this extensive system insulating PCAOB members from removal deprived the President of the ability to adequately oversee the Board's actions. *Id.* at 492, 496, 130 S.Ct. 3138.

The question here is whether SEC ALJs serve sufficiently important executive functions, and whether the restrictions on their removal are sufficiently onerous, that the President has lost the ability to take care **\*464** that the laws are faithfully executed. Petitioners' argument on this point is straightforward: SEC ALJs are inferior officers; they can only be removed by the SEC Commissioners if good cause is found by the Merits Systems Protection Board; SEC Commissioners and MSPB members can only be removed by the President for cause; so, SEC ALJs are insulated from the President by at least two layers of for-cause protection from removal, which is unconstitutional under *Free Enterprise Fund*. The SEC responds that this case is not like *Free Enterprise Fund*. First, it contends that SEC ALJs primarily serve an adjudicatory role. Second, it asserts that the for-cause protections for ALJs are not as stringent as those which applied to PCAOB members at the time of *Free Enterprise Fund*—or, at least, that this court should read the removal protections for ALJs that way to avoid constitutional problems.

We agree with Petitioners and hold that the removal restrictions are unconstitutional. The Supreme Court decided in *Lucia* that SEC ALJs are "inferior officers" under the Appointments Clause because they have substantial authority within SEC enforcement actions. *Lucia v. SEC,* ––– U.S. ––––, 138 S. Ct. 2044, 2053, 201 L.Ed.2d 464 (2018). And in *Free Enterprise Fund* it explained that the President must have adequate control over officers and how they carry out their functions. 561 U.S. at 492, 496, 130 S.Ct.

3138. If principal officers cannot intervene in their inferior officers' actions except in rare cases, the President lacks the control necessary to ensure that the laws are faithfully executed. So, if SEC ALJs are "inferior officers" of an executive agency, as the Supreme Court in *Lucia* indicated was the case at least for the purposes of the Appointments Clause, they are sufficiently important to executing the laws that the Constitution requires that the President be able to exercise authority over their functions. Specifically, SEC ALJs exercise considerable power over administrative case records by controlling the presentation and admission of evidence; they may punish contemptuous conduct; and often their decisions are final and binding. *Lucia,* 138 S. Ct. at 2053–54. But 5 U.S.C. § 7521(a) provides that SEC ALJs may be removed by the Commission "only for good cause established and determined by the Merit Systems Protection Board (MSPB) on the record after opportunity for hearing before the Board." (Parenthetical not in original.) And the SEC Commissioners may only be removed by the President for good cause.

The dissenting opinion's response is all built on dicta from *Free Enterprise Fund*. There, in noting what issues the Court was leaving open, the Court identified characteristics that were true of ALJs that were not true of PCAOB members: "[U]nlike members of the [PCAOB], many" ALJs "perform adjudicative rather than enforcement or policymaking functions." *Free Enterprise Fund,* 561 U.S. at 507 n.10, 130 S.Ct. 3138. Far from "stat[ing]" that this "may justify multiple layers of removal protection," *post* at 478, the Court merely identified that its decision does not resolve the issue presented here. In any event, the Court itself said in *Myers* that "quasi[-]judicial" executive officers must nonetheless be removable by the President "on the ground that the discretion regularly entrusted to that officer by statute has not been on the whole intelligently or wisely exercised." 272 U.S. at 135, 47 S.Ct. 21.[19] **\*465** So even if ALJs' functions are more adjudicative than PCAOB members, the fact remains that two layers of insulation impedes the President's power to remove ALJs based on their exercise of the discretion granted to them.[20]

Finally, the SEC urges us to interpret the for-cause protections for ALJs to instead allow removal for essentially any reason. Even if we could do so (and the statutory language likely does not give us that flexibility), that would not solve the

Article II problem. As noted above, the MSPB is part of the mix as well. Furthermore, MSPB members "may be removed by the President only for inefficiency, neglect of duty, or malfeasance in office." 5 U.S.C. § 1202(d). So, for an SEC ALJ to be removed, the MSPB must find good cause and the Commission must choose to act on that finding. And members of both the MSPB and the Commission have for-cause protection from removal by the President. Simply put, if the President wanted an SEC ALJ to be removed, at least two layers of for-cause protection stand in the President's way.

Thus, SEC ALJs are sufficiently insulated from removal that the President cannot take care that the laws are faithfully executed. The statutory removal restrictions are unconstitutional.

### III.

In sum, we agree with Petitioners that the SEC proceedings below were unconstitutional. The SEC's judgment should be vacated for at least two reasons: (1) Petitioners were deprived of their Seventh Amendment right to a civil jury; and (2) Congress unconstitutionally delegated legislative power to the SEC by failing to give the SEC an intelligible principle by which to exercise the delegated power. We also hold that the statutory removal restrictions for SEC ALJs are unconstitutional, **\*466** though we do not address whether vacating would be appropriate based on that defect alone.[21]

We GRANT the petition for review, VACATE the decision of the SEC, and REMAND for further proceedings consistent with this opinion.

W. Eugene Davis, Circuit Judge, dissenting:
The majority holds that (1) administrative adjudication of the SEC's enforcement action violated Petitioners' Seventh Amendment right to a jury trial; (2) Congress unconstitutionally delegated an Article I legislative power to the executive branch when it gave the SEC the discretion to choose between bringing its enforcement action in an Article III court or before the agency without providing an intelligible principle to guide the SEC's decision; and (3) the removal protections on SEC administrative law judges violate Article II's requirement that the President "take Care that the Laws be faithfully executed." I respectfully disagree with each of these conclusions.

### I.

The majority holds that the Seventh Amendment grants Petitioners the right to a jury trial on the facts underlying the SEC's enforcement action, and administrative adjudication without a jury violated that right. In reaching this conclusion, the majority correctly recognizes that a case involving "public rights" may be adjudicated in an agency proceeding without a jury notwithstanding the Seventh Amendment.[1] But, the majority then erroneously concludes that the SEC's enforcement action does not involve "public rights." In my view, the majority misreads the Supreme Court's decisions addressing what are and are not "public rights."

### A.

As declared by Professors Wright and Miller, "A definitive statement by the Supreme Court regarding congressional authority in this context is found in 🚩 *Atlas Roofing v. Occupational Safety & Health Review Commission*."[2] That case concerned the Occupational Safety and Health Act ("OSHA" or "the Act"), which created a new statutory duty on employers to avoid maintaining unsafe or unhealthy working conditions. OSHA also empowered the Federal Government, proceeding before an administrative agency without a jury, to impose civil penalties on those who violated the Act.[3] Two employers who had been cited for violating the Act argued that a suit in a federal court by the Government seeking civil penalties for violation of a statute is classically a suit at **\*467** common law for which the Seventh Amendment provides a right to a jury trial; therefore, Congress cannot deprive them of that right by simply assigning the function of adjudicating the Government's right to civil penalties to an administrative forum where no jury is available.[4] The Court, in a unanimous opinion, disagreed:

> At least in cases in which "public rights" are being litigated—*e.g., cases in which the Government sues in its sovereign capacity to enforce public rights created by statutes within the power of Congress to enact*—the Seventh Amendment does

not prohibit Congress from assigning the factfinding function and initial adjudication to an administrative forum with which the jury would be incompatible.... This is the case even if the Seventh Amendment would have required a jury where the adjudication of those rights is assigned instead to a federal court of law instead of an administrative agency. [5]

*Atlas Roofing* drew its definition of "public rights" from, inter alia, *Crowell v. Benson*, which described "public rights" in slightly broader terms: matters "***which arise between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments***." [6]

The Supreme Court has never retreated from its holding in *Atlas Roofing*. [7] In fact, the Court implicitly re-affirmed *Atlas Roofing*'s definition of "public rights" as recently as 2018, when it decided *Oil States Energy Services, LLC v. Greene's Energy Group, LLC.* [8] That case involved the Leahy-Smith America Invents Act, which granted the Patent and Trademark Office ("PTO") the power to reconsider a previously-issued patent via an administrative process called "inter partes review." [9] This was a departure from historical practice, which placed this function in Article III courts alone. [10] The petitioner argued that inter partes review violated both Article III and the Seventh Amendment. [11] The Court disagreed and explained that Congress has "significant latitude" to assign adjudication of "public rights" to non-Article III tribunals that do not use a jury. [12] Moreover, the Court, quoting *Crowell*, defined "public rights" as "matters 'which arise between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative **\*468** departments.' " [13]

As mentioned, *Atlas Roofing*'s definition of "public rights" is a slightly narrower version of *Crowell*'s definition. Thus,

when *Oil States* re-affirmed *Crowell*, it necessarily re-affirmed *Atlas Roofing*'s definition as well. [14]

*Oil States* is also significant because it held that historical practice is not determinative in matters governed by the public rights doctrine, as such matters " 'from their nature' can be resolved in multiple ways." [15] Accordingly, the Court rejected the view that "because courts have traditionally adjudicated patent validity in this country, courts must forever continue to do so." [16]

Like *Oil States*, this court relied on *Crowell* to define "public rights" in *Austin v. Shalala*. [17] That case involved the Government's action to recover overpayment of social security benefits via an administrative proceeding before the Social Security Administration. [18] *Austin* rejected the plaintiff's argument that the proceeding violated her Seventh Amendment right, explaining that "if Congress may employ an administrative body as a factfinder in imposing money penalties for the violation of federal laws"—as was done in *Atlas Roofing* and in the securities statutes at issue here—"it plainly may employ such a body to recover overpayments of government largess." [19]

Consistent with the above cases, our sister circuits routinely hold that an enforcement action by the Government for violations of a federal statute or regulation is a "public right" that Congress may assign to an agency for adjudication without offending the Seventh Amendment. [20] For example, the Eleventh Circuit relied solely on *Atlas Roofing* when it rejected a Seventh Amendment challenge to administrative adjudication of an *SEC* enforcement action and declared "it is well-established that the Seventh Amendment does not require a jury trial in administrative proceedings designed to adjudicate statutory 'public rights.' " [21]

The SEC's enforcement action satisfies *Atlas Roofing*'s definition of a "public **\*469** right," as well as the slightly broader definition set forth in *Crowell* and applied in *Oil States* and *Austin.* The broad congressional purpose of the securities laws is to "protect investors." [22] For example, the Securities Act of 1933 was "designed to provide investors with full disclosure of material information

Fed. Sec. L. Rep. P 101,401

concerning public offerings of securities in commerce, to protect investors against fraud and, through the imposition of specified civil liabilities, to promote ethical standards of honesty and fair dealing." [23] The Dodd-Frank Act, which, inter alia, expanded the SEC's authority to pursue civil penalties in administrative proceedings, [24] was "intended to improve investor protection," particularly in light of the Bernard Madoff Ponzi scheme. [25] Other circuits have consistently recognized that "[w]hen the SEC sues to enforce the securities laws, it is vindicating public rights and furthering public interests, and therefore is acting in the United States's sovereign capacity." [26] Thus, the SEC's enforcement action is a "public right" because it is a case "in which the Government sues in its sovereign capacity to enforce public rights created by statutes within the power of Congress to enact." [27] It is also a matter "which arise[s] between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments." [28]

Because the SEC's enforcement action is a "public right," the Seventh Amendment does not prohibit Congress from assigning its adjudication to an administrative forum that lacks a jury. [29] As discussed below, the fact that the securities statutes at issue resemble (but are not identical to) common-law fraud does not change this **\*470** result. [30] It also makes no difference that federal courts have decided claims under the securities statutes for decades. [31]

### B.

The majority's conclusion that the SEC's enforcement action is not a "public right" is based primarily on an erroneous reading of *Granfinanciera, S.A. v. Nordberg.* [32] Specifically, the majority interprets that case as abrogating *Atlas Roofing.* *Granfinanciera* did nothing of the sort.

In *Granfinanciera,* a bankruptcy trustee sued in bankruptcy court (where a jury was unavailable) to avoid allegedly fraudulent transfers the defendants had received from the debtor. [33] The defendants argued that they were entitled to a jury trial under the Seventh Amendment. [34] A key issue was whether the trustee's claim involved "public" or

"private" rights. The Court held that the action was a private right. [35]

Unlike *Atlas Roofing,* *Granfinanciera* did not involve a suit by or against the Federal Government. This distinction is important. In discussing what constitutes a "public right," *Granfinanciera,* citing *Atlas Roofing,* recognized that "Congress may effectively supplant a common-law cause of action carrying with it a right to a jury trial with a statutory cause of action shorn of a jury trial right if that statutory cause of action *inheres in, or lies against, the Federal Government in its sovereign capacity.*" [36] *Granfinanciera* then clarified that "the class of 'public rights' whose adjudication Congress may assign to administrative agencies ... *is more expansive* than *Atlas Roofing*'s discussion suggests"; [37] i.e., the "Government need not be a party for a case to revolve around 'public rights' " provided certain other criteria are met. [38] Nevertheless, and contrary to what is implied by the majority, *Granfinanciera*'s recognition that the public-rights doctrine can extend to cases where the Government is not a party in no way undermines or alters *Atlas Roofing*'s holding that a case where the Government sues in its sovereign capacity to enforce a statutory right is a case involving "public rights." [39]

**\*471** Because the bankruptcy trustee's suit involved only private parties and not the Government, *Granfinanciera*'s analysis is solely concerned with whether the action was one of the "seemingly 'private' right[s]" that are within the reach of the public-rights doctrine. Thus, any considerations or requirements discussed in *Granfinanciera* that go beyond *Atlas Roofing* or *Crowell* apply only to cases not involving the Government.

This understanding of *Granfinanciera* is supported by our subsequent decision in *Austin,* which stated:

> Although the definition is somewhat nebulous, at a minimum, suits involving public rights are those "which arise between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments." *Crowell v. Benson,* 285 U.S. 22, 50, 52 S. Ct. 285, 292, 76 L.Ed. 598 (1932). *Beyond that,*

certain *other cases* are said to involve public rights where Congress has created a "seemingly 'private' right that is so closely integrated into a public regulatory scheme as to be a matter appropriate for agency resolution with limited involvement by the Article III judiciary."

⚑ Granfinanciera, 492 U.S. at 54, 109 S.Ct. 2782 .... [40]

Similarly, while ⚑ *Oil States* acknowledged that ⚑ *Crowell* did not provide the sole definition of what constitutes a "public right", it did not discuss any of the other "formulations" because ⚑ *Crowell*'s definition was met. [41]

The majority overlooks the fact that ⚑ *Granfinanciera*'s expansion of the public-rights doctrine applies only when the Government is not a party to the case. As a result, the majority applies "considerations" that have no relevance here. For example, the majority, quoting ⚑ *Granfinanciera*, states that "jury trials would not 'go far to dismantle the statutory scheme' or 'impede swift resolution' of statutory claims." Again, ⚑ *Granfinanciera* discussed these considerations in the context of a suit between private persons, not a case involving the Government acting in its sovereign capacity under an otherwise valid statute creating enforceable public rights. [42] Indeed, neither ⚑ *Austin* nor ⚑ *Oil States*, both of which were decided after ⚑ *Granfinanciera* and which found public rights to exist, mentions these considerations. [43]

The majority also states that the securities statutes at issue created causes of **\*472** action that "reflect" and "echo" common-law fraud. But this does not matter, because, as ⚑ *Granfinanciera* itself recognized, the public-rights doctrine allows Congress to "fashion causes of action that are closely **analogous** to common-law claims and place them beyond the ambit of the Seventh Amendment by assigning their resolution to a forum in which jury trials are unavailable." [44]

The majority asserts that ⚑ *Atlas Roofing* is distinguishable from the SEC's enforcement action because "OSHA empowered the government to pursue civil penalties regardless of whether any employe[e]s were 'actually injured or killed as a result of the [unsafe working] condition.' " [45] But the securities statutes share this feature: The SEC may impose civil penalties on a person who makes a material misrepresentation even if no harm resulted from the misrepresentation. [46] The statutory cause of action created by the securities statutes is "new" to the common law as the one created by OSHA. [47]

Relatedly, the majority harps on the fact that federal courts have dealt with actions under the securities statutes for decades. But *Oil States* makes clear that "[h]istorical practice is not decisive here." [48] "That Congress chose the courts in the past does not foreclose its choice of [an administrative adjudication] today." [49]

The majority also states that "securities-fraud enforcement actions are not the sort that are uniquely suited for agency adjudication." Again, this is not relevant. As *Oil States* explained, "the public-rights doctrine applies to matters 'arising between the government and others, which from their nature do not require judicial determination **and yet are susceptible of it**.' " [50] Indeed, "matters governed by the public-rights doctrine 'from their nature' can be **\*473** resolved in multiple ways." [51]

Finally, it should be emphasized that ⚑ *Tull v. United States* [52] does not control the outcome here. That case concerned the Government's suit **in district court** seeking civil penalties and an injunction for violations of the Clean Water Act. [53] ⚑ *Tull* did not involve an administrative proceeding. Thus, while ⚑ *Tull* concluded that the Government's claim was analogous to a "Suit at common law" for Seventh Amendment purposes, [54] the Court did not engage in the "quite distinct inquiry" into whether the claim was also a "public right" that Congress may assign to a non-Article III forum where juries are unavailable. [55] ⚑ *Tull* itself acknowledges in a footnote prior decisions "holding that the Seventh Amendment is not applicable to administrative proceedings," making clear that it was not deciding whether the defendant would be entitled to a jury in an administrative adjudication. [56]

## C.

In summary, the SEC's enforcement action against Petitioners for violations of the securities laws is a "public right" under Supreme Court precedent as well as our own. Accordingly, Congress could and did validly assign adjudication of

that action to an administrative forum where the Seventh Amendment does not require a jury.

## II.

I also disagree with the majority's alternative holding that Congress exceeded its power by giving the SEC the authority to choose to bring its enforcement action in either an agency proceeding without a jury or to a court with a jury. The majority reasons that giving the SEC this power without providing guidelines on the use of that power violates Article I by delegating its legislative authority to the agency. The majority's position runs counter to Supreme Court precedent. As set forth below, by authorizing the SEC to bring enforcement actions either in federal court or in agency proceedings, Congress fulfilled its legislative duty.

In support of its determination that Congress unconstitutionally delegated its authority to the SEC, the majority relies on 🚩 *Crowell v. Benson*, wherein the Supreme Court explained that "the mode of determining" cases involving public rights "is completely within congressional control." [57] 🚩 *Crowell* did not state that Congress cannot authorize that a case involving public rights may be determined in either of two ways. By passing Dodd-Frank § 929P(a), Congress established that SEC enforcement actions can be brought in Article III courts or in administrative proceedings. In doing so, Congress fulfilled its duty of controlling the mode of determining public rights cases asserted by the SEC.

 **\*474**  The majority maintains that because the SEC has "the power to decide which defendants should receive certain legal processes (those accompanying Article III proceedings) and which should not," then such a decision falls under Congress's legislative power. The Supreme Court's decision in 🚩 *United States v. Batchelder* [58] demonstrates that the majority's position on this issue is incorrect.

In 🚩 *Batchelder*, the issue presented was whether it was constitutional for Congress to allow the Government, when prosecuting a defendant, to choose between two criminal statutes that "provide[d] different penalties for essentially the same conduct." [59] The defendant had been convicted under the statute with the higher sentencing range, and the Court of Appeals determined that the delegation of

authority to prosecutors to decide between the two statutes, and thus choose a higher sentencing range for identical conduct, was a violation of due process and the nondelegation doctrine. [60] Specifically, the Court of Appeals determined that "such prosecutorial discretion could produce 'unequal justice' " and that it might be "impermissibl[e] [to] delegate to the Executive Branch the Legislature's responsibility to fix criminal penalties." [61]

The Supreme Court disagreed. The Court explained that "[t]he provisions at issue plainly demarcate the range of penalties that prosecutors and judges may seek and impose." [62] The Court further stated: "In light of that specificity, the power that Congress has delegated to those officials is no broader than the authority they routinely exercise in enforcing the criminal laws." [63] The Court concluded: "Having informed the courts, prosecutors, and defendants of the permissible punishment alternatives available under each Title, Congress has fulfilled its duty." [64]

The Supreme Court has analogized agency enforcement decisions to prosecutorial discretion exercised in criminal cases. [65] If the Government's prosecutorial authority to decide between two criminal statutes that provide for different sentencing ranges for essentially the same conduct does not violate the nondelegation doctrine, then surely the SEC's authority to decide between two forums that provide different legal processes does not violate the nondelegation doctrine. Thus, the SEC's forum-selection authority is part and parcel of its prosecutorial authority. [66]

Although no other circuit court appears to have addressed the particular nondelegation issue presented in this case, a district court did so in 🚩 *Hill v. SEC*. [67] Like the  **\*475** majority does here, the plaintiff in 🚩 *Hill* relied on 🚩 *I.N.S. v. Chadha* [68] to assert that the SEC's choice of forum is a legislative action because it "alter[s] the rights, duties, and legal relations of individuals." [69] 🚩 *Chadha* addressed the question whether a provision in the Immigration and Nationality Act (INA) allowing one House of Congress to veto the Attorney General's decision to allow a particular deportable alien to remain in the United States violated the Presentment Clauses and bicameral requirement of Article I. [70] Specifically, it addressed whether Congress, after validly delegating authority to the Executive, can then alter or revoke

that valid delegation of authority through the action of just one House.

I agree with the district court in 🚩 *Hill* that if 🏳 *Chadha*'s definition of legislative action is interpreted broadly and out of context, then any SEC decision which affected a person's legal rights—including charging decisions—would be legislative actions, which is contrary to the Supreme Court's decision in 🏳 *Batchelder*. [71] 🏳 *Chadha*, one of the primary authorities the majority relies on, does not touch on any issue involved in this case.

I agree with the persuasive and well-reasoned decision of the district court in 🚩 *Hill* that "Congress has properly delegated power to the executive branch to make the forum choice for the underlying SEC enforcement action." [72] In sum, it is clear to me that Congress's decision to give prosecutorial authority to the SEC to choose between an Article III court and an administrative proceeding for its enforcement actions does not violate the nondelegation doctrine.

### III.

Finally, the majority concludes that the statutory removal restrictions applicable to SEC administrative law judges are unconstitutional because they violate Article II's requirement that the President "take Care that the Laws be faithfully executed." Specifically, the majority determines that SEC ALJs enjoy at least two layers of for-cause protection, and that such insulation from the President's removal power is unconstitutional in light of the Supreme Court's decisions in *Free Enterprise Fund v. Public Company Accounting Oversight Board* [73] and 🏳 *Lucia v. SEC*. [74] I disagree. Rather than support the majority's conclusion, these cases explain why the SEC ALJs' tenure protections are constitutional: ALJs perform an adjudicative function.

*Free Enterprise* concerned the Public Company Accounting Oversight Board ("PCAOB"), which Congress created in 2002 to regulate the accounting industry. [75] The PCAOB's powers included promulgating standards, inspecting accounting firms, initiating formal investigations and disciplinary proceedings, and issuing sanctions. [76] In other words, PCAOB members were inferior officers who exercised "significant **\*476** executive power." [77] The

President could not remove the members of the PCAOB; rather, they could be removed by the Securities and Exchange Commission under certain, limited circumstances. [78] Furthermore, SEC Commissioners cannot themselves be removed by the President except for inefficiency, neglect of duty, or malfeasance in office. [79] While prior cases upheld restrictions on the President's removal power that imposed one level of protected tenure, *Free Enterprise* held that these dual for-cause limitations on the removal of PCAOB members unconstitutionally impaired the President's ability to ensure that the laws be faithfully executed, because "[n]either the President, nor anyone directly responsible to him, nor even an officer whose conduct he may review only for good cause, has full control over the [PCAOB]." [80]

*Free Enterprise*, however, "did not broadly declare all two-level for-cause protections for inferior officers unconstitutional." [81] Furthermore, the Court expressly declined to address "that subset of independent agency employees who serve as administrative law judges." [82] The Court made two observations about ALJs that potentially distinguished them from the PCAOB: (1) whether ALJs are "Officers of the United States" was, at that time, a disputed question, and (2) "unlike members of the [PCAOB], many administrative law judges of course perform ***adjudicative rather than enforcement or policymaking functions or possess purely recommendatory powers***." [83]

The Supreme Court subsequently addressed the first observation in 🏳 *Lucia v. SEC*. [84] There, the Court held that SEC ALJs are "inferior officers" within the meaning of the Appointments Clause in Article II. [85] However, the Court again expressly declined to decide whether multiple layers of statutory removal restrictions on SEC ALJs violate Article II. [86]

Thus, neither *Free Enterprise* nor 🏳 *Lucia* decided the issue raised here: whether multiple layers of removal restrictions for SEC ALJs violate Article II. As the Ninth Circuit recently concluded, the question is open. [87]

It is important to recognize that the Constitution does not expressly prohibit removal protections for "Officers of the United States." [88] The concept that such protections may be unconstitutional is drawn from the fact that "Article II vests '[t]he executive Power ... in a President of the United States

of America,' who must 'take Care that the Laws be faithfully executed.' " [89] The test is functional, not categorical:

**\*477** The analysis contained in our removal cases is designed ***not*** to define rigid categories of those officials who may or may not be removed at will by the President, but to ensure that Congress does not interfere with the President's exercise of the "executive power" and his constitutionally appointed duty to "take care that the laws be faithfully executed" under Article II. [90]

Consistent with this standard, *Free Enterprise* thoroughly explained why two levels of removal protection for the PCAOB interfered with the executive power. [91] The first step in the Court's analysis focused on the fact that the PCAOB exercised "significant executive power" [92] as it "determine[d] the policy and enforce[d] the laws of the United States." [93] Then the Court explained how the PCAOB's removal protections subverted the President's ability to oversee this power. [94] The point here is that the function performed by the officer is critical to the analysis—the Court did not simply conclude that because members of the PCAOB were "Officers of the United States" (which was undisputed) [95] that dual for-cause protections were unconstitutional.

Unlike the PCAOB members who determine policy and enforce laws, SEC ALJs perform solely adjudicative functions. As the 🚩*Lucia* Court stated, "an SEC ALJ exercises authority 'comparable to' that of a federal district judge conducting a bench trial." [96] Their powers include supervising discovery, issuing subpoenas, deciding motions, ruling on the admissibility of evidence, hearing and examining witnesses, generally regulating the course of the proceeding, and imposing sanctions for contemptuous conduct or procedural violations. [97] After a hearing, the ALJ issues an initial decision that is subject to review by the Commission. [98] Commentators have similarly observed that "SEC ALJs do not engage in enforcement or rulemaking" [99] and proceedings before them are "analogous to that which would occur before a federal judge." [100]

🚩*Free Enterprise* stated, albeit in dicta, that the fact that an ALJ performs adjudicative rather than enforcement or policymaking functions may justify multiples layers of removal protection. [101] I believe this to be the case. The

ALJs' role is similar to that of a federal judge; [102] it is not central to the functioning of the Executive Branch for purposes of the Article II removal precedents. [103] As the Southern District of **\*478** New York concluded, invalidating the "good cause" removal restrictions enjoyed by SEC ALJs would only "undermine the ALJs' clear adjudicatory role and their ability to 'exercise[ ] ... independent judgment on the evidence before [them], free from pressures by the parties or other officials within the agency.' " [104]

In fact, the Ninth Circuit recently employed similar reasoning in *Decker Coal Co. v. Pehringer*, which held that two layers of removal protection for ALJs in the Department of Labor do not violate Article II. [105] Like SEC ALJs, the ALJs in *Decker Coal* performed "a purely adjudicatory function." [106] The majority's decision is in tension, if not direct conflict, with *Decker Coal*.

🚩*Free Enterprise* also noted that the exercise of "purely recommendatory powers" may justify multiple removal protections. [107] When an SEC ALJ issues a decision in an enforcement proceeding, that decision is essentially a recommendation as the Commission can review it de novo. [108] Even when the Commission declines review, the ALJ's decision is "deemed the action of the Commission." [109] Furthermore, the Commission is not required to use an ALJ and may elect to preside over the enforcement action itself. [110] This further supports the conclusion that the SEC ALJs' removal protections do not interfere with the President's executive power.

The majority reasons that because 🚩*Lucia* determined that SEC ALJs are inferior officers under the Appointments Clause, "they are sufficiently important to executing the laws that the Constitution requires that the President be able to exercise authority over their functions," and, consequently, multiple for-cause protections inhibit the President's ability to take care that the laws be faithfully executed. But nowhere does the majority explain ***how*** the ALJs' tenure protections interfere with the President's ability to execute the laws. The majority does not mention 🚩*Free Enterprise*'s observation that the performance of "adjudicative rather than enforcement or policymaking functions" or "possess[ing] purely recommendatory powers" distinguishes ALJs from the PCAOB and may justify multiples layers of removal protection for ALJs. [111] The majority does not mention

that 🚩 *Lucia* found SEC ALJs to be similar to a federal judge. [112] The majority does not mention *Decker Coal*. Instead, the majority applies what is essentially a rigid, categorical standard, not the functional analysis required by the Supreme Court's precedents. [113]

**\*479** Accordingly, I disagree with the majority that multiple layers of removal protection for SEC ALJs violate Article II. Because SEC ALJs solely perform an adjudicative function, and because their powers are recommendatory, these removal restrictions do not interfere with the President's ability to "take Care that the Laws be faithfully executed."

**IV.**

I find no constitutional violations or any other errors with the administrative proceedings below. Accordingly, I would deny the petition for review.

**All Citations**

34 F.4th 446, Fed. Sec. L. Rep. P 101,401

---

## Footnotes

1  Multiple *amici* have filed briefs with this court as well: the Cato Institute, Phillip Goldstein, Mark Cuban, Nelson Obus, and the New Civil Liberties Alliance. Each argues that the SEC proceedings exceeded constitutional limitations for reasons that Petitioners raise.

2  Veneration of the jury as safeguard of liberty predates the American Founding. Our inherited English common-law tradition has long extolled the jury as an institution. William Blackstone said that trial by jury is "the glory of the English law" and "the most transcendent privilege which any subject can enjoy or wish for, that he cannot be affected, either in his property, his liberty, or his person, but by the unanimous consent of twelve of his neighbors and equals." 🚩 *Mitchell v. Harmony*, 54 U.S. (13 How.) 115, 142–43, 14 L.Ed. 75 (1851) (quoting 4 William Blackstone, Commentaries on the Laws of England 227–29 (Oxford, Clarendon Pr. 1992) (1765)); *see also* Jennifer W. Elrod, *W(h)ither The Jury? The Diminishing Role of the Jury Trial in Our Legal System*, 68 Wash. & Lee L. Rev. 3, 7 (2011). Indeed, King George III's attempts to strip colonists of their right to trial by jury was one of the chief grievances aired against him and was a catalyst for declaring independence. The Declaration of Independence para. 20 (U.S. 1776).

3  *See also* Kenneth Klein, *The Validity of The Public Rights Doctrine in Light of the Historical Rationale of the Seventh Amendment*, 21 Hastings Const. L.Q. 1013, 1015 (1994) ("At the time the Constitution was proposed, the people of the United States greatly distrusted government, and saw the absence of a guaranteed civil jury right as a reason, standing alone, to reject adoption of the Constitution; only by promising the Seventh Amendment did the Federalists secure adoption of the Constitution in several of the state ratification debates.").

4  The Seventh Circuit was referring to the Ninth Circuit's opinion in 🚩 *SEC v. Clark*, 915 F.2d 439, 442 (9th Cir. 1990). 🚩 *Clark* did not address the issue whatsoever.

5  Indeed, the SEC regularly brings securities-fraud actions in Article III courts and adjudicates them through jury trials. *See, e.g., SEC v. Fowler*, 6 F.4th 255, 258–60 (2d Cir. 2021); *SEC v. Johnston*, 986 F.3d 63, 71 (1st Cir. 2021); 🚩 *SEC v. Life Partners Holdings, Inc.*, 854 F.3d 765, 772 (5th Cir. 2017); *SEC v. Quan*, 817

Case 4:18-cv-05159-HSG   Document 61-1   Filed 06/16/23   Page 46 of 111
Jarkesy v. Securities and Exchange Commission, 34 F.4th 446 (2022)

Fed. Sec. L. Rep. P 101,401

F.3d 583, 587 (8th Cir. 2016); *SEC v. Miller*, 808 F.3d 623, 626 (2d Cir. 2015); ⚑ *SEC v. Jasper*, 678 F.3d 1116, 1119, 1121–22 (9th Cir. 2012); *SEC v. Seghers*, 298 F. App'x 319, 321 (5th Cir. 2008).

6   The dissenting opinion contends that these considerations are "not decisive" (that the SEC has for decades sued in Article III courts under securities statutes) or "not determinative" (that those same suits are not unique to agency adjudication). To disregard these facts is to ignore the Supreme Court's explanation for what public rights are made of. And in any event, though the facts may not in isolation make up a private right, they together establish (along with the other considerations discussed above) that the right being vindicated here is a private right, not a public one.

7   Moreover, the Supreme Court has noted that agency adjudicators generally do not have special expertise to address structural constitutional claims—precisely the issues central to this case. ⚑ *Carr v. Saul*, —— U.S. ——, 141 S. Ct. 1352, 1360, 209 L.Ed.2d 376 (2021) ("[T]his Court has often observed that agency adjudications are generally ill suited to address structural constitutional challenges, which usually fall outside the adjudicators' areas of technical expertise.").

8   *Cf.* Ronald Reagan, Presidential News Conference (Aug. 12, 1986), https://www.presidency.ucsb.edu/documents/the-presidents-news-conference-957.

9   This is an alternative holding that provides ground for vacating the SEC's judgment. "This circuit follows the rule that alternative holdings are binding precedent and not obiter dictum." ⚑ *Texas v. United States*, 809 F.3d 134, 178 n.158 (5th Cir. 2015) (quoting *United States v. Potts*, 644 F.3d 233, 237 n.3 (5th Cir. 2011)).

10   Indeed, President Woodrow Wilson, the original instigator of the agency that became the SEC, believed agencies like that one could solve the "problem" of congressional gridlock and the burden of popular accountability. *See* ⚑ *Cochran v. SEC*, 20 F.4th 194, 218 (5th Cir. 2021) (Oldham, J., concurring) ("Wilson's 'new constitution' would ditch the Founders' tripartite system and their checks and balances for a 'more efficient separation of politics and administration, which w[ould] enable the bureaucracy to tend to the details of administering progress without being encumbered by the inefficiencies of politics.' " (quoting Ronald J. Pestritto, Woodrow Wilson and the Roots of Modern Liberalism 227 (2005))), *cert. granted sub nom., SEC v. Cochran*, 21-1239, 2022 WL 1528373, —— U.S. ——, —— S.Ct. ——, --- L.Ed.2d —— (U.S. May 16, 2022); *see also id.* ("Wilson's goal was to completely separate 'the province of constitutional law' from 'the province of administrative function.' " (quoting Philip Hamburger, Is Administrative Law Unlawful? 464 (2014))).

11   Locke's perspective on the legislature's delegation of its power was influential in the United States around the time of the framing of the Constitution. *See* Hamburger, *supra* at 384.

12   Principles of non-delegation had even taken hold in England before the American Founding. *See* Hamburger, *supra* at 381 (explaining that "even under [King] James I, the judges recognized that the king's prerogative power came from his subjects—that he was exercising a power delegated by the people" and, as a result, he could not transfer the royal powers to anyone else); *see also id.* ("[P]arliamentary subdelegations were widely understood to be unlawful.").

13   Some contemporary academics have argued that the non-delegation doctrine lacks a sound historical basis. *See* Julian Davis Mortenson & Nicholas Bagley, *Delegation at the Founding*, 121 Colum. L. Rev. 277 (2021); *but see* Ilan Wurman, *Nondelegation at the Founding*, 130 Yale L.J. 1490 (2021) (arguing that the doctrine was present at the Founding); Philip Hamburger, *Delegating or Divesting?*, 115 Nw. U. L. Rev. Online 88 (2020) (similar). Of course, our role as an inferior court is to faithfully apply Supreme Court precedent, so

we do not reach the proper historical scope of the non-delegation doctrine. *See* 🔖 *Morrow v. Meachum*, 917 F.3d 870, 874 n.4 (5th Cir. 2019).

14      Adrian Vermeule, *No*, 93 Tex. L. Rev. 1547, 1558 (2015) ("[T]here is [no] delegation of legislative power at all so long as the legislature has supplied an 'intelligible principle' to guide the exercise of delegated discretion. Where there is such a principle, the delegatee is exercising executive power, not legislative power." (emphasis and footnote omitted)).

15      Moreover, at the Virginia Ratifying Convention in 1788, then-delegate John Marshall suggested that it is proper to the legislative power to determine the expedience of assigning particular matters for jury trial. *See* John Marshall on the Fairness and Jurisdiction of the Federal Courts, *in* 2 The Debate on the Constitution 740 (Bernard Bailyn ed. 1993) ("The Legislature of Virginia does not give a trial by jury where it is not necessary. But gives it wherever it is thought expedient. The Federal Legislature will do so too, as it is formed on the same principles.").

16      As a member of this court aptly noted just last year, the fact that the modern administrative state is real and robust does not mean courts are never called to declare its limits. *See* 🔖 *Cochran*, 20 F.4th at 222 (Oldham, J., concurring) ("If administrative agencies 'are permitted gradually to extend their powers by encroachments —even petty encroachments—upon the fundamental rights, privileges and immunities of the people,' the Court warned that 'we shall in the end, while avoiding the fatal consequences of a supreme autocracy, become submerged by a multitude of minor invasions of personal rights, less destructive but no less violative of constitutional guaranties.' " (quoting 🔖 *Jones v. SEC*, 298 U.S. 1, 24–25, 56 S.Ct. 654, 80 L.Ed. 1015 (1936))).

17      Because we vacate the SEC's judgment on various other grounds, we do not decide whether vacating would be the appropriate remedy based on this error alone. *See Collins v. Yellen*, 27 F.4th 1068, 1069 (5th Cir. 2022) (remanding to the district court to determine what remedy, if any, is appropriate in light of the Supreme Court's holding that removal restrictions applicable to the Director of the Federal Housing Finance Agency were unconstitutional).

18      Of course, the President's authority over appointments derives from the Appointments Clause as well. *See* U.S. Const. art. II, § 2, cl. 2.

19      The dissenting opinion deems this proposition from 🔖 *Myers* to be *obiter dicta* that the Court subsequently disregarded in 🔖 *Humphrey's Executor v. United States*, 295 U.S. 602, 626–28, 55 S.Ct. 869, 79 L.Ed. 1611 (1935). *Post* at 478 n.113. But that itself is to disregard the Supreme Court's more recent guidance, which fortifies the Court's "landmark decision" in 🔖 *Myers* and narrowed 🔖 *Humphrey's Executor*. *See* 🔖 *Seila Law*, 140 S. Ct. at 2191–92, 2197–99 & n.2 (limiting the 🔖 *Humphrey's Executor* exception to 🔖 *Myers* to cases involving "for-cause removal protections [given] to a multimember body of experts, balanced along partisan lines, that perform[ ] legislative and judicial functions and [are] said not to exercise any executive power," while casting doubt on the existence of wholly non-executive, quasi-legislative or quasi-judicial agency powers altogether); *see also* 🔖 *City of Arlington v. F.C.C.*, 569 U.S. 290, 305 n.4, 133 S.Ct. 1863, 185 L.Ed.2d 941 (2013) (noting that "[agency] activities take 'legislative' and 'judicial' forms, but they are exercises of—indeed, under our constitutional structure they *must* be exercises of—the 'executive Power' " (citing U.S. Const. art. II, § 1, cl. 1)).

20      In the next breath, the dissenting position draws from a law review article that "[t]he ALJs' role is similar to that of a federal judge." *Post* at 477. It then concludes that they must be insulated from removal by the president

to maintain their independence. But that analogy runs out under a little scrutiny. The SEC's ALJs are not mere neutral arbiters of federal securities law; they are integral pieces within the SEC's powerful enforcement apparatus. The ALJs report to the Commission itself and act under authority delegated by it. SEC Organization Chart (2020), https://www.sec.gov/about/secorg.pdf; 15 U.S.C. § 78d-1(a); 17 C.F.R. § 200.30-10. As the amicus brief by the Cato Institute points out, these administrative proceedings differ significantly from cases resolved in federal district courts and reviewed by federal courts of appeals. Cato Amicus Br. at 19–31. First, the Commission has *ex parte* discussions with the prosecutors to determine whether to pursue securities-fraud claims. Then the Commission itself decides what claims should be brought by the prosecutors. Only then do ALJs resolve the claims, which are then again reviewed by the Commission. Suffice it to say, even if ALJs have some of the same "tools of federal trial judges," *Lucia*, 138 S. Ct. at 2053, they use those tools at the direction of and with the power delegated to them by the Commission.

21   Petitioners also argue that the SEC violated their equal protection rights, and that its decision was infected with bias and violated their due process rights. Because we vacate the SEC's decision on other grounds, we decline to reach these issues.

1   *See, e.g.,* *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 42 n.4, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989) ("If a claim that is legal in nature asserts a 'public right,' ... then the Seventh Amendment does not entitle the parties to a jury trial if Congress assigns its adjudication to an administrative agency or specialized court of equity. The Seventh Amendment protects a litigant's right to a jury trial only if a cause of action is legal in nature and it involves a matter of 'private right.' " (citation omitted)).

2   9 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2302.2, at 59 (4th ed. 2020) (citing *Atlas Roofing Co. v. Occupational Safety & Health Rev. Comm'n*, 430 U.S. 442, 97 S.Ct. 1261, 51 L.Ed.2d 464 (1977)) (italics added).

3   *Atlas Roofing*, 430 U.S. at 445, 97 S.Ct. 1261.

4   *Id.* at 449–50, 97 S.Ct. 1261.

5   *Id.* at 450, 455, 97 S.Ct. 1261 (emphasis added; paragraph break omitted); *see also* *id.* at 458, 97 S.Ct. 1261 ("Our prior cases support administrative factfinding in only those situations involving 'public rights,' *e.g.*, where the Government is involved in its sovereign capacity under an otherwise valid statute creating enforceable public rights.").

6   *Id.* at 452, 97 S.Ct. 1261 (quoting *Crowell v. Benson*, 285 U.S. 22, 50, 52 S.Ct. 285, 76 L.Ed. 598 (1932)) (emphasis added); *see also* *id.* at 456, 457, 460, 97 S.Ct. 1261 (citing *Crowell*, 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598).

7   Gideon Mark, *SEC and CFTC Administrative Proceedings*, 19 U. PA. J. CONST. L. 45, 95 (2016).

8   —— U.S. ——, 138 S. Ct. 1365, 200 L.Ed.2d 671 (2018).

9   *Id.* at 1370–72.

10   *Id.* at 1384 (Gorsuch, J., dissenting) ("[F]rom the time it established the American patent system in 1790 until about 1980, Congress left the job of invalidating patents at the federal level to courts alone.").

Fed. Sec. L. Rep. P 101,401

11   *Id.* at 1372.

12   *Id.* at 1373, 1379.

13   *Id.* at 1373 (quoting *Crowell*, 285 U.S. at 50, 52 S.Ct. 285).

14   *Oil States* did not purport to provide an exhaustive definition of "public rights," and the opinion alludes to the possibility that, under certain circumstances, matters not involving the Government may also fall within the realm of "public rights." *See* *id.* However, the Court did not need to address these other, "various formulations" of "public rights," because inter partes review fell squarely within *Crowell*'s definition. *See* *id.* This court reached a similar conclusion in *Austin v. Shalala*, discussed below.

15   *Id.* at 1378 (quoting *Ex parte Bakelite Corp.*, 279 U.S. 438, 451, 49 S.Ct. 411, 73 L.Ed. 789 (1929)).

16   *Id.*; *see also* *id.* ("That Congress chose the courts in the past does not foreclose its choice of the PTO today.").

17   994 F.2d 1170, 1177 (5th Cir. 1993).

18   *Id.* at 1173.

19   *Id.* at 1177-78 (citing *Oceanic Steam Navigation Co. v. Stranahan*, 214 U.S. 320, 339, 29 S.Ct. 671, 53 L.Ed. 1013 (1909)).

20   *See, e.g., Imperato v. SEC*, 693 F. App'x 870, 876 (11th Cir. 2017) (unpublished) (administrative adjudication for violations of the Securities Exchange Act); *Crude Co. v. FERC*, 135 F.3d 1445, 1454–55 (Fed. Cir. 1998) (Mandatory Petroleum Allocation Regulations); *Cavallari v. Office of Comptroller of Currency*, 57 F.3d 137, 145 (2d Cir. 1995) (Financial Institutions Reform, Recovery and Enforcement Act); *Sasser v. Adm'r EPA*, 990 F.2d 127, 130 (4th Cir. 1993) (Clean Water Act).

21   *Imperato*, 693 F. App'x at 876 (citing *Atlas Roofing*, 430 U.S. at 455–56, 97 S.Ct. 1261).

22   *Smallwood v. Pearl Brewing Co.*, 489 F.2d 579, 592 (5th Cir. 1974).

23   *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). In a similar vein, the Investment Advisers Act of 1940 seeks to "protect[ ] investors through the prophylaxis of disclosure," in order to eliminate "the darkness and ignorance of commercial secrecy," which "are the conditions upon which predatory practices best thrive." *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 200, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963).

24   Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, Sec. 929P, 124 Stat. 1376, 1862–64 (2010) (codified at 15 U.S.C. §§ 77h-1(g), 78u-2(a), 80a-9(d), 80b-3(i)).

25   Mark Jickling, Congressional Research Service, R41503 *The Dodd-Frank Wall Street Reform and Consumer Protection Act: Title IX, Investor Protection* at i (2010).

26 ⚑ ⚠ *SEC v. Diversified Corporate Consulting Grp.*, 378 F.3d 1219, 1224 (11th Cir. 2004)*, abrogated on other grounds by* ⚑ ⚠ *Kokesh v. SEC*, —— U.S. ——, 137 S. Ct. 1635, 198 L.Ed.2d 86 (2017); *see also* ⚑ ⚠ *SEC v. Rind*, 991 F.2d 1486, 1491 (9th Cir. 1993); *United States v. Badger*, 818 F.3d 563, 566 (10th Cir. 2016).

27 ⚑ *Atlas Roofing*, 430 U.S. at 450, 97 S.Ct. 1261.

28 ⚑ *Crowell*, 285 U.S. at 22, 52 S.Ct. 285; ⚑ *Oil States*, 138 S. Ct. at 1373; ⚑ *Austin*, 994 F.2d at 1177.

The majority asserts that "[t]he dissenting opinion cannot define a 'public right' without using the term itself in the definition." First, I rely on definitions the Supreme Court has provided. Second, while ⚑ *Atlas Roofing* does use "public rights" to define "public rights," ⚑ *Crowell* does not. Furthermore, ⚑ *Granfinanciera* observed that ⚑ *Atlas Roofing* "left the term 'public rights' undefined" and so looked to ⚑ *Crowell* to fill in any perceived gap. ⚑ *Granfinanciera*, 492 U.S. at 51 n.8, 109 S.Ct. 2782; *see also* ⚑ *id.* at 53, 109 S.Ct. 2782 (noting that, under ⚑ *Atlas Roofing*, a "public right" is simply "a statutory cause of action [that] inheres in, or lies against, the Federal Government in its sovereign capacity").

29 ⚑ *Atlas Roofing*, 430 U.S. at 450, 97 S.Ct. 1261; ⚑ *Granfinanciera*, 492 U.S. at 52–54, 109 S.Ct. 2782; ⚑ *Oil States*, 138 S. Ct. at 1379.

30 *See* ⚑ *Granfinanciera*, 492 U.S. at 52, 109 S.Ct. 2782 ("Congress may fashion causes of action that are closely **analogous** to common-law claims and place them beyond the ambit of the Seventh Amendment by assigning their resolution to a forum in which jury trials are unavailable" if the action involves "public rights.").

31 *See* ⚑ *Oil States*, 138 S. Ct. at 1378 ("[W]e disagree with the dissent's assumption that, because courts have traditionally adjudicated patent validity in this country, courts must forever continue to do so. Historical practice is not decisive ... [in] matters governed by the public-rights doctrine .... That Congress chose the courts in the past does not foreclose its choice of the PTO today.")

32 ⚑ 492 U.S. 33, 109 S.Ct. 2782, 106 L.Ed.2d 26.

33 ⚑ *Id.* at 36.

34 ⚑ *Id.* at 40.

35 ⚑ *Id.* at 55, 64.

36 ⚑ *Granfinanciera*, 492 U.S. at 53, 109 S.Ct. 2782 (citing ⚑ *Atlas Roofing*, 430 U.S. at 458, 97 S.Ct. 1261) (emphasis added).

37 ⚑ *Id.* at 53, 109 S.Ct. 2782 (emphasis added).

38 ⚑ *Id.* at 54, 109 S.Ct. 2782 (citing ⚑ *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 586, 596–99, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985)).

39   🚩 *Granfinanciera* itself makes this clear when it states:

> The crucial question, ***in cases not involving the Federal Government***, is whether "Congress, acting for a valid legislative purpose pursuant to its constitutional powers under Article I, [has] create[d] a seemingly 'private' right that is so closely integrated into a public regulatory scheme as to be a matter appropriate for agency resolution with limited involvement by the Article III judiciary." If a statutory right is not closely intertwined with a federal regulatory program Congress has power to enact, ***and if that right neither belongs to nor exists against the Federal Government***, then it must be adjudicated by an Article III court.

🚩 *Id.* at 54-55, 109 S.Ct. 2782 (quoting 🚩 *Thomas,* 473 U.S. at 593–94, 105 S.Ct. 3325) (footnote omitted; emphasis added; bracketed alterations in original).

40   🚩 *Austin,* 994 F.2d at 1177 (emphasis added).

41   🚩 *Oil States,* 138 S. Ct. at 1373.

42   🚩 *Granfinanciera,* 492 U.S. at 61, 63, 109 S.Ct. 2782.

43   The same goes for the out-of-circuit decisions cited in footnote 20 above. 🚩 *Atlas Roofing,* in a footnote, does make a passing reference to "go far to dismantle the statutory scheme." 🚩 430 U.S. at 454 n.11, 97 S.Ct. 1261. But the Court was merely describing its reasoning in another bankruptcy case. Nothing in 🚩 *Atlas Roofing* suggests that this consideration is relevant to whether Congress may assign the Government's enforcement action to an administrative proceeding lacking a jury.

44   🚩 *Granfinanciera,* 492 U.S. at 52, 109 S.Ct. 2782 (citations omitted); *see also* 🚩 *id.* at 53, 109 S.Ct. 2782 ("Congress may effectively supplant a common-law cause of action carrying with it a right to a jury trial with a statutory cause of action shorn of a jury trial right if that statutory cause of action inheres in, or lies against, the Federal Government in its sovereign capacity." (citing 🚩 *Atlas Roofing,* 430 U.S. at 458, 97 S.Ct. 1261)); *accord* 🚩 *Crude Co.,* 135 F.3d at 1455 ("The public right at issue is not converted into a common law tort simply because the theory of liability underlying the enforcement action is analogous to a common law tort theory of vicarious liability.").

45   Majority Op. at 458–59 (quoting 🚩 *Atlas Roofing,* 430 U.S. at 445, 97 S.Ct. 1261).

46   *See* 🚩 15 U.S.C. §§ 78u-2(c), 🚩 77h-1(g)(1), 🚩 80a-9(d)(3), 🚩 80b-3(i)(3).

47   🚩 *Atlas Roofing* recognized that, before (and after) OSHA, a person injured by an unsafe workplace condition may have an action at common law for negligence. *See* 🚩 *Atlas Roofing,* 430 U.S. at 445, 97 S.Ct. 1261. Through OSHA, specific safety standards were promulgated, and the Government could bring an enforcement action for a violation even if no one was harmed by the violation. *Id.* Similarly, before enactment of the securities statutes, an investor who was defrauded in the course of a securities transaction had a common-law action for fraud. Like OSHA, the securities statutes expressly prohibited certain conduct and empowered the SEC to bring an enforcement action for a violation, even if no one was actually harmed by the violation.

48    🚩 138 S. Ct. at 1378.

49    🚩 *Id.* 🚩 *Oil States* likewise refutes the majority's assertion that "[t]he inquiry is thus inherently historical." I add that the majority's support for this proposition consists of a concurring opinion in 🚩 *Granfinanciera* and the plurality opinion in 🚩 *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) (plurality), which addressed whether a bankruptcy court may decide a breach of contract action between two private parties.

50    🚩 *Id.* at 1373 (citing 🚩 *Crowell*, 285 U.S. at 50, 52 S.Ct. 285) (emphasis added).

51    🚩 *Id.* at 1378 (quoting 🚩 *Ex parte Bakelite Corp.*, 279 U.S. at 451, 49 S.Ct. 411).

52    🚩 481 U.S. 412, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987).

53    🚩 *Id.* at 414–15, 107 S.Ct. 1831.

54    🚩 *Id.* at 425, 107 S.Ct. 1831.

55    🚩 *Granfinanciera*, 492 U.S. at 42 n.4, 109 S.Ct. 2782; *accord* 🚩 *Sasser*, 990 F.2d at 130.

56    🚩 *Tull*, 481 U.S. at 418 n.4, 107 S.Ct. 1831 (citing 🚩 *Atlas Roofing*, 430 U.S. at 454, 97 S.Ct. 1261; 🚩 *Pernell v. Southall Realty*, 416 U.S. 363, 383, 94 S.Ct. 1723, 40 L.Ed.2d 198 (1974)).

57    🚩 285 U.S. at 50, 52 S.Ct. 285 (quoting 🚩 *Ex parte Bakelite Corp.*, 279 U.S. at 451, 49 S.Ct. 411).

58    🚩 442 U.S. 114, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979).

59    🚩 *Id.* at 116, 99 S.Ct. 2198.

60    🚩 *Id.* at 123, 125–26, 99 S.Ct. 2198.

61    🚩 *Id.* at 125–26, 99 S.Ct. 2198.

62    🚩 *Id.* at 126, 99 S.Ct. 2198.

63    🚩 *Id.*

64    🚩 *Id.* (citation omitted).

65    *See* 🚩 *Heckler v. Chaney*, 470 U.S. 821, 832, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985) ("[W]e recognize that an agency's refusal to institute proceedings shares to some extent the characteristics of the decision of a prosecutor in the Executive Branch not to indict—a decision which has long been regarded as the special province of the Executive Branch ....").

66    *Cf.* 🚩 *SEC v. Chenery Corp.*, 332 U.S. 194, 203, 67 S.Ct. 1760, 91 L.Ed. 1995 (1947) ("[T]he choice made between proceeding by general rule or by individual, ad hoc litigation is one that lies primarily in the informed discretion of the administrative agency.") (citation omitted).

67    🚩 114 F. Supp. 3d 1297 (N.D. Ga. 2015) (holding that SEC's forum-selection authority does not violate the nondelegation doctrine), *vacated and remanded on other grounds*, 🚩 825 F.3d 1236 (11th Cir. 2016).

68    🚩 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983).

69    🚩 *Hill*, 114 F. Supp. 3d at 1312 (quoting 🚩 *Chadha*, 462 U.S. at 952, 103 S.Ct. 2764).

70    🚩 462 U.S. at 923, 946, 103 S.Ct. 2764.

71    🚩 *Hill*, 114 F. Supp. 3d at 1313.

72    🚩 *Id.*

73    🚩 561 U.S. 477, 130 S.Ct. 3138, 177 L.Ed.2d 706 (2010).

74    🚩 ─── U.S. ───, 138 S. Ct. 2044, 201 L.Ed.2d 464 (2018).

75    🚩 *Id.* at 484-85, 130 S.Ct. 3138.

76    🚩 *Id.* at 485, 130 S.Ct. 3138.

77    🚩 *Id.* at 514, 130 S.Ct. 3138.

78    🚩 *Id.* at 486, 503, 130 S.Ct. 3138.

79    🚩 *Id.* at 487, 130 S.Ct. 3138.

80    🚩 *Id.* at 496, 130 S.Ct. 3138.

81    *Decker Coal Co. v. Pehringer*, 8 F.4th 1123, 1132 (9th Cir. 2021).

82    🚩 *Free Enter. Fund*, 561 U.S. at 507 n.10, 130 S.Ct. 3138.

83    *Id.* (citations omitted; emphasis added).

84    🚩 ─── U.S. ───, 138 S. Ct. 2044, 201 L.Ed.2d 464 (2018).

85    🚩 *Id.* at 2055.

86    🚩 *Id.* at 2051 & n.1.

87    *See Decker Coal Co.*, 8 F.4th at 1132.

88    ERWIN CHEMERINSKY, CONSTITUTIONAL LAW § 4.2 (5th ed. 2015) ("No constitutional provision addresses the [President's] removal power.").

89    🚩 *Free Enter. Fund*, 561 U.S. at 483, 130 S.Ct. 3138 (quoting U.S. CONST., art. II §§ 1 & 3).

90    🚩 *Morrison v. Olson*, 487 U.S. 654, 689–90, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988) (footnote omitted; emphasis added).

91    🚩 *Free Enter. Fund*, 561 U.S. at 495–96, 130 S.Ct. 3138.

92    🚩 *Id.* at 514, 130 S.Ct. 3138.

93    🚩 *Id.* at 484, 130 S.Ct. 3138; *see also* 🚩 *id.* at 508, 130 S.Ct. 3138 (describing the PCAOB as "the regulator of first resort and the primary law enforcement authority for a vital sector of our economy").

94    🚩 *Id.* at 498, 130 S.Ct. 3138.

95    🚩 *Id.* at 506, 130 S.Ct. 3138.

96    🚩 *Lucia*, 138 S. Ct. at 2049 (quoting 🚩 *Butz v. Economou*, 438 U.S. 478, 513, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978)).

97    🚩 *Id.*

98    🚩 *Id.*

99    Mark, *supra*, at 107.

100   David Zaring, *Enforcement Discretion at the SEC*, 94 TEX. L. REV. 1155, 1166 (2016).

101   🚩 561 U.S. at 507 n.10, 130 S.Ct. 3138.

102   🚩 *Lucia*, 138 S. Ct. at 2049.

103   🚩 *Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 537 F.3d 667, 669 (D.C. Cir. 2008) (Kavanaugh, J., dissenting) (citing 🚩 *Morrison*, 487 U.S. at 691–92, 108 S.Ct. 2597).

104   🚩 *Duka v. SEC*, 103 F. Supp. 3d 382, 395–96 (S.D.N.Y. 2015), *abrogated on other grounds by* 🚩 *Tilton v. SEC*, 824 F.3d 276 (2d Cir. 2016) (quoting 🚩 *Butz*, 438 U.S. at 513–14, 98 S.Ct. 2894). *See also* Mark, *supra*, at 102–08 (arguing that multiple layers of removal protection for SEC ALJs do not violate Article II); Zaring, *supra*, at 1191–95 (same).

105   *Decker Coal Co.*, 8 F.4th at 1133.

106   *Id.*

107   🚩 *Free Enter. Fund*, 561 U.S. at 507 n.10, 130 S.Ct. 3138.

Fed. Sec. L. Rep. P 101,401

108  *See* 🚩*Lucia*, 138 S. Ct. at 2049 (citing 17 C.F.R. § 201.360(d)); 🚩5 U.S.C. § 557(b).

109  🚩*Lucia*, 138 S. Ct. at 2049 (quoting 15 U.S.C. § 78d-1(c)).

110  🚩*Id.* (citing 17 C.F.R. § 201.110).

111  🚩561 U.S. at 507 n.10, 130 S.Ct. 3138.

112  🚩138 S. Ct. at 2049.

113  🚩*Morrison*, 487 U.S. at 689–90, 108 S.Ct. 2597. The majority also cites 🚩*Myers v. United States*, 272 U.S. 52, 135, 47 S.Ct. 21, 71 L.Ed. 160 (1926), for the proposition that quasi-judicial executive officers must be removable by the President. But that part of 🚩*Myers* is dicta, which is why the Court disregarded it in 🚩*Humphrey's Executor v. United States*, 295 U.S. 602, 626–28, 55 S.Ct. 869, 79 L.Ed. 1611 (1935).

---

**End of Document**                                                  © 2023 Thomson Reuters. No claim to original U.S. Government Works.

142 S.Ct. 1087
Supreme Court of the United States.

Jane **DOE**

v.

**FACEBOOK**, INC.

No. 21-459
|
Decided March 7, **2022**

Case below, 625 S.W.3d 80.

**Opinion**

The petition for a writ of certiorari is denied.

Statement of Justice THOMAS respecting the denial of certiorari.

In 2012, an adult, male sexual predator used **Facebook** to lure 15-year-old Jane **Doe** to a meeting, shortly after which she was repeatedly raped, beaten, and trafficked for sex. **Doe** eventually escaped and sued **Facebook** in Texas state court, alleging that **Facebook** had violated Texas' anti-sex-trafficking statute and committed various common-law offenses. **Facebook** petitioned the Texas Supreme Court for a writ of mandamus dismissing **Doe's** suit. The court held that a provision of the Communications Decency Act known as § 230 bars **Doe's** common-law claims, but not her statutory sex-trafficking claim.

Section 230(c)(1) states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). The Texas Supreme Court emphasized that courts have uniformly treated internet platforms as "publisher[s]" under § 230(c)(1), and thus immune, whenever a plaintiff 's claim " 'stem[s] from [the platform's] publication of information created by third parties.' " *In re Facebook, Inc.*, 625 S.W.3d 80, 90 (Tex. 2021) (quoting *1088 *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (CA5 2008)). As relevant here, this expansive understanding of publisher immunity requires dismissal of claims against internet companies for failing to warn consumers of product defects or failing to take reasonable steps "to protect their users from the malicious or objectionable activity of other users." 625 S.W.3d, at 83. The Texas Supreme Court acknowledged that it is "plausible"

to read § 230(c)(1) more narrowly to immunize internet platforms when plaintiffs seek to hold them "strictly liable" for transmitting third-party content, *id.*, at 90–91, but the court ultimately felt compelled to adopt the consensus approach, *id.*, at 91.

This decision exemplifies how courts have interpreted § 230 "to confer sweeping immunity on some of the largest companies in the world," *Malwarebytes, Inc. v. Enigma Software Group USA, LLC*, 592 U. S. ——, ——, 141 S.Ct. 13, 13, 208 L.Ed.2d 197 (2020) (statement of THOMAS, J., respecting denial of certiorari), particularly by employing a "capacious conception of what it means to treat a website operator as [a] publisher or speaker," *id.*, at ——, 141 S.Ct., at 17 (internal quotation marks omitted). Here, the Texas Supreme Court afforded publisher immunity even though **Facebook** allegedly "knows its system facilitates human traffickers in identifying and cultivating victims," but has nonetheless "failed to take any reasonable steps to mitigate the use of **Facebook** by human traffickers" because doing so would cost the company users—and the advertising revenue those users generate. Fourth Amended Pet. in No. 2018–69816 (Dist. Ct., Harris Cty., Tex., Feb. 10, 2020), pp. 20, 22, 23; see also Reply Brief 3, n. 1, 4, n. 2 (listing recent disclosures and investigations supporting these allegations).

It is hard to see why the protection § 230(c)(1) grants publishers against being held strictly liable for third parties' content should protect **Facebook** from liability for its *own* "acts and omissions." Fourth Amended Pet., at 21.

At the very least, before we close the door on such serious charges, "we should be certain that is what the law demands." *Malwarebytes*, 592 U. S., at ——, 141 S.Ct. at, 18. As I have explained, the arguments in favor of broad immunity under § 230 rest largely on "policy and purpose," not on the statute's plain text. *Id.*, at ——, 141 S.Ct., at 15. Here, the Texas Supreme Court recognized that "[t]he United States Supreme Court—or better yet, Congress—may soon resolve the burgeoning debate about whether the federal courts have thus far correctly interpreted section 230." 625 S.W.3d, at 84. Assuming Congress does not step in to clarify § 230's scope, we should do so in an appropriate case.

Unfortunately, this is not such a case. We have jurisdiction to review only "[f]inal judgments or decrees" of state courts. 28 U.S.C. § 1257(a). And finality typically requires "an effective determination of the litigation and not of merely interlocutory

212 L.Ed.2d 244, 22 Cal. Daily Op. Serv. 2430, 29 Fla. L. Weekly Fed. S 155

or intermediate steps therein." *Market Street R. Co. v. Railroad Comm'n of Cal.*, 324 U.S. 548, 551, 65 S.Ct. 770, 89 L.Ed. 1171 (1945). Because the Texas Supreme Court allowed **Doe's** statutory claim to proceed, the litigation is not "final." Conceding as much, **Doe** relies on a narrow exception to the finality rule involving cases where "the federal issue, finally decided by the highest court in the State, will survive and require decision regardless of the outcome of future state-court proceedings." *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 480, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975). But that exception cannot apply here because the Texas courts have not yet conclusively adjudicated a personal-jurisdiction defense

that, if successful, would "effectively moot the federal-law question raised here." **\*1089** *Jefferson v. City of Tarrant*, 522 U.S. 75, 82, 118 S.Ct. 481, 139 L.Ed.2d 433 (1997).

I, therefore, concur in the Court's denial of certiorari. We should, however, address the proper scope of immunity under § 230 in an appropriate case.

**All Citations**

142 S.Ct. 1087 (Mem), 212 L.Ed.2d 244, 22 Cal. Daily Op. Serv. 2430, 29 Fla. L. Weekly Fed. S 155

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Blue Flag – Appeal Notification

Appeal Filed by   DZ RESERVE, ET AL v. META PLATFORMS, INC.,
9th Cir.,   June 21, 2022

2022 WL 912890
Only the Westlaw citation is currently available.
United States District Court, N.D. California.

DZ RESERVE, et al., Plaintiffs,
v.
META PLATFORMS, INC., Defendant.

Case No. 3:18-cv-04978-JD
|
Signed 03/29/2022

**Attorneys and Law Firms**

Reuben D. Nathan, Nathan & Associates, APC, Newport Beach, CA, Eric Alfred Kafka, Cohen Milstein Sellers Toll PLLC, New York, NY, Geoffrey Aaron Graber, Paul Michael Stephan, Pro Hac Vice, Cohen Milstein Sellers Toll PLLC, Washington, DC, for Plaintiff Lauren Meyers.

Eric Alfred Kafka, Cohen Milstein Sellers Toll PLLC, New York, NY, Geoffrey Aaron Graber, Julia Horwitz, Paul Michael Stephan, Pro Hac Vice, Cohen Milstein Sellers & Toll PLLC, Washington, DC, Charles Philip Reichmann, Law Offices of Charles Reichman, Kensington, CA, for Plaintiff DZ Reserve.

Eric Alfred Kafka, Cohen Milstein Sellers Toll PLLC, New York, NY, Geoffrey Aaron Graber, Karina Grace Puttieva, Paul Michael Stephan, Pro Hac Vice, Cohen Milstein Sellers & Toll PLLC, Washington, DC, Cohen Milstein Sellers Toll PLLC, Washington, DC, for Plaintiff Cain Maxwell.

Elizabeth L. Deeley, Melanie Marilyn Blunschi, Nicole Charlene Valco, Latham & Watkins LLP, San Francisco, CA, Susan E. Engel, Pro Hac Vice, Andrew Brian Clubok, Pro Hac Vice, Latham & Watkins LLP, Washington, DC, for Defendant.

**ORDER RE MOTION TO CERTIFY
CLASS AND *DAUBERT* MOTIONS**

JAMES DONATO, United States District Judge

**\*1** In this action alleging fraud against Meta Platforms, Inc. (Meta), formerly known as Facebook, named plaintiffs DZ Reserve and Cain Maxwell have asked to certify a class of United States residents who paid Meta for placement of advertisements on social media platforms. Dkt. No. 282. The gravamen of the lawsuit is that Meta inflated its potential advertising reach to consumers, and charged artificially high premiums for ad placements. Meta opposes certification, and filed two *Daubert* motions challenging the opinions and conclusions proffered by plaintiffs' expert witnesses. Dkt. Nos. 285, 286.

Three claims alleged in the Third Amended Complaint (TAC) remain in play. Dkt. No. 332. [1] The Court dismissed with prejudice plaintiffs' claims for breach of the implied covenant of good faith and fair dealing and a quasi-contract claim. Dkt. No. 255 at 2. The Court sustained plaintiffs' claims for fraudulent misrepresentation and fraudulent concealment, with the proviso that plaintiffs could not pursue those claims for conduct before August 15, 2015. *Id.* at 1-2. While the certification motion was pending, the Court granted a motion for judgment on the pleadings and dismissed plaintiffs' claim of restitution under the California Unfair Competition Law (UCL). Dkt. No. 366. The UCL claim was sustained for injunctive relief only. *Id.* at 2. Consequently, the claims subject to certification are fraudulent misrepresentation and fraudulent concealment for damages, and the UCL for injunctive relief.

**DISCUSSION**

**I. BACKGROUND**

Before getting into the merits, a few words about Meta's brief are in order. Meta fired a blunderbuss of objections at certification. Virtually every page of its lengthy opposition brief presented a new argument, often in just a paragraph or two of discussion. As a result, many of its arguments were underdeveloped to the point where the Court had ample justification to disregard them. Even so, the Court undertook the burden of sorting through Meta's brief to identify and address what appear to be its main arguments. Meta aggravated this situation further by making factual arguments much more suited to summary judgment proceedings than a class certification motion. To be sure, as the ensuing certification standards make clear, the Court will review the evidence as pertinent to the question of whether a class should certified. Meta's arguments went far beyond that inquiry.

The parties' familiarity with the record is assumed. In pertinent part, the undisputed facts are that Meta sells advertising to businesses and business owners like plaintiffs DZ Reserve and Cain Maxwell. Dkt. No. 332 at ¶ 2 Meta's Ads Manager platform is used by advertisers to identify their advertising targets, including the demographic reach they desire. *Id.* at ¶ 3. After advertisers select their targeting and placement criteria, the Ads Manager displays a "Potential Reach" for the advertisement. *See* Dkt. No. 282-3. The Potential Reach is expressed as a number of people that the ad may reach. *Id.* The default Potential Reach number, before any targeting criteria are selected, is the Potential Reach for people in the United States aged 18 and up, which was shown during the putative class period to be over 200 million people. Dkt. No. 281-9 at ¶¶ 55-60. As targeting criteria are selected, the Potential Reach is revised accordingly. Dkt. No. 282-3; 281-13 at 54:21-59:25. Meta describes the Potential Reach as an estimate of people in the ad's target audience. *See* Dkt. No. 296-17 at 3.

## II. CLASS CERTIFICATION STANDARDS

**\*2** Plaintiffs propose to certify this class under Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3):

> All United States residents (including natural persons and incorporated entities) who, from August 15, 2014, to the present ("Class Period"), paid for the placement of at least one advertisement on Facebook's platforms, including the Facebook and Instagram platforms, which was purchased through Facebook's Ads Manager or Power Editor.

> Excluded from the class are: (1) advertisements purchased pursuant to agreements other than Facebook's Terms of Service or Statement of Rights and Responsibilities; (2) advertisements purchased using only non-lookalike Custom Audiences as the targeting criteria; (3) advertisements purchased using Reach and Frequency buying; (4) advertisements purchased with the objectives of canvas app engagement, canvas app installs, offer claims, event responses, page likes, or external; and (5) advertisements for which Facebook provided Potential Reach lower than 1000.

Dkt. No. 282 at 15.

The Court has written extensively on the standards for class certification, which informs the discussion here. *See, e.g.*, *Sapan v. Yelp, Inc.*, No. 18-cv-3240-JD, 2021 WL 5302908 (N.D. Cal. Nov. 15, 2021); *Meek v. SkyWest, Inc.*, — F. Supp.

3d —, 2021 WL 4461180 (N.D. Cal. Sep. 29, 2021). A class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quotations omitted). The overall goal is "to select the metho[d] best suited to adjudication of the controversy fairly and efficiently." *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 568 U.S. 455, 460 (2013) (internal quotations omitted) (modification in original). Plaintiffs must show that their proposed class satisfies all four requirements of Rule 23(a), and at least one of the subsections of Rule 23(b).

*Comcast*, 569 U.S. at 33 (2013); *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001), *amended by* 273 F.3d 1266 (9th Cir. 2001). As the parties seeking certification, plaintiffs bear the burden of showing that the requirements of Rule 23 are met for their proposed class. *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012).

The Court's class certification analysis "must be rigorous and may entail some overlap with the merits of the plaintiff's underlying claim," but merits questions may be considered only to the extent that they are "relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen*, 568 U.S. at 465-66 (internal quotations and citations omitted). The class certification procedure is decidedly not an alternative form of summary judgment or an occasion to hold a mini-trial on the merits. *Alcantar v. Hobart Service*, 800 F.3d 1047, 1053 (9th Cir. 2015). The decision of whether to certify a class is entrusted to the sound discretion of the district court. *Zinser*, 253 F.3d at 1186.

## III. RULE 23(B)(3) CLASS

The Rule 23(a) factors are the same for certification of the proposed class under Rule 23(b)(2) or (b)(3), and the conclusions reached here for the Rule 23(a) elements apply to both types of classes. The main difference is the predominance element of Rule 23(b)(3), which Rule 23(b)(2) does not require. The Court takes up the proposed Rule 23(b)(3) class first.

**\*3** The Court granted Meta's motion for judgment on the pleadings to dismiss plaintiffs' UCL claims for restitution, *see* Dkt. No. 366, so monetary relief is only available for plaintiffs' common law fraudulent concealment and fraudulent misrepresentation claims.

#### A. Numerosity (23(a)(1))

Rule 23(a)(1) requires that a proposed class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Plaintiffs state, with evidentiary support, that "[d]uring each year of the class period, more than 2 million United States advertisers purchased Facebook ads." Dkt. No. 282 at 15. Meta does not contest numerosity, and the Court finds this element is satisfied.

#### B. Typicality and Adequacy (23(a)(3)-(4))

Rule 23(a) requires the named plaintiffs to demonstrate that their claims are typical of the putative class, and that they are capable of fairly and adequately protecting the interests of the class. Fed. R. Civ. P. 23(a)(3)-(4). The named plaintiffs say typicality is satisfied because they "bring the same legal claims as the rest of the putative [c]lass" and "rely on the same grounds for liability as the rest of the class." Dkt. No. 282 at 17. Plaintiffs also say that they are adequate representatives because "[t]hey have no conflicts with the class," have "participated actively in this case," and their counsel has no conflicts, has experience with class actions, and has demonstrated a "willingness to vigorously prosecute this action." *Id.*

Meta makes multiple objections to adequacy and typicality. The primary one is that the proposed class is said to include a diverse population of advertisers ranging from " 'large sophisticated corporations' to 'individuals and small businesses.' " Dkt. No. 294 at 16-17. In Meta's view, this means that the putative class members are necessarily in such disparate positions vis-à-vis its advertising services that the named plaintiffs, as advertisers on the smaller end of the spectrum, cannot fairly or adequately represent them. *Id.*

The objection is not well taken. To start, typicality is demonstrated when "the claims or defenses of the representative parties are typical of the claims or defenses of the class." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998), *overruled on other grounds by Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." (internal quotation marks omitted). *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175

(9th Cir. 2010). "Under the rule's permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon*, 150 F.3d at 1019.

That is the situation here. Plaintiffs have adduced evidence indicating that, regardless of size or buying power, Meta's customers saw similar representations by Meta about its advertising reach and programs. Advertisers were shown the same default Potential Reach of over 200 million people before they applied any targeting criteria. Dkt. No. 281-9 at ¶¶ 55-60. Plaintiffs' expert, Dr. Charles Cowan, states that even with different targeting criteria for each advertiser, inflated Potential Reach representations were made across Meta's platform. Dkt. No. 281-11 at ¶ 33. All advertising customers were shown Potential Reach estimates that were inflated by a similar percentage. *Id.* at ¶ 15. [2]

**\*4**  It may be that class members differ in advertising budgets and scope of purchases, as Meta suggests, but Meta has not shown that these differences defeat typicality or the named plaintiffs' ability to adequately represent all class members. This is not a case where the record demonstrates that the products, pricing, and programs accessed by class members were so dissimilar that typicality and adequacy could not be established. *See, e.g.*, *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 489-90 (N.D. Cal. 2008) (denying certification of antitrust class where evidence demonstrated putative class members purchased entirely different products at different prices). In effect, Meta simply posits that typicality and adequacy cannot be established because the class includes large and small ad purchasers. The problem with this approach is that it is *ipse dixit* and not an evidence-based objection.

Meta's case citations do not lead to a different conclusion. It overreads *In re Facebook, Inc., PPC Advertising Litig.*, 282 F.R.D. 446 (N.D. Cal. 2012), *aff'd sub nom. Fox Test Prep v. Facebook, Inc.*, 588 F. App'x 733 (9th Cir. 2014), to stand for the proposition that a " 'diverse group' of advertisers" necessarily undercuts adequacy and typicality. Dkt. No. 293-4 at 16-17. But that case in fact determined that typicality had been demonstrated. *In re Facebook, Inc.*,, 282 F.R.D. at 453-54. Adequacy was not found because the record failed to show that the named plaintiffs had suffered a concrete injury from the challenged conduct. *Id.* at 454. That is not a circumstance present here.

Meta also has not demonstrated an evidence-based reason to reject the adequacy of the named plaintiffs generally. Adequacy of representation asks whether: "(1) the representative plaintiffs and their counsel have any conflicts of interest with other class members, and (2) will the representative plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Staton v. Boeing Co.,* 327 F.3d 938, 957 (9th Cir. 2003). Meta did not make a serious effort at answering either inquiry in the negative, and plaintiffs have demonstrated that no such concerns are in play here. *See* Dkt. No. 282 at 16-17.

Meta's effort to recast its typicality and adequacy challenges as questions of reliance and UCL standing is equally unavailing. *See* Dkt. No. 294 at 15. To start, named plaintiffs demonstrated reliance by proffering evidence that DZ Reserve was deterred from using Meta ads after learning that the Potential Reach was an inaccurate metric. Dkt. No. 293-27 at 193:17-194:5. Similarly, named plaintiff Maxwell relied on Potential Reach to set his budgets and would not have spent money on Meta ads if he knew Potential Reach was inaccurate. *See* Dkt. No. 293-29 at 199:8-12; Dkt. No. 317-2 at 257:3-14. Meta says that the named plaintiffs would still have purchased ads if they knew the Potential Reach was inaccurate. Dkt. No. 294 at 16. But plaintiffs also indicated that they would have spent less on ads after learning the Potential Reach was inaccurate, demonstrating that they were deceived into spending more money. *See, e.g.*, Dkt. No. 317-3 at 105:21-106:5. This and similar evidence also establishes reliance for UCL standing purposes. *See Walker v. Life Insurance Co. of the Sw.,* 953 F.3d 624, 630 (9th Cir. 2020) ("To bring a UCL claim, a plaintiff must establish he suffered 'as a result of' the defendant's conduct.") (quoting *Cal. Bus. & Prof. Code § 17204*); *In re Tobacco II Cases,* 46 Cal. 4th 298, 325 (Cal. 2009) (named plaintiffs, not absent ones, must provide evidence of actual reliance at the certification stage).

Meta's mention of an arbitration provision in contracts for advertising after May 2018, Dkt. No. 294 at 17, also does not defeat the adequacy and typicality of the named plaintiffs. The complaint in this case was filed in August 2018. Dkt. No. 1. Despite that, and knowing of the arbitration clause and its possible application to plaintiffs, Meta never sought to compel arbitration, and instead vigorously litigated this lawsuit in federal court as if arbitration were not an option. A good argument can be made that Meta has waived arbitration on this record. *See Anderson v. Starbucks Corp.,* No. 20-

cv-01178-JD, 2022 WL 797014 (N.D. Cal. March 16, 2022) (and cases cited therein). In addition, the record shows that the named plaintiffs purchased ads before and after May 2018, which indicates that they are adequate representatives for advertisers who purchased ads both before and after May 28, 2018. *See* Dkt. No 328-2 at ¶ 21. If for some presently unknown reason an adjustment to the class definition might be required on arbitration grounds, the Court can alter or amend it at any time before entry of a final judgment. *Fed. R. Civ. P. 23(c)(1)(C); see also Powers v. Hamilton Cty. Pub. Def. Com'n,* 501 F.3d 592, 619 (6th Cir. 2007).

**\*5** Plaintiffs have satisfied the elements of adequacy and typicality.

## C. Commonality (23(a)(2)) and Predominance (23(b)(3)

The commonality requirement under Rule 23(a)(2) is satisfied when "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Because "any competently crafted class complaint literally raises common questions," the Court's task is to look for a common contention "capable of classwide resolution -- which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Alcantar,* 800 F.3d at 1052 (internal quotations and citations omitted). What matters is the "capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Dukes,* 564 U.S. at 350 (internal quotations omitted) (emphasis in original). This does not require total uniformity across a class. "The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Hanlon,* 150 F.3d at 1019. "[E]ven a single common question will do." *Dukes,* 564 U.S. at 359. The commonality standard imposed by Rule 23(a)(2) is "rigorous." *Leyva v. Medline Indus. Inc.,* 716 F.3d 510, 512 (9th Cir. 2013).

Rule 23(b)(3) sets out the related but nonetheless distinct requirement that the common questions of law or fact predominate over the individual ones. This inquiry focuses on whether the "common questions present a significant aspect of the case and [if] they can be resolved for all members of the class in a single adjudication." *Hanlon,* 150 F.3d at 1022 (internal quotations and citation omitted); *see also*

🚩 *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016). Each element of a claim need not be susceptible to classwide proof, 🚩 *Amgen*, 568 U.S. at 468-69, and the "important questions apt to drive the resolution of the litigation are given more weight in the predominance analysis over individualized questions which are of considerably less significance to the claims of the class." 🚩 *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1134 (9th Cir. 2016). Rule 23(b)(3) permits certification when "one or more of the central issues in the action are common to the class and can be said to predominate, ... even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." 🚩 *Tyson*, 577 U.S. at 453 (internal quotations omitted).

"Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)," 🚩 *Comcast*, 569 U.S. at 34, and the main concern under subsection (b)(3) is "the balance between individual and common issues." ⚠️ *In re Hyundai and Kia Fuel Economy Litigation*, 926 F.3d 539, 560 (9th Cir. 2019) (en banc) (internal quotations omitted). The Court finds it appropriate to assess commonality and predominance in tandem, with a careful eye toward ensuring that the specific requirements of each are fully satisfied. *See, e.g.*, *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1120-21 (9th Cir. 2017).

### 1. Liability

**\*6** Plaintiffs have demonstrated that the main liability issues are common to the class members and are capable of resolution with common evidence. For the fraudulent concealment and fraudulent misrepresentation claims, plaintiffs must show: "(a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e. to induce reliance; (d) justifiable reliance; and (e) resulting damage." 🚩 *Engalla v. Permanente Med. Grp., Inc.*, 15 Cal. 4th 951, 974 (1997). For plaintiffs' UCL claims (for which only commonality must be shown as part of the 23(a) factors, given the unavailability of monetary relief), plaintiffs must show that members of the public were likely to be deceived. 🚩 *Williams v. Gerber Products Co.*, 552 F.3d 934, 938 (9th Cir. 2008) (claims under UCL and CLRA are "governed by the 'reasonable consumer' test"; plaintiffs "must show that

members of the public are likely to be deceived") (internal quotations and citations omitted).

Consequently, the main liability question is the same for all class members: did Meta's Potential Reach metric mislead advertisers? Meta does not disagree, and instead hurls a grab bag of challenges to plaintiffs' ability of proving an answer in their favor. Much of Meta's argument against commonality and predominance is simply that the evidence does not support plaintiffs' case. That is not the pertinent inquiry at the certification stage. The question is whether it makes sense under Rule 23 and as a matter of due process and efficiency to present the liability dispute to a jury on behalf of a class. Whether plaintiffs can ultimately prove it up at trial is a different matter altogether.

To the extent a merits inquiry is warranted, plaintiffs have adduced evidence showing that all class members were exposed to a similar representation about the ability of Potential Reach to reach "people," namely unique individuals. *See, e.g.*, Dkt. No. 282-3; Dkt. No. 281-9 at ¶¶ 55-60. This is seen in the Ads Manager interface, which represented Potential Reach as a number of people. *See, e.g.*, Dkt. No. 281-8. The evidence further shows that Meta's Potential Reach metric was not actually an estimate of people reached, but an estimate of "accounts" reached. *See* Dkt. No. 281-60 at ECF 10. Because the number of unique accounts and unique people were different, this led to an inaccurate representation of how many people the advertisements could reach. *See* Dkt. No. 281-11 at ¶ 15.

Meta does not dispute that the Potential Reach numbers were presented in terms of people. Instead, Meta says that the Potential Reach numbers were not uniformly inaccurate as a result of different targeting criteria producing different Potential Reach numbers. Dkt. No. 293-4 at 18-20. Even so, Potential Reach was always expressed as a number of "people," and the discrepancy between people and accounts made the number inaccurate, even if the numerical value of the inaccuracy varied across advertisers. Consequently, plaintiffs have shown that the question of whether Meta made misrepresentations to all class members can be shown through common evidence.

Meta's knowledge of the misleading statements, and intent to deceive, also lend themselves to resolution by common evidence. *See, e.g.*, *Brickman v. Fitbit, Inc.*, No. 15-cv-2077-JD, 2017 WL 5569827, at \*6 (N.D. Cal. Nov. 20, 2017) (citing 🚩 *Small v. Fritz Cos., Inc.*, 30 Cal. 4th 167, 173-74

(2003)). Several documents show that Meta knew that its Potential Reach estimate did not accurately reflect the number of people its advertisements could reach. *See* Dkt. No. 281-25; Dkt. No. 281-27. Meta's intent for advertisers to rely on its Potential Reach numbers is also provable through common evidence. Meta knew that the potential reach number was the most important number in its ads creation interface and that advertisers frequently relied on the estimated audience to build their budgets and advertising strategies. Dkt. No. 281-8.

**\*7** So too for materiality and reliance. In common law and UCL fraud cases, questions of materiality and reliance do not necessarily undermine predominance and commonality.

*Brickman*, 2017 WL 5569827, at \*6-\*7; *Milan v. Clif Bar & Co.*, No. 18-cv-2354-JD, 2021 WL 4427427, at \*5 (N.D. Cal. Sep. 27, 2021). "[A] presumption, or at least an inference, of reliance arises wherever there is a showing that a misrepresentation was material." *Tobacco II Cases*, 46 Cal. 4th at 327. A misrepresentation is material "if a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question." *Id.* (internal quotations omitted). The question of materiality "can be proved through evidence common to the class." *Amgen*, 568 U.S. at 467. Plaintiffs have established that materiality and reliance can be shown in this case through common evidence. Potential Reach metrics were shown to all advertisers in the Ads Manager. Dkt. No. 282-3; Dkt. No. 282-4. Meta has acknowledged that Potential Reach is an important number for advertisers. Dkt. No. 281-8. A majority of advertisers rely on Potential Reach as a metric for their advertisements. Dkt. No. 281-22.

Plaintiffs have also established that proof of injury is susceptible to common evidence. Among other evidence, a report from Pivotal Research showed that Potential Reach numbers exceeded census counts for various demographics, Dkt. No. 282-22 and several internal documents indicated various causes of inflated Potential Reach levels, *see, e.g.*, Dkt. No. 282-28; 282-7; 282-31; 282-32. Plaintiffs' expert, Dr. Cowan, conducted a statistical analysis to determine the percentage of inflation for both nationwide and targeted advertisements. *See* Dkt. No. 282-8. He concluded that it was a statistical certainty that, for any advertisement with a Potential Reach of at least 1,000 people or more, the estimate would be significantly inflated above the actual number of people the advertisement could reach. *Id.*

Meta says that Dr. Cowan improperly assumed that the inflated estimates found in the default national population (United States, aged 18-65) Potential Reach were equally applicable across all targeted groups, and that each measure of inflation was distributed across targeted groups. Dkt. No. 281-11 ¶ 82. Meta's expert, Dr. Steven Tadelis, says that this is a flawed assumption because Meta's data sampling shows that sources of inflation are not distributed evenly across all smaller demographics that an advertiser might choose. Dkt. No. 293-44 ¶ 125. But Dr. Tadelis does not conclude that no inflation occurred at all, only that Dr. Cowan did not measure the exact inflation resulting from any given targeting criteria because inflation for any given sub population may be different from the inflation for the default national population. This criticism does not foreclose classwide proof of injury.

### 2. Damages and *Daubert* Motions re Dr. Allenby and Mr. McFarlane

While a damages methodology need not deliver mathematical precision, and may accommodate some individual variability among class members, *see In re Capacitors Antitrust Litigation*, No. 17-md-2801-JD, 2018 WL 5980139, at \*9 (N.D. Cal. Nov. 14, 2018), it must be capable of determining damages across the class in a reasonably accurate fashion.

*Comcast*, 569 U.S. at 35 (plaintiffs bear burden of showing that "damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)"). The damages model "must measure only those damages attributable to" the plaintiffs' theory of liability. *Id.* Put plainly, the damages model must reasonably reflect the claims and evidence in the case.

Plaintiffs have proffered experts who analyzed the evidence to arrive at a price premium that advertisers paid for inflated Potential Reach values. Dkt. No. 281-3 at 21. Dr. Cowan measured the amount of inflation associated with Potential Reach as a result of the misleading "people" metric. *Id.* Dr. Allenby used a "conjoint survey" to test the impact of inflated Potential Reach on advertisers' budgets. *Id.* Dr. Roughgarden, an auction expert, calculated a price premium. *Id.* Dr. Levy, an economist, confirmed that Dr. Roughgarden's price premium properly considered supply and demand, and that damages could be calculated on a classwide basis. *Id.* Plaintiffs also offer expert witness Mr. McFarlane, who opined about the price premium class members paid compared to if no potential reach metric was provided at all. *Id.*

**\*8**  Meta offers little in its class certification brief to attack plaintiffs' damages models. It relies instead on two separately filed *Daubert* motions to exclude the opinions of Dr. Allenby and Mr. McFarlane, and by extension, the portions of Dr. Levy and Dr. Roughgarden's opinions that rely on the reports of Dr. Allenby and Mr. McFarlane. Dkt. Nos. 284-4, 284-6.

Overall, Meta has not demonstrated a good reason to exclude Dr. Allenby's work. Under the familiar standards of Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), there is no "definitive checklist or test" used to evaluate the reliability of proposed expert testimony. *Daubert*, 509 U.S. at 593-94. The question for the Court at this stage is to decide whether Dr. Allenby will use a generally accepted method for determining price premiums, or whether his approach is "junk science" akin to predicting criminality by feeling the bumps on a person's head. *General Electric Co. v. Joiner*, 522 U.S. 136, 153 n.6 (1997) (Stevens, J., concurring in part).

The "inquiry into the evidence's ultimate admissibility should go to the weight that evidence is given at the class certification stage." *Sali v. Corona Reg'l Med. Ctr.*, 9-9 F.3d 996, 1006 (9th Cir. 2018). The Court determines whether the expert evidence helps to establish whether class certification is appropriate. *See Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011).

Dr. Allenby conducted a conjoint survey and analyzed the data using both a linear regression model and a "logit model" (another type of statistical analysis) before determining that the logit model did not best fit the data. Meta does not suggest that a conjoint survey is an untested method, nor does it claim that it is improper to use a linear regression to analyze survey data. Rather, Meta says that the specific regression that Dr. Allenby used was a novel type of analysis that purposely excluded data from the analysis. Dkt. No. 284-4 at 10-12.

This Court has found conjoint analysis to be a reliable method of determining price premiums. *See, e.g.*, *Milan v. Clif Bar & Co.*, No. 18-cv-2354-JD, 2021 WL 4467427, at \* 7 (N.D. Cal. Sep. 27, 2021). Meta does not dispute the generally utility of conjoint analysis, and focuses its critique on Dr. Allenby's use of a linear regression model to analyze the data from the conjoint survey. Dkt. No. 284-4 at 10. Plaintiffs have shown that Dr. Allenby chose a linear regression model that is a standard method for analyzing this data. Dkt. No. 304-17

at 143:9-18; 304-20 at 57:23-58:7. Dr. Allenby's choice of one particular data analysis method over another goes to the weight of his opinion, not its admissibility. *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1036 (9th Cir. 2010). To the extent that Meta suggests that Dr. Allenby improperly limited his data set, this too is a question of weight to be afforded to the opinion, not its admissibility. *In re Capacitors Antitrust Litig.*, No. 17-md-2801-JD, 2018 WL 5980139, at \*6 (N.D. Cal. Nov. 14, 2018). Dr. Allenby states that he chose a subset of the data to analyze based on the fact that his conjoint survey included allocations of advertising for both Meta and Google ads, but only Meta ads are at issue in this case. Dkt. No. 304-17 at 288:10-289:8.

**\*9**  This is enough to be sound and useful for certification purposes. If evidence emerges at trial that substantially impeaches Dr. Allenby's methods and conclusions, the door may be opened to consideration of decertification.

Meta's objections to Mr. McFarlane's report lead to a different outcome. Meta says that Mr. McFarlane offered nothing more than his personal interpretation of documents and evidence. Dkt. No. 284-6 at 7. Meta also says that Mr. McFarlane used a price premium figure that he did not calculate, and merely applied it in an obvious fashion to the amount of money plaintiffs are said to have spent on advertising. *Id.* at 3.

These objections are well taken. Overall, Mr. McFarlane's report does not offer any specialized or scientific expertise, or anything beyond the typical knowledge and experience of a jury. *See* Fed. R. Evid. 702; *Daubert*, 509 U.S. at 592. The documents Mr. McFarlane interprets are reasonably intelligible to a jury without special assistance. Consequently, exclusion of Mr. McFarlane's opinions and report is required. Any portion of Dr. Roughgarden's opinions that is drawn on Mr. McFarlane's work is also excluded, unless an independent basis for it is demonstrated. The Court declines to undertake that analysis on the record as it currently stands. Meta may pursue it in a motion in limine, as circumstances warrant.

Because plaintiffs have adequately shown that they can calculate damages on a classwide basis using Dr. Allenby's report and evidence from their other experts (excluding Mr. McFarlane), they have shown an adequate damages model under Rule 23(b)(3).

**D. Superiority**

The final certification question is whether the ends of justice and efficiency are served by certification. Rule 23(b)(3) requires a finding that proceeding as a class is superior to other ways of adjudicating the controversy, which in this case would mean individual actions by each putative class member. There can be no doubt here that a class is the superior method of handling the claims of individual advertisers. The price premium at issue here for each advertiser is no more than $32, Dkt. No. 281-3, and it is not likely for class members to recover large amounts individually if they prevailed. No reasonable person is likely to pursue these claims on his or her own, especially given the cost and other resources required to litigate against a company like Meta, which has already retained multiple experts and shown that it is committed to strongly defending this case. This all "vividly points to the need for class treatment." *Just Film*, 847 F.3d at 1123.

## IV. RULE 23(B)(2) CLASS

Plaintiffs seek certification of a class under Rule 23(b)(2) for the UCL injunctive relief claim. Such a class may be certified when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "Class certification under Rule 23(b)(2) is appropriate only where the primary relief sought is declaratory or injunctive." *Zinser*, 253 F.3d at 1195. The primary use of Rule 23(b)(2) classes has been the certification of civil rights class actions, but courts have certified many different kinds of classes under Rule 23(b)(2). *See Parsons v. Ryan*, 754 F.3d 657, 686 (9th Cir. 2014). The Rule 23(a) requirements of numerosity, commonality, typicality, and adequacy must also be shown for a Rule 23(b)(2) class. *Zinser*, 253 F.3d at 186. As discussed, plaintiffs have met their burden for proving the Rule 23(a) requirements.

**\*10** For Rule 23(b)(2), the Court is not required "to examine the viability or bases of class members' claims for declaratory and injunctive relief, but only to look at whether class members seek uniform relief from a practice applicable to all of them." *Rodriguez v. Hayes*, 591 F.3d 1105, 1125 (9th Cir. 2010). "It is sufficient to meet the requirements of Rule 23(b)(2) that class members complain of a pattern or practice that is generally applicable to the class as a whole." *Id.* (quoting *Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir. 1998)) (internal quotations omitted).

The California Supreme Court has held that "[i]njunctions are the 'primary form of relief available under the UCL to protect consumers from unfair business practices." *Kwikset Corp. v. Superior Court*, 51 Cal.4th 310, 337 (2011); *see also Tobacco Cases II*, 46 Cal. 4th at 319. For the proposed Rule 23(b)(2) class, plaintiffs seek injunctive relief in the form of an order directing Meta to "either (a) correct the [Potential Reach] metric by removing known sources of inflation, or (b) remove the [Potential Reach] metric altogether." Dkt. No. 281-3 at 18.

Plaintiffs have standing to seek an injunction. As our circuit has determined, "a previously deceived consumer may have standing to seek an injunction against false advertising or labeling, even though the consumer now knows or suspects that the advertising was false at the time of the original purchase," because "[k]nowledge that the advertisement or label was false in the past does not equate to knowledge that it will remain false in the future." *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 969 (9th Cir. 2018). Plaintiffs have proffered deposition testimony to the effect that they would consider purchasing ads from Meta again if Meta corrected or removed the misleading Potential Reach metric. Dkt. No. 282-65 at 242:18-23; Dkt. No. 282-64 at 105:24-106:5. This establishes plaintiffs' standing to pursue injunctive relief in this case.

Meta's arguments to the contrary are unavailing. To start, Meta repeats the same arguments that it already made in its motion for judgment on the pleadings, Dkt. No. 270, that plaintiffs have failed to show they lack an adequate remedy at law. The Court has already determined that plaintiffs have shown an inadequate remedy at law for their injunctive relief claim under the UCL. Dkt. No. 366 at 2.

Meta also says that plaintiffs did not show they face a threat of actual future harm because at least one inflation source has already been remediated and Meta updated disclosures about multiple accounts. Dkt. No. 293-4 at 25. This is a merits question that is not properly decided at the class certification stage.

Meta's passing comment that the injunction plaintiffs seek is "overbroad and unworkable," Dkt. No. 293-4 at 25, is no basis for denying certification. The remark was not developed in a meaningful way, and concerns about the scope of an injunction are premature at this stage. *See B.K. ex rel. Tinsley v. Snyder*, 922 F.3d 957, 972 (9th Cir. 2019). There is

considerably more to be done in this case, namely trial, before the specific terms of an injunction might warrant debate.

Consequently, a Rule 23(b)(2) class is appropriate for plaintiffs' UCL claims.

## CONCLUSION

The Court certifies the proposed class under Rule 23(b)(3) for the common law fraud claims, and under Rule 23(b)(2) for the UCL injunction claim. Plaintiffs DZ Reserve, Inc. and Cain Maxwell are appointed class representatives, and their counsel at Cohen Milstein Sellers & Toll PLLC and the Law Offices of Charles Reichmann are appointed class counsel.

 **\*11** Meta's motion to exclude the report and testimony of Dr. Allenby is denied. Meta's motion to exclude the report and testimony of Mr. McFarlane is granted.

Plaintiffs are directed to file by April 29, 2022, a proposed plan for dissemination of notice to the classes. Plaintiffs will meet and confer with Meta at least 10 days in advance of filing the plan so that the proposal can be submitted on a joint basis, to the fullest extent possible.

A status conference is set for May 26, 2022, at 10:00 a.m. in Courtroom 11, 19th Floor, San Francisco. The parties are directed to file a joint statement by May 19, 2022, with proposed dates for the final pretrial conference and trial.

The parties are referred to Magistrate Judge Hixson for a settlement conference to be held as his schedule permits.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2022 WL 912890

## Footnotes

1    The TAC was originally filed under seal as Dkt. No. 166. The Court denied the administrative motion to seal the TAC without prejudice, *see* Dkt. No. 320, and the TAC was refiled as Dkt. No. 332.

2    Dr. Cowan's work is discussed in more detail later in the order.

**End of Document**                                                          © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Lemmon v. Snap, Inc., 995 F.3d 1085 (2021)

Case 4:18-cv-05159-HSG    Document 61-1    Filed 06/16/23    Page 67 of 111

Prod.Liab.Rep. (CCH) P 21,155, 21 Cal. Daily Op. Serv. 4203...

KeyCite Yellow Flag - Negative Treatment
Distinguished by  Jackson v. Airbnb, Inc.,   C.D.Cal.,   November 4, 2022

995 F.3d 1085
United States Court of Appeals, Ninth Circuit.

Carly LEMMON; Michael Morby, as surviving
parents of Hunter Morby (deceased); Samantha
Brown; Marlo Brown, as surviving parents of
Landen Brown (deceased), Plaintiffs-Appellants,
v.
SNAP, INC., doing business in California
as Snapchat, Inc., Defendant-Appellee.

No. 20-55295
|
Argued and Submitted February
11, 2021 San Francisco, California
|
Filed May 4, 2021

**Synopsis**
**Background:** Parents of motor vehicle passengers brought
wrongful death action against social media company, alleging
claim for negligent design based on vehicle occupants being
prompted by social media cell phone application's speed filter
to travel at high speeds and share that over social media,
which caused vehicle to run off the road and crash into tree.
The United States District Court for the Central District of
California, Michael W. Fitzgerald, J., 440 F.Supp.3d 1103,
dismissed the action. Parents appealed.

**[Holding:]** The Court of Appeals, Wardlaw, Circuit Judge,
held that social media company was not entitled to immunity
under the Communications Decency Act (CDA), in negligent
design claim.

Reversed and remanded.

**Procedural Posture(s):** On Appeal; Motion to Dismiss for
Failure to State a Claim.

West Headnotes (12)

**[1]**    **Federal Courts** 🔑 Statutes, regulations, and
ordinances, questions concerning in general

**Federal Courts** 🔑 Pleading

The Court of Appeals reviews de novo both
the district court's order dismissing a complaint
for failure to state a claim and any questions
of statutory interpretation that informed that
decision. Fed. R. Civ. P. 12(b)(6).

2 Cases that cite this headnote

**[2]**    **Federal Civil Procedure** 🔑 Insufficiency in
general

A complaint will survive a motion to dismiss for
failure to state a claim if it states a plausible claim
for relief, that is, if it permits the reasonable
inference that the defendant is liable for the
misconduct alleged. Fed. R. Civ. P. 12(b)(6).

2 Cases that cite this headnote

**[3]**    **Telecommunications** 🔑 Privilege or
immunity

Purpose of immunity granted to internet
providers under the Communications Decency
Act (CDA) is to promote the continued
development of the internet and other interactive
computer services. Communications Act of 1934
§ 230, 47 U.S.C.A. § 230(c)(1).

4 Cases that cite this headnote

**[4]**    **Telecommunications** 🔑 Privilege or
immunity

A plaintiff enjoys immunity under the
Communications Decency Act (CDA) only
if it is (1) a provider or user of an
interactive computer service (2) whom a plaintiff
seeks to treat, under a state law cause of
action, as a publisher or speaker (3) of
information provided by another information
content provider. Communications Act of 1934 §
230, 47 U.S.C.A. § 230(c)(1).

Case 4:18-cv-05159-HSG   Document 61-1   Filed 06/16/23   Page 68 of 111

Lemmon v. Snap, Inc., 995 F.3d 1085 (2021)

Prod.Liab.Rep. (CCH) P 21,155, 21 Cal. Daily Op. Serv. 4203...

10 Cases that cite this headnote

**[5]**   **Telecommunications**  ⚑  Privilege or
immunity

Social media company was not entitled to
immunity under the Communications Decency
Act (CDA), in negligent design claim asserted
by parents of motor vehicle passengers who
died when vehicle crashed into tree after
passengers and driver used company's social
media application's speed filter, which allegedly
prompted them to travel at high rates of speed;
claim did not treat company as "publisher or
speaker," as it asserted that company negligently
designed the application with a defect that
encouraged dangerous driving, which did not
depend on company's publishing of third-party
content. Communications Act of 1934 § 230,

⚑ 47 U.S.C.A. § 230(c)(1).

6 Cases that cite this headnote

**[6]**   **Telecommunications**  ⚑  Privilege or
immunity

"Publication," as required for immunity under
the Communications Decency Act (CDA),
generally involves reviewing, editing, and
deciding whether to publish or to withdraw from
publication third-party content on the internet.

Communications Act of 1934 § 230,  ⚑ 47
U.S.C.A. § 230(c)(1).

7 Cases that cite this headnote

**[7]**   **Telecommunications**  ⚑  Privilege or
immunity

Regardless of the type of claim brought, a
court deciding whether immunity under the
Communications Decency Act (CDA) focuses
on whether the duty the plaintiff alleges stems
from the defendant's status or conduct as a
publisher or speaker of content on the internet.

Communications Act of 1934 § 230,  ⚑ 47
U.S.C.A. § 230(c)(1).

2 Cases that cite this headnote

**[8]**   **Products Liability**  ⚑  Risk-utility test

Under California law, a negligent design
action asks whether a reasonable person would
conclude that the reasonably foreseeable harm of
a product, manufactured in accordance with its
design, outweighs the utility of the product.

**[9]**   **Telecommunications**  ⚑  Privilege or
immunity

The immunity provision of the Communications
Decency Act (CDA) cuts off liability only
when a plaintiff's claim faults the defendant for
information provided by third parties on the
internet; thus, internet companies remain on the
hook when they create or develop their own
internet content. Communications Act of 1934 §

230,  ⚑ 47 U.S.C.A. §§ 230(c)(1), ⚑ 230(f)(3).

2 Cases that cite this headnote

**[10]**   **Telecommunications**  ⚑  Privilege or
immunity

The immunity provision of the Communications
Decency Act (CDA) was not meant to create a
lawless no-man's-land on the internet; those who
use the internet continue to face the prospect
of liability, even for their neutral tools, so long
as plaintiff's claims do not blame them for the
content that third parties generate with those

tools. Communications Act of 1934 § 230,  ⚑ 47
U.S.C.A. § 230(c)(1).

2 Cases that cite this headnote

**[11]**   **Federal Courts**  ⚑  Theory and Grounds of
Decision of Lower Court

The Court of Appeals may affirm the district
court's dismissal for failure to state a claim on
any ground supported by law. Fed. R. Civ. P.
12(b)(6).

2 Cases that cite this headnote

Prod.Liab.Rep. (CCH) P 21,155, 21 Cal. Daily Op. Serv. 4203...

**[12]**   **Federal Courts** 🔑  In general;  necessity

The Court of Appeals will generally refrain from deciding an issue on appeal that the district court has not had the opportunity to evaluate.

2 Cases that cite this headnote

**\*1087**  Appeal from the United States District Court for the Central District of California, Michael W. Fitzgerald, District Judge, Presiding, D.C. No. 2:19-cv-04504-MWF-KS

**Attorneys and Law Firms**

Naveen Ramachandrappa (argued), Bondurant Mixson & Elmore LLP, Atlanta, Georgia, for Plaintiffs-Appellants.

Jonathan H. Blavin (argued) and Rosemarie T. Ring, Munger Tolles & Olson LLP, San Francisco, California; John B. Major and Anne K. Conley, Munger Tolles & Olson LLP, Los Angeles, California; for Defendant-Appellee.

Before: Kim McLane Wardlaw and Carlos T. Bea, Circuit Judges, and James David Cain, Jr., * District Judge.

**OPINION**

WARDLAW, Circuit Judge:

Carly Lemmon, Michael Morby, Samantha Brown, and Marlo Brown ("the Parents") are the surviving parents of two boys who died in a tragic, high-speed car accident. They sued Snap, Inc. ("Snap"), a social media provider, alleging that it encouraged their sons to drive at dangerous speeds and thus caused the boys' deaths through its negligent design of its smartphone application Snapchat. We must decide whether the district court correctly dismissed that action when it concluded that the Communications Decency Act ("CDA") barred the Parents' claim because it sought to treat Snap "as the publisher or speaker of any information provided by another information content provider." 🚩 47 U.S.C. § 230(c)(1).

We conclude that, because the Parents' claim neither treats Snap as a "publisher or speaker" nor relies on "information provided by another information content provider," Snap does not enjoy immunity from this suit under 🚩 § 230(c)(1). We

therefore reverse the district court's Rule 12(b)(6) dismissal of the Parents' lawsuit and remand for further proceedings.

**I.**

Because the district court dismissed this action pursuant to Federal Rule of Civil Procedure 12(b)(6), we accept as true the allegations contained in the Parents' amended complaint and view them in the light most favorable to the Parents. 🚩 **\*1088** *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1096 (9th Cir. 2019).

**A.**

According to the Parents' amended complaint, Jason Davis (age 17), Hunter Morby (age 17), and Landen Brown (age 20) were driving down Cranberry Road in Walworth County, Wisconsin at around 7:00 p.m. on May 28, 2017. Jason sat behind the wheel, Landen occupied the front passenger seat, and Hunter rode in the back seat. At some point during their drive, the boys' car began to speed as fast as 123 MPH. They sped along at these high speeds for several minutes, before they eventually ran off the road at approximately 113 MPH and crashed into a tree. Tragically, their car burst into flames, and all three boys died.

Shortly before the crash, Landen opened Snapchat, a smartphone application, to document how fast the boys were going. Snapchat is a social media platform that allows its users to take photos or videos (colloquially known as "snaps") and share them with other Snapchat users. To keep its users engaged, Snapchat rewards them with "trophies, streaks, and social recognitions" based on the snaps they send. Snapchat, however, does not tell its users how to earn these various achievements.

The app also permits its users to superimpose a "filter" over the photos or videos that they capture through Snapchat at the moment they take that photo or video. Landen used one of these filters—the "Speed Filter"—minutes before the fatal accident on May 28, 2017. The Speed Filter enables Snapchat users to "record their real-life speed." An example of the digital content that a Snapchat user might create with this filter is portrayed below.

**\*1089**



A Snapchat user could also "overlay" the above information onto a mobile photo or video that they previously captured.

Many of Snapchat's users suspect, if not actually "believe," that Snapchat will reward them for "recording a 100-MPH or faster [s]nap" using the Speed Filter. According to plaintiffs, "[t]his is a game for Snap and many of its users" with the goal being to reach 100 MPH, take a photo or video with the Speed Filter, "and then share the 100-MPH-Snap on Snapchat."

Snapchat allegedly knew or should have known, before May 28, 2017, that its users believed that such a reward system existed and that the Speed Filter was therefore incentivizing young drivers to drive at dangerous speeds. Indeed, the Parents allege that there had been: a series of news articles about this phenomenon; an online petition that "called on Snapchat to address its role in encouraging dangerous speeding"; at least three accidents linked to Snapchat users' pursuit of high-speed snaps; and at least one other lawsuit

against Snap based on these practices. While Snapchat warned its users against using the Speed Filter while driving, these **\*1090** warnings allegedly proved ineffective. And, despite all this, "Snap did not remove or restrict access to Snapchat while traveling at dangerous speeds or otherwise properly address the danger it created."

## B.

On May 23, 2019, Hunter's and Landen's parents filed this negligent design lawsuit against Snap. Snap moved to dismiss the Parents' initial complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), contending that the Parents had failed to allege a plausible negligence claim and that the Communications Decency Act immunized it from liability. The district court agreed and dismissed the Parents' first complaint for failure to allege "a causal connection between Defendant's Speed Filter and the car accident" and because it was "not clear whether their claim is barred under the [CDA]." However, it granted leave to amend so that the Parents could cure these deficiencies.

On November 18, 2019, the Parents filed an amended complaint, which Snap moved to dismiss on the same grounds as before. This time, the district court granted the motion to dismiss solely on the basis of immunity under 47 U.S.C. § 230(c)(1). Because it concluded that the CDA rendered Snap immune from the Parents' claim, it did not address Snap's argument that the Parents had again failed to plead causation adequately. The district court denied further leave to amend, and entered a final judgment on February 25, 2020. The Parents then filed this timely appeal.

## II.

**[1]  [2]**  We review de novo both the district court's order dismissing the Parents' claim pursuant to Federal Rule of Civil Procedure 12(b)(6) and any questions of statutory interpretation that informed that decision. *Dyroff,* 934 F.3d at 1096. The Parents' amended complaint will survive at this stage if it states "a plausible claim for relief," *i.e.*, if it permits "the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted). This standard requires determining whether the CDA bars

Lemmon v. Snap, Inc., 995 F.3d 1085 (2021)

Prod.Liab.Rep. (CCH) P 21,155, 21 Cal. Daily Op. Serv. 4203...

the Parents' claim as pleaded in the amended complaint. *See* ⚑ *id.*

## III.

**[3]** In 1996, when the internet was young and few of us understood how it would transform American society, Congress passed the CDA. *See* ⚑ 47 U.S.C. § 230. That act "provide[d] internet companies with immunity from certain claims" in order " 'to promote the continued development of the Internet and other interactive computer services.' " ⚑ *HomeAway.com, Inc. v. City of Santa Monica,* 918 F.3d 676, 681 (9th Cir. 2019) (quoting ⚑ 47 U.S.C. § 230(b)(1)). Specifically, Congress commanded that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."[1] ⚑ 47 U.S.C. § 230(c)(1); *see also* ⚑ *id.* § 230(e)(3) (explicitly preempting any state or local law inconsistent with this section). Though somewhat jargony, this provision shields from **\*1091** liability those individuals or entities that operate internet platforms, to the extent their platforms publish third-party content.

**[4]** To determine whether ⚑ § 230(c)(1) applies here—and thus immunizes Snap from the Parents' claim—we apply the three-prong test set forth in ⚑ *Barnes v. Yahoo!, Inc.,* 570 F.3d 1096 (9th Cir. 2009). Snap thus enjoys CDA immunity only if it is "(1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of information provided by another information content provider." ⚑ *Dyroff,* 934 F.3d at 1097 (quoting ⚑ *Barnes,* 570 F.3d at 1100–01). We examine each of these questions in turn.

### A.

The parties do not dispute that Snap is a provider of an "interactive computer service," and we agree that Snap qualifies as one given the CDA's "expansive" definition of that term. ⚑ *Kimzey v. Yelp! Inc.,* 836 F.3d 1263, 1268 (9th Cir. 2016) (citation omitted); *see also* ⚑ *Barnes,* 570

F.3d at 1101. According to the amended complaint, the Snapchat application permits its users to share photos and videos through Snap's servers and the internet. Snapchat thus necessarily "enables computer access by multiple users to a computer server," ⚑ 47 U.S.C. § 230(f)(2), and Snap, as the creator, owner, and operator of Snapchat, is therefore a "provider" of an interactive computer service. ⚑ *Id.* § 230(f)(3).

### B.

**[5]** The second ⚑ *Barnes* question asks whether a cause of action seeks to treat a defendant as a "publisher or speaker" of third-party content.[2] ⚑ *Dyroff,* 934 F.3d at 1097; ⚑ *Barnes,* 570 F.3d at 1100. We conclude that here the answer is no, because the Parents' claim turns on Snap's design of Snapchat.

**[6]** **[7]** In this particular context, "publication" generally "involve[s] reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content." ⚑ *HomeAway,* 918 F.3d at 681 (citation omitted). A defamation claim is perhaps the most obvious example of a claim that seeks to treat a website or smartphone application provider as a publisher or speaker, but it is by no means the only type of claim that does so. ⚑ *Barnes,* 570 F.3d at 1101–02; *see also* ⚑ *Doe v. Internet Brands, Inc.,* 824 F.3d 846, 851 (9th Cir. 2016). Thus, regardless of the type of claim brought, we focus on whether "the duty the plaintiff alleges" stems "from the defendant's status or conduct as a publisher or speaker." ⚑ *Barnes,* 570 F.3d at 1107.

Here, the Parents seek to hold Snap liable for its allegedly "unreasonable and negligent" design decisions regarding Snapchat. They allege that Snap created: (1) Snapchat; (2) Snapchat's Speed Filter; and (3) an incentive system within Snapchat that encouraged its users to pursue certain unknown achievements and rewards. The Speed Filter and the incentive system then supposedly worked in tandem **\*1092** to entice young Snapchat users to drive at speeds exceeding 100 MPH.

**[8]** The Parents thus allege a cause of action for negligent design—a common products liability tort. This type of claim rests on the premise that manufacturers have a "duty to exercise due care in supplying products that do not present an unreasonable risk of injury or harm to the public." Lewis

Prod.Liab.Rep. (CCH) P 21,155, 21 Cal. Daily Op. Serv. 4203...

Bass, *Prods. Liab.: Design & Mfg. Defects* § 2.5 (2d ed., Sept. 2020 Update). Thus, a negligent design action asks whether a reasonable person would conclude that "the reasonably foreseeable harm" of a product, manufactured in accordance with its design, "outweigh[s] the utility of the product." *Merrill v. Navegar, Inc.*, 26 Cal.4th 465, 110 Cal.Rptr.2d 370, 28 P.3d 116, 125 (2001) (citation omitted); *see also Morden v. Cont'l AG*, 235 Wis.2d 325, 611 N.W.2d 659, 674 (2000) (explaining that the relevant "duty of care requires manufacturers to foresee all reasonable uses and misuses and the consequent foreseeable dangers" of their products "and to act accordingly" (citation omitted)). [3]

The duty underlying such a claim differs markedly from the duties of publishers as defined in the CDA. Manufacturers have a specific duty to refrain from designing a product that poses an unreasonable risk of injury or harm to consumers. *See* Dan B. Dobbs et al., *Dobbs' Law of Torts* § 478 (2d ed., June 2020 Update). Meanwhile, entities acting solely as publishers—*i.e.*, those that "review[ ] material submitted for publication, perhaps edit[ ] it for style or technical fluency, and then decide[ ] whether to publish it," *Barnes*, 570 F.3d at 1102—generally have no similar duty. *See Dobbs' Law of Torts* § 478.

It is thus apparent that the Parents' amended complaint does not seek to hold Snap liable for its conduct as a publisher or speaker. Their negligent design lawsuit treats Snap as a products manufacturer, accusing it of negligently designing a product (Snapchat) with a defect (the interplay between Snapchat's reward system and the Speed Filter). Thus, the duty that Snap allegedly violated "springs from" its distinct capacity as a product designer. *Barnes*, 570 F.3d at 1107. This is further evidenced by the fact that Snap could have satisfied its "alleged obligation"—to take reasonable measures to design a product more useful than it was foreseeably dangerous—without altering the content that Snapchat's users generate. *Internet Brands*, 824 F.3d at 851. Snap's alleged duty in this case thus "has nothing to do with" its editing, monitoring, or removing of the content that its users generate through Snapchat. *Id.* at 852.

To the extent Snap maintains that CDA immunity is appropriate because the Parents' claim depends on the ability of Snapchat's users to use Snapchat to communicate their speed to others, it disregards our decision in *Internet Brands*. That Snap allows its users to transmit user-generated content to one another does not detract from the fact that the Parents seek to hold Snap liable for its role in violating its distinct duty to design a reasonably safe product. As in *Internet Brands*, Snap "acted as the 'publisher or speaker' of user content by" transmitting Landen's snap, "and that action could be described as a 'but-for' cause of [the boys'] injuries." 824 F.3d at 853. This is unsurprising: Snap "is an internet publishing business. Without **\*1093** publishing user content, it would not exist." *Id.* But though publishing content is "a but-for cause of just about everything" Snap is involved in, that does not mean that the Parents' claim, specifically, seeks to hold Snap responsible in its capacity as a "publisher or speaker." *Id.* The duty to design a reasonably safe product is fully independent of Snap's role in monitoring or publishing third-party content. [4]

Because the Parents' claim does not seek to hold Snap responsible as a publisher or speaker, but merely "seek[s] to hold Snapchat liable for its own conduct, principally for *the creation* of the Speed Filter," § 230(c)(1) immunity is unavailable. *Maynard v. Snapchat, Inc.*, 346 Ga.App. 131, 816 S.E.2d 77, 81 (2018) (emphasis added).

## C.

CDA immunity is also unavailable in this case because the Parents' negligent design claim does not turn on "information provided by another information content provider." *Barnes*, 570 F.3d at 1101.

**[9]**  By its plain terms, and as the last part of the *Barnes* test recognizes, § 230(c)(1) cuts off liability only when a plaintiff's claim faults the defendant for information provided by third parties. 47 U.S.C. § 230(c)(1). Thus, internet companies remain on the hook when they create or develop their own internet content. *See Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1162 (9th Cir. 2008) (en banc). And they also may face liability to the extent they are " 'responsible ... in part, for the creation or the development of' the offending content" on the internet. *Id.* at 1162 (quoting 47 U.S.C. § 230(f)

(3)); *see also* *Kimzey*, 836 F.3d at 1269 (asking whether a defendant "ma[de] a material contribution to the creation or development of [the] content" underlying a given claim).

This case presents a clear example of a claim that simply does not rest on third-party content. Snap indisputably designed Snapchat's reward system and Speed Filter and made those aspects of Snapchat available to users through the internet. *See* *Roommates*, 521 F.3d at 1168 (noting that the word "develop" in the CDA connotes "making usable or available"). And the Parents' negligent design claim faults Snap solely for Snapchat's architecture, contending that the app's Speed Filter and reward system worked together to encourage users to drive at dangerous speeds.

Notably, the Parents do not fault Snap in the least for publishing Landen's snap. Indeed, their amended complaint fully disclaims such a reading of their claim: "The danger is not the Snap [message using the Speed Filter] itself. Obviously, no one is harmed by the post. Rather, the danger is the speeding." AC ¶ 14. While we need not accept conclusory allegations contained in a complaint, we must nonetheless read the complaint in the light most favorable to the Parents. *See* *Dyroff*, 934 F.3d at 1096. And this statement reinforces our own reading of the Parents' negligent design claim as standing independently of the content that Snapchat's users create with the Speed Filter.

**\*1094** To sum up, even if Snap is acting as a publisher in releasing Snapchat and its various features to the public, the Parents' claim still rests on nothing more than Snap's "own acts." *Roommates*, 521 F.3d at 1165. The Parents' claim thus is not predicated on "information provided by another information content provider." *Barnes*, 570 F.3d at 1101.

 **[10]**  Each of Snap's novel attempts to expand CDA immunity beyond these straightforward principles is to no avail. To start, while providing content-neutral tools does not render an internet company a "creator or developer" of the downstream content that its users produce with those tools, our case law has never suggested that internet companies enjoy absolute immunity from all claims related to their content-neutral tools. *See* *Dyroff*, 934 F.3d at 1099; *Kimzey*, 836 F.3d at 1269–70; *Roommates*, 521 F.3d at 1175. To the contrary, "[t]he [CDA] was not meant to create a lawless no-man's-land on the Internet." *Roommates*, 521 F.3d at 1164. Those who

use the internet thus continue to face the prospect of liability, even for their "neutral tools," so long as plaintiffs' claims do not blame them for the content that third parties generate with those tools.

Next, the Parents' allegations concerning the Speed Filter and Snapchat's reward system are not a creative attempt to plead around the CDA. In the cases where such creative pleading has posed a concern, the plaintiff's claims, at bottom, depended on a third party's content, without which no liability could have existed. *See* *Dyroff*, 934 F.3d at 1096 (alleging defendant developed content because its website's "recommendation and notification functions were 'specifically designed to make subjective, editorial decisions about users based on their posts' "); *Kimzey*, 836 F.3d at 1269 (alleging defendant developed content when it integrated a third party's defamatory review "into its own 'advertisement' or 'promotion' on Google" using its "unique star-rating system"). However, as already explained, the Parents' claim does not depend on what messages, if any, a Snapchat user employing the Speed Filter actually sends. This is thus not a case of creative pleading designed to circumvent CDA immunity.

Last, Snap misunderstands the import of our statement in *Dyroff* that a website's "tools meant to facilitate the communication and content of others" were "not content in and of themselves." 934 F.3d at 1098. For even accepting that statement at face value, it does nothing to advance Snap's argument. It is by now clear that the Parents' negligent design claim does not turn on the content of Landen's particular snap. Thus, if Snapchat's Speed Filter and award system were not content for purposes of the CDA, then the Parents' negligence or negligent design claim would rest on no CDA "content" whatsoever, and Snap would still receive no immunity. After all, CDA immunity is available only to the extent a plaintiff's claim implicates third-party content. *See* 47 U.S.C. § 230(c)(1).

*\*\*\**

In short, Snap "is being sued for the predictable consequences of" designing Snapchat in such a way that it allegedly encourages dangerous behavior. *Roommates*, 521 F.3d at 1170. The CDA does not shield Snap from liability for such claims. *See* *Internet Brands*, 824 F.3d at 853 ("Congress

Prod.Liab.Rep. (CCH) P 21,155, 21 Cal. Daily Op. Serv. 4203...

has not provided an all purpose get-out-of-jail-free card for businesses that publish user content on the internet, though any claims might have a marginal chilling effect on internet publishing businesses.").

## IV.

**[11]** Snap has also urged us to affirm the district court's decision on the alternative **\*1095** ground that the Parents have failed to plead adequately in their amended complaint the causation element of their negligent design claim. Though we may affirm on any ground supported by law, we decline to exercise that discretion here for three reasons. *Upper Skagit Indian Tribe v. Lundgren*, —— U.S. ——, 138 S. Ct. 1649, 1654, 200 L.Ed.2d 931 (2018).

**[12]** First, the district court dismissed the Parents' amended complaint based "entirely on the CDA[,] and we refrain from deciding an issue that the district court has not had the opportunity to evaluate." *Roommates*, 521 F.3d at 1175 n.40. Second, the district court stated when it dismissed the Parents' amended complaint that it would ordinarily have granted leave to amend, but it declined to do so based on its belief that the Parents could not surmount the issue of CDA immunity. It thus appears the district court would have granted further leave to amend if the sole defect in the Parents' amended complaint was a mere failure to plead legal causation. Third, the district court has yet to decide whether there exists a conflict between Wisconsin and California law on the issue of legal causation. Nor has it decided, in the event there is such a conflict, which state's law governs that claim. *See generally Cooper v. Tokyo Elec. Power Co. Holdings, Inc.*, 960 F.3d 549, 559 (9th Cir. 2020) (laying out the relevant analytic framework), *cert. denied sub nom. Cooper v. TEPCO*, No. 20-730, —— U.S. ——, 141 S.Ct. 1735, —— L.Ed.2d —— (U.S. Mar. 29, 2021).

## V.

For these reasons, we **REVERSE** the district court's dismissal of the Parents' amended complaint on the ground of immunity under 47 U.S.C. § 230(c)(1) and **REMAND** this matter for further proceedings consistent with this opinion.

**All Citations**

995 F.3d 1085, Prod.Liab.Rep. (CCH) P 21,155, 21 Cal. Daily Op. Serv. 4203, 2021 Daily Journal D.A.R. 4358

## Footnotes

\*    The Honorable James David Cain, Jr., United States District Judge for the Western District of Louisiana, sitting by designation.

1    The statute defines an "interactive computer service" as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet ...." 47 U.S.C. § 230(f)(2). Meanwhile, an "information content provider" is "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." *Id.* § 230(f)(3).

2    The district court and the parties have, at various times, suggested that this aspect of the *Barnes* test is undisputed. Having parsed the Parents' arguments and citations before both our court and the district court, we do not agree. Though those arguments could have benefited from greater analytic exposition, the Parents have sufficiently preserved this issue for our review. In any event, it is within our discretion to reach this issue. *See In re Mercury Interactive Corp. Secs. Litig.*, 618 F.3d 988, 992 (9th Cir. 2010) (noting we may exercise our discretion in this regard when "the issue presented is purely one of law and ... does not depend

Prod.Liab.Rep. (CCH) P 21,155, 21 Cal. Daily Op. Serv. 4203...

on the factual record developed below" (citation omitted)). We exercise that discretion here, given that Snap addressed this issue both in its answering brief and before the district court.

3    The parties have agreed that the tort law of either California or Wisconsin governs in this case. *See generally* Restatement (Second) of Torts § 398 (1965) ("A manufacturer of a chattel made under a plan or design which makes it dangerous for the uses for which it is manufactured is subject to liability to others whom he should expect to use the chattel or to be endangered by its probable use for physical harm caused by his failure to exercise reasonable care in the adoption of a safe plan or design.").

4    Nor would proving causation through the snap that Landen sent shortly before his death implicate 🚩 § 230(c)(1) immunity, because the Parents do not fault Snap for publishing that photo message. Instead, that snap merely suggests, as circumstantial evidence, that the alleged negligent design of Snapchat had the very causal effect that the Parents' otherwise allege. By contrast, we note that the Parents would not be permitted under 🚩 § 230(c)(1) to fault Snap for publishing other Snapchat-user content (*e.g.*, snaps of friends speeding dangerously) that may have incentivized the boys to engage in dangerous behavior. For attempting to hold Snap liable using such evidence would treat Snap as a publisher of third-party content, contrary to our holding here. *See* Section III.C. *infra*.

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.



# READING SECTION 230 AS WRITTEN

*Adam Candeub*[*]

Section 230 of the Communications Decency Act gives internet platforms legal protection for content moderation. Even though the statute is 25 years old, courts have not clearly stated which provision within section 230 protects content moderation. Some say section 230(c)(1), others section 230(c)(2). But section 230(c)(1) speaks only to liability arising from third-party content, codifying common carriers' liability protection for delivering messages.

And while section 230(c)(2) addresses content moderation, its protections extend only to content moderation involving certain types of speech. All content moderation decisions for reasons not specified in section 230(c)(2), such as based on material being considered "hate speech," "disinformation," or "incitement," stand outside section 230's protections. More important, because section 230(c)(2) regulates both First Amendment protected and unprotected speech, it does raise constitutional concerns, but they may not be fatal.

Introduction ............................................................................................. 140

I.     Section 230 and Congressional Purpose ....................................... 142

II.    The Relationship Between Sections 230(c)(1) & 230(c)(2) .......... 145

III.   The Relationship Between Sections 230(c)(1) & 230(f)(3) ........... 151

IV.    Interpreting Section 230(c)(1) ...................................................... 154

V.     Interpreting Section 230(c)(2) ...................................................... 159

---

[*] Professor of Law, Michigan State University College of Law (candeub@msu.edu). Many thanks to the participants in the Journal of Free Speech Law inaugural symposium, in particular Eugene Volokh for his superb advice and input.

VI.   The Constitutionality of Section 230(c)(2) ................................................. 160

    A.   Non-Ejusdem Generis Reading ............................................................ 160

        1.   "Otherwise objectionable": objective reading ............................ 160

        2.   "Otherwise objectionable": subjective reading ......................... 161

    B.   Ejusdem Reading .................................................................................. 166

        1.   Section 230 as content-based restriction on protected speech . 166

        2.   Viewpoint-neutral but content-based regulation and section 230 ................................................................................................. 171

Conclusion ............................................................................................................ 172

## INTRODUCTION

Those who want the dominant internet platforms to impose greater restrictions on expression often claim, "Freedom of speech is not freedom of reach."[1] The slogan asks social media platforms to refrain from amplifying hurtful, threatening, or otherwise injurious speech. The slogan's supporters do not appear to call for censorship—but only for social media to limit the ability to spread ideas they find dangerous or objectionable through the platforms' content moderation and promotion policies.

An alternative vision posits that democratic deliberation needs an agora, a place where citizens can discuss views in a free and open way, approaching each other as equals. Social media is, as the Supreme Court has declared, the "public square"[2] and therefore should afford a place for all citizens to engage in political debate *with a relatively equal opportunity for reach.* Dominant social media firms that have the power to control public discourse should refrain from censoring controversial or threatening ideas. Otherwise, political discussion devolves into something analogous to Karl Wittfogel's "beggar's democracy," in which we are free to discuss only

---

[1] *See, e.g.,* Renee Diresta, *Free Speech Is Not the Same As Free Reach,* WIRED (Aug. 30, 2018), https://tinyurl.com/ysfcrddx; Andrew Pulver, *Sacha Baron Cohen: Facebook Would Have Let Hitler Buy Ads for 'Final Solution,'* THE GUARDIAN (Nov. 22, 2019), https://tinyurl.com/ec33e3ed.

[2] Packingham v. North Carolina, 137 S. Ct. 1730, 1732 (2017) ("Social media . . . are the principal sources for knowing current events, checking ads for employment, speaking and listening in the modern public square, and otherwise exploring the vast realms of human thought and knowledge.").

those matters about which the Big Tech oligarchs care little.[3]

Section 230 of the Communications Decency Act limits platforms' legal liability for the content moderation policies they impose. How courts apply this provision will advance one, or the other, vision of the internet.

Even though the statute is 25 years old, courts disagree as to which provision in section 230 protects content moderation. Some conclude that section 230(c)(1) provides such protection.[4] But section 230(c)(1) speaks only to liability arising from third-party content, codifying common carriers' liability protection for the messages they deliver. Its text says nothing about platforms' *own* moderation. In his statement concerning a denial of certiorari, the only Supreme Court statement on section 230 to date, Justice Thomas has recognized how interpreting section 230 to cover content moderation departs from the statutory text.[5]

Rather, section 230(c)(2) protects content moderation, but only content moderation involving speech of the types it lists. As is argued in *Interpreting 47 U.S.C. § 230(c)(2)* (published in this volume),[6] this list should be read under the *ejusdem generis* canon of statutory construction and refers to categories of speech considered regulable in 1996, the year Congress wrote the statute. Restrictions based on justifications not specified in section 230(c)(2)—such as that certain posts constitute "hate speech," "disinformation," or "incitement" which do not reach the level of criminal behavior—stand outside section 230's protections.

Reading section 230(c)(2) as written poses a question that courts have ignored,

---

[3] Karl Wittfogel, Oriental Despotism, A Comparative Study of Total Power 125–26 (1957).

[4] *See, e.g.,* Levitt v. Yelp! Inc., No. C-10-1321 EMC, 2011 WL 5079526, at *6 (N.D. Cal. Oct. 26, 2011), *aff'd*, 765 F.3d 1123 (9th Cir. 2014); *see* Eric Goldman, Internet Law: Cases & Materials 298 (2021), https://perma.cc/KVX9-7ENN

[5] Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC, 141 S. Ct. 13, 16 (2020) (Thomas, J., respecting the denial of certiorari) ("Courts have also departed from the most natural reading of the text by giving Internet companies immunity for their own content. Section 230(c)(1) protects a company from publisher liability only when content is 'provided by another information content provider.' . . . But from the beginning, courts have held that § 230(c)(1) protects the 'exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content.'").

[6] Adam Candeub & Eugene Volokh, *Interpreting 47 U.S.C. § 230(c)(2)*, 1 J. Free Speech L. 175 (2021).

largely because most content moderation cases have been decided under section 230(c)(1): Is Section 230(c)(2) an unconstitutional, content-based regulation of speech? This Article provides some tentative answers to that question.

The article proceeds as follows. Part I describes the well-known history that led to section 230's passage. Drawing on this history, as well as a textual analysis, Part II sets forth the most natural understanding of sections 230(c)(1) and (c)(2): the former limits platform liability for third party content and the latter limits platform liability for content moderation. This section critiques courts that have expanded section 230(c)(1) to include content moderation protection. Part III examines the relationship between sections 230(c)(1) and (f)(3). Parts IV and V set forth textual analyses of sections 230(c)(1) and (c)(2) respectively. (Part V briefly summarizes the analysis from *Interpreting 47 U.S.C. § 230(c)(2)*.) Part VI analyzes the constitutionality of section 230(c)(2), first under a non-*ejusdem generis* reading and then an *ejusdem generis* reading. Given precedent's lack of clarity, the Article concludes tentatively that even in the unlikely event that section 230 is ruled unconstitutional, severability would be the best remedy.

## I.   Section 230 and Congressional Purpose

Congress passed section 230 as part of the Communications Decency Act of 1996 (CDA), an effort to control pornography and other non-family-friendly material on the internet. As opposed to the outright speech bans in the CDA that were struck down in *Reno v. ACLU*,[7] section 230 aimed to empower parents to control internet content. It did so, in part, by overruling a New York state case, *Stratton Oakmont v. Prodigy*.[8] Early platforms, such as Prodigy and its numerous bulletin boards, claimed they could not offer porn-free environments because of *Stratton Oakmont*. Developing the common law of defamation, the court had ruled that Prodigy was a "publisher" for all statements on its bulletin board (and thus potentially liable for those statements) because it content-moderated posts to render its forum "family friendly."

*Stratton Oakmont*'s legal conclusion created a Hobson's choice for platforms' content moderation: either moderate content and face liability for all posts on your bulletin board, or don't moderate and have posts filled with obscenity or naked images. That legal rule was hardly an incentive for platforms to create family-friendly

---

[7] Reno v. ACLU, 521 U.S. 844, 859 n.25 (1997).

[8] 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995).

online environments.

Congress came to the rescue with section 230(c)(2),[9] which states that all internet platforms "shall not be held liable" for editing to remove content that they consider to be "obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable."[10] Congress eliminated the Hobson's choice: when platforms content-moderate for these specific reasons, they would no longer be held liable for everything on their site.

Notice what section 230's text does *not do:* give platforms protection for content moderation for any reason not specified in section 230(c)(2). That would include "disinformation," "hate speech," "misgendering," "religious hatred," or for that matter the traffic prioritizations the platforms perform to give people content they want. Yet, some courts have blessed such an untextual expansion,[11] which is only possible under an all-inclusive reading of "otherwise objectionable" that seems implausible.[12]

Not only is the text silent about content moderation for such a broad range of reasons, but the legislative history is too. Representatives Christopher Cox and Ron Wyden floated a bill, titled "Internet Freedom and Family Empowerment Act,"[13]

---

[9] 47 U.S.C. § 230(c)(2); 141 Cong. Rec. S8310–03 (daily ed. June 14, 1995) (statement of Sen. Coats) ("I want to be sure that the intent of the amendment is not to hold a company who tries to prevent obscene or indecent material under this section from being held liable as a publisher for defamatory statements for which they would not otherwise have been liable . . . . Am I further correct that the subsection (f)(4) defense is intended to protect companies from being put in such a catch-22 position? If they try to comply with this section by preventing or removing objectionable material, we don't intend that a court could hold that this is assertion of editorial content control, such that the company must be treated under the high standard of a publisher for the purposes of offenses such as libel."); 141 Cong. Rec. H8470 (daily ed. Aug. 4, 1995) (statement of Rep. Cox, referring to *Stratton* decision as "backward"); 141 Cong. Rec. H8471 (daily ed. Aug. 4, 1995) (statement of Rep. Goodlatte, criticizing *Stratton* decision).

[10] The question of whether "otherwise objectionable" should be understood as an open-ended term is examined in Candeub & Volokh, *supra* note 6.

[11] See, e.g., Fed. Agency of News LLC, et al. v. Facebook, Inc., 395 F. Supp. 3d 1295 (N.D. Cal. 2019) (dismissing discrimination claims under Title II and 42 U.S.C. § 1983); Sikhs for Justice "SFJ", Inc. v. Facebook, Inc., 144 F. Supp. 3d at 1095–96 (N.D. Cal. 2015) (holding that section 230 bars discrimination claims).

[12] *See* Candeub & Volokh, *supra* note 6.

[13] Internet Freedom and Family Empowerment Act, H.R. 1978, 104th Cong. (1995–96).

that became section 230.[14] It was an alternative to Senator J. James Exon's bill that criminalized the transmission of indecent material to minors, which was codified in section 223.[15] Both became part of the Communications Decency Act, but the Supreme Court struck down Senator Exon's portion, leaving section 230.[16]

In comments on the House floor, Representative Cox explained that section 230 would reverse *Stratton Oakmont* and advance the regulatory goal of allowing families greater power to control online content, protecting them from "offensive material, some things in the bookstore, if you will that our children ought not to see. . . . I want to make sure that my children have access to this future and that I do not have to worry about what they might running into online. I would like to keep that out of my house and off of my computer. How should we do this?"[17] He stated that "[w]e want to encourage [internet services] . . . to everything possible for us, the customer, to help us control, at the portals of our computer, at the front door of our house, what comes in and what our children see."[18]

In fact, the comments in the Congressional record from *every* supporting legislator—and it received strong bipartisan support—reveal an understanding that the Online Family Empowerment amendment, now codified as section 230, was a

---

[14] Robert Cannon, *The Legislative History of Senator Exon's Communications Decency Act: Regulating Barbarians on the Information Superhighway*, 49 FED. COMM. L.J. 51, 69 (1996).

[15] *Id.*; Felix T. Wu, *Collateral Censorship and the Limits of Intermediary Immunity*, 87 NOTRE DAME L. REV. 293, 316 (2011); 141 Cong. Rec. H8468–69 (daily ed. Aug. 4, 1995). The Supreme Court declared unconstitutional Senator Exon's part of the CDA. *See* Ashcroft v. ACLU, 535 U.S. 564, 564 (2002) ("This Court found that the Communications Decency Act of 1996 (CDA)—Congress' first attempt to protect children from exposure to pornographic material on the Internet—ran afoul of the First Amendment in its regulation of indecent transmissions and the display of patently offensive material. That conclusion was based, in part, on the crucial consideration that the CDA's breadth was wholly unprecedented.").

[16] Reno v. ACLU, 521 U.S. 844, 859 n.24 (1997) ("Some Members of the House of Representatives opposed the Exon Amendment because they thought it 'possible for our parents now to child-proof the family computer with these products available in the private sector.' They also thought the Senate's approach would 'involve the Federal Government spending vast sums of money trying to define elusive terms that are going to lead to a flood of legal challenges while our kids are unprotected.' These Members offered an amendment intended as a substitute for the Exon Amendment, but instead enacted as an additional section of the Act entitled 'Online Family Empowerment.'").

[17] 141 Cong. Rec. H8469 (daily ed. Aug. 4, 1995) (statement of Rep. Cox).

[18] *Id.* at H8470.

non-regulatory approach to protecting children from pornography and other material perceived to be harmful that the federal government *already* regulated.[19]

## II.   The Relationship Between Sections 230(c)(1) & 230(c)(2)

Both section 230's text and congressional intent target a narrow set of harms: pornography, indecency, and other material considered regulable at the time. This understanding undermines the claim that section 230 claims must be read "broadly" as a seminal charter of online internet immunity carefully considered by Congress. Certain legislators, decades later, may make claims to that effect.[20] And some commentators have echoed these post hoc claims.[21] But, as the Supreme

---

[19] 141 Cong. Rec. H8470 (daily ed. Aug. 4, 1995) (statement of Rep. Wyden) ("We are all against smut and pornography . . . . [rather] than give our Government the power to keep offensive material out the hands of children . . .We have the opportunity to build a 21st century policy for the Internet employing . . . the private sector"); 141 Cong. Rec. H8470 (daily ed. Aug. 4, 1995) (statement of Rep. Danner) ("I strongly support . . . address[ing] the problem of children having untraceable access through on-line computer services to inappropriate and obscene pornography materials available on the Internet"); 141 Cong. Rec. H8471 (daily ed. Aug. 4, 1995) (statement of Rep. White) ("I have got small children at home. . . . I want to be sure can protect them from the wrong influences on the Internet."); *id.* (statement of Rep. Lofgren) ("[The Senate approach] will not work. It is a misunderstanding of the technology. The private sector is out giving parents the tools that they have. I am so excited that there is more coming on. I very much endorse the Cox-Wyden amendment"); *id.* (statement of Rep. Goodlatte) ("Congress has a responsibility to help encourage the private sector to protect our children from being exposed to obscene and indecent material on the Internet"); *id.* (statement of Rep. Markey) (supporting the amendment because it "deals with the content concerns which the gentlemen from Oregon and California have raised"); *id.* (statement of Rep. Fields) (congratulating the legislators for "this fine work").

[20] Ron Wyden, *I Wrote This Law to Protect Free Speech. Now Trump Wants to Revoke It*, CNN Business Perspectives (June 9, 2020), https://tinylink.net/4KNX2 ("Republican Congressman Chris Cox and I wrote Section 230 in 1996 to give up-and-coming tech companies a sword and a shield, and to foster free speech and innovation online. Essentially, 230 says that users, not the website that hosts their content, are the ones responsible for what they post, whether on Facebook or in the comments section of a news article. That's what I call the shield. But it also gave companies a sword so that they can take down offensive content, lies and slime—the stuff that may be protected by the First Amendment but that most people do not want to experience online."); Jeff Kosseff, The Twenty-Six Words That Created the Internet 64 (2019) (quoting a June 2017 interview with Ron Wyden, in which he says, "We really were interested in protecting the platforms from being held liable for the content posted on their sites and being sued out of existence").

[21] As an example, Jeff Kosseff's The Twenty-Six Words That Created the Internet

Court says, "Post-enactment legislative history (a contradiction in terms) is not a legitimate tool of statutory interpretation."[22]

While section 230(c)(2) dominated the legislative discussion, section 230(c)(1) has dominated judicial decisions.[23] Section 230(c)(1) eliminates internet platforms' "publisher or speaker" liability for the third-party user content they post. It states, "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."[24] In short, it treats internet platforms as conduits, such as the telephone or telegraph companies. Unlike publishers, these entities do not face strict liability under common law for the content they carry.

And section 230(c)(1), though *not* the focus of legislative attention as evidenced from the legislative history, makes good sense as written. Early platforms, such as AOL and Prodigy, would have been crushed with the legal liability of having to review all posts. Section 230(c)(1) said they were not liable for third party content—and Section 230(c)(2) said they would not become so even if they edited such content for certain, enumerated reasons. Thus, Section 230(c)(1) ratified and expanded on *Cubby v. Compuserve*, an early internet opinion that ruled that because Compuserve did not moderate or edit content, Compuserve had no liability for user posts.[25]

In a manner roughly analogous to the liability protections extended to conduits and common carriers, such as telegraphs and telephones,[26] section 230(c)(1)

---

recounts the legislative history of section 230, arguing that its motivation was to counter pornography and duly footnoting the legislative history. However, when the book goes on to claim that Section 230 sought to protect online actors from crushing liability, it cites to post-enactment claims by legislators. See *id.* ch. 3 ("Chris and Ron Do Lunch") and accompanying footnotes.

[22] Bruesewitz v. Wyeth LLC, 562 U.S. 223, 242 (2011).

[23] *See* Elizabeth Banker, Internet Ass'n, *A Review of Section 230's Meaning & Application Based on More Than 500 Cases* (July 27, 2020), https://perma.cc/4B7B-U88S.

[24] 47 U.S.C. § 230(c)(1).

[25] Cubby, Inc. v. CompuServe Inc., 776 F. Supp. 135 (S.D.N.Y. 1991).

[26] Telegraph companies generally had no liability for the statements they transmitted, but they could be liable if they acted with malice or with knowledge that the sender was not privileged to make the statement. *See* RESTATEMENT (SECOND) OF TORTS § 612(2); Mason v. Western Union Tel. Co., 125 Cal. Rptr. 53, 56 (1975); Figari v. New York Tel. Co., 303 N.Y.S.2d 245, 259 (1969); Western

removes liability for causes of action that include, in their elements, treating the "interactive computer service," *i.e.,* platform, as a publisher or speaker of another's words. The classic example is defamation: A Facebook user posts a defamatory statement, and the defamed plaintiff sues Facebook on the theory that, by allowing the post to stay up on its site, Facebook acted as a publisher of the post. The plaintiff's cause of action would include an element that treats the platform as "a publisher or speaker" of the user's words. Section 230(c)(1) would bar the action against Facebook, leaving the only action available to the plaintiff to be one against the user. Section 230(c)(1) thereby allowed AOL and Prodigy to run bulletin boards without the potential liability risk that hosting millions of user generated posts presents.

Taken together, both section 230's text and legislative history point to the same interpretation: Section 230(c)(1) allows platforms to accept posts from their users without liability for such speech, i.e., the situation in *Cubby*. It generally shields platforms for liability created by speech that the platform hosts. Section 230(c)(2), in turn, protects platforms that want to content-moderate, giving them protection when removing, editing, or blocking third-party, user-generated content for certain enumerated reasons:[27]

---

Union Tel. Co. v. Lesesne, 182 F.2d 135, 137 (4th Cir. 1950); Von Meysenbug v. Western Union Tel. Co., 54 F. Supp. 100, 101 (S.D. Fla. 1946); O'Brien v. Western Union Tel. Co., 113 F.2d 539 (1st Cir. 1940); Klein v. Western Union Tel. Co., 13 N.Y.S.2d 441, 443 (App. Div. 1939); Peterson v. W. Union Tel. Co., 65 Minn. 18, 23 (1896); Annotation, *Liability of Telegraph or Telephone Company for Transmitting or Permitting Transmission of Libelous or Slanderous Messages*, 91 A.L.R.3d 1015 (1979).

It is often said that telephone companies have absolute immunity. Cases support this claim, *see* Anderson v. New York Tel. Co., 320 N.E.2d 647 (1974), and the Restatement of Torts also reaches this conclusion. RESTATEMENT (SECOND) OF TORTS § 581 cmt. b (1976). *Anderson* reasons that because telephone companies have an obligation to carry all messages, they should not be liable for them. But common carriage law predating *Anderson* and comprehensive public utility regulation took a different approach, reasoning that, because companies have the right to refuse unlawful messages, they are liable for their *knowing* transmission. Godwin v. Carolina Tel. & Tel. Co., 136 N.C. 258, 48 S.E. 636, 637 (1904); Application of Manfredonio, 183 Misc. 770, 770–71, 52 N.Y.S.2d 392, 392 (Sup. Ct. 1944); Lesesne v. Willingham, 83 F. Supp. 918, 924 (E.D.S.C. 1949); Bruce Wyman, *Illegality As an Excuse for Refusal of Public Service*, 23 HARV. L. REV. 577, 584–85 (1910); *see also* O'Brien v. W.U. Tel. Co., 113 F.2d 539, 543 (1st Cir. 1940) (so suggesting).

[27] This view of section 230(c)(1) has been explored in greater detail elsewhere. *See* Adam

| Section | Legal Protection |
|---------|------------------|
| 230(c)(1) | No liability as publishers based on third-party posts |
| 230(c)(2) | No liability for content-moderating obscene, lewd, lascivious, filthy, excessively violent, and harassing content, and similar content |
| Not covered | No immunity for liability (if some cause of action so provides) for content-moderating types of speech not mentioned in 230(c)(2) |

Some courts have taken a different approach, holding that section 230 bars "lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content."[28] That language has been quoted extensively.[29]

The language comes from the influential *Zeran* case, but many courts forget the *immediately preceding* language. To quote *Zeran* fully, section 230

> creates a federal immunity to any cause of action that would make service providers *liable for information originating with a third-party user of the service*. Specifically, § 230 precludes courts from entertaining claims that would place a computer service provider in a publisher's role. Thus, lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content—are barred.[30]

The "traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content" are examples of third-party content decisions that section 230 protects. It does not protect platform as to their *own* editorial decisions or judgments.

When quoted out of context, the "its" would seem to suggest that section 230 immunizes the platform's publisher role. But this is an example of sloppy drafting and an imprecise pronoun antecedent, as the sentence prior speaks of "information

---

Candeub, *Bargaining for Free Speech: Common Carriage, Network Neutrality, and Section 230,* 22 Yale J. L. & Tech. 391, 429 (2020); Edward Lee, *Moderating Content Moderation: A Framework for Nonpartisanship in Online Governance*, 70 Am. U. L. Rev. 913, 945–62 (2021).

[28] Zeran v. Am. Online, Inc., 129 F.3d 327, 330 (4th Cir. 1997).

[29] According to a Westlaw search, at least 98 cases quote the language directly from *Zeran.* That count probably underestimates the influence of the language, because the quotation appears in other cases that are themselves quoted.

[30] Barrett v. Rosenthal, 146 P.3d 510, 516 (Cal. 2006) (quoting *Zeran*, 129 F.3d at 330) (emphasis added).

originating with a third-party user of the service."

Numerous courts mischaracterize the *Zeran* language and interpret section 230 as immunizing platforms' *own editorial decisions.* To take a typical example, in *Levitt v. Yelp!,* the plaintiff alleged that Yelp! "manipulate[d] . . . review pages—by removing certain reviews and publishing others or changing their order of appearance."[31] The *Levitt* plaintiffs argued that Yelp!'s behavior constituted unfair or fraudulent business under Cal. Bus. & Prof. Code § 17200. But the elements of the unfair or fraudulent business practices law have nothing to do with speaking or publishing third party content. Rather, they ask whether Yelp! engaged in an "unlawful, unfair or fraudulent business act or practice" or an "unfair, deceptive, untrue or misleading advertising and any act."

Ignoring this straightforward analysis, the court ruled that section 230(c)(1) immunized Yelp!'s conduct, supporting its conclusion by quoting the "traditional editorial functions" language of *Zeran.*[32] But notice the court's confusion here: Yelp! allegedly made changes and conscious re-arrangements to reviews in violation of its representations to users and customers—plaintiffs sought to make Yelp! accountable for *its own* editorial decisions and false representations.

The *Levitt* court's reading of section 230(c)(1) would protect platforms from contract, consumer fraud or even civil rights claims, freeing them to discriminate against certain users and throw them off their platforms. Courts are thus relying upon Section 230 to immunize platforms for their own speech and actions—from

---

[31] Levitt v. Yelp! Inc., No. C-10-1321 EMC, 2011 WL 5079526, at *6 (N.D. Cal. Oct. 26, 2011), *aff'd*, 765 F.3d 1123 (9th Cir. 2014).

[32] *Id.*

contract liability with their own users,[33] their own consumer fraud,[34] their own violation of users' civil rights,[35] and even assisting in terrorism.[36]

The only statement by a Supreme Court Justice on section 230 recognized the error of reading section 230(c)(1) to include a platform's "editorial functions." In his statement respecting the denial of certiorari, Justice Thomas strongly criticized "construing § 230(c)(1) to protect any decision to edit or remove content." He realized that, for instance, "[w]ith no limits on an Internet company's discretion to take down material, § 230 now apparently protects companies who racially discriminate in removing content."[37]

---

[33] Caraccioli v. Facebook, Inc., 167 F. Supp. 3d 1056, 1066 (N.D. Cal. 2016) (stressing that "the immunity bestowed on interactive computers service providers by § 230(c) prohibits all of Plaintiff's claims [including contract claims] against Facebook"), *aff'd*, 700 F. App'x 588 (9th Cir. 2017); Lancaster v. Alphabet Inc., No. 15-CV-05299-HSG, 2016 WL 3648608, at *5 (N.D. Cal. July 8, 2016) (finding that, where "plaintiff[s] asserting breach of the implied covenant of good faith and fair dealing sounding in contract," "CDA precludes any claim seeking to hold Defendants liable for removing videos from Plaintiff's YouTube channel"); Fed. Agency of News LLC v. Facebook, Inc., 395 F. Supp. 3d 1295, 1307–08 (N.D. Cal. 2019) (asserting that CDA "immunizes Facebook from . . . the fourth cause of action for breach of contract [between plaintiff and Facebook]").

[34] Gentry v. eBay, Inc., 99 Cal. App. 4th 816, 836 (2002) (interpreting that "Appellants' UCL cause of action is based upon . . . [the claim] that eBay misrepresented the forged collectibles offered for sale in its auctions").

[35] Sikhs for Justice "SFJ", Inc., 144 F. Supp. 3d 1088, 1094–95 (N.D. Cal. 2015).

[36] Force v. Facebook, Inc., 934 F.3d 53, 57 (2d Cir. 2019).

[37] Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC, 141 S. Ct. 13, 17 (2020). Goldman & Miers collect cases "show[ing] that Internet services have won essentially all of the lawsuits to date brought by terminated/removed users. Accordingly, Internet services currently have unrestricted legal freedom to make termination/removal decisions." Eric Goldman & Jess Miers, *Online Account Terminations/Content Removals and the Benefits of Internet Services Enforcing Their House Rules*, 1 J. FREE SPEECH L. 191, 192 (2020). It is worth observing that most of the removals in the dataset have been under section 230(c)(1), supporting Justice Thomas's concern that this provision has been overread; the text is clear that section 230(c)(2) controls removals. Judges across the country are expressing misgiving similar to Justice Thomas's. *See* In re Facebook, Inc., __ S.W.3d __, 2021 WL 2603687, at *7 (Tex. June 25, 2021) ("We agree that Justice Thomas's recent writing lays out a plausible reading of section 230's text."); Force v. Facebook, Inc., 934 F.3d 53, 77 (2d Cir. 2019) (Katzman, C.J., dissenting) ("Instead, we today extend a provision that was designed to encourage computer service providers to shield minors from obscene material so that it now immunizes those same providers for allegedly connecting terrorists to one another. Neither the impetus for nor the text of § 230(c)(1) requires such a result.").

Similarly, in a recent statement, the Ninth Circuit in *Lemmon v. Snap* made clear that section 230(c)(1) only protects against claims that include speaking or publishing third party content and does not protect against claims merely involving a platform's "editorial functions." Clarifying the applicable law, the *Lemmon* court stated that section 230 only protects a defendant internet platform if the claims seek to treat the platform, "*under a state law cause of action, as a publisher or speaker . . . of information provided by another information content provider.*"[38] This makes clear that section 230(c)(1) only applies to causes of action which contain as elements publishing or speaking third party information, such as defamation and criminal threat.

Last, reading section 230(c)(1) to protect content moderation reads section 230(c)(2) out of the statute. If section 230(c)(1) protects "editorial functions," that includes the removals and content moderation that section 230(c)(2) addresses. Reading one provision of a statute to render another superfluous violates the canon against surplusage, a basic rule of statutory construction. As the Supreme Court has held, "[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant."[39] The Court emphasizes that the canon "is strongest when an interpretation would render superfluous another part of the same statutory scheme."[40] Here, the expansive *Zeran* reading of section 230(c)(1) renders superfluous section 230(c)(2), the immediately succeeding provision. Justice Thomas has recognized this point.[41]

## III.    THE RELATIONSHIP BETWEEN SECTIONS 230(C)(1) & 230(F)(3)

Section 230(f)(3) as well as section 230(c)(2) constrains the scope of section 230(c)(1), a point Justice Thomas recognized in *Malwarebytes*.[42] But courts have

---

[38] Lemmon v. Snap, Inc., 995 F.3d 1085, 1091 (9th Cir. 2021) (emphasis added) (quoting Dyroff v. Ultimate Software Grp., Inc., 934 F.3d 1093, 1097 (9th Cir. 2019), and Barnes v. Yahoo!, Inc., 570 F.3d 1096, 1100–01 (9th Cir. 2009)).

[39] Corley v. United States, 556 U.S. 303, 314 (2009) (quoting Hibbs v. Winn, 542 U.S. 88, 101 (2004)).

[40] Marx v. Gen. Revenue Corp., 568 U.S. 371, 386 (2013).

[41] Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC, 141 S. Ct. 13, 17 (2020) (Thomas, J., respecting the denial of certiorari) (citing e-ventures Worldwide, LLC v. Google, Inc., 2017 WL 2210029, *3 (M.D. Fla. Feb. 8, 2017) (rejecting the interpretation that § 230(c)(1) protects removal decisions because it would "swallow[] the more specific immunity in (c)(2)").

[42] *Id.* at 16–19.

*Journal of Free Speech Law*          [2021]

not carefully explained the relationship between these sections, as the recent *Gonzales* case (discussed below) indicates. A proper understanding of section 230(f)(3) would limit a platform's protections under section (c)(1) against liability for third-party content, although concededly the statutory text does not define a sharp line between the provisions.

Section 230(f)(3) defines an "internet content provider" as "any person or entity that is responsible, in whole or in part, for the creation or development of information."[43] The term "interactive computer service" is defined as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions."[44] Section 230(c)(1) only protects "interactive computer services," and internet content providers do not receive section 230(c)(1) protection. Putting these provisions together, if an interactive computer service creates "in whole or part" content then it becomes an internet content provider, at least with respect to that content—and stands outside section 230(c)(1) protection.

While the mere deletion of a comment here or there likely does not constitute content creation or development, some types of content moderation do. Moderating and editing which, pursuant to a distinct plan or policy, change or shape the nature of online discussion likely cross the line into content creation. As a starting principle, an anthology editor does create or develop content when he selects certain works to publish or promote. Similarly, an editor that moderates content pursuant to a clear plan or bias creates content. For example, Thomas Bowdler developed content when he moderated the content of Shakespeare's plays to make them more acceptable to Victorian audiences.

Analogously, imposing complex content moderation regimes for acceptable posting very well might be closer to bowdlerizing than to deleting the odd comment. This would be particularly the case if the content moderation regime had biases that promoted or retarded certain types of discussions even in subtle ways—as social media critics allege. And, if so, then the platforms, when they engage in content moderation, are internet content providers that lack section 230(c)(2)

---

[43] 47 U.S.C. § 230(f)(3).

[44] 47 U.S.C. § 230(f)(2).

protections because they are content creators under section 230(f)(3).

But the line between editing a few comments and Thomas Bowdler is not clear, and very few courts have attempted to draw the line. Courts have proposed differing tests, most influentially in the Ninth Circuit in *Fair Housing Council of San Fernando Valley v. Roommates.Com*. There, the court found that "[b]y requiring subscribers to provide the information as a condition of accessing its service, and by providing a limited set of pre-populated answers, Roommate becomes much more than a passive transmitter of information."[45] The court reasoned that, by requiring information from users that other users could use to make discriminatory judgments, the platform became a content creator and potentially liable under anti-discrimination laws. Other courts reason that a platform that makes a "material contribution" to online material becomes an internet content provider, leaving much vagueness as to how to define "material contribution."[46]

A recent case, *Gonzalez v. Google LLC,*[47] demonstrates the difficulty—and indeed perils—of drawing the line. The case involved allegations that internet platforms contributed to or promoted terrorist activity in violation of the Anti-Terrorism Act (ATA).[48] Plaintiffs alleged that "Google uses computer algorithms to match and suggest content to users based upon their viewing history. . . . [I]n this way, Google has 'recommended ISIS videos to users' and enabled users to 'locate other videos and accounts related to ISIS,' and that by doing so, Google assists ISIS in spreading its message."[49]

In *Gonzales*, over a vigorous and insightful dissent, the court distinguished *Roommates* on the grounds that "The Roommates website did not employ 'neutral tools'; it required users to input discriminatory content as a prerequisite to accessing its tenant-landlord matching service."[50] Rather, in *Gonzales*, "the algorithms do not treat ISIS-created content differently than any other third-party created content, and thus are entitled to § 230 immunity."[51]

---

[45] 521 F.3d 1157, 1166 (9th Cir. 2008).

[46] Huon v. Denton, 841 F.3d 733, 742 (7th Cir. 2016).

[47] 2 F.4th 871 (9th Cir. 2021).

[48] 18 U.S.C. § 2333.

[49] *Gonzalez*, 2 F.4th at 881.

[50] *Id.* at 894.

[51] *Id.*

This claim is strange. Platforms use algorithms to allow them to selectively distinguish, with ever greater power and specificity, different content for different users. If users type in searches of type X, they will receive promoted content of type X; if users type in searches of type Y, they will receive promoted content of type Y. The business model of these platforms requires them to identify different preferences of consumers and precisely match them to (i) content that will keep their attention focused on the platform and (ii) advertisers interested in sending them advertisements.

The problem with the *Gonzales* court's reading is that it is far from clear that there are "neutral" algorithms or even that the term is coherent. The court never defines "neutrality" and asserts, without justification, that "algorithms do not treat ISIS-created content differently than any other third-party created content, and thus are entitled to § 230 immunity." But, of course, platforms treat different content differently. That is their *raison d'etre*, as the more precise distinctions among users and their content leads to more effective matching for advertisers.

Indeed, Big Tech's defenders, at least when arguing against non-discrimination requirements, use this evident fact to argue that social media "neutrality" is impossible. For instance, Kir Nuthi explains that "[n]ondiscrimination is a central feature of traditional common carriers, but it is not a feature of social media. Unlike the railroads and communications companies of the Gilded Age, social media relies on the ability to contextualize and discriminate between different content."[52]

Section 230(f)(2) implies there is a point at which content moderation becomes content creation. The provision does not state where that point is, and courts have yet to provide useful tests to locate it. While this article does not suggest a test, a textual reading of section 230 must not read section 230(f)(2) out of the statute, and must recognize that the interactive computer services that cross a line into content provision lose their protection as to the content that they provide.

## IV.   INTERPRETING SECTION 230(C)(1)

Section 230(c)(1) states:

No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.[53]

---

[52] Kir Nuthi, *Conservatives Want Common Carriage. They're Not Going to Like It.*, TECHDIRT (June 8, 2021), https://tinyurl.com/32sdp82r.

[53] 47 U.S.C. § 230(c)(1).

The first appellate decision interpreting this provision, *Zeran v. AOL,*[54] read the word "publisher" to include what the common law would consider "distributor" liability as well as "publisher" liability. Its opinion was extremely influential and, with perhaps one exception,[55] the courts of appeals have followed *Zeran,* conceding what can only be viewed as a first mover advantage. But as the recent statement from Justice Thomas points out, it is far from clear that this interpretation is correct.

At common law, a person is subject to "publisher" liability if he makes "an affirmative act of publication to a third party."[56] This "affirmative act requirement" ordinarily "depict[s] the defendant as part of the initial making or publishing of a statement."[57] A "distributor," under common law, in contrast, is "one who only delivers or transmits defamatory matter published by a third person."[58]

Publishers or speakers are subject to a higher liability standard, traditionally strict liability, although that standard is rarely imposed given the constitutional limits on libel law set forth in *New York Times v. Sullivan* and *Gertz.*[59] By contrast, distributors, which do not exercise editorial control, face liability only when they have knowledge or constructive knowledge that the content they are transmitting is illegal.[60]

Following this common law understanding, the word "publisher" is ambiguous because it sometimes references initial publication and other times subsequent

---

[54] Zeran v. Am. Online, Inc., 129 F.3d 327 (4th Cir. 1997).

[55] Chicago Lawyers' Committee For Civil Rights Under Law v. Craigslist, 519 F.3d 666, 668–669 (7th Cir. 2008) ("Subsection (c)(1) does not mention 'immunity' or any synonym. Our opinion in *Doe* explains why § 230(c) as a whole cannot be understood as a general prohibition of civil liability for web-site operators and other online content hosts").

[56] Benjamin C. Zipursky, *Online Defamation, Legal Concepts, and the Good Samaritan*, 51 VAL. U. L. REV. 1, 18 (2016); RESTATEMENT (SECOND) OF TORTS § 558 (1977) (listing a statement and publication as separate elements of defamation).

[57] Zipursky, *supra* note 56, at 19.

[58] RESTATEMENT (SECOND) OF TORTS § 581.

[59] *See* W. PAGE KEETON, DAN B. DOBBS, ROBERT E. KEETON & DAVID G. OWEN, PROSSER AND KEETON ON TORTS § 113, at 810–11 (5th ed. 1984); *compare* RESTATEMENT (SECOND) OF TORTS § 581(1) *with* New York Times Co. v. Sullivan, 376 US 254 (1964), *and* Gertz v. Robert Welch, Inc., 418 U.S. 323 (1974).

[60] *See generally* Smith v. California, 361 U.S. 147, 152–54 (1959).

distribution of content.[61] Because a "distributor" can be thought of as a type of "publisher," the word "publisher" has developed a generic sense, referring to publishers and distributors, as well as a specific sense, referring to the "initial" maker of the statement.

It is not clear whether Congress intended the generic or the specific meaning of publisher. Like the term "congressman," which refers to both senators and representatives, but usually refers to representatives, "publisher" refers both to those who "actually publish" and those who republish or distribute.

Recognizing this textual ambiguity, Justice Thomas has written that "To be sure, recognizing some overlap between publishers and distributors is not unheard of. Sources sometimes use language that arguably blurs the distinction between publishers and distributors. One source respectively refers to them as 'primary publishers' and 'secondary publishers or disseminators,' explaining that distributors can be 'charged with publication.'"[62]

Nonetheless, because a distributor is a type of publisher, the *Zeran* court ruled that section 230(c)(1) protects against both types of liability. And the results of that decision have been dramatic—essentially eliminating any platform responsibility for the content they carry.

The *Zeran* court's textual reasoning is not solid. It simply states that distributors are a type of publisher and assumes Congress intended the generic, not specific, meaning. It ignores textual evidence in the statute that points in the opposite direction: If Congress wanted to eliminate both publisher and distributor liability, it would have created a categorical immunity in § 230(c)(1), stating that "No provider shall be held liable for information provided by a third party" and would not have used language that explicitly limited its protection to speaking and publishing third-party content. In fact, when Congress wants to use categorical language to block liability on any theory (and not just on a speaker-or-publisher theory), it does so—using such categorical language in the very next subsection, Section

---

[61] *See, e.g.,* RESTATEMENT (SECOND) OF TORTS § 578 ("Except as to those who only deliver or transmit defamation published by a third person, one who repeats or otherwise republishes defamatory matter is subject to liability as if he had originally published it.").

[62] *See* Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC, 141 S. Ct. 13, 15 (2020) (Thomas, J., respecting denial of certiorari) (quoting KEETON ET AL., *supra* note 59, at 799, 803).

230(c)(2).[63]

Second, as Justice Thomas recently observed in a statement respecting the denial of certiorari, "Congress expressly imposed distributor liability in the very same Act that included § 230. Section 502 of the Communications Decency Act makes it a crime to 'knowingly . . . display' obscene material to children, even if a third party created that content. This section is enforceable by civil remedy. It is odd to hold, as courts have, that Congress implicitly eliminated distributor liability in the very Act in which Congress explicitly imposed it."[64] If the Act follows consistent usage throughout the statute, section 230 would not affect distributor liability.

The *Zeran* court also relied on policy arguments, worrying that,

> If computer service providers were subject to distributor liability, they would face potential liability each time they receive notice of a potentially defamatory statement—from any party, concerning any message. Each notification would require a careful yet rapid investigation of the circumstances surrounding the posted information, a legal judgment concerning the information's defamatory character, and an on-the spot editorial decision whether to risk liability by allowing the continued publication of that information. Although this might be feasible for the traditional print publisher, the sheer number of postings on interactive computer services would create an impossible burden in the Internet context.[65]

This policy concern may have had some force in 1996. However, in today's world of AI and automated takedowns—and the large platforms' moderating teams that number well into the tens of thousands—the concern seems misplaced. And imposing distributor liability on mid-sized or small web firms would not force them to hire armies of staff to review allegations of libel or similar unlawfulness: Rather, as with data breach obligations and other cybersecurity duties, reasonable behavior for dealing with notices could be scaled to firm size and resources. Under current law, the myriad internet data breach obligations found in statutes such as HIPAA[66]

---

[63] "No provider or user of an interactive computer service shall be held liable on account of any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable." 47 U.S.C. § 230(c)(2).

[64] *Enigma Software Grp.*, 141 S. Ct. at 15 (emphasis in original) (citing 47 U.S.C. § 223(d)).

[65] Zeran v. Am. Online, Inc., 129 F.3d 327, 333 (4th Cir. 1997).

[66] Fero v. Excellus Health Plan, Inc., 236 F. Supp. 3d 735, 763 (W.D.N.Y. 2017), *on*

*Journal of Free Speech Law*                         [2021]

and title V of the Gramm-Leach-Bliley Act have premised and scaled liability for unlawful behavior on the capacities of small firms to follow best practices.[67] While this is not the forum to spell out the details, small firms could be exempted or best practices could be developed for what constitutes "knowledge" for distributor liability.[68] Such a burden is hardly crushing—after all, both small and large websites already have takedown obligations under the Digital Millennium Copyright Act.[69]

There is another problem: Websites will have to determine whether something is, in fact, libelous. Or, more realistically, they will have the obligation to assess the risk of libel associated with certain statements and gauge whether to accept such risk. This problem was addressed in distributor liability for telegraph liability. Courts solved this problem by only assigning liability if the libel was "apparent on the face" of the message."[70] Under this rule, only the most egregious types of speech would incur liability, as well as speech previously adjudged libelous or unlawful, which some courts have ruled section 230(c)(1) protects.[71] And, again, the accuracy of judgment to which a platform is to be held could scale to its resources, and best practices or safe harbors could be created either by courts or the Federal Communications Commission.

---

*reconsideration*, 304 F. Supp. 3d 333 (W.D.N.Y. 2018), *order clarified*, 502 F. Supp. 3d 724 (W.D.N.Y. 2020) (in lawsuit for data breach for HIPAA-regulated entity, "both the breach of contract claim and implied covenant claim arise out of the Excellus Defendants' failure to protect the confidentiality of Plaintiffs' personal information and to comply with policies, industry standards, and best practices for data security").

[67] Title V of the GLBA states that "each financial institution has an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information." 15 U.S.C. § 6801(a); *see also* Board of Governors of the Federal Reserve System, *Interagency Guidelines Establishing Information Security Standards [Small-Entity Compliance Guide]* (Aug. 2, 2013), https://tinyurl.com/5d43nb3z ("To achieve these objectives, an information security program must suit the size and complexity of a financial institution's operations and the nature and scope of its activities.").

[68] This idea resonates with Kyle Langvardt's *Can The First Amendment Scale?*, 1 J. Free Speech L. 273 (2021), which suggests that traditional publisher and distributor categories may need to soften in the face of changing technology.

[69] 17 U.S.C.A. § 512(c).

[70] *See* sources cited in note 26.

[71] Hassell v. Bird, 5 Cal. 5th 522, 532 (2018).

## V.    INTERPRETING SECTION 230(C)(2)

Title 47 U.S.C. § 230(c)(2) states:

> No provider or user of an interactive computer service shall be held liable on account of . . . any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected."

The provision's scope turns on how the final "otherwise objectionable" should be interpreted. There are two choices: (i) an *ejusdem generis* reading in which the term refers to those objectionable things that are similar to the rest of the list and (ii) a non-*ejusdem-generis* reading in which "otherwise objectionable" is read "in the abstract" referring to literally any other objectionable thing. (Under the canon of *ejusdem generis*, "Where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words."[72])

Courts have had difficulty in determining what is the "similar nature" that unites the section 230(c)(2) list. *Interpreting 47 U.S.C. § 230(c)(2)*[73] shows that all these terms referred in the 1990s to areas of then-permitted, or commonly believed to be permitted, types of telecommunications regulation. "Obscene, lewd, lascivious, and filthy" speech had been regulated on cable television and in telephone calls—and of course in broadcasting.[74] "Harassing" telephone calls had also long been seen by Congress as regulable, and continue to be regulated to this day.[75] "Excessively violent" speech was considered regulable content, like indecent content, in the context of regulating over-the-air broadcasting.[76]

An *ejusdem generis* reading would constrain the legal immunities in section 230(c)(2). If section 230's content moderation protections are found *only* in section 230(c)(2), not section 230(c)(1), then platforms receive such immunity only when moderating the types of speech section 230(c)(2) enumerates.

Of course, courts may ignore statutory canons even if there is a convincing

---

[72] Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 115 (2001).

[73] Candeub & Volokh, *supra* note 6.

[74] *Id.* at 180–83.

[75] 47 U.S.C. § 223.

[76] Candeub & Volokh, *supra* note 6, at 182.

argument for their application—and the canons sometimes can point in opposite directions.[77] Without *ejusdem generis*, "otherwise objectionable" would be interpreted in the abstract—*and not refer* to the list at all but rather to any possible objectionable content. This reading would provide immunity for virtually any content-moderation decision that a platform deems appropriate.

The *ejusdem* and non-*ejusdem* readings are subject to different constitutional analyses. The former is content-based. The latter is likely not. The following section examines the constitutionality of section 230(c)(2) under each interpretation.

## VI.    THE CONSTITUTIONALITY OF SECTION 230(C)(2)

The *ejusdem generis* reading of section 230(c)(2) seems less likely to survive First Amendment scrutiny than the non-*ejusdem-generis* reading, though the matter is not certain.

### A.    Non-Ejusdem Generis Reading

Under a non-*ejusdem* interpretation, section 230(c)(2)'s "otherwise objectionable" catchall term assumes an "in abstract" meaning, referring to any content objectionable in the platform's view. The statute's use of the phrase "material that the provider or user considers" to be objectionable bolsters this interpretation. The word "considers" suggests a subjective, or at least, individualized judgment.

Yet, even a non-*ejusdem-generis*, "in abstract" reading of "otherwise objectionable" has ambiguity. It could be read in a subjective way which would allow *any* objectionable material—or in an objective way which would refer to the category of speech people would likely find objectionable. The following examines the provision's constitutionality (1) under an objective reading and (2) under a subjective reading. An objective reading is likely content-based while a subjective reading could be content-neutral.

### 1.    "Otherwise objectionable": objective reading

The "objective" interpretation has several arguments for it. First, "objectionable" has a meaning that describes and categorizes speech independent of individual's particular judgments. For instance, "otherwise religious" in the phrase "Christian, Hindi, Jewish, or otherwise religious" has a distinct content—and if section 230(c)(2) were to be so read, it would be clearly content-based.

Second, Congress intended "otherwise objectionable" to refer to a distinct set

_____

[77] KARL N. LLEWELLYN, THE COMMON LAW TRADITION: DECIDING APPEALS 521–35 (1960).

of speech. The statute's clear purpose was to combat certain speech in media, such as indecency and profanity. In other words, Congress likely intended to catch other types of speech it thought to be regulable in telecommunications media in 1996. There is no evidence from the legislative history that Congress intended a purely subjective understanding of "objectionable." The evidence suggests that Congress intended to impose some sort of community standards even if imposed via individual internet platforms.

Third, when Congress wants individual subjective judgments about particular content be controlling, it does so explicitly. For instance, the statute banning "pandering advertisements in the mails" "provides a procedure whereby any householder may insulate himself from advertisements that offer for sale 'matter which the addressee in his sole discretion believes to be erotically arousing or sexually provocative.'"[78] Under Post Office procedure, which the Supreme Court has upheld, the Post Office must accept *any* advertisement as qualifying under the statute that a mail householder judges arousing or provocative. If Congress had wanted a subjective reading, it would have used language similar to that found in this statute, *i.e.,* used words like "sole discretion." The use of the word "consider" does not convey subjectivity in such a definitive way.

An "objective" reading of "otherwise objectionable" would be subject to a constitutionality analysis similar to that of an *ejusdem generis* reading,[79] as both are content-based and refer to a similar set of things.

### 2.  "Otherwise objectionable": subjective reading

On the other hand, a purely subjective reading is also reasonable and probably the better of the two readings (assuming one rejects the *ejusdem generis* approach, which I think is the best reading of all). As mentioned above, the text references what the platform "considers" to be objectionable, suggesting a subjective approach. Also, even if what everyone considers to be objectionable could be defined in some theoretical way as a distinct set of speech, this category is fuzzy and amorphous—suggesting that in practice the statute refers to whatever a platform subjectively deems objectionable.

A purely subjective reading of section 230 does not at first blush appear to be a

---

[78] Rowan v. U.S. Post Office. Dep't, 397 U.S. 728, 729–30 (1970).

[79] *See* Part VI.B.1.

regulation of speech at all. A platform can choose to moderate content according to the factors in section 230(c)(2) or not. Section 230 does not mandate or compel any particular type of speech, nor does it punish any particular type of speech. The statute does not define objectionable but leaves the definition and application to individuals.

Yet it could still be a regulation of speech, even if a content-neutral one. Section 230 favors the expression of a certain type of speech—those that interactive computer services would likely find objectionable. "Even if the hypothetical measure on its face appeared neutral as to content and speaker, its purpose to suppress speech and its unjustified burdens on expression would render it unconstitutional."[80] Certainly, Congress *intended* restrictions on the flow of speech.

Further, by encouraging private censorship, Congress successfully made certain types of information more difficult to obtain. "'[T]he Court long has recognized that by limiting the availability of particular means of communication, content-neutral restrictions can significantly impair the ability of individuals to communicate their views to others.'"[81]

In order to justify a content-neutral regulation, the government must demonstrate, among other things, that "it furthers an important or substantial governmental interest [and that] the governmental interest is unrelated to the suppression of free expression."[82] Courts typically do not require a "least restrictive means" test, requiring instead that the means be narrowly tailored and leave ample alternative outlets.[83] But the government still "may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals."[84] We must identify the content-neutral governmental goal of section 230 and see whether section 230 is narrowly tailored to that goal.

Identifying neutral interests supporting section 230 is not an easy inquiry. Most of its stated policy goals are quite content-based. Congress sought to empower

---

[80] Sorrell v. IMS Health Inc., 564 U.S. 552, 566 (2011).

[81] City of Ladue v. Gilleo, 512 U.S. 43, 55 n.13 (1994) (quoting Geoffrey R. Stone, *Content-Neutral Restrictions*, 54 U. Chi. L. Rev. 46, 57 (1987)).

[82] United States v. O'Brien, 391 U.S. 367, 377 (1968).

[83] *See* Ward v. Rock Against Racism, 491 U.S. 781, 797–99 (1989).

[84] McCullen v. Coakley, 573 U.S. 464, 486 (2014).

parents' power to limit children's access to "objectionable and inappropriate"[85] speech and further "vigorous enforcement of obscenity and harassment."[86] Similarly, as discussed below, the legislative history as it exists suggests that the justifications for Congress passing the statute were content-based.

On the other hand, the stated justifications include some neutral justifications, such as to "promote the continued development of the Internet and other interactive computer services," "preserve the vibrant and competitive free market," and "encourage the development of technologies which maximize user control over what information is received by individuals, families, and schools."[87]

This ambiguity could lead to a finding of neutrality because the Court allows itself flexibility in determining statutory justification. For instance, in *Turner*,[88] the Court ruled on the constitutionality of the "must carry" obligations of the 1992 Cable Television Consumer Protection and Competition Act.[89] This law required cable systems to carry over-the-air television broadcasting. As some of the justices recognized, this appeared to be a content-based regulation.[90] Congressmen, ever solicitous to the local broadcaster who carries their political advertisements and whose news shows cover politicians' deeds, granted broadcasters favors by forcing cable systems to carry their content.[91]

The Court looked past this obvious purpose and found that the law's stated

---

[85] 47 U.S.C. § 230(b)(4).

[86] 47 U.S.C. § 230(b)(5).

[87] 47 U.S.C. § 230(b)(1)-(3).

[88] Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622 (1994).

[89] 47 U.S.C. §§ 534(b)(1)(B), (h)(1)(A), 535(a).

[90] 512 U.S. at 677 (O'Connor, J., dissenting) ("Preferences for diversity of viewpoints, for localism, for educational programming, and for news and public affairs all make reference to content. They may not reflect hostility to particular points of view, or a desire to suppress certain subjects because they are controversial or offensive. They may be quite benignly motivated. But benign motivation, we have consistently held, is not enough to avoid the need for strict scrutiny of content-based justifications."); *id.* at 680 ("But when a content-based justification appears on the statute's face, we cannot ignore it because another, content-neutral justification is present.").

[91] Cass R. Sunstein, *The First Amendment in Cyberspace*, 104 Yale L.J. 1757, 1767 (1995) ("What was the purpose of the must-carry rules? This is a complex matter. A skeptic, or perhaps a realist, might well say that the rules were simply a product of the political power of the broadcasting industry. Perhaps the broadcasting industry was trying to protect its economic interests at the expense of cable.").

justification was to preserve free, over-the-air television. The Court ruled that the regulation, in simply specifying the source of programming to be carried, was not content-based.[92]

The Court could follow the *Turner* approach in interpreting section 230. The statute's stated purposes of "promot[ing] the continued development of the Internet and other interactive computer services" and "encourag[ing] the development of technologies which maximize user control over what information is received by individuals, families, and schools" might serve as content-neutral justifications.[93] One could say that limiting liability for content moderation furthers these goals by lowering the cost of blocking and moderation technologies. If you want to create markets in what is essentially private censorship, then lowering liabilities associated with creating tools for censorship is a good idea.

While this argument might very well win the day, there are a few caveats. First, *Turner* explicitly recognized the market power of the cable systems as justifying, in part, must-carry.[94] Given the market power of cable, it had the power to silence others, and therefore access was required. In contrast, section 230(c)(2) affects Twitter as well as your personal website—the big and the little. It is possible that the Court's willingness to find a content-neutral justification—which would be more likely to be upheld—stemmed from its overall greater willingness to accept regulation of dominant firms than smaller actors.

Second, the provision favors certain types of expression—namely forwarding a set of opinions and views through editing, amplifying, muting, shaping, and content-moderating posters' comments. It is perhaps odd to think of comment deletion as expression or speech. But, it can be, for reasons similar to those discussed in Part III in relation to section 230(f)(3). A comment thread subject to a strict content

---

[92] Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 663 (1994) ("[T]he importance of local broadcasting outlets 'can scarcely be exaggerated, for broadcasting is demonstrably a principal source of information and entertainment for a great part of the Nation's population.' The interest in maintaining the local broadcasting structure does not evaporate simply because cable has come upon the scene.").

[93] 47 U.S.C. § 230(b)(1)–(3).

[94] *Turner*, 512 U.S. at 632–33 ("In brief, Congress found that the physical characteristics of cable transmission, compounded by the increasing concentration of economic power in the cable industry, are endangering the ability of over-the-air broadcast television stations to compete for a viewing audience and thus for necessary operating revenues.").

moderation policy certainly expresses something different than a comment thread that is not so subject—just as a bonsai tree, which is pruned to control its growth, is different from a tree than is allowed to develop freely.

By adopting content moderation policies, platforms can promote (or hide) ideas and control discussion. They become the anthologists of the internet, editing discussion to create versions of expression they prefer. Similarly, they become, in a sense, book publishers.[95] They promise to provide a free service—access to their platforms—in exchange for producing speech that they like. The exchange is analogous to an advance that a book publisher would give an author.

Third, even though stated in broad language, Congress's policies in section 230 cannot be plausibly read to support massive private censorship on any topics that the platforms please, which is what section 230 as interpreted by many courts today protects. To the degree section 230 allows the dominant internet firms to impose their own censorship rules—rules that can promote anything—section 230 minimizes "user control over what information is received." Congress never even considered section 230 as protecting giant internet platforms, which did not exist in 1996 and which, with the other "FAANG" companies, now enjoy close to 22% of the S&P's total market capitalization.[96]

Finally, it may be that a subjective section 230 in fact subverts the goals of "promoting the continued development of the Internet and other interactive computer services" and "encourag[ing] the development of technologies which maximize user control over what information is received by individuals, families, and

---

[95] Daphne Keller speaks of "amplification," which she defines "to encompass various platform features, like recommended videos on YouTube or the ranked newsfeed on Facebook, that increase people's exposure to certain content beyond that created by the platform's basic hosting or transmission features." Daphne Keller, *Amplification and Its Discontents: Why Regulating the Reach of Online Content Is Hard*, 1 J. Free. Speech L. 227, 231 (2021). This seems to be a type of publication, in which the platform acts like an anthologist selecting messages to be repeated and shaping and directing discourse. It is not simply transmitting messages, and therefore falls outside section 230(c)(1). Ashutosh Bhagwat makes the argument that such editorializing is constitutionally protected. Ashutosh Bhagwat, *Do Platforms Have Editorial Rights?*, 1 J. Free Speech L. 97, 111–23 (2021). If so, however, such editorializing is the *platform's speech* and thus not within section 230(c)(1).

[96] Sergei Klebnikov, *Apple, Microsoft, Amazon, Google and Facebook Make up a Record Chunk of the S&P 500. Here's Why That Might Be Dangerous*, Forbes.com (July 24, 2020), https://tinyurl.com/cy49pkr9.

schools"—particularly given the ill-defined line between interactive computer services and internet content providers set forth in sections 230(c) and 230(f)(3).

If one combines the subjective reading of "otherwise objectionable" with a highly restrictive view of section 230(f)(3), as some courts appear to have done, then platforms would be free to content-moderate in ways that could undermine users' willingness to express themselves online. Comments or arguments can be deleted, specially segregated, or, under some understandings of "content moderation," tagged with warnings. If these types of content moderation do not qualify as content provision under section 230(f)(3), then section 230(c)(2) would protect all such efforts. Exposing comments to such treatment does not further the goals of "user control" or the "growth of the internet."

## B.  *Ejusdem Reading*

The arguments for an *ejusdem generis* reading are discussed in *Interpreting 47 U.S.C. § 230(c)(2)*. An *ejusdem* reading likely renders section 230 content-based, as the terms in § 230(c)(2) refer to a distinct type of content: speech Congress thought regulable because it was inappropriate for children and families. The next question is whether a content-based section 230 is constitutional. To survive strict scrutiny, a content-based regulation of speech must be narrowly tailored to serve a compelling governmental interest, and that is a difficult test to pass.

On the other hand, classifying a provision as content-based does not necessarily doom it to strict scrutiny.[97] In particular, viewpoint-neutral (even though content-based) speech restrictions may not need to be subjected to strict scrutiny in certain contexts, particularly in designated public fora.

### 1.  Section 230 as content-based restriction on protected speech

Under the *ejusdem* reading, section 230(c)(2) covers matters Congress thought

---

[97] In *Denver Area,* arguably the case closest on point, the Court refrained from specifying what level of scrutiny should be applied to decency regulation on cable television. *See* Denver Area Educ. Telecommunications Consortium, Inc. v. FCC, 518 U.S. 727, 741–42 (1996) (plurality opin.) ("But no definitive choice among competing analogies (broadcast, common carrier, bookstore) allows us to declare a rigid single standard, good for now and for all future media and purposes. That is not to say that we reject all the more specific formulations of the standard—they appropriately cover the vast majority of cases involving government regulation of speech. Rather, aware as we are of the changes taking place in the law, the technology, and the industrial structure related to telecommunications, see, *e.g.*, Telecommunications Act of 1996 . . ., we believe it unwise and unnecessary definitively to pick one analogy or one specific set of words now.")

regulable in 1996. In particular, it explicitly disfavors a whole category of speech that now receives full or near full First Amendment protection under the Supreme Court's decision in *Brown v. Entertainment Merchants Association*.[98] In that case, the Court used strict scrutiny to strike down a restriction on the sale of violent video games to minors without parental permission.

And section 230 places a much higher burden on violent speech than does the California statute, which didn't restrict access to violent video games by adults or by minors who had adults who were willing to get the games for them. Section 230 limits the amount of violent content available to everyone, including adults.

While section 230's limit on speech is permissive and incentivizing—platforms do not have to block but are also not required to do so—the Court has found similar laws to be unconstitutional restrictions of speech. For instance, the Court ruled unconstitutional a statute giving permissive authority to cable systems to censor indecent material in *Denver Area Educational Telecommunications Consortium, Inc. v. FCC*.[99] More generally, the Court has rejected for First Amendment reasons laws that place special burdens, legal or financial, on certain types of speech or speakers.[100]

*Denver Area* is probably the case most on-point to the question of whether content-based pro-decency regulation on the internet is constitutional. Yet it is a fractured opinion that by design does not offer clear precedent, as the Justices could not agree on the applicable constitutional standard or even if there should be one. Each of the three challenged provisions received different votes—with the plurality opinion failing to win a majority for any provision. Arguably, however, the guidance that it does provide suggests that section 230 is unconstitutional, though just barely.

The case involved three provisions of the Cable Television Consumer Protection and Competition Act of 1992 (Cable Act), a statute that dealt with leased access of cable channels and public, educational, and government (PEGs) cable channels. Section 10(a) required cable systems to lease channels to local programmers as a way of providing competition to the large cable programming networks and

---

[98] 564 U.S. 786 (2011).

[99] 518 U.S. 727 (1996).

[100] Leathers v. Medlock, 499 U.S. 439, 447 (1991); Arkansas Writers' Project, Inc. v. Ragland, 481 U.S. 221, 230 (1987).

encouraging the creation of local content; section 10(c) required cable systems to carry (for free) public, educational, and government channels, which give free access for community programming, school programs, government meetings, and the like; and section 10(b) required cable systems to segregate indecent material on specific cable channels.[101]

Section 10(a), which applies to "leased access channels," reversed prior law by permitting cable operators to allow or prohibit "programming" that they "reasonably believe[s] . . . depicts sexual . . . activities or organs in a patently offensive manner." Section 10(c) gives cable operators the same authority over PEGs. Under section 10(b), which applies only to leased access channels, operators must segregate "patently offensive" programming on a single channel, block that channel from viewer access, and unblock it (or later reblock it) upon subscriber's written request.[102]

Sections 10(a) and 10(c) permit cable systems to proscribe content depicting "sexual activities or organs in a patently offensive manner." The plurality opinion—and the other opinions—understood this language as including unprotected obscenity as well as the indecent programming covered in *Pacifica*.[103]

There was disagreement about the theory of state action, the first step in any First Amendment analysis. Justice Breyer in his plurality recognized that the government mandates to carry certain cable channels were a type of state action. He did not go so far as Justice Kennedy to find a public forum, but found the channel set-aside to be sufficient government action for First Amendment purposes.

Given this type of government action, the plurality concluded, the First Amendment required a free speech balancing between speakers (PEG and leased

---

[101] 47 U.S.C. §§ 532(h), 532(j), and note following § 531.

[102] *Id.*

[103] *Denver Area*, 518 U.S. at 744 (plurality opin.) ("[T]he problem Congress addressed here is remarkably similar to the problem addressed by the FCC in *Pacifica*, and the balance Congress struck is commensurate with the balance we approved there. In *Pacifica* this Court considered a governmental ban of a radio broadcast of 'indecent' materials, defined in part, like the provisions before us, to include 'language that describes, in terms patently offensive as measured by contemporary community standards for the broadcast medium, sexual or excretory activities and organs, at times of the day when there is a reasonable risk that children may be in the audience.'" (quoting FCC v. Pacifica Found., 438 U.S. 726, 732 (1978)).

access channels) against cable operators.[104] In contrast, Justice Kennedy, joined by Justice Ginsburg, went further and considered the public access cable channels to be designated public fora—in which the First Amendment would prohibit virtually any restriction on speakers' expression.[105]

In elaborating upon his balancing test, Justice Breyer pointed out that cable operators have monopoly power, allowing them to engage in private censorship if unchecked; they are extraordinarily involved with government regulation on a local level; and, as a realistic matter, their First Amendment interests as editors are weak.[106] Given these considerations, Breyer ruled that for section 10(a), the balance tipped in favor of the cable operators, permitting them to limit indecent speech. In addition, section 10(a) simply restores the rights that cable operators once had over leased access channels.[107]

On the other hand, with section 10(c), Justice Breyer found that the expressive rights of speakers predominated and therefore, the plurality found it unconstitutional. Unlike section 10(a), section 10(c) does not give back to cable operators the editorial rights that they once enjoyed. The countervailing cable operator's First Amendment interest is nonexistent, or at least much diminished, because these channels were meant for public access,[108] and cable operators did not historically exercise editorial control over them.[109] Last, local boards and commissions and other governmental or quasi-governmental groups typically oversee public access channels. These supervisory regimes presumably would control offensive content consistent with community standards

The peculiar facts of *Denver Area*—government-required cable channel set-asides—do not permit a clear application to section 230. But section 230 is closer to section 10(c) than 10(a), which suggests it may be unconstitutional.

First, the Cable Act targets indecent speech of approximately the sort *Pacifica* permitted to be regulated, and indeed likely just a subset of indecent speech, closer

---

[104] *Id.* at 744–47.

[105] *Id.* at 792 (Kennedy, J., dissenting).

[106] *Id.* at 738, 760–61 (Breyer, J., plurality opin.).

[107] *Id.* (citing 47 U.S.C. § 532(c)(2)).

[108] *Id.* at 761.

[109] *Id.*

to obscenity.[110] The speech section 230 covers (even under the *ejusdem generis* reading) is much broader than that in *Pacifica*, because it includes fully First Amendment protected "excessively violent" speech. If it is unconstitutional for government even to permit a cable operator to censor regulable *indecent* speech, on its own volition on a quasi-governmental channel, then constitutional concerns seem present when the government disadvantages *protected* unregulable speech on the entire internet. This factor weighs against section 230's constitutionality.

Second, the interest in protecting children from indecent programming supported the Court's ruling that section 10(a) is constitutional. The government interest in protecting children from fully First Amendment-protected speech is *less* powerful than the interest in protecting them from unprotected speech, such as obscenity. Here, section 230 regulates fully protected speech, i.e., speech that is excessively violent. This factor weighs against section 230's constitutionality.

Third, the plurality opinion balances the interests of the cable operators and the public, finding that the cable operators' interests predominated in section 10(a), but making the opposite determination in section 10(c).[111] The interests the Court identified as determinative were cable operators' historical rights of control over leased access and section 10(a)'s viewpoint neutrality. Significantly, section 10(a) only returned cable operators the discretion they once had.

This factor probably cuts against section 230. Congress, in the CDA, was responding to *Stratton Oakmont*, a case that determined whether an internet bulletin board was more like a telephone company or bookstore, which had limited liability for third party content, or like a newspaper, which is generally liable for the content it prints. *Stratton Oakmont* said that platforms that edit are more like newspapers. In reversing *Stratton Oakmont,* if Congress had simply imposed carrier liability, *i.e.,* only passed section 230(c)(1), not (c)(2), Congress could have been said to have "restore[d]" internet platforms to their rightful protection against liability. Instead, Congress created an entirely new, content-based regime that has no obvious precedent in United States communications law.

---

[110] *Id.* at 749, 755, 761–51.

[111] *Id.* at 743–44 ("The First Amendment interests involved are therefore complex, and require a balance between those interests served by the access requirements themselves (increasing the availability of avenues of expression to programmers who otherwise would not have them) and the disadvantage to the First Amendment interests of cable operators and other programmers (those to whom the operator would have assigned the channels devoted to access)").

But these observations are speculative. The unusual facts of *Denver Area* and its hesitance to announce a level of scrutiny for regulations on cable television—let alone the internet—diminish its precedential force for section 230.

The strongest argument for section 230's unconstitutionality is probably its inclusion of the "excessively violent" term, which targets unregulatable, constitutional protected speech. Striking the phrase from the statute would help solve that problem, and the power of the federal judiciary to partially invalidate a statute in that fashion has been firmly established since *Marbury v. Madison*.[112]

When Congress includes an express severability clause in the relevant statute, courts generally follow it.[113] The Communications Act, which section 230 is part of, has an express severability clause.[114] Lower courts have relied upon this clause for statutes aimed at indecency in almost exactly the same situation presented in section 230. In *Carlin Commc'ns, Inc. v. FCC*,[115] the court had to interpret section 223(b) of the Federal Communications Commission Authorization Act of 1983, which prohibits "obscene and indecent" telephone communications. The court reasoned that, . . . "[w]ere the term 'indecent' to be given meaning other than *Miller* obscenity, we believe the statute would be unconstitutional. . . . [T]he words 'or indecent' are separable so as to permit them to be struck and the statute otherwise upheld.[116]

## 2. Viewpoint-neutral but content-based regulation and section 230

Another way of analyzing the *ejusdem generis* reading of section 230(c)(2) is as a viewpoint-neutral but content-based regulation.

As an initial matter, it is not clear that section 230(c) is viewpoint-neutral, although it seems likely. Protecting platforms' ability to ban types of speech Congress

---

[112] Barr v. Am. Ass'n of Political Consultants, Inc, 140 S. Ct. 2335, 2350 (2020).

[113] *Id.* at 2349.

[114] 47 U.S.C. § 608 ("If any provision of this chapter or the application thereof to any person or circumstance is held invalid, the remainder of the chapter and the application of such provision to other persons or circumstances shall not be affected thereby."). The "chapter" referred to in the severability clause is Chapter 5 of Title 47, which includes sections 151 through 700 of Title 47, a group of provisions of which section 230 is part.

[115] 837 F.2d 546 (2d Cir. 1988).

[116] Carlin Commc'ns, Inc. v. FCC, 837 F.2d 546, 560–61 (2d Cir. 1988) (citing Regan v. Time, Inc., 468 U.S. 641, 652–53 (1984)).

thought regulable in telecommunications media in 1996, section 230 does not, for instance, target speakers advocating obscenity or advocating against it—it applies to all who distribute obscenity, whether they think obscenity sexually liberating, find it sexist and objectifying, or aren't trying to express any viewpoint at all. Like the FCC's regulation of "obscene, indecent, and profane" broadcast programming, or prohibitions on loud speakers in public parks, section 230 is viewpoint-neutral, as it prohibits speech regardless of one's view on these matters.

On the other hand, the line between viewpoint-neutral and viewpoint-based regulations is "is not a precise one."[117] The Court has held that a statute is viewpoint-based if it "distinguishes between two opposed sets of ideas: those aligned with conventional moral standards and those hostile to them; those inducing societal nods of approval and those provoking offense and condemnation."[118] In *Brunetti*, the Supreme Court found that the PTO's exclusion of "immoral or scandalous" trademarks from the trademark registration system did precisely that.

Following *Brunetti*, section 230 arguably forwards a "sense of propriety,"[119] and "distinguishes between two opposed sets of ideas": those types of speech considered so "objectionable" and so likely to 'provoke offense" in 1996 as to justify regulation in telecommunications media versus those types of ideas that were sufficiently acceptable that would not be considered regulable.

The strength of this argument rests on whether one thinks "regulable in 1996" speech is truly a discernible viewpoint in the same way that "immoral" or "scandalous" is. Given that very few people would even know what "regulable in 1996" encompasses, it likely refers to a "set of ideas" that is theoretical at best. This argument may simply point to the fuzziness of the viewpoint-based/viewpoint-neutral distinction rather than to a practical legal barrier.

### Conclusion

Section 230 sets forth the immunity regime for internet content. Courts sometimes erroneously read section 230(c)(1), not section 230(c)(2), as immunizing content moderation decisions. And, similarly, courts ignore that section 230(f)(2) limits the immunity that the statute provides for content moderation. This misreading has expanded section 230 protections in ways that ignore the text and

---

[117] Rosenberger v. Rector & Visitors of Univ. of Virginia, 515 U.S. 819, 831 (1995).

[118] Iancu v. Brunetti, 139 S. Ct. 2294, 2300 (2019).

[119] *Id.* (internal quotation marks omitted).

congressional intent.

Identifying section 230(c)(2) as the source of liability protection raises constitutional concerns, particularly under an *ejusdem generis* reading. However, it is not clear that these concerns render the provision unconstitutional; and to the degree constitutional concerns are present, severability may offer the best solution.

*Journal of Free Speech Law*