Exhibit #2

2022 WL 17669645 (U.S.) (Appellate Brief)
Supreme Court of the United States.

Reynaldo GONZALEZ, et al., Petitioners,

v.

GOOGLE LLC, Respondent.

No. 21-1333.
December 7, 2022.

On Writ of Certiorari to the United States Court of Appeals for the Ninth Circuit

**Brief of U.S. Senator Ted Cruz, Congressman Mike Johnson, and Fifteen
Other Members of Congress as Amici Curiae in Support of Neither Party**

Christopher G. Byrnes, The Heritage Foundation, 214 Massachusetts Ave. NE, Washington, DC 20002, Gene P. Hamilton, America First Legal Foundation, 300 Independence Ave. SE, Washington, DC 20003, C. Boyden Gray, R. Trent Mccotter, Jonathan Berry, Michael Buschbacher, Boyden Gray & Associates PLLC, 801 17th St. NW, Suite 350, Washington, DC 20006, (202) 706-5488, mccotter@boydengray, associates.com, Counsel of Record.

## *i  TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. ii
INTEREST OF *AMICI CURIAE* ........................................................................ 1
SUMMARY OF ARGUMENT .............................................................................. 3
ARGUMENT ........................................................................................................ 6
I. Section 230(c)(1) Does Not Provide Immunity and Is Relevant Only to Claims Whose Elements Require Treating a Platform As the Publisher or Speaker ........................................................................................ 6
A. The Correct Scope and Effect of § 230(c)(1) ............................................... 7
B. Lower Courts Have Dramatically Misinterpreted § 230(c)(1) ..................... 10
1. *Zeran:* The Original Flawed Decision ....................................................... 10
2. *Zeran's* Flawed Analysis Has Led to the Widespread Erroneous Conferral of Immunity ............................ 14
II. Restoring § 230(c)(1)'s Proper Scope Will Reinvigorate § 230(c)(2)(A), Which Provides Immunity in Limited Circumstances ............................................................................................ 17
III. The Court Should Correct the Ninth Circuit's Flawed Interpretation of § 230(c) and Remand for Reevaluation of Petitioners' Claims ........................................................ 22
CONCLUSION ..................................................................................................... 24

## *ii  TABLE OF AUTHORITIES

CASES

*Anderson v. TikTok, Inc.*, No. 22-cv-1849, 2022 WL 14742788 (E.D. Pa. Oct. 25, 2022) ................................................................. 15-16
*Batzel v. Smith*, 333 F.3d 1018 (9th Cir. 2003) ................................ 15
Chi. Law. *Comm. for Civil Rts. Under Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666 (7th Cir. 2008) ................................................................. 15
*Force v. Facebook, Inc.*, 934 F.3d 53 (2d Cir. 2019) ..................... 7, 8, 11, 22
*F.T.C. v. Accusearch Inc.*, 570 F.3d 1187 (10th Cir. 2009) ............. 12
*Green v. Am. Online (AOL)*, 318 F.3d 465 (3d Cir. 2003) ............. 15
*Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12 (1st Cir. 2016) ................................................................. 10, 15, 16

*Jones v. Dirty World Ent. Recordings LLC*, 755 F.3d 398 (6th Cir. 2014) ........................................................................ 10

*Klayman v. Zuckerberg*, 753 F.3d 1354 (D.C. Cir. 2014) .............. 10

*Malwarebytes, Inc. v. Enigma Software Grp. USA*, 141 S. Ct. 13 (2020) ........................................................................ *passim*

*NetChoice, LLC v. Paxton*, 49 F.4th 439 (5th Cir. 2022) ............... 21

**iii** *Kloeckner v. Solis*, 568 U.S. 41 (2012) ................................. 14

*Packingham v. North Carolina*, 137 S. Ct. 1730 (2017) ................ 3

*Sikhs for Just., Inc. v. Facebook, Inc.*, 144 F. Supp. 3d 1088 (N.D. Cal. 2015) .................................................................. 17-18

*Stratton Oakmont, Inc. v. Prodigy Serus. Co.*, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995) ........................................... 8, 12

*Sw. Airlines Co. v. Saxon*, 142 S. Ct. 1783 (2022) ........................ 16

*Universal Comm. Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413 (1st Cir. 2007) ........................................................................ 15

*Yates v. United States*, 574 U.S. 528 (2015) ................................. 20

*Zeran v. America Online, Inc.*, 129 F.3d 327 (4th Cir. 1997) ......... 10, 11, 13, 14

**STATUTES**

47 U.S.C. § 230(a) .......................................................... 3

47 U.S.C. § 230(c) .......................................................... *passim*

47 U.S.C § 230(f) .......................................................... 14

**CONGRESSIONAL DOCUMENTS**

Senator Ted Cruz, Letter to Ambassador Robert Lighthizer, United States Trade Representative, Nov. 1, 2019 .......................... 18

**iv** Press Release, Senator Ted Cruz, *Sen. Cruz Calls on USTR to Eliminate Inclusion of Special Protections for Big Tech in U.S. Trade Deals* (Nov. 1, 2019) ...................................................... 18-19

**OTHER AUTHORITY**

Adam Candeub, *Reading Section 230 as Written*, 1 J. FREE SPEECH L. 139 (2021) ............................................................... 8, 14, 20-21

Adam Candeub & Eugene Volokh, *Interpreting 47 U.S.C. § 230(c) (2)*, 1 J. FREE SPEECH L. 175 (2021) ................................... 19-20

JEFF KOSSEFF, THE TWENTY-SIX WORDS THAT CREATED THE INTERNET (2019) ................................................... 17

JOSH HAWLEY, THE TYRANNY OF BIG TECH (2021) ............... 17

Restatement (Second) of Torts (1977) ................................... 12

William E. Buelow III, *Re-Establishing Distributor Liability on the Internet*, 116 W. VA. L. REV. 313 (2013) ............................ 12

**NEWS MEDIA & OPINION**

Avi Selk, *Facebook Told Two Women Their Pro-Trump Videos Were 'Unsafe'*, WASH. POST (Apr. 10, 2018), https://tinyurl.com/2fyshj46 ........................................................................ 19

Brian Flood, *Twitter, Facebook Have Censored Trump 65 Times Compared to Zero for Biden*, **v** *Study Says*, Fox NEWS (Oct. 19, 2020), https://tiny url.com/3u3yd4us ............................... 22

Chuck Grassley, Opinion, *'Big Tech' Is Censoring Conservatives*, THE GAZETTE (Feb. 28, 2022), https://tinyurl.com/2sesc4vb .......... 19

Diana Glebova, *Zuckerberg Admits Facebook Suppressed Hunter Biden Laptop Story Ahead of 2020 Election*, NAT'L REVIEW (Aug. 26, 2022), https://tinyurl.com/z5v9mwjz ............................ 19

Case 4:18-cv-05159-HSG   Document 61-2   Filed 06/16/23   Page 4 of 46

Reynaldo GONZALEZ, et al., Petitioners, v. GOOGLE LLC,..., 2022 WL 17669645...

Erik Schelzig, *Twitter Shuts Down Blackburn Campaign Announcement Video*, AP NEWS (Oct. 9, 2017), https:// tinyurl.com/2rv3v577 ........................................................................ 19

Felicia Somnez & Amy B. Wang, *YouTube Suspends Ron Johnson for a Week After GOP Senator Touts Questionable Drugs to Fight COVID-19*, WASH. POST (June 11, 2021), https://tinyurl.com/ ms44ckzz ................................................................................................. 19

Marco Rubio, Opinion, *We Must Stop Silicon Valley-Democrat Collusion Before Conservatives Are Silenced for Good*, Fox NEWS (July 28, 2021), https://tinyurl.com/yc8d3nap ............................ 21

Matt Schlapp, Opinion, *Big Tech Keeps Trying to Silence Conservatives and It Won't Stop Until We Stop Them*, Fox NEWS (Mar. 30, 2022), https://tinyurl.com/2tr4rnnx ................................ 19

Michael Nunez, *Former Facebook Workers: We Routinely Suppressed Conservative News*, **\*vi** GIZMODO (May 9, 2016), https://tinyurl.com/4xjdhbnz ............................................................ 19

Michael Rubin, *Why Does Big Tech Censor Conservatives and Not Terrorists, AM.* ENTERPRISE INST. (Mar. 3, 2021), https:// tinyurl.com/wx9wm968 ............................................................... 21

Mike Lee, Opinion, *Big Tech Companies Falsely Claim No Bias Against Conservatives-They May Be Violating Law*, FOX NEWS (Oct. 29, 2020), https://tinyurl.com/2e7u7sx5 ............................. 19

## *1  INTEREST OF *AMICI CURIAE* [1]

*Amici curiae* are seventeen members of the United States Senate and House of Representatives: Senators Ted Cruz, Mike Braun, Joni Ernst, Lindsey O. Graham, Charles E. Grassley, Bill Hagerty, James Lankford, Mike Lee, Cynthia M. Lummis, Marco Rubio, and Roger F. Wicker; and Representatives Mike Johnson, Jodey C. Arrington, Scott Fitzgerald, Doug Lamborn, Victoria Spartz, and Tom Tiffany.

*Amici* have a strong interest in the proper interpretation of 🚩 § 230. Several *amici* sit on Committees that oversee matters related to Section 230 of the Communications Decency Act, including the Senate Committee on the Judiciary; the Senate Committee on Commerce, Science, and Transportation; and the House Committee on the Judiciary.

Several *amici* have also proposed their own legislation to revise or repeal 🚩 § 230, but all agree that the lower courts' interpretation of the current 🚩 § 230 has strayed far from its text. These misguided decisions have conferred near-absolute immunity on Big Tech companies to alter and push harmful content, while simultaneously censoring conservative viewpoints on important political and social matters. *Amici* are united by their interest in seeing courts **\*2** construe 🚩 § 230 according to its clear but narrow text, rather than based on the courts' policy judgments.

## *3  SUMMARY OF THE ARGUMENT

The internet and social media are "the most important places ... for the exchange of views." 🚩 *Packingham v. North Carolina,* 137 S. Ct. 1730, 1735 (2017). But that marketplace of ideas has been under assault by Big Tech companies that selectively censor and remove opposing viewpoints on a wide range of important political and social matters-all without the slightest fear of legal liability, and in defiance of Congress's mandate that the "Internet and other interactive computer services offer a forum for a true diversity of political discourse." 🚩 47 U.S.C. § 230(a)(3).

Reynaldo GONZALEZ, et al., Petitioners, v. GOOGLE LLC,..., 2022 WL 17689645...

Case 4:18-cv-05159-HSG   Document 61-2   Filed 06/16/23   Page 5 of 46

This state of affairs is largely the result of lower courts' erroneous interpretations of two provisions of § 230(c) of the Communications Decency Act of 1996. *See* 47 U.S.C. § 230(c); Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 133, 138 (1996). This Court should correct those flawed interpretations and remand this case so the lower courts can reevaluate Petitioners' claims under the proper framework.

*First,* § 230(c)(1) states that internet service providers cannot be deemed the "publisher" or "speaker" of third-party content on their platforms. Like many lower courts, Petitioners' Question Presented erroneously assumes this provision "immunizes" certain conduct, including "traditional editorial functions," Pet. i, but that is doubly wrong. Section 230(c)(1) is merely definitional-it does not provide immunity. And it applies only to those liability regimes like defamation whose elements turn on whether the defendant is a mere "distributor" of **\*4** others' speech, or instead is the publisher or speaker itself. Historically, publishers and speakers faced different liability regimes than distributors, although neither group was considered "immune" from liability. For such causes of action, all § 230(c)(1) does is preclude courts from treating internet service providers as the speaker or publisher of third-party content on their websites. *See* Part I, *infra*.

*Second,* § 230(c)(2)(A) does expressly provide immunity, but only where platforms "in good faith" remove or restrict access to third-party content that is "obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable." 47 U.S.C. § 230(c)(2)(A). Under standard canons of interpretation, the "otherwise objectionable" language refers only to material in the same league as the terms preceding it-i.e., especially egregious telecommunications content over which Congress was understood to have regulatory authority, consistent with the First Amendment. *See* Part II, *infra*.

Despite the narrow textual scope of these provisions, lower courts have persistently held that § 230(c) provides internet platforms with immunity from almost *all* suits that pertain in any way to online content.

For example, the decisions below held that § "230(c)(1) precludes liability" in almost all suits about "material posted on the website by someone else," Pet.App.19a, 29a, because such suits effectively treat the platforms as "publishers" and challenge their "editorial decisions" or "traditional editorial **\*5** functions" in deciding which content to keep or remove, Pet.App.31a, 38a, 39a, 41a, 244a.

That analysis is wrong at every step. Section 230(c)(1) does not directly "preclude[] liability" at all, let alone based on whether the platform is exercising "traditional editorial functions," a term that appears nowhere in the statute. Because almost any decision about preserving, removing, or altering content can be described as an "editorial function," the lower courts' misinterpretation of § 230(c)(1) has led to a broad grant of immunity completely untethered from the text of the statute, and it has also rendered entirely superfluous the limited grant of immunity in § 230(c)(2) for removal of especially egregious content.

As a result of this warped view of § 230(c)(1), platforms have been found immune from suits far outside the narrow scope of immunity Congress actually authorized in § 230(c)(2), which has been largely eviscerated. Confident in their ability to dodge liability, platforms have not been shy about restricting access and removing content based on the politics of the speaker, an issue that has persistently arisen as Big Tech companies censor and remove content espousing conservative political views, despite the lack of immunity for such actions in the text of § 230(c).

Reynaldo GONZALEZ, et al., Petitioners, v. GOOGLE LLC,..., 2022 WL 17669645...

Case 4:18-cv-05159-HSG   Document 61-2   Filed 06/16/23   Page 6 of 46

This Court should return 🚩 § 230(c) to its textual scope and make clear that beyond that realm, the statute is silent. Because the lower courts' erroneous interpretation of 🚩 § 230(c) so infected their analysis in **\*6** this case, this Court should remand for those courts to apply the corrected framework to Petitioners' claims in the first instance. *See* Part III, *infra*.

Under that framework, 🚩 § 230(c)(1) does not directly provide any immunity for Google. At most, it requires that Google not be deemed the publisher or speaker of certain content, but that determination is relevant only if the elements of Petitioners' claims under the Anti-Terrorism Act turn on whether Google itself is the publisher or speaker of the challenged content-an issue on which *amici* take no position. Even if Google is deemed not to be the speaker or publisher of the challenged content, that does not mean Google necessarily receives immunity, as 🚩 § 230(c)(1) itself does not provide immunity at all. Nor does 🚩 § 230(c)(2) provide immunity here, as Google's challenged actions do not fall within the narrow scope of that provision, which does not grant *carte blanche* for social media companies to invoke immunity for removing content that any eggshell-psyche user might possibly deem offensive.

## ARGUMENT

**I.** 🚩 **Section 230(c)(1) Does Not Provide Immunity and Is Relevant Only to Claims Whose Elements Require Treating a Platform As the Publisher or Speaker.**

Lower courts have consistently held that 🚩 § 230(c)(1) precludes liability for a wide swath of claims against internet service providers. But both aspects of that approach are wrong.

**\*7** 🚩 Section 230(c)(1) does not provide any immunity. Rather, it states a definition: no internet service provider "shall be treated as the publisher or speaker of any information provided by another information content provider." 🚩 47 U.S.C § 230(c)(1). Although this requirement can *indirectly* affect liability, it (1) does not directly confer immunity, and (2) applies only in limited circumstances where the elements of a claim turn on treating an internet platform as the speaker or publisher of others' words. Outside of this limited realm, 🚩 § 230(c)(1) plays no role whatsoever, and the lower courts-including the Ninth Circuit below-have erred by turning 🚩 § 230(c)(1) into a super-immunity provision.

### A. The Correct Scope and Effect of 🚩 § 230(c)(1).

"To see how far we have strayed from the path on which Congress set us out, we must consider where that path began." 🚩 *Force v. Facebook, Inc.*, 934 F.3d 53, 77 (2d Cir. 2019) (Katzmann, C.J., concurring in part and dissenting in part) (arguing that courts have drastically misinterpreted 🚩 § 230(c)).

Justice Thomas has explained how 🚩 § 230(c)(1)'s text--in particular its reference to "publisher or speaker"--invokes the terminology of traditional common-law liability, which should guide courts' interpretation of 🚩 § 230(c)(1) today. "Traditionally, laws governing illegal content distinguished between publishers or speakers (like newspapers) and distributors (like newsstands and libraries)." **\*8** *Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC*, 141 S. Ct. 13, 14 (2020) (Thomas, J., respecting denial of certiorari). Publishers "could be strictly liable for transmitting illegal content" "because they exercised editorial control" over the publication of that content. *Id.* Distributors, on the other hand, were liable "only when they knew (or constructively knew) that content was illegal" because they "acted as a mere conduit without exercising editorial control." *Id.*

Case 4:18-cv-05159-HSG   Document 61-2   Filed 06/16/23   Page 7 of 46

Reynaldo GONZALEZ, et al., Petitioners, v. GOOGLE LLC,..., 2022 WL 17669645...

Accordingly, even when not labeled as the publisher or speaker, a defendant was not given immunity, although the plaintiffs burden was higher.

Congress was aware of this distinction when it enacted 🔖 § 230(c)(1) in response to the New York state trial court decision in 🚩 *Stratton Oakmont, Inc. v. Prodigy Servs. Co.*, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995), which had likewise "use[d] the same terms"-i.e., "publisher" and "distributor"-in the context of libel claims against an online platform, *Malwarebytes*, 141 S. Ct. at 15-16 (Thomas, J., respecting denial of certiorari) (citation omitted).

🔖 Section 230(c)(1), then, has a narrow scope. It targets only those causes of action that "include, in their elements, treating the ... platform ... as a publisher or speaker of another's words." Adam Candeub, *Reading Section 230 as Written*, 1 J. FREE SPEECH L. 139, 147 (2021); *see* 🔖 *Force*, 934 F.3d at 81 (Katzmann, C.J., concurring in part and dissenting in part) ("The question is ... whether to establish the claim the court must necessarily view the defendant, not as a publisher in the abstract, but rather as *the* publisher of that third-party information."). The "classic example is defamation," Candeub, **\*9** *Reading Section 230 as Written, supra*, 1 J. FREE SPEECH L. at 147, although 🔖 § 230(c)(1) is not limited to defamation claims.

And 🔖 § 230(c)(1) also has a narrow effect for any qualifying causes of action: the court is merely barred from treating the online platform as the publisher or speaker of another's content. In the context of defamation, for example, 🔖 § 230(c)(1) provides that platforms can be held liable for third-party content only if the defendant would be culpable under the higher standard for "distributor" liability. *See Malwarebytes*, 141 S. Ct. at 14 (Thomas, J., respecting denial of certiorari). Although this provides platforms with a strong litigation advantage, it does not mean they are entitled to *immunity*.

Statutory context confirms this interpretation of 🔖 § 230(c)(1). If Congress had intended to fully immunize internet service providers from distributor liability, it could have done so using the same language it did in the very next subsection, which provides that "[n]o provider or user of an interactive computer service shall be held liable" in certain specified circumstances. 🔖 47 U.S.C. § 230(c)(2). Indeed, courts' erroneously broad interpretation of 🔖 § 230(c)(1) has rendered entirely superfluous the narrower 🔖 § 230(c)(2) immunity. *See* Part II, *infra*.

Further, Congress elsewhere indicated that it was not providing immunity for distributors. "Congress expressly imposed distributor liability in the very same Act that included 🔖 § 230" by making it a crime to "'knowingly ... display' obscene material to children, **\*10** even if a third party created that content." *Malwarebytes*, 141 S. Ct. at 15 (Thomas, J., respecting denial of certiorari) (citing 🚩 47 U.S.C. § 223(d)).

### B. Lower Courts Have Dramatically Misinterpreted 🔖 § 230(c)(1).

Despite its clear text, lower courts have warped 🔖 § 230(c)(1) beyond all recognition, holding that it provides broad immunity against a wide range of claims involving online content even while openly acknowledging that the statutory text itself says no such thing. *See, e.g.,* 🔖 *Jones v. Dirty World Ent. Recordings LLC*, 755 F.3d 398, 406 (6th Cir. 2014) ("Although 🔖 § 230(c)(1) does not explicitly mention immunity or a synonym thereof, this and other circuits have recognized the provision to protect internet service providers for the display of content created by someone else.") (collecting authorities); *see also* Pet.App.29a-31a; 🔖 *Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 18-19 (1st Cir. 2016); 🔖 *Klayman v. Zuckerberg*, 753 F.3d 1354, 1359 (D.C. Cir. 2014).

Case 4:18-cv-05159-HSG   Document 61-2   Filed 06/16/23   Page 8 of 46

Reynaldo GONZALEZ, et al., Petitioners, v. GOOGLE LLC,..., 2022 WL 17669645...

### 1. *Zeran:* The Original Flawed Decision.

Almost every erroneous 🚩 § 230(c)(1) decision can trace its roots back to 🚩 *Zeran v. America Online, Inc.,* 129 F.3d 327 (4th Cir. 1997), which held that 🚩 § 230(c)(1) provides immunity whenever a suit seeks "to hold a service provider liable for its exercise of a publisher's traditional editorial functions-such as deciding whether to publish, withdraw, postpone or alter content." 🚩 *Id.* at 330.

**\*11** The immunity conferred by *Zeran* is expansive because most claims involving online content can be framed as a challenge to removing, keeping, or altering content. *See* 🚩 *Force,* 934 F. 3d. at 81 (Katzmann, C.J., concurring in part and dissenting in part) (rejecting the view that 🚩 § 230(c)(1) covers "the full range of activities in which [entities subject to 🚩 § 230(c)(1)] might engage").

*Zeran* rests on several errors. *First,* it mistakenly collapsed the publisher/distributor distinction. The court believed that distributor liability "is merely a subset, or a species, of publisher liability" because "distributors are considered to be publishers" in many scenarios. 🚩 129 F.3d at 332. The court pointed to examples like "the negligent communication of a defamatory statement" and argued that in such scenarios, distributors "may also be regarded as participating to such an extent ... as to be regarded as publishers." *Id.*

Rather than acknowledge that sometimes it may be difficult to determine whether a party is acting as a publisher or as a distributor, *see Malwarebytes,* 141 S. Ct. at 15 (Thomas, J., respecting denial of certiorari), the Fourth Circuit instead held that distributors of online content *necessarily* act as publishers of that same content.

But not every act of distribution "constitute[s] publication." 🚩 *Zeran,* 129 F.3d at 332. In many circumstances, even online, it is easy to distinguish the two because a distributor acts only as a conduit that "delivers or transmits matter *published by a* **\*12** *third person."* Restatement (Second) of Torts § 581 (1977) (emphasis added). There is also a distinction in how an entity can react to allegedly illegal material. *See* William E. Buelow III, *Re-Establishing Distributor Liability on the Internet,* 116 W. VA. L. REV. 313, 345 (2013). A platform generally acts like a publisher if it can directly edit or alter the specific offending material, but it acts like a distributor if all it can do is remove the post or video in its entirety. *See id.*

More importantly, Congress itself distinguished between publisher and distributor liability, and courts cannot subsequently interpret that distinction into oblivion. As noted above, "Congress enacted the [Communications Decency Act] in response to" *Stratton Oakmont,* which itself expressly distinguished between publisher and distributor liability based on *who* was responsible for publication, 🚩 *F.T.C. v. Accusearch Inc.,* 570 F.3d 1187, 1195 (10th Cir. 2009). On the way to holding that the defendant internet service provider was a "publisher rather than a distributor," the court in *Stratton Oakmont* contrasted liability where the provider "republishes ... as if he had originally published" (*i.e.,* "publisher"-based liability), with distributor liability. 🚩 *Stratton Oakmont,* 1995 WL 323710, at \*3 ("In contrast [to the liability of republishers], distributors such as book stores and libraries may be liable for defamatory statements of others only if they knew or had reason to know of the defamatory statement at issue.").

It was error for *Zeran* to disregard the finely tuned distinction that both Congress and *Stratton Oakmont* **\*13** had employed. *See Malwarebytes,* 141 S. Ct. at 15 (Thomas, J., respecting denial of certiorari).

*Second,* having vastly expanded the scope of conduct covered by 🚩 § 230(c)(1), *Zeran* committed another error by granting immunity for that broad group. As explained above, 🚩 § 230(c)(1) does not immunize any conduct at all. It simply directs that

Reynaldo GONZALEZ, et al., Petitioners, v. GOOGLE LLC,..., 2022 WL 17669645...

Case 4:18-cv-05159-HSG   Document 61-2   Filed 06/16/23   Page 9 of 46

certain conduct be treated as falling into one of two different liability regimes, neither of which necessarily results in immunity for the defendant.

This judicially imposed immunity was premised largely on non-textual statutory "purposes" and on the "Internet context." 129 F.3d at 333. "If computer service providers were subject to distributor liability, they would face potential liability each time they receive notice" of illegal third-party content on their platform. *Id.* While it "might be feasible for the traditional print publisher" or distributor to handle the management of such potentially illegal content, the court reasoned, "the sheer number of postings on interactive computer services would create an impossible burden in the Internet context." *Id.*

"Because the probable effects of distributor liability on the vigor of Internet speech and on service provider self-regulation are directly contrary to § 230's statutory purposes," the court concluded that Congress did not "intends" to leave platforms exposed to distributor liability in § 230(c)(1). *Id.* The Fourth Circuit seems to have believed that the text of § 230(c)(1) was not strong enough, and that Congress must have meant to go further and provide **\*14** immunity-despite the notable omission of any such language in the statutory text and the fact that Congress did expressly provide immunity for a narrow set of conduct in the very next subsection. But as this Court has recognized in other contexts, "even the most formidable argument concerning the statute's purposes could not overcome the clarity [of] the statute's text." *Kloeckner v. Solis*, 568 U.S. 41, 55 n.4 (2012).

*Third, Zeran* asserted that providers would be entitled to immunity even for content they had "alter[ed]." 129 F.3d at 330. But that conflicts with another provision in the Communications Decency Act, which states that an "information content provider" includes anyone "responsible, in whole or *in part*, for the creation or development" of the content, 47 U.S.C. § 230(f)(3) (emphasis added), and "[n]owhere does [ § 230(c)(1)] protect a company that is itself the information content provider," *Malwarebytes*, 141 S. Ct at 16 (Thomas, J., respecting denial of certiorari). Stated another way, content created by a platform is not third-party content at all, and thus § 230(c)(1) does not apply, contrary to *Zeran. See* Candeub, *Reading Section 230 as Written, supra*, 1 J. FREE SPEECH L. at 151-52.

### 2. *Zeran's* Flawed Analysis Has Led to the Widespread Erroneous Conferral of Immunity.

Numerous circuits, including the Ninth Circuit as recognized in the decision below, have readily adopted **\*15** *Zeran's* flawed logic, and the results confirm just how far those courts have strayed from the text of § 230(c)(1).

Courts have invoked § 230(c)(1) to find immunity from a wide variety of causes of action that pertain in any way to online content, under the doubly erroneous view that all such claims treat platforms as publishers and that any publication activities are entitled to immunity. This includes claims that online providers engaged in or encouraged housing discrimination, *see Chi. Law. Comm. for Civil Rts. Under Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666, 671-72 (7th Cir. 2008); negligence, *see Green v. Am. Online (AOL)*, 318 F.3d 465, 470-71 (3d Cir. 2003); securities fraud and cyberstalking, *see Universal Comm. Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 420-22 (1st Cir. 2007); and sex trafficking, *see Jane Doe*, 817 F.3d at 16-21. The Ninth Circuit has even provided immunity for content that the service provider itself had altered, which is not covered by § 230(c)(1) at all. *See Batzel v. Smith*, 333 F.3d 1018, 1031 (9th Cir. 2003).

A recent case demonstrates just how expansively courts continue to interpret § 230(c)(1) to provide Big Tech platforms with almost unquestioned immunity. In *Anderson v. TikTok, Inc.*, No. 22-cv-1849, 2022 WL 14742788 (E.D. Pa. Oct. 25, 2022),

Case 4:18-cv-05159-HSG    Document 61-2    Filed 06/16/23    Page 10 of 46

Reynaldo GONZALEZ, et al., Petitioners, v. GOOGLE LLC,..., 2022 WL 17669645...

the district court relied on Third Circuit precedent to hold that the video-sharing platform TikTok was immune under 🗁 § 230(c)(1) for distributing videos of teenagers engaged in the "Blackout Challenge," where "users strangle themselves with household items and then encourage others to do the same." 🏳 **\*16** *TikTok,* 2022 WL 14742788, at \*2. The plaintiff argued that her claims--for design defects and failure to warn--properly treated TikTok as a distributor (not a publisher) in accordance with 🗁 § 230(c)(1), but the court held that the claims actually required treating TikTok as a publisher because the case "involves decisions related to the ... distribution of [third-party] content." 🏳*Id.* at \*7.

Invoking *Zeran,* the court erroneously conflated publication and distribution to the point that it covered almost anything an internet service provider does (or does not do) with respect to content. *Id* at \*4. And then, also invoking *Zeran,* the court compounded that error by holding that 🗁 § 230(c)(1) grants immunity against any claims falling within that overbroad scope of "publication." *See* 🏳*id.* at \*4-7.

\* \* \*

Some courts have justified their expansive misreading of 🗁 § 230(c)(1) on the premise that " 🗁 section 230 should not be construed grudgingly." 🗁 *Jane Doe,* 817 F.3d at 18. But a statute should be construed according to its "ordinary, contemporary, common meaning"-neither "grudgingly" nor expansively. 🗁 *Sw. Airlines Co. v. Saxon,* 142 S. Ct. 1783, 1788 (2022). Anything beyond that common meaning is a policy decision for Congress, not the courts. *See* 🗁 *Malwarebytes,* 141 S. Ct. at 18 (Thomas, J., respecting the denial of certiorari) (stating that courts have "filter[ed] their decisions through the policy argument that 🗁 Section 230(c)(1) should be construed broadly") (internal quotation marks omitted).

**\*17** This Court should hold that the ordinary, contemporary, common, and natural reading of 🗁 § 230(c)(1) provides only a definitional statement for a limited set of cases, rather than the "nearly impenetrable super-First Amendment" that the lower courts have construed it to mean. JEFF KOSSEFF, THE TWENTY-SIX WORDS THAT CREATED THE INTERNET 95 (2019).

## II. Restoring 🗁 § 230(c)(1)'s Proper Scope Will Reinvigorate 🗁 § 230(c)(2)(A), Which Provides Immunity in Limited Circumstances.

As noted above, one of the strongest arguments supporting the view that 🗁 § 230(c)(1)'s definitional statement does not provide immunity is that Congress expressly provided immunity in the very next subsection, 🗁 § 230(c)(2), which precludes liability where internet service providers "in good faith" remove material that is "obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable." 🗁 47 U.S.C. § 230(c)(2)(A).

But few courts have had to interpret 🗁 § 230(c)(2) because it has been rendered irrelevant by their erroneous transformation of 🗁 § 230(c)(1) into a super-immunity provision. *See* JOSH HAWLEY, THE TYRANNY OF BIG TECH 128 (2021) ( "[W]hen the dust had cleared from this strenuous bout of judicial renovation, 🗁 Section 230 had been completely rewritten."). For example, when an organization for Sikhs alleged that Facebook used race to determine who could access the group's Facebook page, the district and circuit courts **\*18** both analyzed the claim under 🗁 § 230(c)(1), rather than 🗁 § 230(c)(2), even though the latter directly addresses restriction of access to content. *See* 🗁 *Sikhs for Just., Inc. v. Facebook, Inc.,* 144 F. Supp. 3d 1088,

1094-95 (N.D. Cal. 2015), *aff'd*, 697 F. App'x 526 (9th Cir. 2017). Given the courts' longstanding erroneous interpretation of § 230(c)(1), they unsurprisingly granted immunity, even though restricting access to a Facebook page on the basis of race is in no way a "good faith" restriction of content on par with removing obscenity, as § 230(c)(2) would require before a court could confer immunity.

Restoring § 230(c)(1) to its proper scope would revitalize § 230(c)(2)'s narrow grant of immunity, where "Congress expected that tech companies would carry others' speech without favor to any specific viewpoint, and would keep defamatory and other unlawful speech off their platforms." Senator Ted Cruz, Letter to Ambassador Robert Lighthizer, United States Trade Representative, Nov. 1, 2019, *available at* https://tinyurl.com/2kuhrrpx. But because of courts' erroneous expansion of § 230(c)(1), large platforms currently enjoy immunity even for censoring content with which they simply disagree on political grounds.

And Big Tech companies have not been shy about "routinely censor[ing] lawful-- overwhelmingly conservative-speech with which they disagree. From Twitter locking the account of Senate Majority Leader Mitch McConnell's campaign to YouTube demonetizing a conservative comedian's account following pressure from the left, the examples of **\*19** censorship are as disturbing as they are numerous." Press Release, Senator Ted Cruz, *Sen. Cruz Calls on USTR to Eliminate Inclusion of Special Protections for Big Tech in U.S. Trade Deals* (Nov. 1, 2019). [2]

But removing or restricting content because of the politics of the user is not "good faith" and thus not entitled to immunity under § 230(c)(2). As scholars have argued, "a pattern of dishonest explanation of the basis for removal--for instance, referring to facially neutral terms of service while covertly applying them in a viewpoint-discriminatory way--might **\*20** be inconsistent with 'good faith,' which is often defined as requiring an honest explanation of one's position." Adam Candeub & Eugene Volokh, *Interpreting 47 U.S.C. § 230(c)(2)*, 1 J. FREE SPEECH L. 175, 177 (2021).

Moreover, conservative viewpoints on social and political matters do not rise to the level of being "obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable," § 230(c)(2)(A), and thus removal of such content is not eligible for immunity at all. Platforms sometimes invoke the catch-all "otherwise objectionable," but the canon of *ejusdem generis* squarely rejects that view. That canon provides that "[w]here general words follow specific words in a statutory enumeration, the general words are usually construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Yates v. United States*, 574 U.S. 528, 545 (2015) (cleaned up).

Accordingly, § 230(c)(2)'s "otherwise objectionable" phrase must mean material that is in the same league as "obscene, lewd, lascivious, filthy, excessively violent, [or] harassing" material. 47 U.S.C. § 230(c)(2)(A). Those examples largely track categories of especially egregious telecommunications speech that were commonly believed to be regulable by the government. *See* Candeub & Volokh, *supra, Interpreting 47 U.S.C. § 230(c)(2)*, 1 J. FREE SPEECH L. at 180-83. But so-called misinformation, "'disinformation,' 'hate speech,' 'misgendering,' [and] 'religious hatred'" do not rise to that level-and thus removal or restriction of such content does not qualify **\*21** for immunity under § 230(c)(2). Candeub, *Reading Section 230 as Written, supra, 1* J. FREE SPEECH L. at 143.

One court has gotten it right, however. In upholding Texas's social media law H.B. 20, which generally bars social media platforms from removing posts made by users in Texas based on their viewpoints, the Fifth Circuit confirmed that "read in context, § 230(c)(2) neither confers nor contemplates a freestanding right to censor," but rather "only considers the removal of limited categories of content, like obscene, excessively violent, and similarly objectionable expression"--and thus "says nothing about viewpoint-based or geography-based censorship." *NetChoice, LLC v. Paxton*, 49 F.4th 439, 468 (5th Cir. 2022).

Finally, online platforms' own behavior confirms the inapplicability of 🚩 § 230(c)(2) to censoring conservative viewpoints. Platforms often remove certain material when posted by conservatives, while consciously leaving the same type of material online when posted by liberals or others. [3] Content-removal **\*22** decisions that turn on the identity of the speaker, rather than the nature of the content, are not covered by 🚩 § 230(c)(2) at all and also confirm that platforms do not view the content as on par with obscenity and excessive violence.

Once the Court restores the proper interpretation of 🚩 § 230(c)(1), the important but narrow immunity that Congress conferred in 🚩 § 230(c)(2) will regain its place of prominence in suits about online service providers' removal and restriction of content.

### III. The Court Should Correct the Ninth Circuit's Flawed Interpretation of 🚩 § 230(c) and Remand for Reevaluation of Petitioners' Claims.

The courts below relied on the misguided *Zeran* line of cases to hold that Google is immunized from Petitioners' claims under the Anti-Terrorism Act because 🚩 § 230(c)(1) allegedly precludes liability for any challenge to a platform's "editorial decisions" or "traditional editorial functions." Pet.App.39a, 244a.

The lower courts' analysis was so thoroughly infected by their erroneous precedent on 🚩 § 230(c) that this Court should pronounce the correct view of 🚩 § 230(c) and then remand for the lower courts to reevaluate Petitioners' claims under the proper framework. *See* 🚩 *Force*, 934 F.3d at 84 (Katzmann, C.J., concurring in part and dissenting in part) (arguing the **\*23** case should be remanded for reevaluation under the correct interpretation of 🚩 § 230(c)).

In particular, this Court should hold that 🚩 § 230(c)(1) does not directly provide immunity at all, and it applies only to claims whose elements turn on treating Google as the publisher or speaker of other parties' content. Even for such claims, 🚩 § 230(c)(1) does not necessarily confer immunity but instead only precludes a court from treating Google as the speaker or publisher of third-party content. Whether that ultimately affects or precludes liability will turn on Petitioners' specific causes of action. But 🚩 § 230(c)(1) itself does nothing more, nor has Google sought immunity pursuant to the narrow confines of 🚩 § 230(c)(2).

*Amici* take no position on whether Petitioners ultimately should prevail, nor on whether algorithms pushing ISIS videos constitute Google's own content or instead remain third-party content. *Amici* contend that those issues would be best addressed afresh by the lower courts after this Court has scraped away the layers of erroneous 🚩 § 230(c) precedent on which the decisions below relied.

### **\*24** CONCLUSION

The Court should remand so the lower courts can reevaluate Petitioners' claims under the correct interpretation of 🚩 § 230(c) as pronounced by this Court.

Respectfully submitted,

CHRISTOPHER G. BYRNES THE HERITAGE FOUNDATION

Reynaldo GONZALEZ, et al., Petitioners, v. GOOGLE LLC,..., 2022 WL 17669645...

Case 4:18-cv-05159-HSG   Document 61-2   Filed 06/16/23   Page 13 of 46

214 Massachusetts Ave. NE

Washington, DC 20002

GENE P. HAMILTON AMERICA FIRST LEGAL FOUNDATION

300 Independence Ave. SE

Washington, DC 20003

C. BOYDEN GRAY

R. TRENT MCCOTTER

*Counsel of Record*

JONATHAN BERRY MICHAEL BUSCHBACHER BOYDEN GRAY & ASSOCIATES PLLC

801 17th St. NW, Suite 350

Washington, DC 20006

(202) 706-5488

mccotter@boydengray

associates.com

December 7, 2022

### Footnotes

1      No counsel for any party has authored this brief in whole or in part, and no entity or person, aside from *amici curiae* and their counsel, made any monetary contribution intended to fund the preparation or submission of this brief. The parties have filed blanket-consent letters.

2      *See also, e.g.*, Chuck Grassley, Opinion, *'Big Tech' Is Censoring Conservatives*, THE GAZETTE (Feb. 28, 2022), https://tinyurl.com/2sesc4vb ("I was surprised to learn that Facebook recently flagged a news article I posted on one of my Facebook pages as 'false information.'"); Mike Lee, Opinion, *Big Tech Companies Falsely Claim No Bias Against Conservatives-They May Be Violating Law*, Fox NEWS (Oct. 29, 2020), https://tinyurl.com/2e 7u7sx5; Diana Glebova, *Zuckerberg Admits Facebook Suppressed Hunter Biden Laptop Story Ahead of 2020 Election*, NAT'L REVIEW (Aug. 26, 2022), https://tinyurl.com/z5v9mwjz; Matt Schlapp, Opinion, *Big Tech Keeps Trying to Silence Conservatives and It Won't Stop Until We Stop Them*, Fox NEWS (Mar. 30, 2022), https://tinyurl.com/2tr4rnnx (discussing YouTube banning videos of Donald Trump's speech at the 2022 Conservative Political Action Conference); Felicia Somnez & Amy B. Wang, *YouTube Suspends Ron Johnson for a Week After GOP Senator Touts Questionable Drugs to Fight COVID-19*, WASH. POST (June 11, 2021), https://tinyurl.com/ms44ckzz; Avi Selk, *Facebook Told Two Women Their Pro-Trump*

Reynaldo GONZALEZ, et al., Petitioners, v. GOOGLE LLC,..., 2022 WL 17669645...

Case 4:18-cv-05159-HSG   Document 61-2   Filed 06/16/23   Page 14 of 46

*Videos Were 'Unsafe'*, WASH. POST (Apr. 10, 2018), https: //tinyurl.com/2fyshj46; Erik Schelzig, *Twitter Shuts Down Blackburn Campaign Announcement Video*, AP NEWS (Oct. 9, 2017), https://tinyurl.com/2rv3v577; Michael Nunez, *Former Facebook Workers: We Routinely Suppressed Conservative News*, GIZMODO (May 9, 2016), https:// tinyurl.com/4xjdhbnz.

3    *See, e.g.*, Marco Rubio, Opinion, *We Must Stop Silicon Valley-Democrat Collusion Before Conservatives Are Silenced for Good*, FOX NEWS (July 28, 2021), https://tinyurl.com/yc8d3nap (noting the "hypocrisy" of social media companies censoring Covid-19 vaccine skepticism when "President Biden himself cast suspicion on the efficacy of the vaccines ... [and] Vice President Kamala Harris ... declar[ed] that '[i]f Donald Trump tells us that we should take it, I'm not taking it.'"); Michael Rubin, *Why Does Big Tech Censor Conservatives and Not Terrorists, AM.* ENTERPRISE INST. (Mar. 3, 2021), https://tinyurl.com/wx9wm968; Brian Flood, *Twitter, Facebook Have Censored Trump 65 Times Compared to Zero for Biden, Study Says*, FOX NEWS (Oct. 19, 2020), https://tinyurl.com/3u3yd4us.

---

**End of Document**                                                      © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 17640417 (U.S.) (Appellate Brief)

Supreme Court of the United States.

Reynaldo GONZALEZ, et al., Petitioners,

v.

GOOGLE LLC.

No. 21-1333.

December 7, 2022.

On Writ of Certiorari to the United States Court of Appeals for the Ninth Circuit

**Brief for the State of Texas as Amicus Curiae Suggesting Reversal**

Ken Paxton, Attorney General of Texas, Brent Webster, First Assistant Attorney General, Office of the Attorney General, P.O. Box 12548 (MC 059), Austin, Texas 78711-2548, Judd.Stone@oag.texas.gov, (512) 936-1700.

Judd E. Stone II, Solicitor General, Counsel of Record, Lanora C. Pettit, Principal Deputy Solicitor General, Bill Davis, Deputy Solicitor General, Ryan S. Baasch, Kyle D. Highful, Assistant Solicitors General.

### *i TABLE OF CONTENTS

Table of Authorities ................................................................ II

Interest of Amicus Curiae ........................................................ 1

Summary of Argument ............................................................ 1

Argument ............................................................................ 3

I. Section 230 Does Not Shield Google from Liability for the Recommendations It Provides. 3

A. Section 230's text provides no protection for Google's recommendations ................................................. 4

B. Section 230's history confirms that it does not shield Internet platforms from the consequences of their own conduct ............................................................... 8

II. Judicial Expansion of Section 230 Causes Real-World Harm ............................................................... 17

III. Faithfully Interpreting Section 230 Will Neither Render It a Nullity nor Threaten the Internet. 20

Conclusion .......................................................................... 22

### *ii TABLE OF AUTHORITIES

**Cases:**

*ACLU v. Reno*, 929 F. Supp. 824 (E.D. Pa. 1996) .............. 14

*Bennett v. Google, LLC*, 882 F.3d 1163 (D.C. Cir. 2018) ........ 3, 6

*Cain v. Chesapeake & Potomac Tel. Co.*, 3 App. D.C. 546 (D.C. Cir. 1894) ........................................................ 16

*Carlin Commc'ns, Inc. v. Mountain States Tel. & Tel. Co.*, 827 F.2d 1291 (9th Cir. 1987) .................................... 13

*Chesapeake & Potomac Tel. Co. of Va. v. Carless*, 102 S.E. 569 (Va. 1920) ..................................................... 16

*Cianci v. New Times Pub. Co.*, 639 F.2d 54 (2d Cir. 1980) . 11

*Doe v. GTE Corp.*, 347 F.3d 655 (7th Cir. 2003) ................ 14

*Doe v. Internet Brands, Inc.*, 824 F.3d 846 (9th Cir. 2016) . 5

*Emery v. Rochester Tel. Corp.*, 3 N.E.2d 434 (N.Y. 1936) ....... 16

*In re Facebook, Inc.*, 625 S.W.3d 80 (Tex. 2021) .............. 5, 6

*Fair Hous. Council of San Fernando Valley v. Roommates. com, LLC*, 521 F.3d 1157 (9th Cir. 2008) ......................... 8, 17

*Force v. Facebook, Inc.*, 934 F.3d 53 (2d Cir. 2019) .......... 16

*Henderson v. Source for Pub. Data, L.P.*, 53 F.4th 110 (4th Cir. 2022) ................ 5

*Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12 (1st Cir. 2016) ................ 19

**\*iii** *Lunney v. Prodigy Servs. Co.*, 723 N.E.2d 539 (N.Y. 1999) ................ 12

*Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC*, 141 S. Ct. 13 (2020) ................ 10, 12, 16, 19, 21

*Mountain States Tel. & Tel. Co. v. Hinchcliffe*, 204 F.2d 381 (10th Cir. 1953) ................ 16

*NetChoice, LLC v. Paxton*, 49 F.4th 439 (5th Cir. 2022) ..... 18

*NetChoice, LLC v. Paxton*, 142 S. Ct. 1715 (2022) ................ 17

*NetChoice, LLC v. Paxton*, 573 F. Supp. 3d 1092 (W.D. Tex. 2021) ................ 18

*O'Brien v. W. U. Tel. Co.*, 113 F.2d 539 (1st Cir. 1940) ....... 11

*Reno v. ACLU*, 521 U.S. 844 (1997) ................ 9, 10, 15

*Stratton Oakmont, Inc. v. Prodigy Servs. Co.*, 1995 WL 323710 (N.Y. Sup. Ct. 1995) ................ 10, 12, 13, 14

*W. Union Tel. Co. v. Ferguson*, 57 Ind. 495 (1877) ................ 13

*Zeran v. Am. Online, Inc.*, 129 F.3d 327 (4th Cir. 1997) ..... 6, 15, 16

**Constitutional Provision and Statutes:**

U.S. Const. amend. I ................ 18

18 U.S.C.:

§ 2333(a) ................ 6

§ 2333(d)(2) ................ 5, 6, 21

**\*iv** 47 U.S.C.:

§ 223(a) ................ 9, 15

§ 223(d) ................ 9, 15

§ 230(a)(3) ................ 18

§ 230(c) ................ 4, 15

§ 230(c)(1) ................ , 3-8, 14, 21

§ 230(c)(2) ................ 14

§ 230(c)(2)(A) ................ 3

§ 230(e)(1) ................ 15

§ 230(e)(3) ................ 17

§ 230(f)(3) ................ 5, 8, 15, 16

Communications Decency Act of 1996, Title V ................ 8

Communications Decency Act § 230 ................ 1-4, 6-22

Telecommunications Act of 1996 ................ 9, 10, 14

Telecommunications Act of 1996:

§ 502 ................ 9, 10

§ 509 ................ 10

**Other Authorities:**

141 Cong. Rec. H8470 (daily ed. Aug. 4, 1995) ................ 10

141 Cong. Rec. S9019 (daily ed. June 26, 1995) ................ 9

Adam Candeub, *Reading Section 230 as Written*, 1 J. FREE SPEECH L. 139 (2021) ................ 11, 13, 16

H. Rep. No. 104-458 (1996) ................ 13

Letter from Nat'l Ass'n of Att'ys Gen. to Cong. Leaders (May 23, 2019), https://tinyurl.com/naagletter2019 ................ 20

Mary Graw Leary, *The Indecency and Injustice of Section 230 of the Communications Decency Act*, 41 HARV. J.L. & PUB. POL'Y 553 (2018) .................................................................... 22

 **v** Mississippi State University Extension, *Types of Internet Connections*, https://tinyurl.com/dialupconnection .................. 13

Robert Cannon, *The Legislative History of Senator Exon's Communications Decency Act: Regulating Barbarians on the Information Superhighway*, 49 FED. COMM. L.J. 51 (1996) . 9, 15

## *1 INTEREST OF AMICUS CURIAE [1]

The State of Texas has an interest in the proper interpretation of Section 230 of the Communications Decency Act. Like other States, Texas asks this Court to correct the lower courts' misapplication of Section 230 in a way that prevents injured citizens from obtaining relief for wrongs committed through the Internet. *See* Br. of Tennessee. Those lower-court decisions generally serve to protect bad actors from the consequences of their actions-not to promote the free exchange of ideas on the Internet.

But Texas also has a more specific interest: Internet platforms are relying on Section 230 in other litigation that is likely to come before the Court to defeat a Texas law that protects free speech on the Internet. That litigation presents important questions, and the Court's decision in this case may affect it.

## SUMMARY OF ARGUMENT

I. Section 230 directs courts not to treat the provider of an interactive computer service as "the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). That rule of construction is irrelevant here, where petitioners allege that Google's *own* recommendations aided and abetted the acts of terror perpetrated by ISIS. Neither those recommendations nor the algorithms that produced them were provided by "another" party. Google **2** went beyond passively hosting content. It actively promoted certain videos over others. Section 230 does not shield it from liability for doing so.

Section 230's statutory history confirms that it is inapplicable here. Congress enacted Section 230 as part of a broader statutory scheme to limit children's access to Internet pornography. Section 230 does that by allowing Internet platforms to remove pornography (and similar content) without risk of being called to account for the content *they fail* to remove. In that way, Section 230 reflects a deliberate choice by Congress to treat Internet platforms like telephone companies, which have long had a warrant to remove certain content without becoming liable for everything else that occurs on their platforms. But Section 230's historical context does not suggest that Congress intended the statute to provide a blanket immunity for any claim tangentially related to third-party content.

II. Overbroad judicial interpretations of Section 230 have harmed States and their citizens in two ways. *First*, a court infringes state sovereignty whenever it incorrectly holds that Section 230 prevents a State from enforcing its laws. *Second*, a court harms a State's citizens whenever it misapplies Section 230 and improperly prevents those citizens from obtaining redress for wrongs committed online. This Court should stem the tide of those harms by faithfully interpreting Section 230.

III. Social-media giants and their advocates often prognosticate that any restriction on Section 230's reach would result in the end of the digital world as we know it. Those concerns are hyperbolic. A lack of Section 230 protection by no means

guarantees liability. Plaintiffs, including petitioners, must still prove their claims. Allowing petitioners' claims here to proceed would not make **\*3** Google liable for the content of every video it recommends. Rather, Google faces potential liability only if petitioners can demonstrate that recommendations *themselves* amount to "aiding and abetting" terrorism. And even if correctly interpreting ⚑Section 230 requires companies like Google to adjust their business models, that does not foretell disaster. Indeed, given rampant online evils like human trafficking and child pornography, such an adjustment may well prove salutary. But if Internet platforms believe the social value of their businesses justifies an immunity broader than that conferred by ⚑Section 230's text, that is a trade-off that Congress, rather than the courts, should make.

## ARGUMENT

### I. ⚑Section 230 Does Not Shield Google from Liability for the Recommendations It Provides.

⚑Section 230 prevents a court from treating a provider of "an interactive computer service" (an Internet platform) as the publisher or speaker of information provided by "another information content provider" (an unaffiliated content producer). ⚑47 U.S.C. § 230(c)(1). And it protects a provider that makes a good-faith effort to restrict access to pornography and other content that is "obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable" from liability for content that it does not restrict. ⚑*Id.* § 230(c)(2)(A). But it does not confer broad immunity on a provider merely because a claim involves third-party content.

Here, petitioners do not allege that Google is directly liable for what the *terrorists* did, but for what *Google* did. According to petitioners, Google actively aided and abetted terrorism by recommending ISIS videos to YouTube users. J.A. 169-70, 173. Because petitioners' claims do not seek to hold Google liable for information provided **\*4** by another information content provider, ⚑Section 230(c)(1) provides Google no protection.

The precedent on which Google relies is conspicuously flawed. It rests principally on a single circuit decision from ⚑Section 230's infancy that deviated from that statute's text in a policy-driven and misguided effort to protect then-nascent Internet service providers. That precedent also ignores ⚑Section 230's historical context, which shows that ⚑Section 230 was enacted to allow website operators to remove pornography without risking strict liability for content they do not censor-not to provide operators with a shield so expansive that it approaches the protections of sovereign immunity. Judicial decisions expanding ⚑Section 230's protections beyond its text have instead improperly immunized online businesses from liability for facilitating such heinous acts as child sex trafficking and international terrorism, as well as invidiously discriminating among who may use their services.

As a matter of first impression, this Court should recognize the scope of the statute's plain language, backed up by the context that framed its enactment. That is the only way to honor the delicate balance that Congress struck between fostering the Internet's growth and ensuring that growth does not jeopardize the most vulnerable and impressionable Americans.

### A. ⚑Section 230's text provides no protection for Google's recommendations.

Entitled "Protection for private blocking and screening of offensive material," ⚑Section 230 limits the liability of providers of an interactive computer service in targeted ways. Its centerpiece is subsection (c), "Protection for 'Good Samaritan' blocking and screening of offensive material." Subsection (c)(1) states that "[n]o provider or **\*5** user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." "[I]nformation content provider" is defined by subsection (f)(3) as "any person or entity that is responsible, in whole or in part, for the creation

or development of information provided through the Internet or any other interactive computer service." Google argues that

📙 Section 230(c)(1) bars petitioners' claims. *E.g.*, Br. in Opp. 20. It does not.

Petitioners allege that Google repeatedly and knowingly recommended ISIS videos to YouTube users. J.A. 169, 173. According to petitioners, those recommendations were made because the ISIS videos were selected by automated algorithms created by Google. J.A. 173. Petitioners seek damages under a federal law that creates liability "as to any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed" an act of international terrorism. 18 U.S.C. § 2333(d)(2); *see* J.A. 176-78. Petitioners thus seek to hold Google liable for taking affirmative acts-aiding and abetting terrorists-by recommending terrorist videos based on algorithms that Google created. Because those recommendations are not "information provided by another information content provider," 📙 Section 230(c)(1) offers Google no protection.

A recent decision of the Supreme Court of Texas, *In re Facebook, Inc.*, 625 S.W.3d 80 (Tex. 2021) (orig. proceeding), is instructive. In that case, human-trafficking survivors brought claims for "negligence, negligent undertaking, gross negligence, and products liability based on Facebook's alleged failure to warn of, or take adequate measures to prevent, sex trafficking on its internet platforms." *Id.* at 83. The plaintiffs also brought claims **\*6** "under a Texas statute creating a civil cause of action against those who intentionally or knowingly benefit from participation in a sex-trafficking venture." *Id.* The court (largely relying on federal circuit authority that it recognized as dubious) held that 📙 Section 230 barred the plaintiffs' common-law claims. *Id.* at 93-96. But the court also held that the plaintiffs' statutory claims could proceed. *Id.* at 96-101. The court reasoned that the statutory claims did not "treat Facebook as [someone] who bears responsibility for the words or actions of third-party content providers," but instead treated Facebook "like any other party who bears responsibility for its *own* wrongful acts." *Id.* at 98. And the court found it "highly unlikely that Congress... sought to immunize those companies from *all* liability for the way they run their platforms, even liability for their own knowing or intentional acts as opposed to those of their users." *Id.*

Like the statutory claims in *Facebook*, but unlike the claims at issue in many cases in which courts have held that 📙 Section 230 barred relief, petitioners' claims do not seek to hold Google liable for "information provided by another information content provider." 📙 47 U.S.C. § 230(c)(1). That is, petitioners' claims do not seek to hold Google liable merely for harm caused by third-party information. *Cf., e.g., Bennett v. Google, LLC*, 882 F.3d 1163, 1164 (D.C. Cir. 2018) (plaintiffs claim was based on an allegedly defamatory message posted by a third party); 📙 *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 328 (4th Cir. 1997) (same). Instead, the harm alleged by petitioners is death resulting from an act of international terrorism. J.A. 155, 178, 181. Federal law creates primary liability for the attack. 18 U.S.C. § 2333(a). And it creates secondary liability for aiding and abetting it. *Id.* § 2333(d)(2).

**\*7** Petitioners' claims, therefore, are two steps removed from any third-party posts. They seek to hold Google secondarily liable for a terrorist act. And their theory is that Google aided and abetted the terrorists by actively and voluntarily recommending ISIS videos. Those recommendations were provided by Google, not by ISIS or any other information content provider. Petitioners thus allege that Google's own acts-the recommendations it provided-make it secondarily liable for physical actions that the terrorists took, not for posting information online. Whether that theory entitles petitioners to relief remains to be seen. But regardless of whether petitioners can link the video recommendations and the murder on the merits, 📙 Section 230 plays no role here.

Of course, Google's liability under petitioners' theory does, in a limited respect, depend on third-party content. If ISIS videos did not exist on its platform, Google could not face potential aiding-and-abetting liability for recommending those videos. But 📙 Section 230 does not preempt petitioners' claims merely because third-party content is somehow involved. "[📙 Section 230(c)(1)] does not insulate a company from liability for all conduct that happens to be transmitted through the internet. Instead, protection under 📙 § 230(c)(1) extends only to bar certain claims, in specific circumstances, against particular types of parties."

*Henderson v. Source for Pub. Data, L.P.*, 53 F.4th 110, 129 (4th Cir. 2022); *see Doe v. Internet Brands, Inc.*, 824 F.3d 846, 853 (9th Cir. 2016) (noting that Section 230 "does not provide a general immunity against all claims derived from third-party content").

The court of appeals rejected petitioners' argument that "Google does more than merely republish content created by third parties." Pet. App. 31a. It did so by applying a "material contribution" test, according to which **\*8** a website operator "creat[es] or develop[s]" third-party content when it alters the content in a way that materially contributes *"to its alleged unlawfulness."* Pet. App. 32a (quoting *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157,1168 (9th Cir. 2008) (*en banc*)). But this Court need not address the propriety of the material-contribution test for determining whether the alteration of third-party content makes a defendant an information content provider under Section 230(f)(3), because Google's recommendations were solely its own acts. It is those recommendations, not Google's hosting or alteration of ISIS's videos, that are at issue here.

The court of appeals also erred in concluding that Google's conduct here is not outside of Section 230's scope because Google's "algorithms do not treat ISIScreated content differently than any other third-party created content." Pet. App. 37a. That is a *merits* determination. And that reasoning is flawed because a recommendation, by its very nature, treats some content differently from other content. There are a vast number of videos on YouTube. Google's algorithms sort through them and select a handful of videos to recommend to a given user at a given time. That is the *opposite* of treating all content the same. And Section 230(c)(1) does not shield Google's decision to go beyond merely hosting content and to instead promote certain videos over others.

### B. Section 230's history confirms that it does not shield Internet platforms from the consequences of their own conduct.

The statutory history of Section 230 confirms the congressional intent to encourage Internet platforms to remove pornography and similar content, not to grant **\*9** platforms government-like immunity for their own conduct. Supplementing legislation that criminalized the sharing of pornography, Section 230 gave Internet companies telephone-like liability protections, which allowed them to voluntarily remove pornography even as they carried countless other forms of content. This was necessary because an early-Internet judicial decision concluded that online platforms that remove *any* content become liable for *all* of it. Cases decided shortly after Section 230's enactment, however, badly distorted this statutory framework, requiring this Court's intervention.

1. Section 230 was enacted as part of the Telecommunications Act of 1996, the "major components of [which] have nothing to do with the Internet." *Reno v. ACLU*, 521 U.S. 844, 857 (1997). The exception was "Title V-known as the 'Communications Decency Act of 1996.'" *Id.* at 858. That Act, in turn, provided two independent but overlapping legislative solutions for how to limit children's access to Internet pornography.

*First*, Senator Jim Exon's proposal, ultimately enacted as Section 502 of the Telecommunications Act, 47 U.S.C. § 223(a), (d), took a heavy-handed approach to what was then considered a severe problem of pornography on the Internet. Time Magazine "pour[ed] fuel" on this incendiary issue when it incorrectly reported that over 80% of images available on early Internet platforms were pornographic. 141 Cong. Rec. S9019 (daily ed. June 26, 1995) (statement of Rep. Grassley) (reprinted version of the story). That story was introduced in Congress. *Id.* And "[t]he study became the source of endless articles and

editorials." Robert Cannon, *The Legislative History of Senator Exon's Communications Decency Act: Regulating Barbarians on the Information Superhighway*, 49 FED. COMM. L.J. 51, 54 (1996). In order "to **\*10** protect minors from 'indecent' and 'patently offensive' communications on the Internet," 🚩 *Reno*, 521 U.S. at 849, Senator Exon's legislation imposed criminal penalties on persons who send such images to minors or who "knowingly permit[] any telecommunications facility under his control to be used" for such activity "with the intent that it be used for such" activity, 🚩 *id.* at 859-60; *see* Telecommunications Act of 1996, Pub. L. 104-104, 110 Stat. 56, § 502.

*Second*, some representatives likewise recognized the need to protect children from pornography but favored a lighter legislative touch. They proposed what became Section 509 of the Telecommunications Act, and later 🚩 Section 230, "as a substitute for the Exon" approach. 🚩 *Reno*, 521 U.S. at 858 n.24. Instead of being coercive, 🚩 Section 230 more gently encouraged Internet platforms to be "Good Samaritans" by voluntarily removing pornography. 141 Cong. Rec. H8470 (daily ed. Aug. 4, 1995) (statement of Rep. Cox, one of the bill's sponsors). To do that, it provided legal *protection* to Internet platforms that opted to remove such content. That protection was important in the light of a state-court decision from New York that threatened to expose Internet platforms that remove content to tremendous legal liability for what they did *not* remove. *Id.*

2. The New York *case*- 🚩 *Stratton Oakmont, Inc. v. Prodigy Servs. Co.*, 1995 WL 323710 (N.Y. Sup. Ct. 1995)-misapplied "specific background legal principles" about how Internet platforms should be liable for their users' speech. *Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC*, 141 S. Ct. 13, 14 (2020) (Thomas, J., statement respecting denial of certiorari). Specifically, the court applied *newspaper-type* liability to an Internet platform's decisions about what to transmit, even though **\*11** Internet platforms generally bear no resemblance to newspapers. The bill that became 🚩 Section 230 represented Congress's rejection of that misapplication, providing critical context for how 🚩 Section 230 operates.

Tort law has long applied different liability standards to speech intermediaries. The classic example is defamation: newspapers and other comparable publishers are generally deemed to be the speakers of any third-party content they carry and are held liable to the same extent as the underlying authors. *See, e.g.,* 🚩 *Cianci v. New Times Pub. Co.*, 639 F.2d 54, 60-61 (2d Cir. 1980) (explaining that such publishers are "subject to liability just as if [they] had published [the libelous content] originally"). A newspaper, therefore, cannot defend against a defamation action on the ground that some unaffiliated party was the author of the defamation it printed.

Other entities are liable for third-party content they carry only in limited contexts. A telegraph company, for example, could be held liable only in the "rare case[]" in which it "happened to know that the message" it transmitted "was [tortious] or that the sender was acting, not in the protection of any legitimate interest, but in bad faith and for the purpose of traducing another." 🚩 *O'Brien v. W. U. Tel. Co.*, 113 F.2d 539, 543 (1st Cir. 1940). Telephone companies, meanwhile, are generally regarded as completely immune from liability for the third-party content they carry. *See* Adam Candeub, *Reading Section 230 as Written*, 1 J. FREE SPEECH L. 139, 146 n.26 (2021) (collecting authorities). [2]

**\*12** The *Stratton Oakmont* court botched the application of these established liability frameworks to the new Internet medium. [3] In that case, "[a]n early Internet company was sued for failing to take down defamatory content posted by an unidentified commenter on a message board." *Malwarebytes*, 141 S. Ct. at 14 (Thomas, J.). The *Stratton Oakmont* court accepted that Internet platforms generally were "conduit[s]" not legally responsible for their users' speech. 🚩 1995 WL 323710, at \*3. But it concluded that liability was appropriate there because "the company... held itself out as a family-friendly service provider that moderated and took down offensive content." *Malwarebytes*, 141 S. Ct. at 14 (Thomas, J.). In the court's view, the practice of taking down *some* content made the Internet platform liable, just like a newspaper, for all the content it allowed to remain available. 🚩 *Stratton Oakmont*, 1995 WL 323710, at \*3, \*4.

"Congressmen on both sides of the debate"-Senator Exon's side, and those who favored the light-touch approach-"found *Stratton* objectionable." Cannon, *supra*, at 62. That is because the case essentially "create[d] a 'Hobson's choice'" for Internet platforms: they could either "creat[e] 'child safe' areas that expose" their companies to "liability as ... editor[s], monitor[s], or publisher[s]" of *everything* on their platforms, or they could "do[] nothing," allowing pornography to blight their spaces, "in order to protect [themselves] from liability." **\*13** *Id.* As a result, "[e]arly platforms ... claimed they could not offer porn-free environments because of *Stratton Oakmont*." Candeub, *supra*, at 142.

3. "One of the specific purposes of" what became 🚩 Section 230 was "to overrule *Stratton-Oakmont v. Prodigy* and any other similar decisions." H. Rep. No. 104-458, at 194 (1996) (Conf. Rep.) (cleaned up). *Stratton Oakmont's* Hobson's choice blocked Congress's goal of limiting Internet pornography. Its reasoning also made little practical sense because telephone companies, the closest analogue to Internet companies, had long been allowed to remove certain content without jeopardizing their immunity from liability for other content passing through their wires. *See, e.g,* 🚩 *Carlin Commc'ns, Inc. v. Mountain States Tel. & Tel. Co.,* 827 F.2d 1291, 1292 (9th Cir. 1987) (pre-recorded pornographic messages). Likewise for telegraph companies: "If... the message is expressed in indecent, obscene or filthy language, then, in our opinion, the telegraph company will be excused from the [obligatory] transmission of any such message." *W. Union Tel. Co. v. Ferguson,* 57 Ind. 495, 498-99 (1877) (stating the common law rule). 🚩 Section 230 attempted to solve the Hobson's choice problem by largely adopting the same liability framework for the Internet. *See, e.g.*, Candeub, *supra*, at 146.

For many reasons, prevailing sentiment at the time aptly supported the equivalence between telephones and the Internet. For one, Internet service was generally delivered "through a modem that uses a telephone line to connect to the Internet." *See* Mississippi State University Extension, *Types of Internet Connections*, https://tinyurl.com/dialupconnection (noting that a "dial-up" **\*14** connection "was the first widely used type of Internet connection"). [4]

Additionally, instantaneous communication on Internet platforms most nearly resembled and was regarded as "analogous to a telephone party line, using a computer and keyboard rather than a telephone." 🚩 *ACLU v. Reno,* 929 F. Supp. 824, 835 (E.D. Pa. 1996) (three-judge panel's findings of fact), *aff'd,* 🚩 521 U.S. 844 (1997). That is "because, as with the telephone, an Internet user must act affirmatively and deliberately to retrieve specific information online." *Id.* at 851-52; *see* 🚩 *Doe v. GTE Corp.,* 347 F.3d 655, 659 (7th Cir. 2003) (Easterbrook, J.) ("A web host, like a delivery service or phone company, is an intermediary."). And, after all, 🚩 Section 230 was enacted as part of the "Telecommunications Act" of 1996-an Act that in most relevant part modified federal law that applied to telephones.

🚩 Section 230 codified the telephone-style liability scheme for Internet platforms in two ways. *First*, it provided that "[n]o provider or user of an interactive computer service"-i.e., an Internet platform-"shall be treated as the publisher or speaker of any information provided by *another.*" 🚩 47 U.S.C. § 230(c)(1) (emphasis added). *Second*, it established that this default rule is not displaced if the Internet platform takes action "in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable." 🚩 *Id.* § 230(c)(2). That way, a message board like the one at issue in *Stratton Oakmont* could remove pornography without becoming responsible for other potentially tortious material it did *not* remove. **\*15** Importantly, however, 🚩 Section 230 offered no protection to "information content providers"-meaning persons or entities "responsible, in whole or in part, for the creation or development of information." 🚩 *Id.* § 230(f)(3).

4. Although Section 230 was originally offered as a "substitute" for Senator Exon's legislation, it was (as already noted) ultimately "enacted as an *additional* section of the Act." *Reno*, 521 U.S. at 858 n.24 (emphasis added). Indeed, it provided that nothing in it should "be construed to impair the enforcement of" Exon's language. 47 U.S.C. § 230(e)(1). "As a result, the [two components] were described as fitting together 'like a hand in a glove.'" Cannon, *supra*, at 68. Exon's component criminalized acts of sharing pornography. 47 U.S.C. § 223(a), (d). And Section 230 protected "Good Samaritan[s]" who take it down. *Id.* § 230(c).

5. Two early court decisions had an outsized impact on the interpretation of the Communications Decency Act and continue to have significant distorting effects on how lower courts apply Section 230.

*First*, in *Reno*, this Court held that Exon's approach ran afoul of the First Amendment because it "effectively suppresse[d] a large amount of speech that adults ha[d] a constitutional right to receive and to address to one another." 521 U.S. at 874. That took the Exon glove off the Section 230 hand.

*Second*, in *Zeran v. America Online*, 129 F.3d 327, the Fourth Circuit adopted an atextual test for determining when Section 230's protection applies. Specifically, it concluded that "lawsuits seeking to hold an [Internet platform] liable for its exercise of a publisher's traditional editorial functions-such as deciding whether to publish, withdraw, postpone *or alter* content-are barred." *Id.* at 330 (emphasis added). This ruling ran **\*16** directly afoul of the provision of Section 230 that expressly maintained liability for those "responsible, in whole or in part, for the creation or development of information." 47 U.S.C. § 230(f)(3). Nevertheless, *Zeran* started a cascade of authority whereby other circuits and state courts adopted the Fourth Circuit's decision, treating it as akin to a decision of *this* Court. *See, e.g., Force v. Facebook, Inc.*, 934 F.3d 53, 63 (2d Cir. 2019) (*Zeran* was a "seminal" decision); Candeub, *supra*, at 154-55 ("with perhaps one exception," the lower courts all follow *Zeran).*

*Zeran's* capacious conception of Section 230 protection has wrongly immunized Internet platforms from liability in a range of situations, including for their *own* conduct. *See Malwarebytes*, 141 S. Ct. at 16 (Thomas, J.). But Section 230 does not, and was not designed to, protect Internet platforms from the consequences of their own actions. An Internet platform, after all, can remove pornography without committing its own unlawful acts. And the telephone companies to which Internet platforms were compared have historically been liable for their *own* acts and omissions-notwithstanding the absence of liability for their *users'* speech. *See, e.g., Mountain States Tel. & Tel. Co. v. Hinchcliffe*, 204 F.2d 381,382 (10th Cir. 1953) ("where a telephone company negligently fails to furnish proper telephone facilities"); *Cain v. Chesapeake & Potomac Tel. Co.*, 3 App. D.C. 546, 553 (D.C. Cir. 1894) (holding that a telephone company can be held liable for misleading callers about a subscriber's availability); *Emery v. Rochester Tel. Corp.*, 3 N.E.2d 434, 437 (N.Y. 1936) ("unexplained failure to give any service"); *Chesapeake & Potomac Tel. Co. of Va. v. Carless*, 102 S.E. 569, 570 (Va. 1920) (negligently disconnecting subscribers).

**\*17 \* \* \***

Far from suggesting that the Court should depart from Section 230's plain text, the statute's history confirms that it means what it says: Section 230 provides targeted protections for platforms that want to censor pornography and other harmful content without being exposed to liability for all third-party content that is not removed. But Section 230 does not "create a

lawless noman's-land on the Internet." *Roommates.com*, 521 F.3d at 1164. And just as acts that aid and abet terrorists "are unlawful when [done] face-to-face or by telephone, they don't magically become lawful when [done] electronically online." *Id.*

## II. Judicial Expansion of Section 230 Causes Real-World Harm.

The proper interpretation of Section 230 is no mere academic exercise. By going beyond Section 230's text, courts have harmed States and their citizens in two ways.

*First*, state sovereignty is infringed when courts improperly hold that Section 230 preempts state law. Section 230(e)(3) provides that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." The stakes for States are therefore high.

For example, Texas recently enacted "a groundbreaking... law that addresses the power of dominant social media corporations to shape public discussion of the important issues of the day." *NetChoice, LLC v. Paxton*, 142 S. Ct. 1715,1716 (2022) (Alito, J., dissenting from grant of application to vacate stay). That law seeks to preserve free speech on the Internet by preventing the biggest social-media platforms from censoring users based on viewpoint. *Id.*

**\*18** Trade associations representing the platforms sued the Texas Attorney General, arguing primarily that the law violates the First Amendment. *Id.* In the alternative, the trade organizations, whose members include Google and YouTube, *NetChoice, LLC v. Paxton*, 573 F. Supp. 3d 1092, 1103 (W.D. Tex. 2021), *vacated and remanded sub nom.* *NetChoice, LLC v. Paxton*, 49 F.4th 439 (5th Cir. 2022), have also argued that Texas's law "is preempted by" Section 230, *id.* at 1101. If Section 230 is given an overbroad interpretation, Texas may be unable to enforce its carefully structured scheme for protecting free speech in the digital public square. It would be remarkable for Section 230 to preempt a law like Texas's which, after all, dovetails with one of Section 230's own stated values-free speech. 47 U.S.C. § 230(a)(3). And Texas's law in no way frustrates Section 230's safe harbor for the removal of pornography. It does not impose *any* liability on the Internet platforms for content they fail to remove. And it allows them to continue removing pornography in multiple ways. First, removing pornography will generally (and perhaps always) not constitute "viewpoint" discrimination, and so will not fall within the law's proscription. *NetChoice*, 49 F.4th at 445-46. Second, the law gives Internet platforms an explicit permit to remove unlawful content or content they are "specifically authorized to censor by federal law," even if it would constitute "viewpoint" discrimination. *Id.* at 446. In all events, the Court should not interpret Section 230 in a way here that pre-determines the answer to the questions posed in that case.

*Second*, courts have prevented the citizens of Texas and other States from obtaining redress for their injuries. Courts have strayed so far from the statute's text that they now extend immunity to online platforms even **\*19** when the plaintiff is not "trying to hold the defendants liable 'as the publisher or speaker' of third-party content" but only for "the defendant's own misconduct." *Malwarebytes*, 141 S. Ct. at 18 (Thomas, J.).

For example, in *Jane Doe No. 1 v. Backpage.com, LLC*, victims of sex trafficking alleged "that Backpage, with an eye to maximizing its profits, engaged in a course of conduct designed to facilitate sex traffickers' efforts to advertise their victims on the website." 817 F.3d 12, 16 (1st Cir. 2016). The plaintiffs further alleged that "Backpage's expansion strategy involved the deliberate structuring of its website to facilitate sex trafficking," that "Backpage selectively removed certain postings made in the 'Escorts' section (such as postings made by victim support organizations and law enforcement 'sting' advertisements)

and tailored its posting requirements to make sex trafficking easier," and that Backpage removed metadata from uploaded photographs to protect traffickers. *Id.* at 16-17.

As a result of being trafficked through Backpage, one plaintiff was allegedly raped over 1,000 times. *Id.* at 17. Yet the court embraced a "broad construction" of Section 230 and an admittedly "capacious conception of what it means to treat a website operator as the publisher or speaker of information provided by a third party." *Id.* at 19. The court focused on "but-for" causation-that is, there would have been no harm "but for the content of the postings," *id.* at 20-and held that each decision Backpage made, even if intended to facilitate sex trafficking, was undertaken as a "publisher" and therefore entitled to protection under Section 230, *id.* at 20-21.

The attorneys general of 44 States, the District of Columbia, and two Territories have pointed out to Congress **\*20** that courts have interpreted Section 230 too broadly and reached "the perverse result" of protecting those who knowingly profit from illegal activity. Letter from Nat'l Ass'n of Att'ys Gen. to Cong. Leaders (May 23, 2019), https://tinyurl.com/naagletter2019. For these reasons, it is critical that the Court faithfully construe Section 230 and avoid the interpretive errors made by many lower courts. *See* Br. of Tennessee.

### III. Faithfully Interpreting Section 230 Will Neither Render It a Nullity nor Threaten the Internet.

Google insists that a holding from this Court that Section 230 does not bar petitioners' claims would make Section 230 "a dead letter" and "would threaten the basic organizational decisions of the modern internet." Br. in Opp. 22. Google is wrong.

*First*, neither petitioners nor the State of Texas suggest that Section 230 offers Google and other online platforms no protections. It certainly does. Section 230 shields Google from claims seeking to hold it liable as though it had spoken or published the myriad videos it hosts, and it allows Google to maintain that shield even when it chooses to censor pornography and similar offensive content. Section 230's protections would still fully honor Congress's decision that Internet platforms *not* be treated like newspapers, for example.

*Second*, as petitioners recognize, recommending content does not make a platform liable for the recommended content, but only for the recommendation. *See* Pet. Br. 28-29. That distinction is subtle but significant because it could affect-among other things-questions of causation and the extent of liability. Here, recommending ISIS videos potentially exposes Google to aiding-and-abetting liability because *the recommendations themselves* are allegedly unlawful. And petitioners must **\*21** show that the *recommendations themselves* caused their alleged harm. By contrast, if the alleged offense-or the act that proximately caused petitioners' harm-were creating and posting terrorist recruiting videos, Google would not be liable. Similarly, Google would not become liable for defamation by recommending a defamatory video. Holding Google liable for the contents of a third-party video would violate Section 230(c)(1)'s prohibition on treating Google "as the publisher or speaker of any information provided by another information content provider." Holding Google liable for its own recommendations does not.

*Third*, a lack of protection from Section 230 does not mean that Google will be liable for these or any other recommendations. "Paring back the sweeping immunity courts have read into § 230 would not necessarily render defendants liable for online misconduct. It simply would give plaintiffs a chance to raise their claims in the first place." *Malwarebytes*, 141 S. Ct. at 18 (Thomas, J.). Plaintiffs must still prove their cases. *See id.* Here, for example, it may be that recommending ISIS videos does not constitute aiding and abetting the terrorists "by knowingly providing substantial assistance." 18 U.S.C. § 2333(d)(2). A lack of

🚩Section 230 protection just means that a court can consider that question. Honoring Congress's enacted language will result in a new status quo that gives platforms and consumers alike ample protections from liability and abuse.

More fundamentally, Google assumes that "the basic organizational decisions of the modern internet"-which were enabled only by an overbroad interpretation of 🚩Section 230-are desirable. Br. in Opp. 22. But it is highly debatable that the 'Internet as we know it' is ... what we want it to be, particularly when it comes to sex **\*22** trafficking, pornography, child sex-abuse images, and exploitation." Mary Graw Leary, *The Indecency and Injustice of Section 230 of the Communications Decency Act, 41 HARV. J.L. & PUB. POL'Y 553, 554 (2018)*. "It is clear that, whatever 🚩§ 230 did for the legitimate digital economy, it also did for the illicit digital economy." *Id.* And 🚩Section 230's overbroad interpretation has left victims of this illicit behavior unable to obtain adequate redress. If that trade-off is worthwhile, it is one for Congress to make-not for Google to obtain through textually unjustifiable interpretations of 🚩Section 230.

## CONCLUSION

The Court should reverse the court of appeals' judgment and remand the case for further proceedings.

Respectfully submitted.

KEN PAXTON

Attorney General of Texas

BRENT WEBSTER

First Assistant Attorney General

OFFICE OF THE ATTORNEY GENERAL

P.O. Box 12548 (MC 059)

Austin, Texas 78711-2548

Judd.Stone@oag.texas.gov

(512) 936-1700

JUDD E. STONE II

Solicitor General

*Counsel of Record*

LANORA C. PETTIT

Principal Deputy Solicitor General

BILL DAVIS

Deputy Solicitor General

RYAN S. BAASCH

KYLE D. HIGHFUL

Assistant Solicitors General

DECEMBER 2022

## Footnotes

1       No counsel for any party authored this brief, in whole or in part. No person or entity other than the State of Texas
        contributed monetarily to its preparation or submission. Counsel of record for all parties received notice of amicus's
        intention to file this brief. The State of Texas takes no position on whether petitioners will prevail on the merits of their
        claims.

2       There is some authority for the proposition that telephone companies may be held liable for the "*knowing* transmission"
        of tortious third-party content. Candeub, *supra*, at 146 n.26. But, because telephone companies (unlike telegraph
        companies) seldom have the opportunity to review speech *before* it is transmitted, this category of liability, if it exists
        at all, is exceedingly narrow.

3       Indeed, after ⬜Section 230 was enacted, New York's high court overruled *Stratton Oakmont* because it concluded-
        consistent with what was by then the prevailing view-that an Internet platform is more analogous to a "telephone
        company" than a newspaper. *Lunney v. Prodigy Servs. Co.*, 723 N.E.2d 539, 542 (N.Y. 1999).

4       All websites were last accessed on December 7, 2022.

---

**End of Document**                                        © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 17650509 (U.S.) (Appellate Brief)

Supreme Court of the United States.

Reynaldo GONZALEZ, et al., Petitioners,

v.

GOOGLE LLC.

No. 21-1333.

December 7, 2022.

On Writ of Certiorari to the United States Court of Appeals for the Ninth Circuit

**Brief for the United States as Amicus Curiae in Support of Vacatur**

Brian H. Fletcher, Acting Solicitor General, Counsel of Record, Michael D. Granston, Deputy Assistant Attorney General, Malcolm L. Stewart, Deputy Solicitor General, Caroline A. Flynn, Assistant to the Solicitor General, Daniel Tenny, Courtney L. Dixon, Attorneys, Department of Justice, Washington, D.C. 20530-0001, (202) 514-2217, SupremeCtBriefs@usdoj.gov.

**\*I  QUESTION PRESENTED**

Whether 47 U.S.C. 230(c)(1), which states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider," bars petitioners' claims alleging that Google LLC violated the Antiterrorism Act of 1990, 18 U.S.C. 2331 *et seq.*, by hosting on its YouTube platform, and providing targeted recommendations for, videos created by a foreign terrorist organization.

[Note: Page II missing in original document]

**\*III  TABLE OF CONTENTS**

| | |
|---|---|
| Interest of the United States .................................................................................................................. | 1 |
| Statement: | |
| A. Section 230 .......................................................................................................................................... | 2 |
| B. The present controversy ...................................................................................................................... | 4 |
| Summary of argument ............................................................................................................................. | 8 |
| Argument ................................................................................................................................................. | 11 |
| A. Section 230 prohibits courts from holding a website liable for failing to block or remove third-party content, but it does not immunize the site's own conduct ............................................................... | 12 |
| 1. The defendant must be a provider of an interactive computer service ............................................... | 13 |
| 2. The plaintiff's claim must seek to treat the defendant as a "publisher or speaker" of third-party content ... | 13 |
| 3. The content must be provided by another information content provider ............................................. | 21 |
| B. The judgment of the court of appeals should be vacated ...................................................................... | 24 |
| 1. Section 230(c)(1) bars plaintiffs' claims to the extent they are premised on YouTube's failure to block or remove third-party content .......................................................................................................... | 25 |
| 2. Section 230(c)(1) does not preclude plaintiffs' claims based on YouTube's targeted recommendations | 26 |
| 3. Plaintiffs' alternative theories lack merit ......................................................................................... | 32 |
| Conclusion ................................................................................................................................................ | 35 |

**TABLE OF AUTHORITIES**

Cases:

*Barnes v. Yahoo!, Inc.*, 570 F.3d 1096 (9th Cir. 2009) ........ 15

**\*IV** Cases - Continued: Page

*Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119 (9th Cir. 2003) ................................................... 12

*Cianci v. New Times Publ'g Co.*, 639 F.2d 54 (2d Cir. 1980) ...................................................... 3

*Cutter v. Wilkinson*, 544 U.S. 709 (2005) ........................ 32

*Dennis v. MyLife.Com, Inc.*, No. 20-cv-954, 2021 WL 6049830 (D.N.J. Dec. 20, 2021) ............................ 24

*Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134 (2018) .............................................................. 12

*Erie Ins. Co. v. Amazon.com, Inc.*, 925 F.3d 135 (4th Cir. 2019) .............................................................. 15

*Fair Hous. Council v. Roommates.com, LLC*, 521 F.3d 1157 (9th Cir. 2008) ....................................... 13, 16, 17, 29

*FCC v. AT&T Inc.*, 562 U.S. 397 (2011) ............................. 22

*Force v. Facebook, Inc.*, 934 F.3d 53 (2d Cir. 2019), cert. denied, 140 S. Ct. 2761 (2020) .................................. 8, 13, 28, 31

*FTC v. Accusearch Inc.*, 570 F.3d 1187 (10th Cir. 2009) .... 21, 22

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974) ............... 3

*Getachew v. Google, Inc.*, 491 Fed. Appx. 923 (10th Cir. 2012) .............................................................. 29

*Henderson v. The Source for Public Data, L.P.*, 53 F.4th 110 (4th Cir. 2022) ................................................. 16, 24

*Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12 (1st Cir. 2016), cert. denied, 137 S. Ct. 622 (2017) ...................... 18, 19

*Levitt v. Yelp! Inc.*, No. C-10-1321, 2011 WL 5079526 (N.D. Cal. Oct. 26, 2011) .................................................. 16

*Malwarebytes, Inc. v. Enigma Software Grp. USA LLC*, 141 S. Ct. 13 (2020) .................................................. 17, 18, 19, 21

*Marshall's Locksmith Serv., Inc. v. Google, LLC*, 925 F.3d 1268 (D.C. Cir. 2019) ............................................. 13, 29

**\*V** *O'Kroley v. Fastcase, Inc.*, 831 F.3d 352 (6th Cir. 2016), cert. denied, 137 S. Ct. 639 (2017) ................................ 29

*Quarles v. United States*, 139 S. Ct. 1872 (2019) ............... 23

*Reno v. American Civil Liberties Union*, 521 U.S. 844 (1997) ............................................................. 2, 21, 33

*Stratton Oakmont, Inc. v. Prodigy Servs. Co.*, No. 31063/94, 1995 WL 323710 (N.Y. Sup. Ct. 1995) ................. 2, 3

*Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413 (1st Cir. 2007) ...................................................... 12, 21

*Zeran v. America Online, Inc.*, 129 F.3d 327 (4th Cir. 1997), cert. denied, 524 U.S. 937 (1998) ......................... 13, 15, 17, 18, 20

Constitution and statutes:

U.S. Const. Amend. I ................................................ 3

Allow States and Victims to Fight Online Sex Trafficking Act of 2017, Pub. L. No. 115-164, 132 Stat. 1253 .................... 19

§ 2(1), 132 Stat. 1253 ............................................... 19

§ 2(3), 132 Stat. 1253 ............................................... 19

§ 4(a), 132 Stat. 1254 ............................................... 19

Antiterrorism Act of 1990, 18 U.S.C. 2331 *et seq* .................. 4

18 U.S.C. 2333(a) ............................................... 4, 25

18 U.S.C. 2333(d) ............................................... 25

18 U.S.C. 2333(d)(2) ............................................ 5

Child Online Protection Act, Pub. L. No. 105-277, Div. C,
Tit. XIV, § 1403, 112 Stat. 2681-736 ............................ 33

Communications Act of 1934, 47 U.S.C. 151 *et seq*.:

§ 230, 47 U.S.C. 230 ............................................. 1

47 U.S.C. 207 ................................................... 21

Communications Decency Act of 1996, Pub. L. No. 104-104,
Tit. V, 110 Stat. 133 .......................................... 2

**\*VI**  § 509, 110 Stat. 137-139 ................................ 1, 2

47 U.S.C. 223 ................................................... 21

47 U.S.C. 223(d)(1)(B) .......................................... 20, 21

47 U.S.C. 223(e)(6) ............................................. 21

47 U.S.C. 230 ................................................... *passim*

47 U.S.C. 230(a)(1) ............................................. 3

47 U.S.C. 230(a)(3) ............................................. 3, 15

47 U.S.C. 230(b)(1) ............................................. 1, 3

47 U.S.C. 230(b)(4) ............................................. 4, 15

47 U.S.C. 230(c) ................................................ 4

47 U.S.C. 230(c)(1) ............................................. *passim*

47 U.S.C. 230(c)(2) ............................................. 4

47 U.S.C. 230(e)(3) ............................................. 4

47 U.S.C. 230(e)(5) ............................................. 19

47 U.S.C. 230(f)(2) ............................................. 8, 13, 23, 33

47 U.S.C. 230(f)(3) ............................................. 9, 21, 22, 29

47 U.S.C. 230(f)(4)(A) .......................................... 23

47 U.S.C. 230(f)(4)(B) .......................................... 23

47 U.S.C. 230(f)(4)(C) .......................................... 23

47 U.S.C. 231 ................................................... 33

47 U.S.C. 231(a)(1) ............................................. 34

47 U.S.C. 231(b)(3) ............................................. 34

47 U.S.C. 231(e)(5) ............................................. 34

Justice Against Sponsors of Terrorism Act, Pub. L. No.
114-222, § 4(a), 130 Stat. 854 ................................. 4

Telecommunications Act of 1996, Pub. L. No. 104-104, §
509, 110 Stat. 137 ............................................. 1

Miscellaneous:

Dan B. Dobbs et al., *Hornbook on Torts* (2d ed. 2016) ........... 2, 3, 14, 20

**\*VII**  H.R. Conf. Rep. No. 458, 104th Cong., 2d Sess.
(1996) ......................................................... 2

H.R. Rep. No. 572, 115th Cong., 2d Sess. Pt. 1 (2018) ........... 24

*Oxford English Dictionary Online* (3d ed. modified Sept. 2022) ..................................... 22

*Prosser and Keeton on the Law of Torts* (W. Page Keeton ed., 5th ed. 1984) ..................... 20

Restatement (Second) of Torts (1977) ..................................... 3, 14, 20

*Webster's Third New International Dictionary of the English Language* (1993) ..................................... 14, 22

## *1  INTEREST OF THE UNITED STATES

This case concerns a federal statute commonly known as Section 230 of the Communications Decency Act of 1996, [1] which prohibits courts from treating a provider of an interactive computer service as the "publisher or speaker" of third-party content posted on its platform. 47 U.S.C. 230(c)(1). The United States has a substantial interest in the proper interpretation of that provision. Congress enacted Section 230 "to promote the continued development of the Internet," 47 U.S.C. 230(b)(1),

**\*2**  by protecting online service providers and users from unwarranted liability. But an overly broad reading of Section 230(c)(1) would undermine the enforcement of other important federal statutes by both private plaintiffs and federal agencies.

## STATEMENT

### A.  Section 230

Congress enacted the Communications Decency Act of 1996 (CDA) as part of the Telecommunications Act of 1996. Pub. L. No. 104-104, Tit. V, 110 Stat. 133; see *Reno* v. *American Civil Liberties Union*, 521 U.S. 844, 857-858 (1997). One CDA provision, entitled "Protection for private blocking and screening of offensive material" and commonly referred to as Section 230, establishes protections for online service providers, including websites and other online platforms. CDA § 509, 110 Stat. 137-139 (47 U.S.C. 230).

A "specific purpose[]" of the provision was to respond to a state trial-court decision, *Stratton Oakmont, Inc.* v. *Prodigy Servs. Co.*, No. 31063/94, 1995 WL 323710 (N.Y. Sup. Ct. 1995). H.R. Conf. Rep. No. 458, 104th Cong., 2d Sess. 194 (1996). *Stratton Oakmont* involved a defamation suit against an online service provider, Prodigy, based on messages a third party had posted on one of Prodigy's online bulletin boards. 1995 WL 323710, at *1. Under common-law defamation principles, one who "publishes" a defamatory statement - *i.e.*, communicates it to someone other than the person defamed - can be held liable without proof that he knew the statement was defamatory, resulting in a form of strict liability. See Dan B. Dobbs et al., *Hornbook on Torts* 938 (2d ed. 2016) (Dobbs). And subsequent publishers can likewise face strict liability under the general rule that "one who repeats or otherwise republishes  **\*3**  defamatory matter is subject to liability as if he had originally published it." *Cianci* v. *New Times PubVg Co.*, 639 F.2d 54, 61 (2d Cir. 1980) (Friendly, J.) (quoting Restatement (Second) of Torts § 578 (1977) (Restatement)). [2]

The *Stratton Oakmont* court used the term "publisher" to refer to the kind of entity who could be held strictly liable in this way, and understood the term to include entities like newspapers, which are presumed to have editorial control over what they print. 1995 WL 323710, at *3. The plaintiffs had argued that Prodigy maintained that kind of control over the content on its bulletin boards because Prodigy screened postings in some respects and sometimes removed postings it deemed objectionable.

*Id.* at *2-*3. The court agreed that those attempts at content moderation rendered Prodigy a "publisher" of, and thus liable for, any defamatory speech that remained. *Id.* at *4-*5.

In the legislative findings accompanying 🔖Section 230, Congress recognized that the Internet "represent[s] an extraordinary advance in the availability of educational and informational resources" and "offer[s] a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity." 🔖47 U.S.C. 230(a)(1) and (3). Congress declared it the "policy of the United States" to "promote the continued development of the Internet and other interactive computer services," 🔖47 U.S.C. 230(b)(1), and to "remove disincentives for the development and utilization of blocking and filtering **\*4** technologies" that could better restrict access to objectionable material online, 🔖47 U.S.C. 230(b)(4).

To that end, 🔖Section 230(c) establishes two complementary protections. 🔖Section 230(c)(1) directs that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 🔖47 U.S.C. 230(c)(1). And 🔖Section 230(c)(2) states that "[n]o provider or user of an interactive computer service shall be held liable on account of *** any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable." 🔖47 U.S.C. 230(c)(2)(A). The statute expressly preempts any "cause of action" or "liability" "under any State or local law that is inconsistent with" those provisions. 🔖47 U.S.C. 230(e)(3).

## B. The Present Controversy

1. Plaintiffs (petitioners here) are relatives of No-hemi Gonzalez, an American citizen who was murdered in a November 2015 terrorist attack in Paris, France, for which the Islamic State of Iraq and Syria (ISIS) claimed responsibility. J.A. 14, 19-20. In 2016, plaintiffs sued respondent Google LLC under the Antiterrorism Act of 1990 (ATA), 18 U.S.C. 2331 *et seq.* The ATA authorizes American nationals injured "by reason of an act of international terrorism" to bring a civil action for treble damages in federal court. 18 U.S.C. 2333(a). In 2016, Congress amended the ATA to impose secondary civil liability on "any person who aids and abets, by knowingly providing substantial assistance" to, "an act of international terrorism." Justice Against Sponsors **\*5** of Terrorism Act, Pub. L. No. 114-222, § 4(a), 130 Stat. 854 (18 U.S.C. 2333(d)(2)).

In their operative complaint, plaintiffs allege that Google is liable under the ATA for providing resources and assistance to ISIS through Google's ownership of the YouTube video-sharing platform. J.A. 18. YouTube allows users to register an account, establish a "channel," post videos, and post comments on other users' videos. J.A. 59, 62. According to plaintiffs, ISIS and its adherents have used YouTube "to disseminate its videos and messages and execute its propaganda, recruitment, and operational campaigns." J.A. 72. Plaintiffs allege that, notwithstanding YouTube's policies prohibiting terrorist content, J.A. 65, "[p]rior to the Paris attacks, [YouTube] refused to actively monitor" the site "to block ISIS's use of" the platform, J.A. 157-158. Plaintiffs further allege that, even after identifying ISIS content, YouTube took inadequate steps to remove those accounts or to prevent blocked accounts from being reestablished. J.A. 158.

Plaintiffs also allege that YouTube supplies its users with videos that other users have posted. First, a user can "subscribe[]" to another user's "channel," and YouTube will "distribute" new videos on that channel to the channel's subscribers. J.A. 172. Second, plaintiffs allege that YouTube implements "computer algorithms" to "suggest[]" to particular users "videos and accounts" that are "similar" to those the user has previously watched and that play automatically when another video ends. J.A. 173; see J.A. 170 (screenshot of this feature showing a sidebar titled "Up next" with five videos listed). Plaintiffs allege that, by using the algorithms and related features to "recommend[] ISIS **\*6** videos," YouTube "assists ISIS in spreading its message." J.A. 169.

Plaintiffs additionally allege that Google maintains a commercial service called "AdSense," which allows users to "share in the revenue" from advertisements placed alongside the users' YouTube videos. J.A. 163. Plaintiffs allege that ISIS-affiliated users have received revenue from Google for participating in AdSense. J.A. 164-165.

2. The district court dismissed plaintiffs' complaint for failure to state a claim. Pet. App. 172a. The court held that ⚑Section 230(c)(1) barred plaintiffs' ATA claims except to the extent they were premised on revenue sharing through AdSense. *Id.* at 193a-207a. The court further held that the revenue-sharing claims did not plausibly allege an ATA violation. *Id.* at 214a-215a.

3. A divided panel of the Ninth Circuit affirmed. Pet. App. 1a-169a.

a. The court of appeals agreed with the district court that plaintiffs' non-revenue-sharing ATA claims were barred by ⚑Section 230(c)(1). Pet. App. 17a-44a. The court of appeals first held that YouTube provides an "interactive computer service" and is thus eligible for ⚑Section 230 protection. *Id.* at 29a-30a. The court then held that most of plaintiffs' ATA claims seek "to treat YouTube as a publisher or speaker" of ISIS content within the meaning of ⚑Section 230(c)(1). *Id.* at 30a-31a. The court stated that "[p]ublishing encompasses 'any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online.'" *Id.* at 31a (citation omitted). And it concluded that, "[b]ecause the non-revenue sharing claims seek to impose liability for allowing ISIS to place content on the **\*7** YouTube platform, they seek to treat [YouTube] as a publisher." *Ibid.*

The court of appeals further held that YouTube had not acted as an "information content provider" with respect to ISIS videos. Pet. App. 31a-44a. Plaintiffs had argued that YouTube "develop[s] the ISIS content that appears on YouTube, at least in part," *id.* at 32a (brackets in original), by recommending ISIS content to other users through its algorithms, *id.* at 38a. The court disagreed. It emphasized the absence of allegations that YouTube's algorithms treated ISIS-created content more favorably than any other content type. *Id.* at 37a. The court concluded that, because YouTube recommends content "based upon users' viewing history and what is known about the users," its recommendations reflect the same "core principle" as "a traditional search engine." *Id.* at 38a.

Finally, the court of appeals held that ⚑Section 230(c)(1) did not apply to plaintiffs' AdSense-related claims because those claims were premised on Google "giving ISIS money," not on "the publication of third-party information." Pet. App. 46a (emphasis omitted). The court agreed with the district court, however, that the revenue-sharing allegations did not state a claim for either direct or aiding-and-abetting liability under the ATA. *Id.* at 47a-68a.

b. Judge Berzon concurred. Pet. App. 81a-92a. She viewed circuit precedent as dictating the conclusion that ⚑Section 230(c)(1) bars claims based on YouTube's recommendations. *Id.* at 81a-82a. She explained, however, that if she were writing on a clean slate, she would hold that the term "publisher" in ⚑Section 230(c)(1) "does not include activities that promote or recommend content." *Id.* at 82a.

**\*8** c. Judge Gould concurred in part and dissented in part. Pet. App. 92a-110a. He agreed with the majority that ⚑Section 230(c)(1) protects YouTube from liability for "carrying the posts from ISIS on its platform." *Id.* at 102a. He would have held, however, that ⚑Section 230(c)(1) does not immunize YouTube from claims based on conduct that "that goes beyond merely publishing" ISIS videos, such as "recommending terrorism-related content based on past content viewed." *Ibid.* Judge Gould endorsed the views articulated by Chief Judge Katzmann's separate opinion in a similar case, ⚑*Force v. Facebook, Inc.*, 934 F.3d 53 (2d Cir. 2019), cert. denied, 140 S. Ct. 2761 (2020). Pet. App. 98a.

**SUMMARY OF ARGUMENT**

Section 230(c)(1) directs that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. 230(c)(1). That text is typically analyzed in three elements: (1) the defendant must be a provider of an "interactive computer service," and (2) the plaintiff's claim must seek to treat the defendant as a "publisher or speaker" of (3) "information provided by another information content provider." Section 230(c)(1) precludes a plaintiff's claim only if all three elements are met.

A. Section 230(c)(1)'s text is most naturally read to prohibit courts from holding a website liable for failing to block or remove third-party content, but not to immunize other aspects of the site's own conduct.

1. The statute's definition of "interactive computer service" covers most interactive websites and other providers of online services. 47 U.S.C. 230(f)(2).

2. A claim "treat[s]" an online-service-provider defendant "as the publisher or speaker" of information if **9** it seeks to hold the defendant liable for the presence of unlawful content on the defendant's platform. 47 U.S.C. 230(c)(1). "Publisher" is best read in this context to refer to one who commits the common-law act of "publication": the communication or dissemination of expressive material to another. Claims alleging liability based on a platform operator's failure to block or remove material created and posted by third parties meet this element, regardless of the precise cause of action. This includes claims alleging that the defendant was negligent or reckless with respect to, or had actual or constructive knowledge of, the disseminated material's objectionable character. Challenges to other aspects of the defendant's conduct, however - such as certain kinds of claims targeting the platform's own design choices - do not treat the defendant as a "publisher or speaker" of content provided by others and therefore do not trigger Section 230(c)(1) protection.

3. The third required element is that the disseminated material must have been "provided by another information content provider." 47 U.S.C. 230(c)(1). The statute defines "information content provider" to include anyone who "is responsible, in whole or in part, for the creation or development of information." 47 U.S.C. 230(f)(3). A website operator therefore loses Section 230(c)(1) protection when it is partially responsible for the content at issue. But a website does not become a co-developer (and thus an "information content provider") of third-party content merely by taking actions to display it or make it more accessible or usable.

B. Section 230(c)(1) bars plaintiffs' ATA claims to the extent those claims are premised on YouTube's alleged failure to block or remove ISIS videos from its **10** site, but the statute does not bar claims based on YouTube's alleged targeted recommendations of ISIS content. The judgment below therefore should be vacated.

1. Plaintiffs' broadest theory of direct and secondary ATA liability is that YouTube is liable for allowing ISIS-affiliated users to create accounts and post videos on the site. The court of appeals correctly held that Section 230(c)(1) precludes liability on that basis. YouTube is undoubtedly a provider of an interactive computer service, and plaintiffs do not allege that YouTube edited or otherwise contributed to the creation of the videos at issue. To the extent plaintiffs allege that YouTube violated the ATA by allowing its platform to be used for the dissemination of videos, Section 230(c)(1) bars their claims.

2. Plaintiffs' allegations regarding YouTube's use of algorithms and related features to recommend ISIS content require a different analysis. That theory of ATA liability trains on YouTube's own conduct and its own communications, over and above

its failure to block or remove ISIS content from its site. Because that theory does not ask the court to treat YouTube as a publisher or speaker of content created and posted by others, 🚩 Section 230(c)(1) protection is not available.

That does not mean that YouTube should be deemed an information content provider with respect to the videos themselves. Although 🚩 Section 230(c)(1) does not preclude liability premised on YouTube's recommendations if the elements of a private ATA suit are otherwise met, liability must be determined without regard to the fact that the recommended videos appeared on YouTube's own platform. Because the court of appeals did not consider whether plaintiffs have adequately **\*11** pleaded the elements of ATA liability on that theory, the case should be remanded so that the court may do so in the first instance.

3. Plaintiffs' other arguments lack merit. YouTube acts as a provider of an interactive computer service when it displays content on its site to users, even in the absence of an affirmative request. An online platform does not become an information content provider by taking the technical steps necessary to render user-generated content available to others on the site, such as creating URLs for videos and embedding them in hyperlinks. Finally, plaintiffs suggest that a platform becomes an information content provider by "notifying" users about new content. But to the extent they are challenging YouTube's distribution of new videos on a channel to the channel's subscribers, that feature is not meaningfully different from YouTube hosting the channel in the first place, and it does not justify treating YouTube as a co-creator of that content.

## ARGUMENT

🚩 Section 230(c)(1) directs that a website operator may not be "treated as the publisher or speaker" of content provided by others. 🚩 47 U.S.C. 230(c)(1). This Court has never construed that provision. Over the last quarter century, however, the courts of appeals have developed a substantial body of precedent applying 🚩 Section 230(c)(1) to disparate factual settings.

Congress's most immediate objective in enacting 🚩 Section 230(c)(1) was to protect online service providers from possible defamation liability when they remove some objectionable third-party content but allow other postings to remain. The lower courts have correctly recognized that 🚩 Section 230(c)(1)'s text goes beyond that immediate objective. Many courts, however, have **\*12** concluded that 🚩 Section 230 should be construed "broadly, so as to effectuate Congress's 'policy choice'" to protect the operators of interactive websites. 🚩 *Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 418 (1st Cir. 2007); see, *e.g.*, 🚩 *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1123 (9th Cir. 2003). And they have applied that approach to foreclose claims even when platform operators' allegedly wrongful conduct went well beyond a failure to block or remove objectionable third-party content.

That approach to 🚩 Section 230(c)(1) contradicts this Court's admonition that, absent some contrary "'textual indication,'" a court's views about the policy Congress sought to achieve provide "no license" to give statutory provisions "anything but a fair reading." 🚩 *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018) (citation omitted). The Court should give 🚩 Section 230(c)(1) a fair reading, with no thumb on the scale in favor of either a broad or a narrow construction. Properly construed, 🚩 Section 230(c)(1) protects YouTube from asserted ATA liability for hosting or failing to remove ISIS-related content, but not for claims based on YouTube's own conduct in designing and implementing its targeted-recommendation algorithms.

### A. 🚩 Section 230 Prohibits Courts From Holding A Website Liable For Failing To Block Or Remove Third-Party Content, But It Does Not Immunize The Site's Own Conduct

🚩 Section 230(c)(1) states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 🚩 47 U.S.C. 230(c)(1). That text is typically analyzed in three elements, all of which must be present for 🚩 Section 230(c)(1) **13** to bar the claim: (1) the defendant must be a provider of an "interactive computer service," and (2) the plaintiff's claim must seek to treat the defendant as a "publisher or speaker" of (3) "information provided by another information content provider." We address those elements in turn.

#### 1. The defendant must be a provider of an interactive computer service

🚩 Section 230 defines "interactive computer service" as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server." 🚩 47 U.S.C. 230(f)(2). That definition encompasses early online service providers like Prodigy and America Online. See, *e.g.*, 🚩 *Zeran v. America Online, Inc.*, 129 F.3d 327, 328-329 (4th Cir. 1997), cert. denied, 524 U.S. 937 (1998). It also includes interactive websites such as dating or housing services, see, *e.g.*, 🚩 *Fair Hous. Council v. Room-mates.com, LLC*, 521 F.3d 1157, 1162 n.6 (9th Cir. 2008) (en banc); search engines that reproduce content from other websites, see, *e.g.*, *Marshall's Locksmith Serv., Inc. v. Google, LLC*, 925 F.3d 1263, 1268 (D.C. Cir. 2019); and social media services like YouTube, Face-book, and Twitter, see, *e.g.*, 🚩 *Force v. Facebook, Inc.*, 934 F.3d 53, 64 (2d Cir. 2019), cert. denied, 140 S. Ct. 2761 (2020). In most 🚩 Section 230(c)(1) cases, this element is not disputed.

#### 2. The plaintiff's claim must seek to treat the defendant as a "publisher or speaker" of third-party content

In the view of the United States, a plaintiff's claim seeks to "treat[]" a website provider as "the publisher or speaker" of third-party content, 🚩 47 U.S.C. 230(c)(1), if liability turns on the provider's failure to block or **14** remove unlawful content from its platform, so that avoiding liability would require the defendant to withdraw or refuse to publish that content. By contrast, if the plaintiff's claim seeks to hold the defendant liable for other aspects of its own conduct, imposing liability does not "treat" the defendant as a "publisher or speaker," even if third-party speech is essential to the plaintiff's cause of action.

a. 🚩 Section 230 does not define the term "publisher." As a matter of ordinary usage, that term can refer broadly to "one that makes [something] public," or more narrowly to "one whose business is publishing." *Webster's Third New International Dictionary of the English Language* 1837 (1993) *(Webster's Third)*. Several clues suggest that 🚩 Section 230(c)(1) uses "publisher" in its broader sense. The word is paired with "speaker," which carries the more general sense of "one that speaks." *Id.* at 2185. The broader sense of "publisher" also accords with the word's common-law meaning and 🚩 Section 230(c)(1)'s origin. As noted above, "publication" is an element of the tort of defamation that encompasses all "communication intentionally or by a negligent act to one other than the person defamed." Restatement § 577(1). In that context, the term is not limited to persons whose business is publishing. See Dobbs § 37.4, at 940. And at common law, publication specifically includes a failure to remove speech exhibited on one's property. See Restatement § 577(2).

b. The more difficult interpretive task is to identify the types of legal claims that would "treat[]" an entity like YouTube "as the publisher or speaker" of third-party content displayed on its site. 🚩 47 U.S.C. 230(c)(1). 🚩 Section 230(c)(1) reflects Congress's recognition that "imposing tort liability on companies that serve as **15** intermediaries for other parties' potentially

Reynaldo GONZALEZ, et al., Petitioners, v. GOOGLE LLC., 2022 WL 17650509 (2022)

injurious messages" could substantially impede the development of online platforms. *Zeran*, 129 F.3d at 330-331. "It would be impossible for service providers to screen each of their millions of postings for possible problems." *Id.* at 331. And if (as in *Stratton Oakmont*, see p. 3, *supra*) the provider's removal of *some* content triggered potential legal liability for any unlawful third-party content that remained, providers would have a strong incentive to eschew screening mechanisms - the opposite of Congress's intent in enacting the CDA. See *Zeran*, 129 F.3d at 331; see also 47 U.S.C. 230(b)(4). Alternatively, "providers might choose to severely restrict the number and type of messages posted," *Zeran*, 129 F.3d at 331, to the detriment of Americans who have turned to the Internet for "a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity," 47 U.S.C. 230(a)(3).

Section 230(c)(1) represents Congress's effort to avoid those harms. The provision most obviously applies to causes of action, like defamation, that allege the violation of legal duties imposed on publishers and speakers as such. But other causes of action may likewise "be premised on the publication or speaking of what one might call 'information content.'" *Barnes* v. *Yahoo!, Inc.*, 570 F.3d 1096, 1101 (9th Cir. 2009). "[W]hat matters is not the name of the cause of action - defamation versus negligence versus intentional infliction of emotional distress" - but "whether the cause of action inherently requires the court to treat the defendant as the 'publisher or speaker' of content provided by another." *Id.* at 1101-1102.

Section 230(c)(1) applies, however, only when a plaintiff's theory of liability seeks to hold the defendant **\*16** liable for allowing unlawful third-party information to remain on its platform. "[T]o hold someone liable as a publisher at common law was to hold them responsible for the content's improper character." *Henderson* v. *The Source for Public Data, L.P.*, 53 F.4th 110, 122 (4th Cir. 2022). The protection is not triggered merely because "there is a 'but-for' causal relationship between the act of publication and liability." *Ibid.*

For instance, Section 230(c)(1) should not bar a products-liability claim against an online marketplace, even if a third-party retailer creates the product's online listing, if the plaintiff's claim is based on the product's defect. Cf. *Erie Ins. Co.* v. *Amazon.com, Inc.*, 925 F.3d 135, 139-140 (4th Cir. 2019). Section 230(c)(1) should not insulate a review website from claims that it manipulated third-party reviews to extort businesses. But see *Levitt* v. *Yelp! Inc.*, No. C-10-1321, 2011 WL 5079526, at *6-*9 (N.D. Cal. Oct. 26, 2011). And, as the courts below recognized here, Section 230(c)(1) should not immunize Google from plaintiffs' ATA claims based on Google sharing revenue from advertisements that accompany ISIS-created videos. Pet. App. 45a-46a.

As those examples show, Section 230(c)(1) protects an online platform from claims premised on its dissemination of third-party speech, but the statute does not immunize a platform's *other* conduct, even if that conduct involves the solicitation or presentation of third-party content. The Ninth Circuit's *Room-mates.com* decision illustrates the point in the context of a website offering a roommate-matching service. 521 F.3d at 1161. As a condition of using the service, Roommates.com "require[d] each subscriber to disclose his sex, sexual orientation and whether he would bring children to a household," and to "describe his preferences **\*17** in roommates with respect to the same three criteria." *Ibid.* The plaintiffs alleged that asking those questions violated housing-discrimination laws, and the court of appeals agreed that Section 230(c)(1) did not shield Roommates.com from liability for its "own acts" of "posting the questionnaire and requiring answers to it." *Id.* at 1165.

Imposing liability in such circumstances does not treat online platforms as the publishers or speakers of content provided by others. Nor does it obligate them to monitor their platforms to detect objectionable postings, or compel them to choose between

"suppressing controversial speech or sustaining prohibitive liability." *Zeran*, 129 F.3d at 333. Illustrating that distinction, the *Roommates.com* court held that although Section 230(c)(1) did not apply to the website's discriminatory questions, it *did* shield the website from liability for any discriminatory third-party content that users unilaterally chose to post on the site's "generic" "Additional Comments" section. 521 F.3d at 1174-1175.

c. In a statement respecting the denial of certiorari in *Malwarebytes, Inc. v. Enigma Softivare Grp. USA, LLC*, 141 S. Ct. 13 (2020), Justice Thomas suggested a narrower interpretation of Section 230(c)(1)'s "publisher or speaker" element. Drawing on the provision's origin as a response to *Stratton Oakmont*, the statement suggested that Section 230(c)(1) may have had only one "modest" effect: to "indicate[] that an Internet provider does not become the publisher of a piece of third-party content - and thus subjected to strict liability - simply by hosting or distributing that content." *Id.* at 14-15. On that understanding, Section 230(c)(1) would shield a website operator from a cause of action that seeks to impose strict liability for third-party **\*18** content, but not from allegations that the defendant acted with actual or constructive knowledge. *Ibid.*

Justice Thomas's *Malwarebytes* statement correctly noted two respects in which lower courts have extended Section 230(c)(1) beyond its proper bounds. First, some courts have misconstrued Section 230(c)(1) to confer immunity whenever an online service provider's allegedly unlawful conduct can be analogized to actions traditionally performed by a book or newspaper publisher. *Malwarebytes*, 141 S. Ct. at 16. Those decisions rest on the mistaken premise that the term "publisher" refers to companies whose *business* is publishing. See p. 14, *supra*. And courts have compounded that error by extending Section 230(c)(1)'s protections to activities beyond the "publication" of the third-party content itself. These cases have read Section 230(c)(1) to "protect[] the 'exercise of a publisher's traditional editorial functions,'" including even the *alteration* of content. *Mal-ivarebytes*, 141 S. Ct. at 16 (quoting *Zeran*, 129 F.3d at 330).

Second, as Justice Thomas further explained, some lower courts have read Section 230(c)(1) to immunize website operators whose platforms are knowingly designed to facilitate their use for unlawful activity. In *Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12 (2016), cert. denied, 137 S. Ct. 622 (2017), for example, the First Circuit considered a claim that a classifieds website had violated federal prohibitions on sex trafficking. The plaintiffs alleged that Backpage.com - which allowed users to post ads for "Escorts" - had "deliberately structured its website to facilitate illegal human trafficking" by, among other things, "accept[ing] anonymous payments, fail[ing] to verify e-mails, and stripp[ing] metadata from photographs to make crimes **\*19** harder to track." *Malwarebytes*, 141 S. Ct. at 17. The First Circuit held that the website's actions were shielded by Section 230(c)(1) because they amounted to "choices about what content can appear on the website and in what form," and thus fell "within the purview of traditional publisher functions." *Backpage.com*, 817 F.3d at 21.

Under the principles articulated above, the *Backpage.com* decision was erroneous. The plaintiffs did not seek to treat Backpage.com as the publisher or speaker of the ads through which others carried out sex trafficking. Rather, they sought to hold the operator liable for its own policies and platform-design choices that facilitated sex trafficking. Where a website operator's conduct in furthering unlawful activities goes well beyond failing to block or remove objectionable third-party content from its platform, holding the operator liable does not "treat" it "as the publisher or speaker of" the third-party posts.[3]

Justice Thomas correctly identified ways in which some lower courts have unduly expanded Section 230(c)(1), and he rightly emphasized that the terms "publisher" and "speaker" should be construed in light **\*20** of their common-law roots. But it does not follow that Section 230(c)(1) should be limited to claims based on strict-liability theories. As explained above, in defamation law, "publication" refers broadly to the communication of expressive material to another. See Restatement § 577;

see also p. 14, *supra*. And although the common law set a different standard of liability for distributors and others "who perform a secondary role in disseminating defamatory matter," *Prosser and Keeton on the Law of Torts* § 113, at 810-811 (W. Page Keeton ed., 5th ed. 1984) (Prosser), those entities likewise communicate content to others and therefore are "publishers." See *id.* at 799 ("[E]very one who takes part in the publication *** is charged with publication."); see also Dobbs § 37.4, at 940 ("Anyone who participates in publication can be a publisher."); *Zeran*, 129 F.3d at 334. Accordingly, leading torts authorities refer to both kinds of actors as "publishers." See Prosser § 113, at 803-804 (referring to the original speaker and entities like newspapers as "primary publishers," and to entities like libraries and newsstands as "secondary publishers" and "disseminator publisher[s]"); see also Dobbs § 37.4, at 942 (distinguishing between "primary publishers" and other "publishers *** called transmitters, distributors, or secondary publishers").

Thus, where a website operator's alleged wrongful act is the failure to block or remove objectionable third-party content from its site, imposing liability would "treat" the operator as "the publisher or speaker" within the meaning of Section 230(c)(1), even if the plaintiff alleges that the operator acted negligently, recklessly, or with actual or constructive knowledge. [4]

### *21   3. The content must be provided by another information content provider

Section 230 defines "information content provider" to mean "any person or entity that is responsible, *in whole or in part*, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. 230(f)(3) (emphasis added). The italicized language makes clear that, when two (or more) entities are jointly responsible "for the creation or development of" particular online content, each is an "information content provider" with respect to that content. See, *e.g.,* *FTC v. Accusearch Inc.*, 570 F.3d 1187, 1197 (10th Cir. 2009) (explaining that "there may be several information content providers with respect to a single item of information"). And by limiting the provision's application to claims based on "information provided by *another* information content provider," 47 U.S.C. 230(c)(1) (emphasis added), Section 230(c)(1) instructs that an online platform "remains liable for its own speech." *Lycos*, 478 F.3d at 419.

Determining what qualifies as "creation or development" of content under Section 230(f)(3) therefore can be integral to the Section 230(c)(1) analysis. The word "create" is straightforward: "to bring into existence" or  *22  "make out of nothing and for the first time." *Webster's Third* 532. But the meaning of "develop" in this context is less clear-cut. On the one hand, the transitive verb can be used as a close synonym of "create," though usually to refer to a drawn-out process. See *Oxford English Dictionary Online* (3d ed., modified Sept. 2022) ("[t]o formulate or create by successive stages of improvement or advancement"). But the word can also mean to "cause to increase or improve," "promote the growth of," or "expand by a process of growth." *Webster's Third* 618; see also *Oxford English Dictionary Online* ("[t]o bring (something) to a fuller or more advanced state; to improve, extend"). In this sense, the word conceivably could encompass a website operator's efforts to augment third-party content generally, or to make it more readily available or viewable.

Contextual considerations indicate that Congress did not intend "development" to carry its broadest "definitional possibilities." *FCC v. AT&T Inc.*, 562 U.S. 397, 407 (2011). Within Section 230(f)(3), "development" is paired with "creation," a term that unambiguously excludes measures platforms employ to make third-party information more available to users without altering its content. Section 230(f)(3) also refers to one who is *"responsible"* for the information's development. That term typically connotes more than being a but-for cause or making an incidental contribution to an end result. See *Accusearch*, 570 F.3d at 1199 ("We would not ordinarily say that one who builds a highway is 'responsible' for the use of that highway by a fleeing bank robber.").

Adjacent subsections likewise indicate that "development" does not include actions a website takes to better display preexisting third-party content or make it more usable. 🚩Section 230's definition of "interactive **\*23** computer service" includes an "access software provider," 🚩47 U.S.C. 230(f)(2), which the statute defines as a provider of "software" or "enabling tools" that "filter, screen, allow, or disallow content," "pick, choose, analyze, or digest content," or "transmit, receive, display, forward, cache, search, subset, organize, reorganize, or translate content." 🚩47 U.S.C. 230(f)(4)(A), (B), and (C). It would make little sense for Congress to specifically include entities that provide "enabling tools" that "filter," "organize," and "reorganize" content as among those to which 🚩Section 230(c)(1) applies, only to categorically withdraw that protection through the definition of "information content provider." Rather, the statute's structure suggests that content development must go beyond the mere provision of basic organizational or display tools that Congress viewed as inherent in an interactive online service.

More fundamentally, deeming a website an "information content provider" whenever it enhances user access to third-party content would produce a "self-defeating" result. 🚩*Quarles* v. *United States*, 139 S. Ct. 1872, 1879 (2019). Interactive websites invariably provide tools that enable users to create, and other users to find and engage with, information. A chatroom might supply topic headings to organize posts; a photo-sharing site might offer a feature for users to signal that they like or dislike a post; a classifieds website might enable users to add photos or maps to their listings. If such features rendered the website a co-developer of all users' content, 🚩Section 230(c)(1) would be a dead letter.

By contrast, other actions may implicate website operators more deeply in objectionable content. If, for example, a website seeks out information from third parties and compiles that information into background- **\*24** check reports, 🚩Section 230(c)(1) protection should not be available for the reports. Cf. 🚩*Henderson*, 53 F.4th at 128-129; but see 🏴*Dennis* v. *MyLife.Com, Inc.*, No. 20-cv-954, 2021 WL 6049830, at \*6 (D.N.J. Dec. 20, 2021) (holding that a background-check site could not face liability for a "reputation score" it generated, because the score was based on information originating from others). The same is true if a classifieds website solicits advertisements for illegal services and edits third-party postings to make their unlawful nature more difficult to detect. See H.R. Rep. No. 572, 115th Cong., 2d Sess. Pt. 1, at 5 (2018) (noting that Backpage.com had been "soliciting" sex-related content and "systematically editing" ads to "delete incriminating words"). Thus, when an online service provider substantially adds or otherwise contributes to a third party's information - such that the resulting content can fairly be deemed the joint product of the provider and that party - both may be viewed as "information content providers" with respect to that content, and both may be held accountable even on claims that would treat the platform as the "publisher or speaker" of that content.

### B. The Judgment Of The Court Of Appeals Should Be Vacated

The court of appeals correctly held that 🚩Section 230(c)(1) bars plaintiffs' claims to the extent they allege that YouTube violated the ATA by publishing videos created by ISIS. But plaintiffs also allege that YouTube violated the ATA by providing targeted recommendations of ISIS content to others in a way that radicalized viewers or recruited them to ISIS's cause. That theory of liability does not seek to hold YouTube liable for hosting, or failing to remove, unlawful third-party content. Rather, it challenges YouTube's own conduct in **\*25** designing and implementing recommendation algorithms that result in the communication of a distinct message from YouTube. Whatever its viability under the ATA, that theory does not implicate 🚩Section 230(c)(1) because it does not seek to hold YouTube liable as the "publisher or speaker" of ISIS content.

*1.* 🚩*Section 230(c)(1) bars plaintiffs' claims to the extent they are premised on YouTube's failure to block or remove third-party content*

Plaintiffs assert claims against Google, as the owner of YouTube, for direct and secondary liability under the ATA. They allege that YouTube - an undisputed provider of an interactive computer service, see Pet. App. 29a; see also *id.* at 193a n.8 - provided resources to, and aided and abetted, ISIS and its terrorist activities. J.A. 176-183. The communication of content is not an essential element of an ATA violation. See 18 U.S.C. 2333(a) and (d). But many of the allegations in plaintiffs' operative complaint assert that the specific *way* YouTube assisted ISIS's terrorist activities was by disseminating ISIS content on its platform.

Plaintiffs allege that ISIS "openly maintained and used official YouTube accounts with little or no interference," J.A. 18, and thereby utilized the "YouTube platform and services to distribute high-production-quality videos, images, and recordings," J.A. 17. Plaintiffs further allege that ISIS used those videos "to issue terroristic threats, attract attention to its terror attacks and atrocities, instill and intensify fear from terror attacks, intimidate and coerce civilian populations, take credit for terror attacks," and "communicate its desired messages about the terror attacks." J.A. 64. In this manner, ISIS allegedly "use[d] YouTube to actually carry out essential communication components of ISIS's **\*26** terror attacks," *ibid.*, and to recruit new adherents, J.A. 75-79. ATA claims based on this theory necessarily target YouTube's role as a publisher of harmful or otherwise objectionable third-party content.

Moreover, the videos themselves are "information provided by another information content provider." 🔖47 U.S.C. 230(c)(1). Plaintiffs allege that ISIS and its affiliates filmed, edited, and posted the videos that appeared on their user channels. *E.g.*, J.A. 17, 61, 69, 172. And plaintiffs do not allege that YouTube altered the videos. See J.A. 61 ("Google does not preview or edit content published by users to their own YouTube channels or accounts.").

By asserting ATA claims premised on such allegations, plaintiffs asked the district court to "treat[]" YouTube as a "publisher or speaker" by holding the platform liable for allowing (or failing to remove) unlawful content provided by "another information content provider." 🔖47 U.S.C. 230(c)(1). The court of appeals correctly held that 🔖Section 230(c)(1) foreclosed those theories of ATA liability. See Pet. App. 29a-31a, 33a.

### *2.* 🔖*Section 230(c)(1) does not preclude plaintiffs' claims based on YouTube's targeted recommendations*

a. In addition to alleging that YouTube has failed to remove ISIS-related content from its platform, plaintiffs allege that YouTube has violated the ATA by using "computer algorithms" and related features to "suggest[]" to particular users "YouTube videos and accounts" that are "similar" to videos and accounts those users have previously watched. J.A. 173; see J.A. 169. These "suggestions" are located on "the side margin of the user's YouTube page," and suggested videos "automatically load and play when a selected video ends," J.A. 173; the complaint includes a screenshot showing a **\*27** sidebar entitled "Up next" with multiple videos listed, J.A. 170. Plaintiffs allege that, through this feature, YouTube has "recommended ISIS videos" to other users, J.A. 169, thereby enabling ISIS to "use[] YouTube as a tool to connect with others and promote its terrorist activity," J.A. 173. Plaintiffs' recommendation-based claims under the ATA would face obstacles on the merits. See p. 32 & n.5, *infra*. But 🔖Section 230(c)(1) does not shield YouTube from any liability it might otherwise face for recommending ISIS content.

The distinction between a recommendation and the recommended content is particularly clear when the recommendation is explicit. If YouTube had placed a selected ISIS video on a user's homepage alongside a message stating, "You should watch this," that message would fall outside 🔖Section 230(c)(1). Encouraging a user to watch a selected video is conduct distinct from the video's publication (*i.e.*, hosting). And while YouTube would be the "publisher" of the recommendation message itself, that message would not be "information provided by another information content provider." 🔖47 U.S.C. 230(c)(1).

Here, plaintiffs do not contend that YouTube's recommendations take that explicit form. Rather, plaintiffs allege that YouTube "has recommended ISIS videos" by causing ISIS-affiliated content to appear on a user's "Up next" sidebar. J.A. 169-170. But the

effect of YouTube's algorithms is still to communicate a message from YouTube that is distinct from the messages conveyed by the videos themselves. When YouTube presents a user with a video she did not ask to see, it implicitly tells the user that she "will be interested in" that content "based on the video and account information and characteristics." J.A. 173. The appearance **\*28** of a video in a user's queue thus communicates the implicit message that YouTube "thinks you, the [user] - you, specifically - will like this content." *Force*, 934 F.3d at 82 (Katzmann, C.J., concurring in part and dissenting in part). And because YouTube created the algorithms that determine which videos will be recommended to which users, the recommendations are bound up with YouTube's own platform-design choices.

A claim premised on YouTube's use of its recommendation algorithms thus falls outside of Section 230(c)(1) because it seeks to hold YouTube liable for its own conduct and its own communications, above and beyond its failure to block ISIS videos or remove them from the site. See pp. 16-17, *supra.* To be sure, those algorithms operate in conjunction with YouTube's display of third-party content. But as explained above, Section 230(c)(1) does not immunize providers from all claims in which third-party content plays a role. See pp. 15-16, *supra.* If a third party unaffiliated with YouTube recommended ISIS videos posted on YouTube, Section 230(c)(1) would not insulate that party from any liability those recommendations otherwise might create. See *Force*, 934 F.3d at 82 (Katzmann, C.J., concurring in part and dissenting in part). Section 230(c)(1) would be likewise inapplicable if YouTube recommended ISIS content posted on a different media platform. Cf. Pet. Br. 30. So too here: a claim premised on YouTube's recommendations, even for content posted on its own platform, does not "seek to punish [YouTube] for the content others post" or "for deciding whether to publish third parties' content." *Force*, 934 F.3d at 77 (Katzmann, C.J., concurring in part and dissenting in part).

**\*29** b. The court of appeals analyzed the issue differently. The court considered whether, by recommending ISIS videos through the "Up next" feature, YouTube became a creator or developer (and thus an information content provider) of the videos it suggested. Pet. App. 31a-39a. If that were so, Section 230(c)(1) would not protect YouTube from liability even for allowing the videos to remain on the site. The court held that YouTube's recommendation feature does not have that effect, reasoning that the "Up next" algorithm is analogous to a "more sophisticated" search engine. *Id.* at 38a.

The court of appeals was correct in holding that YouTube is not an "information content provider" of any ISIS videos it recommends. That term encompasses persons who participate in the "creation or development of" online "information." 47 U.S.C. 230(f)(3). YouTube's algorithms direct content to particular users only *after* that content has been created, developed, and posted (by third parties) on YouTube's platform. And the larger statutory context reinforces the conclusion that a website's choices about the organization and presentation of user-generated content do not constitute the "creation or development" of that material. See pp. 22-23, *supra.*

For essentially the same reason, courts of appeals have consistently recognized that a website does not act as an information content provider by offering a method to search or filter third-party content. See *Marshall's Locksmith*, 925 F.3d at 1269; *O'Kroley* v. *Fastcase, Inc.*, 831 F.3d 352, 354-355 (6th Cir. 2016), cert. denied, 137 S. Ct. 639 (2017); *Getachew* v. *Google, Inc.*, 491 Fed. Appx. 923, 925-926 (10th Cir. 2012); *Roommates.com*, 521 F.3d at 1175. To be sure, YouTube's algorithms **\*30** operate differently from many search engines in that they generate targeted recommendations without specific user queries. But in determining whether YouTube is an "information content provider" of the videos it recommends, the salient point is that the algorithms simply direct to particular users videos that were created and developed without YouTube's involvement.

Thus, YouTube's use of recommendation algorithms does not make it an "information content provider" of the videos it recommends. A court determining YouTube's ATA liability therefore could give no weight to YouTube's hosting of the videos.

It does not follow, however, that Section 230(c)(1) shields YouTube from possible ATA liability for making the targeted recommendations themselves. Even if YouTube plays no role in the videos' creation or development, it remains potentially

liable for its own conduct and its own communications, to the extent those go beyond allowing third-party content to appear on the site. Such claims fall outside 🚩Section 230(c)(1) because they do not seek to hold YouTube liable as a "publisher or speaker." See pp. 16-19, *supra*.

c. An online platform's potential liability in these circumstances is subject to important limitations. Three related limits are especially significant.

First, as this case illustrates, determining 🚩Section 230(c)(1)'s application to a particular case is not an all-or-nothing choice. 🚩Section 230(c)(1) generally does not shield a website operator from liability for its own communications or other conduct. But despite YouTube's use of allegedly unlawful revenue-sharing and targeted-recommendation features, 🚩Section 230(c) (1) continues to protect YouTube from liability for failing to remove **\*31** third-party content, including the content it has recommended. See pp. 25-26, 29-30, *supra*; see also 🚩*Force*, 934 F.3d at 85 (Katzmann, C.J., concurring in part and dissenting in part).

Second, for purposes of determining whether YouTube can be held liable for the targeted recommendations at issue here, 🚩Section 230(c)(1) precludes the court from giving weight to the fact that the recommended videos appear on YouTube's own site. As suggested above (see p. 28, *supra*), the court instead should analyze plaintiffs' claims as it would if YouTube had recommended ISIS videos posted on *other* sites. In particular, in determining whether plaintiffs have adequately alleged an ATA claim, the court can consider the alleged content of the recommended videos, as it would if YouTube's recommendations of videos on another platform were alleged to constitute prohibited assistance to ISIS. But 🚩Section 230(c)(1) would still preclude the court from considering, as a possible form of assistance giving rise to ATA liability, either YouTube's provision of a platform for the posting of the videos or YouTube's failure to block or remove them.

Third, the court of appeals concluded that 🚩Section 230(c)(1) precludes liability based on YouTube's targeted recommendations because YouTube is not alleged to give any preference or priority to ISIS content, Pet. App. 37a, but instead "matches what it knows about users based on their historical actions and sends third-party content to users that [YouTube] anticipates they will prefer," *id.* at 38a. That understanding of 🚩Section 230(c)(1) was flawed, because the recommendations' status as YouTube's own conduct does not depend on the criteria YouTube considers in directing particular videos to particular users. Those criteria may be **\*32** directly relevant, however, in determining YouTube's liability under specific causes of action, including whether plaintiffs have plausibly alleged the elements of aiding-and-abetting liability under the ATA. See U.S. Br. at 17-26, *Twitter, Inc.* v. *Taamneh*, cert. granted, No. 21-1496 (Oct. 3, 2022).

d. Because the court of appeals held that 🚩Section 230(c)(1) precluded any ATA claim based on a non-revenue-sharing theory, it did not examine whether plaintiffs could state a claim based on YouTube's recommendation function. Because this Court is "a court of review, not of first view," 🚩*Cutter* v. *Wilkinson*, 544 U.S. 709, 718 n.7 (2005), the Court should vacate the judgment below and remand the case to allow the court of appeals to conduct that analysis in the first instance, informed by the Court's decision in *Taamneh*. [5]

### 3. Plaintiffs' alternative theories lack merit

Plaintiffs offer additional rationales for concluding that their recommendation-based ATA claims fall outside 🚩Section 230(c) (1). Those theories are unpersuasive.

a. In the courts below, plaintiffs did not dispute that YouTube is a provider of an interactive computer service. See p. 25, *supra*. But in this Court, plaintiffs **\*33** argue that YouTube does not act as such a provider when it recommends content to others.

Specifically, plaintiffs argue (Br. 44) that YouTube "provides or enables" a user's "access" to a "server," 47 U.S.C. 230(f)(2), only when a user makes a "specific request" to the server, such as by clicking on a video link. And they contend that YouTube is no longer "acting as" a provider of an interactive computer service when it "sends a user third-party material which the recipient had not requested." Br. 43-44.

That argument reflects a misunderstanding of what the statute requires. When a user directs her browser to the youtube.com website, or opens the YouTube app on an Internet-enabled smartphone, YouTube has provided the user with access to its server. And plaintiffs allege that YouTube provides the recommendations at issue on its online platform. See J.A. 169-170, 173.

b. Plaintiffs also argue (Br. 34-39) that YouTube acts as a content creator - and therefore an information content provider - because it generates URLs for user videos and embeds those URLs in hyperlinks and hy-perimages. But the creation of navigational hyperlinks is inherent in the provision of an online platform; a URL is an address where content can be located. See *Reno, 521 U.S. at 852*. A website does not act as an information content provider by taking the technical steps necessary to render user-generated online content visible to others.

A related federal statute enacted a year after the CDA reflects this commonsense understanding. See Child Online Protection Act, Pub. L. No. 105-277, Div. C, Tit. XIV, § 1403, 112 Stat. 2681-736 (1998) (47 U.S.C. 231). Section 231 criminalizes certain "communica-tion[s]" of obscene material "by means of the World **\*34** Wide Web." 47 U.S.C. 231(a)(1). The statute specifies that providing "an Internet information location tool" - defined to include "hypertext links" that "refer[] or link[] users to an online location" - does not constitute a "communication." 47 U.S.C. 231(b)(3) and (e)(5). Similarly here, YouTube's creation of location tools does not render it a creator or developer of the linked speech.

c. Plaintiffs also suggest (Br. 34) that a platform becomes a content creator by "notifying a user that something new is available on the website." Although plaintiffs do not specify a YouTube feature they have in mind, their complaint alleges that YouTube automatically "distribute[s]" new videos posted on a channel to that channel's subscribers. J.A. 172. But that mechanism simply implements the user's decision to subscribe to a particular channel and thus to request material from that channel as it becomes available in the future. Such a feature is no different from YouTube hosting the channel in the first place - an act that plaintiffs appear to agree is protected by Section 230. See Br. 26, 42; see also Pet. 2.

## **\*35** CONCLUSION

The judgment of the court of appeals should be vacated.

Respectfully submitted.

BRIAN H. FLETCHER

*Acting Solicitor General* [*]

MICHAEL D. GRANSTON

*Deputy Assistant Attorney*

*General*

MALCOLM L. STEWART

*Deputy Solicitor General*

CAROLINE A. FLYNN

*Assistant to the Solicitor*

*General*

DANIEL TENNY

COURTNEY L. DIXON

*Attorneys*

DECEMBER 2022


## Footnotes

1    That common name is technically a misnomer, as the provision appeared in Section 509 of the Telecommunications Act of 1996 (of which the Communications Decency Act was one title), and was enacted as a new Section 230 of the Communications Act of 1934. See Communications Decency Act of 1996, Pub. L. No. 104-104, Tit. V, § 509, 110 Stat. 137-139.

2    Notwithstanding these common-law principles, the First Amendment limits the imposition of strict liability in this context. See, *e.g.,* *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 347 (1974); see also Dobbs 938-940.

3    In 2018, Congress responded to *Backpage.com* by enacting the Allow States and Victims to Fight Online Sex Trafficking Act of 2017 (FOSTA), Pub. L. No. 115-164, 132 Stat. 1253. FOSTA amended Section 230 to add new exceptions to Section 230(c)(1) for certain civil and criminal sex-trafficking and prostitution laws. See § 4(a), 132 Stat. 1254 (47 U.S.C. 230(e)(5)). FOSTA's "Sense of Congress" provision states that Section 230 "was never intended to provide legal protection to websites that unlawfully promote and facilitate prostitution" or "facilitate traffickers in advertising the sale of unlawful sex acts with sex trafficking victims." § 2(1), 132 Stat. 1253. Congress described the amendment as a "clarification" of the statute, not as a change to its original scope. § 2(3), 132 Stat. 1253.

4    Justice Thomas's *Malwarebytes* statement also stated that another CDA provision, 47 U.S.C. 223(d)(1)(B), "expressly imposed distributor liability" enforceable by a civil cause of action at 47 U.S.C. 207, and observed that it would be "odd" for Congress to have created such liability in one provision while eliminating it in another. 141 S. Ct. at 15. But it is not clear that Section 223(d)(1)(B) (which this Court held unconstitutional in *Reno v. American Civil Liberties Union,* 521 U.S. 844 (1997)) was civilly enforceable. Section 207 provides a cause of action for a person "claiming to

be damaged by any common carrier," 47 U.S.C. 207, and 🚩 Section 223(e)(6) states that "nothing in [🚩 Section 223] shall be construed to treat interactive computer services as common carriers," 🚩 47 U.S.C. 223(e)(6).

5        Because the two cases were dismissed on different grounds, Pet. App. 4a, 17a-18a, the court of appeals evaluated the allegations against the *Taamneh* defendants (including Google) without considering whether 🚩 Section 230 narrowed the potential theories of ATA liability, see *id.* at 68a-75a. As explained in the government's amicus brief in that case, see U.S. Br. at 13-30, *Taamneh, supra* (No. 21-1496), even when 🚩 Section 230 is put to the side and all of the allegations against the *Taamneh* defendants are considered, those allegations are insufficient to state a claim for secondary liability under the ATA. Unlike this case, however, *Taamneh* does not present a direct-liability claim.

*        The Solicitor General is recused in this case.

---