Exhibit #3

# SUPREME COURT
# OF THE UNITED STATES

---

```
          IN THE SUPREME COURT OF THE UNITED STATES

- - - - - - - - - - - - - - - - - -

REYNALDO GONZALEZ, ET AL.,         )

               Petitioners,        )

          v.                       ) No. 21-1333

GOOGLE LLC,                        )

               Respondent.         )

- - - - - - - - - - - - - - - - - -
```

```
Pages:  1 through 163

Place:  Washington, D.C.

Date:   February 21, 2023
```

---

**HERITAGE REPORTING CORPORATION**
*Official Reporters*
1220 L Street, N.W., Suite 206
Washington, D.C.  20005
(202) 628-4888
www.hrccourtreporters.com

1

```
 1      IN THE SUPREME COURT OF THE UNITED STATES

 2   - - - - - - - - - - - - - - - - - -

 3   REYNALDO GONZALEZ, ET AL.,          )

 4                   Petitioners,        )

 5             v.                        ) No. 21-1333

 6   GOOGLE LLC,                         )

 7                   Respondent.         )

 8   - - - - - - - - - - - - - - - - - -

 9

10                    Washington, D.C.

11              Tuesday, February 21, 2023

12

13        The above-entitled matter came on for oral

14   argument before the Supreme Court of the United

15   States at 10:03 a.m.

16

17   APPEARANCES:

18   ERIC SCHNAPPER, ESQUIRE, Seattle, Washington; on

19        behalf of the Petitioners.

20   MALCOLM L. STEWART, Deputy Solicitor General,

21        Department of Justice, Washington, D.C.; for

22        the United States, as amicus curiae, supporting

23        vacatur.

24   LISA S. BLATT, ESQUIRE, Washington, D.C.; on behalf of

25        the Respondent.
```

2

```
 1                 C O N T E N T S
 2   ORAL ARGUMENT OF:                    PAGE:
 3   ERIC SCHNAPPER, ESQ.
 4       On behalf of the Petitioners        3
 5   ORAL ARGUMENT OF:
 6   MALCOLM L. STEWART, ESQ.
 7       For the United States, as amicus
 8       curiae, supporting vacatur         70
 9   ORAL ARGUMENT OF:
10   LISA S. BLATT, ESQ.
11       On behalf of the Respondent       114
12   REBUTTAL ARGUMENT OF:
13   ERIC SCHNAPPER, ESQ.
14       On behalf of the Petitioners      161
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                   P R O C E E D I N G S
 2                              (10:03 a.m.)
 3              CHIEF JUSTICE ROBERTS:  We'll hear
 4    argument this morning in Case 21-1333, Gonzalez
 5    versus Google.
 6              Mr. Schnapper.
 7            ORAL ARGUMENT OF ERIC SCHNAPPER
 8             ON BEHALF OF THE PETITIONERS
 9              MR. SCHNAPPER:  Mr. Chief Justice, and
10    may it please the Court:
11              Section 230(c)(1) distinguishes
12    between claims that seek to hold an Internet
13    company liable for content created by someone
14    else and claims based on the company's own
15    conduct.  That distinction is drawn in each of
16    the three sections of the statute.
17              First, Section 230(c)(1) is limited to
18    claims that would treat the defendant as a
19    publisher of third-party content.  The statute
20    uses "published" in the common law sense.  The
21    Fourth Circuit decision in Henderson correctly
22    interprets the statute in that manner and
23    concludes that it involves two elements:  the
24    claim must be based on the action of the
25    defendant in disseminating third-party content,
```

1    and the harm must arise from the content itself.

2         Second, Section 231 -- 230(c)(1) is

3    limited to publication of information provided

4    by another content provider, which is often

5    referred to as third-party content.  The

6    statutory defense doesn't apply insofar as a

7    claim is based on words written by the defendant

8    or other content created by the defendant.  In

9    some circumstances, the manner in which

10   third-party content is organized or presented

11   could convey other information from the

12   defendant itself, as the government notes.

13        Third, Section 230(c)(1) only applies

14   insofar as a defendant was acting as an Internet

15   computer service.  Most entities that are

16   Internet computer services do other things as

17   well.  This Court technically is an interactive

18   computer service because of its website.  It

19   does other things, as it is doing today.

20   Conduct that falls outside that line of activity

21   is outside the scope of this statute.

22        A number of the briefs in this case

23   urge the Court to adopt a general rule that

24   things that might be referred to as a

25   recommendation are inherently protected by the

Official  Subject to Review

1    statute, a decision which would require the

2    courts to then fashion some judicial definition

3    of "recommendation."

4            We think the Court should decline that

5    invitation and should instead focus on

6    interpreting the specific language of the

7    statute.

8            I welcome the Court's questions.

9            JUSTICE THOMAS:  Mr. Snapper --

10   Schnapper, just so we're clear about what we're

11   -- your claim is, are you saying that YouTube's

12   application of its algorithms is particular

13   to -- in this case, that they're using a

14   different algorithm to the one that, say,

15   they're using for cooking videos, or are they

16   using the same algorithm across the board?

17           MR. SCHNAPPER:  It's the same

18   algorithm across --

19           JUSTICE THOMAS:  So --

20           MR. SCHNAPPER:  -- the board.

21           JUSTICE THOMAS:  -- so what is -- if

22   -- if it's the same algorithm, I think you have

23   to give us a clearer example of what your point

24   is exactly.  The same algorithm to present

25   cooking videos to people who are interested in

1    cooking and ISIS videos to people who are

2    interested in ISIS, racing videos to people who

3    are interested in racing.

4              Then I think you're going to have to

5    explain more clearly, if it's neutral in that

6    way, how your claim is set apart from that.

7              MR. SCHNAPPER:  Surely.  The -- if I

8    might turn to the practice of displaying

9    thumbnails, which is a major part of what's at

10   issue here, the problem -- and the issue is not

11   the manner in which YouTube displays videos.  It

12   actually displays, as you doubtless know from

13   having looked at, these little pictures, which

14   are referred to as thumbnails.  They are

15   intended to encourage the viewer to click on

16   them and go see a video.

17             It's the use of algorithms to generate

18   these -- these thumbnails that's at issue, and

19   the thumbnails, in turn, involve a -- involve

20   content created by the defendant.

21             JUSTICE THOMAS:  But the -- it's

22   basing the thumbnails -- from what I understand,

23   it's based upon what the algorithm suggests the

24   user is interested in.  So, if you're interested

25   in cooking, you don't want thumbnails on light

```
 1    jazz.  You -- so the -- it's -- it's -- it's
 2    neutral in that sense.  You're interested in
 3    cooking.  Say you get interested in rice -- in
 4    pilaf from Uzbekistan.  You don't want pilaf
 5    from some other place, say, Louisiana.
 6           The -- so the -- I don't see how that
 7    is any different from what is happening in this
 8    case.  And what I'm trying to get you to focus
 9    on is if -- if the -- are we talking about the
10    neutral application of an algorithm that works
11    generically for pilaf and -- and it also works
12    in a similar way for ISIS videos?  Or is there
13    something different?
14           MR. SCHNAPPER:  No, I think that's
15    correct, but -- but our -- our view is that the
16    fact that a -- a -- an algorithm is neutral
17    doesn't alter the application of the statute.
18    The statute requires that one work through each
19    of the elements of the defense and see if it
20    applies.
21           The -- the lower courts, in a couple
22    of cases, have said that -- really disregarding
23    the requirements of the -- of the defense, that
24    as long as an algorithm is neutral, that puts
25    the -- the conduct outside the -- within the
```

1    protection of the statute.  But that's not what

2    the statute says.

3          The statute says you must be acting --

4    you must be -- the claim must treat you as a

5    publisher.

6          CHIEF JUSTICE ROBERTS:  Well, but, I

7    mean, the -- the -- the difference is that the

8    Google, You -- YouTube, they're still not

9    responsible for the content of the videos or --

10    or text that is transmitted.

11          Your focus is on the actual selection

12    and recommendations.  They're responsible that a

13    particular item is there but not for what the

14    item -- item says.  And I don't -- I -- I think

15    part -- it may be significant if the algorithm

16    is the same across -- as Justice Thomas was

17    suggesting, across the different subject

18    matters, because then they don't have a focused

19    algorithm with respect to terrorist activities

20    or -- or pilaf or something, and then I think it

21    might be harder for you to say that there's

22    selection involved for which they could be held

23    responsible.

24          MR. SCHNAPPER:  The -- the -- the

25    statute, I think, doesn't draw the distinction

1    that way.  The -- the claim here is about the

2    encouragement of -- of -- of users to go look at

3    particular content.  And that's the JASTA claim

4    that we'll hear about tomorrow.

5            And the underlying substantive claim

6    is encouraging people to go look at ISIS videos

7    would be aiding and abetting ISIS.  More on that

8    tomorrow.

9            But, if that's an actionable claim,

10   then the conduct here would fit within it,

11   the -- because certain individuals would be

12   shown these thumbnails, which would encourage

13   them to go look at those videos.

14           JUSTICE KAGAN:  So I think you're

15   right, Mr. Schnapper, that the statute doesn't

16   make that distinction.  This was a pre-algorithm

17   statute.  And, you know, everybody is trying

18   their best to figure out how this statute

19   applies, the statute which was a pre-algorithm

20   statute applies in a post-algorithm world.

21           But I think what was lying underneath

22   Justice Thomas's question was a suggestion that

23   algorithms are endemic to the Internet, that

24   every time anybody looks at anything on the

25   Internet, there is an algorithm involved,

1    whether it's a Google search engine or whether

2    it's this YouTube site or -- or -- or a Twitter

3    account or countless other things, that

4    everything involves ways of organizing and

5    prioritizing material.

6          And -- and that would essentially mean

7    that, you know, 230 -- I guess what I'm asking

8    is, does -- does -- does your position send us

9    down the road such that 230 really can't mean

10   anything at all?

11          MR. SCHNAPPER:  I -- I -- I don't

12   think so, Your Honor.  The question -- as you

13   say, algorithms are ubiquitous, but the question

14   is what does the defendant do with the

15   algorithm.  If it uses the algorithm to direct

16   -- to encourage people to look at ISIS videos,

17   that's within the scope of JASTA.

18          It's not different than if back in

19   1996 a lot of clerks somewhere at Prodigy did

20   this manually and just had a bunch of file cards

21   and they figured out who was interested in what.

22          The statute would have meant the same

23   thing there that it does now.  It's automated,

24   it's at a larger scale, but it doesn't change

25   the nature of what they're doing with the

1    algorithm.  So --
2              JUSTICE SOTOMAYOR:  Can I -- I'm
3    sorry, finish.
4              MR. SCHNAPPER:  The -- the -- the
5    brief -- I think the brief for Respondent points
6    to a number of uses of algorithms, for example,
7    to pick the cheapest fare or things like that.
8    That's just outside the scope of the statute.
9    The algorithm is being used there to generate
10   additional content.
11             So the question is what you do with
12   the algorithm.  The fact that you did it with an
13   algorithm doesn't give -- yield a different
14   result than if you had a lot of hard-working
15   people in a -- in an office somewhere doing the
16   same thing.
17             JUSTICE SOTOMAYOR:  You seem --
18             JUSTICE KAGAN:  Well, I -- I -- I
19   guess I --
20             JUSTICE SOTOMAYOR:  Oh.
21             JUSTICE KAGAN:  -- I -- I take the
22   point -- if -- if I could?
23             JUSTICE SOTOMAYOR:  No, no, go ahead.
24             JUSTICE KAGAN:  You know, I take the
25   point that there are a lot of algorithms that

1    are not going to produce pro-ISIS content and

2    that won't create a problem under this statute,

3    but maybe they'll produce defamatory content or

4    maybe they'll produce content that violates some

5    other law.

6         And your -- your argument can't be

7    limited to this one statute.  It has to extend

8    to any number of harms that can be done by -- by

9    speech and -- and so by the organization of

10   speech in ways that basically every provider

11   uses.

12        MR. SCHNAPPER:  Well, if I might turn

13   to the example of you said -- you referred to an

14   algorithm that produces defamation.  I may be

15   paraphrasing that wrong.

16        If the -- if the -- let's say the

17   algorithm generates a recommendation -- a --

18   a -- a face -- a thumbnail that on its face

19   is -- is benign, it just says interesting

20   information about Frank, you go there, and it's

21   defamatory.

22        The defendant's not responsible -- or

23   excuse me -- the defense applies to the video

24   itself that you saw.  The question would be

25   whether the thumbnail was actionable.  And under

1    -- in most circumstances, thumbnails aren't

2    going to be actionable.

3         In addition, the -- the thumbnails

4    typically include a snippet from a -- a video or

5    a text or whatever.  If the snippet itself were

6    defamatory, again, the defense -- the statutory

7    defense would apply because what was being

8    displayed was third-party content.  And so the

9    statute still applies there.

10        JUSTICE ALITO:  Suppose that Google

11   could -- YouTube could display these thumbnails

12   purely at random, but if it does anything than

13   displaying them purely at random, isn't it

14   organizing and presenting information to people

15   who access YouTube?

16        MR. SCHNAPPER:  Yes, but --

17        JUSTICE ALITO:  All right.

18        MR. SCHNAPPER:  -- that doesn't put it

19   within the scope of the statute.

20        JUSTICE ALITO:  Well, does that --

21   does that constitute publishing?

22        MR. SCHNAPPER:  Yes.  So they would --

23        JUSTICE ALITO:  It does?

24        MR. SCHNAPPER:  -- they would be

25   publishing -- they would be publishing the --

1    the thumbnail.

2              JUSTICE ALITO:  Right.

3              MR. SCHNAPPER:  But -- but, if the --

4    if the thumbnail isn't itself -- if -- if the --

5    if the -- they way they're using it is -- is --

6    is encouraging people to engage --

7              JUSTICE ALITO:  Well, that's a

8    different question, though, isn't it?  I -- I

9    don't know where you're drawing the line.

10   That's the problem.

11             MR. SCHNAPPER:  Oh, I see, I see, I

12   see.

13             JUSTICE ALITO:  That's the problem

14   that I see.

15             MR. SCHNAPPER:  Oh.

16             JUSTICE ALITO:  Unless you're --

17   you're saying that the publication requirement

18   is satisfied under all circumstances unless the

19   thumbnails are presented purely at random.

20             MR. SCHNAPPER:  It's publication even

21   if it's at random, but the -- but the -- the --

22   the injury in the hypothetical we're talking

23   about about ISIS doesn't follow from the content

24   of the thumbnail.  The thumbnail would typically

25   be fairly benign.  The harm comes --

1          JUSTICE ALITO:  Yeah, but in every

2     instance, in those instances where the thumbnail

3     is benign, that's not a concern for purposes of

4     this case, but in all those instances where some

5     plaintiff might have some cause of action based

6     on the content of the video that has been posted

7     --

8          MR. SCHNAPPER:  There would have to be

9     a cause of action, as we assert there is in

10    JASTA, for encouraging people to go look at the

11    video.  That's a fairly uncommon form of cause

12    of action.

13         The cause of action -- insofar as the

14    plaintiff asserts a cause of action based on the

15    video itself, that's within the -- that you've

16    been sent to, that's within the scope of the

17    defense.

18         JUSTICE JACKSON:  Is that because of

19    the way in which you're interpreting the

20    statute?  I mean, can we -- can we back up a

21    little bit and try to at least help me get my

22    mind around your argument about how we should

23    read the text of the statute?

24         I took your brief to be arguing and

25    that of those who support you that the statute

1    really is about one kind of publishing conduct,

2    and that is the failure to block or screen

3    offensive content.

4          Am I right about that?  In other

5    words, what you say is covered by Section 230

6    and that Google could, like -- could rightly

7    claim immunity for is a claim that there was

8    something defective about their ability to

9    screen or block content, that the content is up

10   there and you should be liable for it?

11         MR. SCHNAPPER:  I -- I think we --

12   we've -- I -- I think that's not our claim.

13         JUSTICE JACKSON:  Okay.

14         MR. SCHNAPPER:  I think we are trying

15   to distinguish between liability for what's in

16   the content that's on their websites that you

17   could access and actions they take to encourage

18   you to go look at it.

19         JUSTICE JACKSON:  Yes, yes, that's

20   your claim.  I'm just trying to --

21         MR. SCHNAPPER:  If you encourage it,

22   then we're --

23         JUSTICE JACKSON:  -- understand how

24   you read the statute.  Your -- the statute, you

25   say, covers only scenarios in which the claim

17

1    that's being made is that there's offensive

2    content on the website, that you didn't take it

3    down, that, you know, you failed to screen it

4    out, but if you're making a claim that you're

5    encouraging people to look at this content,

6    that's something different, that's the claim

7    you're making, and it's not covered by the

8    statute.

9          MR. SCHNAPPER:  That's our -- that's

10   the distinction --

11         JUSTICE JACKSON:  All right.

12         MR. SCHNAPPER:  -- we're trying to

13   draw.  I mean, it -- the distinction is

14   illustrated by the e-mail in the Dyroff case,

15   which -- which is the precedent that -- that got

16   us here in the Ninth Circuit.

17         In that case, there was a, I think,

18   26-word -- 26-word e-mail from the website to an

19   individual which read something like there's

20   something new that's been posted to the question

21   where can I buy heroin in Jacksonville, Florida.

22   To access it, use this URL or use this URL.

23         It's our contention that that is

24   outside the protection of the statute.

25         JUSTICE JACKSON:  But is that really

1    different -- I guess I'm trying -- so they would

2    argue, I think, that even assuming that the

3    statute only covered the kinds of things that

4    you say it covers, you know, defective blocking

5    and screening, meaning there's still offensive

6    stuff on your website and you should be liable

7    for it, I think they would say that to the

8    extent your claim is talking about their --

9    their algorithm that presents the information,

10   it's really the same thing, that you're -- that

11   it reduces -- it's tantamount to saying we

12   haven't, you know, blocked this information,

13   it's still on the website, because algorithms

14   are the way in which the information is

15   presented.

16            MR. SCHNAPPER:  So, if I may make

17   clear, as I may not have done that well, the

18   distinction we're drawing, our claim is not that

19   they did an inadequate job of block -- of

20   keeping things off their -- their computers that

21   you can access from -- from outside or from

22   failure to -- to block it.

23            It's that that's the -- that's the

24   heartland of the statute.  What we're saying is

25   that insofar as they were encouraging people to

19

```
 1   go look at things, that's what's outside the
 2   protection of the statute, not that the stuff
 3   was there.
 4            If they stopped recommending things
 5   tomorrow and -- and all sorts of horrible stuff
 6   was on their website, as far as we read the
 7   statute, they're fine.  It's the recommendation
 8   practice that we think is actionable.
 9            JUSTICE SOTOMAYOR:  Can I break down
10   your complaint a moment?  There -- the vast
11   majority of it is paragraph after paragraph
12   after paragraph that says they're liable because
13   they failed to take ISIS off their website.  I
14   think, as I'm listening to you today, you seem
15   to have abandoned that and -- and are saying
16   they don't have to take it off their website.
17            MR. SCHNAPPER:  That --
18            JUSTICE SOTOMAYOR:  Am I correct about
19   that?
20            MR. SCHNAPPER:  That's exactly right.
21   That -- that --
22            JUSTICE SOTOMAYOR:  So that can't be
23   --
24            MR. SCHNAPPER:  -- is the way we've
25   framed the question presented.
```

1           JUSTICE SOTOMAYOR:  So that can't be

2     --

3           MR. SCHNAPPER:  We did not advance

4     that claim.

5           JUSTICE SOTOMAYOR:  So you're

6     abandoning that claim, so that can't be aiding

7     and abetting.  So I think I'm listening to you,

8     and the only aiding and abetting that you're

9     arguing is the recommendation, correct?

10          MR. SCHNAPPER:  That's correct.

11          JUSTICE SOTOMAYOR:  You're not arguing

12    that they're -- some of these providers create

13    chat rooms or put people together, users

14    together.  You're not claiming that that's part

15    of what you're arguing about?  The social

16    networking, I want to call it.

17          MR. SCHNAPPER:  Well, that's not at

18    issue in this case.

19          JUSTICE SOTOMAYOR:  It's in --

20          MR. SCHNAPPER:  Face --

21          JUSTICE SOTOMAYOR:  -- tomorrow's

22    case?  All right.

23          MR. SCHNAPPER:  Face -- if I can be

24    more specific --

25          JUSTICE SOTOMAYOR:  All right.  So

1    you're limiting -- you're limiting your --

2              MR. SCHNAPPER:  -- Facebook --

3    Facebook does that.

4              JUSTICE SOTOMAYOR:  All right.

5              MR. SCHNAPPER:  Facebook recommends

6    people --

7              JUSTICE SOTOMAYOR:  Right.

8              MR. SCHNAPPER:  -- which is very

9    difficult to find within the four walls of the

10   statute.  Google's created a lot of things but

11   so far not --

12             JUSTICE SOTOMAYOR:  But you're not

13   claiming that in this case?

14             MR. SCHNAPPER:  Not in -- it's not

15   what --

16             JUSTICE SOTOMAYOR:  You're just

17   focusing --

18             MR. SCHNAPPER:  No.  This is about

19   content.  It not about --

20             JUSTICE SOTOMAYOR:  This is about

21   content.  And I just want to focus your

22   complaint so I understand it very clearly.

23   You're saying the -- the YouTube or the "Next

24   up" feature of the algorithm that says you

25   viewed this and so you might like this, it's the

```
 1      "you might like this" that's the aiding and
 2      abetting?
 3                MR. SCHNAPPER:  Uh --
 4                JUSTICE SOTOMAYOR:  What -- what part
 5      of what they're doing?  Because, I mean, you --
 6      whoever the user is types in something, they get
 7      an ISIS video, you say that's okay -- they can't
 8      be liable for you, the -- me, the viewer,
 9      looking at the ISIS vehicle.  But the Internet
10      providers can be liable for what?
11                MR. SCHNAPPER:  Okay.  So they're --
12      they're --
13                JUSTICE SOTOMAYOR:  For showing me the
14      next video that's similar to that?
15                MR. SCHNAPPER:  All right.  They're --
16      it would be helpful perhaps if I distinguish
17      between two kinds of practices that -- that go
18      on at YouTube.  The complaint doesn't describe
19      them in detail, but we're fairly familiar with
20      them.  So what we can talk --
21                JUSTICE SOTOMAYOR:  I'm glad, but I'm
22      going to be to look at complaint because it can
23      only survive if the complaint is adequate.  So
24      you're going to have to tell me where in the
25      complaint you're saying this if I'm going to
```

1    think about holding them liable.  So --

2              MR. SCHNAPPER:  I'm about three

3    questions --

4              JUSTICE SOTOMAYOR:  -- you're going to

5    have to separate out the two things then.

6              MR. SCHNAPPER:  Okay.  I'm about three

7    questions behind.  Let me ---

8              JUSTICE SOTOMAYOR:  All right.

9              MR. SCHNAPPER:  -- let me try and do

10   my best here.  So what we've been talking about

11   up until now is the use of -- of thumbnails to

12   encourage people to look at content -- people

13   who haven't clicked on any video yet.  And our

14   contention is the use of thumbnails is -- is the

15   same thing under the statute as sending someone

16   an e-mail and saying:  You might like to look at

17   this new video.

18             Now the "Up next" feature is a

19   different problem, and the problem there is --

20   is that when you click on one video and you

21   picked that one, YouTube will automatically keep

22   sending you more videos which you haven't asked

23   for.

24             That, in our view, runs afoul of a

25   different element of the statutory defense,

1    which is that they be acting as an interactive

2    computer service.  And when they go beyond

3    delivering to you what you've asked for, to

4    start sending things you haven't asked for, our

5    contention is they're no longer acting as an

6    interactive computer service.

7         JUSTICE SOTOMAYOR:  All right.  So,

8    even if I accept that you're right that sending

9    you unrequested things that are similar to what

10   you've viewed, whether it's a thumbnail or an

11   e-mail, how does that become aiding and

12   abetting?  I'm going back to Justice Thomas's

13   question, okay, which is, if they aren't

14   purposely creating their algorithm in some way

15   to feature ISIS videos, if they're -- I mean, I

16   can really see that an Internet provider who was

17   in cahoots with ISIS provided them with an

18   algorithm that would take anybody in the world

19   and find them for them and -- and do recruiting

20   of people by showing them other videos that will

21   lead them to ISIS, that's an intentional act,

22   and I could see 230 not going that far.

23        I guess the question is, how do you

24   get yourself from a neutral algorithm to an

25   aiding and abetting?

1                    MR. SCHNAPPER:  Right.

2                    JUSTICE SOTOMAYOR:  An intent,

3      knowledge.  There has to be some intent to aid

4      and abet.  You have to have knowledge that

5      you're doing this.

6                    MR. SCHNAPPER:  Yes.

7                    JUSTICE SOTOMAYOR:  So how do you get

8      there?

9                    MR. SCHNAPPER:  So the -- the -- if --

10     if the algorithm recommends an ISIS video or it

11     automatically plays it, that -- as we'll see

12     tomorrow, that by itself isn't going to satisfy

13     aiding and abetting.

14                   Aiding and abetting requires knowledge

15     that it's happening.  So the elements of the

16     aiding and abetting claim, which we'll be

17     talking about tomorrow, address the question

18     you're asking.

19                   If -- if this was teed up, if they

20     didn't know it was happening, and the other

21     elements of an aiding-and-abetting claim were

22     present, they would not be liable for aiding and

23     abetting.

24                   CHIEF JUSTICE ROBERTS:  Thank you,

25     counsel.

1         Just one short question.  Your -- your

2    friend on the other side presented an analogy

3    that she thought would be helpful, which -- a

4    book seller that has a table with sports books

5    on it and somebody comes in and says, I'm

6    looking for the book about Roger Maris, and the

7    bookseller says, well, it's over there on the

8    table with the other sports books.

9         Isn't that analogous to what's

10   happening here?  You type in ISIS --

11        MR. SCHNAPPER:  I'm not sure -- I'm

12   not sure where that -- that gets us.  I mean, it

13   wouldn't be any different than sending an e-mail

14   saying that.

15        CHIEF JUSTICE ROBERTS:  Well, we'll

16   figure out where we get -- it gets us in a

17   minute.  But I just want to know if you think

18   that's a good -- a good analogy.

19        MR. SCHNAPPER:  I -- I -- I'm a little

20   concerned to know where it's taking me.  It's an

21   analogy of --

22        (Laughter.)

23        MR. SCHNAPPER:  -- it's an analogy of

24   sorts.

25        CHIEF JUSTICE ROBERTS:  That's what we

1    call -- that's what we call questions.
2               MR. SCHNAPPER:  But -- but I still --
3    I mean, I'm going to -- at some point, I'm going
4    to go yes, but you still have to fit it within
5    the four walls of the statute.  Perhaps you
6    could -- you could tell me what lies ahead.  I
7    think I could -- I mean, sure, it's an analogy
8    of sorts, but --
9               (Laughter.)
10               CHIEF JUSTICE ROBERTS:  What lies
11    ahead is, I give up, Your Honor.
12               MR. SCHNAPPER:  -- but I would like to
13    know what it leads up to.  Yes.  Yeah.  But --
14               CHIEF JUSTICE ROBERTS:  No, what lies
15    ahead is the idea that you could look at that
16    and say it's not pitching something in
17    particular to the person who's made the request.
18    It is recognizing that it's a request about a
19    particular subject matter and it's there on the
20    table, and they might want to look at that or
21    they may not want to look at it.
22               But it's really just a 21st Century
23    version of what has taken place for a long time
24    in many contexts, which, when you ask a
25    question, people are putting together a group of

1   things, not necessarily precisely answering your

2   question.  I mean, if somebody said --

3           MR. SCHNAPPER:  Yes -- no, I -- all

4   right.  I think -- I think I know where we're

5   going here.

6           The -- insofar as I -- I go to YouTube

7   and I say show me a cat -- you know, it's a

8   little more complicated than this -- but show me

9   -- show -- -- tell me what cat videos you have,

10  and in responding to that, they're --

11          CHIEF JUSTICE ROBERTS:  Sure.  That's

12  an easy case.  They give you a bunch of cat

13  videos.  You don't have any complaint about

14  something like that.

15          In this case, if they put in

16  something, say, show me ISIS videos, they would

17  get a bunch of ISIS videos, and you don't have

18  any objection to that given the way the search

19  was phrased.

20          MR. SCHNAPPER:  It -- I have to answer

21  that with precision.  If I say, play for me an

22  ISIS video, and they just directly play the

23  video, then what they've done falls within the

24  language of the statute.  It's requested, it's

25  purely third-party content, and I would try and

1     be hold -- trying to be holding them liable for

2     displaying that content.

3          But what actually has happened -- and

4     this is maybe analogous to what goes on to some

5     extent at Twitter, where they might actually

6     literally just show you the thing.  But what's

7     happening at YouTube is they're not doing that.

8          I type in ISIS video, and there are

9     going to be a catalogue of thumbnails which they

10    created.  It's as if I went into the bookstore

11    and said, I'm interested in sports books, and

12    they said, we've got this catalogue which we

13    wrote of sports books, sports books we have

14    here, and handed that to me.  They created that

15    content.

16         And -- and -- and if you publish

17    content you've created, you're not within the

18    four walls of the statute.  So --

19         CHIEF JUSTICE ROBERTS:  But you would

20    not -- you would not -- under your theory, they

21    would not be liable for the content of the

22    books, they'd be liable for the catalogue?

23         MR. SCHNAPPER:  By -- by -- by

24    providing the catalogue.

25         CHIEF JUSTICE ROBERTS:  Okay.  Thank

1   you.

2          Justice Thomas, anything further?

3          JUSTICE THOMAS:  What if the YouTube,

4   instead of automatically providing this list,

5   which is hard -- it's hard for me because I

6   don't see this as -- I see these as suggestions

7   and not really recommendations because they

8   don't really comment on them.

9          But what if you had to click on

10  something like "For more like this, click here"?

11  Would that also be, as far as you're concerned,

12  aiding and abetting or outside this statute?

13         MR. SCHNAPPER:  It's -- so you --

14  you've played one video and they say click here

15  to see another one?

16         JUSTICE THOMAS:  No, click here if you

17  want suggestions for more like this.

18         MR. SCHNAPPER:  No, suggestions are --

19  depending how it happens.  Let's say they say

20  send me more -- show me more thumbnails.  It's

21  outside the statute.

22         And if I might come back to an earlier

23  part of what's embedded in your question, we

24  aren't asking the Court to adopt a rule that's

25  about recommendations versus suggestions.

1            What we're suggesting -- what -- what

2       we're arguing is -- is that this -- is that you

3       take the normal standards in each of the

4       elements and you apply it to what's going on.

5       It doesn't -- it doesn't matter if they're

6       encouraging it.

7            If -- if -- in terms of aiding and

8       abetting, if someone comes to me and says what's

9       al-Baghdadi's phone call -- phone number, I'd

10      like to call him, and I give him the phone

11      number, I'm aiding and abetting even if I -- I

12      don't say, and I hope you'll join ISIS.

13           Whether we label it a recommendation

14      or not on our view is not the issue here.  We

15      tried to say that in our brief.

16           JUSTICE THOMAS:  Thank you.

17           MR. SCHNAPPER:  Was that responsive?

18      I'm not --

19           JUSTICE THOMAS:  Well, it's

20      responsive, but I don't understand it.

21           (Laughter.)

22           JUSTICE THOMAS:  You called -- I mean,

23      if you called Information and asked for

24      al-Baghdadi's number and they give it to you, I

25      don't see how that's aiding and abetting.

1          And I don't understand how a neutral

2    suggestion about something that you've expressed

3    an interest in is aiding and abetting.  I just

4    don't -- I don't understand it.

5          And I'm trying to get you to explain

6    to us how something that is standard on YouTube

7    for virtually anything that you have an interest

8    in suddenly amounts to aiding and abetting

9    because you're in the ISIS category.

10          MR. SCHNAPPER:  Well, again, I'll be

11    answering that probably again tomorrow, but as

12    little -- what you describe without more

13    probably wouldn't.

14          But, as you'll -- as we'll learn

15    tomorrow, the circumstances are far different

16    than that, that these -- YouTube and these other

17    companies were repeatedly told by government

18    officials, by the media, dozens of times that

19    this was going on, and they didn't do any --

20    they did almost nothing about it.

21          That's very different than providing

22    one phone number through Information.

23          JUSTICE THOMAS:  Well, I mean, did --

24          MR. SCHNAPPER:  So it goes to the

25    scope of JASTA, not to 230.

```
 1              JUSTICE THOMAS:  So we've gone from
 2     recommendation to inaction being the source of
 3     the problem.  And this is what I'm -- you know,
 4     the -- I understand you're putting it in
 5     context, but I -- it's hard for me also to
 6     understand where this obligation to take
 7     specific actions can lead to an
 8     aiding-and-abetting claim.
 9              MR. SCHNAPPER:  Well, the
10     interconnection in this case is that -- that
11     we're focusing on the recommendation function,
12     that they are affirmatively recommending or
13     suggesting ISIS content, and it's -- and it's
14     not mere inaction.
15              Mere inaction might work under aiding
16     and abetting, but we'll get there tomorrow, but
17     -- but the claim that we're focusing on today is
18     that, in fact, they're affirmatively
19     recommending things.  You turn on your computer
20     and the -- and the -- the -- the computers at --
21     at YouTube send you stuff you didn't ask them
22     for.  They just send you stuff.  It's no
23     different than if they were sending you e-mails.
24     That's affirmative conduct.
25              CHIEF JUSTICE ROBERTS:  Justice Alito?
```

34

        1              JUSTICE ALITO:  I'm afraid I'm
        2    completely confused by whatever argument you're
        3    making at the present time.
        4              So, if someone goes on YouTube and
        5    puts in ISIS videos and they show thumbnails of
        6    ISIS videos, and don't -- don't -- don't tell me
        7    anything about the substantive underlying tort
        8    claim, if the person is -- if -- if YouTube is
        9    sued for doing that, is it acting as a publisher
       10    simply by displaying these thumbnails of ISIS
       11    videos after a search for ISIS videos?
       12              MR. SCHNAPPER:  It is acting as a
       13    publisher but of something that they helped to
       14    create because the thumbnail is a joint creation
       15    that involves materials from a third party and a
       16    URL from them and some other things.
       17              JUSTICE ALITO:  So, if YouTube uses
       18    thumbnails at all, it is acting as a publisher
       19    with respect to every thumbnail that it
       20    displays?
       21              MR. SCHNAPPER:  Yes.  Yes.  They're --
       22    they're publishing the thumbnails.  And the
       23    question is, are the thumbnails third-party
       24    content, or are they content they've created?
       25    And the problem is they are content.

35

```
 1              JUSTICE ALITO:  Yeah, I mean, if
 2    that's your argument, then you're really arguing
 3    that -- that this statute does not provide
 4    protection against a suit that is in substance
 5    based on the third-party-provided content.
 6              MR. SCHNAPPER:  No, we're -- we're
 7    basing the -- I'm sorry.  I don't mean to be so
 8    --
 9              JUSTICE ALITO:  Okay.
10              MR. SCHNAPPER:  That -- that -- that
11    they -- the particular business model they have
12    involves using this -- these thumbnails, which
13    are materials they've in part created to --
14    to -- to operate.
15              Let me --
16              JUSTICE ALITO:  So they shouldn't use
17    thumbnails at all?  If they want protection
18    under the statute, they shouldn't use
19    thumbnails?
20              MR. SCHNAPPER:  Let me -- let --
21    that's -- that's the problem they have with the
22    way the statute's written.  So, if I -- if I may
23    give a --
24              JUSTICE ALITO:  Is there any other way
25    they could organize themselves without using
```

1    thumbnails?  I suppose, if you type in "I want

2    ISIS videos," they can just put ISIS video 1,

3    ISIS video 2, and so forth.

4         MR. SCHNAPPER:  That's the technical

5    problem they have.

6         JUSTICE ALITO:  Well, would that be

7    acting as a publisher if they did that?

8         MR. SCHNAPPER:  Yes, but they'd be

9    publishing third-party content because the video

10   itself is the content.  If I might -- if I might

11   respond --

12        JUSTICE ALITO:  Okay.  I just -- I --

13   I -- I have one final question.  It's a

14   technical question and probably better addressed

15   to Ms. Blatt.

16        Is it your contention that everybody

17   who uses YouTube and searches for a video

18   involving a particular subject will be

19   automatically presented with thumbnails that are

20   related to that regardless of that user's

21   YouTube setting, preferences, preferences that

22   YouTube allows you to --

23        MR. SCHNAPPER:  I -- I -- I don't -- I

24   don't know.  The practices are too varied.  I

25   don't know.  But, if I -- if I --

```
 1              JUSTICE ALITO:  You don't know if
 2   somebody uses YouTube, they can -- can -- do
 3   they have -- is there a function that allows
 4   them not to be presented with similar videos?
 5              MR. SCHNAPPER:  I -- I don't know.  I
 6   mean, I've gone onto -- on YouTube and never
 7   seen that, but I -- I wouldn't --
 8              JUSTICE ALITO:  Uh-huh.  Okay.
 9              MR. SCHNAPPER:  The functions there
10   are widely varied.  But if I might make a
11   broader point about the way you framed
12   that question?
13              JUSTICE ALITO:  I -- I think you --
14   you answered my question.  Thank you.
15              CHIEF JUSTICE ROBERTS:  Justice
16   Sotomayor?
17              JUSTICE SOTOMAYOR:  I -- I do.  This
18   has gone further than I thought or your position
19   has gone further than I thought.
20              No provider or user of a interactive
21   computer service shall be treated as the
22   publisher or speaker of any information provided
23   by another information content provider.
24              And I thought that you started by
25   telling me, if I put in ISIS and they just give
```

1    me a download of information, the Internet

2    provider is not liable, correct, under (c)(1)?

3    I just read to you (c)(1), correct?

4              MR. SCHNAPPER:  It -- it depends what

5    the information is they give you.

6              JUSTICE SOTOMAYOR:  If they give me

7    everything that has --

8              MR. SCHNAPPER:  If they give you

9    information they created --

10             JUSTICE SOTOMAYOR:  No, they have --

11             MR. SCHNAPPER:  -- they're not

12   protected.

13             JUSTICE SOTOMAYOR:  So you are going

14   to the extreme.  Assume I don't think you're

15   right, I think you're wrong, that if I put in a

16   search and they give me materials that they

17   believe answers my search, no matter how they

18   organize it, that they're okay.  Do you

19   survive -- does your complaint survive if I

20   believe 230 goes that far?

21             MR. SCHNAPPER:  So it depends on what

22   materials they present you with.  If -- if all

23   they presented you with -- Twitter would maybe

24   be a cleaner example -- is materials created by

25   third parties, they -- what they've published is

 1    third-party materials, and they're good.

 2              If they present you with things that

 3    they wrote, at the other extreme, then they're

 4    not protected because what they presented is not

 5    third-party content.

 6              JUSTICE SOTOMAYOR:  So why do you

 7    think the thumbnails are -- I type it in, they

 8    give me a thumbnail of everything they think

 9    answers my inquiry, the suggestion box.

10              MR. SCHNAPPER:  Yes.

11              JUSTICE SOTOMAYOR:  Why are they

12    liable?

13              MR. SCHNAPPER:  Because a thumbnail is

14    not exclusively third-party material.  It's a

15    joint operation, and you can find -- if you look

16    at the thumbnail, it'll have a picture, which

17    comes from the third party, it has an embedded

18    URL, which comes from the defendant, and it

19    might have some information below the --

20              JUSTICE SOTOMAYOR:  The URL tells you

21    where to find it, correct?

22              MR. SCHNAPPER:  Sorry?

23              JUSTICE SOTOMAYOR:  The URL tells you

24    where to find it?  It's a computer language that

25    tells you this is where this is located?

40

```
 1              MR. SCHNAPPER:  Yes, but it is
 2    information within the meaning of the statute.
 3    This is no different than an e-mail which writes
 4    it out for you.
 5              JUSTICE SOTOMAYOR:  If I don't accept
 6    your line --
 7              MR. SCHNAPPER:  Yeah.
 8              JUSTICE SOTOMAYOR:  -- assume that
 9    you've lost on that -- with that line.
10              MR. SCHNAPPER:  Yes.
11              JUSTICE SOTOMAYOR:  I gave you an
12    example earlier of an Internet provider working
13    directly with ISIS and doing an algorithm that
14    -- teaching them how to do an algorithm that
15    will look for everybody who is just
16    ISIS-related.  There's more a collusion in the
17    creation than a neutral algorithm.
18              How do I draw the line between not
19    accepting your point about the thumbnails and
20    going to the other extreme of active collusion?
21    Because there has to be a line somewhere in
22    between.  It can't be merely because you're a
23    computer person that you can create an algorithm
24    that discriminates against people.  You have no
25    problem with that, right?  If a -- if a --
```

```
1              MR. SCHNAPPER:  The writing of the
2      algorithm would probably constitute aiding and
3      abetting --
4              JUSTICE SOTOMAYOR:  Exactly.  If you
5      write one that discriminated against people or a
6      user, you're probably going to be liable.
7              MR. SCHNAPPER:  I'm not sure, as we
8      describe it, it would fall outside the four
9      walls of the defense.  If you write an algorithm
10     that -- that in response -- that in -- that --
11     the -- the way you implement it's --
12             JUSTICE SOTOMAYOR:  If you write an
13     algorithm --
14             MR. SCHNAPPER:  -- going to put you
15     outside the defense.  Yes.
16             JUSTICE SOTOMAYOR:  -- if you write an
17     algorithm for someone that, in its structure,
18     ensures the discrimination between people, a
19     dating app, for example, someone comes to you
20     and says, I'm going to create an algorithm that
21     inherently discriminates against people, it
22     won't match black people to white people, Asian
23     people to Hispanics, it's going to discriminate,
24     you would say that Internet provider is
25     discriminating, correct?
```

1            MR. SCHNAPPER:  I would -- what they

2     did -- the way the distinction played out would

3     be important, though.  They would -- you know,

4     if -- if they're -- they would have to fall

5     outside of one of the elements of the claim.

6            It's hard to do this in the abstract.

7            JUSTICE SOTOMAYOR:  All right.

8            CHIEF JUSTICE ROBERTS:  Justice Kagan?

9            JUSTICE KAGAN:  Mr. Schnapper, can I

10    give you three kinds of practices and you tell

11    me which gets 230 protection and which doesn't?

12            So one is the YouTube practices that

13    you're complaining of, and we know you think

14    that that does not get 230 protection.

15            A second would be Facebook or Twitter

16    or any entity that essentially prioritizes

17    items.  So you're on Facebook and certain items

18    are prioritized on your news feed, or certain

19    tweets are prioritized on your Twitter feed, all

20    right, and that there's some algorithm that's

21    doing that and that's amplifying certain

22    messages rather than other messages on your

23    feed.  That's the second.

24            And then the third is just a regular

25    search engine.  You know, you put in a search

    1    and something comes back, and in some ways, you

    2    know, that's one giant recommendation system.

    3    Here's the first item you should look at.

    4    Here's the second item you should look at.

    5              So are all three of those not

    6    protected, or what happens to my second and

    7    third?  Are they protected or not protected?

    8    And if they're -- and if they are protected,

    9    what's the difference between them and your

   10    practices?

   11              MR. SCHNAPPER:  Certainly.  So let me

   12    -- let me start with the search engine.  The --

   13    the -- there's a lot of discussion on search

   14    engines, but there's not a specific provision in

   15    the statute that says search engines are

   16    protected.  The question is, do they fit within

   17    the language of the statute?

   18              So, if I ask a search engine for

   19    stories about John Doe and it gives me a list

   20    and, if I click on one of them, it turns out to

   21    be defamatory, they're not liable because

   22    they --

   23              JUSTICE KAGAN:  Well, they just gave

   24    it to you.  It's the first thing.  They just

   25    prioritized it.  They think it's really a great

1    one to click on.

2            MR. SCHNAPPER:  The -- the mere fact

3    -- there are three -- multiple questions here.

4    First, are they liable just because what you --

5    you -- you clicked on turned out to be

6    defamatory?  The answer we think is no.

7            Secondly, what if the snippet that

8    they took from the John Doe document said John

9    Doe is a shoplifter?  And the answer is they're

10   not liable because they didn't write that.  It's

11   publishing third-party content.

12           The third question is, could they be

13   liable for the way they prioritize things?  And

14   the answer is I think so.  It's going to depend

15   how -- what happened.  And the example, I could

16   --

17           JUSTICE KAGAN:  So even all the way to

18   the -- to the straight search engine, that they

19   could be liable for their prioritization system?

20           MR. SCHNAPPER:  Yes, there was -- let

21   me --

22           JUSTICE KAGAN:  Okay.

23           MR. SCHNAPPER:  If I might continue --

24   if I --

25           JUSTICE KAGAN:  No, I appreciate the

1     -- the -- go ahead.  I'm sorry.

2          MR. SCHNAPPER:  Those are the facts

3     which led the European Union to fine Google 2.3

4     billion euros, because they used prioritization

5     to wipe out competition --

6          JUSTICE KAGAN:  Okay.  So here's --

7          MR. SCHNAPPER:  -- for things they

8     were selling.

9          JUSTICE KAGAN:  Yeah, so I don't think

10    that a court did it over there, and I think that

11    that's my concern, is I can imagine a world

12    where you're right that none of this stuff gets

13    protection.  And, you know, every other industry

14    has to internalize the costs of its conduct.

15    Why is it that the tech industry gets a pass?  A

16    little bit unclear.

17          On the other hand, I mean, we're a

18    court.  We really don't know about these things.

19    You know, these are not like the nine greatest

20    experts on the Internet.

21          (Laughter.)

22          JUSTICE KAGAN:  And I don't have to --

23    I don't have to accept all Ms. Blatt's "the sky

24    is falling" stuff to accept something about,

25    boy, there is a lot of uncertainty about going

1    the way you would have us go, in part, just

2    because of the difficulty of drawing lines in

3    this area and just because of the fact that,

4    once we go with you, all of a sudden we're

5    finding that Google isn't protected.  And maybe

6    Congress should want that system, but isn't that

7    something for Congress to do, not the Court?

8              MR. SCHNAPPER:  Well, I -- I think the

9    -- the -- the -- the line-drawing problems are

10   real.  No one minimizes that.  I think that the

11   task for this Court is to apply the statute the

12   way it was written.

13             And if I might return to a point that

14   Justice Alito made, much of what goes on now

15   didn't exist in 1996.  The statute was written

16   to address one or two very specific problems

17   about defamation cases, and it drew lines around

18   certain kind of things and it protected those.

19             It did not and could not have

20   written -- been written in such a way to protect

21   everything else that might come along that was

22   highly desirable.  Congress didn't adopt a

23   regulatory scheme.  They protected a few things.

24   It will inevitably happen, it has happened, that

25   companies have devised practices which are maybe

1    highly laudable, but they don't fit within the
2    four walls of the statute.
3         That will continue to happen no matter
4    what happens -- what you do.  And the answer is,
5    when -- when someone devises some new -- some
6    new practice that may be highly desirable but
7    doesn't fit within the four walls of the
8    statute, the -- the industry has to go back to
9    Congress and say:  We need you to broaden the
10   statute because you wrote this to protect chat
11   rooms in 1996, and we want to do something that
12   doesn't fit within the statutes.
13        And -- and using thumbnails would be a
14   perfect example of that.
15        JUSTICE KAGAN:  Thank you.
16        CHIEF JUSTICE ROBERTS:  Justice
17   Gorsuch?
18        JUSTICE GORSUCH:  Mr. Schnapper, I
19   just want to make sure I understand, as you say,
20   the statutory language and how this case fits
21   with it, and if we could start with Section
22   230(f)(4), which defines the term "access
23   software provider."  It includes, among other
24   things, picking, choosing, analyzing, or
25   digesting content.

1           And we might in another world in our

2     First Amendment jurisprudence think of picking

3     and choosing, analyzing or digesting content as

4     content providing, but the statute seems to

5     suggest that's not what it is, it's something

6     different in this context, in this statutory

7     context, and it's protected.

8           Do you agree with that?

9           MR. SCHNAPPER:  No.  Let -- and I --

10    if I might explain why?

11          JUSTICE GORSUCH:  Briefly.

12          MR. SCHNAPPER:  I'll do my best.

13    The -- the language that you refer to in

14    Section (f)(4) doesn't apply here.

15          JUSTICE GORSUCH:  No, I -- I -- I --

16    we'll get to that in a minute.  But let's just

17    take that as given, okay, that I think that

18    what, say, Google does in picking, choosing,

19    analyzing, or even digesting content just makes

20    it an access software provider.  Let's take that

21    as given.  And so that would normally be

22    protected activity.

23          But (f)(3) carves out a scenario where

24    you become a content provider, and that's

25    something different in my mind to picking,

1    choosing, analyzing, or digesting content, okay?

2    Let's just take those two premises as given.

3         MR. SCHNAPPER:  Okay.

4         JUSTICE GORSUCH:  All right?  You got

5    to do something beyond picking, choosing, or

6    analyzing or digesting content, which is what

7    search engines typically do, even as I

8    understand it.  You've got to do something

9    beyond that.

10        As I take your argument, you think

11   that the Ninth Circuit's Neutral Tools Rule is

12   wrong because, in a post-algorithm world,

13   artificial intelligence can generate some forms

14   of content, even according to Neutral Rules.

15        I mean, artificial intelligence

16   generates poetry, it generates polemics today.

17   That -- that would be content that goes beyond

18   picking, choosing, analyzing, or digesting

19   content.  And that is not protected.

20        Let's -- let's assume that's right,

21   okay?  Then I guess the question becomes, what

22   do we do about YouTube's recommendations?

23        And -- and as I see it, we have a few

24   options.  We could say that YouTube does

25   generate its own content when it makes a

1   recommendation, says up next.  We could say no,

2   that's more like picking and choosing.

3            Or we could say the Ninth Circuit's

4   Neutral Tools test was mistaken because, in some

5   circumstances, even neutral tools, like

6   algorithms, can generate through artificial

7   intelligence forms of content and that the Ninth

8   Circuit wasn't sensitive to that possibility and

9   remand the case for it to consider that

10   question.

11            What's wrong with that?

12            MR. SCHNAPPER:  Well, it's not our

13   theory, but it's --

14            (Laughter.)

15            MR. SCHNAPPER:  If the alternative is

16   what Ms. Blatt will be telling you, I'll --

17            JUSTICE GORSUCH:  I'm not asking you,

18   you know, hey, I'll win at any cost.

19            MR. SCHNAPPER:  No, there's nothing

20   wrong with it.

21            JUSTICE GORSUCH:  I'm asking you

22   what's -- what's -- whether that is a correct

23   analysis of the statutory terms you keep

24   referring us to --

25            MR. SCHNAPPER:  Yes.

1           JUSTICE GORSUCH:  -- or whether it is
2      not.
3           MR. SCHNAPPER:  Yes, yes, yes.  As --
4      as we've said, this now is close to something we
5      set out in our brief, which is that the -- that
6      the algorithm could create things on its own.
7      It could create a catalogue of ISIS videos,
8      which would be analogous to a compilation under
9      Section 101 of the Copyright Act.
10          A compilation is a distinct entity,
11     it's copyrightable, even if the elements of it
12     were not.  So, yes, absolutely, the software
13     could create something like that.  It would not
14     be third-party content, and, therefore, it would
15     fall outside the scope of the statute.
16          JUSTICE GORSUCH:  Thank you.
17          CHIEF JUSTICE ROBERTS:  Justice
18     Kavanaugh?
19          JUSTICE KAVANAUGH:  Just to pick up on
20     Justice Gorsuch's questions, the idea of
21     recommendations is not in the statute.  And the
22     statute does refer to organization and the
23     definition, as he was saying, of interactive
24     computer service means one that filters,
25     screens, picks, chooses, organizes content.

1          And your position, I think, would mean

2    that the very thing that makes the website an

3    interactive computer service also mean that it

4    loses the protection of 230.  And just as a

5    textual and structural matter, we don't usually

6    read a statute to, in essence, defeat itself.

7          So what's your response to that?

8          MR. SCHNAPPER:  My response is that

9    the text doesn't apply here.  Let me explain

10   why.  The -- the element in the -- the list in

11   -- in (f)(4) refers to only one of the three

12   kinds of interactive computer services in

13   (f)(2).

14          In (f)(2) -- and this is -- this is on

15   page 267 of the petition appendix.  (f)(2) says

16   an interactive computer service means -- and

17   there -- it gives you three candidates, you've

18   got one of them -- an information service, a

19   system, or an access software provider.

20          Now YouTube is one of the first two.

21   It doesn't -- it's not a software provider.  The

22   definition in (f)(4) only delineates who is an

23   access software provider.  It doesn't apply to

24   who's an information system or service.  And

25   that was Congress's choice.

1          Congress didn't say you're an

2     interactive -- you're a service, an information

3     service or a system if you do those things.  It

4     said you're only -- those things only bring you

5     within the four walls of interactive computer

6     service if you're -- if you're a software

7     provider.  And -- and that made sense in the

8     context of what was happening in 1996.

9          In 1996, if you wanted to go online,

10    you would typically sign up with CompuServe or

11    Prodigy and they would literally give you

12    diskettes.  They would sell -- they would be

13    selling you software.

14         And -- and this provision in (f)(4) is

15    about that activity.  That's not what's

16    happening here.

17         JUSTICE KAVANAUGH:  Well, just -- just

18    to go back to 1996 and maybe pick up on Justice

19    Kagan's questions earlier, it seems that you

20    continually want to focus on the precise issue

21    that was going on in 1996, but then Congress

22    drafted a broad text, and that text has been

23    unanimously read by courts of appeals over the

24    years to provide protection in this sort of

25    situation and that you now want to challenge

1    that consensus.

2           But the amici on the other side say:

3    Well, to do that, to pull back now from the

4    interpretation that's been in place would create

5    a lot of economic dislocation, would really

6    crash the digital economy with all sorts of

7    effects on workers and consumers, retirement

8    plans and what have you, and those are serious

9    concerns and concerns that Congress, if it were

10   to take a look at this and try to fashion

11   something along the lines of what you're saying,

12   could account for.

13          We are not equipped to account for

14   that.  So are the predictions of problems

15   overstated?  If so, how?  And are we really the

16   right body to draw back from what had been the

17   text and consistent understanding in courts of

18   appeals?

19          MR. SCHNAPPER:  Well, I -- our

20   position is that the text doesn't -- doesn't say

21   this.  With regard to the issue of what we've

22   come to call recommendations, this isn't a

23   longstanding, well-established body of

24   precedent.  It's really three decisions:  the

25   decision in this case, the Dyroff decision, and

1    Force.  And -- and of the eight justices to --

2         JUSTICE KAVANAUGH:  What about the

3    implications then?  Go to that, the implications

4    for the economy, that you have a lot of amicus

5    briefs that we have to take seriously that say

6    this is going to cause a lot of economic

7    dislocation in the country.

8         MR. SCHNAPPER:  I mean, I'd say a

9    couple things in response to that.  The first

10   one is, on a close reading of the amicus briefs,

11   it's clear that they are urging the Court to

12   hold that a wide variety of different kinds of

13   things are protected.  They're -- they're

14   inviting the Court to adopt a rule that

15   recommendations are protected and that whatever

16   they're doing would qualify as a recommendation.

17        The -- you can't --

18        JUSTICE KAVANAUGH:  Well, I think

19   they're saying a recommendation is a

20   recommendation, something express.  And your --

21   your whole thing is the algorithms are an

22   implied recommendation.  And they're saying:

23   Well, they're not an express recommendation.

24   That -- that -- so --

25        MR. SCHNAPPER:  I'm --

56

1              JUSTICE KAVANAUGH:  But, in any event,
2       why don't we focus on the question.
3              MR. SCHNAPPER:  Yes.  Yes.
4              JUSTICE KAVANAUGH:  Do you -- do you
5       challenge the -- the basic point?
6              MR. SCHNAPPER:  I think -- I think --
7       yes.
8              JUSTICE KAVANAUGH:  And so --
9              MR. SCHNAPPER:  We -- we do, on -- on
10      a couple grounds.  One of them is that I'm not
11      sure all these decisions -- these briefs are
12      distinguishing as we have today between
13      liability because of the content of third-party
14      materials and the recommendation function
15      itself.
16             A -- a distinction between more and
17      less specific suggestions --
18             JUSTICE KAVANAUGH:  What would the
19      difference be in liability, in damages?
20             MR. SCHNAPPER:  I'm sorry, between
21      which two things?
22             JUSTICE KAVANAUGH:  The third-party
23      content and the recommendation.
24             MR. SCHNAPPER:  Well, most of the time
25      the recommendations isn't going to --

```
 1              JUSTICE KAVANAUGH:  Like how would the
 2    money at the end of the day differ if you are
 3    successful?
 4              MR. SCHNAPPER:  It might not be.  But
 5    most recommendations just aren't actionable.  I
 6    mean, there -- there is no cause of action for
 7    telling someone to look at a book that has
 8    something defamatory in it.
 9              JASTA, the statute we're talking about
10    tomorrow, is unusual in that recommendations
11    could run you afoul of the statute, but there
12    are very few claims that are like that.  So
13    it's -- it's a very different kind of situation.
14    It's -- the implications of this are limited
15    because the kinds of circumstances in which a
16    recommendation would be actionable are limited.
17              JUSTICE KAVANAUGH:  Thank you.
18              CHIEF JUSTICE ROBERTS:  Justice
19    Barrett?
20              JUSTICE BARRETT:  I'd like to take you
21    back, Mr. Schnapper, to Justice Sotomayor's
22    questions about the complaint.  It seems to me
23    that the complaint in this case is materially
24    indistinguishable from the complaint in
25    tomorrow's case.  Do you agree?  Same aiding and
```

```
1    --
2              MR. SCHNAPPER:  The complaint in which
3    case?  I'm sorry.
4              JUSTICE BARRETT:  In tomorrow's case,
5    in the Taamneh case, the Twitter case, and this
6    one.
7              MR. SCHNAPPER:  Pretty much.
8              JUSTICE BARRETT:  So they're both
9    relying on the same aiding-and-abetting theory.
10   So, if you lose tomorrow, do we even have to
11   reach the Section 230 question here?  Would you
12   concede that you would lose on that ground here?
13             MR. SCHNAPPER:  No.  The -- there was
14   a motion to dismiss in tomorrow's case on JASTA
15   grounds.  It didn't get decided.  So, if we lose
16   tomorrow, they'll be -- the defense will be free
17   in this case to -- to move to dismiss, but we'd
18   be entitled to try to amend the complaint in
19   this case to satisfy whatever standard you
20   establish tomorrow.
21             JUSTICE BARRETT:  Okay.  Let me ask
22   you this.  I'm switching gears now.  So Section
23   230 protects not only providers but also users.
24   So I'm thinking about these recommendations.
25   Let's say I retweet an ISIS video.  On your
```

1    theory, am I aiding and abetting and does the

2    statute protect me, or does my putting the

3    thumbs-up on it create new content?

4              MR. SCHNAPPER:  I -- we don't read the

5    word "user" in -- that broadly.  There's not

6    been a lot of litigation about this.

7              We -- we think the word "user" is

8    there to deal with a situation in which one

9    entity accesses a -- a -- a server, YouTube, for

10   example, and then someone else uses that entity,

11   like when I go to FedEx Office, FedEx Office is

12   the user that is accessing my e-mail, and the

13   statute protects them when I look at the FedEx

14   computer and find the defamatory --

15             JUSTICE BARRETT:  Well, let's say that

16   I disagree with you.  Let's say I'm an entity

17   that's using the service -- the service, so I

18   count as a user.  You know, my computer is

19   accessing the servers when I retweet the image.

20   On your theory, could I be liable under JASTA

21   for aiding and abetting without -- do I lose 230

22   protection --

23             MR. SCHNAPPER:  Right.  Right.  Right.

24             JUSTICE BARRETT:  -- if I created new

25   content?

```
 1                 MR. SCHNAPPER:  The problem -- whether

 2      it's enough for JASTA is a separate --

 3                 JUSTICE BARRETT:  Okay.  Right.  Fair

 4      enough.

 5                 MR. SCHNAPPER:  The question is, is it

 6      outside of 230?

 7                 JUSTICE BARRETT:  Is it outside of

 8      230.

 9                 MR. SCHNAPPER:  Right.  And our view

10      is the statute doesn't mean anyone who's a user

11      who re -- who tweet -- who -- who conveys

12      third-party liable is protected.  If you --

13      let's say that you -- you read a book, and it

14      says John Doe is a shoplifter, and you send an

15      e-mail that says John Doe is a shoplifter,

16      you're using, you know, the Internet.  You're

17      using the -- the e-mail system.

18                 But nobody thinks that -- that Section

19      230 gives -- is a blanket exemption for

20      defamation on the website as long as you're

21      quoting somebody else.

22                 Retweeting is a very automatic way of

23      doing it, but if you start down that road, you'd

24      end up having to hold that -- that anytime I

25      send a defamatory e-mail, I'm protected as long
```

```
 1    as I'm quoting somebody else.  And I don't think
 2    anybody would --
 3              JUSTICE BARRETT:  Well, I guess I
 4    don't understand -- I mean, let's see, I guess I
 5    don't understand logically why your argument
 6    wouldn't mean that I was creating new content if
 7    I retweeted or if I liked it or if I said check
 8    this out.  Why --
 9              MR. SCHNAPPER:  Well -- well, you --
10              JUSTICE BARRETT:  -- why wouldn't
11    that?
12              MR. SCHNAPPER:  -- you would be, but
13    I'm advancing an argument that gets to the same
14    place, which is you're -- you're not a user
15    within the meaning of the statute just because
16    you use -- you go on e-mail or -- or YouTube or
17    -- or on Twitter.
18              JUSTICE BARRETT:  Let's say I disagree
19    with you.  Let's say that I think you're a user
20    of Twitter if you go on Twitter and you're using
21    Twitter and you retweet or you like or you say
22    check this out.  On your theory, I'm not
23    protected by Section 230.
24              MR. SCHNAPPER:  That's content you've
25    created.
```

```
 1          JUSTICE BARRETT:  That's content I've
 2   created.  Okay.  And on the content creation
 3   point, let's imagine -- it seems like you're
 4   putting a whole lot of weight on the fact that
 5   these are thumbnails, and so it's something that
 6   YouTube separately creates.
 7          MR. SCHNAPPER:  Yes.
 8          JUSTICE BARRETT:  What if they just
 9   screenshot?  They just screenshot the ISIS
10   thing.  They don't do the thumbnail.  Then are
11   they --
12          MR. SCHNAPPER:  That's -- that's pure
13   third-party content.
14          JUSTICE BARRETT:  That's pure third --
15   so this is just about how YouTube set it up?
16          MR. SCHNAPPER:  That's -- that's --
17   that's correct in this context.  And it gets
18   back to the conversation we were having earlier
19   about this is a new technology that didn't exist
20   in 1996, and rather than ask Congress to write
21   the statute to cover it, they just went ahead
22   and did it.
23          JUSTICE BARRETT:  Okay.  And last
24   question, turning to the statutory text.  So it
25   seems to me that some the briefs in this case
```

1    are focusing on what it means to treat someone
2    as a publisher, treat an entity as a publisher.
3    You're not really focusing on that and the
4    traditional editorial functions argument.  I
5    mean, you're really focusing on the content
6    provider argument, correct?
7              MR. SCHNAPPER:  No.  Well, we've
8    advanced views as to each element of the claim.
9    Our --
10             JUSTICE BARRETT:  But today you've
11   really been honing in on this are you actually
12   creating content or just presenting third-party
13   content.
14             MR. SCHNAPPER:  Well, I've been
15   answering -- that's where the questions --
16             JUSTICE BARRETT:  Yes.
17             MR. SCHNAPPER:  -- have taken us, but
18   -- but -- but our -- our view would be that
19   you're not being treated as a publisher of the
20   video just because you -- you publish the
21   thumbnail.
22             JUSTICE BARRETT:  Okay.  Thank you.
23             MR. SCHNAPPER:  You're not being
24   harmed by the thumbnail.
25             JUSTICE BARRETT:  Thank you.

1          CHIEF JUSTICE ROBERTS:  Justice

2     Jackson?

3          JUSTICE JACKSON:  So I guess -- I

4     guess I'm thoroughly confused, but let me -- let

5     me try to -- let me try to understand what your

6     argument is.  I think that the confusion that

7     I'm feeling is arising from the possibility that

8     we're talking about two different concepts and

9     conflating them in a way.

10          I thought that Section 230 and the

11     questions that we were asking in this case today

12     was about whether there was immunity and whether

13     Google could claim the defense of immunity and

14     that that's actually different than the question

15     of whether whatever it does gives rise to

16     liability.  That is, is there liability for

17     aiding and abetting?  That's tomorrow's

18     question.

19          And to the extent that you keep coming

20     back to this notion of creating content or

21     whatnot, I feel like we're conflating the two in

22     a way that I'd like to just see if I can clear

23     up from my perspective.

24          Your brief says that the immunity

25     question, Section 230(c)(1)'s text is most

1    naturally read to prohibit courts from holding a

2    website liable for failing to block or remove

3    third-party content.

4          And I read the arguments in your brief

5    and I read what you said about Stratton Oakmont

6    and the sort of background, and so I thought

7    your argument was that the -- that you can only

8    claim immunity, Google, if the claim that's

9    being made against you is about your failing to

10    block or remove third-party content.

11          To the extent we are making a claim

12    about recommendations or doing anything else,

13    any of the, you know, hypotheticals that people

14    have brought up, that's outside of the scope of

15    the statute because, really, the statute is

16    narrowly tailored in a way to protect Internet

17    platforms from claims about failing to block or

18    remove, right?  I mean, that's what I thought

19    was happening.

20          All right.  So, if that's true, then

21    all the hypotheticals and the questions about

22    are you aiding and abetting if Google, you know,

23    has a priority list or if there's

24    recommendations, maybe, but that's not in the

25    statute because we're just talking about

1    immunity.  We're just talking about whether or
2    not you've made a claim for failing to block or
3    remove in this case today related to Section
4    230.
5            Am I doing too much of a separation
6    here in terms of how I'm conceiving of it?
7            MR. SCHNAPPER:  Well, let me
8    articulate what -- what the contention is that
9    we are advancing, and I think it's not quite the
10   way you described it.  The contention we're
11   advancing is that a variety of things that we're
12   loosely characterizing as recommendations fall
13   outside of the statute.
14           JUSTICE JACKSON:  Why?
15           MR. SCHNAPPER:  Because, in some of
16   them, the defendant's not being treated as the
17   publisher; because, in some of them, third-party
18   content's being -- content is being created by
19   the defendant; because, in some of them, the
20   defendant's not acting as an interactive
21   computer service.
22           JUSTICE JACKSON:  I see.  So I -- I
23   thought -- I thought you were -- the answer to
24   why was because the statute is limited, because
25   the statute only focuses on certain kind of

1   publisher conduct, and to the extent that --

2   that they're doing anything else, recommending

3   or whatever, that's not going to be covered by

4   this statute.

5            But you're sort of saying, well, let's

6   look at what they're actually doing and it may

7   fit in or it may not.  You're not sort of hewing

8   very closely to the understanding of the

9   original scope of the statute in terms of what

10  it is trying to immunize these platforms

11  against.

12           MR. SCHNAPPER:  I -- I -- I think

13  we're trying to do that in somewhat more of a

14  particularized way, that is, to -- to identify

15  -- to work our way through each of the three

16  specific elements of the statute, each tied to

17  particular language, to --

18           JUSTICE JACKSON:  But I've got to tell

19  you I don't see three elements in this.  I mean,

20  part of me -- part of this is all the confusion,

21  I think, that has developed over time about the

22  meaning of the statement in the statute, right?

23           I don't see three elements.  I see

24  literally a sentence, and the sentence in my

25  view reads as though they're trying to actually

1    direct courts to not impose publisher liability,

2    strict publisher liability, against the backdrop

3    of Stat -- of Stratton Oakmont.

4          So there's like some -- somehow we've

5    gotten to a world in which we've teased out

6    three elements and we're trying to fit it all

7    into that, when I thought there was sort of a

8    very simple, sort of straightforward way to read

9    the statute that you articulate in your brief,

10   which is this is really -- this statute, (c)(1),

11   is really just Congress trying to not

12   disincentivize these platforms for blocking and

13   screening offensive conduct.

14         And so what they said is let's look at

15   (c)(1).  Let's have (c)(2).  Let's have a system

16   in which a system -- a platform is not going to

17   be punished, strict liability for just having

18   offensive conduct on their website and, if they

19   try, if they try to screen out, we're not --

20   we're going to say you won't be responsible for

21   that either.  That's (c)(2).

22         But it really doesn't speak to whether

23   you do a recommendation or whether you have an

24   algorithm that does priorities or any of these

25   other things.  That's how I thought that -- that

1    at least I was looking at the statute in light

2    of its purposes and history and -- and -- and

3    Stratton Oakmont and all of that, in which case

4    I think you would win unless your

5    recommendation's argument really is just the

6    same thing as saying they are hosting ISIS

7    videos on their website.

8          MR. SCHNAPPER:  Well, I -- I think --

9    I think we do have to be drawing that

10   distinction.  But with regard to your question

11   about the three elements, the -- the text does

12   take you there.

13         It says, if you track the briefs,

14   probably of either side, the -- part of what

15   we're arguing about, the meaning of treat as a

16   publisher because that's the first couple of

17   words of the statute.

18         Then we're arguing about did they

19   create the content because publisher has to be

20   of -- has to be of information provided by

21   another content provider.  So we have to parse

22   out the meaning of that.

23         And then it refers to the defendant as

24   an interactive computer service.  And we have to

25   parse out the meaning of, well, what does that

1    mean?  So we -- we are forced to -- this --

2    this -- the language of the statute has those

3    three components.  And it -- although the

4    overall purpose is I think as you described it,

5    the language is more complex and particularized.

6              JUSTICE JACKSON:  Thank you.

7              CHIEF JUSTICE ROBERTS:  Thank you,

8    counsel.

9              Mr. Stewart.

10             ORAL ARGUMENT OF MALCOLM L. STEWART

11          FOR THE UNITED STATES, AS AMICUS CURIAE,

12                   SUPPORTING VACATUR

13             MR. STEWART:  Thank you, Mr. Chief

14    Justice and may it please the Court:

15             I'd like to begin by addressing the

16    Roger Maris hypothetical because I -- I think it

17    illustrates our position and limits on our

18    position.

19             Imagine in a particular state there

20    was an unusually protective law that said no

21    books at sellers shall be held liable on any

22    theory for the content of any book that it sells

23    and then the scenario that the Chief Justice

24    described occurred, the person was asked where

25    is the Roger Maris book and said it's over on

1    that table with the other sports book -- books.

2              Now, if the book seller was sued for

3    making that statement, our position would be

4    there's no way textually that the immunity

5    statute would apply.  This is a statement about

6    the book, not the contents of the book.

7              Now, the statement "the book is over

8    there" is so obviously innocuous that it might

9    seem like pedantry to quibble about should the

10   dismissal of the suit be based on immunity or

11   for failure to state a claim.

12             But a court in thinking about the

13   possibility of harder cases down the road should

14   distinguish carefully between liability for the

15   content itself, liability for statements about

16   the content.

17             And the other one other thing I would

18   say is, if the consequence of saying it's over

19   there was that the book seller lost its immunity

20   for the content of the book, that would be a big

21   deal.  But our position on 230(c)(1) is nothing

22   like that.

23             Our position is that the Internet

24   service provider can be sued for its own

25   organizational choices, but the fact that it

1    makes organizational choices doesn't deprive it

2    of the protection it receives for liability

3    based on the third-party content.

4           I welcome the Court's questions.

5           JUSTICE THOMAS:  Well, I'm still

6    confused.  But what if the book seller said it's

7    over there on the table with the other

8    trustworthy books?

9           MR. STEWART:  I mean, I think at that

10   point you would be asking could it conceivably

11   be an actionable tort to describe the book as

12   trustworthy.

13          JUSTICE THOMAS:  Well, we're putting a

14   lot of weight on organization.  But doesn't it

15   really depend on how we're organizing it and on

16   what the basis of the organization -- for

17   example, we could say this set -- you could

18   organize it on the basis of what's more

19   trustworthy than -- than something else.

20          MR. STEWART:  I think that might

21   matter with respect to whether there was

22   substantive liability under the underlying cause

23   of action.  It -- it shouldn't matter for

24   purposes, either of the hypothetical immunity I

25   -- statute I described, which focuses

1    exclusively on the contents of the books or for

2    230(c)(1).

3            Now, Mr. Schnapper said in a colloquy

4    earlier that he thought the allegations in his

5    complaint are basically the same as those in the

6    Twitter complaint.  And the government is

7    arguing in Twitter that those allegations are

8    not sufficient to state a claim under the

9    Antiterrorism Act.

10           So our -- our interest in 230(c)(1) is

11   not in allowing this particular suit to go

12   forward.  It is in preserving the distinction

13   between immunity -- protection for the

14   underlying content and protection for the

15   platform's own choices.

16           JUSTICE THOMAS:  Well, I -- I just

17   think it's just going to be difficult.  How

18   would you respond to Justice Gorsuch's

19   hypothetical about the artificial intelligence

20   creating content organizational decisions?

21           MR. STEWART:  I think the

22   organizational decisions could still be

23   subjected to a suit.  Whether you think of them

24   as recommendations or simply as the platform --

25   the operation of the platform, it's still the

74

1    platform's own choice.

2          And if you ask how did a particular

3    video wind up in the queue of a particular

4    individual, it -- it could be some -- some sort

5    of artificial intelligence that was making that

6    choice but it would have to do with the --

7    YouTube's administration of its own platform.

8          It wouldn't be a choice made by any

9    third-party who had posted it, because third

10   parties who post on YouTube don't direct their

11   videos to particular recipients.

12         And -- and I -- I do want to emphasize

13   this -- this theory, this rationale applies even

14   in the most mundane circumstances.  For

15   instance, if you do a Google search on the name

16   for a famous person and you misspell the name

17   slightly, you still get lots of content about

18   that person.  Google knows that it's smarter

19   than we are and it knows that -- more about what

20   we want than the literal terms of our search

21   might suggest.

22         I went to the Court's website and used

23   the docket search function and typed in Google

24   and left off the -- the final E and I got a

25   message that said no items find -- found.  In

1    order to call up the docket for this case, you

2    have to spell Google exactly right.

3            Now, the choice between those two

4    modes of operating the platform, it's

5    extraordinarily unlikely, almost inconceivable

6    that it could ever give rise to legal liability,

7    but those are choices made by the platforms

8    themselves.  They are not choices made by any

9    third-party.  They just don't implicate

10   230(c)(1).

11           And the choice -- any conceivable

12   lawsuit about the decision to use one mode of

13   operation rather than another, presumably, would

14   be dismissed on the merits.  But --

15           JUSTICE KAGAN:  I -- I think the

16   problem, Mr. Stewart, with minimizing what your

17   position is is that in trying to separate the

18   content from the choices that are being made,

19   whether it's by YouTube or anyone else, you

20   can't present this content without making

21   choices.  So in every case in which there is

22   content, there's also a choice about

23   presentation and prioritization.

24           And the whole point of suits like

25   this, is that those choices about presentation

1    and prioritization amplify certain message --

2    messages and thus create more harm.

3         Now I appreciate what you're saying is

4    like, well, that doesn't mean that you're going

5    to have liability in every case, but -- but --

6    but still, I mean, you are creating a world of

7    lawsuits.  Really anytime you have content, you

8    also have these presentational and

9    prioritization choices that can be subject to

10   suit.

11        MR. STEWART:  Let -- let me say a

12   couple things about that.  The first thing I

13   would say is you could make substantially the

14   same argument about employment decisions; that

15   is, in order for YouTube to operate, it has to

16   hire employees.

17        But Ms. Blatt acknowledges in the --

18   the brief that employment decisions wouldn't be

19   shielded by 230(c)(1) if there was an allegation

20   of unlawful discrimination for instance.

21        So the fact that the platform has to

22   make some sorts of organizational choices

23   doesn't mean it's immune from suit in the rare

24   instance where it might make a choice that

25   violates some other provision of law.

1          The second thing is that the concern

2     we have in mind are things like imagine a

3     hypothetical job matching service like Indeed,

4     where job applicants can post their

5     qualifications and potential employers can post

6     their own listings and the website will match

7     them up.

8          And suppose it came to light that the

9     job -- the job search mechanism was routing the

10    high-paying, more professional jobs

11    disproportionately to the white applicants and

12    the lower paying jobs to the black applicants

13    even when the qualifications were the same.

14         At -- at a general level, you could

15    describe that as choices about which content

16    would go to which users.  But when we saw that

17    kind of stark impropriety in the criteria that

18    the platform was -- was using, I think we would

19    say there has to be -- assuming it violates

20    applicable law, 230(c)(1) really shouldn't be

21    protecting that.  That's not -- the complaint we

22    have here is not to the content itself or the

23    presence of the third-party job postings on the

24    platform.  The complaint is about the use of

25    illicit criteria to decide which users will get

1    which content.

2            And our point is, in the more

3    innocuous cases or in the borderline cases where

4    the criteria seem a little bit shaky but it's

5    not clear whether they violate any applicable

6    law, that -- that choice ought to be made based

7    on the law that the plaintiff invokes as the

8    cause of action.

9            And the Court ought to be determining

10   does the use of those criteria violate that law?

11   And it --

12           CHIEF JUSTICE ROBERTS:  Well, I was

13   just going to say, your -- the problem with your

14   analogies is that they involve -- I don't know

15   how many employment decisions are made in the

16   country every day, but I know that whatever it

17   is, hundreds of millions, billions of responses

18   to inquiries on the Internet are made every day.

19           And as Justice Kagan suggested, under

20   your view, every one of those would be a

21   possibility of a lawsuit, if they thought there

22   was something that the algorithm referred that

23   was defamatory, that, you know, whatever it is,

24   exposed them to harmful information.  And so

25   that maybe the analogy doesn't fit the

1    particular -- particular context.

2              MR. STEWART:  I mean, I think it is

3    true that many platforms today are making an

4    enormous number of these choices.  And if

5    Congress thinks that circumstances have changed

6    in such a way that amendments to the statute are

7    warranted because things that didn't exist or

8    that weren't on people's minds in 1996 have

9    taken on greater prominence, that would be a

10   choice for Congress to make.  But --

11             CHIEF JUSTICE ROBERTS:  Well, but

12   choice for Congress to make -- I mean, the --

13   the amici suggest that if we wait for Congress

14   to make that choice, the Internet will -- will

15   be sunk.  And so maybe that's not as persuasive

16   a outcome as it might seem in other cases.

17             MR. STEWART:  I -- I think the main

18   thing I would say is most of the amici making

19   that projection are making it based on a

20   misunderstanding of our position; namely, they

21   are misunder- our -- misunderstanding our

22   position to be that once YouTube recommends a

23   video or once YouTube sends a video to a

24   particular user without the user requesting it,

25   that YouTube is liable for any impropriety in

1    the content of the video itself.

2          And that's not our position.  Our

3    position is that YouTube's own conduct falls

4    outside of 230(c)(1).  It's unlikely in very

5    many instances to give rise to actual liability.

6          JUSTICE KAVANAUGH:  Why not?  Why --

7    why -- why wouldn't it be liable?  Explain that.

8          MR. STEWART:  I think the reason --

9    the reason we would say is for -- for -- in this

10    case, in particular, to -- to look ahead a

11    little bit to the -- the Twitter argument

12    tomorrow, there were questions at the beginning

13    of Mr. Schnapper's presentation about the role

14    that neutrality played in the analysis.  And our

15    view is neutrality is not part of the 230(c)(1)

16    analysis.  But it's a big part of the

17    Antiterrorism Act analysis because we say a

18    person is much more likely to be liable for

19    aiding and abetting if it is due -- kind of

20    giving special treatment to the primary

21    wrongdoing, if it is taking --

22          JUSTICE KAVANAUGH:  Well you -- keep

23    going.

24          MR. STEWART:  And -- and -- and so, if

25    it is, in fact, the case that YouTube is

1  applying neutral algorithms, is simply showing

2  more ISIS videos to people who've shown an

3  interest in ISIS, just as it does more cat

4  videos to people who've shown an interest in --

5  in cats, that's much less likely to give rise to

6  liability under the Antiterrorism --

7        JUSTICE KAVANAUGH:  And much less

8  likely -- I'm not sure based on what.  You seem

9  to be putting a lot of stock on the liability

10  piece of this, rather than, as Justice Jackson,

11  was saying, the immunity piece.  And I'm just

12  not sure, you know, if we -- if we go down this

13  road, I'm not sure that's going to really pan

14  out.  Certainly, as Justice Kagan says, lawsuits

15  will be non-stop --

16        MR. STEWART:  I --

17        JUSTICE KAVANAUGH:  -- on defamatory

18  material, which there's a lot of, that is out

19  there and finds its way onto the websites that

20  host third-party conduct.

21        MR. STEWART:  And -- and --

22        JUSTICE KAVANAUGH:  There will be lots

23  of lawsuits.  You agree with that?

24        MR. STEWART:  I -- I wouldn't

25  necessarily agree with there would be lots of

1     lawsuits, simply because there are a lot of
2     things to sue about, but they would not be suits
3     that have much likelihood of prevailing,
4     especially if the Court makes clear that even
5     after there's a recommendation, the website
6     still can't be treated as the publisher or
7     speaker of the underlying third-party content.
8                  JUSTICE KAVANAUGH:  Well, just bigger
9     picture, then, to the Chief's question, isn't it
10    better for -- to keep it the way it is, for us,
11    and Congress -- to put the burden on Congress to
12    change that and they can consider the
13    implications and make these predictive
14    judgments?
15                 You're asking us right now to make a
16    very precise predictive judgment that, don't
17    worry about it, it's really not going to be that
18    bad.  I don't know that that's at all the case,
19    and I don't know how we can assess that in any
20    meaningful way.
21                 MR. STEWART:  I -- I think, with
22    respect, that that -- that characterization of
23    the existing case law overstates the extent to
24    which courts are in agreement that platform
25    design choices --

1            JUSTICE KAVANAUGH:  Assume they are.

2     Assume the status quo is against you in the law.

3     And you're asking us, well, the status quo is

4     wrong, okay, and this Court is the first time

5     we're getting to look at it.  But don't worry

6     about the implications of this because it's

7     really all going to be fine, there won't be much

8     successful lawsuits, there won't be really many

9     lawsuits at all.

10            And I -- I don't know how we can make

11     that assessment.

12            MR. STEWART:  I think if the Court

13     thought that kind of the interpretive question,

14     looking at the plain language of the statute,

15     was on a knife's edge, it was an authentically

16     close call, then, yes, the Court could -- and

17     the Court perceived the existing case law to be

18     basically uniform, the Court could give some

19     weight to the interest in stability.

20            But I think, for us, neither of those

21     things is true.

22            JUSTICE BARRETT:  Mr. Stewart -- oh,

23     sorry.  Please finish.

24            MR. STEWART:  I was -- I was going to

25     say the statutory text really is not -- it may

1    have a little bit of ambiguity at the margins,

2    but it is very clearly focused on protecting the

3    platform from liability for information provided

4    by another information content provider, not by

5    the platform's own choices.

6              I'm sorry, Justice Barrett?

7              JUSTICE BARRETT:  No, no, no, I'm

8    sorry.

9              So speaking of this question of what

10   are the implications of this, and Justice

11   Jackson's points about liability and immunity

12   overlapping, it seems like one of the responses

13   to should we worry about this is, well, it's

14   going to be the rare kind of claim that could be

15   based on recommendations.

16             So speaking of that, what is the

17   government's position, if you have one, on

18   whether, if the plaintiffs below lose tomorrow

19   in Twitter, should we just send this back?

20   Because there isn't -- I mean, you said the

21   government's position is that there is no claim.

22   So --

23             MR. STEWART:  Certainly, our position

24   -- we haven't analyzed the -- the Gonzalez --

25             JUSTICE BARRETT:  Right.

85

1          MR. STEWART:  -- complaint in detail,
2     but that is our position as to the Twitter
3     complaint.  And Mr. Schnapper said he doesn't
4     perceive a material difference between the two.
5          Now, presumably, the Court granted
6     cert in both cases because it thought it would
7     at least be helpful to clarify the law both as
8     to the Antiterrorism Act and as to Section
9     230(c)(1).  But if the Court no longer believes
10    that or if it resolves Twitter in such a way
11    that it seems evident that its decision on the
12    230(c)(1) issue wouldn't ultimately be
13    outcome-determinative in Gonzalez, then it could
14    vacate and remand for further analysis of the
15    ATA question.  That would be a permissible -- I
16    mean, a possible course of action.
17          JUSTICE BARRETT:  Okay.
18          CHIEF JUSTICE ROBERTS:  Thank you,
19    counsel.
20          We're talking about the prospect of
21    significant liability in litigation.  And -- and
22    up to this point, people have focused on the ATA
23    because that's the one point that's at issue
24    here.
25          But I suspect there would be many,

1    many times more defamation suits, discrimination

2    suits, as -- as some of the discussion has been

3    this morning, infliction of emotional distress,

4    antitrust actions.

5         I -- I mean, it -- I guess I'd be

6    interested to understand exactly what the

7    government's position is on the scope of the

8    actions that could be brought and whether or not

9    we ought to be -- I mean, it would seem to me

10   that the terrorism support thing would be just a

11   tiny bit of all the other stuff.  And why

12   shouldn't we be concerned about that?

13        MR. STEWART:  Let me just address the

14   -- the potential causes of action that you

15   mentioned.  For defamation, even if somebody is

16   suing about the recommendation, 230(c)(1) still

17   directs that the platform can't be treated as

18   the publisher or speaker of the underlying

19   content.  And so the question --

20        CHIEF JUSTICE ROBERTS:  Well, right.

21   But it's -- it's -- defamation law is implicated

22   if you repeat libel, even though you didn't

23   originally commit defamation.

24        MR. STEWART:  If you repeat it, and so

25   if YouTube circulated videos with a little blurb

87

1    saying -- and I think one of the amicus briefs

2    describes this hypothetical scenario -- if you

3    repeated it with a little blurb saying this

4    video shows that John Smith is a murderer, then,

5    yes, there would be liability.  But --

6              CHIEF JUSTICE ROBERTS:  But there

7    wouldn't be if you just repeated it without any

8    commentary?  Normally, it would be if you're the

9    newspaper and you just publish something, so and

10   so's a shoplifter, the newspaper would be liable

11   for that.

12             MR. STEWART:  No, we think it should

13   be analyzed as though it were an explicit

14   recommendation.  And so if Google had posted a

15   message that we said we recommend that you watch

16   this video, now the recommendation would be its

17   own content.  But in answering the question can

18   it be held liable for defamation, you would ask:

19   Can a person under the law of the applicable --

20   of the relevant state be held liable for

21   recommending content that is itself defamatory,

22   if the recommender does not repeat the

23   defamatory aspects of that content in the course

24   of the recommendation?

25             And our understanding is that at least

1    under the common law the answer to that would be

2    no, that simply saying you should read this book

3    that turns out to be defamatory would not be

4    basis for defamation liability.

5              I think the same would basically be

6    true of intentional infliction of emotional

7    distress.  That is, unless you could show that

8    the platform was acting with the intent to cause

9    emotional distress by circulating the video,

10   there would be no liability.  And the fact that

11   the third-party poster may have met the elements

12   of that offense wouldn't carry the day.

13             With respect to antitrust, if you had

14   a claim that a particular search engine had

15   configured its results in such a way as to boost

16   its own products or to diminish the search

17   results for products of the competitor and if

18   that were found to be a viable claim under the

19   antitrust laws, there would be no reason to

20   insulate the provider from liability for that.

21             CHIEF JUSTICE ROBERTS:  Now that's --

22   that's a broad overview of a lot of different

23   areas of law, but, certainly, the law is not

24   established the way you're suggesting, I -- I

25   think, in any of those areas.

1          MR. STEWART:  But I guess the question

2    is, what did Congress intend to do or what did

3    it do when it passed this statute?

4          And Congress didn't create anything

5    that was -- even resembled a -- an all purposes

6    of immunity, immunity for anything it might do

7    in the course of its functions.  It focused very

8    precisely on information provided by another

9    information content provider.

10          CHIEF JUSTICE ROBERTS:  Thank you,

11    thank you.

12          Justice Thomas?

13          Justice Alito?

14          JUSTICE ALITO:  In the government's

15    view, are there any circumstances in which an

16    Internet service provider could be sued for

17    defamatory content in a video that it provides?

18          MR. STEWART:  I think --

19          JUSTICE ALITO:  Third-party video.

20          MR. STEWART:  -- I think the only --

21    given our understanding of the -- the common

22    law, I think the only way that would happen is

23    if the third-party provider, in circulating the

24    video, added its own comment that incorporated

25    the defamatory gist of the allegations.

1          And as the Chief Justice was pointing

2     out, it is true that under common law, if you

3     repeat somebody else's defamatory statement but

4     say what it is, that you can be held liable for

5     that.

6          JUSTICE ALITO:  I mean, imagine the

7     most defamatory -- terribly defamatory video.

8     So suppose the competitor of a restaurant posts

9     a video saying that this rival restaurant

10    suffers from all sorts of health problems, it --

11    it creates a fake video showing rats running

12    around in the kitchen, it says that the chef has

13    some highly communicable disease and so forth,

14    and YouTube knows that this is defamatory, knows

15    it's -- it's completely false, and yet refuses

16    to take it down.

17          They could not be civilly liable for

18    that?

19          MR. STEWART:  That -- that's our -- I

20    mean, we think that Zeran -- Zeran was not

21    exactly a defamation case, but it fit within --

22    pretty closely within that profile.  That is,

23    Zeran was the early Fourth Circuit case in which

24    a person posted a video that purported to be

25    from another person and subjected that other

1    person to complaints and harassment that seemed

2    justified to -- to the people who were doing it.

3              JUSTICE ALITO:  Well, did any -- did

4    any entity have that scope of protection under

5    common law?

6              MR. STEWART:  No, not -- no, I don't

7    believe so.  And that was the point of (c)(1).

8    The point of (c)(1) was to say --

9              JUSTICE ALITO:  Well, it was at least

10   to -- to shield Internet service providers from

11   liability they -- excuse me -- based on their

12   status as a publisher.

13             MR. STEWART:  I -- I wouldn't put it

14   as --

15             JUSTICE ALITO:  But even a distributor

16   wouldn't have immunity if it knew as a matter of

17   fact that this material that it was distributing

18   was defamatory, isn't that right?

19             MR. STEWART:  I mean, that -- that --

20   that is right.  I think we would think of the

21   distributor as a subcategory of publisher, but,

22   yes, the book seller would not be strictly

23   liable.  And, obviously, Justice Thomas --

24             JUSTICE ALITO:  You really think that

25   Congress meant to go that far?

92

```
 1              MR. STEWART:  We -- we do, but,

 2    obviously, that is -- if we're arguing about

 3    whether the failure to take something down is

 4    actionable if it is done knowingly and with an

 5    understanding of the contents, then that --

 6    that's a very different argument from the one

 7    that we've been having up to this point.

 8              That -- that would be saying that the

 9    statute should be construed --

10              JUSTICE ALITO:  But that is your --

11    but that is your position?

12              MR. STEWART:  Our position --

13              JUSTICE ALITO:  That is the

14    government's position, is it not?

15              MR. STEWART:  -- our position -- yes,

16    our position is that if the -- if the wrong

17    alleged is simply the failure to block or remove

18    the third-party content, that 230(c)(1) protects

19    the platform from liability for that, whether

20    it's based on a strict liability theory or on a

21    theory -- theory of negligence or

22    unreasonableness in failing to take the material

23    down upon request.

24              JUSTICE ALITO:  The Internet service

25    provider wants to -- really has it in for
```

1    somebody, wants to harm this person as much as

2    possible, and so posts extraordinarily gruesome

3    videos of a family member who's been involved in

4    an automobile accident or something like that.

5              MR. STEWART:  Well, when you use the

6    verb "posts," that -- that's a different

7    analysis.  That is, if YouTube created --

8              JUSTICE ALITO:  No, it's provided by

9    somebody else, and YouTube knows that it's --

10   knows what it's -- what it is, and yet it puts

11   it up and refuses to take it down.

12             MR. STEWART:  Yes.  Our view is, if

13   the only wrong alleged is the failure to block

14   or remove, that would be protected by 230(c)(1).

15   But -- but that's -- the 230(c)(1) protection

16   doesn't go beyond that.  And the theory of

17   protecting the -- the website from that was that

18   the wrong is essentially done by the person who

19   makes the post, the website at most allows the

20   harm to continue.

21             And what we're talking about when

22   we're talking about the -- the website's own

23   choices are affirmative acts by the website, not

24   simply allowing third-party material to stay on

25   the platform.

94

```
 1            JUSTICE ALITO:  So an express
 2   recommendation would potentially subject YouTube
 3   to civil liabilities.  So they put up -- they
 4   say, watch this ISIS video, spectacular, okay,
 5   they could be liable there?
 6            MR. STEWART:  Yes, if the other
 7   elements --
 8            JUSTICE ALITO:  If it's expressed.
 9   What if it's just implicit?  What if it's the
10   fact that they put this up first and therefore
11   amplify the message of that?
12            MR. STEWART:  Again, you would have to
13   ask -- they -- they could potentially be held
14   liable for that, but you would have to ask
15   whether the elements of the relevant tort have
16   been shown.  And with respect to the ATA, those
17   elements include scienter, causation of the
18   relevant harm, et cetera.
19            If you were looking at another cause
20   of action, you would look at those elements.
21   And I think part of our reason for preferring
22   that most of the work be done at the liability
23   stage rather than the 230(c)(1) stage is, rather
24   than do a kind of undirected inquiry into
25   whether this seems neutral enough, you would be
```

1    looking at a specific cause of action and asking
2    but for 230(c)(1), would this be an actionable
3    tort under --
4            JUSTICE KAGAN:  Let me just make sure
5    I understand.  Let's talk about defamation and
6    an explicit recommendation, go watch this video,
7    it's the greatest of all time, okay?  But it
8    does not repeat anything about the video.  It
9    just says go watch this video, it's the greatest
10    of all time.  And the video is terribly
11    defamatory in the way Justice Alito was
12    describing.
13            Now is the provider on the hook for
14    that defamation?
15            MR. STEWART:  The two things I would
16    say are that depends on the defamation law of
17    the relevant state, and, as we say in the brief,
18    you should analyze that as though the platform
19    was recommending in the same terms a video
20    posted on another site.
21            So, if it would give rise to
22    defamation liability under the law of the
23    relevant state to give that sort of glowing
24    recommendation of content posted on a different
25    platform, then there's no reason that YouTube

1    should be off the hook by virtue of the fact

2    that the material was on its own platform.

3             JUSTICE KAGAN:  And -- and now it's --

4             CHIEF JUSTICE ROBERTS:  Thank you.

5             Justice Sotomayor, anything further?

6             JUSTICE SOTOMAYOR:  Let's assume we're

7    looking for a line because it's clear from our

8    questions we are, okay?  And let's assume that

9    we're uncomfortable with a line that says merely

10   recommending something without adornment, you

11   suggest, we -- you're -- you might be interested

12   in this, something neutral, not something like

13   they're right, watch this video, because I could

14   see someone possibly having a defamation action

15   if they said -- if I said that video is right

16   about that person.

17            I could see someone saying that I'm

18   spreading a defamatory statement, correct?

19            MR. STEWART:  I mean, we -- we don't

20   understand the common law to have operated in

21   that way, but, obviously, the laws vary from

22   state to state and a particular law -- state

23   could adopt a law to that effect.

24            JUSTICE SOTOMAYOR:  All right.  How do

25   we draw a line so we don't have to go past the

1    complaint in every case?

2              MR. STEWART:  I mean --

3              JUSTICE SOTOMAYOR:  And I think that's

4    where my colleagues seem to be suffering.

5              And I understand your point, which is

6    there is a line at which affirmative action by

7    an Internet provider should not get them

8    protection under 230(c) because that seems

9    logical.  The -- the example I used earlier, the

10   dating site, they create a search engine that

11   discriminates.  Their action is in creating the

12   search engine.  And I would think they would be

13   liable for that.  So tell -- tell me how we get

14   there.

15             MR. STEWART:  I guess whether they

16   would be liable would depend on the applicable

17   substantive law, which could be a federal law or

18   it could be a state law.  And those questions,

19   obviously, are -- are routinely decided at the

20   motion to dismiss stage.  That is, with respect

21   to the search engine choices that I described

22   earlier, do you include misspellings or not?

23   The plaintiff would still have to identify a law

24   that was violated by the choice that the search

25   engine made and would have to allege facts

1    sufficient to show a violation of law.

2            And -- and suits like that could

3    easily be dismissed at the pleading stage.  But

4    it would at least predominantly be a question of

5    the adequacy of the allegations under the

6    underlying law.

7            CHIEF JUSTICE ROBERTS:  Justice Kagan?

8            JUSTICE KAGAN:  I guess I thought that

9    the claims in these kinds of suits are that in

10   making the recommendation or in presenting

11   something as first, so really prioritizing it,

12   that the -- the provider is -- is amplifying the

13   harm, is creating a kind of harm that wouldn't

14   have existed had the provider made other

15   choices.

16           Are you saying that that -- that is

17   something that could lead to liability or is

18   not?

19           MR. STEWART:  I think it is something

20   that could lead to liability, but, again, it

21   would -- you would have to establish the

22   elements of the -- of the substantive law.  And

23   so kind of the hypothetical we're concerned with

24   and the hypothetical that I -- I think would

25   come out in our view as the wrong way under

1    Respondent's theory is imagine a particular
2    platform had been systematically promoting
3    third-party ISIS videos and promoting in the
4    sense of putting them at the top of people's
5    queues, not of adding their own messages, in
6    order to enlist support for ISIS.
7              If that was the motivation and you
8    could show the right causal link to a particular
9    act of international terrorism, then that could
10   give rise to liability under the ATA.
11             JUSTICE KAGAN:  And you're not saying
12   that the motivation matters for 230; you're
13   saying that the motivation matters with respect
14   to the -- the liability question down the road,
15   right?
16             MR. STEWART:  Exactly.  Exactly.
17             CHIEF JUSTICE ROBERTS:  Justice
18   Gorsuch?
19             JUSTICE GORSUCH:  Mr. Stewart, I just
20   again kind of want to make sure I understand
21   your argument, and so I'm going to ask you a
22   question similar to what I asked Mr. Schnapper,
23   which is the Ninth Circuit held that any
24   information a company provides using neutral
25   tools is protected under 230.  That's at 34a of

100

1    the -- of the petition.

2              And your argument is that this neutral

3    tools test isn't in the statute.  What is in the

4    statute is a distinction on the one hand between

5    interactive computer service and access software

6    providers and on the other hand content

7    providers.

8              And when we look at that, the access

9    software provider is protected for picking,

10   choosing, analyzing, or even digesting content.

11   So 230 protects an access software provider, an

12   interactive computer service provider, who does

13   any of those things, whether using a neutral

14   tool or not.  They -- they can order, they can

15   pick, they can choose, they can analyze, they

16   can digest however they wish and they're

17   protected, even those -- even though those

18   editorial functions we might well think of as

19   some form of content in our First Amendment

20   jurisprudence, but, here, they're shielded by

21   230.

22             And then your argument, I think, goes

23   that none of that means that they're protected

24   for content generated beyond those functions.

25   And it doesn't matter whether that content is

1    generated by neutral rules or not.  That content

2    is actionable whether the -- and one could think

3    of content generated by neutral rules, for

4    example, by artificial intelligence.

5         And another problem also is that it

6    begs the question what a neutral rule is.  Is an

7    algorithm always neutral?  Don't many of them

8    seek to profit-maximize or promote their own

9    products?  Some might even prefer one point of

10   view over another.

11        And because the Ninth Circuit applied

12   the wrong test, this neutral tools test, rather

13   than the content test, we should remand the case

14   for reconsideration under the appropriate

15   standard.  Is that a fair summary of your

16   position?  And, if not, what am I missing?

17        MR. STEWART:  I think the thing -- the

18   aspect of that we would disagree with is we

19   don't think that the definition of "access

20   software provider" means that an entity is

21   immune from liability for performing all of

22   those functions.

23        The statute makes clear that even if

24   you perform those sorting, arranging, et cetera,

25   functions, you still fall within the definition

1    of "interactive computer service," and you are

2    still entitled to the protection of (c)(1).

3            But the protection of (c)(1) is

4    protection from liability for the third-party

5    content.  And so, if you perform those sorting

6    functions in a way that was otherwise unlawful,

7    you could be on the hook for that.

8            And that -- that takes me back to the

9    hypothetical about the job placement service

10   that discriminates based on race.  The -- the

11   allegation of the job placement -- of that job

12   placement service is not that it created any of

13   its own content.  The allegation would be that

14   with respect to third-party content provided by

15   the firms that were looking for employees, it

16   had used an impermissibly legal -- a legally

17   impermissible criterion to decide which content

18   would be sent to which users.  And that wouldn't

19   be protected by (c)(1) because imposing

20   liability wouldn't hold the platform -- wouldn't

21   treat the platform as the publisher or speaker

22   of the third-party content.

23           JUSTICE GORSUCH:  Thank you.

24           CHIEF JUSTICE ROBERTS:  Justice

25   Kavanaugh?

1          JUSTICE KAVANAUGH:  First, to follow

2     up on Justice Alito's question, the distributor

3     liability question, my understanding is that

4     issue is not before us at this time, right?

5          MR. STEWART:  That's correct.

6          JUSTICE KAVANAUGH:  And your position,

7     though, or your response to him suggested that

8     if we were addressing that, the reason that

9     falls within 230 is because the distributor at

10    common law or at least by 1996 was treated as a

11    secondary publisher in the circumstances

12    described there.  Is that --

13         MR. STEWART:  That's basically

14    correct, yes.

15         JUSTICE KAVANAUGH:  Okay.  Then

16    focusing on the text of the statute and

17    following up on Justice Gorsuch's question, it

18    seems to me that the key move in your position

19    as I understand it is to treat organization

20    through the algorithms as the same thing as an

21    express recommendation.  Is that accurate?

22         MR. STEWART:  I don't -- I don't think

23    we would put it quite that way.  That is, in

24    some instances, if the operation of the

25    algorithm causes particular content to appear in

1    a particular person's queue that the person

2    hadn't requested, then that person might

3    perceive it to be a recommendation at least to

4    the effect that you will like this based on what

5    you have seen before.

6            So algorithms can't have that effect.

7    I don't know that we would equate the two.  I

8    think we would say more the recommendation is

9    simply one instance of the platform potentially

10   being held liable for its own content rather

11   than the third-party content.

12           JUSTICE KAVANAUGH:  And if the

13   algorithm prioritizes certain content, that

14   becomes the platform's own speech under your

15   theory of 231, correct -- or 230?

16           MR. STEWART:  I don't know that we

17   would call it the platform's own speech, but

18   it's the platform's own conduct, the platform's

19   own choice.  And so, if -- if it violated

20   antitrust law, for instance, to prioritize

21   search results in a particular way, whether or

22   not you thought of that as speech by the -- the

23   platform, it would be the platform's own

24   conduct.  Holding it liable for that sort of

25   ordering wouldn't be treating it as the

1    publisher or speaker of any of the third-party

2    submissions.

3            JUSTICE KAVANAUGH:  So the other side

4    and the amici say that happens -- that's what

5    the -- and Justice Kagan's question, that's

6    happening everywhere.

7            MR. STEWART:  And --

8            JUSTICE KAVANAUGH:  And, therefore,

9    230 really becomes somewhat meaningless, and

10   you've read what makes the definition of

11   "interactive computer service," including

12   organizing, to be a self-defeating provision

13   that really does nothing at all.

14           MR. STEWART:  No, I think -- I mean, I

15   think, if -- if it is happening everywhere, that

16   is, if search engines are using a wide variety

17   of mechanisms to decide how content should be

18   ordered, that --

19           JUSTICE KAVANAUGH:  Do you disagree

20   with that?  I mean, that's all --

21           MR. STEWART:  No, I -- no, I agree

22   with that.

23           JUSTICE KAVANAUGH:  Okay.

24           MR. STEWART:  And I think that's

25   probably because there are very few, if any,

1    laws out there that direct Internet service

2    providers to order the content in a particular

3    way.

4            If a particular legislature wanted to

5    say it will now be a violation of our law to

6    give greater priority to search results of

7    companies that advertise with you, then the

8    question whether that could violate the Commerce

9    Clause, the question whether it could violate

10   the First Amendment, those would be live

11   questions.

12           They wouldn't be 230(c)(1) questions

13   because the state's attempt to impose liability

14   on that rationale would not be an attempt to

15   hold the platform liable as the publisher or

16   speaker of the third-party content.

17           JUSTICE KAVANAUGH:  Thank you.

18           CHIEF JUSTICE ROBERTS:  Justice

19   Barrett?

20           JUSTICE BARRETT:  I want to ask you

21   the question that Mr. Schnapper and I went back

22   and forth about, thumbnails versus screenshots.

23   What would the government's position on that be?

24           So, if there were screenshots on the

25   side, his objection seemed to be that it was

1    Google's content because YouTube creates these

2    thumbnails.

3              MR. STEWART:  And that -- that was one

4    aspect of Mr. Schnapper's theory that we

5    disagreed --

6              JUSTICE BARRETT:  Disagreed.

7              MR. STEWART:  -- with in the brief.

8              That is, we thought that it's

9    basically the same content, the same information

10   either way, even if in the one instance Google

11   is creating a URL and in the other instance it's

12   not.

13             JUSTICE BARRETT:  So, for purposes of

14   this case, is there any difference -- let's

15   imagine that the Google algorithm when you

16   search for ISIS prioritizes videos produced by

17   ISIS in search results.  I'm not talking about

18   being on YouTube.  Content produced by ISIS, as

19   opposed to articles, if you're just looking for

20   articles about ISIS, they could be critical of

21   ISIS, they could be all kinds of things, but in

22   the search result rankings, you first get the

23   article -- the articles written by ISIS, videos

24   made by ISIS.

25             Is that the same thing as this case

1    then?

2              MR. STEWART:  I think that would be

3    the same thing as this case because we would say

4    the fact that the videos appear in that order is

5    the result of choices made by the platform, not

6    the choice of any person who posted an ISIS

7    video on the platform.

8              And Congress -- it was very important

9    to Congress to absolve the platforms of

10   liability for the third-party content, but it

11   didn't try to go beyond that.  The likelihood

12   that ISIS would be held liable just for that

13   seems very, very slim, but it would not be a 231

14   -- 230(c)(1) question, it would be a question

15   under whatever cause of action the plaintiff

16   invoked.

17             JUSTICE BARRETT:  Okay.  And then what

18   about users and retweets and likes, the question

19   I asked Mr. Schnapper about that.  So, you know,

20   I gather 230(c) would protect me from liability

21   if I simply retweeted.

22             On Ms. Blatt's theory, on your theory,

23   if I retweet it, am I doing something different

24   than pointing to third-party content?

25             MR. STEWART:  I mean, I think,

1    honestly, there hasn't been a lot of litigation

2    over the -- the -- the user prong of it, and

3    those are difficult issues.  I think 230(c)(1)

4    at the very least would say just by virtue of

5    having retweeted, you can't be treated as though

6    you had made the original post yourself.

7            But, with respect to you retweet, can

8    the retweet itself be grounds for liability,

9    I -- I'm not sure, and I doubt that there would

10    be much of a common law history to draw upon.

11            JUSTICE BARRETT:  So you -- but the

12    logic of your position, I think, is that

13    retweets or likes or check this out, for users,

14    the logic of your position would be that 230

15    would not protect in that situation either,

16    correct?

17            MR. STEWART:  I -- I think it would --

18    I think more or less the case, the -- the one

19    difference I would point to between the user and

20    the platform is the user is -- who reads a tweet

21    is typically making an individualized choice, do

22    I want to like this tweet, retweet it, or

23    neither, whereas the -- the platform decisions

24    about which video should wind up in -- in my

25    queue at a particular point in time, there's no

1    live human being making that choice on an

2    individualized basis.  It's being -- that --

3    those choices are being made on a systemic

4    basis.

5          JUSTICE BARRETT:  Thank you.

6          CHIEF JUSTICE ROBERTS:  Justice

7    Jackson?

8          JUSTICE JACKSON:  Yes.  So can -- can

9    you help me to understand whether there really

10   is a difference between the recommendations and

11   what you say is core 230 conduct?

12         I mean, I get -- I get and I'm holding

13   firm in my mind that 230 immunity, Congress

14   intended it to be directed to certain conduct by

15   the platform and that conduct is its failure to

16   block or screen the offensive conduct, so that

17   if the claim is this offensive content is on

18   your website and you didn't block or screen it,

19   230 says you're immune.  I get that.

20         I guess what I'm trying to understand

21   is whether you say and plaintiff says,

22   Petitioner in this case says, well, what they're

23   really doing in the situation in which they

24   display it under a banner that says "up next" is

25   more than just providing that content and

1    failing to block it.  They are promoting it in

2    some way.

3            And I -- I'm really drilling down on

4    whether or not there is actually a distinction

5    in a world of the Internet where, as Ms. Blatt

6    and others have said, in order to be a platform,

7    what you're doing is you have an algorithm, and

8    in the universe of things that exist, you are

9    presenting it to people so that they can read

10   it.

11           Why -- why is that -- even though

12   it's -- you know, you call it a recommendation

13   or whatever, why is that act any different than

14   being a publisher who has this information and

15   hasn't taken it down?

16           MR. STEWART:  I mean, I think I would

17   say, in -- in the situation that 230(c)(1) was

18   designed to address, the decision whether the

19   material would go up on the platform was not

20   that of the platform itself, it was the decision

21   of the third-party poster.

22           And Congress said, once that has

23   happened, you also can't be liable for failing

24   to take it down.  But, with respect to what

25   prominence you give it, that's the result of

1    your own choice, not the third-party poster.

2              Now, in most circumstances, it won't

3    make a difference because the recommendation

4    won't be actionable.  And so what we are

5    concerned with is the -- the hypothetical that I

6    suggested earlier.  You have --

7              JUSTICE JACKSON:  Yes.  I mean, I get

8    the -- I get the liability piece and all of

9    the -- the parade of horribles will depend on

10   whether or not they can actually be held liable

11   for organizing it in a certain way.  And you say

12   they probably can't.  And others say they might

13   be able to.  And that's a separate issue.

14             Just back on the 230 piece of it, in

15   terms of Congress's intent with respect to the

16   scope of immunity, I'm -- I -- I guess I just

17   want to understand why Google or YouTube, when

18   they have a box that brings up all of the ISIS

19   videos and tees them up, and if you don't do

20   anything, they just keep playing, why that's

21   actually different than the newspaper publisher

22   who gets the offensive content and decides to

23   put it on page 1 versus page 20, it seemed like

24   Congress in 230 was saying, if you -- if -- if

25   under the common law a newspaper publisher would

1    be liable for having put it on page 1 or

2    whatever and given it to people, we don't want

3    that to be the case for these Internet service

4    companies.

5            And so I -- I don't know that I

6    understand fully why the fact that it's

7    called -- that you call it a recommendation or

8    whatever is actually any different.

9            MR. STEWART:  I -- I guess one

10   difference I would point to is newspaper

11   publishers can make decisions about what will be

12   on the front page and what'll be in the back,

13   but it's going to be the same for everybody.

14           And one of the things about why we

15   call them targeted recommendations with YouTube

16   is they are being sent differently to different

17   users.  And the situation we're concerned with

18   is what if a platform is able through its

19   algorithms to identify users who are likely to

20   be especially receptive to ISIS's message, and

21   what if it systematically attempts to radicalize

22   them by sending more and more and more and more

23   extreme ISIS videos, is that the sort of

24   behavior that implicates either the text or the

25   purposes of Section 230(c)(1), and we would say

1    that it doesn't.

2                JUSTICE JACKSON:  Thank you.

3                CHIEF JUSTICE ROBERTS:  Thank you,

4    counsel.

5                MR. STEWART:  Thank you.

6                CHIEF JUSTICE ROBERTS:  Ms. Blatt.

7                   ORAL ARGUMENT OF LISA S. BLATT

8                   ON BEHALF OF THE RESPONDENT

9                MS. BLATT:  Mr. Chief Justice, and may

10   it please the Court:

11               Section 230(c)(1)'s 26 words created

12   today's Internet.  (c)(1) forbids treating

13   websites as "the publisher or speaker of any

14   information provided by another."  Publication

15   means communicating information.  So, when

16   websites communicate third-party information and

17   the plaintiff's harm flows from that

18   information, (c)(1) bars the claim.

19               The other side agrees Section 230 bars

20   any claim that YouTube aided and abetted ISIS by

21   broadcasting ISIS videos.  So they instead focus

22   on YouTube's organization of videos based on

23   what's known about viewers, what they call

24   targeted recommendations.  They say that feature

25   can be separated out because it implicitly

115

1    conveys what viewers should watch or that they

2    might like the content.

3         But accepting that theory would let

4    plaintiffs always plead around (c)(1).  All

5    publishing requires organization and inherently

6    conveys that same implicit message.

7         Plaintiffs should not be able to

8    circumvent (c)(1) by pointing to features

9    inherent in all publishing.  (c)(1) reflects

10   Congress's choice to shield websites for

11   publishing other people's speech, even if they

12   intentionally publish other people's harmful

13   speech.

14        Congress made that choice to stop

15   lawsuits from stifling the Internet in its

16   infancy.  The result has been revolutionary.

17   Innovators opened up new frontiers for the world

18   to share infinite information, and websites

19   necessarily pick, choose, and organize what

20   third-party information users see first.

21        Helping users find the proverbial

22   needle in the haystack is an existential

23   necessity on the Internet.  Search engines thus

24   tailor what users see based on what's known

25   about users.  So does Amazon, Tripadvisor,

1    Wikipedia, Yelp!, Zillow, and countless video,

2    music, news, job-finding, social media, and

3    dating websites.  Exposing websites to liability

4    for implicitly recommending third-party context

5    defies the text and threatens today's Internet.

6              I welcome your questions.

7              JUSTICE THOMAS:  Ms. Blatt, is --

8    could you give me an example of, not a

9    recommendation, but an endorsement similar to

10   this that would take you beyond 230?

11             MS. BLATT:  Sure.  So whenever you

12   have something that's going beyond the implicit

13   features of publishing and you have an express

14   statement, you have a continuum, and this

15   continuum is this:  You have something that's

16   the functional equivalent of an implicit

17   message, basically a topic heading or "Up next,"

18   all the way to the other extreme of an

19   endorsement of the content, such that the

20   website is adopting the content as its own.

21             Now, when you have that situation, the

22   claim is fairly treating the website for

23   publishing its own speech, and you can separate

24   that out from the harm that's just coming from

25   the information provided by another.

117

     1               And the danger which your
     2     hypotheticals has raised with express speech is
     3     where on that continuum any express speech may
     4     go, because unlike Google and YouTube, which are
     5     the two world's largest sites, we don't have a
     6     lot of endorsements and that kind of stuff, but
     7     other websites and other users use a myriad of
     8     topic headings and emojis that have different
     9     meanings that I'm not prepared and you would
    10     have to know what they mean, like kinds of
    11     checkmarks and, I don't know, high fives and all
    12     kinds of things.
    13               But the basic features of topic
    14     headings, "Up next," "Trending now," those kinds
    15     of things we would say are core, inherent --
    16     they're no different than expressing what is
    17     implicit in any publishing, which is we hope you
    18     read this.
    19               CHIEF JUSTICE ROBERTS:  Well, it seems
    20     to me that the language of the statute doesn't
    21     go that far.  It says that -- their claim is
    22     limited, as I understand it, to the
    23     recommendations themselves.  In other words,
    24     this -- this is the list of things that you
    25     might like.

1          But that information, the

2    recommendation, is not provided -- under the

3    words of the statute, it's not provided by

4    another information content provider.  It's

5    provided by YouTube or -- or Google.

6          And so, although whatever the

7    liability issue may be, there's some issue

8    tomorrow and there are a lot of others, the

9    presence of an immunity under 230(c), it seems

10   to me, is just not directly applicable.

11         MS. BLATT:  Well, that's incorrect

12   because of the word "recommendation."  There is

13   no word called "recommendation" on YouTube's

14   website.  It is videos that are posted by third

15   parties.  That is solely information provided by

16   another.

17         You could say any posting is a

18   recommendation.  Any time anyone publishes

19   something, you could be said, it's a

20   recommendation.  Anything.

21         CHIEF JUSTICE ROBERTS:  Well, the

22   videos just don't appear out of thin air.  They

23   appear pursuant to the algorithms that your

24   clients have.  And those algorithms must be

25   targeted to something.  And they're targeted --

119

1    that targeting, I think, is fairly called a

2    recommendation, and that is Google's.  That's

3    not the -- the provider of the underlying

4    information.

5            MS. BLATT:  So nothing in the statute

6    or the common law defamation turns on the degree

7    of tailoring or how you organized it.  There's

8    no distinct actionable message.  If you say I

9    think my readers would all be interested in this

10   or I think the readers in ZIP code 2005 would be

11   interested in it, or you walk up to someone and

12   say I'm going to defame someone because I

13   thought you might be interested in it, it's

14   still publishing.

15           And the other side gives you no line

16   and no way to say in some way that would be

17   workable or give websites or users any clarity

18   of how you would organize the world's

19   information.  Just think about search.  There

20   are 3.5 billion searches per day.  All of those

21   are displays of other people's information.  And

22   you could call all of them a recommendation that

23   are tailored to the user because all search

24   engines take user information into account.

25   They take the location, the language, and what

1    have you.

2           And I can give the example of

3    football.  Football -- the same two users will

4    enter the word "football" and get radically

5    different results based on the user's past

6    search history and their location and their

7    language because most of the world thinks of

8    football as soccer, not the way we do.

9           And so if you go down this road of did

10   you target it, then you have to say how much?

11   Was the topic hitting too much?  Was it okay to

12   have a violence channel?  Was it okay to have a

13   sex channel?  Was it okay to have, you know,

14   what have you, some other channel about skinny

15   models that you could say, well, that just kept

16   repeating the -- the channel and that made me

17   crazy.  So --

18           JUSTICE JACKSON:  But, Ms. -- Ms.

19   Blatt, Mr. Stewart suggests all of those kinds

20   of questions in terms of the extent of liability

21   for this kind of organization would be addressed

22   in the context of liability, not -- by that I

23   mean each state -- when somebody tried to claim

24   that YouTube had done something improper in

25   terms of pulling up those kinds of videos, that

Official Subject to Final Review

1    each state would then look and determine, based

2    on their own, you know, common law, whether or

3    not you were liable.  And he posits that that

4    wouldn't happen very often.  But we don't know.

5              My question is isn't there something

6    different to what Congress was trying to do with

7    230?  Isn't it true that that statute had a more

8    narrow scope of immunity than is -- than courts

9    have, you know, ultimately interpreted it to

10   have and that what YouTube is arguing here

11   today, and that it really was just about making

12   sure that your platform and other platforms

13   weren't disincentivized to block and screen and

14   remove offensive conduct -- content?

15             And so to the extent the question

16   today is, well, can we be sued for making

17   recommendations, that's just not something the

18   statute was directed to.

19             MS. BLATT:  So can I take this in two

20   parts?  Because I -- I feel like your first part

21   of your question is addressing what the dispute

22   is between the parties, and the second part of

23   your question goes most deeper, and which is,

24   you know, beyond the question presented.

25             But just on your first question about

1    why not -- why do you need an immunity as

2    opposed to liability, and in our view, that's

3    like saying -- I mean, that's death by a

4    thousand cuts, and the Internet would have never

5    gotten off the ground if anybody could sue every

6    time and it was left up to 50 states' negligence

7    regime.

8            And let me give you an example.  A

9    website could put something alphabetical in

10   terms of reviews, and every Young, Williams and

11   Zimmerman, i.e., X, Y, Z, could say, well, that

12   was negligent because you should have rated it

13   somewhere else.

14           JUSTICE JACKSON:  No, I totally

15   understand that.  But I think my things are not

16   actually different.

17           What I'm saying is that problem that

18   you identify, which is a real problem, the

19   Internet never would have gotten off the ground

20   if everybody would have sued, was not what

21   Congress was concerned about at the time it

22   enacted this statute.

23           MS. BLATT:  Well, so I -- that's

24   correct.  I mean, that's incorrect for a number

25   of reasons.  And we can talk about what two

1  choices you're talking about.  There's only two

2  arguments on the table for what you could think

3  that (c)(1) does.

4          And that is it simply says, you know,

5  no Internet -- interactive computer service

6  shall be treated as a publisher.  And you could

7  think, well, there are two -- two ways of

8  looking at that.  One is that you need an

9  external law that has publication as an element.

10  And then, second, which I think that your

11  question may be going to, is it only directed to

12  eliminating forms of strict liability across all

13  causes of action?  And so both -- both of those

14  ways are highly problematic and also inaccurate,

15  given what was happening in 1996.

16          In terms of just looking at this as is

17  this just talking about defamation, it plainly

18  can't be because the statute would be a dead

19  letter upon inception because any defamation

20  cause of action can be replead as negligence or

21  intentional infliction of emotional distress.

22          So we think the word "treat," which

23  means to regard, applies whenever the claim is

24  treating the -- or imposing liability because --

25  by virtue of publishing; in other words --

1          JUSTICE JACKSON:  But what do you do
2     -- what do you do with the title and the content
3     and the context?  Right?  The title of Section
4     230 is "protection for private blocking and
5     screening of offensive material."
6          MS. BLATT:  So let me just pinpoint,
7     then, the second one, which hopefully I won't --
8     we'll get to on section (e), which is all the
9     exceptions.
10          But in terms of the title, Stratton
11     Oakmont and restrictions, (c)(1) and (c)(2) are
12     a pair.  So what you have is (c)(2) is -- and
13     they work together, and if you -- every time you
14     weaken (c)(1), you make (c)(2) useless and
15     defeats the whole point of this statute, at
16     least in terms of cleaning up the Internet.
17          (c)(2) is just a safe harbor and
18     directs what happens when you take stuff down.
19     It says nothing about what happens to the
20     content that's left up.  And so the more any
21     website removes material, it perversely is
22     showing that it has knowledge or should have
23     known or could have known about the content that
24     was left up.
25          And so you have one of two things

125

    1    happen -- that would happen and would have
    2    happened then and would happen now.  The first
    3    is websites just won't take down content.  And
    4    that just defeats it -- the whole point, and you
    5    basically have the Internet of filth, violence,
    6    hate speech and everything else that's not
    7    attractive.
    8            And the second thing, which I think a
    9    lot of the briefs are worried about in terms of
   10    free speech, is you have websites taking
   11    everything down and leaving up -- you know,
   12    basically you take down anything that anyone
   13    might object to, and then you basically have,
   14    and I'm speaking figuratively and not literally,
   15    but you have the Truman Show versus a horror
   16    show.
   17            You have only anodyne, you know,
   18    cartoon-like stuff that's very happy talk, and
   19    otherwise you just have garbage on the Internet.
   20    And Congress would not have achieved its purpose
   21    of -- and, remember, it had in all those
   22    findings only three of which are addressing the
   23    harmful content.  Most of it is dealing with
   24    having free speech flourish on the Internet,
   25    jump-starting a new industry.

Official Subject to Final Review

126

1          And it's inconceivable that any

2     website would have started in -- I mean, one

3     lawsuit freaked out the Congress.

4          JUSTICE KAGAN:  Ms. Blatt?

5          MS. BLATT:  Yes.  Sorry.

6          JUSTICE KAGAN:  Just suppose that this

7     were a pro-ISIS algorithm.  In other words, it

8     was an algorithm that was designed to give

9     people ISIS videos, even if they hadn't

10    requested them or hadn't shown any interest in

11    them.

12         Still the same answer, that -- that --

13    that a claim built on that would get 230

14    protection?

15         MS. BLATT:  Yes, except for the way

16    Justice Sotomayor raised it, which is material

17    support.  So, if there's any -- I mean, there's

18    a criminal exception.  So, if you have material

19    supporting collusion with ISIS, that's excepted

20    from the statute.

21         But, if I can just take the notion of

22    algorithms, either they're raising --

23         JUSTICE KAGAN:  But -- but -- but what

24    I take you to be saying is that in general --

25    and this goes back to Justice Thomas's very

127

1    first question --

2                MS. BLATT:  Yes.

3                JUSTICE KAGAN:  -- in general, whether

4    it's neutral or whether it's not neutral,

5    whether it is designed to push a particular

6    message, does not matter under the statute and

7    you get protection either way?

8                MS. BLATT:  That's correct.  And just

9    referring -- I agree with what Justice Gorsuch

10   said, except for he was saying that somehow the

11   Ninth Circuit was at fault because it recognized

12   this was an easy case.

13              It's not the Ninth Circuit's fault

14   that the complaint said there's nothing wrong

15   with your algorithm.  You just kept repeating

16   the same information, independent of any

17   content.

18              And so we shouldn't be faulted because

19   his complaint doesn't allege anything wrongful.

20              JUSTICE KAGAN:  No --

21              MS. BLATT:  But, in your hypothetical,

22   where someone could say -- and, again, this is

23   always going to turn on the claim.  But let's

24   just think of -- I don't know what your

25   hypothetical would be about tortious speech, but

1     the bookstore example, you could decide that you

2     want to put the adult bookstore -- book -- adult

3     book section separated from the kid section.

4     That's a "biased" choice, and I'm doing scare

5     quotes for the transcript, but --

6          JUSTICE KAGAN:  Or -- or have an

7     algorithm that looks for defamatory speech and

8     puts it up top, right, and you're still saying

9     230 protection?

10         MS. BLATT:  So our test, when you look

11    at the claim, and so, if you have a claim for

12    defamation, is always going to look at the claim

13    and say is the harm flowing from the third-party

14    information or from the website's own conduct or

15    speech.

16         And so, if I can mention the race

17    example, that's an excellent example of the

18    claim has nothing to do with the content of the

19    third-party information.  It can be --

20         JUSTICE KAGAN:  Right.  But this is

21    the claim would have something to do with the

22    content of the information.  It would say, you

23    know, my complaint is that you just made

24    defamatory speech available to millions of

25    people who otherwise would never have seen it.

1      And you are on the hook for that.  That was your

2      choice.  That's your responsibility.

3              Why doesn't -- why -- why -- why

4      should there be protection for that?

5              MS. BLATT:  Well, so, if there was

6      some sort of misrepresentation or some sort of

7      terms of service that you weren't going to do

8      that, but let me give you an example where this

9      opens up a can of worms is because you could say

10     that about any content, that you elevated the

11     most recent content.

12              I mean, search engines of all kinds,

13     including Google Search, but all the amici

14     briefs are telling you they have to make

15     choices.  They've got an undescribable amount of

16     content, and it has to be based on something,

17     whether it's relevance to a user request, a

18     search history.  If it says headache, the

19     Microsoft example, do you want something from

20     the 18 -- you know, the 1300s, or do you want

21     something that's a little more recent?  Do you

22     --

23              JUSTICE BARRETT:  Okay.  But what if

24     -- what if -- I'm sorry, but I just want to make

25     sure in Justice Kagan's example, what if the

```
 1    criteria, the sorting mechanism, was really
 2    defamatory or pro-ISIS?
 3              I guess I don't see analytically why
 4    your argument wouldn't say, as Justice Kagan
 5    said, that, yeah, 230 applies to that.
 6              MS. BLATT:  Well, I mean, it's similar
 7    to your -- your 303 case.  You can make a
 8    distinction between content choices in terms of
 9    how you would organize or deal with any kind of
10    publication, whether it's a book, a newspaper, a
11    television channel, that kind of stuff, and that
12    is inherent to all publishing.  But you --
13              JUSTICE KAGAN:  Right.  So you're
14    saying 230 does apply to that?
15              MS. BLATT:  Yes.
16              JUSTICE KAGAN:  230 gives protection
17    regardless?
18              MS. BLATT:  Yes.  I hope I didn't say
19    something incorrect.
20              JUSTICE KAGAN:  230 gives protection
21    --
22              MS. BLATT:  Yes.
23              JUSTICE KAGAN:  -- regardless, whether
24    it's like put the defamatory stuff up top, put
25    the pro-ISIS stuff on top, or whether it's, you
```

131

1    know, what -- what people might consider a more

2    content-neutral principle.

3              MS. BLATT:  Correct.  And let me just

4    say you have websites that are hate speech, so

5    they may be elevating more racist speech as

6    opposed to some other speech that talks about

7    how the equality of the races.

8              You might have a speech devoted to,

9    you know, an interest of a certain community,

10   like an ethnic community.  So they may be

11   saying, you know what, we don't want to put some

12   other kind of content, we may want to publish

13   it, but we may want to put it further down on

14   our algorithm.  And if you said -- again, this

15   is a content distinction.

16             If you have a claim that --

17             JUSTICE KAGAN:  So I can't imagine

18   that -- and, you know, we're in a predicament

19   here, right, because this is a statute that was

20   written at a different time when the Internet

21   was completely different, but the problem that

22   the statute is trying to address is you're being

23   held responsible for what is another person's

24   defamatory remark.

25             Now, in my example, you're not being

1    held responsible for another person's defamatory

2    remark.  You're being held responsible for your

3    choice in broadcasting that defamatory remark to

4    millions and millions of people who wouldn't

5    have seen it otherwise through this

6    pro-defamatory algorithm.

7            MS. BLATT:  I mean --

8            JUSTICE KAGAN:  And the question is,

9    you know, should 230 really be taken to go that

10   far?

11           MS. BLATT:  The question is can you

12   carve out pro-defamatory as opposed to pro

13   anything else, pro some other type of content

14   that someone may be suing over over negligence.

15           If I can just give you an example of a

16   TV channel.  When you broadcast an excessively

17   violent TV channel, you're giving it a new

18   audience that they wouldn't otherwise have.

19   It's still inherent to publishing.  And if you

20   decide to run reruns of the most sexually

21   explicit and violently explicit, you could say

22   that's a bad thing, and it may be, but on your

23   choice -- but it would be protected under 230.

24           In terms of what was happening in

25   1996, I strongly disagree with the notion that

1    algorithms weren't present based on targeted

2    recommendations.  The Center For Democracy and

3    Technology has this wonderful history lesson of

4    what was happening in '92 through '94 on how

5    targeted recommendations developed.

6              And you had something called news

7    groups, which were for anyone using the

8    Internet, that was sort of what people did.

9    They signed up for a news group, and those news

10   groups adopted the technology that is the

11   technology that is alleged in this case.

12             They looked at what the user was

13   looking at.  Say the user was looking at science

14   news.  And they thought, oh, that also user is

15   looking at some other kind of news, maybe on

16   psychology or something.  And so they would make

17   recommendations based on your user history and

18   that of others.

19             Amazon two months into 1997 introduced

20   its famous feature, if you buy X, you might like

21   Y based on that technology.  So this technology

22   was present starting in '92.

23             And '92 through '96, the Internet was

24   definitely different, but it was kind of a mess.

25   You still had to organize it.  So there were

1    search engines.  There was all kinds of features

2    that were organizing content because even then

3    it was massive.  It's just now on, like, an

4    exponentially greater scale.

5            JUSTICE JACKSON:  Ms. Blatt, I guess

6    my concern is that your theory that 230 covers

7    the scenario that Justice Kagan pointed out

8    seems to bear no relationship in my view to the

9    text --

10           MS. BLATT:  Okay.

11           JUSTICE JACKSON:  -- of the actual

12   statute.

13           MS. BLATT:  Sure.

14           JUSTICE JACKSON:  I mean, the -- the

15   -- when we look at 230(c), it says protection

16   for good samaritan blocking and screening of

17   offensive material, suggesting that Congress was

18   really trying to protect those Internet

19   platforms that were in good faith blocking and

20   screening offensive material.

21           Yet, if we take Justice Kagan's

22   example, you're saying the protection extends to

23   Internet platforms that are promoting offensive

24   material.  So it suggests to me that it is

25   exactly the opposite of what Congress was trying

1    to do in the statute.

2         MS. BLATT:  Well, I think promoting --

3    I think a lot of things are offensive that other

4    people might think are entertaining, and so --

5         JUSTICE JACKSON:  No, it's not about

6    -- it's not about whether -- let's take as a

7    given we're talking about offensive material

8    because that's all through the statute, right?

9    You don't -- you don't disagree that Congress

10   was focused on offensive material, that that's

11   sort of the basis of the whole statutory scheme.

12        So, if we take as a given that we're

13   talking about offensive material, it looks to me

14   from the text of the statute that Congress is

15   trying to immunize those platforms that are

16   taking it down, that are doing things to try to

17   clean up the Internet.

18        And in the hypothetical that was just

19   presented, we have a platform that is not only

20   not taking it down in the way that the statute

21   is focused on, it is creating a separate

22   algorithm that pushes to the front so that more

23   people would see than otherwise the offensive

24   material.

25        So how is that even conceptually

Official — Subject to Final Review

136

1    consistent with what it looks as though this

2    statute is about?

3              MS. BLATT:  Well, so just a couple

4    things.  And, again, I -- we're on this

5    defamatory material.  The website itself does

6    something defamatory that's not -- it's

7    independent of the third-party content.  It's

8    not protected.

9              But that same hypothetical could be

10   said if it was on the front -- the home page as

11   opposed to you had to do a search engine first.

12   And I don't see anything in the statute that

13   protects it.

14             In terms of what I think your deeper

15   section is -- deeper concern is, the reading of

16   the statute, I don't think it's coterminous with

17   (c)(2), which is dealing with the type of

18   offensive material, which, by the way, doesn't

19   mention defamation.

20             In terms of (c), we talked about how

21   they work together.  We talked about how it

22   could be easily overrode if it had just

23   publication.  The one thing we didn't talk about

24   was the structure in Section (e).  (e) is a

25   laundry list, a laundry list, of a variety of

1    exceptions under federal law to which (c)(1)
2    does not apply as well as (c)(2).  And those
3    exceptions make very little sense if (c)(1) is
4    read the way you're reading it.  It would almost
5    never apply to (c)(2).
6         And let's just take federal criminal
7    laws.  It would make very little sense because
8    those laws -- almost none of them have strict
9    liability as an element, and vanishingly few
10   would be publication or speaking as an element.
11   It's in there for no other reason, other than
12   that (c)(1) would otherwise apply to the -- the
13   -- the information provided by another.
14        And in terms of just the pure text,
15   when you keep saying its failure to take down,
16   I'm hearing you say what Congress wrote was
17   treatment as a publisher.  That means
18   dissemination.  That means publishing.
19        JUSTICE JACKSON:  So Congress didn't
20   say that.
21        MS. BLATT:  You cannot be held liable
22   for publishing.
23        JUSTICE JACKSON:  If you look at the
24   statute, it says "protection for good Samaritan
25   blocking and screening."  If you take into

138

1    account Stratton Oakmont, if -- those things I

2    thought were like a given, what -- what the

3    people who were crafting this statute were

4    worried about was filth on the Internet and the

5    extent to which, because of that court case and

6    -- and perhaps others, the platforms were not

7    being incentivized to take it down, because if

8    they were trying to take it down like Prodigy,

9    they were going to be slammed because they were

10   going to be treated as a publisher.

11          And so the statute is like we want you

12   to take these things down, and so here's what

13   we're going to do.  We're going to say that just

14   because they're on your -- your -- your website,

15   it doesn't mean you're going to be held

16   automatically liable for it.  And that's (c)(1).

17   And to the extent you're in (c)(2), you're

18   trying to take it down but you don't get them

19   all, we're not going to hold you liable for it.

20          That seems to me to be a very narrow

21   scope of immunity that doesn't cover whether or

22   not you're making recommendations or promoting

23   or doing anything else.

24          MS. BLATT:  Well, I mean, that that is

25   -- what I understand the government and the

1     Petitioner to be saying is that disseminating,

2     even 24/7 disseminating of ISIS videos, is

3     protected.  The only thing that's not protected

4     is whether you can tease out something about the

5     organization and call it a recommendation when

6     there is no express speech recommending it.

7     It's just the placement of where in the order in

8     which content appears.

9           And that same complaint could be made

10    about search engines.  So I think, under your

11    view, search engines would not be covered

12    because they are taking user information,

13    targeting recommendations in the sense of

14    they're saying we think you would be interested

15    in the first content as opposed to the content

16    on, you know, 1,692,000 sections.  I mean, they

17    have millions and millions of hits for any

18    search result.

19          And if you think those are

20    recommendations and the other side gives you no

21    basis for distinguishing between search engines,

22    then the statute is just very different than I

23    think the one that Congress was talking about,

24    because, again, if you're going to look at

25    findings and history and policy, this is about

1    diversity of viewpoints, jump-starting an

2    industry, having information flourishing on the

3    Internet, and free speech.

4            JUSTICE BARRETT:  Ms. Blatt, what

5    about Justice Sotomayor's dating hypothetical?

6    The discrimination, like, oh, we're only going

7    to -- we're not going to match black people and

8    white people, et cetera, what about that?  Is

9    that given 230's shield?

10           MS. BLATT:  Absolutely not, because

11   any disparate treatment claim or race

12   discrimination is saying you're treating people

13   different regardless of the content.

14           So if I'm -- I'm going to use it like

15   with an advertising, like I don't know, whether

16   I'm a woman of 10 or -- I mean, that was a bad

17   example -- a woman of 30 or whatever, and

18   whether I live somewhere, it really doesn't

19   matter in terms of the law that's prohibiting

20   discrimination.  The law is indifferent to what

21   the content is.  It's just very unhappy about

22   any kind of status-based distinction.

23           So we think -- and the -- the harm

24   that would flow is not the third-party

25   information.  It's the website's conduct,

1    whether you want to call it speech or conduct,

2    that's based on status.

3            JUSTICE BARRETT:  But what about the

4    dating profile?  I mean, isn't that part of the

5    content?  Isn't that part of the third-party

6    information?

7            MS. BLATT:  Sure.  And it's just --

8    you could put it a bunch of different ways.  You

9    could say, even before the profiles go up,

10   there's a complete harm, or even if the profiles

11   go up, it doesn't matter.  We would distinguish

12   between the way dating sites work, which don't

13   work based on status but based on criteria

14   that's uploaded, and those are, you know, you're

15   matching with somebody else.  The website is not

16   saying you should only date a white person.

17           JUSTICE BARRETT:  Okay.  Then what

18   about news?  What about an algorithm that says,

19   you know, you are a white person, you're only

20   going to be interested in news about white

21   people.  And it will screen out anything that is

22   a story featuring racial justice issues.

23           MS. BLATT:  Yeah, again, anything

24   based on status because the harm is complete,

25   independent of the information, but if a website

1    wants to say we're going to celebrate Black

2    History Month, no, a white person or black

3    person is not going to be able to complain and

4    say, well, I didn't get enough white history

5    month on your website.  Those are claims that

6    are core within treating them as publishing of

7    the information --

8              JUSTICE BARRETT:  Yeah, but I guess

9    I'm -- don't you think you're just fighting on

10   liability?

11             MS. BLATT:  No.

12             JUSTICE BARRETT:  I mean, it seems to

13   me that you're kind of going back to liability,

14   because all of those are choices that are made

15   independently, right?  I mean, we've been

16   talking about the distinction between -- or --

17   or the lack of distinction, in your view,

18   between the content itself and the website's

19   choice of how to publish it.

20             I guess I don't see why --

21             MS. BLATT:  So here's --

22             JUSTICE BARRETT:  -- for 230 purposes.

23             MS. BLATT:  Here's our test, and it's

24   the test the Fourth Circuit recently took in

25   Henderson, and it's the test the Ninth Circuit

1        took.

2                Let me give you an example and -- that

3        I think may help; with the ad revenue sharing.

4        So this was an allegation that YouTube was

5        giving money to ISIS.  Now, this was in

6        connection with third-party videos, third-party

7        information.  But the court said no, that is not

8        within Section 230 because that's independent of

9        the information, that's giving money to ISIS.

10       That kind of, whatever you think about its

11       validity under the statute, you're not treating

12       them as a publisher; you're treating them as a

13       financer.

14               And it's just -- and that's the test

15       of the Fourth Circuit too.  The Fourth Circuit

16       is looking -- in that case, it was about -- you

17       know, all kinds of things were happening with

18       third-party information, and they were trying to

19       tease out is it the credit report, did they

20       contribute to the credit report, was it based on

21       the website's failure to -- to notify the

22       employee?

23               And what the Fourth Circuit said is

24       the exact same thing we said, and it's the exact

25       same thing the plaintiff has said on four pages

1   of its brief, for four times in its brief, that

2   you're looking for the harm.  What is the harm

3   caused?  And this case is the perfect example.

4   The plaintiffs suffered a terrible fate, and

5   their argument is it's because people were

6   radicalized by ISIS.

7            And if you start with the concession

8   that the dissemination of those ISIS videos are

9   -- and a claim based on that is barred, the

10  question is, is what additional comes from the

11  way it was organized?

12           The government just says I don't know,

13  let some state figure it out.  That's not very

14  helpful to Internets that have to work on a

15  national level and are posting and sorting and

16  organizing billions upon billions upon billions

17  of piece of -- pieces of information.

18           JUSTICE BARRETT:  Just to clarify,

19  this is my last point, you're happy with the

20  Henderson test, the Fourth Circuit test?

21           MS. BLATT:  Yes.  I would say

22  Henderson is like 96 percent correct.  I got a

23  little lost when they were going down the common

24  law on publication, but the result was great.  I

25  just thought they got a little weird on the

1    publication.

2             But yeah, no, their test is correct,

3    and it's also the Ninth Circuit's test on the

4    ISIS revenue.  It's the exact same test we quote

5    in our brief, and it's the exact same test

6    Petitioner did.

7             And what the harm test is doing, if I

8    could just explain it because it kinds

9    shorthand, but if you take the -- which I'm not

10   sure Justice Jackson agrees with, but if you

11   take the underlying notion that this bars

12   treatment as a publisher, and you're saying,

13   well, can they get around it by the way they're

14   pleading it, you're just looking to the harm, so

15   you are saying you can't really say that's

16   negligence or intentional infliction because the

17   harm is coming from the publishing of the

18   defamatory content.

19            And so what I think all these cases

20   where the courts are correctly saying 230 does

21   not apply to the claim, is they're isolating the

22   harm and saying that's independent of the

23   third-party information.  It's either based on

24   the website's own speech or it's website's own

25   conduct that's independent of the harm flowing

146

1    from the third-party information.

2           JUSTICE ALITO:  If YouTube labeled

3    certain videos as the product of what it labels

4    as responsible news providers, that would be --

5    that would be Google's own content, right?

6           MS. BLATT:  Yes.  Yes.

7           JUSTICE ALITO:  And --

8           MS. BLATT:  Yes.  Can I say one thing

9    just because --

10          JUSTICE ALITO:  Yeah.  Sure.

11          MS. BLATT:  -- I forgot to mention

12    thumbnails?  I'm sorry.  Thumbnails aren't

13    mentioned in the complaint.  So I was literally

14    trying to figure out what he was talking about

15    when I was up there because it's just not

16    something in the complaint.  But that is a

17    screenshot of the information being provided by

18    another.  It's the embedded third-party speech.

19    Okay.  Sorry.  Keep going.

20          JUSTICE ALITO:  All right.  So if --

21    but then if I do a search for today's news in

22    YouTube -- and in fact, I did that yesterday --

23    and all the top hits were very well-known news

24    sources.  Those are not recommendations.  That's

25    not YouTube's speech?  The fact that YouTube put

147

 1    those at the top, so those are the ones I'm most

 2    likely to look at, that's not YouTube's speech?

 3         MS. BLATT:  Right.  But, I mean, all

 4    search engines work the same way.  If you type

 5    in whatever you type in, there is a algorithm

 6    that's deciding what content to display.  It has

 7    to be displayed somehow.

 8         And what I think is going on, on

 9    YouTube or it's certainly going on on Google

10    search, is they're not going to -- they're

11    looking at what did other users look, how

12    popular was it, that kind of thing.  You know,

13    is it -- is that news source, you know, from

14    Russia?  Probably not going to get on the top

15    list.

16         So, yeah, they're having to make

17    choices because there could be over a billion

18    hits from yours, and there are a -- a billion

19    hours of videos watched each day on YouTube and

20    500 hours uploaded every minute.  So it's a lot

21    of content on YouTube.

22         So some of it's based on channels.

23    And some of it's based on searches.  But they

24    have to organize it somehow.  But that is what's

25    going on, I think, on your top searches, is

1    they're -- in most search engines too, and you

2    can look at the Microsoft brief, they're basing

3    it on what -- time spent on those news sites,

4    how many users are looking at them, how relevant

5    it is, if it's -- if you're -- if you're typing

6    in the Turkey earthquake they might be elevating

7    some stuff featuring that because it -- you

8    know, seems more relevant.

9            If there's a recent election, they

10   might feature that.  So all these kinds of

11   decisions are being made by websites every day.

12           JUSTICE ALITO:  Would -- would the --

13   would Google collapse and the Internet be

14   destroyed if YouTube and, therefore, Google were

15   potentially liable for posting and refusing to

16   take down videos that it knows are defamatory

17   and false?

18           MS. BLATT:  Well, I don't think Google

19   would.  I think probably every other website

20   might be, because they're not as big as Google.

21   But here's what happens.

22           I mean, you do have that situation in

23   Europe, but there -- there's not class actions.

24   There's not plaintiffs' lawyers.  There's not

25   the tort system.  So what you would have is a

149

1    deluge of people saying, you know, my -- that
2    restaurant review was -- you know, you say my
3    restaurant review, I didn't like it.
4            I think Yelp! does an amazing job on
5    this, about how much they got hit and had to
6    spend, you know, almost crushing litigation
7    because they were being accused of being, you
8    know, biased on reviewers.  And everyone -- no
9    matter what -- they couldn't win for losing or
10   lose for winning, whatever the phrase is,
11   because whoever they -- whoever got reviewed,
12   somebody was upset.
13           And so I think those websites, they
14   never would have happened.  And they probably
15   would collapse.
16           CHIEF JUSTICE ROBERTS:  Thank you,
17   counsel.  Justice Thomas, anything further?
18           Justice Alito?
19           Justice Sotomayor?
20           Justice Kagan?
21           Justice Gorsuch?
22           JUSTICE GORSUCH:  Ms. Blatt, I -- I
23   kind of want to return to some of the questions
24   I asked earlier.  It seems to me inherent in
25   (c)(1) is a distinction between those who are

1    simply interactive computer services and those

2    who are information content providers.

3            And so, when we flip over to (f), the

4    distinction I -- I -- I glean from that is that

5    if you're picking, choosing, analyzing, or

6    digesting content, which is the bulk of what you

7    -- how you describe Google's activities in -- in

8    the search engine context, are -- are protected

9    and that content must be something more than

10   that, providing content must be something more

11   than that.

12           Is -- is that right in your view?

13           MS. BLATT:  I -- I thought you were

14   absolutely correct.  And I think some of the

15   amici's briefs do this.  In terms of if you're

16   looking at what is information being created or

17   developed, there is that distinction.  It can't

18   be that you -- by sorting, you created or

19   partially developed the information.

20           So I think you had it exactly right.

21   I got a little upset when you talked about a

22   remand that somehow the Ninth Circuit got it

23   wrong.

24           JUSTICE GORSUCH:  Well, let's -- let's

25   go there next then, because it seems to me that

1    even under that understanding of the statute,

2    there is some residual content for which an

3    interactive computer service can be liable.

4         You'd agree with that, that that's

5    possible?

6         MS. BLATT:  Not on this complaint

7    because --

8         JUSTICE GORSUCH:  No, no, no, of

9    course, not on this complaint, but in the

10   abstract, it -- it's possible?

11        MS. BLATT:  Absolutely correct.

12        JUSTICE GORSUCH:  Okay.  And then,

13   when -- when it comes to what the Ninth Circuit

14   did, it applied this neutral tools test, and I

15   guess my problem with that is that language

16   isn't anywhere in the statute, number one.

17        Number two, you can use algorithms as

18   well as persons to generate content, so just

19   because it's an algorithm doesn't mean it

20   doesn't -- can't generate content, it seems to

21   me.

22        And third, that I'm not even sure any

23   algorithm really is neutral.  I'm not even sure

24   what that test means because most algorithms are

25   designed these days to maximize profits.

1          There are other examples -- Justice

2     Kagan offered some, the Solicitor General

3     offered some -- where an algorithm might be --

4     contain a -- a point of view and even a

5     discriminatory one.

6          So I -- I guess I'm not sure I

7     understand why the Ninth Circuit's test was the

8     appropriate one and why a remand wouldn't be

9     appropriate to have it apply the test that we

10     just discussed.

11          MS. BLATT:  Because it's not -- I

12     don't think that was the Ninth Circuit's test.

13     It was one sentence that -- maybe I think it

14     mentioned it twice -- that's basically, you

15     know, almost making fun of the complaint.

16          The complaint doesn't --

17          JUSTICE GORSUCH:  Oh, oh, okay.  Okay.

18     So we're just disagreeing over how we read the

19     Ninth Circuit's opinion, but if I read it that

20     way, then would a remand be appropriate?

21          MS. BLATT:  Well, I'm -- I'm going to

22     say no because I don't understand how -- how

23     somehow that they have a bad complaint means the

24     Ninth Circuit's worse off when the Ninth Circuit

25     said over and over and over you haven't -- this

153

```
1    is just the way you're organizing it.

2            And the complaint never alleges there

3    was something independently wrongful about the

4    content.  It never says these were colloquial

5    recommendations.  It just says because you

6    previously liked this content.

7            And one other thing.  The complaint

8    never even alleges that YouTube ever recommended

9    to any -- in terms of even displaying an ISIS

10   video, to anybody who wasn't looking for it.  I

11   don't even know how you could get ISIS on your

12   YouTube system unless you were searching for it.

13   And the one --

14           JUSTICE GORSUCH:  I certainly

15   understand your -- your -- your complaints about

16   the complaint.  But, if I -- if -- if you --

17   you -- you don't think neutral tools -- you're

18   not defending the neutral tools principle either

19   as I understand it.

20           MS. BLATT:  I'm defending it with

21   respect to Justice Kagan's question, absolutely,

22   because she's concerned about biased algorithms,

23   and she doesn't have to worry about that in this

24   case because they have neutral algorithms.  They

25   don't allege.  And what they mean by neutral
```

```
 1    algorithms is neutral with respect to content.
 2    So there's no --
 3              JUSTICE GORSUCH:  Thank you.
 4              MS. BLATT:  Okay.
 5              JUSTICE GORSUCH:  Thank you.
 6              MS. BLATT:  Thank you.
 7              CHIEF JUSTICE ROBERTS:  Justice
 8    Kavanaugh?  No?
 9              Justice Barrett?
10              Justice Jackson?
11              JUSTICE JACKSON:  So I understood you
12    to say that 230 immunizes platforms for
13    treatment as a publisher, which you take to mean
14    if they are acting as a publisher in the sense
15    that they are organizing and editing and -- not
16    editing, but organizing and -- content.
17              MS. BLATT:  Communicating,
18    broadcasting, which includes how it's displayed.
19              JUSTICE JACKSON:  And -- and would
20    that include -- I -- I just want to go back to
21    Justice Alito's point.  Would that include the
22    home page of the YouTube website that has a
23    featured video box and the featured video is the
24    ISIS video?
25              MS. BLATT:  Right.
```

155

1            JUSTICE JACKSON:  That is -- is
2    covered?
3            MS. BLATT:  Well, maybe not because
4    that gets into my continuum question.  If you
5    think that featured is some sort of endorsement
6    such that the claim is actually treating the
7    website as -- and that the harm is flowing from
8    that -- the word feature, then that's out of 2
9    -- 230.
10           I think you would --
11           JUSTICE JACKSON:  No, I'm sorry, why?
12    Why -- why is that out of 230?
13           MS. BLATT:  So the whole point about
14    what we're saying is making sure that if you
15    start with the assumption that the dissemination
16    of YouTube -- I'm sorry -- of ISIS videos, you
17    can't hold the YouTube liable for that, then the
18    only question that we're concerned about and
19    which is so destabilizing is if you can just
20    plead around it by pointing to anything inherent
21    in the publication.
22           And the government never said what
23    websites are supposed to do.
24           JUSTICE JACKSON:  No, this is not
25    inherent in the publication.

```
 1              MS. BLATT:  Exactly, it's featured.
 2              JUSTICE JACKSON:  So -- so -- so this
 3    is helpful, I mean, if --
 4              MS. BLATT:  Yes.
 5              JUSTICE JACKSON:  -- we -- we have
 6    a -- a home page on YouTube and it has featured
 7    as the little title and a box, and let's say the
 8    algorithm randomly selects videos from their
 9    content and puts them up for a week at a time,
10    and the random video that it selected is the
11    YouTube -- is the ISIS video, and it runs when
12    you open up YouTube for a week.
13              MS. BLATT:  Right.
14              JUSTICE JACKSON:  Covered or not
15    covered?
16              MS. BLATT:  Well, it depends on
17    whether you think it's an endorsement of -- I
18    mean, if it said this is the Library of Congress
19    and we feature this because we want to show you
20    how bad ISIS is, you know, I don't know.
21              The reason why I care so much about
22    this is because, like I said, Google and YouTube
23    don't do this, but all the other amicus briefs
24    are talking about they do things like that and
25    they might have a little emoji.
```

157

```
 1            JUSTICE JACKSON:  No, I guess I'm just
 2      trying -- I don't understand.  I just want to
 3      know whether the -- put -- putting on the home
 4      page of YouTube, the decision to have an
 5      algorithm that puts on its home page various
 6      videos, third-party content, and it turns out
 7      that one of those videos is an ISIS video and
 8      the person is radicalized and they harm the
 9      Petitioner's family.
10            MS. BLATT:  Yes.  So that is inherent
11      to publishing the home page.  The word
12      "feature," actually using the express statement
13      of feature, it -- first of all, is not -- the
14      website didn't have to do it.  The owner --
15            JUSTICE JACKSON:  So I'm sorry,
16      inherent to publishing, it's covered?
17            MS. BLATT:  The home page.
18            JUSTICE JACKSON:  It's covered?
19            MS. BLATT:  Absolutely, because no
20      website -- how are you supposed to -- how are
21      you supposed to operate a website unless you put
22      a home page on, and so they have to do
23      something.
24            And if you could always say, well, the
25      home page -- you know, unless you're just going
```

Official   Subject to Final Review

158

1    to do it alphabetically or reverse chronological

2    order, a website is always going to be sued for

3    negligence.

4         JUSTICE JACKSON:  All right.  So, if

5    I -- if I disagree with you and I -- and I'm --

6    about the meaning of the statute, all right,

7    focusing in on the meaning of the statute, you

8    say if you're making editorial judgments about

9    how to organize things, then you're a publisher

10   and you're covered.

11        If I think that the statute really

12   only provides immunity if the claim is that the

13   platform has this ISIS video there and it can be

14   accessed and it hasn't taken it down, do you

15   have an argument that the recommendations that

16   they're talking about is -- is tantamount to the

17   same thing?

18        MS. BLATT:  Yes, because the only

19   basis for saying recommendations are not covered

20   is -- that I saw is the government saying is it

21   conveys a distinct implicit message that you

22   might be interested.  That is a distinct

23   implicit message that can only -- it happens

24   every time you publish.

25        If you publish one thing on the

1   Internet, it conveys a distinct message of dear

2   reader, we sat around and thought you might be

3   interested --

4           JUSTICE JACKSON:  And you're saying --

5           MS. BLATT:  Or we want to make money

6   --

7           JUSTICE JACKSON:  You're saying that

8   -- that there's no -- that organizational

9   choices that put that content on the front page,

10  on the first thing, when you open it up without

11  typing in anything, cannot be isolated and that

12  it's the same thing as it appears on the

13  Internet anywhere such that 230 applies?

14          MS. BLATT:  Yes, yes, and I'll use the

15  government's own words.  They said if you hold

16  them liable for topic headings, you render the

17  statute a dead letter because you have to

18  organize the content.  So if you think the topic

19  headings are conveying some implicit message you

20  can target out, the government said then the web

21  can't function.

22          And I think we care about it because

23  we're big websites that have lots of

24  information.  Other websites, and all the amici

25  briefs are saying, is our whole business is

1    organizing to make it useful.  If you need a

2    job, you're going to organize it by location --

3              JUSTICE JACKSON:  Are you aware of any

4    defamation claim in any state or jurisdiction in

5    which you would be held liable, you would -- you

6    would actually be liable for organizational

7    choices like this?

8              MS. BLATT:  No, I'm not worried about

9    the defamation claim.  I'm worried for a

10   products liability claim or what the government

11   kept saying, your design choices.  Those could

12   just be a product liability claim or a

13   negligence claim.  You negligently went

14   alphabetical or you negligently featured

15   whatever you featured that made my, you know,

16   kid addicted to whatever it was.  And that --

17   those kind of claims happen because they're

18   publishing.  And the whole point of getting this

19   statute was to protect against publishing.  So

20   whatever is publishing, inherent to publishing,

21   yeah, has to be covered.

22             JUSTICE JACKSON:  Thank you.

23             CHIEF JUSTICE ROBERTS:  Thank you,

24   counsel.

25             Rebuttal, Mr. Schnapper?

1          REBUTTAL ARGUMENT OF ERIC SCHNAPPER

2             ON BEHALF OF THE PETITIONERS

3          MR. SCHNAPPER:  Thank you, Mr. Chief

4    Justice, and may it please the Court:

5             If I might start with my colleague's

6    reference to things inherent in publishing, I

7    would just offer a cautionary note and review of

8    the transcript will support this.  That -- that

9    has been given an extraordinarily expansive

10   account here.

11            So topic headings were characterized

12   as inherent in publishing.  You know, a topic

13   heading could how Bob steals things all the

14   time.  That's not --  shouldn't be protected.

15   She mentioned "trending now" as inherent in

16   publishing, but that's like "featured today."

17   You could -- you could have a site that didn't

18   use the words "trending now."  Auto-play

19   certainly isn't inherent in publication.

20            And she mentioned home pages, and you

21   have to have a home page, and that's fair, but

22   you don't have to have on the home page selected

23   things that you're drawing people's attention

24   to.  The home page that I have on my desktop for

25   Google is a box and those charming little

 1    cartoons, and there isn't anything featured

 2    there.  One could have a -- a website home page

 3    for YouTube that wasn't promoting particular

 4    things.  That's just how they've chosen to do

 5    it.

 6              With regard to neutral tools, and this

 7    goes back to the point a number of you made

 8    about race, a neutral algorithm can end up

 9    creating very non-neutral rules.  It's not hard

10    to imagine that an algorithm might conclude that

11    most people who -- who went to Spelman and

12    Morehouse now live in Prince George's County

13    and, therefore, in showing you videos, people

14    who asked for videos about places to live near

15    Washington, if they're black, they'll be shown

16    Prince George's County; if they'll be -- if

17    they're white, they'll be shown Montgomery

18    County.

19              The algorithms can create those kinds

20    of rules.  Whether -- characterizing that as

21    neutral loses its force once the defendant knows

22    it's happening.  You know, to some extent,

23    algorithms and computer functions can run amuck,

24    but you can't call it neutral once the defendant

25    knows that its algorithm is doing that.  And

163

         1    this runs a little bit into the issue that we'll

         2    be talking about tomorrow.

         3           Two short points and then one closing

         4    item.  With regard to Rule -- Section (f)(4), I

         5    said this before, I just want to reiterate it,

         6    Section (f)(4) does not apply to systems or to

         7    information services.  It only applies to

         8    software providers.  The language of the statute

         9    is very specific.

        10           And with the question about the

        11    possible implications of the decision in -- in

        12    Taamneh, it -- it is fair -- it is normal

        13    practice in the district court when there's a

        14    motion to dismiss, to permit the plaintiff to

        15    amend, to deal with the relevant standard, and

        16    that's exactly what we ought to be afforded an

        17    opportunity to do.

        18           Thank you very much.

        19           CHIEF JUSTICE ROBERTS:  Thank you,

        20    counsel.

        21           The case is submitted.

        22           (Whereupon, at 12:44 p.m., the case

        23    was submitted.)

        24

        25

**1**

1 [3] 36:2 112:23 113:1
1,692,000 [1] 139:16
10 [1] 140:16
10:03 [2] 1:15 3:2
101 [1] 51:9
114 [2] 2:11
12:44 [1] 163:22
1300s [1] 129:20
161 [1] 2:14
18 [1] 129:20
1996 [12] 10:19 46:15 47:
11 53:8,9,18,21 62:20 79:8
103:10 123:15 132:25
1997 [1] 133:19

**2**

2 [4] 36:3 155:8
2.3 [1] 45:3
20 [1] 112:23
2005 [1] 119:10
2023 [1] 1:11
21 [1] 1:11
21-1333 [1] 3:4
21st [1] 27:22
230 [51] 10:7,9 16:5 24:22
32:25 38:20 42:11,14 52:4
58:11,23 59:21 60:6,8,19
61:23 64:10 66:4 99:12,25
100:11,21 103:9 104:15
105:9 109:14 110:11,13,19
112:14,24 114:19 116:10
121:7 124:4 126:13 128:9
130:5,14,16,20 132:9,23
134:6 142:22 143:8 145:
20 154:12 155:9,12 159:13
230's [1] 140:9
230(c [4] 97:8 108:20 118:9
134:15
230(c)(1 [25] 3:11,17 4:2,
13 71:21 73:2,10 75:10 76:
19 77:20 80:4,15 85:9,12
86:16 92:18 93:14,15 94:
23 95:2 106:12 108:14
109:3 111:17 113:25
230(c)(1)'s [2] 64:25 114:
11
230(f)(4 [1] 47:22
231 [3] 4:2 104:15 108:13
24/7 [1] 139:2
26 [1] 114:11
26-word [2] 17:18,18
267 [1] 52:15

**3**

3 [1] 2:4
3.5 [1] 119:20
30 [1] 140:17
303 [1] 130:7
34a [1] 99:25

**5**

50 [1] 122:6
500 [1] 147:20

**7**

70 [1] 2:8

**9**

92 [1] 133:4,22,23
94 [1] 133:4
96 [2] 133:23 144:22

**A**

a.m [2] 1:15 3:2
abandoned [1] 19:15
abandoning [1] 20:6
abet [1] 25:4
abetted [1] 114:20
abetting [23] 9:7 20:7,8 22:
2 24:12,25 25:13,14,16,23
30:12 31:8,11,25 32:3,8
33:16 41:3 59:1,21 64:17
65:22 80:19
ability [1] 16:8
able [4] 112:13 113:18 115:
7 142:3
above-entitled [1] 1:13
absolutely [6] 51:12 140:
10 150:14 151:11 153:21
157:19
absolve [1] 108:9
abstract [2] 42:6 151:10
accept [4] 24:8 40:5 45:23,
24
accepting [2] 40:19 115:3
access [12] 13:15 16:17 17:
22 18:21 47:22 48:20 52:
19,23 100:5,8,11 101:19
accessed [2] 158:14
accesses [1] 59:9
accessing [2] 59:12,19
accident [1] 93:4
according [1] 49:14
account [6] 10:3 54:12,13
119:24 138:1 161:10
accurate [1] 103:21
accused [1] 149:7
achieved [1] 125:20
acknowledges [1] 76:17
across [5] 5:16,18 8:16,17
123:12
act [7] 24:21 51:9 73:9 80:
17 85:8 99:9 111:13
acting [1] 4:14 8:3 24:1,5
34:9,12,18 36:7 66:20 88:
8 154:14
action [19] 3:24 15:5,9,12,
13,14 57:6 72:23 78:8 85:
16 86:14 94:20 95:1 96:14
97:6,11 108:15 123:13,20
actionable [12] 9:9 12:25
13:2 19:8 57:5,16 72:11
92:4 95:2 101:2 112:4 119:
8
actions [5] 16:17 33:7 86:4,
8 148:23
active [1] 40:20
activities [2] 8:19 150:7

activity [3] 4:20 48:22 53:
15
acts [1] 93:23
actual [3] 8:11 80:5 134:11
actually [15] 6:12 29:3,5 63:
11 64:14 67:6,25 111:4
112:10,21 113:8 122:16
155:6 157:12 160:6
ad [1] 143:3
added [1] 89:24
addicted [1] 160:16
adding [1] 99:5
addition [1] 13:3
additional [2] 11:10 144:
10
address [5] 25:17 46:16
86:13 111:18 131:22
addressed [2] 36:14 120:
21
addressing [4] 70:15 103:
8 121:21 125:22
adequacy [1] 98:5
adequate [1] 22:23
administration [1] 74:7
adopt [5] 4:23 30:24 46:22
55:14 96:23
adopted [1] 133:10
adopting [1] 116:20
adornment [1] 96:10
adult [2] 128:2,2
advance [1] 20:3
advanced [1] 63:8
advancing [3] 61:13 66:9,
11
advertise [1] 106:7
advertising [1] 140:15
affirmative [3] 33:24 93:23
97:6
affirmatively [2] 33:12,18
afforded [1] 163:16
afoul [2] 23:24 57:11
afraid [1] 34:1
agree [7] 48:8 57:25 81:23,
25 105:21 127:9 151:4
agreement [1] 82:24
agrees [2] 114:19 145:10
ahead [7] 11:23 27:6,11,15
45:1 62:21 80:10
aid [1] 25:3
aided [1] 114:20
aiding [24] 9:7 20:6,8 22:1
24:11,25 25:13,14,16,22
30:12 31:7,11,25 32:3,8
33:15 41:2 57:25 59:1,21
64:17 65:22 80:19
aiding-and-abetting [3]
25:21 33:8 58:9
air [1] 118:22
AL [1] 1:3
al-Baghdadi's [2] 31:9,24
algorithm [61] 5:14,16,18,
22,24 6:23 7:10,16,24 8:15,
19 9:25 10:15,15 11:1,9,12,
13 12:14,17 18:9 21:24 24:

14,18,24 25:10 40:13,14,
17,23 41:2,9,13,17,20 42:
20 51:6 68:24 78:22 101:7
103:25 104:13 107:15 111:
7 126:7,8 127:15 128:7
131:14 132:6 141:21 147:
18 147:5 151:19,23 152:3
156:8 157:5 162:8,10,25
algorithms [24] 5:12 6:17
9:23 10:13 11:6,25 18:13
50:6 55:21 81:1 103:20
104:6 113:19 118:23,24
126:22 133:1 151:17,24
153:22,24 154:1 162:19,23
ALITO [43] 13:10,17,20,23
14:2,7,13,16 15:1 33:25
34:1,17 35:1,9,16,24 36:6,
12 37:1,8,13 46:14 89:13,
14,19 90:6 91:3,9,15,24 92:
3,13,24 93:8 94:1,8 95:11
146:2,7,10,20 148:12 149:
18
Alito's [1] 103:2 154:21
allegation [4] 76:19 102:
11,13 143:4
allegations [4] 73:4,7 89:
25 98:5
allege [3] 97:25 127:19
153:25
alleged [3] 92:17 93:13
133:11
alleges [2] 153:2,8
allowing [2] 73:11 93:24
allows [3] 36:22 37:3 93:
19
almost [6] 32:20 75:5 137:
7 152:12 154:6 157:15
alphabetical [2] 122:9 160:
14
alphabetically [1] 158:1
alter [1] 7:17
alternative [1] 50:15
although [2] 70:3 118:6
amazing [1] 149:4
Amazon [2] 115:25 133:19
ambiguity [1] 84:1
amend [2] 58:18 163:15
Amendment [3] 48:2 100:
19 106:10
amendments [1] 79:6
amici [6] 54:2 79:13,18 105:
4 129:13 159:24
amici's [1] 150:15
amicus [7] 1:22 2:7 55:4,
10 70:11 87:1 156:23
among [1] 47:23
amount [1] 129:15
amounts [1] 32:8
amplify [2] 76:1 94:11
amplifying [2] 42:21 98:12
amuck [1] 162:23
analogies [1] 78:14
analogous [3] 26:9 29:4
51:8

analogy [6] 26:2,18,21,23
27:7 78:25
analysis [6] 50:23 80:14,
16,17 85:14 93:7
analytically [1] 130:3
analyze [2] 95:18 100:15
analyzed [2] 84:24 87:13
analyzing [4] 47:24 48:3,
19 49:1,6,18 100:10 150:5
anodyne [1] 125:17
another [21] 4:4 30:15 37:
23 48:1 69:21 75:13 84:4
89:8 90:25 94:19 95:20
101:5,10 114:14 116:25
118:4,16 131:23 132:1
137:13 146:18
answer [8] 28:20 44:6,9,14
47:4 66:23 88:1 126:12
answered [1] 37:14
answering [4] 28:1 32:11
63:15 87:17
answers [2] 38:17 39:9
Antiterrorism [4] 73:9 80:
17 81:6 85:8
antitrust [4] 86:4 88:13,19
104:20
anybody [9] 9:24 24:18 61:
2 122:5 153:10
anytime [2] 60:24 76:7
apart [1] 6:6
app [1] 41:19
appeals [2] 53:23 54:18
appear [4] 103:25 108:4
118:22,23
APPEARANCES [1] 1:17
appears [2] 139:8 159:12
appendix [2] 52:15
applicable [5] 77:20 78:5
87:19 97:16 118:10
applicants [1] 77:4,11,12
application [3] 5:12 7:10,
17
applied [2] 101:11 151:14
applies [11] 4:13 7:20 9:19,
20 12:23 13:9 74:13 123:
23 130:5 159:13 163:7
apply [15] 4:6 13:7 31:4 46:
11 48:14 52:9,23 71:5 130:
14 137:2,5,12 145:21 152:
9 163:6
applying [1] 81:1
appreciate [2] 44:25 76:3
appropriate [4] 101:14
152:8,9,20
area [1] 46:3
areas [2] 88:23,25
aren't [5] 13:1 24:13 30:24
57:5 146:12
argue [1] 18:2
arguing [1] 15:24 20:9,11,
15 31:2 35:2 69:15,18 73:
7 92:2 121:10
argument [31] 1:14 2:2,5,9,
12 3:4,7 12:6 15:22 34:2

35:2 49:10 61:5,13 63:4,6
64:6 65:7 69:5 70:10 76:
14 80:11 92:6 99:21 100:2,
22 114:7 130:4 144:5 158:
15 161:1
**arguments** [2] 65:4 123:2
**arise** [1] 4:1
**arising** [1] 64:7
**around** [7] 15:22 46:17 90:
12 115:4 145:13 155:20
159:2
**arranging** [1] 101:24
**article** [1] 107:23
**articles** [3] 107:19,20,23
**articulate** [2] 66:8 68:9
**artificial** [6] 49:13,15 50:6
73:19 74:5 101:4
**Asian** [1] 41:22
**aspect** [2] 101:18 107:4
**aspects** [1] 87:23
**assert** [1] 15:9
**asserts** [1] 15:14
**assess** [1] 82:19
**assessment** [1] 83:11
**Assume** [3] 38:14 40:8 49:
20 83:1,2 96:6,8
**assuming** [2] 18:2 77:19
**assumption** [1] 155:15
**ATA** [4] 85:15,22 94:16 99:
10
**attempt** [2] 106:13,14
**attempts** [1] 113:21
**attention** [1] 161:23
**attractive** [1] 125:7
**audience** [1] 132:18
**authentically** [1] 83:15
**Auto-play** [1] 161:18
**automated** [1] 10:23
**automatic** [1] 60:22
**automatically** [5] 23:21
25:11 30:4 36:19 138:16
**automobile** [1] 93:4
**available** [1] 128:24
**aware** [1] 160:3

**B**

**back** [21] 10:18 15:20 24:
12 30:22 43:1 47:8 53:18
54:3,16 57:21 62:18 64:20
84:19 102:8 106:21 112:
14 113:12 126:25 142:13
154:20 162:7
**backdrop** [1] 68:2
**background** [1] 65:6
**bad** [5] 82:18 132:22 140:
16 152:23 156:20
**banner** [1] 110:24
**barred** [1] 144:9
**Barrett** [41] 57:19,20 58:4,
8,21 59:15,24 60:3,7 61:3,
10,18 62:1,8,14,23 63:10,
16,22,25 83:22 84:6,7,25
85:17 106:19,20 107:6,13
108:17 109:11 110:5 129:

23 140:4 141:3,17 142:8,
12,22 144:18 154:9
**bars** [3] 111:18,19 145:11
**based** [34] 3:14,24 4:7 6:23
15:5,14 35:5 71:10 72:3
78:6 79:19 81:8 84:15 91:
11 92:20 102:10 104:4
114:22 115:24 120:5 121:
1 129:16 133:1,17,21 141:
2,13,13,24 143:20 144:9
145:23 147:22,23
**basic** [2] 56:5 117:13
**basically** [11] 12:10 73:5
83:18 88:5 103:13 107:9
116:17 125:5,12,13 152:14
**basing** [3] 6:22 35:7 148:2
**basis** [8] 72:16,18 88:4 110:
2,4 135:11 139:21 158:19
**bear** [1] 134:8
**become** [2] 24:11 48:24
**becomes** [3] 49:21 104:14
105:9
**begin** [1] 70:15
**beginning** [1] 80:12
**begs** [1] 101:6
**behalf** [4] 1:19,24 2:4,11,
14 3:8 114:8 161:2
**behavior** [1] 113:24
**behind** [1] 23:7
**believe** [3] 38:17,20 91:7
**believes** [1] 85:9
**below** [2] 39:19 84:18
**benign** [3] 12:19 14:25 15:
3
**best** [3] 9:18 23:10 48:12
**better** [2] 36:14 82:10
**between** [24] 3:12 16:15
22:17 40:18,22 41:18 43:9
56:12,16,20 71:14 73:13
75:3 85:4 100:4 109:19
110:10 121:22 130:8 139:
21 141:12 142:16,18 149:
25
**beyond** [4] 24:2 49:5,9,17
93:16 100:24 108:11 116:
10,12 121:24
**biased** [3] 128:4 149:8 153:
22
**big** [4] 71:20 80:16 148:20
159:23
**bigger** [1] 82:8
**billion** [3] 45:4 119:20 147:
17,18
**billions** [4] 78:17 144:16,
16,16
**bit** [5] 15:21 45:16 78:4 80:
11 84:1 86:11 163:1
**black** [6] 41:22 77:12 140:7
142:1,2 162:15
**blanket** [1] 60:19
**BLATT** [76] 1:24 2:10 36:
15 50:16 76:17 111:5 114:
6,7,9 116:7,11 118:11 119:
5 120:19 121:19 122:21

124:6 126:4,5,15 127:2,8,
21 128:10 129:5 130:6,15,
18,22 131:3 132:7,11 134:
5,10,13 135:2 136:3 137:
21 138:24 140:4,10 141:7,
23 142:11,21,23 144:21
146:6,8,11 147:3 148:18
149:22 150:13 151:6,15
152:11,21 153:20 154:4,6,
17,25 155:3,13 156:1,4,13,
16 157:10,17,19 158:18
159:5,14 160:8
**Blatt's** [2] 45:23 108:22
**block** [4] 16:2,9 18:19,22
65:2,10,17 66:2 92:17 93:
13 110:16,18 111:1 121:13
**blocked** [1] 18:12
**blocking** [6] 18:4 68:12
124:4 134:16,19 137:25
**blurb** [2] 86:25 87:3
**board** [2] 5:16,20
**Bob** [1] 161:13
**body** [2] 54:16,23
**book** [20] 26:4,6 57:7 60:13
70:22,25 71:1,2,6,6,7,19,
20 72:6,11 88:2 91:22 128:
2,3 130:10
**books** [10] 26:4,8 29:11,13,
13,22 70:21 71:1 72:8 73:
1
**bookseller** [1] 26:7
**bookstore** [3] 29:10 128:1,
2
**boost** [1] 88:15
**borderline** [1] 78:3
**both** [5] 58:8 85:6,7 123:13,
13
**box** [5] 39:9 112:18 154:23
156:7 161:25
**boy** [1] 45:25
**break** [1] 19:9
**brief** [15] 11:5,5 15:24 31:
15 51:5 64:24 65:4 68:9
76:18 95:17 107:7 144:1,1
145:5 148:2
**Briefly** [1] 48:11
**briefs** [12] 4:22 55:5,10 56:
11 62:25 69:13 87:1 125:9
129:14 150:15 156:23 159:
25
**bring** [1] 53:4
**brings** [1] 112:18
**broad** [2] 53:22 88:22
**broadcast** [1] 132:16
**broadcasting** [3] 114:21
132:3 154:18
**broaden** [1] 47:9
**broader** [1] 37:11
**broadly** [1] 59:5
**brought** [2] 65:14 86:8
**built** [1] 126:13
**bulk** [1] 150:6
**bunch** [4] 10:20 28:12,17
141:8

**burden** [1] 82:11
**business** [2] 35:11 159:25
**buy** [2] 17:21 133:20

**C**

**c)(1** [22] 38:2,3 68:10,15 91:
7,8 102:2,3,19 114:12,18
115:4,8,9 123:3 124:11,14
137:1,3,12 138:16 149:25
**c)(2** [10] 68:15,21 124:11,
12,14,17 136:17 137:2,5
138:17
**cahoots** [1] 24:17
**call** [17] 20:16 27:1,1 31:9,
10 54:22 75:1 83:16 104:
17 111:12 113:7,15 114:23
119:22 139:5 141:1 162:
24
**called** [6] 31:22,23 113:7
118:13 119:1 133:6
**came** [3] 1:13 77:8
**candidates** [1] 52:17
**cannot** [2] 137:21 159:11
**cards** [1] 10:20
**care** [2] 156:21 159:22
**carefully** [1] 71:14
**carry** [1] 88:12
**cartoon-like** [1] 125:18
**cartoons** [1] 162:1
**carve** [1] 132:12
**carves** [1] 48:23
**Case** [56] 3:4 4:22 5:13 7:8
15:4 17:14,17 20:18,22 21:
13 28:12,15 33:10 47:20
50:9 54:25 57:23,25 58:3,
4,5,5,14,17,19 62:25 64:11
66:3 69:3 75:1,21 76:5 80:
10,25 82:18,23 83:17 90:
21,23 97:1 101:13 107:14,
25 108:3 109:18 110:22
113:3 127:12 130:7 133:
11 138:5 143:16 144:3
153:24 163:21,22
**cases** [8] 7:22 46:17 71:13
78:3,3 79:16 85:6 145:19
**cat** [4] 28:7,9,12 81:3
**catalogue** [5] 29:9,12,22,
24 51:7
**category** [1] 32:9
**cats** [1] 81:5
**causal** [1] 99:8
**causation** [1] 94:17
**cause** [14] 15:5,9,11,13,14
55:6 57:6 72:22 78:8 88:8
94:19 95:1 108:15 123:20
**caused** [1] 144:3
**causes** [3] 86:14 103:25
123:13
**cautionary** [1] 161:7
**celebrate** [1] 142:1
**Center** [1] 133:2
**Century** [1] 27:22
**cert** [1] 85:6
**certain** [12] 9:11 42:17,18,

21 46:18 66:25 76:1 104:
13 110:14 112:11 131:9
146:3
**Certainly** [7] 43:11 81:14
84:23 88:23 147:9 153:14
161:19
**cetera** [3] 94:18 101:24
140:8
**challenge** [2] 53:25 56:5
**change** [2] 10:24 82:12
**changed** [1] 79:5
**channel** [7] 120:12,13,14,
16 130:11 132:16,17
**channels** [1] 147:22
**characterization** [1] 82:
22
**characterized** [1] 161:11
**characterizing** [2] 66:12
162:20
**charming** [1] 161:25
**chat** [2] 20:13 47:10
**cheapest** [1] 11:7
**check** [3] 61:7,22 109:13
**checkmarks** [1] 117:11
**chef** [1] 90:12
**CHIEF** [45] 3:3,9 8:6 25:24
26:15,25 27:10,14 28:11
29:19,25 33:25 37:15 42:8
47:16 51:17 57:18 64:1 70:
7,13,23 78:12 79:11 85:18
86:20 87:6 88:21 89:10 90:
1 96:4 98:7 99:17 102:24
106:18 110:6 114:3,6,9
117:19 118:21 149:16 154:
7 160:23 161:3 163:19
**Chief's** [1] 82:9
**Chiefs** [25] 52:25 74:1,6,8
75:3,11,22 76:24 78:6 79:
10,12,14 97:24 104:19 108:
6 109:21 110:1 112:1 115:
10,14 128:4 129:2 132:3,
23 142:19
**choices** [27] 71:25 72:1 73:
15 75:7,8,18,21,25 76:9,22
77:15 79:4 82:25 84:5 93:
23 97:21 98:15 108:5 110:
3 123:1 129:15 130:8 142:
14 147:17 159:9 160:7,11
**choose** [2] 100:15 115:19
**chooses** [1] 51:25
**choosing** [9] 47:24 48:3,
18 49:1,5,18 50:2 100:10
150:5
**chosen** [1] 162:4
**chronological** [1] 158:1
**Circuit** [16] 3:21 17:16 50:8
90:23 99:23 101:11 127:
11 142:24,25 143:15,15,23
144:20 150:22 151:13 152:
24
**Circuit's** [8] 49:11 50:3
127:13 145:3 152:7,12,19,
24
**circulated** [1] 86:25

**circulating** [2] 88:9 89:23
**circumstances** [11] 4:9 13:1 14:18 32:15 50:5 57:15 74:14 79:5 89:15 103:11 112:2
**circumvent** [1] 115:8
**civil** [1] 94:3
**civilly** [1] 90:17
**claim** [63] 3:24 4:7 5:11 6:6 8:4 9:1,3,5,9 16:7,7,12,20, 25 17:4,6 18:8,18 20:4,6 25:16,21 33:8,17 34:8 42:5 63:8 64:13 65:8,8,11 66:2 71:11 73:8 84:14,21 88:14,18 110:17 114:18,20 116:22 117:21 120:23 123:23 126:13 127:23 128:11, 11,12,18,21 131:16 140:11 144:9 145:21 155:6 158:12 160:4,9,10,12,13
**claiming** [2] 20:14 21:13
**claims** [8] 3:12,14,18 57:12 65:17 98:9 142:5 160:17
**clarify** [2] 85:7 144:18
**clarity** [1] 119:17
**class** [1] 148:23
**Clause** [1] 106:9
**clean** [1] 135:17
**cleaner** [1] 38:24
**cleaning** [1] 124:16
**clear** [8] 5:10 18:17 55:11 64:22 78:5 82:4 96:7 101:23
**clearer** [1] 5:23
**clearly** [3] 6:5 21:22 84:2
**clerks** [1] 10:19
**click** [8] 6:15 23:20 30:9,10, 14,16 43:20 44:1
**clicked** [2] 23:13 44:5
**clients** [1] 118:24
**close** [3] 51:4 55:10 83:16
**closely** [2] 67:8 90:22
**closing** [1] 163:3
**code** [1] 119:10
**collapse** [2] 148:13 149:15
**colleague's** [1] 161:5
**colleagues** [1] 97:4
**colloquial** [1] 153:4
**colloquy** [1] 73:3
**collusion** [3] 40:16,20 126:19
**come** [4] 30:22 46:21 54:22 98:25
**comes** [9] 14:25 26:5 31:8 39:17,18 41:19 43:1 144:10 151:13
**coming** [3] 64:19 116:24 145:17
**comment** [2] 30:8 89:24
**commentary** [1] 87:8
**Commerce** [1] 106:8
**commit** [1] 86:23
**common** [12] 3:20 88:1 89:21 90:2 91:5 96:20 103:10

**109:**10 112:25 119:6 121:2 144:23
**communicable** [1] 90:13
**communicate** [1] 114:16
**communicating** [2] 114:15 154:17
**community** [2] 131:9,10
**companies** [4] 32:17 46:25 106:7 113:4
**company** [2] 3:13 99:24
**company's** [1] 3:14
**competition** [1] 45:5
**competitor** [2] 88:17 90:8
**compilation** [2] 51:8,10
**complain** [1] 142:3
**complaining** [1] 42:13
**complaint** [34] 19:10 21:22 22:18,22,23,25 28:13 38:19 57:22,23,24 58:2,18 73:5,6 77:21,24 85:1,3 97:1 127:14,19 128:23 139:9 146:13,16 151:6,9 152:15, 16,23 153:2,7,16
**complaints** [2] 91:1 153:15
**complete** [2] 141:10,24
**completely** [3] 34:2 90:15 131:21
**complex** [1] 70:5
**complicated** [1] 28:8
**components** [1] 70:3
**CompuServe** [1] 53:10
**computer** [24] 4:15,16,18 24:2,6 33:19 37:21 39:24 40:23 51:24 52:3,12,16 53:5 59:14,18 66:21 69:24 100:5,12 102:1 105:11 123:5 150:1 151:3 162:23
**computers** [2] 18:20 33:20
**concede** [1] 58:12
**conceivable** [1] 75:11
**conceivably** [1] 72:10
**conceiving** [1] 66:6
**concepts** [1] 64:8
**conceptually** [1] 135:25
**concern** [5] 15:3 45:11 77:1 134:6 136:15
**concerned** [9] 26:20 30:11 86:12 98:23 112:5 113:17 122:21 153:22 155:18
**concerns** [2] 54:9,9
**concession** [1] 144:7
**conclude** [1] 162:10
**concludes** [1] 3:23
**conduct** [23] 3:15 4:20 7:25 9:10 16:1 33:24 45:14 67:1 68:13,18 80:3 81:20 104:18,24 110:11,14,15,16 121:14 128:14 140:25 141:1 145:25
**configured** [1] 88:15
**conflating** [2] 64:9,21
**confused** [3] 34:2 64:4 72:

6
**confusion** [2] 64:6 67:20
**Congress** [36] 46:6,7,22 47:9 53:1,21 54:9 62:20 68:11 79:5,10,12,13 82:11, 11 89:2,4 91:25 108:8,9 110:13 111:22 112:24 115:14 121:6 122:21 125:20 126:3 134:17,25 135:9,14 137:16,19 139:23 156:18
**Congress's** [2] 52:25 112:15 115:10
**connection** [1] 143:6
**consensus** [1] 54:1
**consequence** [1] 71:18
**consider** [3] 50:9 82:12 131:1
**consistent** [2] 54:17 136:1
**constitute** [2] 13:21 41:2
**construed** [1] 92:9
**consumers** [1] 54:7
**contain** [1] 152:4
**content** [176] 3:13,19,25 4:1,4,5,8,10 6:20 8:9 9:3 11:10 12:1,3,4 13:8 14:23 15:6 16:3,9,9,16 17:2,5 21:19, 21 23:12 28:25 29:2,15,17, 21 33:13 34:24,24,25 35:5 36:9,10 37:23 39:5 44:11 47:25 48:3,4,19,24 49:1,6, 14,17,19,25 50:7 51:14,25 56:13,23 59:3,25 61:6,24 62:1,2,13 63:5,12,13 64:20 65:3,10 66:18 69:19,21 70:22 71:15,16,20 72:3 73:14, 20 74:17 75:18,20,22 76:7 77:15,22 78:1 80:1 82:7 84:4 86:19 87:17,21,23 89:9,17 92:18 95:24 100:6,10, 19,24,25 101:1,3,13 102:5, 13,14,17,22 103:25 104:10, 11,13 105:17 106:2,16 107:1,9,18 108:10,24 110:17, 25 112:22 115:2 116:19,20 118:4 121:14 124:2,20,23 125:3,23 127:17 128:18,22 129:10,11,16 130:8 131:12, 15 132:13 134:2 136:7 139:8,15,15 140:13,21 141:5 142:18 145:18 146:5 147:6,21 150:2,6,9,10 151:2,18,20 153:4,6 154:1,16 156:9 157:6 159:9,18
**content's** [1] 66:18
**content-neutral** [1] 131:2
**contention** [6] 17:23 23:14 24:5 36:16 66:8,10
**contents** [3] 71:6 73:1 92:5
**context** [10] 33:5 48:6,7 53:8 62:17 79:1 116:4 120:22 124:3 150:8
**contexts** [1] 27:24
**continually** [1] 53:20

**continue** [3] 44:23 47:3 93:20
**continuum** [4] 116:14,15 117:3 155:4
**contribute** [1] 143:20
**conversation** [1] 62:18
**convey** [1] 4:11
**conveying** [1] 159:19
**conveys** [5] 60:11 115:1,6 158:21 159:1
**cooking** [5] 5:15,25 6:1,25 7:3
**Copyright** [1] 51:9
**copyrightable** [1] 51:11
**core** [3] 110:11 117:15 142:6
**correct** [23] 7:15 19:18 20:9,10 38:2,3 39:21 41:25 50:22 62:17 63:6 96:18 103:5,14 104:15 109:16 122:24 127:8 131:3 144:22 145:2 150:14 151:11
**correctly** [2] 3:21 145:20
**cost** [1] 50:18
**costs** [1] 45:14
**coterminous** [1] 136:16
**couldn't** [1] 149:9
**counsel** [7] 25:25 70:8 85:19 114:4 149:17 160:24 163:20
**count** [1] 59:18
**countless** [2] 10:3 116:1
**country** [2] 55:7 78:16
**County** [3] 162:12,16,18
**couple** [6] 7:21 55:9 56:10 69:16 76:12 136:3
**course** [4] 85:16 87:23 89:7 151:9
**COURT** [29] 1:1,14 3:10 4:17,23 5:4 30:24 45:10,18 46:7,11 55:11,14 70:14 71:12 78:9 82:4 84:4,12,16,17,18 85:5,9 114:10 138:5 143:7 161:4 163:13
**Court's** [3] 5:8 72:4 74:22
**courts** [9] 5:2 7:21 53:23 54:17 65:1 68:1 82:24 121:8 145:20
**cover** [2] 62:21 138:21
**covered** [16] 16:5 17:7 18:3 67:3 139:11 155:2 156:14,15 157:16,18 158:10,19 160:21
**covers** [3] 16:25 18:4 134:6
**crafting** [1] 138:3
**crash** [1] 54:6
**crazy** [1] 120:17
**create** [11] 12:2 20:12 34:14 40:23 41:20 51:6,7,13 54:4 59:3 69:19 76:2 89:4 97:10 162:19
**created** [20] 3:13 4:8 6:20 21:10 29:10,14,17 34:24

**35:**13 38:9,24 59:24 61:25 62:2 66:18 93:7 102:12 114:11 150:16,18
**creates** [3] 62:6 90:11 107:1
**creating** [11] 24:14 61:6 63:12 64:20 73:20 76:6 97:11 98:13 107:11 135:21 162:9
**creation** [3] 34:14 40:17 62:2
**credit** [2] 143:19,20
**criminal** [2] 126:18 137:6
**criteria** [6] 77:17,25 78:4,10 130:1 141:13
**criterion** [1] 102:17
**critical** [1] 107:20
**crushing** [1] 149:6
**curiae** [3] 1:22 2:8 70:11
**cuts** [1] 122:4

---

## D

**D.C** [3] 1:10,21,24
**damages** [1] 56:19
**danger** [1] 117:1
**date** [1] 141:16
**dating** [6] 41:19 97:10 116:3 140:5 141:4,12
**day** [7] 57:2 78:16,18 88:12 119:20 147:19 148:11
**days** [1] 151:25
**dead** [2] 123:18 159:17
**deal** [4] 59:8 71:21 130:9 163:15
**dealing** [2] 125:23 136:17
**dear** [1] 159:1
**death** [1] 122:3
**decide** [6] 77:25 102:17 105:17 128:1 132:20
**decided** [2] 58:15 97:19
**decides** [1] 112:22
**deciding** [1] 147:6
**decision** [10] 3:21 5:1 54:25,25 75:12 85:11 111:18, 20 157:4 163:11
**decisions** [10] 54:24 56:11 73:20,22 76:14,18 78:15 109:23 113:11 148:11
**decline** [1] 5:4
**deeper** [2] 121:23 136:14, 15
**defamation** [22] 12:14 46:17 60:20 86:1,15,21,23 87:18 88:4 90:21 95:5,14,16, 22 96:14 119:6 123:17,19 128:12 136:19 160:4,9
**defamatory** [32] 12:3,21 13:6 43:21 44:6 57:8 59:14 60:25 78:23 81:17 87:21,23 88:3 89:17,25 90:3,7, 7,14 91:18 95:11 96:18 128:7,24 130:2,24 131:24 132:1,3 136:5,6 145:18 148:16

**defame** [1] 119:12
**defeat** [1] 52:6
**defeats** [2] 124:15 125:4
**defective** [2] 16:8 18:4
**defendant** [13] 3:18,25 4:7,
8,12,14 6:20 10:14 39:18
66:19 69:23 162:21,24
**defendant's** [3] 12:22 66:
16,20
**defending** [2] 153:18,20
**defense** [12] 4:6 7:19,23
12:23 13:6,7 15:17 23:25
41:9,15 58:16 64:13
**defies** [1] 116:5
**defines** [1] 47:22
**definitely** [1] 133:24
**definition** [6] 5:2 51:23 52:
22 101:19,25 105:10
**degree** [1] 119:6
**delineates** [1] 52:22
**delivering** [1] 24:3
**deluge** [1] 149:1
**Democracy** [1] 133:2
**Department** [1] 1:21
**depend** [4] 44:14 72:15 97:
16 112:9
**depending** [1] 30:19
**depends** [4] 38:4,21 95:16
156:16
**deprive** [1] 72:1
**Deputy** [1] 1:20
**describe** [6] 22:18 32:12
41:8 72:11 77:15 150:7
**described** [6] 66:10 70:4,
24 72:25 97:21 103:12
**describes** [1] 87:2
**describing** [1] 95:12
**design** [2] 82:25 160:11
**designed** [4] 111:18 126:8
127:5 151:25
**desirable** [2] 46:22 47:6
**desktop** [1] 161:24
**destabilizing** [1] 155:19
**destroyed** [1] 148:14
**detail** [2] 22:19 85:1
**determine** [1] 121:1
**determining** [1] 78:9
**developed** [4] 67:21 133:5
150:17,19
**devised** [1] 46:25
**devises** [1] 47:5
**devoted** [1] 131:8
**differ** [1] 57:2
**difference** [9] 8:7 43:9 56:
19 85:4 107:14 109:19
110:10 112:3 113:10
**different** [42] 5:14 7:7,13 8:
17 10:18 11:13 14:8 17:6
18:1 23:19,25 26:13 32:15,
21 33:23 40:3 48:6,25 55:
12 57:13 64:8,14 88:22 92:
6 93:6 95:24 108:23 111:
13 112:21 113:8,16 117:8,
16 120:5 121:6 122:16

**131**:20,21 133:24 139:22
140:13 141:8
**differently** [1] 113:16
**difficult** [3] 21:9 73:17 109:
3
**difficulty** [1] 46:2
**digest** [1] 100:16
**digesting** [4] 47:25 48:3,
19 49:1,6,18 100:10 150:6
**digital** [1] 54:6
**diminish** [1] 88:16
**direct** [4] 10:15 68:1 74:10
106:1
**directed** [3] 110:14 121:18
123:11
**directly** [3] 28:22 40:13
118:10
**directs** [2] 86:17 124:18
**disagree** [7] 59:16 61:18
101:18 105:19 132:25 135:
9 158:5
**disagreed** [2] 107:5,6
**disagreeing** [1] 152:18
**discriminate** [1] 41:23
**discriminated** [1] 41:5
**discriminates** [1] 40:24
41:21 97:11 102:10
**discriminating** [1] 41:25
**discrimination** [6] 41:18
76:20 86:1 140:6,12,20
**discriminatory** [1] 152:5
**discussed** [1] 152:10
**discussion** [3] 42:13 86:2
**disease** [1] 90:13
**disincentivize** [1] 68:12
**disincentivized** [1] 121:
13
**diskettes** [1] 53:12
**dislocation** [2] 54:5 55:7
**dismiss** [4] 58:14,17 97:20
163:14
**dismissal** [1] 71:10
**dismissed** [2] 75:14 98:3
**disparate** [1] 140:11
**display** [3] 13:11 110:24
147:6
**displayed** [3] 13:8 147:7
154:18
**displaying** [5] 6:8 13:13
29:2 34:10 153:9
**displays** [4] 6:11,12 34:20
119:21
**disproportionately** [1] 77:
11
**dispute** [1] 121:21
**disregarding** [1] 7:22
**disseminating** [3] 3:25
139:1,2
**dissemination** [3] 137:18
144:8 155:15
**distinct** [5] 51:10 119:8
158:21,22 159:1
**distinction** [20] 3:15 8:25
9:16 17:10,13 18:18 42:2

**56**:16 69:10 73:12 100:4
111:4 130:8 131:15 140:
22 142:16,17 149:25 150:4,
17
**distinguish** [4] 16:15 22:
16 71:14 141:11
**distinguishes** [1] 3:11
**distinguishing** [2] 56:12
139:21
**distress** [4] 86:3 88:7,9
123:21
**distributing** [1] 91:17
**distributor** [2] 91:15,21
103:2,9
**district** [1] 163:13
**diversity** [1] 140:1
**docket** [2] 74:23 75:1
**document** [1] 44:8
**Doe** [4] 43:19 44:8,9 60:14,
15
**doing** [4] 19:10 25:11
15 22:5 25:5 29:7 34:9 40:
13 42:21 55:16 60:23 65:
12 66:5 67:2,6 91:2 108:
23 110:23 111:7 128:4
135:16 138:23 145:7 162:
25
**done** [7] 12:8 18:17 28:23
92:4 93:18 94:22 120:24
**doubt** [1] 109:9
**doubtless** [1] 6:12
**down** [30] 10:9 17:3 19:9
60:23 71:13 81:12 90:16
92:3,23 93:11 99:14 111:3,
15,24 120:9 124:18 125:3,
11,12 131:13 135:16,20
137:15 138:7,8,12,18 144:
23 148:16 158:14
**download** [1] 38:1
**dozens** [1] 32:18
**drafted** [1] 53:22
**draw** [8] 8:25 17:13 40:18
54:16 96:25 109:10
**drawing** [5] 14:9 18:18 46:
2 69:9 161:23
**drawn** [1] 3:15
**drew** [1] 46:17
**drilling** [1] 111:3
**due** [1] 80:19
**Dyroff** [2] 17:14 54:25

---

### E

**e-mail** [11] 17:14,18 23:16
24:11 26:13 40:3 59:12 60:
15,17,25 61:16
**e-mails** [1] 33:23
**each** [9] 3:15 7:18 31:3 63:
8 67:15,16 120:23 121:1
147:19
**earlier** [9] 30:22 40:12 53:
19 62:18 73:4 97:9,22 112:
6 149:24
**early** [1] 90:23
**earthquake** [1] 148:6

**easily** [2] 98:3 136:22
**easy** [2] 28:12 127:12
**economic** [2] 54:5 55:6
**economy** [2] 54:6 55:4
**edge** [1] 83:15
**editing** [2] 154:15,16
**editorial** [3] 63:4 100:18
158:8
**effect** [3] 96:23 104:4,6
**effects** [1] 54:7
**eight** [1] 55:1
**either** [10] 68:21 69:14 72:
24 107:10 109:15 113:24
126:22 127:7 145:23 153:
18
**election** [1] 148:9
**element** [8] 23:25 52:10 63:
8 123:9 137:9,10
**elements** [13] 3:23 7:19 25:
15,21 31:4 42:5 51:11 67:
16,19,23 68:6 69:11 88:11
94:7,15,17,20 98:22
**elevated** [1] 129:10
**elevating** [2] 131:5 148:6
**eliminating** [1] 123:12
**else's** [1] 90:3
**embedded** [3] 30:23 39:17
146:18
**emoji** [1] 156:25
**emojis** [1] 117:8
**emotional** [4] 86:3 88:6,9
123:21
**emphasize** [1] 74:12
**employee** [1] 143:22
**employees** [2] 76:16 102:
15
**employers** [1] 77:5
**employment** [3] 76:14,18
78:15
**enacted** [1] 122:22
**encourage** [6] 6:15 9:12
10:16 16:17,21 23:12
**encouragement** [1] 9:2
**encouraging** [6] 9:6 14:6
15:10 17:5 18:25 31:6
**end** [3] 57:2 60:24 162:8
**endemic** [1] 9:23
**endorsement** [4] 116:9,19
155:5 156:17
**endorsements** [1] 117:6
**engage** [1] 14:6
**engine** [10] 10:1 42:25 43:
12,18 44:18 88:14 97:10,
12,21,25 98:14 136:15
**engines** [13] 43:14,15 49:7
105:16 115:23 119:24 129:
12 134:1 139:10,11,21 147:
4 148:1
**enlist** [1] 99:6
**enormous** [1] 79:4
**enough** [4] 60:2,4 94:25
142:4
**ensures** [1] 41:18
**enter** [1] 120:4

**entertaining** [1] 135:4
**entities** [1] 4:15
**entitled** [2] 58:18 102:2
**entity** [8] 42:16 51:10 59:9,
10,16 63:2 91:4 101:20
**equality** [1] 131:7
**equate** [1] 104:7
**equipped** [1] 54:13
**equivalent** [1] 116:16
**ERIC** [5] 1:18 2:3,13 3:7
161:1
**especially** [2] 82:4 113:20
**ESQ** [4] 2:3,6,10,13
**ESQUIRE** [2] 1:18,24
**essence** [1] 52:6
**essentially** [3] 10:6 42:16
93:18
**establish** [2] 58:20 98:21
**established** [1] 88:24
**ET** [4] 1:3 94:18 101:24 140:
8
**ethnic** [1] 131:10
**Europe** [1] 148:23
**European** [1] 45:3
**euros** [1] 45:4
**even** [39] 14:20 18:2 24:8
31:11 44:17 48:19 49:7,14
50:5 51:11 58:10 74:13 77:
13 82:4 86:15,22 89:5 91:
15 100:10,17,17 101:9,23
107:10 111:11 115:11 126:
9 134:2 135:25 139:2 141:
9,10 151:1,22,23 152:4
153:8,9,11
**event** [1] 56:1
**everybody** [5] 9:17 36:16
40:15 113:13 122:20
**everyone** [1] 149:8
**everything** [6] 10:4 38:7
39:8 46:21 125:6,11
**everywhere** [2] 105:6,15
**evident** [1] 85:11
**exact** [4] 143:24,24 145:4,5
**exactly** [12] 5:24 19:20 41:
4 75:2 86:6 90:21 99:16,
16 134:25 150:20 156:1
163:16
**example** [27] 5:23 11:6 12:
13 38:24 40:12 41:19 44:
15 47:14 59:10 72:17 97:9
101:4 116:8 120:2 122:8
128:1,17,17 129:8,19,25
131:25 132:15 134:22 140:
17 143:2 144:3
**examples** [1] 152:1
**excellent** [1] 128:17
**except** [2] 126:15 127:10
**excepted** [1] 126:19
**exception** [1] 126:18
**exceptions** [2] 124:9 137:
1,3
**excessively** [1] 132:16
**exclusively** [2] 39:14 73:1
**excuse** [2] 12:23 91:11

Official - Subject to Final Review

**exemption** [1] 60:19
**exist** [4] 46:15 62:19 79:7
  111:8
**existed** [1] 98:14
**existential** [1] 115:22
**existing** [2] 82:23 83:17
**expansive** [1] 161:9
**experts** [1] 45:20
**explain** [6] 6:5 32:5 48:10
  52:9 80:7 145:8
**explicit** [4] 87:13 95:6 132:
  21,21
**exponentially** [1] 134:4
**exposed** [1] 78:24
**Exposing** [1] 115:8
**express** [9] 55:20,23 94:1
  103:21 116:13 117:2,3
  139:6 157:12
**expressed** [2] 32:2 94:8
**expressing** [1] 117:16
**extend** [1] 12:7
**extends** [1] 134:22
**extent** [11] 18:8 29:5 64:19
  65:11 67:1 82:23 120:20
  121:15 138:5,17 162:22
**external** [1] 123:9
**extraordinarily** [3] 75:5
  93:2 161:9
**extreme** [5] 38:14 39:3 40:
  20 113:23 116:18

---

**F**

**f)(2** [3] 52:13,14,15
**f)(3** [1] 48:23
**f)(4** [6] 48:14 52:11,22 53:
  14 163:4,6
**face** [4] 12:18,18 20:20,23
**Facebook** [5] 21:2,3,5 42:
  15,17
**fact** [17] 7:16 11:12 33:18
  44:2 46:3 62:4 71:25 76:
  21 80:25 88:10 91:17 94:
  10 96:1 108:4 113:6 146:
  22,25
**facts** [2] 45:2 97:25
**failed** [2] 17:3 19:13
**failing** [7] 65:2,9,17 66:2
  92:22 111:1,23
**failure** [9] 16:2 18:22 71:11
  92:3,17 93:13 110:15 137:
  15 143:21
**Fair** [4] 60:3 101:15 161:21
  163:12
**fairly** [5] 14:25 15:11 22:19
  116:22 119:1
**faith** [1] 134:19
**fake** [1] 90:11
**fall** [5] 41:8 42:4 51:15 66:
  12 101:25
**falling** [1] 45:24
**falls** [4] 4:20 28:23 80:3
  103:9
**false** [2] 90:15 148:17
**familiar** [1] 22:19

**family** [2] 93:3 157:9
**famous** [2] 74:16 133:20
**far** [9] 19:6 21:11 24:22 30:
  11 32:15 38:20 91:25 117:
  21 132:10
**fare** [1] 11:7
**fashion** [2] 5:2 54:10
**fate** [1] 144:4
**fault** [2] 127:11,13
**faulted** [1] 127:18
**feature** [10] 21:24 23:18 24:
  15 114:24 133:20 148:10
  155:8 156:19 157:12,13
**featured** [4] 154:23,23 155:
  5 156:1,6 160:14,15 161:
  16 162:1
**features** [4] 115:8 116:13
  117:13 134:1
**featuring** [2] 141:22 148:7
**February** [1] 1:11
**federal** [3] 97:17 137:1,6
**FedEx** [3] 59:11,11,13
**feed** [3] 42:18,19,23
**feel** [2] 24:21 121:20
**feeling** [1] 64:7
**few** [6] 46:23 49:23 57:12
  105:25 137:9
**fighting** [1] 142:9
**figuratively** [1] 125:14
**figure** [4] 9:18 26:16 144:
  13 146:14
**figured** [1] 10:21
**file** [1] 10:20
**filters** [1] 51:24
**filth** [2] 125:5 138:4
**final** [2] 36:13 74:24
**financer** [1] 143:13
**find** [8] 21:9 24:19 39:15,21,
  24 59:14 74:25 115:21
**finding** [1] 46:5
**findings** [2] 125:22 139:25
**finds** [1] 81:19
**fine** [3] 19:7 45:3 83:7
**finish** [2] 11:3 83:23
**firm** [1] 110:13
**firms** [1] 102:15
**First** [25] 3:17 43:3,24 44:4
  48:2 52:20 55:9 69:16 76:
  12 83:4 94:10 98:11 100:
  19 103:1 106:10 107:22
  115:20 121:20,25 125:2
  127:1 136:11 139:15 157:
  13 159:10
**fit** [10] 9:10 27:4 43:16 47:1,
  7,12 67:7 68:6 78:25 90:
  21
**fits** [1] 47:20
**fives** [1] 117:11
**flip** [1] 150:3
**Florida** [1] 17:21
**flourish** [1] 125:24
**flourishing** [1] 140:2
**flow** [1] 140:24
**flowing** [1] 128:13 146:25

**155:**7
**flows** [1] 114:17
**focus** [5] 5:7 8:8 11:21:
  21 53:20 56:2 114:21
**focused** [6] 8:18 84:2 85:
  22 89:7 135:10,21
**focuses** [2] 66:25 72:25
**focusing** [6] 21:17 33:11,
  17 63:1,3,5 103:16 158:7
**follow** [2] 14:23 103:1
**following** [1] 103:17
**football** [4] 120:3,3,4,8
**forbids** [1] 114:12
**Force** [2] 55:1 162:21
**forced** [1] 70:1
**forgot** [1] 146:11
**form** [2] 15:11 100:19
**forms** [3] 49:13 50:7 123:
  12
**forth** [3] 36:3 90:13 106:22
**forward** [1] 73:12
**found** [2] 74:25 88:18
**four** [9] 21:9 27:5 29:18 41:
  8 47:2,7 53:5 143:25 144:
  1
**Fourth** [3] 3:21 90:23 142:
  24 143:15,15,23 144:20
**framed** [2] 19:25 37:11
**Frank** [1] 12:20
**freaked** [1] 13:5
**free** [4] 58:16 125:10,24
  140:3
**friend** [1] 26:2
**front** [4] 113:12 135:22 136:
  10 159:9
**frontiers** [1] 115:17
**fully** [1] 113:6
**fun** [1] 152:15
**function** [5] 33:11 37:3 56:
  14 74:23 159:21
**functional** [1] 116:16
**functions** [9] 37:9 63:4 89:
  7 100:18,24 101:22,25 102:
  6 162:23
**further** [7] 30:2 37:18,19
  85:14 96:5 131:13 149:17

---

**G**

**garbage** [1] 125:19
**gather** [1] 108:20
**gave** [2] 40:11 43:23
**gears** [1] 58:22
**General** [6] 1:20 4:23 77:
  14 126:24 127:3 152:2
**generate** [7] 6:17 11:9 49:
  13,25 50:6 151:18,20
**generated** [3] 100:24 101:
  1,3
**generates** [3] 12:17 49:16,
  16
**generically** [1] 7:11
**George's** [2] 162:12,16
**gets** [9] 26:12,16 42:11 45:
  12,15 61:13 62:17 112:22

**155:**4
**getting** [2] 83:5 160:18
**giant** [1] 43:2
**gist** [1] 89:25
**give** [32] 5:23 11:13 27:11
  28:12 31:10,24 35:23 37:
  25 38:5,6,8,16 39:8 42:10
  53:11 75:6 80:5 81:5 83:
  18 95:21,23 99:10 106:6
  111:25 116:8 119:17 120:
  2 122:8 126:8 129:8 132:
  15 143:2
**given** [12] 28:18 48:17,21
  49:2 89:21 113:2 123:15
  135:7,12 138:2 140:9 161:
  9
**gives** [8] 43:19 52:17 60:19
  64:15 119:15 130:16,20
  139:20
**giving** [4] 80:20 132:17
  143:5,9
**glad** [1] 22:21
**glean** [1] 150:4
**glowing** [1] 95:23
**GONZALEZ** [4] 1:3 3:4 84:
  24 85:13
**GOOGLE** [30] 1:6 3:5 8:8
  10:1 13:10 16:6 45:3 46:5
  48:18 64:13 65:8,22 74:15,
  18,23 75:2 87:14 107:10,
  15 112:17 117:4 118:5
  129:13 147:9 148:13,14,18,
  20 156:22 161:25
**Google's** [5] 21:10 107:1
  119:2 146:5 150:7
**Gorsuch** [22] 47:17,18 48:
  11,15 49:4 50:17,21 51:1,
  16 99:18,19 102:23 127:9
  149:21,22 150:24 151:8,12
  152:17 153:14 154:3,5
**Gorsuch's** [3] 51:20 73:18
  103:17
**got** [4] 17:15 29:12 49:4,8
  52:18 67:18 74:24 129:15
  144:22,25 149:5,11 150:21,
  22
**gotten** [3] 68:5 122:5,19
**government** [9] 4:12 32:
  17 73:6 138:25 144:12
  155:22 158:20 159:20 160:
  10
**government's** [7] 84:17,
  21 86:7 89:14 92:14 106:
  23 159:15
**granted** [1] 85:5
**great** [4] 43:25 144:24
**greater** [3] 79:9 106:6 134:
  4
**greatest** [3] 45:19 95:7,9
**ground** [3] 58:12 122:5,19
**grounds** [3] 56:10 58:15
  109:8
**group** [2] 27:25 133:9
**groups** [3] 133:7,10

**gruesome** [1] 93:2
**guess** [23] 10:7 11:19 18:1
  24:23 49:21 61:3,4 64:3,4
  86:5 89:1 97:15 98:8 110:
  20 112:16 113:9 130:3
  134:5 142:8,20 151:15
  152:6 157:1

---

**H**

**hand** [3] 45:17 100:4,6
**handed** [1] 29:14
**happen** [8] 46:24 47:3 89:
  22 121:4 125:1,1,2 160:17
**happened** [6] 29:3 44:15
  46:24 111:23 125:2 149:
  14
**happening** [15] 7:7 25:15,
  20 26:10 29:7 53:8,16 65:
  19 105:6,15 123:15 132:24
  133:4 143:17 162:22
**happens** [8] 30:19 43:6 47:
  4 105:4 124:18,19 148:21
  158:23
**happy** [2] 125:18 144:19
**harassment** [1] 91:1
**harbor** [1] 124:17
**hard** [5] 30:5,5 33:5 42:6
  162:9
**hard-working** [1] 11:14
**harder** [2] 8:21 71:13
**harm** [23] 4:1 14:25 76:2
  93:1,20 94:18 98:13,13
  114:17 116:24 128:13 140:
  23 141:10,24 144:2,2 145:
  7,14,17,22,25 155:7 157:8
**harmed** [1] 63:24
**harmful** [3] 78:24 115:12
  125:23
**harms** [1] 12:8
**hate** [2] 125:6 131:4
**haystack** [1] 99:7
**headache** [1] 129:18
**heading** [2] 116:17 161:13
**headings** [5] 117:8,14 159:
  16,19 161:11
**health** [1] 90:10
**hear** [2] 3:3 9:4
**hearing** [1] 137:16
**heartland** [1] 18:24
**held** [16] 8:22 70:21 87:18,
  20 90:4 94:13 99:23 104:
  10 108:12 112:10 131:23
  132:1,2 137:21 138:15
  160:5
**help** [5] 15:21 110:9 143:3
**helped** [1] 34:13
**helpful** [5] 22:16 26:3 85:7
  144:14 156:3
**Helping** [1] 115:21
**Henderson** [4] 3:21 142:
  25 144:20,22
**heroin** [1] 17:21
**hewing** [1] 67:7
**high** [1] 117:11

**high-paying** [1] 77:10

**highly** [5] 46:22 47:1,6 90: 13 123:14

**hire** [1] 76:16

**Hispanics** [1] 41:23

**history** [9] 69:2 109:10 120: 6 129:18 133:3,17 139:25 142:2,4

**hit** [1] 149:5

**hits** [3] 139:17 146:23 147: 18

**hitting** [1] 120:11

**hold** [9] 3:12 29:1 55:12 60: 24 102:20 106:15 138:19 155:17 159:15

**holding** [5] 23:1 29:1 65:1 104:24 110:12

**home** [14] 136:10 154:22 156:6 157:3,5,11,17,22,25 161:20,21,22,24 162:2

**honestly** [1] 109:1

**honing** [1] 63:11

**Honor** [2] 10:12 27:11

**hook** [4] 95:13 96:1 102:7 129:1

**hope** [3] 31:12 117:17 130: 18

**hopefully** [1] 124:7

**horrible** [1] 19:5

**horribles** [1] 112:9

**horror** [1] 125:15

**host** [1] 81:20

**hosting** [1] 69:6

**hours** [2] 147:19,20

**however** [1] 100:16

**human** [1] 110:1

**hundreds** [1] 78:17

**hypothetical** [15] 14:22 70: 16 72:24 73:19 77:3 87:2 98:23,24 102:9 112:5 127: 21,25 135:18 136:9 140:5

**hypotheticals** [3] 65:13, 21 117:2

---

**I**

**i.e** [1] 122:11

**idea** [2] 27:15 51:20

**identify** [4] 67:14 97:23 113:19 122:18

**illicit** [1] 77:25

**illustrated** [1] 17:14

**illustrates** [1] 70:17

**image** [1] 59:19

**imagine** [9] 45:11 62:3 70: 19 77:2 90:6 99:1 107:15 131:17 162:10

**immune** [3] 76:23 101:21 110:19

**immunity** [23] 16:7 64:12, 13,24 65:8 66:1 71:4,10,19 72:24 73:13 81:11 84:11 89:6,6 91:16 110:13 112: 16 118:9 121:8 122:1 138: 21 158:12

**immunize** [2] 67:10 135: 15

**immunizes** [1] 154:12

**impermissible** [1] 102:17

**impermissibly** [1] 102:16

**implement** [1] 41:11

**implicate** [1] 75:9

**implicated** [1] 86:21

**implicates** [1] 113:24

**implications** [7] 55:3,3 57: 14 82:13 83:6 84:10 163: 11

**implicit** [8] 94:9 115:6 116: 12,16 117:17 158:21,23 159:19

**implicitly** [2] 114:25 116:4

**implied** [1] 55:22

**important** [2] 42:3 108:8

**impose** [2] 68:1 106:13

**imposing** [2] 102:19 123: 24

**improper** [1] 120:24

**impropriety** [2] 77:17 79: 25

**inaccurate** [1] 123:14

**inaction** [3] 33:2,14,15

**inadequate** [1] 18:19

**incentivized** [1] 138:7

**inception** [1] 123:19

**include** [5] 13:4 94:17 97: 22 154:20,21

**includes** [4] 47:23 154:18

**including** [2] 105:11 129: 13

**inconceivable** [2] 75:5 126:1

**incorporated** [1] 89:24

**incorrect** [3] 118:11 122: 24 130:19

**Indeed** [1] 77:3

**independent** [6] 127:16 136:7 141:25 143:8 145: 22,25

**independently** [2] 142:15 153:3

**indifferent** [1] 140:20

**indistinguishable** [1] 57: 24

**individual** [2] 17:19 74:4

**individualized** [2] 109:21 110:2

**individuals** [1] 9:11

**industry** [5] 45:13,15 47:8 125:25 140:2

**inevitably** [1] 46:24

**infancy** [1] 115:16

**infinite** [1] 115:18

**infliction** [4] 86:3 88:6 123: 21 145:16

**information** [65] 4:3,11 12: 20 13:14 18:9,12,14 31:23 32:22 37:22,23 38:1,5,9 39:19 40:2 52:18,24 53:2 69:20 78:24 84:3,4 89:8,9

**99:24 107:9 111:14 114:** 14,15,16,18 **115:**18,20 **116:** 25 118:1,4,15 **119:**4,19,21, 24 **127:**16 **128:**14,19,22 **137:**13 **139:**12 **140:**2,25 141:6,25 142:7 143:7,9,18 144:17 145:23 146:1,17 150:2,16,19 159:24 163:7

**inherent** [14] 115:9 117:15 130:12 132:19 149:24 155: 20,25 157:10,16 160:20 161:6,12,15,19

**inherently** [3] 4:25 41:21 115:5

**injury** [1] 14:22

**innocuous** [2] 71:8 78:3

**Innovators** [1] 115:17

**inquiries** [1] 78:18

**inquiry** [2] 39:9 94:24

**insofar** [5] 4:6,14 15:13 18: 25 28:6

**instance** [8] 15:2 74:15 76: 20,24 104:9,20 107:10,11

**instances** [4] 15:2,4 80:5 103:24

**instead** [3] 5:5 30:4 114:21

**insulate** [1] 88:20

**intelligence** [6] 49:13,15 50:7 73:19 74:5 101:4

**intend** [1] 89:2

**intended** [2] 6:15 110:14

**intent** [4] 25:2,3 88:8 112: 15

**intentional** [4] 24:21 88:6 123:21 145:16

**intentionally** [1] 115:12

**interactive** [19] 4:17 24:1, 6 37:20 51:23 52:3,12,16 53:2,5 66:20 69:24 100:5, 12 102:1 105:11 123:5 150:1 151:3

**interconnection** [1] 33:10

**interest** [8] 32:3,7 73:10 81:3,4 83:19 126:10 131:9

**interested** [18] 5:25 6:2,3, 24,24 7:2,3 10:21 29:11 86:6 96:11 119:9,11,13 139:14 141:20 158:22 159: 3

**interesting** [1] 12:19

**internalize** [1] 45:14

**international** [1] 99:9

**Internet** [45] 3:12 4:14,16 9: 23,25 22:9 24:16 38:1 40: 12 41:24 45:20 60:16 65: 16 71:23 78:18 79:14 89: 16 91:10 92:24 97:7 106:1 111:5 113:3 114:12 115: 15,23 116:5 124:9 125:12, 5 124:16 125:5,19,24 131: 20 133:8,23 134:18,23 135: 17 138:4 140:3 148:13 159:1,13

**Internets** [1] 144:14

**interpretation** [1] 54:4

**interpreted** [1] 121:9

**interpreting** [2] 5:6 15:19

**interpretive** [1] 83:13

**interprets** [1] 3:22

**introduced** [1] 133:19

**invitation** [1] 5:5

**inviting** [1] 55:14

**invoked** [1] 108:16

**invokes** [1] 78:7

**involve** [3] 6:19,19 78:14

**involved** [3] 8:22 9:25 93:3

**involves** [4] 3:23 10:4 34: 15 35:12

**involving** [1] 36:18

**ISIS** [69] 6:1,2 7:12 9:6,7 10: 16 14:23 19:13 22:7,9 24: 15,17,21 25:10 26:10 28: 16,17,22 29:8 31:12 32:9 33:13 34:5,6,10,11 36:2,2, 3 37:25 40:13 51:7 58:25 62:9 69:6 81:2,3 94:4 99:3, 6 107:16,17,18,20,21,23, 24 108:6,12 112:18 113:23 114:20,21 126:9,19 139:2 143:5,9 144:6,8 145:4 153: 9,11 154:24 155:16 156:11, 20 157:7 158:13

**ISIS's** [1] 113:20

**ISIS-related** [1] 40:16

**isn't** [20] 13:13 14:4,8 25: 12 26:9 46:5,6 54:22 56: 25 82:9 84:20 91:18 100:3 121:5,7 141:4,5 151:16 161:19 162:1

**isolated** [1] 159:11

**isolating** [1] 145:21

**issue** [14] 6:10,10,18 20:18 31:14 53:20 54:21 85:12, 23 103:4 112:13 118:7,7 163:1

**issues** [2] 109:3 141:22

**it'll** [1] 39:16

**item** [8] 8:13,14,14 43:3,4 163:4

**items** [3] 42:17,17 74:25

**itself** [18] 4:1,12 12:24 13:5 14:4 15:15 25:12 36:10 52: 6 56:15 71:15 77:22 80:1 87:21 109:8 111:20 136:5 142:18

---

**J**

**JACKSON** [44] 15:18 16: 13,19,23 17:11,25 64:2,3 66:14,22 67:18 70:6 81:10 110:7,8 112:7 114:2 120: 18 122:14 124:1 134:5,11, 14 135:5 137:19,23 145:10 154:10,11,19 155:1,11,24 156:2,5,14 157:1,15,18 158:4 159:4,7 160:3,22

**Jackson's** [1] 84:11

**Jacksonville** [1] 17:21

**JASTA** [8] 9:3 10:17 15:10 32:25 57:9 58:14 59:20 60: 2

**jazz** [1] 7:1

**job** [11] 18:19 77:3,4,9,9,23 102:9,11,11 149:4 160:2

**job-finding** [1] 116:2

**jobs** [2] 77:10,12

**John** [6] 43:19 44:8,8 60: 14,15 87:4

**join** [1] 31:12

**joint** [2] 34:14 39:15

**judgment** [1] 82:16

**judgments** [2] 82:14 158:8

**judicial** [1] 5:2

**jump-starting** [2] 125:25 140:1

**jurisdiction** [1] 160:4

**jurisprudence** [2] 48:2 100:20

**Justice** [350] 1:21 3:3,9 5:9, 19,21 6:21 8:6,16 9:14,22 11:2,17,18,20,21,23,24 13: 10,17,20,23 14:2,7,13,16 15:1,18 16:13,19,23 17:11, 25 19:9,18,22 20:1,5,11,19, 21,25 21:4,7,12,16,20 22:4, 13,21 23:4,8 24:7,12 25:2, 7,24 26:15,25 27:10,14 28: 11 29:19,25 30:2,3,16 31: 16,19,22 32:23 33:1,25,25 34:1,17 35:1,9,16,24 36:6, 12 37:1,8,13,15,15,17 38:6, 10,13 39:6,11,20,23 40:5,8, 11 41:4,12,16 42:7,8,8,9 43:23 44:17,22,25 45:6,9, 22 46:14 47:15,16,16,18 48:11,15 49:4 50:17,21 51: 1,16,17,17,19,20 53:17,18 55:2,18 56:1,4,8,18,22 57: 1,17,18,18,20,21 58:4,8,21 59:15,24 60:3,7 61:3,10,18 62:1,8,14,23 63:10,16,22 25 64:1,1,3 66:14,22 67:18 70:6,7,14,23 72:5,13 73:16, 18 75:15 78:12,19 79:11 80:6,22 81:7,10,14,17,22 82:8 83:1,22 84:6,7,10,25 85:17,18 86:20 87:6 88:21 89:10,12,13,14,19 90:1,6 91:3,9,15,23,24 92:10,13, 24 93:8 94:1,8 95:4,11 96: 3,4,5,6,24 97:3 98:7,7,8 99:11,17,17,19 102:23,24, 24 103:1,2,6,15,17 104:12 105:3,5,8,19,23 106:17,18, 19 107:6,13 108:17 109: 11 110:5,6,6,8 112:7 114:2, 3,6,9 116:7 117:19 118:21 120:18 122:14 124:1 126: 4,6,16,23,25 127:3,9,20 128:6,20 129:23,25 130:4, 13,16,20,23 131:17 132:8 134:5,7,11,14,21 135:5

137:19,23 140:4,5 141:3, 17,22 142:8,12,22 144:18 145:10 146:2,7,10,20 148: 12 149:16,17,18,19,20,21, 22 150:24 151:8,12 152:1, 17 153:14,21 154:3,5,7,7,9, 10,11,19,21 155:1,11,24 156:2,5,14 157:1,15,18 158:4 159:4,7 160:3,22,23 161:4 163:19
justices [1] 55:1
justified [1] 91:2

**K**

KAGAN [39] 9:14 11:18,21, 24 42:8,9 43:23 44:17,22, 25 45:6,9,22 47:15 75:15 78:19 81:14 95:4 96:3 98: 7,8 99:11 126:4,6,23 127:3, 20 128:6,20 130:4,13,16, 20,23 131:17 132:8 134:7 149:20 152:2
Kagan's [5] 53:19 105:5 129:25 134:21 153:21
Kavanaugh [30] 51:18,19 53:17 55:2,18 56:1,4,8,18, 22 57:1,17 80:6,22 81:7,17, 22 82:8 83:1 102:25 103:1, 6,15 104:12 105:3,8,19,23 106:17 154:8
keep [8] 23:21 50:23 64:19 80:22 82:10 112:20 137: 15 146:19
keeping [1] 18:20
kept [3] 120:15 127:15 160: 11
key [1] 103:18
kid [2] 128:3 160:16
kind [25] 16:1 46:18 57:13 66:25 77:17 80:19 83:13 84:14 94:24 98:13,23 99: 20 117:6 120:21 130:9,11 131:12 133:15,24 140:22 142:13 143:10 147:12 149: 23 160:17
kinds [19] 18:3 22:17 42:10 52:12 55:12 57:15 98:9 107:21 117:10,12,14 120: 19,25 129:12 134:1 143:17 145:8 148:10 162:19
kitchen [1] 90:12
knife's [1] 83:15
knowingly [1] 92:4
knowledge [4] 25:3,4,14 124:22
known [4] 114:23 115:24 124:23,23
knows [9] 74:18,19 90:14, 14 93:9,10 148:16 162:21, 25

**L**

label [1] 31:13
labeled [1] 146:2

labels [1] 146:3
lack [1] 142:17
language [15] 5:6 28:24 39: 24 43:17 47:20 48:13 67: 17 70:2,5 83:14 117:20 119:25 120:7 151:15 163: 8
larger [1] 10:24
largest [1] 117:5
last [2] 62:23 144:19
laudable [1] 47:1
Laughter [5] 26:22 27:9 31: 21 45:21 50:14
laundry [2] 136:25,25
law [44] 3:20 12:5 70:20 76: 25 77:20 78:6,7,10 82:23 83:2,17 85:7 86:21 87:19 88:1,23,23 89:22 90:2 91: 5 95:16,22 96:20,22,23 97: 17,17,18,23 98:1,6,22 103: 10 104:20 106:5 109:10 112:25 119:6 121:2 123:9 137:1 140:19,20 144:24
laws [5] 88:19 96:21 106:1 137:7,8
lawsuit [3] 75:12 78:21 126:3
lawsuits [7] 76:7 81:14,23 82:1 83:8,9 115:15
lawyers [1] 148:24
lead [4] 24:21 33:7 98:17, 20
leads [1] 27:13
learn [1] 32:14
least [10] 15:21 69:1 85:7 87:25 91:9 98:4 103:10 104:3 109:4 124:16
leaving [1] 125:11
led [1] 45:3
left [4] 74:24 122:6 124:20, 24
legal [2] 75:6 102:16
legally [1] 102:16
legislature [1] 106:4
less [4] 56:17 81:5,7 109: 18
lesson [1] 133:3
letter [2] 123:19 159:17
level [2] 77:14 144:15
liabilities [1] 94:3
liability [56] 16:15 56:13,19 64:16,16 68:1,2,17 71:14, 15 72:2,22 75:6 76:5 80:5 81:6,9 84:3,11 85:21 87:5 88:4,10,20 91:11 92:19,20 94:22 95:22 98:17,20 99: 10,14 101:21 102:4,20 103: 3 106:13 108:10,20 109:8 112:8 116:3 118:7 120:20, 22 122:2 123:12,24 137:9 142:10,13 160:10,12 163: 14 liable [53] 3:13 16:10 18:6 19:12 22:8,10 23:1 25:22 29:1,21,22 38:2 39:12 41:

6 43:21 44:4,10,13,19 59: 20 60:12 65:2 70:21 79:25 80:7,18 87:10,18,20 90:4, 17 91:23 94:5,14 97:13,16 104:10,24 106:15 108:12 111:23 112:10 113:1 121: 3 137:21 138:16,19 148:15 151:3 155:17 159:16 160: 5,6
libel [1] 86:22
Library [1] 156:18
lies [3] 27:6,10,14
light [3] 6:25 69:1 77:8
likelihood [2] 82:3 108:11
likely [5] 80:18 81:5,8 113: 19 147:2
likes [2] 108:18 109:13
limited [3] 3:17 4:3 12:7 57: 1,14 66:24 117:22
limiting [2] 21:1,1
limits [1] 70:17
line [11] 4:20 14:9 40:6,9, 18,21 96:7,9,25 97:6 119: 15
line-drawing [1] 46:9
lines [3] 46:2,17 54:11
link [1] 99:8
LISA [3] 1:24 2:10 114:7
list [8] 30:4 43:19 52:10 65: 23 117:24 136:25,25 147: 15
listening [2] 19:14 20:7
listings [1] 77:6
literal [1] 74:20
literally [5] 29:6 53:11 67: 24 125:14 146:13
litigation [4] 59:6 85:21 109:1 149:6
little [21] 6:13 15:21 26:19 28:8 32:12 45:16 78:4 80: 11 84:1 86:25 87:3 129:21 137:3,7 144:23,25 150:21 156:7,25 161:25 163:1
live [5] 106:10 110:1 140: 18 162:12,14
LLC [1] 1:6
located [1] 39:25
location [3] 119:25 120:6 160:2
logic [2] 109:12,14
logical [1] 97:9
logically [1] 61:5
long [4] 7:24 27:23 60:20, 25
longer [2] 24:5 85:9
longstanding [1] 54:23
look [36] 9:2,6,13 10:16 15: 10 16:18 17:5 19:1 22:22 23:12,16,27 15,20,21 39: 15 40:15 43:3,4 54:10 57: 7 59:13 67:6 68:14 80:10 83:5 94:20 100:8 121:1 128:10,12 134:15 137:23 139:24 147:2,11 148:2

looked [6] 6:13 133:12
looking [21] 22:9 26:6 69:1 83:14 94:19 95:1 96:7 102: 15 107:19 123:8,16 133:13, 13,15 143:16 144:2 145:14 147:11 148:4 150:16 153: 10
looks [4] 9:24 128:7 135: 13 136:1
loosely [1] 16:2
lose [6] 58:10,12,15 59:21 84:18 149:10
loses [2] 52:4 162:21
losing [1] 149:9
lost [3] 40:9 71:19 144:23
lot [22] 10:19 11:14,25 21: 10 43:13 45:25 54:5 55:4, 6 59:6 62:4 72:14 81:6,18 82:1 88:22 109:1 117:6 118:8 125:9 135:3 147:20
lots [4] 74:17 81:22,25 159: 23
Louisiana [1] 7:5
lower [2] 7:21 77:12
lying [1] 9:21

**M**

made [27] 17:1 27:17 46:14 53:7 65:9 66:2 74:8 75:7,8, 18 78:6,15,18 97:25 98:14 107:24 108:5 109:6 110:3 115:14 120:16 128:23 139: 9 142:14 148:11 160:15 162:7
main [1] 79:17
major [1] 6:9
majority [1] 19:11
MALCOLM [3] 1:20 2:6 70: 10
manner [3] 3:22 4:9 6:11
manually [1] 10:20
many [9] 27:24 78:15 79:3 80:5 83:8 85:25 86:1 101: 7 148:4
margins [1] 84:1
Maris [3] 26:6 70:16,25
massive [1] 134:3
match [3] 41:22 77:6 140:7
matching [2] 77:3 141:15
material [22] 10:5 39:14 81: 18 85:4 91:17 92:22 93:24 96:2 111:19 124:5,21 126: 16,18 134:17,20,24 135:7, 10,13,24 136:5,18
materially [1] 57:23
materials [7] 34:15 35:13 38:16,22,24 39:1 56:14
matter [11] 1:13 27:19 31:5 38:17 47:3 52:5 72:21,23 91:16 100:25 127:6 140: 19 141:11 149:9
matters [3] 8:18 99:12,13
maximize [1] 151:25
mean [74] 8:7 10:6,9 15:20

17:13 22:5 24:15 26:12 27: 3,7 28:2 31:22 32:23 35:1, 7 37:6 45:17 49:15 52:1,3 55:8 57:6 60:10 61:4,6 63: 5 65:18 67:19 70:1 72:9 76:4,6,23 79:2,12 84:20 85:16 86:5,9 90:6,20 91: 19 96:19 97:2 105:14,20 108:25 110:12 111:16 112: 7 117:10 120:23 122:3,24 126:2,17 129:12 130:6 132:7 134:14 138:15,24 139:16 140:16 141:4 142: 12,15 147:3 148:22 151:19 153:25 154:13 156:3,18
meaning [9] 18:5 40:2 61: 15 67:22 69:15,22,25 158: 6,7
meaningful [1] 82:20
meaningless [1] 105:9
meanings [1] 117:9
means [11] 51:24 52:16 63: 1 100:23 101:20 114:15 123:23 137:17,18 151:24 152:23
meant [2] 10:22 91:25
mechanism [2] 77:9 130:1
mechanisms [1] 105:17
media [2] 32:18 116:2
member [1] 93:3
mention [3] 128:16 136:19 146:11
mentioned [5] 86:15 146: 13 152:14 161:15,20
mere [3] 33:14,15 44:2
merely [2] 40:22 96:9
merits [1] 75:14
mess [1] 133:24
message [13] 74:25 76:1 87:15 94:11 113:20 115:6 116:17 119:8 127:6 158: 21,23 159:1,19
messages [4] 42:22,22 76: 2 99:5
met [1] 88:11
Microsoft [2] 129:19 148:2
might [50] 4:24 6:8 8:21 12: 15 15:21 25:22 23:16 27:20 29:5 30:22 33:15 36: 10,10 37:10 39:19 44:23 46:13,21 48:1,10 57:4 71: 8 72:20 74:21 76:24 79:16 89:6 96:11 100:18 101:9 104:2 112:12 115:2 117: 25 119:13 125:13 131:1,8 133:20 135:4 148:6,10,20 152:3 156:25 158:22 159: 2 161:5 162:10
millions [6] 78:17 128:24 132:4,4 139:17,17
mind [4] 15:22 48:25 77:2 110:13
minds [1] 79:8
minimizes [1] 46:10

minimizing [1] 75:16

minute [3] 26:17 48:16 147: 20

misrepresentation [1] 129:6

missing [1] 101:16

misspell [1] 74:16

misspellings [1] 97:22

mistaken [1] 50:4

misunder [1] 79:21

misunderstanding [2] 79: 20,21

mode [1] 75:12

model [1] 35:11

models [1] 120:15

modes [1] 75:4

moment [1] 19:10

money [4] 57:2 143:5,9 159:5

Montgomery [1] 162:17

Month [1] 142:2,5

months [1] 133:19

Morehouse [1] 162:12

morning [2] 3:4 86:3

Most [20] 4:15 13:1 56:24 57:5 64:25 74:14 79:18 90: 7 93:19 94:22 112:2 120:7 121:23 125:23 129:11 132: 20 147:1 148:1 151:24 162:11

motion [3] 58:14 97:20 163:14

motivation [1] 99:7,12,13

move [2] 58:17 103:18

Ms [76] 36:15 45:23 50:16 76:17 108:22 111:5 114:6, 9 116:7,11 118:11 119:5 120:18,18 121:19 122:23 124:6 126:4,5,15 127:2,8, 21 128:10 129:5 130:6,15, 18,22 131:3 132:7,11 134: 5,10,13 135:2 136:3 137: 21 138:24 140:4,10 141:7, 23 142:11,21,23 144:21 146:6,8,11 147:3 148:18 149:22 150:13 151:6,11 152:11,21 153:20 154:4,6, 17,25 155:3,13 156:1,4,13, 16 157:10,17,19 158:18 159:5,14 160:8

much [15] 46:14 58:7 66:5 80:18 81:5,7 82:3 83:7 93: 1 109:10 120:10,11 149:5 156:21 163:18

multiple [1] 44:3

mundane [1] 74:14

murderer [1] 87:4

music [1] 116:2

must [8] 3:24 4:1 8:3,4,4 118:24 150:9,10

myriad [1] 117:7

### N

name [2] 74:15,16

namely [1] 79:20

narrow [2] 121:8 138:20

narrowly [1] 65:16

national [1] 144:15

naturally [1] 65:1

nature [1] 10:25

near [1] 162:14

necessarily [3] 28:1 81:25 115:19

necessity [1] 115:23

need [4] 47:9 122:1 123:8 160:1

needle [1] 115:22

negligence [7] 92:21 122: 6 123:20 132:14 145:16 158:3 160:13

negligent [1] 122:12

negligently [2] 160:13,14

neither [2] 83:20 109:23

networking [1] 20:16

neutral [36] 6:5 7:2,10,16, 24 24:24 32:1 40:17 49:11, 14 50:4,5 81:1 94:25 96: 12 99:24 100:2,13 101:1,3, 6,7,12 127:4,4 151:14,23 153:17,18,24,25 154:1 162: 6,8,21,24

neutrality [2] 80:14,15

never [10] 37:6 122:4,19 128:25 137:5 149:14 153: 2,4,8 155:22

new [11] 17:20 23:17 47:5, 6 59:3,24 61:6 62:19 115: 17 125:25 132:17

news [14] 42:18 116:2 133: 6,9,9,14,15 141:18,20 146: 4,21,23 147:13 148:3

newspaper [6] 87:9,10 112:21,25 113:10 130:10

Next [8] 21:23 22:14 23:18 50:1 110:24 116:17 117: 14 150:25

nine [1] 45:19

Ninth [17] 17:16 49:11 50:3, 7 99:23 101:11 127:11,13 142:25 145:3 150:22 151: 12 152:7,12,19,24,24

nobody [1] 60:18

non-neutral [1] 162:9

non-stop [1] 81:15

none [3] 45:12 100:23 137: 8

normal [2] 31:3 163:12

normally [2] 48:21 87:8

note [1] 161:7

notes [1] 4:12

nothing [8] 32:20 50:19 71: 21 105:13 119:5 124:19 127:14 128:18

notify [1] 143:21

notion [4] 64:20 126:21 132:25 145:11

number [4] 4:22 11:6 12:8 31:9,11,24 32:22 79:4 142:

24 151:16,17 162:7

### O

Oakmont [5] 65:5 68:3 69: 3 124:11 138:1

object [1] 125:13

objection [2] 28:18 106:25

obligation [1] 33:6

obviously [1] 71:8 91:23 92:2 96:21 97:19

occurred [1] 70:24

offense [1] 88:12

offensive [19] 16:3 17:1 18: 5 68:13,18 110:16,17 112: 22 121:14 124:5 134:17,20, 23 135:3,7,10,13,23 136: 18

offer [1] 161:7

offered [2] 152:2,3

office [3] 11:15 59:11,11

officials [1] 32:18

often [2] 4:4 121:4

Okay [40] 16:13 22:7,11 23: 6 24:13 29:25 35:9 36:12 37:8 38:18 44:22 45:6 48: 17 49:1,3,21 58:21 60:3 62:2,23 63:22 83:4 85:17 94:4 95:7 96:8 103:15 105: 23 108:17 120:11,12,13 129:23 134:10 141:17 146: 19 151:12 152:17,17 154:4

once [6] 46:4 79:22,23 111: 22 162:21,24

one [61] 5:14 7:18 12:7 16: 1 23:20,21 26:1 30:14,15 32:22 36:13 41:5 42:5,12 43:2,20 44:1 46:10,16 51: 24 52:11,18,20 55:10 56: 10 58:6 59:8 71:17 75:12 78:20 84:12,17 85:23 87:1 92:6 100:4 101:2,9 104:9 107:3,10 109:18 113:9,14 123:8 124:7,25 126:2 136: 23 139:23 146:8 151:16 152:5,8,13 153:7,13 157:7 158:25 162:2 163:3

ones [1] 147:1

online [1] 53:9

only [29] 4:13 16:25 18:3 20:8 22:23 52:11,22 53:4, 4 58:23 65:7 66:25 89:20, 22 93:13 123:1,11 125:17, 22 135:19 139:3 140:6 141:16,19 155:18 158:12, 18,23 163:7

open [2] 156:12 159:10

opened [1] 115:17

opens [1] 129:9

operate [3] 35:14 76:15 157:21

operated [1] 96:20

operating [1] 75:4

operation [4] 39:15 73:25 75:13 103:24

opinion [2] 152:19

opportunity [1] 163:17

opposed [6] 107:19 122:2 131:6 132:12 136:11 139: 15

opposite [1] 134:25

options [1] 49:24

oral [7] 1:13 2:2,5,9 3:7 70: 10 114:7

order [9] 75:1 76:15 99:6 100:14 106:2 108:4 111:6 139:7 158:2

ordered [1] 105:18

ordering [1] 104:25

organization [9] 12:9 51: 22 72:14,16 103:19 114:22 115:5 120:21 139:5

organizational [2] 71:25 72:1 73:20,22 76:22 159:8 160:6

organize [11] 35:25 38:18 72:18 115:19 119:18 130: 9 133:25 147:24 158:9 159:18 160:2

organized [4] 4:10 119:7 144:11

organizes [1] 51:25

organizing [10] 10:4 13:14 72:15 105:12 112:11 134: 2 144:16 153:1 154:15,16 160:1

original [2] 67:9 109:6

originally [1] 86:23

other [63] 4:8,11,16,19 7:5 10:3 12:5 16:4 24:20 25: 20 26:2,8 32:16 34:16 35: 24 39:3 40:20 42:22 45:13, 17 47:23 54:2 68:25 71:1, 17,17 72:7 76:25 79:16 86: 11 90:25 94:6 98:14 100:6 105:3 107:11 114:19 115: 11,12 116:18 117:7,7,23 119:15,21 120:14 121:12 123:25 126:7 131:6,12 132:13 133:15 135:3 137: 11,11 139:20 147:11 148: 19 152:1 153:7 156:23 159:24

others [5] 111:6 112:12 118:8 133:18 138:6

otherwise [7] 102:6 125: 19 128:25 132:5,18 135:23 137:12

ought [4] 78:6,9 86:9 163: 16

out [40] 9:18 10:21 17:4 23: 5 26:10 40:4 42:2 43:20 44:5 45:4 48:23 51:5 61:8, 22 68:5,19 69:22,25 81:14, 18 88:3 90:2 98:25 106:1 109:13 114:25 116:24 118: 22 126:3 132:12 134:7 139:4 141:21 143:19 144: 13 146:14 155:8,12 157:6

159:20

outcome [1] 79:16

outcome-determinative [1] 85:13

outside [18] 14:20,21 7:25 11:8 17:24 18:21 19:1 30: 12,21 41:8,15 42:5 51:15 60:6,7 65:14 66:13 80:4

over [18] 26:7 45:10 53:23 67:21 70:25 71:7,18 72:7 101:10 109:2 132:14,14 147:17 150:3 152:18,25,25, 25

overall [1] 70:4

overlapping [1] 84:12

overrode [1] 136:22

overstated [1] 54:15

overstates [1] 82:23

overview [1] 88:22

own [33] 3:14 49:25 51:6 71:24 73:15 74:1,7 77:6 80:3 84:5 87:17 88:16 89: 24 93:22 96:2 99:5 101:8 102:13 104:10,14,17,18,19, 23 112:1 116:20,23 121:2 128:14 145:24,24 146:5 159:15

owner [1] 157:14

### P

p.m [1] 163:22

PAGE [20] 2:2 52:15 112: 23,23 113:1,12 136:10 154: 22 156:6 157:4,5,11,17,22, 25 159:9 161:21,22,24 162: 2

pages [2] 143:25 161:20

pair [1] 124:12

pan [1] 81:13

parade [1] 112:9

paragraph [3] 19:11,11,12

paraphrasing [1] 12:15

parse [2] 69:21,25

part [17] 6:9 8:15 20:14 22: 4 30:23 35:13 46:1 67:20, 20 69:14 80:15,16 94:21 121:20,22 141:4,5

partially [1] 150:19

particular [29] 5:12 8:13 9: 3 27:17,19 35:11 36:18 67: 17 70:19 73:11 74:2,3,11 79:1,1,24 80:10 88:14 96: 22 99:1,8 103:25 104:1,21 106:2,4 109:25 127:5 162: 3

particularized [2] 67:14 70:5

parties [4] 38:25 74:10 118: 15 121:22

parts [1] 121:20

party [2] 34:15 39:17

pass [1] 45:15

passed [1] 89:3

past [2] 96:25 120:5

**paying** [1] 77:12
**pedantry** [1] 71:9
**people** [47] 5:25 6:1,2 9:6 10:16 11:15 13:14 14:6 15: 10 17:5 18:25 20:13 21:6 23:12,12 24:20 27:25 40: 24 41:5,18,21,22,22,23 65: 13 81:2,4 85:22 91:2 111: 9 113:2 126:9 128:25 131: 1 132:4 133:8 135:4,23 138:3 140:7,8,12 141:21 144:5 149:1 162:11,13
**people's** [6] 79:8 99:4 115: 11,12 119:21 161:23
**per** [1] 119:20
**perceive** [2] 85:4 104:3
**perceived** [1] 83:17
**percent** [1] 144:22
**perfect** [2] 47:14 144:3
**perform** [2] 101:24 102:5
**performing** [1] 101:21
**perhaps** [3] 22:16 27:5 138:6
**permissible** [1] 85:15
**permit** [1] 163:14
**person** [22] 27:17 34:8 40: 23 70:24 74:16,18 80:18 87:19 90:24,25 91:1 93:1, 18 96:16 104:1,2 108:6 141:16,19 142:2,3 157:8
**person's** [3] 104:1 131:23 132:1
**persons** [1] 151:18
**perspective** [1] 64:23
**persuasive** [1] 79:15
**perversely** [1] 124:21
**petition** [2] 52:15 100:1
**Petitioner** [3] 110:22 139:1 145:6
**Petitioner's** [1] 157:9
**Petitioners** [6] 1:4,19 2:4, 14 3:8 161:2
**phone** [4] 31:9,9,10 32:22
**phrase** [1] 149:10
**phrased** [1] 28:19
**pick** [5] 11:7 51:19 53:18 100:15 115:19
**picked** [1] 23:21
**picking** [6] 47:24 48:2,18, 25 49:5,18 50:2 100:9 150: 5
**picks** [1] 51:25
**picture** [2] 39:16 82:9
**pictures** [1] 6:13
**piece** [5] 81:10,11 112:8,14 144:17
**pieces** [1] 144:17
**pilaf** [4] 7:4,4,11 8:20
**pinpoint** [1] 124:6
**pitching** [1] 27:16
**place** [4] 7:5 27:23 54:4 61: 14
**placement** [4] 102:9,11,12 139:7

**places** [1] 162:14
**plain** [1] 83:14
**plainly** [1] 123:17
**plaintiff** [8] 15:5,14 78:7 97:23 108:15 110:21 143: 25 163:14
**plaintiff's** [1] 114:17
**plaintiffs** [4] 84:18 115:4,7 144:4
**plaintiffs'** [1] 148:24
**plans** [1] 54:8
**platform** [35] 68:16 73:24, 25 74:7 75:4 76:21 77:18, 24 82:24 84:3 86:17 88:8 92:19 93:25 95:18,25 96:2 99:2 102:20,21 104:9,23 106:15 108:5,7 109:20,23 110:15 111:6,19,20 113:18 121:12 135:19 158:13
**platform's** [8] 73:15 74:1 84:5 104:14,17,18,18,23
**platforms** [12] 65:17 67:10 68:12 75:7 79:3 108:9 121: 12 134:19,23 135:15 138:6 154:12
**play** [2] 28:21,22
**played** [3] 30:14 42:2 80: 14
**playing** [1] 112:20
**plays** [1] 25:11
**plead** [2] 115:4 155:20
**pleading** [2] 98:3 145:14
**please** [5] 3:10 70:14 83: 23 114:10 161:4
**poetry** [1] 49:16
**point** [30] 5:23 11:22,25 27: 3 37:11 40:19 46:13 56:5 62:3 72:10 75:24 78:2 85: 22,23 91:7,8 92:7 97:5 101:9 109:19,25 113:10 124:15 125:4 144:19 152: 4 154:21 155:13 160:18 162:7
**pointed** [1] 134:7
**pointing** [4] 90:1 108:24 115:8 155:20
**points** [3] 11:5 84:11 163:3
**polemics** [1] 49:16
**policy** [1] 139:25
**popular** [1] 147:12
**position** [30] 10:8 37:18 52: 1 54:20 70:17,18 71:3,21, 23 75:17 79:20,22 80:2,3 84:17,21,23 85:2 86:7 92: 11,12,14,15,16 101:16 103: 6,18 106:23 109:12,14
**posits** [1] 121:3
**possibility** [4] 50:8 64:7 71:13 78:21
**possible** [5] 85:16 93:2 151:5,10 163:11
**possibly** [1] 96:14
**post** [5] 74:10 77:4,5 93:19 109:6

**post-algorithm** [2] 9:20 49:12
**posted** [9] 15:6 17:20 74:9 87:14 90:24 95:20,24 108: 6 118:14
**poster** [3] 88:11 111:21 112:1
**posting** [3] 118:17 144:15 148:15
**postings** [1] 77:23
**posts** [3] 90:8 93:2,6
**potential** [2] 77:5 86:14
**potentially** [4] 94:2,13 104: 9 148:15
**practice** [4] 6:8 19:8 47:6 163:13
**practices** [6] 22:17 36:24 42:10,12,13 43:10 46:25
**pre-algorithm** [2] 9:16,19
**precedent** [2] 17:15 54:24
**precise** [2] 53:20 82:16
**precisely** [2] 28:1 89:8
**precision** [1] 28:21
**predicament** [1] 131:18
**predictions** [1] 54:14
**predictive** [2] 82:13,16
**predominantly** [1] 98:4
**prefer** [1] 101:9
**preferences** [2] 36:21,21
**preferring** [1] 94:21
**premises** [1] 49:2
**prepared** [1] 117:9
**presence** [2] 77:23 118:9
**present** [8] 5:24 25:22 34: 3 38:22 39:2 75:20 133:1, 22
**presentation** [3] 75:23,25 80:13
**presentational** [1] 76:8
**presented** [11] 4:10 14:19 18:15 19:25 26:2 36:19 37: 4 38:23 39:4 121:24 135: 19
**presenting** [4] 13:14 63: 12 98:10 111:9
**presents** [1] 18:9
**preserving** [1] 73:12
**presumably** [5] 75:13 85:5
**Pretty** [2] 58:7 90:22
**prevailing** [1] 82:3
**previously** [1] 153:6
**primary** [1] 80:20
**Prince** [2] 162:12,16
**principle** [2] 13:2 153:18
**priorities** [1] 68:24
**prioritization** [5] 44:19 45: 4 75:23 76:1,9
**prioritize** [2] 44:13 104:20
**prioritized** [3] 42:18,19 43: 25
**prioritizes** [3] 42:16 104: 13 107:16
**prioritizing** [2] 10:5 98:11
**priority** [2] 65:23 106:6

**private** [1] 124:4
**pro** [2] 132:12,13
**pro-defamatory** [2] 132:6, 12
**pro-ISIS** [4] 12:1 126:7 130:2,25
**probably** [11] 32:11,13 36: 14 41:2,6 69:14 105:25 112:12 147:14 148:19 149: 14
**problem** [19] 6:10 12:2 14: 10,13 23:19,19 33:3 34:25 35:21 36:5 40:25 60:17 75: 16 78:13 101:5 122:17,18 131:21 151:15
**problematic** [1] 123:14
**problems** [4] 46:9,16 54: 14 90:10
**Prodigy** [3] 10:19 53:11 138:8
**produce** [3] 12:1,3,4
**produced** [2] 107:16,18
**produces** [1] 12:14
**product** [2] 146:3 160:12
**products** [4] 88:16,17 101: 9 160:10
**professional** [1] 77:10
**profile** [2] 90:22 141:4
**profiles** [2] 141:9,10
**profit-maximize** [1] 101:8
**profits** [1] 151:25
**prohibit** [1] 65:1
**prohibiting** [1] 140:19
**projection** [1] 79:19
**prominence** [2] 79:9 111: 25
**promote** [1] 101:8
**promoting** [7] 99:2,3 111: 1 134:23 135:2 138:22 162:3
**prong** [1] 109:2
**prospect** [1] 85:20
**protect** [8] 46:20 47:10 59: 2 65:16 108:20 109:15 134:18 160:19
**protected** [31] 4:25 38:12 39:4 43:6,7,7,8,16 46:5,18, 23 48:7,22 49:19 55:13,15 60:12,25 61:23 93:14 99: 25 100:9,17,23 102:19 132: 23 136:8 139:3,3 150:8 161:14
**protecting** [3] 77:21 84:2 93:17
**protection** [30] 8:1 17:24 19:2 35:4,17 42:11,14 45: 13 52:4 53:24 59:22 72:2 73:13,14 91:4 93:15 97:8 102:2,3,4 124:6 126:14 127:7 128:9 129:4 130:16, 20 134:15,22 137:24
**protective** [1] 70:20
**protects** [5] 58:23 59:13 92:18 100:11 136:13

**proverbial** [1] 115:21
**provide** [2] 35:3 53:24
**provided** [16] 4:3 24:17 37: 22 69:20 84:3 89:8 93:8 102:14 114:14 116:25 118: 2,3,5,15 137:5 146:14
**provider** [34] 4:4 12:10 24: 9 30:23,25 38:2 40:12 41: 24 47:23 48:20,24 52:19, 21,23 53:7 63:6 69:21 71: 24 84:4 88:20 89:9,16,23 92:25 95:13 97:7 98:12,14 100:9,11,12 101:20 118:4 119:3
**providers** [10] 20:12 22:10 58:23 91:10 106:7 106:2 146:4 150:2 163:8
**provides** [5] 89:17 99:24 158:12
**providing** [6] 29:24 30:4 32:21 48:4 110:25 150:10
**provision** [4] 43:14 53:14 76:25 105:12
**psychology** [1] 133:16
**publication** [13] 4:3 14:17, 20 114:14 123:9 130:10 136:23 137:10 144:24 145: 1 155:21,25 161:19
**publish** [8] 29:16 63:20 87: 1 105:12 131:12 142:19 158:24,25
**published** [2] 3:20 38:25
**publisher** [36] 3:19 8:5 34: 9,13,18 36:7 37:22 63:2,2, 19 66:17 67:1 68:1,2 69: 16,19 82:6 86:18 91:12,21 102:21 103:11 105:1 106: 15 111:14 112:21,25 114: 13 123:6 137:17 138:10 143:12 145:12 154:13,14 158:9
**publishers** [1] 113:11
**publishes** [1] 118:18
**publishing** [33] 13:21,25, 25 16:1 34:22 36:9 44:11 115:5,9,11 116:13,23 117: 17 119:14 123:25 130:12 132:19 137:18,22 142:6 145:17 157:11,16 160:18, 19,20,20 161:6,12,16
**pull** [1] 54:3
**pulling** [1] 120:25
**punished** [1] 68:17
**pure** [2] 62:12,14 137:14
**purely** [4] 13:12,13 14:19 28:25
**purported** [1] 90:24
**purpose** [2] 70:4 125:20
**purposely** [1] 24:14
**purposes** [7] 15:3 69:2 72: 24 89:5 107:13 113:25 142:22
**pursuant** [1] 118:23
**push** [1] 127:5

Heritage Reporting Corporation

**pushes** [1] 135:22
**put** [26] 13:18 20:13 28:15 36:2 37:25 38:15 41:14 42:25 82:11 91:13 94:3,10 103:23 112:23 113:1 122:9 128:2 130:24,24 131:11, 13 141:8 146:25 157:3,21 159:9
**puts** [6] 7:24 34:5 93:10 128:8 156:9 157:5
**putting** [8] 27:25 33:4 59:2 62:4 72:13 81:9 99:4 157:3

### Q

**qualifications** [2] 77:5,13
**qualify** [1] 55:16
**question** [68] 9:22 10:12, 13 11:11 12:24 14:8 17:20 19:25 24:13,23 25:17 26:1 27:25 28:2 30:23 34:23 36:13,14 37:12,14 43:16 44:12 49:21 50:10 56:2 58:11 60:5 62:24 64:14,18,25 69:10 82:9 83:13 84:9 85:15 86:19 87:17 89:1 98:4 99:14,22 101:6 103:2,3,17 105:5 106:8,9,21 108:14, 14,18 121:5,15,21,23,24, 25 123:11 127:1 132:8,11 144:10 153:21 155:4,18 163:10
**questions** [20] 5:8 23:3,7 27:1 44:3 51:20 53:19 57:22 63:15 64:11 65:21 72:4 80:12 96:8 97:18 106:11, 12 116:6 120:20 149:23
**queue** [3] 74:3 104:1 109:25
**queues** [1] 99:5
**quibble** [1] 71:9
**quite** [2] 66:9 103:23
**quo** [2] 83:2,3
**quote** [1] 145:4
**quotes** [1] 128:5
**quoting** [2] 60:21 61:1

### R

**race** [4] 102:10 128:16 140:11 162:8
**races** [1] 131:7
**racial** [1] 141:22
**racing** [2] 6:2,3
**racist** [1] 131:5
**radicalize** [1] 113:21
**radicalized** [2] 144:6 157:8
**radically** [1] 120:4
**raised** [2] 117:2 126:16
**raising** [1] 126:22
**random** [5] 13:12,13 14:19, 21 156:10
**randomly** [1] 156:8
**rankings** [1] 107:22

**rare** [2] 76:23 84:14
**rated** [1] 122:12
**rather** [8] 42:22 62:20 75:13 81:10 94:23,23 101:12 104:10
**rationale** [2] 74:13 106:14
**rats** [1] 90:11
**re** [1] 60:11
**reach** [1] 58:11
**read** [20] 15:23 16:24 17:19 19:6 38:3 52:6 53:23 59:4 60:13 65:1,4,5 68:8 88:2 105:10 111:9 117:18 137:4 152:18,19
**reader** [1] 159:2
**readers** [2] 119:9,10
**reading** [3] 55:10 136:15 137:4
**reads** [2] 67:25 109:20
**real** [2] 46:10 122:18
**really** [47] 7:22 10:9 16:1 17:25 18:10 24:16 27:22 30:7,8 35:2 43:25 45:18 54:5,15,24 63:3,5,11 65:15 68:10,11,22 69:5 72:15 76:7 77:20 81:13 82:17 83:7, 8,25 91:24 92:25 98:1 105:9,13 110:9,23 111:3 121:11 130:1 132:9 134:18 140:18 145:15 151:23 158:11
**reason** [8] 80:8,9 88:19 94:1 95:25 103:8 137:11 156:21
**reasons** [1] 122:25
**REBUTTAL** [3] 2:12 160:25 161:1
**receives** [1] 72:2
**recent** [3] 129:11,21 148:9
**recently** [1] 142:24
**receptive** [1] 113:20
**recipients** [1] 74:11
**recognized** [1] 127:11
**recognizing** [1] 27:18
**recommend** [1] 87:15
**recommendation** [43] 4:25 5:3 12:17 19:7 20:9 31:13 33:2,11 43:2 50:1 55:16,19,20,22,23 56:14,23 57:16 68:23 82:5 86:16 87:14,16,24 94:2 95:6,24 98:10 103:21 104:3,8 111:12 112:3 113:7 116:9 118:2, 12,13,18,20 119:2,22 139:5
**recommendation's** [1] 69:5
**recommendations** [31] 8:12 30:7,25 49:22 51:21 54:22 55:15 56:25 57:5,10 58:24 65:12,24 66:12 73:24 84:15 110:10 113:15 114:24 117:23 121:17 133:2,5, 17 138:22 139:13,20 146:

24 153:5 158:15,19
**recommended** [1] 153:8
**recommender** [1] 87:22
**recommending** [9] 14:4 33:12,19 67:2 87:21 95:19 96:10 116:4 139:6
**recommends** [2] 21:5 25:10 79:22
**reconsideration** [1] 101:14
**recruiting** [1] 24:19
**reduces** [1] 18:11
**refer** [2] 48:13 51:22
**reference** [1] 161:6
**referred** [5] 4:5,24 6:14 12:13 78:22
**referring** [2] 50:24 127:9
**refers** [2] 52:11 69:23
**reflects** [1] 115:9
**refuses** [2] 90:15 93:11
**refusing** [1] 148:15
**regard** [5] 54:21 69:10 123:23 162:6 163:4
**regardless** [4] 36:20 130:17,23 140:13
**regime** [1] 122:7
**regular** [1] 42:24
**regulatory** [1] 46:23
**reiterate** [1] 163:5
**related** [2] 36:20 66:3
**relationship** [1] 134:8
**relevance** [1] 129:17
**relevant** [8] 87:20 94:15,18 95:17,23 148:4,8 163:15
**relying** [1] 58:9
**remand** [6] 50:9 85:14 101:13 150:22 152:8,20
**remark** [3] 131:24 132:2,3
**remember** [1] 125:21
**remove** [7] 65:2,10,18 66:3 92:17 93:14 121:14
**removes** [1] 124:21
**render** [1] 159:16
**repeat** [5] 86:22,24 87:22 90:3 95:8
**repeated** [2] 87:3,7
**repeatedly** [1] 32:17
**repeating** [2] 120:16 127:15
**replead** [1] 123:20
**report** [2] 143:19,20
**request** [4] 27:17,18 92:23 129:17
**requested** [3] 28:24 104:2 126:10
**requesting** [1] 79:24
**require** [1] 5:1
**requirement** [1] 14:17
**requirements** [1] 7:23
**requires** [3] 7:18 25:14 135:5
**reruns** [1] 132:20
**resembled** [1] 89:5
**residual** [1] 151:2

**resolves** [1] 85:10
**respect** [14] 8:19 34:19 72:21 82:22 88:13 94:16 97:20 99:13 102:14 109:7 111:24 112:15 153:21 154:1
**respond** [2] 36:11 73:18
**Respondent** [5] 1:7,25 2:11 11:5 114:8
**Respondent's** [1] 99:1
**responding** [1] 28:10
**response** [5] 41:10 52:7,8 55:9 103:7
**responses** [2] 78:17 84:12
**responsibility** [1] 129:2
**responsible** [9] 8:9,12,13 12:22 68:20 131:23 132:1,2 146:4
**responsive** [2] 31:17,20
**restaurant** [4] 90:8,9 149:2,3
**restrictions** [1] 124:11
**result** [7] 11:14 107:22 108:5 111:25 115:16 139:18 144:24
**results** [6] 88:15,17 104:21 106:6 107:17 120:5
**retirement** [1] 54:7
**return** [2] 46:13 149:23
**retweet** [7] 58:25 59:19 61:21 108:23 109:7,8,22
**retweeted** [3] 61:7 108:21 109:5
**Retweeting** [1] 60:22
**retweets** [2] 108:18 109:13
**revenue** [2] 143:3 145:4
**reverse** [1] 158:1
**review** [3] 149:2,3 161:7
**reviewed** [1] 149:11
**reviewers** [1] 149:8
**reviews** [1] 122:10
**revolutionary** [1] 115:16
**REYNALDO** [1] 1:3
**rice** [1] 7:3
**rightly** [1] 16:6
**rise** [6] 64:15 75:6 80:5 81:5 95:21 99:10
**rival** [1] 90:9
**road** [6] 10:9 60:23 71:13 81:13 99:14 120:9
**ROBERTS** [39] 3:3 8:6 25:24 26:15,25 27:10,14 28:11 29:19,25 33:25 37:15 42:8 47:16 51:17 57:18 64:1 70:7 78:12 79:11 85:18 86:20 87:6 88:21 89:10 96:4 98:7 99:17 102:24 106:18 110:6 114:3,6 117:19 118:21 149:16 154:7 160:23 163:19
**Roger** [2] 26:6 70:16,25
**role** [1] 80:13
**rooms** [2] 20:13 47:11
**routinely** [1] 97:19

**routing** [1] 77:9
**rule** [6] 4:23 30:24 49:11 55:14 101:6 163:4
**Rules** [5] 49:14 101:1,3 162:9,20
**run** [3] 57:11 132:20 162:23
**running** [1] 90:11
**runs** [3] 23:24 156:11 163:1
**Russia** [1] 147:14

### S

**safe** [1] 124:17
**samaritan** [2] 134:16 137:24
**same** [37] 5:16,17,22,24 8:16 10:22 11:16 18:10 23:15 57:25 58:9 61:13 69:6 73:5 76:14 77:13 88:5 95:19 103:20 107:9,9,25 108:3 113:13 115:6 120:3 126:12 127:16 136:9 139:9 143:24,25 145:4,5 147:4 158:17 159:12
**sat** [1] 159:2
**satisfied** [1] 14:18
**satisfy** [2] 25:12 58:19
**saw** [3] 52:24 77:16 158:20
**saying** [5] 5:11 14:17 18:11,24 19:15 21:23 22:25 23:16 26:14 51:23 54:11 55:19,22 67:5 69:6 71:18 76:3 81:11 87:1,3 88:2 90:9 92:8 96:17 98:16 99:11, 13 112:24 122:3,17 126:24 127:10 128:8 130:14 131:11 134:22 137:15 139:1,14 140:12 141:16 145:12,15, 20,22 149:1 155:14 158:19, 20 159:4,7,25 160:11
**says** [35] 8:2,3,14 12:19 19:12 21:24 26:5,7 31:8 41:20 43:15 50:1 52:15 60:14, 15 64:24 69:13 81:14 90:1 92:5 96:9 110:19,21,22, 24 117:21 123:4 124:19 129:18 134:15 137:24 141:18 144:12 153:4,5
**scale** [1] 10:24 134:4
**scare** [1] 128:4
**scenario** [4] 48:23 70:23 87:2 134:7
**scenarios** [1] 16:25
**scheme** [2] 46:23 135:11
**SCHNAPPER** [149] 1:18 2:3,13 3:6,7,9 5:10,17,20 6:7 7:14 8:24 9:15 10:11 11:4 12:12 13:16,18,22,24 14:3,11,15,20 15:8 16:11,14, 21 17:9,12 18:16 19:17,20, 24 20:3,10,17,20,23 21:2,5, 8,14,18 22:3,11,15 23:2,6, 9 25:1,6,9 26:11,19,23 27:

2,12 **28**:3,20 **29**:23 **30**:13,
18 **31**:17 **32**:10,24 **33**:9 **34**:
12,21 **35**:6,10,20 **36**:4,8,23
**37**:5,9 **38**:4,8,11,21 **39**:10,
13,22 **40**:1,7,10 **41**:1,7,14
**42**:1,9 **43**:11 **44**:2,20,23
**45**:2,7 **46**:8 **47**:18 **48**:9,12
**49**:3 **50**:12,15,19,25 **51**:3
**52**:8 **54**:19 **55**:8,25 **56**:3,6,
9,20,24 **57**:4,21 **58**:2,7,13
**59**:4,23 **60**:1,5,9 **61**:9,12,
24 **62**:7,12,16 **63**:7,14,17,
23 **66**:7,15 **67**:12 **69**:8 **73**:
3 **85**:3 **99**:22 **106**:21 **108**:
19 **160**:25 **161**:1,3
**Schnapper's** [2] **80**:13
**107**:4

**science** [1] **133**:13

**scienter** [1] **94**:17

**scope** [14] **4**:21 **10**:17 **11**:8
**13**:19 **15**:16 **32**:25 **51**:15
**65**:14 **67**:9 **86**:7 **91**:4 **112**:
16 **121**:8 **138**:21

**screen** [8] **16**:2,9 **17**:3 **68**:
19 **110**:16,18 **121**:13 **141**:
21

**screening** [4] **18**:5 **68**:13
**124**:5 **134**:16,20 **137**:25

**screens** [1] **51**:25

**screenshot** [3] **62**:9,9 **146**:
17

**screenshots** [2] **106**:22,24

**search** [47] **10**:1 **28**:18 **34**:
11 **38**:16,17 **42**:25,25 **43**:
12,13,15,18 **44**:18 **49**:7 **74**:
15,20,23 **77**:9 **88**:14,16 **97**:
10,12,21,24 **104**:21 **105**:16
**106**:6 **107**:16,17,22 **115**:23
**119**:19,23 **120**:6 **129**:12,13,
18 **134**:1 **136**:11 **139**:10,11,
18,21 **146**:21 **147**:4,10 **148**:
1 **150**:8

**searches** [4] **36**:17 **119**:20
**147**:23,25

**searching** [1] **153**:12

**Seattle** [1] **1**:18

**Second** [10] **4**:2 **42**:15,23
**43**:4,6 **77**:1 **121**:22 **123**:10
**124**:7 **125**:8

**secondary** [1] **103**:11

**Secondly** [1] **44**:7

**Section** [28] **3**:11,17 **4**:2,13
**16**:5 **47**:21 **48**:14 **51**:9 **58**:
11,22 **60**:18 **61**:23 **64**:10,
25 **66**:3 **85**:8 **113**:25 **114**:
11,19 **124**:3,8 **128**:3,3 **136**:
15,24 **143**:8 **163**:4,6

**sections** [2] **3**:16 **139**:16

**see** [29] **6**:16 **7**:6,19 **14**:11,
11,12,14 **24**:16,22 **25**:11
**30**:6,6,15 **31**:25 **49**:23 **61**:
4 **64**:22 **66**:22 **67**:19,23,23
**96**:14,17 **115**:20,24 **130**:3
**135**:23 **136**:12 **142**:20

**seek** [2] **3**:12 **101**:8

**seem** [8] **11**:17 **19**:14 **71**:9
**78**:4 **79**:16 **81**:8 **86**:9 **97**:4

**seemed** [3] **91**:1 **106**:25
**112**:23

**seems** [20] **48**:4 **53**:19 **57**:
22 **62**:3,25 **84**:12 **85**:11 **94**:
25 **97**:8 **103**:18 **108**:13
**117**:19 **118**:9 **134**:8 **138**:
20 **142**:12 **148**:8 **149**:24
**150**:25 **151**:20

**seen** [4] **37**:7 **104**:5 **128**:25
**132**:5

**selected** [2] **156**:10 **161**:22

**selection** [2] **8**:11,22

**selects** [1] **156**:8

**self-defeating** [1] **105**:12

**sell** [1] **53**:12

**seller** [5] **26**:4 **71**:2,19 **72**:6
**91**:22

**sellers** [1] **70**:21

**selling** [2] **45**:8 **53**:13

**sells** [1] **70**:22

**send** [7] **10**:8 **30**:20 **33**:21,
22 **60**:14,25 **84**:19

**sending** [7] **23**:15,22 **24**:4,
8 **26**:13 **33**:23 **113**:22

**sends** [1] **79**:23

**sense** [8] **3**:20 **7**:2 **53**:7 **99**:
4 **137**:3,7 **139**:13 **154**:14

**sensitive** [1] **50**:8

**sent** [3] **15**:16 **102**:18 **113**:
16

**sentence** [3] **67**:24,24 **152**:
13

**separate** [6] **23**:5 **60**:2 **75**:
17 **112**:13 **116**:23 **135**:21

**separated** [2] **114**:25 **128**:
3

**separately** [1] **62**:6

**separation** [1] **66**:5

**serious** [1] **54**:8

**seriously** [1] **55**:5

**server** [1] **59**:9

**servers** [1] **59**:19

**service** [33] **4**:15,18 **24**:2,6
**37**:21 **51**:24 **52**:3,16,18,24
**53**:2,3,6 **59**:17,17 **66**:21
**69**:24 **71**:24 **77**:3 **89**:16 **91**:
10 **92**:24 **100**:5,12 **102**:1,9,
12 **105**:11 **106**:1 **113**:3
**123**:5 **129**:7 **151**:3

**services** [4] **4**:16 **52**:12
**150**:1 **163**:7

**set** [4] **6**:6 **51**:5 **62**:15 **72**:17

**setting** [1] **36**:21

**sex** [1] **120**:13

**sexually** [1] **132**:20

**shaky** [1] **78**:4

**shall** [3] **37**:21 **70**:21 **123**:6

**share** [1] **115**:18

**sharing** [1] **143**:3

**she's** [1] **153**:22

**shield** [3] **91**:10 **115**:10

**140**:9

**shielded** [2] **76**:19 **100**:20

**shoplifter** [4] **44**:9 **60**:14,
15 **87**:10

**short** [2] **26**:1 **163**:3

**shorthand** [1] **145**:9

**shouldn't** [7] **35**:16,18 **72**:
23 **77**:20 **86**:12 **127**:18
**161**:14

**show** [13] **28**:7,8,9,16 **29**:6
**30**:20 **34**:5 **87**:18 **91**:9 **98**:
**125**:15,16 **156**:19

**showing** [6] **22**:13 **24**:20
**81**:1 **90**:11 **124**:22 **162**:13

**shown** [7] **9**:12 **81**:2,4 **94**:
16 **126**:10 **162**:15,17

**shows** [1] **87**:4

**side** [8] **26**:2 **54**:2 **69**:14
**105**:3 **106**:25 **114**:19 **119**:
15 **139**:20

**sign** [1] **53**:10

**signed** [1] **133**:9

**significant** [2] **8**:15 **85**:21

**similar** [7] **7**:12 **22**:14 **24**:9
**37**:4 **99**:22 **116**:9 **130**:6

**simple** [1] **68**:8

**simply** [11] **34**:10 **73**:24 **81**:
1 **82**:1 **88**:2 **92**:17 **93**:24
**104**:9 **108**:21 **123**:4 **150**:1

**site** [4] **10**:2 **95**:20 **97**:10
**161**:17

**sites** [3] **117**:5 **141**:12 **148**:
3

**situation** [9] **53**:25 **57**:13
**59**:8 **109**:15 **110**:23 **111**:
17 **113**:17 **116**:21 **148**:22

**skinny** [1] **120**:14

**sky** [1] **45**:23

**slammed** [1] **138**:9

**slightly** [1] **74**:17

**slim** [1] **108**:13

**smarter** [1] **74**:18

**Smith** [1] **87**:4

**Snapper** [1] **5**:9

**snippet** [3] **13**:4,5 **44**:7

**so's** [1] **87**:10

**soccer** [1] **120**:8

**social** [2] **20**:15 **116**:2

**software** [13] **47**:23 **48**:20
**51**:12 **52**:19,21,23 **53**:6,13
**100**:5,9,11 **101**:20 **163**:8

**solely** [1] **118**:15

**Solicitor** [2] **1**:20 **152**:2

**somebody** [12] **26**:5 **28**:2
**37**:2 **60**:21 **61**:1 **86**:15 **90**:
3 **93**:1,9 **120**:23 **141**:15
**149**:12

**somehow** [6] **68**:4 **127**:10
**147**:7,24 **150**:22 **152**:23

**someone** [16] **3**:13 **23**:15
**31**:8 **34**:4 **41**:17,19 **47**:5
**57**:7 **59**:10 **63**:1 **96**:14,17
**119**:11,12 **127**:22 **132**:14

**somewhat** [2] **67**:13 **105**:9

**somewhere** [5] **10**:19 **11**:
15 **40**:21 **122**:13 **140**:18

**sorry** [15] **11**:3 **35**:7 **39**:22
**45**:1 **56**:20 **58**:3 **83**:23 **84**:
6,8 **126**:5 **129**:24 **146**:12,
19 **155**:11,16 **157**:15

**sort** [15] **53**:24 **65**:6 **67**:5,7
**68**:7,8 **74**:4 **95**:23 **104**:24
**113**:23 **129**:6,6 **133**:8 **135**:
11 **155**:5

**sorting** [5] **101**:24 **102**:5
**130**:1 **144**:15 **150**:18

**sorts** [6] **19**:5 **26**:24 **27**:8
**54**:6 **76**:22 **90**:10

**SOTOMAYOR** [48] **11**:2,17,
20,23 **19**:9,18,22 **20**:1,5,11,
19,21,25 **21**:4,7,12,16,20
**22**:4,13,21 **23**:4,8 **24**:7 **25**:
2,7 **37**:16,17 **38**:6,10,13 **39**:
6,11,20,23 **40**:5,8,11 **41**:4,
12,16 **42**:7 **96**:5,6,24 **97**:3
**126**:16 **149**:19

**Sotomayor's** [2] **57**:21
**140**:5

**source** [2] **33**:2 **147**:13

**sources** [1] **146**:24

**speaker** [7] **37**:22 **82**:7 **86**:
18 **102**:21 **105**:1 **106**:16
**114**:13

**speaking** [4] **84**:9,16 **126**:
14 **137**:10

**special** [1] **80**:20

**specific** [9] **5**:6 **20**:24 **33**:7
**43**:14 **46**:16 **56**:17 **67**:16
**95**:1 **163**:9

**spectacular** [1] **94**:4

**speech** [28] **12**:9,10 **104**:14,
17,22 **115**:11,13 **116**:23
**117**:2,3 **125**:6,10,24 **127**:
25 **128**:7,15,24 **131**:4,5,6,8
**139**:6 **140**:3 **141**:1 **145**:24
**146**:18,25 **147**:2

**spell** [1] **75**:2

**Spelman** [1] **162**:11

**spend** [1] **149**:6

**spent** [1] **148**:3

**sports** [6] **26**:4,8 **29**:11,13,
13 **71**:1

**spreading** [1] **96**:18

**stability** [1] **83**:19

**stage** [4] **94**:23,23 **97**:20
**98**:3

**standard** [4] **32**:6 **58**:19
**101**:15 **163**:15

**standards** [1] **31**:3

**stark** [1] **77**:17

**start** [7] **24**:4 **43**:12 **47**:21
**60**:23 **144**:7 **155**:15 **161**:5

**started** [2] **37**:24 **126**:2

**starting** [1] **133**:22

**Stat** [1] **68**:3

**state** [14] **70**:19 **71**:11 **73**:8
**87**:20 **95**:17,23 **96**:22,22,
22 **97**:18 **120**:23 **121**:1

**144**:13 **160**:4

**state's** [1] **106**:13

**statement** [6] **67**:22 **71**:3,5,
7 **90**:3 **96**:18 **116**:14 **157**:
12

**statements** [1] **71**:15

**STATES** [5] **1**:1,15,22 **2**:7
**70**:11

**states'** [1] **122**:6

**status** [6] **83**:2,3 **91**:12 **141**:
2,13,24

**status-based** [1] **140**:22

**statute** [121] **3**:16,19,22 **4**:
21 **5**:1,7 **7**:17,18 **8**:1,2,3,
25 **9**:15,17,18,19,20 **10**:22
**11**:8 **12**:2,7 **13**:9,19 **15**:20,
23,25 **16**:24,24 **17**:8,24 **18**:
3,24 **19**:2,7 **21**:10 **23**:15
**27**:5 **28**:24 **29**:18 **30**:12,21
**35**:3,18 **40**:2 **43**:15,17 **46**:
11,15 **47**:2,8,10 **48**:4 **51**:15,
21,22 **52**:6 **57**:9,11 **59**:2,13
**60**:10 **61**:15 **62**:21 **65**:15,
15,25 **66**:13,24,25 **67**:4,9,
16,22 **68**:9,10 **69**:11,17 **70**:2
**71**:5 **72**:25 **79**:6 **83**:14 **89**:
3 **92**:9 **100**:3,4 **101**:23 **103**:
16 **117**:20 **118**:3 **119**:5
**121**:7,18 **122**:22 **123**:18
**124**:15 **126**:20 **127**:6 **131**:
19,22 **134**:12 **135**:1,8,14,
20 **136**:2,12,16 **137**:24 **138**:
3,11 **139**:22 **143**:11 **151**:1,
16 **158**:6,7,11 **159**:17 **160**:
19 **163**:8

**statute's** [1] **35**:22

**statutes** [1] **47**:12

**statutory** [9] **4**:6 **13**:6 **23**:
25 **47**:20 **48**:6 **50**:23 **62**:24
**83**:25 **135**:11

**stay** [1] **93**:24

**steals** [1] **161**:13

**STEWART** [65] **1**:20 **2**:6 **70**:
9,10,13 **72**:9,20 **73**:21 **75**:
16 **76**:11 **79**:2,17 **80**:8,24
**81**:16,21,24 **82**:21 **83**:12,
22,24 **84**:23 **85**:1 **86**:13,24
**87**:12 **89**:1,18,20 **90**:19 **91**:
6,13,19 **92**:1,12,15 **93**:5,12
**94**:6,12 **95**:15 **96**:19 **97**:2,
15 **98**:19 **99**:16,19 **101**:17
**103**:5,13,22 **104**:16 **105**:7,
14,21,24 **107**:3,7 **108**:2,25
**109**:17 **111**:16 **113**:9 **114**:
5 **120**:19

**stifling** [1] **115**:15

**still** [21] **8**:8 **13**:9 **18**:5,13
**27**:2,4 **72**:5 **73**:22,25 **74**:
17 **76**:6 **82**:6 **86**:6 **97**:23
**101**:25 **102**:2 **119**:14 **126**:
12 **128**:8 **132**:19 **133**:25

**stock** [1] **81**:9

**stop** [1] **115**:14

**stopped** [1] **19**:4

Official - Subject to Final Review

**stories** [1] 43:19
**story** [1] 141:22
**straight** [1] 44:18
**straightforward** [1] 68:8
**Stratton** [5] 65:5 68:3 69:3 124:10 138:1
**strict** [5] 68:2,17 92:20 123:12 137:8
**strictly** [1] 91:22
**strongly** [1] 132:25
**structural** [1] 52:5
**structure** [2] 41:17 136:24
**stuff** [15] 18:6 19:2,5 33:21,22 45:12,24 86:11 117:6 124:18 125:18 130:11,24,25 148:7
**subcategory** [1] 91:21
**subject** [5] 8:17 27:19 36:18 76:9 94:2
**subjected** [2] 73:23 90:25
**submissions** [1] 105:2
**submitted** [2] 163:21,23
**substance** [1] 35:4
**substantially** [1] 76:13
**substantive** [5] 9:5 34:7 72:22 97:17 98:22
**successful** [2] 57:3 83:8
**sudden** [1] 46:4
**suddenly** [1] 32:8
**sue** [2] 82:2 122:5
**sued** [7] 34:9 71:2,24 89:16 121:16 122:20 158:2
**suffered** [1] 144:4
**suffering** [1] 97:4
**suffers** [1] 90:10
**sufficient** [2] 73:8 98:1
**suggest** [4] 48:5 74:21 79:13 96:11
**suggested** [3] 78:19 103:7 112:6
**suggesting** [5] 8:17 31:1 33:13 88:24 134:17
**suggestion** [3] 9:22 32:2 39:9
**suggestions** [5] 30:6,17, 18,25 56:17
**suggests** [3] 6:23 120:19 134:24
**suing** [2] 86:16 132:14
**suit** [6] 35:4 71:10 73:11,23 76:10,23
**suits** [6] 75:24 82:2 86:1,2 98:2,9
**summary** [1] 101:15
**sunk** [1] 79:15
**support** [5] 15:25 86:10 99:6 126:17 161:8
**supporting** [4] 1:22 2:8 70:12 126:19
**Suppose** [5] 13:10 36:1 77:8 90:8 126:6
**supposed** [3] 155:23 157:20,21
**SUPREME** [2] 1:1,14

**Surely** [1] 6:7
**survive** [3] 22:23 38:19,19
**suspect** [1] 85:25
**switching** [1] 58:22
**system** [11] 43:2 44:19 46:6 52:19,24 53:3 60:17 68:15,16 148:25 153:12
**systematically** [2] 99:2 113:21
**systemic** [1] 110:3
**systems** [1] 163:6

### T

**Taamneh** [2] 58:5 163:12
**table** [6] 26:4,8 27:20 71:1 72:7 123:2
**tailor** [1] 115:24
**tailored** [2] 65:16 119:23
**tailoring** [1] 119:7
**talked** [3] 136:20,21 150:21
**talks** [1] 131:6
**tantamount** [2] 18:11 158:16
**target** [2] 120:10 159:20
**targeted** [6] 113:15 114:24 118:25,25 133:1,5
**targeting** [2] 119:1 139:13
**task** [1] 46:11
**teaching** [1] 40:14
**tease** [2] 139:4 143:19
**teased** [1] 68:5
**tech** [1] 45:15
**technical** [2] 36:4,14
**technically** [1] 4:17
**technology** [6] 62:19 133:3,10,11,21,21
**teed** [1] 25:19
**tees** [1] 112:19
**television** [1] 130:11
**tells** [1] 39:20,23,25
**term** [1] 47:22
**terms** [23] 31:7 50:23 66:6 67:9 74:20 95:19 112:15 120:20,25 122:10 123:16 124:10,16 125:9 129:7 130:8 132:24 136:14,20 137:14 140:19 150:15 153:9
**terrible** [1] 144:4
**terribly** [2] 90:7 95:10
**terrorism** [2] 86:10 99:9
**terrorist** [1] 8:19
**test** [22] 50:4 100:3 101:12, 12,13 128:10 142:23,24,25 143:14 144:20,20 145:2,3, 4,5,7 151:14,24 152:7,9,12
**text** [18] 8:10 13:5 15:23 52:9 53:22,22 54:17,20 62:24 64:25 69:11 83:25 103:16 123:14 116:5 134:9 135:14 137:14
**textual** [1] 52:5
**textually** [1] 71:4

**themselves** [3] 35:25 75:8 117:23
**theory** [19] 29:20 50:13 58:9 59:1,20 61:22 70:22 74:13 92:20,21,21 93:16 99:1 104:15 107:4 108:22,22 115:3 134:6
**there's** [32] 8:21 17:1,19 18:5 40:16 42:20 43:13,14 50:19 59:5 65:23 68:4 71:4 75:22 81:18 82:5 95:25 109:25 118:7 119:7 123:1 126:17,17 127:14 141:10 148:9,23,24,24 154:2 159:8 163:13
**therefore** [5] 51:14 94:10 105:8 148:14 162:13
**they'll** [6] 12:3,4 58:16 162:15,16,17
**they've** [6] 28:23 34:24 35:13 38:25 129:15 162:4
**thin** [1] 118:22
**thinking** [2] 58:24 71:12
**thinks** [3] 60:18 79:5 120:7
**Third** [11] 4:13 34:15 38:25 39:17 42:24 43:7 44:12 62:14 74:9 118:14 151:22
**third-party** [58] 3:19,25 4:5, 10 13:8 28:25 34:23 36:9 39:1,5,14 44:11 51:14 56:13,22 60:12 62:13 63:12 65:3,10 66:17 72:3 74:9 75:9 77:23 81:20 82:7 88:11 89:19,23 92:18 93:24 99:3 102:4,14,22 104:11 105:1 106:16 108:10,24 111:21 112:1 114:16 115:20 116:4 128:13,19 136:7 140:24 141:5 143:6,6,18 145:23 146:1,18 157:6
**third-party-provided** [1] 35:5
**THOMAS** [20] 5:9,19,21 6:21 8:16 30:2,3,16 31:16,19, 22 32:23 33:1 72:5,13 73:16 89:12 91:23 116:7 149:17
**Thomas's** [1] 9:22 24:12 126:25
**thoroughly** [1] 64:4
**though** [11] 14:8 42:3 67:25 86:22 87:13 95:18 100:17 103:7 109:5 111:11 136:1
**thousand** [1] 122:4
**threatens** [1] 116:5
**three** [16] 3:16 23:2,6 42:10 43:5 44:3 52:11,17 54:24 67:15,19,23 68:6 69:11 70:3 125:22
**thumbnail** [12] 12:18,25 14:1,4,24,24 15:2 24:10 34:14,19 39:8,13,16 62:10 63:21,24

**thumbnails** [33] 6:9,14,18, 19,22,25 9:12 13:1,3,11 14:19 23:11,14 29:9 30:20 34:5,10,18,22,23 35:12,17,19 36:1,19 39:7 40:19 47:13 62:5 106:22 107:2 146:12,12
**thumbs-up** [1] 59:3
**tied** [1] 67:16
**tiny** [1] 86:11
**title** [4] 124:2,3,10 156:7
**today** [4] 4:19 19:14 33:17 41:9 56:12 63:10 64:11 66:3 79:3 121:11,16 161:16
**today's** [3] 114:12 116:5 146:21
**together** [5] 20:13,14 27:25 124:13 136:21
**tomorrow** [16] 9:4,8 19:5 25:12,17 32:11,15 33:16 57:10 58:10,16,20 80:12 84:18 118:8 163:2
**tomorrow's** [5] 20:21 57:25 58:4,14 64:17
**took** [5] 15:24 44:8 142:24 143:1
**tool** [1] 100:14
**Tools** [10] 49:11 50:4,5 99:3 100:3 101:12 151:14 153:17,18 162:6
**top** [8] 99:4 128:8 130:24, 25 146:23 147:1,14,25
**topic** [8] 116:17 117:8,13 120:11 159:16,18 161:11, 12
**tort** [5] 34:7 72:11 94:15 95:3 148:25
**tortious** [1] 127:25
**totally** [1] 122:14
**track** [1] 69:13
**traditional** [1] 63:4
**transcript** [2] 128:5 161:8
**transmitted** [1] 8:10
**treat** [3] 3:18 8:4 63:1,2 69:15 102:21 103:19 123:22
**treated** [9] 37:21 63:19 66:16 82:6 86:17 103:10 109:5 123:6 138:10
**treating** [10] 104:25 114:12 116:22 123:24 140:12 142:6 143:11,12 155:6
**treatment** [5] 80:20 137:17 140:11 145:12 154:13
**Trending** [3] 117:14 161:15,18
**tried** [2] 31:15 120:23
**Tripadvisor** [1] 115:25
**true** [6] 65:20 79:3 83:21 88:6 90:2 121:7
**Truman** [1] 125:15
**trustworthy** [3] 72:8,12,19
**try** [11] 15:21 23:9 28:25 54:10 58:18 64:5,5 68:19,19

**108** [11] 135:16
**trying** [57] 7:8 9:17 16:14, 20 17:12 18:1 29:1 32:5 67:10,13,25 68:6,11 75:17 110:20 121:6 131:22 134:18,25 135:15 138:8,18 143:18 146:14 157:2
**Tuesday** [1] 1:11
**Turkey** [1] 148:6
**turn** [5] 6:8,19 12:12 33:19 127:23
**turned** [1] 44:5
**turning** [1] 62:24
**turns** [4] 43:20 88:3 119:6 157:6
**TV** [2] 132:16,17
**tweet** [3] 60:11 109:20,22
**tweets** [1] 42:19
**twice** [1] 152:14
**Twitter** [16] 10:2 29:5 38:23 42:15,19 58:5 61:17,20,20,21 73:6,7 80:11 84:19 85:2,10
**two** [24] 3:23 22:17 23:5 46:16 49:2 52:20 56:21 64:8,21 75:3 85:4 95:15 104:7 117:5 120:3 121:19 122:25 123:1,7,7 124:25 133:19 151:17 163:3
**type** [6] 26:10 29:8 36:1 39:7 132:13 136:17 147:4,5
**typed** [1] 74:23
**types** [1] 22:6
**typically** [5] 13:4 14:24 49:7 53:10 109:21
**typing** [2] 148:5 159:11

### U

**ubiquitous** [1] 10:13
**ultimately** [2] 85:12 121:9
**unanimously** [1] 53:23
**uncertainty** [1] 45:25
**unclear** [1] 45:16
**uncomfortable** [1] 96:9
**uncommon** [1] 15:11
**under** [39] 12:2,25 14:18 23:15 29:20 33:15 35:18 38:2 51:8 59:20 72:22 73:8 78:19 81:6 87:19 88:1, 18 90:2 91:4 95:3,22 97:8 98:5,25 99:10,25 101:14 104:14 108:15 110:24 112:25 118:2,9 127:6 132:23 137:1 139:10 143:11 151:1
**underlying** [5] 9:5 34:7 72:22 73:14 82:7 86:18 98:6 119:3 145:11
**underneath** [1] 9:21
**understand** [31] 6:22 16:23 21:22 31:10 32:1,4 33:4,6 47:19 49:8 61:4,5 64:5 86:6 95:5 96:20 97:5 99:20 103:19 110:9,20 112:17

113:6 117:22 122:15 138:25 152:7,22 153:15,19 157:2

**understanding** [7] 54:17 67:8 87:25 89:21 92:5 103:3 151:1

**understood** [1] 154:11

**undescribable** [1] 129:15

**undirected** [1] 94:24

**unhappy** [1] 140:21

**uniform** [1] 83:18

**Union** [1] 45:3

**UNITED** [5] 1:1,14,22 2:7 70:11

**universe** [1] 111:8

**unlawful** [2] 76:20 102:6

**Unless** [7] 14:16,18 69:4 88:7 153:12 157:21,25

**unlike** [1] 75:5 80:4

**unlikely** [2] 75:5 80:4

**unreasonableness** [1] 92:22

**unrequested** [1] 24:9

**until** [1] 23:11

**unusual** [1] 57:10

**unusually** [1] 70:20

**up** [53] 15:20 16:9 21:24 23:11,18 25:19 27:11,13 50:1 51:19 53:10,18 60:24 62:15 64:23 65:14 74:3 75:1 77:7 85:22 92:7 93:11 94:3,10 103:2,17 109:24 110:24 111:19 112:18,19 115:17 116:17 117:14 119:11 120:25 122:6 124:16,20,24 125:11 128:8 129:9 130:24 133:9 135:17 141:9,11 146:15 156:9,12 159:10 162:8

**uploaded** [2] 141:14 147:20

**upset** [2] 149:12 150:21

**urge** [1] 4:23

**urging** [1] 55:11

**URL** [7] 17:22,22 34:16 39:18,20,23 107:11

**useful** [1] 160:1

**useless** [1] 124:14

**user** [24] 6:24 22:6 37:20 41:6 59:5,7,12,18 60:10 61:14,19 79:24,24 109:2,19,20 119:23,24 129:17 133:12,13,14,17 139:12

**user's** [2] 36:20 120:5

**users** [19] 9:2 20:13 58:23 77:16,25 102:18 108:18 109:13 113:17,19 115:20,21,24,25 117:7 119:17 120:3 147:11 148:4

**uses** [8] 3:20 10:15 11:6 12:11 34:17 36:17 37:2 59:10

**using** [17] 5:13,15,16 14:5 35:12,25 47:13 59:17 60:

16,17 61:20 77:18 99:24 100:13 105:16 133:7 157:12

**Uzbekistan** [1] 7:4

---
**V**
---

**vacate** [1] 85:14

**vacatur** [3] 1:23 2:8 70:12

**validity** [1] 143:11

**vanishingly** [1] 137:9

**varied** [2] 36:24 37:10

**variety** [4] 55:12 66:11 105:16 136:25

**various** [1] 157:5

**vary** [1] 96:21

**vast** [1] 19:10

**vehicle** [1] 22:9

**verb** [1] 93:6

**version** [1] 27:23

**versus** [5] 3:5 30:25 106:22 112:23 125:15

**viable** [1] 88:18

**video** [55] 6:16 12:23 13:4 15:6,11,15 22:7,14 23:13,17,20 25:10 28:22,23 29:8 30:14 36:2,3,9,17 58:25 63:20 74:3 79:23,23 80:1 87:4,16 88:9 89:17,19,24 90:7,9,11,24 94:4 95:6,8,9,10,19 96:13,15 108:7 109:24 116:1 153:10 154:23,23,24 156:10,11 157:7 158:13

**videos** [54] 5:15,25 6:1,2,11 7:12 8:9 9:6,13 10:16 23:22 24:15,20 28:9,13,16,17 34:5,6,11,11 36:2 37:4 51:7 69:7 74:11 81:2,4 86:25 93:3 99:3 107:16,23 108:4 112:19 113:23 114:21,22 118:14,22 120:25 126:9 139:2 143:6 144:8 146:3 147:19 148:16 155:16 156:8 157:6,7 162:13,14

**view** [18] 7:15 23:24 31:14 60:9 63:18 67:25 78:20 80:15 89:15 93:12 98:25 101:10 122:2 134:8 139:11 142:17 150:12 152:4

**viewed** [2] 21:25 24:10

**viewer** [2] 6:15 22:8

**viewers** [2] 114:23 115:1

**viewpoints** [1] 140:1

**views** [1] 63:8

**violate** [4] 78:5,10 106:8,9

**violated** [2] 97:24 104:19

**violates** [3] 12:4 76:25 77:19

**violation** [2] 98:1 106:5

**violence** [2] 120:12 125:5

**violent** [1] 132:17

**violently** [1] 132:21

**virtually** [1] 32:7

**virtue** [3] 96:1 109:4 123:

25

---
**W**
---

**wait** [1] 79:13

**walk** [1] 119:11

**walls** [7] 21:9 27:5 29:18 41:9 47:2,7 53:5

**wanted** [2] 53:9 106:4

**wants** [3] 92:25 93:1 142:1

**warranted** [1] 79:7

**Washington** [1] 1:10,18,21,24 162:15

**watch** [4] 87:15 94:4 95:6,9 96:13 115:1

**watched** [1] 147:19

**way** [61] 6:6 7:12 9:1 14:5 15:19 18:14 19:24 24:14 28:18 35:22,24 37:11 41:11 42:2 44:13,17 46:1,12,20 60:22 64:9,22 65:16 66:10 67:14,15 68:8 71:4 79:6 81:19 82:10,20 85:10 88:15,24 89:22 95:11 96:21 98:25 102:6 103:23 104:1 106:3 107:10 111:2 112:11 116:18 119:16,16 120:8 126:15 127:7 135:20 136:18 137:4 141:12 144:11 145:13 147:4 152:20 153:1

**ways** [6] 10:4 12:10 43:1 123:7,14 141:8

**weaken** [1] 124:14

**web** [1] 159:20

**website** [39] 4:18 17:2,18 18:6,13 19:6,13,16 52:2 60:20 65:2 68:18 69:7 74:22 77:6 82:5 93:17,19,23 110:18 116:20,22 118:14 122:9 124:21 126:2 136:5 138:14 141:15,25 142:5 148:19 154:22 155:7 157:14,20,21 158:2 162:2

**website's** [7] 93:22 128:14 140:25 142:18 143:21 145:24,24

**websites** [18] 16:16 81:19 114:13,16 115:10,18 116:3,3 117:7 119:17 125:3,10 131:4 148:11 149:13 155:23 159:23,24

**week** [2] 156:9,12

**weight** [3] 62:4 72:14 83:19

**weird** [1] 144:25

**welcome** [3] 5:8 72:4 116:6

**well-established** [1] 54:23

**well-known** [1] 146:23

**what'll** [1] 117:2

**whatever** [20] 13:5 34:2 55:15 58:19 64:15 67:3 78:16,23 108:15 111:13 113:2,8

25

118:6 140:17 143:10 147:5 149:10 160:15,16,20

**whatnot** [1] 64:21

**whenever** [2] 116:11 123:23

**whereas** [1] 109:23

**Whereupon** [1] 163:22

**whether** [53] 10:1,1 12:25 24:10 31:13 50:22 51:1 60:1 64:12,12,15 66:1 68:22,23 72:21 73:23 75:19 78:5 84:18 86:8 92:3,19 94:15,25 97:5 100:13,25 101:2 104:21 106:8,9 110:9,21 111:4,18 112:10 121:2 127:3,4,5 129:17 130:10,23,25 135:6 138:21 139:4 140:15,18 141:1 156:17 157:3 162:20

**white** [9] 41:22 77:11 140:8 141:16,19,20 142:2,4 162:17

**who's** [4] 27:17 52:24 60:10 93:3

**who've** [2] 81:2,4

**whoever** [3] 22:6 149:11,11

**whole** [9] 55:21 62:4 75:24 124:15 125:4 135:11 155:13 159:25 160:18

**wide** [2] 55:12 105:16

**widely** [1] 37:10

**Wikipedia** [1] 116:1

**will** [21] 23:21 24:20 36:18 40:15 46:24 47:3 50:16 58:16 77:6,25 79:14,14 81:15,22 104:4 106:5 112:9 113:11 120:3 141:21 161:8

**Williams** [1] 112:10

**win** [3] 50:18 69:4 149:9

**wind** [2] 74:3 109:24

**winning** [1] 149:10

**wipe** [1] 45:5

**wish** [1] 110:16

**within** [23] 7:25 9:10 10:17 13:19 15:15,16 21:9 27:4 28:23 29:17 40:2 43:16 47:1,7,12 53:5 61:15 90:21,22 101:25 103:9 142:6 143:8

**without** [8] 32:12 35:25 59:21 75:20 79:24 87:7 96:10 159:10

**woman** [2] 140:16,17

**wonderful** [1] 133:3

**word** [8] 59:5,7 118:12,13 120:4 123:22 155:8 157:11

**words** [10] 4:7 16:5 69:17 114:11 117:23 118:3 123:25 126:7 159:15 161:18

**work** [10] 7:18 33:15 67:15 94:22 124:13 136:21 141:12,13 144:14 147:4

**workable** [1] 119:17

**workers** [1] 54:7

**working** [1] 40:12

**works** [2] 7:10,11

**world** [10] 9:20 24:18 45:11 48:1 49:12 68:5 76:6 111:5 115:17 120:7

**world's** [2] 117:5 119:18

**worms** [1] 129:9

**worried** [4] 125:9 138:4 160:8,9

**worry** [4] 82:17 83:5 84:13 153:23

**worse** [1] 152:24

**write** [6] 41:5,9,12,16 44:10 62:20

**writes** [1] 40:3

**writing** [1] 41:1

**written** [8] 4:7 35:22 46:12,15,20,20 107:23 131:20

**wrongdoing** [1] 80:21

**wrongful** [2] 127:19 153:3

**wrote** [4] 29:13 39:3 47:10 137:16

---
**Y**
---

**years** [1] 53:24

**Yelp** [2] 116:1 149:4

**yesterday** [1] 146:22

**yield** [1] 11:13

**Young** [1] 122:10

**yourself** [2] 24:24 109:6

**YouTube** [70] 6:11 8:8 10:2 13:11,15 21:23 22:18 23:21 28:6 29:7 30:3 32:6,16 33:21 34:4,8,17 36:17,21,22 37:2,6,6 42:12 49:24 52:20 59:9 61:16 62:6,15 74:10 75:19 76:15 79:22,23,25 80:25 86:25 90:14 93:7,9 94:2 95:25 107:1,18 112:17 113:15 114:20 117:4 118:5 120:24 121:10 143:4 146:2,22,25 147:9,19,21 148:14 153:8,12 154:22 155:16,17 156:6,11,12,22 157:4 162:3

**YouTube's** [8] 5:11 49:22 74:7 80:3 114:22 118:13 146:25 147:2

---
**Z**
---

**Zeran** [3] 90:20,20,23

**Zillow** [1] 116:1

**Zimmerman** [2] 122:11

**ZIP** [1] 119:10

Heritage Reporting Corporation